BRENT M. RESH
(Nevada Bar No. 14940)
BRENT RESH LAW, PLLC
2401 La Solana Way
Las Vegas, NV 89102
(702) 781-6903
brent@brentreshlaw.com

JESSICA L. BLOME
(California Bar No. 314898, pro hac vice application forthcoming)
J. RAE LOVKO
(California Bar No. 208855, pro hac vice application forthcoming)
GREENFIRE LAW, PC
2748 Adeline Street, Suite A
Berkeley, CA 94703
(510) 900-9502
jblome@greenfirelaw.com
rlovko@greenfirelaw.com

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| WILD HORSE EDUCATION, a non-profit corporation, LAURA LEIGH, individually and on behalf of WILD HORSE EDUCATION, and TAMMI ADAMS, individually and on behalf of WILD HORSE EDUCATION,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF INTERIOR, BUREAU OF LAND MANAGEMENT, BILL GROFFY, Principal Deputy Director and Acting Director of the Bureau of Land Management, and JUSTIN ABERNATHY, acting Nevada State Director of the Bureau of Land Management,<br><br>Defendants. | CASE NO. 3:26-cv-00423-MMD-CSD<br><br>**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** |

1

To all parties and their attorneys of record:

PLEASE TAKE NOTICE that WILD HORSE EDUCATION, a non-profit corporation, LAURA LEIGH, individually and on behalf of WILD HORSE EDUCATION, and TAMMI ADAMS, individually and on behalf of WILD HORSE EDUCATION, hereby move this court for a preliminary injunction against Defendants UNITED STATES DEPARTMENT OF INTERIOR, BUREAU OF LAND MANAGEMENT, BILL GROFFY, Principal Deputy Director and Acting Director of the Bureau of Land Management, and JUSTIN ABERNATHY, acting Nevada State Director of the Bureau of Land Management. This request is submitted pursuant to Rule 65(a) of the Federal Rules of Civil Procedure. Plaintiffs are requesting a preliminary injunction to limit and constrain the Defendants' gather of wild horses at the South Shoshone Herd Management Area (HMA), Bald Mountain HMA, Callaghan HMA, Hickson (north) HMA, and the North Shoshone Herd Area (HA) due to Defendants' violations of the Wild Free-Roaming Horses and Burros Act (WHA), 16 U.S.C. § 1331, *et seq*., Federal Land Policy and Management Act (FLPMA), 43 U.S.C. § 1701 *et seq*., National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 *et seq*., and the Administrative Procedure Act (APA), 5 U.S.C. § 551 *et seq*. Gather operations currently are scheduled to begin on July 10, 2026.

Plaintiffs' motion is supported by the following Memorandum of Points and Authorities; the accompanying Declarations of Jennifer Rae Lovko, Laura Leigh, and Tammi Adams and attached exhibits; Plaintiffs' First Amended Complaint for Injunctive and Declaratory Relief, Dkt. 1; and any written and oral argument and authorities that are presented at or before the hearing on this motion.

DATED: June 10, 2026                    Respectfully Submitted,

                                        */s/ Brent M. Resh*
                                        BRENT M. RESH
                                        (Nevada Bar No. 14940)
                                        BRENT RESH LAW, PLLC
                                        2401 La Solana Way
                                        Las Vegas, NV 89102
                                        (702) 781-6903

brent@brentreshlaw.com

*/s/ Jennifer Rae Lovko*
Jessica L. Blome
(Cal. Bar No. 314898, pro hac vice forthcoming)
J. Rae Lovko
(Cal. Bar No. 208855, pro hac vice forthcoming)
GREENFIRE LAW, PC
2748 Adeline Street, Suite A
Berkeley, CA 94703
(510) 900-9502
jblome@greenfirelaw.com
rlovko@greenfirelaw.com

*Attorneys for Plaintiffs*

3

**TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................................................ 1

II.   FACTUAL OVERVIEW ................................................................................... 2

    A.    Land Use Planning Prior to Adoption of the HMAP / Gather Plan ........................ 2

    B.    HMAP / Gather Plan .................................................................................... 2

    C.    Plaintiffs' Interests ...................................................................................... 6

III.  LEGAL ARGUMENT ....................................................................................... 8

    A.    Plaintiffs are likely to succeed on the merits of their First Cause of Action. ......... 8

        1.    Defendants improperly define the Callaghan Complex to include HMAs that do not share boundaries and for which no animal interchange exists.. 9

        2.    The HMAP for the Callaghan Complex does not comply with the agency's internal guidance. ................................................................................... 12

        3.    BLM's refusal to re-calculate AMLs is arbitrary and capricious. ............ 16

        4.    BLM adopted the HMAP / Gather Plan without proper consultation. ..... 22

    B.    Plaintiffs' will be irreparably harmed if the court does not constrain BLM's actions. ...................................................................................................... 23

    C.    The balance of equities tips in Plaintiffs' favor, as compliance with the WHA is in the public interest. .......................................................................................... 24

IV.   CONCLUSION ................................................................................................ 25

**TABLE OF AUTHORITIES**

**Cases**

*Auer v. Robbins*,
519 U.S. 452 (1997)................................................................................................ 12

*Babaria v. Jaddou*,
87 F.4th 963 (9th Cir. 2023) ................................................................................... 8

*Bernhardt v. L.A. Cnty.*,
339 F.3d 920 (9th Cir. 2003)................................................................................. 27

*Butte County v. Hogen*,
613 F.3d 190 (D.C. Cir. 2010) .............................................................................. 22

*Ctr. for Biological Diversity v. Bernhardt*,
595 F.Supp.3d 890 (D. Ariz. 2022)....................................................................... 23

*Dahl v. Clark*,
600 F. Supp. 585 (D. Nev. 1984) .................................................................... 18, 19

*Daikin Applied Ams. Inc. v. Env't Prot. Agency*,
39 F.4th 701 (D.C. Cir. 2022) ............................................................................... 22

*Dine Citizens Against Ruining Our Env't v. Klein*,
747 F. Supp. 2d 1234 (D. Colo. 2010) .................................................................. 11

*Drakes Bay Oyster Co. v. Jewell*,
747 F.3d 1073 (9th Cir. 2014) ............................................................................... 26

*Envtl. Def. v. United States Army Corps of Eng'rs*,
515 F.Supp.2d 69 (D.D.C. 2007) .......................................................................... 22

*Firebaugh Canal Co. v. United States*,
203 F.3d 568 (9th Cir. 2000).................................................................................. 24

*Friends of Animals v. Sparks*,
200 F.Supp.3d 1114 (D. Mont. 2016) .............................................................. 17, 18

*Friends of Animals v. United States BLM*,
2015 U.S. Dist. LEXIS 17575, No. 3:15-CV-0057-LRH-WGC (D.Nev. Feb. 11, 2015) ....... 26

*Fund for Animals, Inc. v. United States BLM*,
460 F.3d 13 (2006)................................................................................................. 24

*Genuine Parts Co. v. EPA*,
890 F.3d 304 (D.C. Cir. 2018) .............................................................................. 22

*Healey v. McDonough*,
33 Vet. App. 312 (U.S. 2021) ................................................................................ 11

*Leigh v. Raby*,
726 F. Supp. 3d 1207 (D. Nev. 2024) .............................................................. 15, 21

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992)................................................................................................ 26

*Medina v. Anzar*,
No. 2:25-cv-0475 DC AC P, 2025 U.S. Dist. LEXIS 111168 (E.D. Cal. June 11, 2025) ......... 8

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ................................................................................................ 22

*Native Ecosystems Council v. United States Forest Serv.*,
418 F.3d 953 (9th Cir. 2005) ................................................................................ 22

*Rhodes v. Johnson*,
153 F.3d 785 (7th Cir. 1998) ................................................................................ 12

