BRENT M. RESH
(Nevada Bar No. 14940)
BRENT RESH LAW, PLLC
2401 La Solana Way
Las Vegas, NV 89102
(702) 781-6903
brent@brentreshlaw.com

JESSICA L. BLOME
(California Bar No. 314898, pro hac vice application forthcoming)
J. RAE LOVKO
(California Bar No. 208855, pro hac vice application forthcoming)
GREENFIRE LAW, PC
2748 Adeline Street, Suite A
Berkeley, CA 94703
(510) 900-9502
jblome@greenfirelaw.com
rlovko@greenfirelaw.com

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| WILD HORSE EDUCATION, a non-profit corporation, LAURA LEIGH, individually and on behalf of WILD HORSE EDUCATION, and TAMMI ADAMS, individually and on behalf of WILD HORSE EDUCATION,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF INTERIOR, BUREAU OF LAND MANAGEMENT, BILL GROFFY, Principal Deputy Director and Acting Director of the Bureau of Land Management, and JUSTIN ABERNATHY, acting Nevada State Director of the Bureau of Land Management,<br><br>Defendants. | CASE NO. 3:26-cv-00423-MMD-CSD<br><br>**DECLARATION OF LAURA LEIGH ISO PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION** |

1

I, LAURA LEIGH, declare that if called as a witness in this action I would competently testify of my own personal knowledge, as follows:

1.      I am a Plaintiff in this case and also am the Founder and President of Plaintiff Wild Horse Education (WHE).

2.      Plaintiff Wild Horse Education (WHE) is a registered non-profit organization headquartered in Nevada whose purpose is the protection and sane management of wild horses and burros on public lands through educating the public, encouraging scientifically-based management strategy for animals in the wild, promoting public adoptions of removed wild horses and supporting those who adopt, and assisting the public to advocate for the welfare and management of wild horses and burros.

3.      With more than 150,000 members, WHE's mission encompasses the protection of wild horses as well as the health of the public rangelands upon which they live. WHE has an interest in ensuring that wild free-roaming horses and burros are treated as an integral part of public lands, management activities are conducted at the minimal level feasible, and management activities include development and consideration of appropriate land use plans and HMAPs.

4.      WHE members and I regularly document public lands and the animals that reside on these lands. We also document wild horse and burro gather operations, as well as the subsequent placement of wild horses and burros into off-range facilities.

5.      Advocating for the wild horses in the Callaghan Complex is a past, present, and future important issue for myself and WHE.

6.      I have been visiting, viewing, observing, and documenting wild horses in the Callaghan Complex for approximately 16 years. As a result, I have formed strong bonds with the wild horses in the Complex. I know many of the horses by their markings and have watched new foals turn into adults while roaming free in the Complex. I intend on continuing my visits to these public lands into the foreseeable future, including in 2026 and 2027.

2

7. I and WHE members advocate for and regularly visit wild horses in each of the HMAs and the HA within the Callaghan Complex. When visiting, we appreciate the natural beauty, wildlife, and wild horses in the Callaghan Complex. My visits bring me enjoyment, allowing for recreation as well as documentation of wild horses and wildlife.

8. The opportunity to view the wild horses and wildlife in the Callaghan Complex is of significant value to me and other WHE members and increases our use and enjoyment of Nevada's public lands.

9. Based on my repeated and regular visits to the Callaghan Complex, I have legally recognized aesthetic, recreational and conservations interests in the lands, horses, and wildlife of the Complex.

10. My interests in the Complex are safeguarded when BLM follows the law, ensuring that the public lands are preserved for multiple use and sustained yield in a manner that sustains a thriving natural ecological balance. To meet this obligation, BLM must first consider and analyze all of the uses for these lands as such uses are part of the Complex's ecosystem. Without understanding this ecosystem and determining how each resource use potentially contributes to environmental impacts, BLM's management decisions are blindly made.

11. If BLM is allowed to remove 2,000 horses primarily from one HMA in the Callaghan Complex, the health of the horses, wildlife, and range for the Complex will be harmed, which in turn directly harms my aesthetic, recreational, and conservation interests.