*Sports Form, Inc. v. United Press International, Inc.*,
686 F.2d 750 (9th Cir.1982) .................................................................................. 8

*SWAN View Coal. v. Haaland*,
2024 U.S. Dist. LEXIS 114625 (D. Mont. June 28, 2024) ...................................... 22

*United States v. Heffner*,
420 F.2d 809 (4th Cir. 1969) ................................................................................ 12

*Vitkus v. Blinken*,
79 F.4th 352 (4th Cir. 2023) ................................................................................ 27

*WildEarth Guardians v. Zinke*,
2019 U.S. Dist. LEXIS 30357 (D. Mont. Feb. 11, 2019) ........................................ 11

*Winter v. Natl Res. Def. Council, Inc.*, 555 U.S. 7, 129 S. Ct. 365 (2008) ..................................... 8

**Statutes**

16 U.S.C. § 1331 ................................................................................................ 8, 24

16 U.S.C. § 1332(f) ............................................................................................ 16

16 U.S.C. § 1333(b) ........................................................................................... 16

16 U.S.C. § 1333(b)(1) ...................................................................................... 21, 22

5 U.S.C. § 706(2) .............................................................................................. 15

**Other Authorities**

Animal Protection Institute of America, 109 IBLA 112, (1989) ........................................ 16, 17

J. B. Ratner, 199 IBLA 219, (2025) ...................................................................... 16, 17

**Rules**

43 C.F.R. § 4700-0.5 .......................................................................................... 9

43 C.F.R. § 4710.2 ............................................................................................ 8, 9

43 C.F.R. § 4710.3-1 ......................................................................... 9, 11, 14, 20, 22

43 C.F.R. § 4710.4 ............................................................................................ 9, 11

## I. INTRODUCTION

BLM adopted the Callaghan Complex Herd Management Plan / Gather Plan Environmental Assessment (HMAP / Gather Plan) on February 13, 2026. Declaration of Jennifer Rae Lovko, Exhs. B-D. The following month, the Bureau of Land Management (BLM) issued its schedule of gathers for the coming fiscal year; this schedule identifies a gather of 2,000 wild horses from the Callaghan Complex to begin on July 10, 2026. *Id.*, Exh. A, p.1.[1]

The Callaghan Complex, as defined by the HMAP / Gather Plan, consists of the Callaghan, South Shoshone, Bald Mountain, and Hickison (north of US Route 50) Herd Management Areas (HMAs) as well as the North Shoshone Herd Area (HA). Lovko Decl., Exh. D, p.4. The gather area authorized by the Gather Plan contains 1,145,515 acres of land. *Id.* Wild horses are only authorized to use approximately 329,134 acres. *Id*. Despite this vast area of land (and endless possibility for confusion and error), BLM does not specify how many excess horses will be removed from any of the five implicated HMAs or HA. Lovko Decl., Exh. A, p.1. Plaintiffs' counsel communicated with Defendants' counsel several times in April, May, and June, asking that BLM confirm no single HMA would be targeted for removal of all 2,000 horses during the scheduled gather operation. *Id.*, ¶8 and Exh. G. BLM would not confirm how many horses would be removed from any particular location or HMA; the agency left open the possibility of removing all 2,000 horses from one single HMA. *Id.*

Plaintiffs have been forced to file this motion, because BLM will not provide any clarification regarding its planned gather operations. Plaintiffs do not seek to stop the scheduled gather operations for the Callaghan Complex in total, but rather, they respectfully ask this Court to issue an injunction that orders BLM to implement the gather pursuant to its own policy regarding order of removal and ensure that such removal is proportional from each HMA and HA within the Complex.

---

[1] Not all exhibits have printed page numbers; therefore, Plaintiffs' citation to exhibit pages refers to the actual location of the page in the document irregardless of whether the document contains printed page numbers.

## II.  FACTUAL OVERVIEW

### A.  Land Use Planning Prior to Adoption of the HMAP / Gather Plan

BLM adopted the South Shoshone – Eureka Research Area Resource Management Plan (SERA RMP) in March of 1986.[2] Lovko Decl., Exh. D, p. 325; Exh. F. BLM set the "Appropriate Management Level," or AML, for each HMA and HA arbitrarily based on existing populations as of 1982; they are described only as being established for "the short-term." *Id.,* Exh. F, p.29; Leigh Decl., ¶33. Indeed, in its decision adopting the SERA RMP, BLM said the next planning stage would be to create Herd Management Area Plans (HMAPS) for each HMA, which would fully evaluate AML for each HMAP and HA in compliance with the Wild & Free Roaming Horses and Burros Act (WHA). Lovko Decl., Exh. F, pp.3, 14. By the early 2000s, however, BLM had not created any HMAPs for the HMAs or HA in the Complex. Leigh Decl., ¶21. Instead, the agency began scoping for the development of a revised/updated Range Management Plan, with such action to include a re-assessment of the agency's wild horse management strategies. *Id*. BLM eventually abandoned the planned update, leaving in place the 1982 administratively set, short-term AMLs. *Id.*

In 2015, BLM announced it would create an HMAP for the South Shoshone HMA. *Id.*, ¶31. The agency subsequently abandoned this action, too. *Id.,* ¶37.

### B.  HMAP / Gather Plan

BLM began scoping for a Callaghan Complex HMAP in March of 2025. Lovko Decl., Exh. M. In August of 2025, BLM issued a preliminary Environmental Assessment (EA) that converted this action into a proposal for a HMAP and a Gather Plan. Lovko Decl., Exh. E. The Decision Record, Finding of No Significant Impact, and Final EA were issued on February 13, 2026. *Id.*, Exhs. B-D.

In March of 2026, BLM issued it schedule for upcoming gathers; this schedule provides that 2,000 wild horses will be removed from the Callaghan Complex from July 10, 2026, through

---

[2] The SERA RMP is the oldest land use plan in the country that remains fully operational. Leigh Decl, ¶20.

August 31, 2026. Lovko Decl., Exh. A. The HMAP / Gather Plan does not specify from which HMA or HA the 2,000 horses will be removed. Declaration of Laura Leigh, ¶¶46-49. Plaintiffs became concerned that BLM intends to use the HMAP / Gather Plan as authorization to remove all (or the vast majority) of the 2,000 wild horses from only one HMA rather than from various locations within the gather area.[3] *Id.*, ¶¶46-49. Accordingly, on April 15, 2025, Plaintiffs' counsel wrote to BLM's counsel to ask that the agency identify trap locations and the number of

---

[3] On May 18, 2026, BLM approved changes to a mining plan for the Cortez mine, which is located within the South Shoshone HMA. Lovko Decl., Exhs. L, N. These changes add 14 new acres of new activity and revise existing activities. *Id*. The new mining plan allows a wider haul road, construction of a 13.8 kV Powerline and associated utility access road, installation of a new water line, construction of a connector road, use of cyanide in mining operations, and more. *Id*.

BLM's approval was based, at least in part, on the agency's attempt to adhere to "President Trump's Executive Order 14241, Immediate Measures to Increase American Mineral Production, to boost domestic mineral production, reduce U.S. reliance on foreign minerals, and create jobs." *Id*., Exh. N.

In light of this new approval, Plaintiffs are concerned that the scheduled gather for the Callaghan Complex is motivated by a desire to clear the South Shoshone HMA of wild horses to allow easy implementation of the Cortez mining plan's changes. Leigh Decl, ¶47. That is, rather than removing wild horses pursuant to the WHA and the approved HMAP / Gather Plan, the upcoming gather will proceed pursuant to the political motivation of promoting mineral production.