12. Even once removed from the Complex, the horses' health is not safe. Based on my experience, I am aware that horses placed in off-range corrals often end up staying in these corrals for a period of years. Some horses will spend the rest of their lives in these corrals.

13. BLM typically does not publish statistics on wild horse injuries and deaths occurring in off-range corrals; therefore, information on the treatment of animals must necessarily come from eyewitness accounts. WHE supplements eyewitness accounts with information obtained through Freedom of Information Act requests. These records frequently fail to identify the cause of animal injury or death, however. Nevertheless, based upon information

that WHE has been able to obtain, Plaintiffs are aware that horses held at the Palomino Valley and Indian Lakes facilities face unnecessary injury and death.

14.     For example, in 2022, BLM reported that the Indian Lakes facility did not provide adequate access to hay, failed to collect blood samples for Equine Infectious Anemia, failed to timely administer vaccinations, failed to maintain safe fencing, failed to maintain horse hooves, and failed to address poor Henneke body condition scores. Additionally, I am aware that in 2023, approximately 11% of the wild horses at this facility died. While most of the deaths were attributed to "undiagnosed/unknown" reasons, deaths also were attributed to non-life threatening conditions such as eye abnormalities. Deaths also occurred due to traumatic injury or as a result of horses being gelded.

15.     I have documented the capture of wild horses and burros since 2009 and have spent far more days at trap locations than any single past or current BLM Specialist. I am very familiar with what works, what does not and the consistent occurrence of avoidable injuries and deaths because BLM refuses to evaluate its methodology. Based upon documentation that WHE has obtained through Freedom of Information Act requests over the past decade, I am aware that the average death rate of wild horses during gather operations and post-gather handling is approximately 12.5%. I have seen the rate reach as high as 24% in sub-set populations (such as with pregnant jennies/burros).

16.     The rate of foal deaths and miscarriages associated with gathers is unknown as BLM does not require this information to be collected.

17.     Although a common belief is that horse deaths associated with gathers occur mostly during the helicopter operations, the truth is that most deaths come after capture while the horses are at off-range corrals. Capture myopathies such as hyperlipidemia (associated with the removal of all animals living in a wild setting), disease, injuries associated with corral structures, trampling, and more causes these deaths.

18.     My aesthetic, recreational and conservation interests will be harmed by the scheduled gather operations should all of the horses be removed from HMA because BLM has

4

not analyzed the impact of such a skewed implementation. Also, removal from one HMA would not address the health of the wild horses, wildlife, and range in other areas of the Gather Plan's identified gather area (which consists of 1,145,515 acres of land). As a result, harm to these horses, wildlife and the range would remain untreated.

19. The value of my experience in the Callaghan Complex is reduced by BLM unlawfully removing wild horses.

20. I am aware that the SERA RMP was adopted in 1986 by BLM's Mount Lewis Office. It is the oldest, fully operative land use plan in the United States.

21. I am very familiar with the HMAs managed by BLM's Mount Lewis Office, and between 1986 (when the SERA RMP was adopted) and the early 2000s, this office did not prepare any HMAPs. Instead, BLM began scoping for the development of a revised/updated RMP, with such action to include a re-assessment of the agency's wild horse management.

22. I submitted comments to BLM during the scoping process. Unfortunately, this development was subsequently abandoned.

23. Between approximately 2010 and 2015, I worked informally with BLM on a number of projects, including a now-defunct data collection/fertility control plan at Fish Creek and Rocky Hills. I also accompanied the Wild Horse and Burro Specialist on visits to the lands in the Callaghan Complex to examine the health of the range.

24. I communicated with BLM regarding the need to re-calculate the AMLs for the South Shoshone, Bald Mountain, and Callaghan HMAs on numerous occasions. This issue has been a moving target, with BLM always punting the matter to later action.

25. BLM repeatedly told me that one of the reasons the SERA RMP has never been updated is due to lack of personnel. This lack impeded BLM's ability to address daily tasks and to collect and organize data.

26. In 2013, the National Research Council of the National Academies of Science (NAS) released its report, Using Science to Improve the BLM Wild Horse and Burro Program: A Way Forward. This report highlighted problems with BLM's management of wild horses and

5

identified means for improvement. The NAS's findings mirrored WHE's conclusions in many regards.