WHE also currently is before the Interior Board of Appeals (IBLA 2025-0085) with a challenge to BLM's approval of the Robertson Mine, which is located just north of the South Shoshone HMA (in the North Shoshone HA). Leigh Decl, ¶48. This challenge is based on WHE's concern that BLM has never prepared an appropriate HMAP for the South Shoshone HMA, evaluated the repatriation of the North Shoshone HA, examined the cumulative impact of the various uses of this area, or examined the impact of the mine on wild horses, habitat, and resources. *Id.* In light of this challenge, which the Board has yet to rule on, Plaintiffs are concerned that the scheduled gather for the Callaghan Complex is motivated by a desire to clear the South Shoshone HMA of wild horses to allow easy implementation of the Robertson Mine before the merits of WHE's claims are addressed. *Id.*

Plaintiffs also are aware that the Nevada Department of Wildlife has aided hunters who have created exclosures in the South Shoshone HMA near Elephant Head. Leigh Decl, ¶49. Exclosures are areas that block access from unwanted animals (such as wild horses). *Id.* The hunters use the exclosures primarily for Chukar hunting. *Id.* These exclosures are not an approved use. *Id.* In fact, BLM previously authorized the development of a water project in this area for horses (although this development has never occurred). *Id.* Plaintiffs are concerned that the scheduled gather for the Callaghan Complex is motivated by a desire to clear the South Shoshone HMA of wild horses to satisfy hunters' desire to keep these exclosures free from wild horse use.

horses targeted for removal at each location. Lovko Decl., Exh. G, pp.1-2. BLM's counsel responded that the agency "does not yet know where traps will be located or how many excess wild horses will be gathered at any specific trap/location." *Id.* Further, "BLM does not currently have a timeline for the information that you requested." *Id.*

Plaintiffs filed the complaint in this action on May 18, 2026. Dkt. 1. At this time, Defendants' counsel reached out to discuss whether Plaintiffs would be seeking emergency relief. Lovko Decl., Exh. G, p.3. Plaintiffs' counsel responded: "If BLM's gather operations appropriately allocate the removal process throughout the Complex, the plaintiffs do not intend on seeking emergency relief; however, if the agency cannot explain how the process will be implemented, then emergency relief is likely." *Id.*, p.4. Defendants' counsel responded that the desired information was still unavailable, explaining that the contractor BLM hires will be responsible for determining trap site locations and the number of horses to be removed at any individual trap. *Id.*, p.5. BLM had not yet "put the contract out for bid so [the agency] doesn't know which contractor will be doing the work." *Id.*

Plaintiffs' counsel replied, noting that:

> Typically, BLM gives the contractor a logistical number targeted for each HMA. This is necessary for the purpose of determining the location and size of temporary holding corrals, estimated relocation dates, etc. For example, the agency might provide that after 500 horses are removed from North and South Shoshone [], the contractors will move south to accommodate Callaghan and Hickison. After capturing an additional 500 horses, operations will move from Highway 305 to 306 for the remainder of the operation. This will involve an estimated 400 horses from Bald Mountain, 300 on the western edge and outside Callaghan and 300 off the western edge and outside South Shoshone. When does BLM believe such information will be available?

*Id.*, p.6. Counsel for Defendants replied, "The BLM state WHB lead confirmed that there are no targeted/logistical numbers per HMA/area for the upcoming Callaghan gather." *Id.*

Defendants' response is unreasonable. Contractors do not have authority to decide where trap locations are set nor how many horses will be gathered at trap locations under the Wild Horse Act. Leigh Decl., ¶50-51. The where, when, and how of a scheduled gather is prepared by

BLM—as the responsible federal agency—prior to sending out the contract for bid. *Id.*, ¶53. Without this information, contractors cannot prepare bids as they would not know the scope of the work, the type and amount of equipment to be used during the operations, and costs associated with the operations. *Id.*

In an attempt to resolve the matter without judicial intervention, Plaintiffs' counsel again wrote to Defendants' counsel:

> Plaintiffs complaint contends, in part, that the AMLs for each of the Complex's HMAs is far too low and should have been re-calculated with the latest HMAP. It is commonly known that these lands have held far more horses than currentlyallocated by AMLs for some time -- without any harm to land or other uses. While Plaintiffs do not object to the gather of 2,000 horses, the removal of any HMA to either low or high AML during such a gather would cause irreparable harm.
>
> To ensure that this gather does not unlawfully target certain herds over others, would BLM agree that in gathering 2,000 horses from the Complex, the populations in each HMA will remain at or above 4x the current high AML? This would allow BLM to remove the targeted number of horses while allowing Plaintiffs to pursue the litigation on the merits of their claim.

*Id.*, p.6. In the alternative, she also asked whether Defendants would "agree not to remove more than 1,000 horses associated with the South Shoshone HMA and no more than 1,000 horses for the [Callaghan] HMA? It would be highly unusual (based on past gathers) for BLM to remove more than that at one trap site location anyway." *Id.*, p.10. BLM would not agree to any such limitation, nor would the agency agree that the gather operations would occur at more than one HMA in the Callaghan Complex. Lovko Decl., ¶8 and Exh. G.

The wild horses removed from the Callaghan Complex will be taken to the Palomino Valley Wild Horse and Burro Center and Indian Lakes Off-Range Corral. Lovko Decl., ¶17. When BLM first began using off-range corrals, the agency initially believed horses would spend no more than 90 days in short-term off-range corrals. *Id.*, Exh. O, p.44. The amount of time that wild horses and burros spend in such facilities has continued to increase, however. In the late 1990s, animals spent an average of 45-to-60 days in short-term facilities; by 2000, "it was not

uncommon to hold animals for more than a year[,] and by 2008, the average length of stay had increased to 210 days." *Id*. Many animals languish in off-range corrals for even longer periods of time. Leigh Decl, ¶12. It is not uncommon for horses to live at such facilities for multiple years, with unadoptable horses often living out their lives there. *Id.*

BLM typically does not publish statistics on wild horse injuries and deaths occurring in off-range corrals; therefore, information on the treatment of animals must necessarily come from eyewitness accounts. *Id.*, ¶13. WHE supplements eyewitness accounts with information obtained through Freedom of Information Act requests. *Id.* These records frequently fail to identify the cause of animal injury or death. *Id.* Nevertheless, based upon information that WHE has been able to obtain, Plaintiffs are aware that horses held at the Palomino Valley and Indian Lakes facilities face unnecessary injury and death.[4] *Id.*

### C. Plaintiffs' Interests

Plaintiff Wild Horse Education (WHE) is a registered non-profit organization headquartered in Nevada whose purpose is the protection and sane management of wild horses and burros on public lands through educating the public, encouraging scientifically-based

---

[4] Although a common belief is that horse deaths associated with gathers occur mostly during helicopter operations, the truth is that most deaths come after capture while the horses are at off-range corrals. *Id.*, ¶17. Disease, injuries associated with corral structures, trampling, and more causes these deaths. *Id.*

For example, in 2022, BLM reported that the Indian Lakes facility did not provide adequate access to hay, failed to collect blood samples for Equine Infectious Anemia, failed to timely administer vaccinations, failed to maintain safe fencing, failed to maintain horse hooves, and failed to address poor Henneke body condition scores. *Id.*, ¶14. Additionally, in 2023, approximately 11% of the wild horses at this facility died. *Id.* While most of the deaths were attributed to "undiagnosed/unknown" reasons, deaths also were attributed to non-life threatening conditions such as eye abnormalities. *Id.* Deaths also occurred due to traumatic injury or as a result of horses being gelded. *Id.*

Based upon documentation that WHE has obtained through Freedom of Information Act requests over the past decade, Plaintiffs believe the average death rate of wild horses during gather operations and post-gather handling is approximately 12.5%. *Id.*, ¶15. These rates reach as high as 24% in sub-set populations (such as with pregnant jennies/burros). *Id.*

management strategy for animals in the wild, promoting public adoptions of removed wild horses and supporting those who adopt, and assisting the public to advocate for the welfare and management of wild horses and burros. Leigh Decl., ¶2. Plaintiff Laura Leigh is the founder and president of WHE. *Id.*, ¶1. Plaintiff Tammi Adams is a volunteer, member, and the NEPA Program Coordinator for WHE. Declaration of Tammi Adams, ¶1.