27.    As regards the setting of AMLs, the NAS said (at page 197): "Previous reviews of BLM's setting of AMLs consistently reported that established AMLs were not based on thorough assessments of range conditions. The U.S. District Court for the District of Nevada, IBLA, and GAO all noted that AMLs of many HMAs in the 1970s and some in the 1980s were based on administrative decisions rather than information about the carrying capacity of the range (*Dahl v. Clark*, 1984; 109 IBLA 119; GAO, 1990)."

28.    Prior to issuance of the NAS report, WHE and/or I engaged in a number of legal challenges to BLM's compliance with the Wild Horse Act. After its issuance, I decided to wrap up these challenges and enter into a formal volunteer agreement with BLM in the hopes of assisting BLM to comply with the NRC report's recommendations regarding AML. Also, as the Mount Lewis office's management was being impeded by lack of staff, my contributions as a volunteer were necessary.

29.    I entered into a formal volunteer agreement with BLM in April of 2016 to help the Mount Lewis office with its planning actions. As a formal volunteer, I underwent training from BLM and was provided my own cubicle.

30.    During this time, in my discussions with BLM employees, I said that the SERA RMP is outdated, and its objectives do not take into account the current, changed conditions of the public lands. BLM employees did not disagree, but they said that site-specific management goals and objectives needed to be addressed in herd management area plans. In lieu of directly updating the RMP, I was told HMAPs could be used to trigger amendments to the RMP.

31.    In 2015, BLM decided to create a HMAP for the South Shoshone HMA, moving forward with data collection and analysis in 2016. As a volunteer, I helped the agency in this endeavor by looking at BLM's files to compile available data on a number of questions posed by BLM. This included addressing whether the HMA's boundaries and AML should be re-evaluated.

6

32.    In preparing the HMAP for the South Shoshone HMA, I was asked to collect information related to a number of matters, which previously BLM had intended to address in its earlier, aborted revision of the SERA RMP. Specially, I was asked to address the following questions:

How should future forage allocations and allocation adjustments be made between livestock, wild horses, and wildlife?

How should BLM separate out the utilization data between wild horses and livestock?

How should the BLM make decisions about livestock and wild horse management where utilization overlaps and cannot be separated?

How should BLM adjust AML? What criteria should be used?

When is it appropriate to adjust wild horse animal unit months, or AUMS – which correlate with AML – without similar adjustments to livestock or wildlife?

Does the HMA have suitable forage, water and space for wild horses?

What criteria should be used to make future habitat suitability determinations. Should this criteria include fences, acreage, vegetation, water availability, and animal movement and distribution?

How has climate change impacted the HMA? In what ways can the BLM mitigate for these climate changes?

Where are habitat improvement projects appropriate? What kinds of improvement projects are feasible? When is it appropriate to develop or augment water for wild horses?

Are adjustments needed to the HMA's boundaries to take into account habitat needs and wild horse distribution? Should the Shoshone HMA be expanded into the North Shoshone HA?

How should BLM maintain free-roaming behavior within the HMA? How should BLM improve free-roaming behavior where it has become impacted by fences, roads, mining, etc.?

Where has habitat fragmentation occurred? What can BLM do to minimize or reverse wild horse habitat fragmentation?

Should BLM combine appropriate contiguous HMAs as complexes, and if so, what implications for management would result?

33.    Based on my examination of BLM's files, I found no documentation to substantiate the AMLs set by the SERA RMP. Instead, the AMLs merely reflect the number of horses observed in 1982 by BLM (in reality, many of the observations were made by livestock permittee to BLM).

34.    In discussing AML with BLM's Wild Horse and Burro Specialist, we both agreed that the AML for the South Shoshone HMA was too low, with a proper AML likely being between 500-1000 wild horses. This conclusion was based on the fact that since its creation, the South Shoshone HMA population has regularly exceeded 100 horses, but the HMA has only experienced one gather operation (in 2008) since the SERA RMP established AML. Despite this lack of gathers, the health of the wild horses in South Shoshone HMA historically has been good – often better than the health of horses in other HMAs managed by the Battle Mountain District. When the high AML has been exceeded, this also has not resulted in negative impacts to the lands' thriving natural ecological balance.