With more than 150,000 members, WHE's mission encompasses the protection of wild horses as well as the health of the public rangelands upon which they live. Leigh Decl., ¶3. WHE has an interest in ensuring that wild free-roaming horses and burros are treated as an integral part of public lands, management activities are conducted at the minimal level feasible, and management activities include development and consideration of appropriate land use plans and HMAPs. *Id.*

WHE members, including Ms. Leigh and Ms. Adams, regularly document public lands and the animals that reside on these lands. *Id.*, ¶4; Adams Decl., ¶2. They also document wild horse and burro gather operations, as well as the subsequent placement of wild horses and burros into holding facilities. *Id.* WHE members, including Ms. Leigh and Ms. Adams, advocate for and regularly visit wild horses in each of the HMAs and the HA within the Callaghan Complex. Leigh Decl., ¶¶4-7; Adams Decl., ¶¶2-5. When visiting, they appreciate the natural beauty, wildlife, and wild horses in the Callaghan Complex. Leigh Decl., ¶¶7-9; Adams Decl., ¶¶5-7. Their visits bring enjoyment and allow for recreation, as well as documentation of wild horses and wildlife. *Id.*

Ms. Leigh has been visiting, viewing, observing, and documenting wild horses in the Callaghan Complex for approximately 16 years. Leigh Decl., ¶6. As a result, she has formed strong bonds with the wild horses in the Complex. *Id.* Her contact with the Complex also stems from her volunteer work with BLM. *Id.*, ¶¶23, 28-36. Ms. Adams has visited wild horses in the Callaghan Complex on multiple occasions over the years, most recently from May 5-9, 2026. Adams Decl., ¶4. As a result, she also has formed strong bonds with the wild horses in the Complex. *Id.*

Advocating for the wild horses in the Callaghan Complex is a past, present, and future important issue for Laura Leigh, Tammi Adams, and WHE. Leigh Decl., ¶5; Adams Decl., ¶3. The opportunity to view the wild horses and wildlife in the Callaghan Complex is of significant value to them and increases their use and enjoyment of Nevada's public lands. Leigh Decl., ¶8; Adams Decl., ¶6. WHE members, Ms. Leigh and Ms. Adams, intend to continue visiting the Callaghan, South Shoshone, Bald Mountain and Hickison (north of US Route 50) HMAs and the North Shoshone HA into the foreseeable future – including in 2026 and 2027. Leigh Decl., ¶6; Adams Decl., ¶4.

Based on their repeated and regular visits to the Callaghan Complex, WHE members, including Ms. Leigh and Ms. Adams, have aesthetic, recreational, and conservation interests in the wild horses, wildlife, and public lands of the Callaghan Complex. Leigh Decl., ¶9; Adams Decl., ¶8.

## III. LEGAL ARGUMENT

To obtain a preliminary injunction, the movant must demonstrate 1) a likelihood of success on the merits; 2) irreparable harm in the absence of preliminary relief; 3) the balance of equities tips in their favor; and 4) an injunction is in the public interest. *Winter v. Natl Res. Def. Council, Inc.*, 555 U.S. 7, 20, 129 S. Ct. 365, 374 (2008); *Babaria v. Jaddou*, 87 F.4th 963, 976 (9th Cir. 2023); *Medina v. Anzar*, No. 2:25-cv-0475 DC AC P, 2025 U.S. Dist. LEXIS 111168, at *3 (E.D. Cal. June 11, 2025). Plaintiffs' complaint contains three causes of action. Dkt. 1. For purposes of seeking a preliminary injunction, Plaintiffs focus this motion on the First Cause of Action, which is based on violation of the WHA and Administrative Procedure Act. *Id.*, pp.35-36.

**A. Plaintiffs are likely to succeed on the merits of their First Cause of Action.**

Under this factor, Plaintiffs must show a "fair chance of success on the merits" of their claims or "questions . . . serious enough to require litigation." *Sports Form, Inc. v. United Press International, Inc.*, 686 F.2d 750, 754 (9th Cir.1982) (internal citation omitted).

**1. Defendants improperly define the Callaghan Complex to include HMAs that do not share boundaries and for which no animal interchange exists.**

Plaintiffs contend that BLM violated the WHA and APA because the HMAP / Gather Plan improperly combines several HMAs as a complex when there is no evidence of animal interchange between the HMAs. Dkt. 1, pp.35-36.

The WHA authorizes BLM to manage wild horses "in the area where presently found, as an integral part of the natural system of the public lands." 16 U.S.C. § 1331. Under the WHA, BLM "shall maintain a record of the herd areas that existed in 1971, and a current inventory of the numbers of animals and their areas of use." 43 C.F.R. § 4710.2. A herd area (HA) is the geographic designation made by BLM of public land where wild horses resided at the time the WHA was enacted. 43 C.F.R. §§ 4700-0.5, 4710.2, 4710.4. Where BLM has determined that the agency will manage wild horses long-term in the whole or a part of an HA, BLM designates this land as a Herd Management Area (HMA). 43 C.F.R. § 4710.3-1.

In managing wild horses and HMAs, BLM must create an HMAP. 43 C.F.R. § 4710.3-1; *Leigh v. Raby*, 726 F. Supp. 3d, 1207, 1215 (D. Nev. 2024). "HMAPs establish short- and long-term management and monitoring objectives for a specific [wild horse and burro] herd and its habitat." Lovko Decl., Exh. K, p.11. BLM's Wild Horses and Burros Handbook provides that "HMAPs may be prepared for a single HMA or a complex of adjacent HMAs **where animal interchange occurs**." Lovko Decl., Exh. K, p.11 (emphasis added).

Here, BLM improperly designated the Callaghan Complex as containing the Callaghan, South Shoshone, Bald Mountain, and Hickison (north of US Route 50) HMAs as well as the North Shoshone HA. As demonstrated in this excerpted map from the HMAP / Gather Plan, these HMAs and HA are not geographically contiguous:



Lovko Decl., Exh. D, p.4. Moreover, BLM has not previously managed the wild horses in these areas a complex. Leigh Decl., ¶¶38-39. In the past, the agency defined the Callaghan Complex as containing the Callaghan HMA and New Pass-Ravenswood HMA. *Id*. The only gather conducted previously for the South Shoshone HMA (in 2008) treated the HMA independently of any other HMAs. *Id*.

When the public commented that the HMAP / Gather Plan was improperly re-defining the Callaghan Complex to include HMAs for which no animal interchange exists, BLM replied in a conclusory manner that there is animal interchange among the HMAs. Lovko Decl., Exh. D, pp.23, 268. However, this conclusion is unsubstantiated. While the agency has long suspected that some interchange exists among some of the HMAs, Lovko Decl., Exh. H, p.1, the agency

has never provided the public with any documentation to substantiate this suspicion.[5] Moreover, the agency's conclusion ignores that fencing exists along the west side of the Callaghan HMA, limiting the interchange of horses from that area; the land between the South Shoshone HMA and Bald Mountain HMA are separated by a dry lake and numerous fenced private parcels, limiting interchange between the two HMAs. Leigh Decl., ¶40.