35.    Additionally, I shared with BLM that the health of the lands in the South Shoshone HMA actually, highly likely, negatively impacted by having too low of an AML. For example, based on BLM's files, I was able to demonstrate that larger horse populations are critical to limiting the occurrence of wildfires, and I conveyed this needed a hard look in the NEPA review being drafted for the South Shoshone HMAP.

36.    BLM needed to take a hard look at this in its analysis for the South Shoshone HMA HMAP.

37.    Based upon my review of BLM files and discussion with BLM staff, I recommended that BLM also re-visit the South Shoshone HMA's boundaries. When setting the HMA's boundaries, BLM knew that livestock permittees would find the issue "controversial." Therefore, rather than set the boundaries to ensure the free-roaming nature of the wild horse population, BLM contacted livestock permittees directly and asked them how many wild horses

8

they would tolerate in permitted allotments. Not surprisingly, the permittees wanted as few horses as possible to use the lands. And, BLM set the boundaries so as to limit wild horse populations in the flats and valleys, which are used by livestock permittees. Wild horses are relegated to the most rugged terrain with limited or seasonal water and forage.

38.     Although I spent considerable time on the HMAP for the South Shoshone – providing BLM with information and analysis – BLM subsequently abandoned its development of the HMAP. Since that time, I have contacted BLM annually since to ask if HMAP development could be put back on their action priorities.

39.     BLM has not previously managed the wild horses in the South Shoshone, Bald Mountain, Callaghan, and Hickison HMAs as a complex. In fact, in the past, the Callaghan Complex was defined by BLM as containing the Callaghan and New Pass-Ravenswood HMA.

40.     The only gather conducted previously for the South Shoshone HMA (in 2008) treated the HMA independently of any other HMAs. With this gather, BLM managed the HMA separate from the Callaghan, Bald Mountain, and Hickison HMAs. Treating the HMA separately is consistent with the approach taken by BLM when I volunteered with the agency to begin drafting an HMAP for the South Shoshone HMA.

41.     As a BLM volunteer, I examined the issue of animal interchange between the South Shoshone HMA and the Bald Mountain and Callaghan HMAs. In my review of BLM files, I saw that fencing exists along the west side of the Callaghan HMA, limiting the interchange of horses from that area. Also, the land between the South Shoshone HMA and Bald Mountain HMA are separated by a dry lake and numerous fenced private parcels, limiting interchange between these two HMAs.

42.     In adopting the Callaghan Complex HMAP / Gather Plan, BLM offered no reason for concluding that animal interchange occurs among the HMAs. No documentation exists demonstrating such interchange.

43.     In 2024, the Nevada District Court ruled (in *Leigh v. Raby*) that BLM has a mandatory duty to create HMAPs for all HMAs. In response, BLM has begun preparing HMAPs

9

for a number of HMAs – including those HMAs that lay within the Callaghan Complex. However, BLM appears to be trying to create an end-run around the Court's ruling. Instead of following its own policy, which requires site-specific analysis and development of HMAPs, BLM now is developing generic HMAPs that do little more than reaffirm existing AMLs and support gather operations. These generic plans are being "analyzed" through BLM attaching such an HMAP as an appendix to its NEPA review documents.

44.    In using this generic approach, the HMAPs being promulgated by BLM do not follow the agency's own guidance in its Wild Horses and Burros Management Handbook. Rather than address the site-specific needs of wild horses, BLM now is relying on virtually the same objectives and language for all HMAs. The only difference between these HMAPs is that BLM is swapping out basic identification information. No site-specific analysis is being relied upon; the objectives being adopted are standard and not tailored to a specific HMA.

45.    For example, in my duties for WHE, I review and comment on environmental assessments (EAs) issued by BLM. The HMAP for the Callaghan Complex is contained as Appendix XIII in the EA for the Callaghan Complex HMAP / Gather Plan. The exact same HMAP template can be found as Appendix XIII in the EA for the Silver King HMA HMAP / Gather Plan (DOI-BLM-NV-L030-2025-011-EA.

46.    The Callaghan Complex HMAP does not address the questions posed by BLM to me when I assisted in the HMAP for the South Shoshone HMA. The type of data and evidence necessary to address these questions is not contained in documentation BLM provided to the public for this plan.