Plaintiffs contend that BLM acted in an arbitrary and capricious manner by (1) ignoring its own internal guidance, which dictates animal interchange is required in order for public lands to be treated as a complex, and (2) re-defining – without explanation – the Callaghan Complex to include HMAs that do not share boundaries and for which animal interchange is, at best, unknown. Dkt.1. Although an agency's handbooks, manuals, and technical reference documents do not automatically create mandatory duties, where the plain language of such documents establishes how an agency is to act, and such action does not contradict duties established by statute or regulation, the failure of an agency to abide by such plain language is arbitrary and capricious unless the agency reveals a reasonable basis for this failure. *Healey v. McDonough*, 33 Vet. App. 312, 321 (U.S. 2021); *WildEarth Guardians v. Zinke,* 2019 U.S. Dist. LEXIS 30357, at *40-41 (D. Mont. Feb. 11, 2019); *Dine Citizens Against Ruining Our Env't v. Klein*, 747 F. Supp. 2d 1234, 1253 (D. Colo. 2010); *Rhodes v. Johnson*, 153 F.3d 785, 789-90 (7th Cir. 1998); *Auer v. Robbins*, 519 U.S. 452 (1997); *United States v. Heffner*, 420 F.2d 809, 811-13 (4th Cir. 1969). Here, BLM offered no reasonable basis for its failure to adhere to the definition of a

---

[5]In 2016, Ms. Leigh volunteered with BLM's Mount Lewis office, which at that time was beginning to develop an HMAP for the South Shoshone HMA. Leigh Decl., ¶¶29-31. In this capacity, she was given a number of questions to evaluate. *Id.*, ¶32. These questions had originally been crafted by BLM when it considered updating the SERA RMP; however, when that plan was changed, BLM asked that the questions instead be addressed through the HMAP. *Id.* One of the questions that Ms. Leigh was tasked with investigation was whether BLM should combine appropriate contiguous HMAs as complexes, and if so, what implications for management would result? *Id.* With the Callaghan Complex HMAP / Gather Plan, BLM has created a complex without answering whether animal interchange exists and without addressing the implications of combing multiple HMAs into this Complex.

complex as contained in the agency's Wild Horses and Burros Handbook, and accordingly, the WHA and APA have been violated.

### 2. The HMAP for the Callaghan Complex does not comply with the agency's internal guidance.

Plaintiffs aver that Defendants violated the WHA and APA by creating an HMAP that arbitrarily ignores BLM internal guidance and policy for HMAP development. Dkt. 1, pp.35-36. For all HMAs, BLM "shall prepare a herd management area plan, which may cover one or more herd management areas." 43 C.F.R. § 4710.3-1. Management of wild horses and burros in an HMA "shall be at the minimum level necessary to attain the objectives identified in approved land use plans and herd management area plans." 43 C.F.R. § 4710.4. In its 2020 report to Congress, BLM stated:

> Every major management activity that occurs on HMAs starts with the NEPA process. Herd Management Area Plans (HMAPs) summarize the management goals for an HMA and the anticipated actions required to achieve those goals. For many HMAs, the BLM needs to develop and/or update HMAPs to include the use of new and improved population growth suppression methods and population management goals. In addition, these plans need to consider new research results and the potential for changes to AML. The process of developing and updating these plans would continue to provide the opportunity to inform and involve the public in determining the best actions to take on an HMA into the future. Just as with surveys and monitoring, HMAP development is a key component in the decision-making process for BLM's wild horse and burro management activities on the ground.

Lovko Decl., Exh. J, p.22.

An HMAP is not defined in the WHA or its implementing regulations; however, BLM's Wild Horse and Burro Handbook defines the purpose and components of an HMAP, as well as the process by which HMAPs are created. *Id*., Exh. K, pp. 10-11, 36-44. "HMAPs establish short- and long-term management and monitoring objectives for a specific [wild horse and burro] herd and its habitat." *Id*., p. 11. Such objectives may include, but are not limited to, "objectives for herd composition, animal characteristics and habitat development needs." *Id*., p. 10.

12

The first step in preparing an HMAP involves an evaluation of current management that results in the production of a management evaluation report (MER). *Id.*, p. 37. The "key steps" for this evaluation are identified by BLM as: (1) Review existing goals and objectives for the herd and its habitat and determine whether these have been met, partly met, or not met. Incorporate a summary of the rationale supporting BLM's determination in the evaluation report. (2) Compare and contrast the existing and desired condition for the herd and its habitat. (3) Document the gaps (or differences) between the current and desired conditions. These differences represent the issues to be addressed and resolved (i.e., the purpose and need for action). (4) Identify the possible management actions that could be implemented in response to the identified issues. (5) Formulate a range of alternative management strategies for the herd and its habitat from the list of possible management actions (Proposed Action and Alternatives). Each alternative considered should meet the purpose and need for action and respond to the identified issues in whole or in part. (6) Finalize the management evaluation report and provide it to the public for a 30-day review and comment period (public scoping). *Id.*

Plaintiff Laura Leigh volunteered with BLM's Mount Lewis office in 2016, which at that time was developing an HMAP for the South Shoshone HMA. Leigh Decl., ¶¶29, 31-32. In this role, she assisted BLM in collecting and analyzing the type of information necessary for HMAP creation. *Id.* Among the questions she was asked to address when developing her recommendation, Ms. Leigh considered:

> How should future forage allocations and allocation adjustments be made between livestock, wild horses, and wildlife?
>
> How should BLM separate out the utilization data between wild horses and livestock?
>
> How should the BLM make decisions about livestock and wild horse management where utilization overlaps and cannot be separated?
>
> How should BLM adjust AML? What criteria should be used?
>
> When is it appropriate to adjust wild horse animal unit months, or AUMS – which correlate with AML – without similar adjustments

to livestock or wildlife?

Does the HMA have suitable forage, water and space for wild horses?

What criteria should be used to make future habitat suitability determinations. Should this criteria include fences, acreage, vegetation, water availability, and animal movement and distribution?

How has climate change impacted the HMA? In what ways can the BLM mitigate for these climate changes?

Where are habitat improvement projects appropriate? What kinds of improvement projects are feasible? When is it appropriate to develop or augment water for wild horses?

Are adjustments needed to the HMA's boundaries to take into account habitat needs and wild horse distribution? Should the Shoshone HMA be expanded into the North Shoshone HA?

How should BLM maintain free-roaming behavior within the HMA? How should BLM improve free-roaming behavior where it has become impacted by fences, roads, mining, etc.?

Where has habitat fragmentation occurred? What can BLM do to minimize or reverse wild horse habitat fragmentation?

Should BLM combine appropriate contiguous HMAs as complexes, and if so, what

implications for management would result?

Leigh Decl., ¶¶29, 31-32. Here, BLM issued an MER for the Callaghan Complex in March of 2025. Lovko Decl., Exh. M. It does not contain the type of details and information required by the agency's own internal guidance. *Id.* The MER notes that the SERA RMP and other decisions contain wild horse objectives, but BLM does not (1) discuss whether these objectives remain desirable, nor (2) provide any data by which to determine the extent to which these objectives are being met. *Id.* Neither the MER (nor the NEPA analysis conducted for the HMAP) answer the questions that BLM directed Plaintiff LEIGH to address in 2015. Leigh Decl., ¶32; Lovko Decl, Exhs. B-E, M.

The next step in the HMAP analysis process requires BLM to craft well-written

14

management, monitoring, and implementation objectives for a proposed HMAP and its alternatives. Lovko Decl., Exh. K, pp.36-41. Well-written objectives should be specific, measurable, achievable/attainable, reasonable/relevant and trackable within a specified timeframe (SMART). *Id*., pp. 38-39.