47.    I and WHE are concerned that BLM intends to use the Callaghan Complex HMAP / Gather Plan as authorization to remove all (or the vast majority) of the 2,000 wild horses from only one HMA rather than from various locations within the gather area.

48.    For example, the Cortez Mine operates east of the South Shoshone HMA, and necessarily impacts the horses of this HMA due to water drawdown, traffic, and roads. Recently, BLM approved an amendment to this mine's plan of operations. In light of this approval, I am

10

concerned that the scheduled gather for the Callaghan Complex is motivated by a desire to clear the South Shoshone HMA of wild horses in order to allow easy implementation of the Cortez mining plan's changes.

49.     WHE also currently is before the Interior Board of Appeals (IBLA 2025-0085) with a challenge to BLM's approval of the Robertson Mine, which is located just north of the South Shoshone HMA (in the North Shoshone HA). This challenge is based on WHE's concern that BLM has never prepared an appropriate HMAP for the South Shoshone HMA, evaluated the repatriation of the North Shoshone HA, examined the cumulative impact of the various uses of this area, or examined the impact of the mine on wild horses, habitat, and resources. In light of this challenge, which the Board has yet to rule on, I am concerned that the scheduled gather for the Callaghan Complex is motivated by a desire to clear the South Shoshone HMA of wild horses in order to allow easy implementation of the Robertson Mine before the merits of WHE's claims are addressed.

50.     I also am aware that the Nevada Department of Wildlife has aided hunters who have created exclosures in the South Shoshone HMA near Elephant Head. Exclosures are areas that block access from unwanted animals (such as wild horses). The hunters use the exclosures for Chukar hunting. These exclosures are not an approved use. In fact, BLM previously authorized the development of a water project in this area for horses (although this development has never occurred). I am concerned that the scheduled gather for the Callaghan Complex is motivated by a desire to clear the South Shoshone HMA of wild horses in order to satisfy hunters' desire to keep these exclosures.

51.     I am aware that my counsel conversed with Defendants' counsel in an attempt to resolve Plaintiffs' concerns. Based on my experience, I understand that some elements of gather operations are under the control of contractors that BLM hires; however, it is simply not correct that contractors have carte blanche authority to decide where trap locations are set nor how many horses will be gathered at trap locations.

11

52.     When preparing an EA for a gather plan, BLM may identify possible trap locations. I have seen EAs that do this; these EAs analyze the impacts of removing horses at these locations. For example, if trap locations are near greater sage-grouse habitat, this is addressed in the EA.

53.     For the Callaghan Complex, the EA provides that BLM will coordinate with the Nevada Department of Wildlife regarding the locations of staging, trapping, and corrals to minimize impacts to wildlife. Based upon my counsel's conversations with Defendants' counsel (where BLM says the location is left to the contractor), this does not appear to have happened.

54.     I also know that when BLM engages in contract solicitation and funding for gather operations, it provides potential contractors with a plan that identifies the area to be gathered, potential numbers to be captured at each location (which information assists in determining the amount of panels, equipment, and personnel needed), and potential locations for temporary holding corrals (which are dictated partly by the expected numbers to be captured at each trap location). In the event of a gather as large as the Callaghan Complex, the temporary holding corrals might need to change more than once due to the access of roads for semi-trucks in proximity to potential trap locations. When I volunteered with BLM, I assisted staff in creating these plans for contract bids. Without such plans and the information they provide, contractors cannot prepare bids as they would not know the scope of the work, the type and amount of equipment to be used during the operations, and costs associated with the operations.

55.     Attached hereto as **Exhibit 1** is a true and correct copy of WHE's April 14, 2025, public comment on the BLM's scoping for the Callaghan Complex of Wild Horses Herd Management Area Plan and Environmental Assessment.

56.     Attached hereto as **Exhibit 2** is a true and correct copy of WHE's September 3, 2025, public comment on the BLM's Draft Herd Management Area and Gather Plan for the Callaghan Complex of Wild Horses.

12

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated:   June 10, 2026,                                    *Laura Leigh*
                                                           Laura Leigh

13