In 2024, the Nevada District Court addressed a matter of first impression – does BLM have a mandatory duty to create HMAPs for all of the HMAs it manages? *Leigh*, 726 F. Supp. 3d at 1215. Judge Du answered this question in the affirmative, finding that this duty is created through the language in 43 C.F.R. § 4710.3-1. *Id*. at 1218. In response, BLM has begun preparing HMAPs for a number of HMAs – including those HMAs that lay within the Callaghan Complex. Leigh Decl., ¶42. However, faced with the administrative task of creating multiple HMAPs, BLM appears to have created an end-run around Judge Du's ruling. *Id.* Instead of following its own policy, which requires site-specific analysis and development, BLM now is developing generic HMAPs that do little more than reaffirm existing AMLs and support gather operations. *Id.*

The generic HMAPs that BLM has prepared since Judge Du's ruling in *Leigh v. Raby* are being "analyzed" through BLM attaching an HMAP as an appendix to its NEPA review documents. *Id*.  In using this generic approach, the HMAPs being promulgated by BLM do not follow the agency's own guidance in its Wild Horses and Burros Handbook. *Id*., ¶43; Lovko Decl., Exh. K, pp. 10-11, 36-44. Rather than address the site-specific needs of wild horses, BLM now is relying on the same objectives and language for virtually all HMAs. Leigh Decl., ¶¶43-44. The only difference between these HMAPs is that BLM is swapping out basic identification information. *Id.* No site-specific analysis is being relied upon; the objectives being adopted are standard and not tailored to a specific HMA. *Id.* This approach is arbitrary, capricious, and not in accordance with the law. 5 U.S.C. § 706(2).

In August of 2025, BLM issued a preliminary EA that converted the HMAP action into a proposal for a HMAP and a Gather Plan.[6] Lovko Decl., Exh. E. The final EA was subsequently

---

[6] A gather plan is separate from a HMAP, with gather plans tiering to the objectives in the

issued in February of 2026. *Id.*, Exh. D. The EAs focus almost exclusive on whether gather operations should be authorized; the HMAP is little more than an afterthought. *Id.*, Exhs. D-E.

WHE and other members of the public submitted comments to BLM that addressed the MER and preliminary EA's deficiencies. Leigh Decl., Exhs. 1-2; Lovko Decl., Exh. D, pp.264-324. BLM did not seriously consider these comments, either ignoring them completely or dismissing them through conclusory, unsubstantiated statements. Lovko Decl., Exh. D, pp.264-324. Certainly, some elements of wild horse management will be the same across different HMAs, but BLM may not take a generic approach to developing HMAPs. Each HMA has its own unique geography/topography; each HMA has its own unique wildlife population; each HMA has its own unique allotments and associated plans; each HMA has its own unique population of horse herds or bands. Just as land use plans must consider all of an area's unique properties, so too must an HMAP. Here, Appendix XIII of the EA contains the adopted HMAP. Lovko Decl., Exh. D, pp.325-335. The objectives in this HMAP are not tailored specifically to the horses or public lands contained in the Callaghan Complex; the objectives are not SMART objectives; when examining alternatives to this proposed HMAP, BLM did not identify SMART objectives for any alternatives. *Id.*

BLM may only abandon the direction contained in its Wild Horses and Burros Handbook if it first reveals a reasonable basis for this change in policy. *Healey*, 33 Vet. App. at, 321; *WildEarth Guardians*, 2019 U.S. Dist. LEXIS at *40-41; *Dine Citizens Against Ruining Our Env't*, 747 F. Supp. 2d at 1253; *Rhodes*, 153 F.3d at 789-90; *Auer*, 519 U.S. at 452; *Heffner*, 420 F.2d at 811-13. BLM offered no basis for its abandonment, and as such, Defendants have violated the WHA and APA.

### 3. BLM's refusal to re-calculate AMLs is arbitrary and capricious.

Among the management activities that BLM may engage are activities related to the gather and removal of "excess" wild horses and burros from the public range. 16 U.S.C. §§

---

HMAP. Lovko Decl., Exh. K, pp. 44-45, 47, 56. BLM considers an HMAP a plan that leads to implementation decisions, such as gather plans. *Id.*

1332(f), 1333(b). In making determinations that an excess population exists, the Secretary must first establish appropriate management levels (AMLs). *Id*. at § 1332(b). BLM defines AML as "[t]he number of adult horses or burros (expressed as a range with an upper and lower limit) to be managed within an HMA." Lovko Decl., Exh. K, p.56. AMLs are critical to BLM's management and protection of wild horses because "without an accurate AML," BLM cannot determine that an overpopulation exists, "which is a prerequisite for removal." *Friends of Animals v. Sparks*, 200 F.Supp.3d 1114, 1126 (D. Mont. 2016).

Plaintiffs contend that the AMLs for the South Shoshone, Bald Mountain, and Callaghan HMAs are improper as they were established for administrative convenience and do not reflect the optimum number of horses that may appropriately reside on the public lands without causing damage to the thriving natural ecological balance. Dkt. 1, pp.35-36.

In the 1980s, following enactment of the WHA, BLM was faced with an administrative dilemma as it was tasked with creating AMLs, but the agency frequently lacked the necessary data from which to set AML. J. B. Ratner, 199 IBLA 219,*232–35 (2025). To address this, the agency issued an Instruction Memorandum that directed field offices to set AMLs in land use plans based on existing population numbers. *Id*. The Memorandum recognized these AMLs as being a "starting point for monitoring." *Id*. However, when these 1980s AMLs were subsequently challenged, they were set aside; the WHA's requirements are not met when the government relies on AMLs established purely for administrative convenience rather than on appropriate evidence, studies, and analysis. *Id*.; *see also Dahl v. Clark*, 600 F. Supp. 585, 592 (D. Nev. 1984) (stating that AML must be established based on "evidence, analysis, or studies"); *Friends of Animals v. Sparks*, 200 F. Supp. 3d 1114, 1126 (D. Mont. 2016) ("By operating with an outdated AML when it [adopted a removal plan], [the government's] excess animal determination was based, at least in part, on pure guesswork. Without an accurate AML, [the government's] duty to remove could not be triggered because [the government] could not properly determine that an overpopulation existed, which is the prerequisite for removal"); Animal Protection Institute of America, 109 IBLA 112, 118 (1989) (decision to remove horses

17

cannot be based on AMLs established "only for administrative convenience").

In 2013, the National Research Council of the National Academies (NRC) released its report, "Using Science to Improve the BLM Wild Horse and Burro Program: A Way Forward." Lovko Decl., Exh. I. As regards the setting of AMLs, the NRC said:

> Previous reviews of BLM's setting of AMLs consistently reported that established AMLs were not based on thorough assessments of range conditions. The U.S. District Court for the District of Nevada, IBLA, and GAO all noted that AMLs of many HMAs in the 1970s and some in the 1980s were based on administrative decisions rather than information about the carrying capacity of the range (*Dahl v. Clark*, 1984; 109 IBLA 119; GAO, 1990).

*Id.*, p.197.

In recognition of this, BLM's Wild Horse and Burro Handbook recognizes that "AML is set based on in-depth analysis of site-specific resource monitoring data including grazing utilization, trend in range condition, actual use and climatic factors (i.e., AML is not set based on administrative convenience or single surveys). Lovko Decl., Exh. K, p.46

Here, the AMLs were established through adoption of the SERA RMP in 1986. Lovko Decl., Exh. D, p. 325; Exh. F. The AMLs are not based on site-specific evidence, analysis, or studies, *see Dahl*, 600 F.Supp. at 592; Lovko Decl., Exh. K, p.46, Leigh Decl., ¶33, but instead reflect the existing population of wild horses as surveyed in 1982, Lovko Decl., Exh. F, p.29; Leigh Decl., ¶33. BLM said these AMLs would only being used for the "short-term." *Id.* That is, these AMLs were set for administrative convenience, and as such, they cannot be relied upon to make an overpopulation determination. *J. B. Ratner*, 199 IBLA at 232–35; *Dahl*, 600 F.Supp. at 592.

Ms. Leigh has communicated with BLM regarding the need to re-calculate these AMLs on numerous occasions. Leigh Decl., ¶24. This issue has been a moving target, with BLM initially deciding to address the issue when the SERA RMP was revised – but such revision never occurred. *Id.*, ¶¶21, 24. Subsequently, BLM intended to address this issue through the development of individual HMAPs – but this also never occurred. *Id.*, ¶¶21, 30. And now, with the adopted HMAP / Gather Plan, BLM's position is that adjustments to AML are "beyond the

scope" of the plans; AML adjustments must occur through amendment of the SERA RMP. Lovko Decl., Exh. D, p.300.

More specifically, in its decision adopting the SERA RMP, BLM said the next planning stage would be to create HMAPs for each HMA. *Id*., Exh F, pp.3, 14. By the early 2000s, however, no HMAPs were created. Leigh Decl., ¶21. Instead, the agency began scoping for the development of a revised/updated RMP, with such action to include a re-assessment of the agency's wild horse management. *Id*. This development was subsequently abandoned. *Id*., ¶22.

Between approximately 2010 and 2015, Ms. Leigh worked informally with BLM on a number of projects, including a now-defunct data collection/fertility control plan at Fish Creek and Rocky Hills. *Id.*, ¶23. She also accompanied the Wild Horse and Burro Specialist on visits to the lands in the Callaghan Complex to examine the health of the range. *Id.* During this time, BLM told her that one of the reasons the SERA RMP has never been updated is due to lack of personnel. *Id*., ¶25. This lack of personnel impeded BLM's ability to address daily tasks and to collect and organize data. *Id.*

In 2016, Ms. Leigh decided to volunteer with BLM's Mount Lewis office – partly to rectify the lack of manpower. *Id*., ¶28. As a formal volunteer, she underwent training from BLM and was provided her own cubicle. *Id*., ¶29. Much of her work focused on assisting the office with its planning, particularly as regards the development of an HMAP for the South Shoshone HMA.[7] *Id*., ¶¶31-36.

Ms. Leigh found no documentation in BLM's files to substantiate the AMLs set by the SERA RMP. *Id.*, ¶33. She and BLM's Wild Horse and Burro Specialist concurred that the AML for this HMA was too low, with a proper AML likely being closer to 500 wild horses. *Id.*, ¶34. This conclusion was based on the fact that since its creation, the South Shoshone HMA population has regularly exceeded 100 horses, but the HMA has only experienced one gather

---

[7] Ultimately, BLM abandoned its plan to create this HMAP; however, this did not occur before Ms. LEIGH examined the agency's records and submitted written analysis to BLM. Leigh Decl., ¶37.

operation (in 2008) since the SERA RMP established AML. *Id.* And despite this lack of gather operations, the health of the wild horses in South Shoshone HMA historically has been good – often better than the health of horses in other HMAs managed by the Battle Mountain District. *Id*. When the high AML has been exceeded, this also has not resulted in negative impacts to the lands' thriving natural ecological balance. *Id.* Furthermore, Ms. LEIGH shared with BLM that the health of the lands in the South Shoshone HMA actually is negatively impacted by having too low of an AML. *Id.*, ¶34. For example, based on BLM's files, she was able to demonstrate that larger horse populations are critical to limiting the occurrence of wildfires, and BLM needed to take a hard look at this in its analysis for the South Shoshone HMA HMAP. *Id.*

Ms. Leigh's discussions with BLM staff and review of internal documents also revealed that the boundaries of the HMA need to be re-visited. *Id., *¶36. When setting the HMA's boundaries, BLM knew that livestock permittees would find the issue "controversial." *Id.* Therefore, rather than set the boundaries to ensure the free-roaming nature of the wild horse population, BLM contacted livestock permittees directly and asked them how many wild horses they would tolerate in permitted allotments. *Id.* Not surprisingly, the permittees wanted as few horses as possible to use the lands. *Id.* Accordingly, BLM set the boundaries so as to limit wild horse populations in the flats and valleys, which are used by livestock permittees. *Id.* Instead, the horses are relegated to the most rugged terrain with limited or seasonal water and forage.[8] *Id.*

Although Ms. Leigh spent considerable time on the HMAP for the South Shoshone – providing BLM with information and analysis – BLM subsequently abandoned its development of the HMAP. *Id.*, ¶37. Since that time, she has contacted BLM annually since to ask if HMAP development could be put back on their action priorities. *Id.*

In 2024, the Nevada District Court addressed a matter of first impression: does BLM have a mandatory duty to create HMAPs for all of the HMAs it manages? *Leigh v. Raby*, 726 F. Supp. 3d 1207, 1215 (D. Nev. 2024). Judge Du answered this question in the affirmative, finding

---

[8] The majority of the South Shoshone HMA consists of the Shoshone Mountain Range, with elevations reaching up to 8,200 feet in elevation.

that this duty is created through the language in 43 C.F.R. § 4710.3-1. Id. at 1218. In response, BLM began preparing generic HMAPs for a number of HMAs, including those HMAs that lay within the Callaghan Complex. Leigh Decl., ¶¶42-44. However, the adopted Callaghan HMAP / Gather Plan does not remedy the deficiencies of the Complex's AMLs. Instead, the agency refused to address the public's request for AML re-evaluation. Lovko Decl, Exh. D, pp.297-306.

Defendants' adoption of the HMAP / Gather Plan relies upon the AMLs originally set for administrative convenience in the 1980s. Lovko Decl., Exh. F. When creating the HMAP / Gather Plan, BLM was aware that these AMLs are not based on the requisite evidence, analysis, and study mandated by the WHA. Leigh Decl., ¶¶24, 27, 32-36 and Exhx. 1-2; Lovko Decl, Exh. D, pp.297-306. Rather than consider this important issue, the agency acted in an arbitrary and capricious manner by ignoring or minimizing relevant evidence, as well as ignoring relevant factors without adequate explanations. *Daikin Applied Ams. Inc. v. Env't Prot. Agency*, 39 F.4th 701, 711-12 (D.C. Cir. 2022) (citing *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *Genuine Parts Co. v. EPA*, 890 F.3d 304, 312 (D.C. Cir. 2018); *Butte County v. Hogen*, 613 F.3d 190, 194 (D.C. Cir. 2010); *Native Ecosystems Council v. United States Forest Serv.*, 418 F.3d 953, 964-65 (9th Cir. 2005); *Envtl. Def. v. United States Army Corps of Eng'rs*, 515 F.Supp.2d 69, 82 (D.D.C. 2007); *SWAN View Coal. v. Haaland*, 2024 U.S. Dist. LEXIS 114625, at *17 (D. Mont. June 28, 2024); *Ctr. for Biological Diversity v. Bernhardt*, 595 F.Supp.3d 890, 916-17 (D. Ariz. 2022).

Why did BLM refuse to re-evaluate AML?  The agency said such action was "beyond the scope" of the HMAP / Gather Plan. Lovko Decl., Exh. D, p.300. However, it was only beyond the scope because the agency pre-determined that neither the HMAP nor Gather Plan would evaluate AML. The agency legally could have (and should have) amended the AMLs set by the SERA RMP in either the HMAP or the Gather Plan. Lovko Decl., Exh. K, pp.46-47 (recognizing that AML can be revised in HMAPs and gather plans).

For more than a decade, BLM has understood that the AMLs established by the SERA RMP do not comport with the WHA, yet time and again, the agency has avoided having to re-

21

evaluate the AMLs. The agency's planning process has repeatedly delayed all efforts in this regard. Leigh Decl., ¶¶21-22, 24-25, 30, 37; Lovko Decl., Exh. D, p.300. BLM's adoption of an HMAP for the Callaghan Complex violated the WHA and APA by again ignoring the agency's obligation to set AML base on a site-specific study and data. *Dahl*, 600 F. Supp. at 592.

### 4. BLM adopted the HMAP / Gather Plan without proper consultation.

When addressing whether excess horses exist within an HMA that necessitate a gather, BLM "shall consult with the United States Fish and Wildlife Service, wildlife agencies of the State or States wherein wild free-roaming horses and burros are located, such individuals independent of Federal and State government as have been recommended by the National Academy of Sciences, and such other individuals whom he determines have scientific expertise and special knowledge of wild horse and burro protection, wildlife management and animal husbandry as related to rangeland management." 16 U.S.C. § 1333(b)(1).

Here, in the final EA for the HMAP / Gather Plan, BLM says that it consulted with the Nevada Department of Wildlife (NDOW). Lovko Decl., Exh. D, pp.69-70. Further, BLM said it will coordinate with NDOW "regarding the locations of staging, trapping, and corrals to minimize impacts to wildlife." *Id.*, p.70. It is unknown whether BLM has done this consultation for the upcoming scheduled gather operations; however, as Defendants' counsel recently said the location of traps and the number of horses removed at traps is determined by the *contractor* hired to conduct the gather, it appears that such consultation has not occurred. Lovko Decl., Exh. G.

BLM did not consult with United States Fish and Wildlife Service. This not only violates the mandatory duty established by Section 1333 of the WHA, but it is ever the more problematic because the Callaghan Complex contains many threatened, endangered, and sensitive species. Lovko Decl., Exh. D, pp.237-244. BLM may not pick and choose what laws it follows, particularly where the law's language is clear. Section 1333 states that BLM "shall" consult with the United States Fish and Wildlife Service; this is not ambiguous. *Firebaugh Canal Co. v. United States*, 203 F.3d 568, 57374 (9th Cir. 2000) ("[t]he term 'shall' is usually regarded as making a provision mandatory, and the rules of statutory construction presume that the term is

used in its ordinary sense unless there is clear evidence to the contrary. Accordingly, Defendants violated the WHA and APA by failing to consult with appropriate agencies.

**B. Plaintiffs' will be irreparably harmed if the court does not constrain BLM's actions.**

The issue of whether it is unlawful to implement a horse gather decision in only one of multiple HMAs has not been directly addressed by any court, to Plaintiffs' knowledge. However, relevant principles from the WHA and BLM's policies provide guidance on this issue. The WHA provides that each HMA must have its own AML. 16 U.S.C. § 1333(b)(1); 43 C.F.R. § 4710.3-1; *Fund for Animals, Inc. v. United States BLM*, 460 F.3d 13, 16 (2006). When implementing a gather to remove excess wild horses, BLM has identified the order of priority for removal as follows:

> •Nuisance animals (horses impacting public safety, such as through their presence on a major private roadway),
>
> •Horses impacting threatened, endangered or sensitive species,
>
> •Horses located outside an HMA in an area not designated for their long-term maintenance,
>
> •Horses in HMAs that are above AML.

Lovko Decl., Exh. K, p.27. Defendants have been unwilling to state that they will follow this order of priority; they have been unwilling to stipulate that the 2,000 horses scheduled to be gathered will be removed from more than one HMA in the Callaghan Complex. Lovko Decl, ¶8 and Exh. G. In fact, in the EA, BLM focused on the gather area for the Callaghan Complex as a whole. At no time did the agency evaluate the impact of removing only excess horses from one HMA alone. To now implement the HMAP / Gather Plan in a manner inconsistent with this analysis is arbitrary and capricious. Moreover, such removal will irreparably harm Plaintiffs' aesthetic, conservation, and recreational interests in the public lands, wild horses, and wildlife of the Complex. Leigh Decl., ¶¶9-19; Adams Decl., ¶¶8-11.

Plaintiffs' interests in the Complex are safeguarded when BLM follows the law, ensuring that the public lands are preserved for multiple use and sustained yield in a manner that sustains

a thriving natural ecological balance. Leigh Decl., ¶10. To meet this obligation, BLM must first consider and analyze all of the uses for these lands as such uses are part of the Complex's ecosystem. *Id.* Without understanding this ecosystem and determining how each resource use potentially contributes to environmental impacts, BLM's management decisions are blindly made. *Id.*

If BLM is allowed to remove 2,000 horses primarily from one HMA in the Callaghan Complex, the health of the horses, wildlife, and range for the Complex will be harmed, which corresponds to an injury of Plaintiffs' aesthetic, recreational, and conservation interests. Leigh Decl., ¶¶11-19; Adams Decl., ¶¶9-11. These interests will be harmed because BLM has not analyzed the impact of such a skewed implementation. *Id.* Removal from one HMA would not address the health of the wild horses, wildlife, and range in other areas of the Gather Plan's identified gather area (which consists of 1,145,515 acres of land). *Id.* As a result, harm to these horses, wildlife and the range would remain untreated. *Id.*

Plaintiffs' harm is irreparable and warrants the issuance of an injunction. *See Friends of Animals v. United States BLM*, 2015 U.S. Dist. LEXIS 17575, No. 3:15-CV-0057-LRH-WGC at *10-11 (D.Nev. Feb. 11, 2015) (finding irreparable harm where gather would remove 200 horses from HMA visited by the moving party); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 567 (1992) (finding that a person who observes or works with animals of a particular species that are threatened by an agency decision suffers injury "since some animals that might have been the subject of his interest will no longer exist").

**C. The balance of equities tips in Plaintiffs' favor, as compliance with the WHA is in the public interest.**

Consideration of the balance of equities and public interest merge into one inquiry where the government opposes a request for preliminary relief. *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014). The balance of equities addresses the burdens or hardships to Plaintiffs compared with the burden on Defendants if an injunction is ordered. *Winter*, 555 U.S. at 24-31. Consideration of the public interest relates to the impact of an injunction on nonparties.

24

*Bernhardt v. L.A. Cnty.*, 339 F.3d 920, 931 (9th Cir. 2003).

The balance of equities in this case strongly favors the issuance of an injunction directing BLM to implement the upcoming gather in a manner that ensures no one HMA is targeted. The agency should be required to follow its own guidance regarding the priority of removal, and to the extent that horses are removed from any HMAs for the purposes of achieving AML, this removal should occur in each of the HMAs analyzed within the HMAP / Gather Plan's environmental assessment. Such an injunction places no hardship on BLM, but rather, it simply directs BLM to follow its own policies and analysis.

The public interest also weighs in favor of granting a preliminary injunction as BLM's management of wild horses in the Callaghan Complex is intended to ensure the horses are properly protected and managed as an integral part of the HMAs. 16 U.S.C. § 1331. When BLM ignores the WHA's mandates, this is not only tragic for Plaintiffs but for everyone who cherishes these lands and the animals that reside there. The public interest strongly favors an injunction to ensure that BLM abides by the law. *Vitkus v. Blinken*, 79 F.4th 352, 368 (4th Cir. 2023) (finding that the public "undeniably" has an interest in seeing "its governmental institutions follow the law").

## IV. CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court issue a preliminary injunction that places constraints on BLM such that they must follow their own internal guidance regarding the order of priority during removals. This would require BLM to remove all horses located outside of any HMA prior to conducting any gather in any of the Complex's HMAs. Should less than 2,000 wild horses be found outside the Complex's HMAs, the remaining gather should remove horses from at least two different HMAs in the Complex.

DATED:  June 10, 2026,                    Respectfully Submitted,

                                          /s/ Jennifer Rae Lovko
                                          Jessica L. Blome
                                          (Cal. Bar No. 314898, pro hac vice)
                                          Jennifer Rae Lovko
                                          (Cal. Bar No. 208855, pro hac vice
                                          GREENFIRE LAW, PC
                                          2748 Adeline Street, Suite A
                                          Berkeley, CA 94703
                                          (510) 900-9502
                                          jblome@greenfirelaw.com
                                          rlovko@greenfirelaw.com

                                          /s/ Brent M. Resh
                                          Brent M. Resh
                                          (Nevada Bar No. 14940)
                                          BRENT RESH LAW, PLLC
                                          2401 La Solana Way
                                          Las Vegas, NV 89102
                                          (702) 781-6903
                                          brent@brentreshlaw.com

                                          *Attorneys for Plaintiffs Wild Horse Education,
                                          Laura Leigh, and Tammi Adams*