# Exhibit 2

September 3, 2025

To:      DEPARTMENT OF THE INTERIOR Bureau of Land Management
         Nevada Battle Mountain Field Office
         50 Bastain Road
         Battle Mountain, Nevada  89820

Attn:    Samuel Ault, (775) 635-4050, sault@blm.gov
         Jeffrey Kirkwood, (775) 635-4164, jkirkwood@blm.gov

RE:      Callaghan Complex Draft Wild Horse Complex Habitat (Herd) Management Area and Gather
         Plan Environmental Assessment
         NEPA #:  DOI-BLM-NV-B010-2025-0006-EA

Submitted by: Wild Horse Education, the organization, board and members
Prepared by:   Laura Leigh (Wild Horse Education founder and president) and Tammi Adams (Wild
               Horse Education NEPA Program Coordinator, member, and volunteer)


Good Day,


We respectfully submit the following substantive comments and present information, with reasonable
basis, relevant to the Bureau of Land Management's (BLM's or "Agency") identification and delineation
of a different "Callaghan Complex" (Callaghan, North and South Shoshone, Hickison and Bald
Mountain) wild horse herds.  Our substantive comments require BLM's analyses and response prior to
further development of this Draft and Final Herd Management Area and Gather Plan (HMAP)
Environmental Assessment (EA).

Of utmost importance are new issues presented in this comment document and those issues which BLM
ignored or just failed to respond to from our substantive comments provided for the NEPA scoping
portion of this NEPA process.

For examples:

1. BLM has not provided any explanation for the **proposed change in the identity of the Callaghan
   Complex.**  Historically, Callaghan HMA and New Pass-Ravenswood made up the Callaghan
   Complex.  To evaluate historic management strategies, we need to access the existing Gather-EAs for
   the historic complex.  BLM has removed all of them from any online portals.  South Shoshone was
   managed distinctly.  (*We do recognize that New-Pass Ravenswood should be managed in a joint
   management plan with Clan Alpine, Carson District.  However, historically and recently Clan Alpine
   and the New Pass-Ravenswood horses were removed without ever doing any joint planning.  We
   realize this leaves the Battle Mountain District with only the Callaghan HMA to try to get on a gather
   schedule because, without true transparency, Carson took care of New Pass last year.*)

2. In the 2017/2018 District Manager's report BLM stated: The MLFO is currently working on a wild
   horse Herd Management Area Plan (HMAP) for the South Shoshone HMA in Lander County and the
   Roberts Complex in Eureka County. The South Shoshone HMAP was begun in 2016 with
   coordination with the National Office to create a template for HMAPs (our team lead was involved).
   For BLM to simply switch gears after stating they would move forward with a site-specific, landscape

level analysis of South Shoshone to address historic deficits and flaws and create a complex where none existed and simply create a 68 page gather plan (in fact) is unconscionable. BLM must create the HMAP for South Shoshone that was begun in 2016 that they have said numerous times was "in process" or fully disclose data and analysis to demonstrate why they are shortchanging these HMAs.

3. \*\*_**BLM must also provide narrative to explain WHY and provide data supporting its decision to now include wild horses from the Bald Mountain HMA in this Draft Callaghan Complex HMAP and Gather EA, which was not provided for during the scoping NEPA process. (Obviously our scoping comments did not include discussion of the Bald Mountain wild horse HMA because this information was not previously nor transparently provided to the stake holding public by BLM during that NEPA process.)**_

4. **Please provide any prior gather planning that existed prior to 2024, before the current proposition to change the definition of "Callaghan Complex."** "Official file copies of BLM environmental documents and supporting records must be maintained by the originating office," (BLM NEPA Handbook, H-1790-1, pg.122). Including EAs, EISs, RODs, FONSIs, and NOIs. We, and all stakeholders, must be able to read prior herd-specific planning in order to craft fully informed substantive comments.

5. **Please note that "Under 43 CFR §4710.2 and to assure transparency regarding the disposition of HAs, the authorized officer shall permanently maintain a record regarding the location of all HA boundaries and explanations of any changes in field office files."** (BLM WHB Management Handbook, H-4700-1, pg. 7.) Please transparently provide the public all records regarding the Agency decision to establish the North Shoshone as a "non-managed" herd area, including landscape level analyses of range resources and carrying capacity prior to releasing any Draft form of this EA. _** Noteworthy is the non-checkerboard portion of the North Shoshone was not relegated to the wild horses because of a private livestock owner running domestic horses on federally protected WHB herd lands, and no NEPA process occurred for this decision and BLM is actually in violation of federal law by allowing domestic horses to graze on public lands designated under the 1971 Wild and Free-Roaming Horses and Burros Act (as amended) and 43 CFR._

6. **Please note that the Hickison and Bald Mountain HMAs do not have population exchange with any of the HMAs** in the proposed change to the identity of the Complex. **Hickison and Bald Mountain must be removed from any new "complex" HMAP (H-4700-1, 2.5.2).** _"HMAPs may be prepared for a single HMA or a complex of adjacent HMAs where animal interchange occurs."_

7. _BLM has not provided any data that shows if and how population exchange occurs within any of the HMAs in the newly created Complex, which sets BLM up to violate NEPA, the WFRHBA, and federal law._

8. The **EA track is far too superficial** to address and analyze past, present and future issues, deficits and options in an HMAP NEPA planning procedure (42 CFR §4336(a) & (b)). NEPA requires documents to be "concise, clear, and to the point (40 CFR §§1500.2(b) & 1502.4). **The square acreage, timeframe, and numbers of wild horses and burros impacted alone warrants an EIS**. Furthermore, NEPA requires that cumulative impacts and mitigation strategies must be fully analyzed in an EIS rather than an EA in order to protect wild horses and burros (public value/resource) and address habitat impact issues due to encroachment by discretionary permitted uses. This includes BLM compliance with federal law and the enforcement of removing all domestic horses from HMA/HA lands.

For example: Nevada BLM has **never** completed a landscape level analysis for the Callaghan nor Shoshone, but in 2010 (HMAP EA) and 2012 (Shoshone-Eureka RMP Amendment), BMDO did begin this evaluation for the North and South Shoshone. However, all of this data and information is absent from this "Callaghan Complex" HMAP and Gather EA.

*9.* Furthermore, BLM claims appropriate management levels (AMLs) for the Complex WHB herds were "established" in cited FMUDs. ***In fact, the FMUD "established" AMLs were not based on a landscape level analysis of range carrying capacity and certainly are not based on FLPMA "equity" of multiple use resource allocation***, nor for the protection of WHBs habitat and resources. ***In actuality, the cited FMUDs "established" AMLs and herd area boundaries are based on nothing more than livestock permittee delineation and agreement of WHB use and carried forward for administrative convenience, not site-specific, up-to-date data nor analyses***. Indeed, AMLs must be evaluated and established with landscape level data and analyses that establish an up-to-date range carrying capacity (including climate impacts and up-to-date "key and indicator plant species") in this HMAP process under an EIS.

10. Noteworthy and relevant to this proposed HMAP, is the Court ordered that BLM has "unduly delayed" crafting wild horse and burro Herd Management Area Plans (HMAPs) and given them 1-year to complete the Pancake Complex HMAP. The Court also found the Gather Plan deficient in analysis and remanded it back to BLM. BLM was directed by the Honorable Judge Miranda Du to create a transparent herd management area plan (HMAP), and further directed that BLM cannot proceed with any more gathers/roundups at Pancake until deficits are addressed (i.e., impacts to fire fuels after removing wild horses). These two actions were to be completed by NV BLM at the same time (NOT as a singular document) to allow full public involvement in all aspects of NEPA planning through the HMAP.

Indeed, the Shoshone, Callaghan, Hickison, and Bald Mountain HMA AMLs and any gather/removal actions must include evaluation of impacts on fire fuels and reduction of wildfires. History demonstrates reductions in frequency and size of wildfires where massive removals of WHBs has not occurred, and reports increases in wildfire frequency and intensity in areas of Nevada where massive WHB removals have occurred. (*See* following BLM sourced 2020 Nevada Wildfire History Map.)



### WILDFIRES IN NEVADA: AN OVERVIEW

JANN STINNESBECK, SENIOR POLICY ANALYST
Jann.Stinnesbeck@lcb.state.nv.us

JANUARY 2020

11. Gather/permanent removal and population growth suppression (PGS)/sterilization are management "tools," and triggers for implementation of those "tools" are assessed on a site-specific basis through an HMAP. BLM policy states that WHB herds are managed through an HMAP rather than any LUP/RMP. The Callaghan and Shoshone *(and Bald Mountain)* have set AMLs that were merely carried forward from multiple FMUDs for *administrative purposes* into the cited and incredibly out-of-date 1986 Shoshone-Eureka RMP (the oldest in the country) for *administrative convenience*.

By neglecting creation of HMAPs for wild horses and burros for almost 40-years, BLM has increased the conflicts in the region, not decreased them. The entrenchment of conflict due to neglect must not create a roadblock that inhibits sound agency decision-making for protection of the public resource (wild horses and burros). In fact, by BLM neglecting to create HMAPs since the 1986 federal law passed, they have certainly forgotten what "herd management area planning" actually provides beyond the "need" to gather/remove for the "purpose" of population growth suppression (permanent removals and fertility control/sterilization).

12. The Management Evaluation Report (MER) and this Draft EA provided by Nevada BLM BMDO was not adequate nor sufficient for this NEPA process, such as failure to provide past, present, and reasonably foreseeable mining maps, fencing maps, seasonal and perennial water resources, etc. Referencing data and making assertions *without providing "quick links"* to referenced documents impedes public involvement and transparency of cited data and analyses of information in order for stakeholders to determine accuracy of BLM assertions.

Creating a data-rich HMAP that fully analyzes critical habitat locations and needs of wild horses, mitigation measures when critical habitat is impacted, range improvements, and identifies triggers for implementing § 4710.5 Closure to livestock grazing. The HMAP would not close the area to livestock grazing, but identify triggers for when closure would be addressed, data-based and site-specific.

**The existing Land Use Plan is the oldest in the country.** This LUP has been amended and bent numerous times for livestock (Argenta) and others. For wild horses, this LUP is older than finalization of codification of the 1971 law. **The only way to rectify the sheer neglect of management/protection of wild horses in this area is to complete a thorough and data-rich, transparent HMAP.**

**With great information comes great responsibilities (Stan Lee).**

**Everyone is entitled to their own opinion, but not to their own facts (Daniel Patrick Moynihan).**

*Because this is the Shoshone and Callaghan are the only wild horse herds left in the US that has been left to its true wild state, we encourage the BLM to "get it right."*

**BLM must rectify the egregious error of creating merely a gather plan and not an HMAP. As an example: If this were a gather plan, addressing the lack of a data-based AML would be "outside the scope." The appropriate place to address this deficit would be the HMAP. In fact, it is the only place where the public can currently have any input on issues such as AML, boundary lines, water improvements, identifying triggers to remove livestock, etc. Through BLM's choice in creating merely a gather plan (in fact), you are denying the public the ability to address any actual management concern and repeating the pattern established in gather plans of cutting the public out of commenting on anything except removal/fertility control (population growth suppression).**

The BLM's continued manipulation and use of various fertility control substances placed on-top of each other with "zero" monitoring of the impacts and changes to foaling season or seasonal movement behaviors, the herds under this proposed HMAP are perhaps the only truly natural herds of wild horses managed by BLM in the U.S. *Every effort should be made to preserve these herds in as natural a state as possible.*

The Council on Environmental Quality (CEQ) regulations state that *the information used in any NEPA analysis must be of high quality. Accurate scientific analysis, agency expert comments, and public scrutiny are essential to implementing NEPA* (40 CFR 1500.1(b)).

Information and data provided by BLM in this EA are not adequate nor sufficient for this NEPA scoping process to support public understanding and evaluation, thus leading to non-substantive public comments, thwarting the NEPA process.

For example, the BLM's EA failed to provide the public with information and maps of past, present and reasonably foreseeable multiple uses on the Shoshone and Callaghan (active/abandoned mines, fencing, utility/solar, recreation, overlapping livestock allotments, livestock AMPs/range health evaluations, recreation, etc.). Additionally, *site-specific* data, analyses, and maps are required for accurate scientific analysis and evaluation during NEPA management planning and are in accordance with BLM Policy. Such as trends in utilization (wild horses, livestock, domestic horses, and wildlife), including seasonal/critical habitat, seasonal migration routes, site-specific foaling seasons (analyses of impacts from PGS), seasonal and perennial water resources (historical and present day), etc. Referencing data and making assertions without public provision of quick-links to data and analyses to determine accuracy of assertions violates NEPA and lacks scientific integrity and transparency.

DOI Policy defines *Scientific and Scholarly Integrity* in the *Departmental Manual* and *Presidential Memorandum* further emphasizes the need for transparency and *utilization of best management practices utilizing best available science* and *how employees communicate information for management decisions*.

NOTICE OF APPEAL EXHIBIT 1: APPELLANTS COMMENTS DOI-BLM-NV-B010-2025-0006-EA

*Scientific and scholarly information considered in decision-making must be robust, of the highest quality, and the result of rigorous scientific and scholarly processes.*

*Most importantly, it must be trustworthy.  This also includes how employees communicate information and DOI's scientific and scholarly activities, policymaking, management, or regulatory decisions.*

**\*January 27, 2021 *Presidential Memorandum for Restoring Trust in Government Through Scientific Integrity and Evidence-Based Policymaking***

This Presidential Memorandum Order emphasizes that the Federal government must be guided by the best management practices and best available science.

A Task Force on Scientific Integrity was created and assigned to conduct a thorough review of the effectiveness of agency scientific integrity policies developed since the issuance of the presidential memorandum of March 9, 2009.  More specifically:

> • Consider whether existing scientific integrity policies prevent improper political interference in the conduct of scientific research and the collection of scientific or technological data; prevent the suppression or distortion of scientific or technological findings, data, information, conclusions, or technical results; support scientists and researchers of all genders, races, ethnicities, and backgrounds; and advance the equitable delivery of the Federal Government's programs.
> • An analysis of any instances in which existing scientific integrity policies have not been followed or enforced, including whether such deviations from existing policies have resulted in improper political interference in the conduct of scientific research and the collection of scientific or technological data; led to the suppression or distortion of scientific or technological findings, data, information, conclusions, or technical results; disproportionately harmed Federal scientists and researchers from groups that are historically underrepresented in science, technology, and related fields; or impeded the equitable delivery of the Federal Government's programs.

BLM must analyze and provide management options independent of existing planning to obtain the full and complete intended functionality of the HMAP to guide justified management "actions" (i.e., gather, population control, resource development, mitigation).

**An HMAP both complies with and informs an LUP/RMP.  If analysis within the HMAP demonstrates new information, new science, errors in previous analysis, an omission of actual analysis in prior documents, etc., an HMAP would amend an LUP/RMP (like any mining EIS or change in livestock AMPs).**

**The 1971 Wild Free-Roaming Horses and Burros Act as amended (WHBA, PL 92-195) protects herd areas (HAs) established in 1971 (i.e., North Shoshone HA).  Analysis for management of wild horses in North Shoshone HA must be included.  The Norther portion of Shoshone must also be included in analysis for management and triggers for repatriation as mitigation in order to provide protection and habitat for WHBs.**  Noteworthy, a permittee running domestic horses is NOT sufficient reason to remove all wild horses in an HMA and it was dismissed entirely from analysis when other permittees wanted to run horses (see Mustang Monument and others).

NOTICE OF APPEAL EXHIBIT 1: APPELLANTS COMMENTS DOI-BLM-NV-B010-2025-0006-EA

For example: The BLM's 2016 Pine Nut HMAP includes the "zeroed out" Fish Springs HA as part of the HMAP management plan.  For a plethora of reasons, expanded upon below, the North Shoshone HA must be included in any Callaghan Shoshone HMAP NEPA process.

13.  **Federal court has ruled that an HMAP and Gather EA are distinct documents for distinct purposes.**  BLM is attempting to lump them under a singular "action" EA without provision of management nor monitoring plans for management provisions.  An HMAP (just like an HMP) should analyze long- and short-term management options, such as when would some/all domestic livestock be removed to protect habitat for WHBs, what does TNEB look like quantitatively and qualitatively, and removing/moving obstacles (fencing, abandoned utility lines, ROWs, solar fields, etc.) to improve WHB distribution, reduce resource over-utilization, and actually provide management that allows for population exchange between herds.

The HMAP NEPA process should transparently disclose up-to-date data site-specific information to the public during the NEPA process, demonstrating that *best-available science (BAS)* was utilized to establish AMLs, rangeland historic and present day forage carrying capacity, forage allocation (AUMs) determinations, mitigation.  BLM cannot merely claim that FMUDs made an equitable AML determination, especially when the FMUDs (nor RMP) do NOT provide a landscape level analysis and BLM failed to provide/disclose any data or equations used to set AMLs.  BLM merely provides AMLs for the Callaghan and Shoshone in this MER, which were carried forward for decades as an *administrative convenience* to meet *administrative purposes*.

**In general**, the BLM must comply with and provide for the following in any forthcoming compliant HMAP NEPA process for the Callaghan Complex WHBs.

Powers and duties of the Secretary for the Department of the Interior (16 USC §1333) states,

> All wild free-roaming horses and burros are hereby declared to be under the jurisdiction of the Secretary for the purpose of management and protection in accordance with the provisions of this chapter.  The Secretary is authorized and directed to protect and manage wild free-roaming horses and burros as components of the public lands, and he may designate and maintain specific ranges on public lands as sanctuaries for their protection and preservation, where the Secretary after consultation with the wildlife agency of the State wherein any such range is proposed and with the Advisory Board established in section 1337 of this title deems such action desirable.  The Secretary shall manage wild free-roaming horses and burros in a manner that is designed to achieve and maintain a thriving natural ecological balance on the public lands.  He/She shall consider the recommendations of qualified scientists in the field of biology and ecology, some of whom shall be independent of both Federal and State agencies and may include members of the Advisory Board established in section 1337 of this title.  All management activities shall be at the minimal feasible level and shall be carried out in consultation with the wildlife agency of the State wherein such lands are located in order to protect the natural ecological balance of all wildlife species, which inhabit such lands, particularly endangered wildlife species.  Any adjustments in forage allocations on any such lands shall take into consideration the needs of other wildlife species, which inhabit such lands.

The last sentence *Any adjustments in forage allocations on any such lands shall take into consideration the needs of other wildlife species which inhabit such lands.*  LIVESTOCK IS NOT WILDLIFE nor is livestock a public value like wild horses, and adjustments to livestock forage allocations must be considered before permanent removal and other population control actions are taken against wild horses and/or burros.

**The Secretary is authorized and directed to protect and manage wild free-roaming horses and burros as components of the public lands, and she/he may designate and maintain specific ranges on public lands as sanctuaries for their protection and preservation.**

**43 CFR §4700.0-2**: The objectives of these regulations are management of **wild horses and burros as an integral part of the natural system of the public lands under the principle of multiple use**.

**43 CFR §4700.0-5**: Herd area (HA) means the geographic area identified as having been used by a herd as its habitat in 1971.

**43 CFR §4700.0-6**:

(a) Wild horses and burros shall be managed as self-sustaining populations of healthy animals in balance with other uses and the productive capacity of their habitat.

(b) Wild horses and burros shall be considered comparably with other resource values in the formulation of land use plans.

(c) Management activities affecting wild horses and burros shall be undertaken with the goal of maintaining free-roaming behavior.

Additionally, BLM has the responsibility under the Federal Land Policy and Management Act (FLPMA) to manage the public lands for multiple use (*wild horses and burros*) and sustained yield (*provide habitat for wild horses & burros, **the authorized officer may close appropriate areas of the public lands to grazing use by all or a particular kind of livestock***).

**§ 4710.3 Management areas.**
**§ 4710.3-1 Herd management areas.**

Herd management areas shall be established for the maintenance of wild horse and burro herds. In delineating each herd management area, the authorized officer shall consider the appropriate management level for the herd, the habitat requirements of the animals, the relationships with other uses of the public and adjacent private lands, and the constraints contained in § 4710.4.  The authorized officer shall prepare a herd management area plan, which may cover one or more herd management areas.

**§ 4710.3-2 Wild horse and burro ranges.**

Herd management areas may also be designated as wild horse or burro ranges to be managed **principally**, but not necessarily exclusively, for wild horse or burro herds.

**§ 4710.4 Constraints on management.**

Management of wild horses and burros shall be undertaken with the objective of limiting the animals' distribution to **herd areas**.  Management shall be at the minimum level necessary to attain the objectives identified in approved land use plans and herd management area plans.

**§ 4710.5 Closure to livestock grazing.**

(a) If necessary to provide habitat for wild horses or burros, to implement herd management actions, or to protect wild horses or burros, to implement herd management actions, or to protect wild horses or burros from disease, harassment or injury, the authorized officer may close appropriate areas of the public lands to grazing use by all or a particular kind of livestock.
(b) All public lands inhabited by wild horses or burros shall be closed to grazing under permit or lease by domestic horses and burros.
(c) Closure may be temporary or permanent.  After appropriate public consultation, a Notice of Closure shall be issued to affected and interested parties.

**43 CFR §4710.2**: The authorized officer shall maintain a record of the herd areas that existed in 1971, and a current inventory of the numbers of animals and their areas of use.  When herd management areas are established, the authorized officer shall also inventory and monitor herd and habitat characteristics.

Ms. Leigh was in the South Shoshone with the permittee who claimed there was over 400 wild horses; however, Ms. Leigh strongly disagreed with the permittee's assertion based on her years of observations.  However, BLM simply took the permittee's words as fact and "zeroed-out the area," without provision of databased AMLs nor herd area boundary lines consistent with the 1971 WFRHBA.

BLM has known the boundary lines for the Shoshone and Callaghan were incorrect, and in 2010 and 2012, during NEPA planning for HMAP and RMP amendments respectively, BLM moved forward to rectify those inaccuracies, and Ms. Leigh was part of the BLM team doing the data collection and analyses (*see* Matrix Map below).  The BLM Matrix map not only provides rectified herd boundaries, it establishes the entire Shoshone as a "managed" herd area.

**Continues after map on next page**



The NEPA directs BLM to evaluate cumulative impacts in EAs/EISs, and BLM is directed to effectively utilize mitigation of resource impacts from multiple uses, which must be included in an HMAP if not provided in an LUP/RMP (which they are not).

BLM shall certainly be in violation of NEPA and the WFRHBA should they fail to address multiple use cumulative impacts on the HMAs' habitat and resources identified in this proposed HMAP and Gather EA and provide mitigation triggers and strategies for this NEPA process.  *Noteworthy is BLM continues to ignore the fact that gold is **not** considered a critical mineral and the significant environmental impacts to Nevada and human health and the environment – specifically impacts to scarce and declining clean water resources and forage contamination from air dispersion of contaminated soils and herbicide applications (reclamation processes).*  Multiple use impacts ON the wild horse and burro HMAs must be evaluated in an HMAP and mitigation triggers and strategies provided to ensure habitat and resources are available and provided on the HMAs.  Mitigation strategies should include evaluation of the repatriation of herd areas identified at the time of the 1971 WFRHBA when range, habitat, and/or seasonal use/migration corridors are lost to other multiple uses such as mining, solar/wind fields, geothermal, transmission lines, recreation, livestock grazing, etc.

DOI BLM Mitigation Manual (MS-1794) and Mitigation Handbook (H-1794-1): *The effective use of mitigation allows the BLM to support a wide variety of resources and land uses across the landscape. Mitigation of the impacts from land uses ensures that the varied resources of the public's land continue to provide values, services, and functions.  **Mitigation is what sustains the public's land for present and future generations.***

The Mitigation Manual Section and Handbook also relate to and should be used in conjunction with the National Environmental Policy Act (NEPA) Handbook (H-1790-1), among other policies.

The Mitigation Manual Section and Handbook support the BLM's multiple use and sustained yield mission by providing policies to take a consistent and deliberate approach when identifying, considering, and, as appropriate, requiring mitigation, to address impacts to resources from public land uses.  One foundation of this policy's approach is that the BLM should consider mitigation in advance of making decisions about anticipated public land uses.

The BLM is directed to consider the full mitigation hierarchy and implement mitigation at all relevant scales, while incorporating best management practices.  Effective mitigation is durable, defined by outcomes, implemented and monitored for effectiveness, considered within an adaptive management framework, reported upon, managed by a responsible party, guided by the best available science, and developed through effective, early, and frequent communication with the public land user, cooperating agencies, and other stakeholders, including the public (see H-1794-1, §2.1, pg. 2-1).

The Council on Environmental Quality (CEQ) has defined mitigation in its regulations at 40 CFR 1508.1 to include:
- avoiding the impacts by not taking a certain action or parts of an action,
- minimizing impacts by limiting the degree or magnitude of the action and its implementation,
- rectifying the impact by repairing, rehabilitating, or restoring the affected environment,
- reducing or eliminating the impact over time by preservation and maintenance operations during the life of the action, and
- compensating for the impact by replacing or providing substitute resources or environments (*see* Handbook Chapter 3).

Collectively, the five aspects of mitigation (avoid, minimize, rectify, reduce/eliminate, compensate) are referred to as the mitigation hierarchy because they are generally applied in a hierarchical manner (*see* Handbook Chapter 2.2). All five aspects of mitigation can be summarized as avoidance, minimization, and compensation. Mitigation addresses the adverse direct and indirect impacts to the baseline conditions of resources (including consideration of the quantity, quality, and characteristics of those resources) from public land uses.

The BLM will identify, consider, and, as appropriate, require mitigation, to address reasonably foreseeable impacts, whether or not the impacts are "significant" (as defined by 40 CFR 1508.1). The BLM has authority to require appropriate mitigation under a variety of authorities, including FLPMA (*see* Manual Section 1.3).

The BLM will, through the land use planning process, for resources that are considered important, scarce, sensitive, or **have a protective legal mandate (i.e., herd areas)**, identify mitigation standards and **mitigation standards should seek to achieve a no net loss or net benefit outcome for such resources** (*see* Manual, pg. 2-2).

It may be appropriate for the BLM to require compensatory mitigation for residual effects to authorized range improvements (e.g., fencing). (*See* Manual, pg. 3-8.) All compensatory mitigation obligations should be commensurate with the reasonably foreseeable residual effects from public land uses that warrant compensation and that compensatory **mitigation measures demonstrate the appropriate level of timeliness**. The BLM should evaluate the types of compensatory mitigation measures based on their ability to provide the maximum benefit to the impacted resources (i.e., wild horses and burros).

For example: An oil and gas development project will result in the loss of 650 acres of important WHB summer habitat, even after the consideration and application of the first four aspects of the mitigation hierarchy. Through the NEPA analysis and in the decision document, the BLM determines that the restoration of 650 acres of degraded herd area summer habitat in another part of the population's range would be required as compensatory mitigation.

**Proportionality** necessitates that the amount of compensatory mitigation is approximately equivalent with the reasonably foreseeable residual effects of the public land use that warrant compensation (including consideration of direct and indirect residual effects)

For example: A new road has one acre of direct surface impact, but BLM calculates that the road's traffic, noise, and dust creates 10 acres of indirect residual effects in the form of lost WHB habitat, even after the consideration and application of the first four aspects of the mitigation hierarchy. Therefore, one acre of direct surface impact from the construction and use of the new road would be proportional to 10 acres of habitat restoration at another location.

Compensatory mitigation measures should simultaneously be both commensurate with the residual effects and achieve the maximum benefit for the impacted resources to wild horses and burros.

For example: A new road in a narrow HMA valley will result in the loss of 20 acres of intact riparian vegetation, even after the consideration and application of the first four aspects of the mitigation hierarchy. Through the NEPA analysis and in the decision document, the BLM determines that the restoration of 20 acres of riparian vegetation would be required as compensatory mitigation. While there are many places along the river near the new road in need of riparian restoration, the compensatory mitigation measures will be sited in areas farther away in the same watershed, where the last remaining

degraded riparian acres in an important riparian corridor could be restored and the maximum benefit to the watershed's riparian resources could be achieved.

The BLM should clearly describe in the NEPA analysis and decision document(s) how compensatory mitigation measures are commensurate with the reasonably foreseeable residual effects and achieve the maximum benefit to the impacted resources. Among the compensatory mitigation mechanisms that the BLM will generally consider appropriate, consistent with applicable law are mitigation banks, mitigation exchanges, mitigation funds (also known as in-lieu fee programs), and public land user-responsible compensatory mitigation measures (see Manual, pg. 3-20).

For example: A large solar energy development project will result in the degradation of 23,500 acres of wild horse and burro herd management area, even after the consideration and application of the first four aspects of the mitigation hierarchy. Through the NEPA analysis and in the decision document, the BLM determines that the restoration of 23,500 acres of WHB habitat would be required as compensatory mitigation. To fulfill this compensatory mitigation requirement, the public land user could purchase credits from a mitigation bank or mitigation exchange, in which the credits were generated by restoring this WHB habitat at a vital offsite location.

Mitigation Handbook Chapter 4.5 (pgs. 4-1 through 4-3) states, mitigation strategies may be developed: (1) through the NEPA process to inform a programmatic or large geographic-scale analysis; or (2) independent of the NEPA process and any proposed action or decision (and used to inform future decision-making processes).

The BLM should develop mitigation strategies in an HMAP that encompass the following three scopes: all resources and uses, public land use based, and resource based.

Examples:

- A mitigation strategy that considers all of the reasonably foreseeable impacts to resources (e.g., wildlife, wild horses and burros, plants, air quality, cultural, visual) expected from all the foreseeable public land uses (e.g., oil and gas, rights-of-way, mining, recreation) in a geographic area.

- A mitigation strategy developed for a BLM solar energy zone, which considers the reasonably foreseeable impacts to resources expected from the solar energy development in that zone.

- A mitigation strategy developed for wild horse and burro management area, which considers all of the reasonably foreseeable impacts to wild horse and/or burro habitat and resources from all of the foreseeable public land uses in that management zone.

**Creating a mitigation blueprint to protect essential habitat for use by wild horses is essential given the age of the RMP/LUP.** The BLM should define and provide in the HMAP the geographic area of a mitigation strategy to include the relevant landscape necessary to sustain the relevant resources. This geographic area should be as narrow or as broad as necessary to sustain or otherwise achieve established resource objectives and to effectively mitigate for foreseeable impacts. The BLM should define the geographic area for mitigation strategies with consideration to (not in priority order):

A. The scientifically informed distribution of the resources that will be foreseeably impacted by the public land uses considered in the mitigation strategy (e.g., watersheds, airsheds, species' ranges, rare plant distributions, cultural landscapes, viewsheds, etc.).

B. The geographic extent of public land uses (e.g., oil and gas formations, coal basins, solar energy zones, transmission corridors, recreation areas, etc.).
C. Previously defined geographic areas (e.g., EPA's ecoregions, **habitat management zones**, critical habitat, etc.)

When mitigation standards apply to a specific resource (i.e., rather than a specific geographic location) **the BLM should take a landscape-scale approach to meeting the resource mitigation standard**. This may involve siting compensatory mitigation measures outside of the planning area if that is **where the compensatory mitigation will provide the maximum benefit to the impacted resource** (*see* Manual, pg. 5-2). Compensatory mitigation sites should also be selected to minimize conflicts with other available and conflicting public land uses (e.g., recreation, grazing, energy development).

When amending and/or revising a land use plan, the BLM may consider and incorporate relevant components of a mitigation strategy. Additionally, the agency may commit in a land use plan revision or amendment to developing a mitigation strategy subsequent to the land use plan revision or amendment (*see* Handbook, pg. 5-4, and Chapter 4.5 NEPA analysis).

Handbook CHAPTER 6.  MITIGATION IN NEPA ANALYSES FOR PUBLIC LAND USES (pg. 6-1)
Through the NEPA analysis process, the BLM will, to the greatest extent possible, identify and consider the effectiveness of mitigation to address reasonably foreseeable impacts (both significant and non-significant) to resources (and their values, services, and/or functions) from proposed public land uses (BLM-proposed and externally proposed). The BLM will identify any required mitigation in the decision document(s) associated with the NEPA analysis and include any required mitigation in the land use authorization(s).

**Mitigation should not be an afterthought**; mitigation should be considered early and throughout the NEPA analysis process (e.g., scoping, proposed action, alternatives, environmental effects). For example, for BLM-proposed public land uses, the BLM should incorporate appropriate mitigation into the proposed project's design as an integral component of the proposed action (i.e., project design features). Or, for externally proposed public land uses, the BLM should encourage applicants to propose appropriate mitigation for their public land use.

**Proactively proposed mitigation, particularly best management practices, can lead to better resource outcomes and in some cases reduce the reasonably foreseeable impacts of a public land use to below** "**significance" (as defined by 40 CFR 1508.1)** or other potentially relevant statutory or regulatory thresholds. In conducting its analysis through the NEPA process, the BLM should include other appropriate mitigation measures as part of any other reasonable alternatives. **Mitigation measures included in the proposed action and/or any other reasonable alternatives should be evaluated through the analysis of environmental effects**.

**Where they exist and are relevant, mitigation strategies will be used to inform the NEPA analyses for applicable proposed public land uses**. [Emphasis added.]

Any new or unique circumstances warranting updating or modification of the tiered mitigation should also be considered within the NEPA analysis.

*When preparing an Environmental Assessment (EA), mitigation (including compensation) can be implemented to reduce the reasonably foreseeable impacts of the proposed public land use below the threshold of significance*. When mitigation is implemented in order to reach a FONSI, the BLM's decision document(s) must clearly identify the specific mitigation and monitoring commitments necessary

to reduce the reasonably foreseeable impacts to such a level.  BLM has failed to do so in this NEPA HMAP process.

The BLM NEPA Handbook (H-1790-1) states that the description of the proposed action should describe or reference and summarize the mitigation measures (e.g., best management practices) included in the proposed action (which are also known as ameliorative design elements or design features or applicant committed mitigation measures).

**If a mitigation standard does not yet exist for a resource that is considered important, scarce, sensitive, or has a protective legal mandate (i.e., WFRHBA), the BLM should identify and consider appropriate mitigation standards for that resource (e.g., no net loss, net benefit) in alternatives in the NEPA analysis** (*see* Handbook, pg. 6-4).  In most cases, the analysis should specifically address, in an appropriate level of detail, the compensatory mitigation measures, sites, and mechanisms.  However, in some cases, it may be infeasible to identify specific mitigation details at the time of the NEPA analysis (e.g., exact projects will be determined in partnership with a mitigation fund in a post-ROD process) or illegal or otherwise unacceptable to release this information (e.g., under government-to-government consultation).  In these cases, it is important to specify the anticipated compensatory mitigation measures and to describe why more specific information cannot be disclosed.  If mitigation is not included for some impacts (e.g., those impacts are acceptable), the BLM must provide rationale for this determination in the analysis.

*Mitigation*.  Includes, avoiding the impact altogether by not taking a certain action or parts of an action; minimizing impacts by limiting the degree or magnitude of the action and its implementation; rectifying the impact by repairing, rehabilitating, or restoring the affected environment; reducing or eliminating the impact over time by preservation and maintenance operations during the life of the action; and, compensating for the impact by replacing or providing substitute resources or environments (40 CFR 1508.1).

The BLM must minimizing impacts to the Callaghan and Shoshone wild horses and range by identifying, analyzing, and limiting the degree and/or magnitude of multiple use action impacts and implementations (40 CFR 1508.1).  BLM must provide multiple use impact mitigation strategies in an HMAP, and the mitigation standards that may be identified in law, land use plans, and other decision documents supported by appropriate NEPA analysis.

Creating an HMAP is in full compliance with all existing regulations and land use planning.  However, the proposed alternatives within the HMAP need not adhere to existing planning documents.

For example, the northern portion of the Shoshone should be considered as a "managed" WHB herd area because more than one of the criteria are met.  The wild horses of the Callaghan and Shoshone migrate/exchange between multiple other herd areas and, therefore, data, evaluations, and analyses should be provided in the Callaghan Shoshone HMAP process.

**The function of an HMAP is to both** "**comply and inform" decision-making.  Underlying planning was created before a landscape-level analysis was performed (HMAP) for the Callaghan Shoshone wild horses**.  Therefore, BLM may not be in "compliance" with legal requirements to manage (protect and preserve) wild herds and their habitat that can only be addressed in an HMAP.  Much like a Plan of Operations for a mine (or mining EIS) that approves a proposed action outside the scope of existing underlying documents, *a revision process for land use planning would be initiated should the HMAP find that protection and preservation of herd and habitat require such revision.*

**BLM WHB Handbook (H-4700-1; pgs. 10-11)**:

**2.4.1 Habitat and Population Management**

Habitat or population management and monitoring objectives regarding the management of a specific HMA or complex of HMAs are normally identified in a Herd Management Area Plan (HMAP) rather than a LUP

**2.5.2 Herd Management Area Plans**

Herd Management Area Plans (HMAPs) are prepared under 43 CFR 4710.3-1. HMAPs establish short- and long-term management and monitoring objectives for a specific WH&B herd and its habitat. HMAPs also identify the actions to be taken to accomplish herd and habitat management objectives.

HMAPs tier to and must be in conformance with the applicable land use plans (LUPs). If the proposed management strategy is not consistent with the LUP, then the LUP should be amended, or the proposal should be modified or rejected.

An example of where a determination of an appropriate action that would not require RMP/LUP revision is evaluating and raising AML to address the genetically bankrupt representation of the existing AMLs in the complex. The HMAP is an appropriate and authorized NEPA process for setting a site-specific databased AML (never completed for Callaghan Complex) and AML adjustment.

*AML may be adjusted (either up or down) through the site-specific environmental analysis and decision process required by the National Environmental Policy Act of 1970 (NEPA) (P.L. 91-190). A Development of a LUP [land-use plan] amendment or revision is not generally required. (BLM H-4700-1, 2010, pg. 10.)*

The omission of the HMAP during the creation of planning for other interests should not restrict analysis in the HMAP.

The HMAP can serve in the capacity of generating/informing a Land Use Plan (LUP) revision as the handbook indicates and is how the system works in practice for other interests such as mining and livestock through the site-specific management plan.

BLM has also created a plethora of planning documents that prioritize every other interest on public lands without consideration of resource and management needs for WHBs. This has created a complex process requiring any participant in the NEPA process to engage in extensive research to obtain and analyze deficits in every other planning document that would need amendment to reach full analysis and participation under law.

BLM must include analysis of substantive comment in the HMAP Report generated from scoping. By providing such absurdly limited data, BLM is inviting comments that take the form of "vague, open-ended questions," the very definition of non-substantive comments.

Due to the reasons set forth above, we request a second scoping HMAP EA comment period once BLM completes the scoping report and prior to preparing an adequate and concise draft HMAP.

_____

We submit the following additional substantive comments and present information, on a reasonable basis, relevant to the HMAP development requiring analysis and response.

General Comments:

Any wild horse and burro HMAP should provide the equivalent management, monitoring, and mitigation strategies comparable to any habitat management plan for other free-roaming grazing species on public lands.

In short, if BLM BMDO and MLFO want to "get it right," the following must also be considered:
- Boundary lines must be corrected/rectified and North Shoshone should be "managed." The zeroed-out portion of South Shone must be evaluated for use by wild horses, as a permittee running domestic horses is not a sufficient reason to remove wild horses and has been rejected as an option (*see* Mustang Monument, and provided 2012 BLM Matrix Map and boundary corrections)
- Evaluate AMLs – since the Callaghan and Shoshone wild horse population has grown beyond *administratively set* (for administrative convenience and purpose) AMLs, wildfires are less frequent and destroy less acreage throughout the Callaghan and Shoshone, especially when compared to other WHB herd areas where large scale permanent removals have occurred (*see* provided BLM 2020 Nevada Wildfire Map). In fact, this Nevada Wildfire Map clearly demonstrates that where there have been mass removals of WHBs, wildfire events have increased in frequency and impact. At what AML did this impact occur?
- Update/amend oldest RMP in the country (Shoshone-Eureka) to fix mining and livestock grazing to create equitable management of WHBs
- Mining has significantly increased in the Shoshone and Callaghan
- Recreation has significantly increased in the South Shoshone
- Hunting has increased in the South Shoshone
- Historical and present day illegal activities. There are several "pits" up the Shoshone containing carcasses of wild horses, all near visible hunting camps
- Battle Mountain would make a wonderful summer tourist destination for wild horse and burro observation, especially if informational kiosk were established along the 305. The wild horses can only find water now near the 305 due to groundwater impacts from decades of mining, and the 305-fence line should become the Shoshone boundary.
- Per our observations, cattle guards near the 305 have filled with mud, endangering the wild horses and the public
- Populations in the Complex have stabilized and demonstrate self-regulation (*see* BLM's MER provided data compiled below) and comparisons of AMLs and wildfire trends need analysis
- Evaluate impacts of predation on population growth. Include mountain lion population information to compare with existing growth rates.

## 1. BLM must undertake the NEPA EIS analysis track for the Callaghan Complex HMAP

How shall NV BLM address and analyze past, present, and future issues, deficits, mitigation, and options for the 1+Million acre Callaghan Complex in the HMAP NEPA process (pointedly without any adequate maps)?

BLM NEPA Manual H-1790-1, §1.3, pg. 2: DOCUMENTS USED TO MEET NEPA REQUIREMENTS
The BLM uses various types of documents to meet our NEPA requirements. Environmental analysis documents, which must be made available to the public, include environmental impact statements (EISs) and environmental assessments (EAs) (40 CFR 1506.6(b)). If a proposed action will have a significant environmental impact, you must prepare an environmental impact statement (EIS) (40 CFR 1502.1).

The EA track is far too superficial to address and analyze past, present and future issues, deficits and options. The square acreage, timeframe, and numbers of wild horses and burros impacted alone warrants

an EIS.  In addition, cumulative impacts and mitigation strategies must be fully analyzed to protect wild horses (public resource) and address habitat issues due to encroachment by discretionary permitted uses. Nevada BLM has never completed a landscape level analysis for the any of the WHB herds included the Callaghan Complex.

*As defined under NEPA, an EA function is to essentially piecemeal planning due to their limited scope, while EIS function is a more holistic, landscape-level planning and includes mitigation.*

The Callaghan was previously combined with the New Pass-Ravenswood for gathers.  The Callaghan, Shoshone, and Hickison currently defined by BLM as a "Complex," yet includes non-contiguous herd areas spanning over 1 million acres, and requires a landscape level analysis only an EIS can provide.

BLM must create an Environmental Impact Statement (EIS) and not the lesser Environmental Assessment for this HMAP.  There has never been a landscape level analysis of WHB range, habitat, and resources in the Callaghan Complex.  In-depth site-specific data must be made available for public review as well as analysis of science-based management options.  The landscape level analysis for the Complex is long overdue.

**2.  North Shoshone HA Must Be Included in the Callaghan Shoshone HMAP**

BLM has known since its 2012 RMPA analyses that Shoshone herd area boundary lines were incorrect and that the North Shoshone had adequate forage, water, cover, and space to sustain health wild horses and healthy range over the long-term (H-4700-1, H-1601-1, and 43 CFR §4710.1).  Analysis and trigger identification for repatriation of North Shoshone HA must be included in the HMAP.

BLM begins the Management Evaluation simply by stating they "will not" evaluate the North Shoshone in the HMAP.  However, the HA has abundant cover and resources to support thousands of livestock AUMs and other free-roaming grazing wildlife and should be evaluated as part of the HMAP, even if just for mitigation of other multiple use impacts.

BLM must include the data, which serves as a basis for the assertion to not include the North Shoshone HA in the NEPA HMAP process.  Historically, and as this HMAP Scoping is occurring, there remains a population of very healthy wild horses in the HA, along with thriving populations of other free-roaming grazing ungulates (mule deer, pronghorn antelope, and big horn sheep).  The HA and repatriation must be included in the HMAP, including a monitoring plan and setting an AML of greater than "0" to bring the paperwork in line with reality.

Monitoring is vital at Shoshone in light of the historical and ongoing illegal activities (shooting deaths of wild horses in the area), and because the perpetrators that have not been held to account nor even investigated by BLM.

***BLM can NOT simply claim the North Shoshone should be an HA and hide behind fear of conflict and assertions; site-specific data and analyses must be provided.***

Creating an HMAP is in full compliance with all existing regulations and land use planning.

The function of an HMAP is to both "comply and inform" decision-making.

**3. AMLs must be evaluated and set/revised during a landscape level analysis within the HMAP**

The BLM has never transparently provided any site-specific data, methods, analyses, nor evaluation processes identifying the establishment of site-specific AMLs for any herd within the "Callaghan Complex."

Indeed, the Shoshone, Callaghan, and Hickison AMLs and any removal/gather plans must evaluate impact on fire fuels and potential reduction of wildfires (see provided 2020 BLM Nevada Wildfire Map).

Furthermore, the AMLs have never been evaluated based on achievement of a thriving natural ecological balance (TNEB). The AML was not evaluated based on any rangeland health data nor forage carrying capacity of the rangeland, they are simply based on permittee agreements in FMUDs without provision of any data. Multiple years of site-specific rangeland health data, historical to present, are required to complete adequate AMLs for the herds and must be based on up-to-date, best available science and methods, as stated in the DOI BLM Manual and Handbooks.

Previous reviews of BLM's setting of AMLs consistently reported that established AMLs were not based on thorough assessments of range conditions. The U.S. District Court for the District of Nevada, IBLA, and GAO all noted that AMLs of many HMAs in the 1970s and some in the 1980s were based on administrative decisions rather than information about the carrying capacity of the range (Dahl v. Clark, 1984; 109 IBLA 119; GAO, 1990). National Academies of Sciences, Engineering, and Medicine 2013 Report to BLM (*see* Sec 7, pg. 197.)

Although the legislation calls for setting AMLs to maintain a thriving natural ecological balance and to prevent rangeland deterioration, these terms are uninformed by science and open to multiple interpretations; precise definitions would improve the ability to use them as goals for management. For example, the concept of a thriving natural ecological balance does not provide guidance for determining how to allocate forage and other resources among multiple uses, which ecosystem components should be included and monitored in the "balance," or when a system is considered to be out of balance. It brings up arguments over whether such a balance exists in nature or is even possible. (*See* National Academies of Sciences, Engineering, and Medicine 2013 Report to BLM, Sec 7, pg. 227.)

Reasons Given by Managers for Setting and Adjusting Appropriate Management Levels: Often, the forage allocated for existing livestock grazing privileges in an HMA was subtracted from total forage availability to determine the amount available to wildlife and horses. National Academies of Sciences, Engineering, and Medicine 2013 Report to BLM. (See Sec 7, Box 7-1, pg. 228.)

The Wild Horses and Burros Management Handbook (H-4700-1) was written in response to a critique by the Government Accountability Office (GAO) stating that, as of 2008, BLM had not provided formal guidance to its field offices on how AMLs should be established and that there was a lack of consistency in setting AMLs in the agency (GAO, 2008). (National Academies of Sciences, Engineering, and Medicine; 2013; Sec 7, p 197).

BLM Policy H-4700-1, §4.2.2 Establishing or Adjusting AML An interdisciplinary and site-specific environmental analysis and decision process (NEPA) with public involvement is required to establish or adjust AML.

BLM Policy H-4700-1, §4.2.2.1 Establishing AML When establishing AML, the analysis shall include an in-depth evaluation of intensive monitoring data or land health assessment. Intensive monitoring data shall include studies of grazing utilization, range ecological condition and trend, actual use, and climate (weather) data. Population inventory, use patterns, and animal distribution should also be considered. A

minimum of three to five years of data is preferred. Progress toward attainment of other site-specific and landscape-level management objectives should also be considered.

The HMAP EIS is an appropriate and authorized process for setting databased, site-specific AMLs, AML adjustments, and scientifically defining what a Thriving Natural Ecological Balance means and data analyses required to evaluate TNEB. The AML may be adjusted (either up or down) through the site-specific environmental analysis that generates data (past and present) and supports a decision process as required under the National Environmental Policy Act of 1970 (NEPA) (P.L. 91-190).

The appropriate management levels (AMLs) for WHB herd management areas are to be adequately established/verified under the NEPA process within the creation of herd management area plans.

Based on BLM MER provided data, AMLs of 60-100 for the "Callaghan Complex" are absurdly low for a 1.18 million acre complex where exchange of populations is becoming more limited due to livestock and mining threatening any assertions of stability. BLM must disclose an actual databased equation for how AMLs were established. An evaluation to set a new science-based AML must occur. Populations in the complex have reached more than 1,700. A true AML would be closer to actual populations of today rather than what BLM set through historical agreements with permittees.

The BLM cannot infer, evaluate, nor mitigate cumulative impacts to wild horses from "multiple use" management actions without site-specific AMLs and TNEB "definitions and evaluation methods" that are crafted independently of existing planning to obtain the full and complete intended functionality of the HMAP to guide justified BLM management actions.

The Agency's evaluation of cumulative impacts to the wild horses would be merely anecdotal and misleading without site-specific herd management area plans and up-to-date site-specific AMLs. This is significant because any proposed removal of wild horses from these HMAs would be based on unsubstantiated AMLs and an "excess" that is irrelevant of TNEB. In fact, neither of which are supported with new and best available science nor up-to-date site-specific range health evaluations considered adequate under NEPA, FLPMA, or Agency Policies for provision within herd management area plans.

## 4. Fire Fuels Impact Consideration (AML)

Analysis should include the benefits of wild horses on cheat grass and other fire fuels in comparison with domestic livestock and wildlife species. BLM cannot simply state, "domestic livestock are used for fire-fuel reduction" as a "best and fair use" without supporting data nor analyses. Current databased research indicates there are far fewer invasive weeds (fire fuels) where wild horses (and burros) are present, and livestock is not.

BLM has never addressed how many WHBs should be on the range so they can perform a beneficial use removing fire fuels and reducing wildfires. Therefore, wild horse (and burro) beneficial impacts on fire fuel and wildfire reduction should be factored into AML evaluations.

## 5. Foaling Season Must Be Site-Specific Evaluation/Determination

There is not one wild horse goal or objective in the RMP identifying site-specific up-to-date evaluation of foaling seasons, especially considering cumulative impacts from haphazard implementation of a plethora of population growth suppressions/fertility controls.

Yet management goals and protections are established under other HMPs yet not carried forward to protect wild horses (a federally protected public resource) during sensitive periods of their life cycles such as foaling season.

Current BLM policy states, "Foaling period can be documented for each population (individual HMA or HMA complex) through direct observation. The capture of wild horses by using a helicopter to herd the animals is prohibited during the foaling period, which is defined as six weeks on either side of the peak of foaling to assure that young foals are mature enough to be able to remain with their band during gather activities. This period is generally March 1 to June 30 for most wild horse herds. Helicopters may be used year-round in the removal of burros. See BLM Manual Section 4740.1." (See H-4700-1, §4.4.4, pg. 20.)

Despite documentation of gathers taking place during peak foaling seasons (Idaho Owyhee in September 2023, Clan Alpine July-Aug 2023, Pancake July 2023, etc.), BLM fails to complete this essential monitoring and reporting, and fails to consider the cumulative impacts to foaling seasons from the plethora of population growth suppression/fertility control administration given at various times of the year, which skew actual wild horse foaling seasons.

BLM relies on outdated and anecdotal information to define a broad and baseless timeframe for wild horse and burro foaling seasons from March 1 until June 30 (from the 1980s).

BLM must create a databased foaling season for each wild horse herd included in an HMAP. Because BLM is prohibited from doing helicopter drive-trapping during foaling season, the HMAP must provide site-specific analyses.

BLM's outdated and generalized statement completely ignores the PROHIBITION on the use of helicopters 6 weeks prior and 6 weeks post peak foaling season. Essentially BLM is saying the prohibition during foaling season is meaningless, and we can manipulate natural foaling season with drugs and ignore the prohibition if foaling season changes outside scheduling dates created long before BLM began using fertility control.

This is pure neglect of best management practices and best available science of site-specific analysis to comply with one of the only areas where law prevents immediate harms to WHBs from a gather that is mitigated through federal law prohibition.

**6. Population Growth, Fertility Control, and Predation should be analyzed on a site-specific basis**

Overall population growth within the wild horse herds is demonstrated by BLM provided MER data to be between 9.5% and 12%, far below BLM's generalization of 20% to 25%. Compiled BLM provided data from 2009-2024 clearly establishes an overall population growth rate for the Callaghan Complex to be less than 12%. Noteworthy, is the population actually declined significantly and alarmingly (-13%) between 2023 and 2024. Furthermore, it is evident that very healthy wild horse populations have stabilized in accordance with environmental conditions, thus proving sustainable AMLs at these populations.

| YEAR | BALD MOUNTAIN | CALLAGHAN | SOUTH SHOSHONE | TOTAL | **Population Growth Rate (%)** | |
|---|---|---|---|---|---|---|
| 2024 | 205 | 787 | 1971 | 2758 | -13 | |
| 2023 | 940 | 1147 | 2034 | 3181 | 11 | |
| 2022 | 839 | 1024 | 1812 | 2836 | 5 | |
| 2021 | 796 | 971 | 1723 | 2694 | 2 | |
| 2020 | 669 | 814 | 1148 | 2631 | 7 | |
| 2019** | 562 | 684 | 1217 | 2463 | 25 | |
| 2018** | 508 | 602 | 858 | 1968 | 25 | |
| 2017 | 427 | 425 | 721 | 1573 | 13 | |
| 2016 | 359 | 425 | 606 | 1390 | 5 | |
| 2015 | 334 | 512 | 476 | 1322 | 19 | |
| 2014 | 281 | 430 | 400 | 1111 | 36 | |
| 2013 | 211 | 322 | 282 | 815 | 8 | |
| 2012 | 179 | 279 | 298 | 756 | 13 | |
| 2011* | 160 | 249 | 259 | 668 | 8 | |
| 2010# | 135 | 264 | 220 | 619 | 50 | |
| 2009* | 152 | 157 | 103 | 412 | | |
| | | | | | | |
| Total Avg. | | | | 1700 | 14 | **Avg. Pop Growth Rate 2009-2024 (%)** |
| Population Avg. | 331 | 568 | 883 | 1783 | 12 | **Avg Pop Growth Rate 2011-2024 (%)** |
| | | | | | 9.5 | **Avg. Pop Growth w/o identified outlier and guesstimates** |

BLM ESTIMATED WH POPULATION: 2009-2024 (MER 3/24/25)

# Estimate outlier

* BLM Gather and Fertility Control @ Bald Mountain and Callaghan

**Years with 25% population growth are questionable as BLM uses this value to guesstimate when no actual data collected.

Population Growth Suppression (PGS)/fertility control is not a benign management strategy and "tool" with a "one size fits all" application. This is certainly noteworthy for appropriate managment of the Callaghan Complex wild horses, and the evaluation and triggers requiring PGS on these herds is certainly warrented for an HMAP.

Even the least impactful method biologically (PZP) has extensive impact to foaling season. The time of year of application, the wide range of efficacy duration, can not only increase the length of time of foaling season, it can skew it to an entirely different season (i.e., from spring to fall). It can also create more than one "peak foaling" time due to treatment time at one operation and treatment time at another.

The impact to foaling season applies to any type of PGS vaccine or IUD.

Application of PGSs such as GonaCon have never been analyzed to address its impact on foaling season. GonaCon has a long efficacy range from 4-10 years, and even life-long, in the application protocol being used by BLM. How this impacts any (if any) return of foaling season has never even been discussed, let alone analyzed, before BLM employed broad application aimed at keeping numbers down to those acceptable in management plans for all other grazers on the range.

In addition, long-term health consequences to WHBs from application of heavy doses of hormones, including cancers, have never been studied. We are seeing an increase in the number of wild horses captured with cancers as reported by Nevada BLM. If this is due to GonaCon or other environmental

factors (spraying of herbicides, contaminated water resources, contaminated forage from uptake of herbicide chemicals, etc.) remains unknown.

The MER provides no genetic evaluations of the populations of wild horses.  Any form of PGS or permanent sterilization on wild horses, where AML is set at a level that represents genetic bankruptcy, should be strictly forbidden in the HMAP.

Significantly important is the failure of BLM to provide any analyses of predation and mortality of the herds in this MER.  Predation must be included in population modeling for this area.  Mountain lion population information must be included and analyzed, especially in concert with AMLs.  Perhaps some WHB herd areas/HMAs have no predation, however, this area *has* predation.

**7.  Define the definition of "excess" wild horses specifically for the "Callaghan Complex," as AML alone is not a determination of excess.**

(H-4700-1, 4.3) DETERMINATION OF EXCESS
Before issuing a decision to gather and remove animals, the authorized officer shall first determine whether excess WH&B are present and require immediate removal.  In making this determination, the authorized officer shall analyze grazing utilization and distribution, trend in range ecological condition, actual use, climate (weather) data, current population inventory, wild horses and burros located outside the HMA in areas not designated for their long-term maintenance and other factors such as the results of land health assessments which demonstrate removal is needed to restore or maintain the range in a TNEB.

The term "excess animals" is defined as those animals which must be removed from an area in order to preserve and maintain a thriving natural ecological balance and multiple use relationship in that area (16 USC § 1332(f)(2)).  This definition underscores the need to remove excess animals before damage to the range begins to occur.

BLM has never clearly defined what constitutes a determination of "excess" because they have never provided rangeland data nor determination analyses that impacts to TNEB are attributed to wild horses alone.  Additionally, BLM has never provided rangeland data and TNEB analyses demonstrating that the range returns to a TNEB after removals of WHBs.

"This Court is not saying that the BLM is free to round up wild horses whenever a particular range has an overgrazing problem.  Nor is the Court saying that every time the removal of wild horses will have a limited, slightly positive effect on the environment of the range, the BLM can proceed to remove a certain number of those horses."  (*American Horse Protection Ass'n v Frizzel*, 203 F. Supp. 1206 (D. Nev. 1975).)

BLM has consistently defined "excess" by relying on AMLs that were determined through permittee agreements in the 1980s and not through landscape level data and analyses nor multiple use equitability.  The range damage BLM cites has never been obtained through any rangeland monitoring plan for wild horses, but a plan that monitors livestock grazing damage alone.  BLM has never distinguished livestock grazing impacts to rangeland health from wild horse impacts.

BLM must quantitatively and qualitatively define "Thriving Natural Ecological Balance" for the range and resources and specify what triggers would determine "excess" wild horses in an HMAP.

This could be accomplished in conjunction with defining SMART objectives.

Case 3:26-cv-00423-MMD-CSD    Document 23-2    Filed 06/10/26    Page 25 of 43

Page **24** of **42**

**8. Gather methods must be analyzed on a site-specific basis, including provisions for enforceable humane treatment and handling**

WHB Gather plans should comply with the herd management plans (HMPs) for other wild, free-roaming species such as deer, elk, pronghorn, bighorn sheep, etc. WHB Gather plans tier to management plans for greater sage grouse. WHB Gather plans tier to Allotment management plans for domestic livestock. None of these HMPs conform in any way to the critical habitat and forage/resource requirements/needs of wild horses and burros.

BLM states that wild horses interchange and can be found throughout the plan area at different times of the year. However, the only map that BLM provided in the MER delineated a gather area well beyond the proposed plan area boundary and is merely defined by the base of the valley. Any proposed gather ("tool" of management) area must be included as an HMA for evaluation in the HMAP, as the environmental impacts of a "gather" must be included in any future Gather EA that must conform to the HMAP.

Nevada BLM did not provide a single map of utilization, migration routes, or seasonal use areas in the MER. Because BLM WHB Program is notorious for providing anecdotal and misleading maps of WHB HMAs/HAs that even lack keys, we request Nevada BML provide high quality mapping for the HMAs and HA for public review. The map(s) should, at a minimum, include data and demonstrate analyses of wild horse utilization and trends that support BLM's claim that wild horse use remains at the upper elevations during the summer as long as the forage and water last. As these resources are depleted, or when snow drives them down (as early as September in some years), they move off the mountains and into the valleys.

How shall BLM evaluate WHB HMAs and HA for movement/migration/seasonal patterns, and gather trap sights and without any maps nor studies demonstrating migration and seasonal use patterns?

Because, instead of moving traps closer to the locations of wild horses to provide safer travel distance, BLM pushes wild horses (and burros) toward trap sites set for human convenience. These same gather trap sites continued to be utilized by BLM even after all wild horses/burros in a 5-mile radius had been removed, and wild horses/burros are driven, often over very rough terrain, for more than an hour.

How shall NV BLM analyze and provide for the safe capture of wild horses in this HMAP?

Because simply slapping a copy of an unenforceable BLM Comprehensive Animal Welfare Program (CAWP) as an appendix for supplemental information has repeatedly proven disastrous for the welfare and humane handling of our wild horses.

BLM has never analyzed current veterinary standards for "Heat Indexes" nor "Air Quality Indexes" in any process, ever. At Pancake and other Nevada WHB HMAs, wild horses and burros of all ages and health conditions were driven over multiple days during intense wildfire smoke. During the gather, mandated Statewide air quality alerts were issued for both humans and animals at the orange alert index (101-150, dangerous for sensitive), and at the most severe air quality index, maroon (301 and higher, so dangerous humans are told to stay inside with windows closed and run an air purifier and take precautions to protect animals).

NOTICE OF APPEAL EXHIBIT 1: APPELLANTS COMMENTS DOI-BLM-NV-B010-2025-0006-EA

As climate change increases, risks of dangerous heat levels, wildfires, and impacted ambient air quality increase as well. The Nevada BLM has a duty to analyze these potential cumulative impacts (NEPA, 40 CFR §1508.1(g) (3)) to WHBs in any herd management planning strategy.

In addition to the specific comments above, we have witnessed and documented at an overwhelming number of other Nevada gathers of WHB herd: unsafe roads used for transport; excessive hot shot use to speed loading; helicopters flying too fast and too low; dirty trailer floors causing unsafe transport conditions; crowding of trailers; hitting with paddles (including the face); and just about every other issue that is egregiously systemic during wild horse (and burro) gathers.

Furthermore, we have tracked WHBs into holding to continue to monitor impacts from gather. On average: 1 in 9 will die in the first 6 months. More recent events have demonstrated even higher mortality rates from BLM removals of WHBs.

BLM has utilized the exact same capture methods for both wild horses and burros that they have used since the first helicopter roundup over 40-years ago, and they have never provided any public analyses on capture methods in those 40-years.

Undeniably, the BLM consistently hides/obscures public observation of the actual trap pens and loading methods for wild horses (and burros). Historically, handling of wild horses has proven less than humane. Our observations and documentations include wild horses (many heavily pregnant) and newborn foals being driven for miles/hours over rough terrain, foals dying of dehydration, orphaned foals left alone on the range, excessive hotshot use to expedite loading, roping of young foals and dragging by the neck, broken legs/necks due to poor chute/trap placement, etc. These egregious actions have been documented to occur by both BLM and roundup contractor personnel. The more WHE documents these atrocities, the farther away BLM puts our observers from trap sites, sometimes over 4-miles from trap or without any view of gather actions at all.

Indeed, BLM policy (H-4700-1, 43 CFR §4700) prohibits the use of helicopter drive trapping during foaling season. Heavily pregnant mares are susceptible to spontaneous abortions, young foals fall victim to trampling, dehydration, abandoned and left behind with little to no BLM pursuit, etc. Consequently, site-specific foaling seasons must be unambiguously determined by BLM for WHBs.

BLM has not and does not allow public input/analysis on CAWP.

BLM does not allow nor provide analysis/input in gather plans.

BLM does not allow input on gather methods in RMPs or LUPs.

BLM does not provide follow-up analyses nor findings from the mandatory Motorized Vehicle Hearings.

BLM seems to simply say, "We are not going to analyze these concerns anywhere."

Indeed, if BLM claims that comments and analysis of the action of "gather" are not appropriate in an HMAP, then BLM must provide the name of the appropriate process under NEPA.

The BLM must also include impacts to wildfire fuels with the removal of wild horses from the Callaghan Complex.

**9. BLM must provide range data to prove that past removals achieved the goals and objective of Thriving Natural Ecological Balance prior to approving removals as a strategy to reach said goal.**

BLM has never shown that removals of wild horses from any wild horse and/or burro (WHB) herd area achieves a TNEB.

The BLM states that they set the AML at a level that would achieve a thriving natural ecological balance and rangeland health. That statement is simply false and misleading and not backed by any BLM provided data nor analyses.

Please provide all rangeland health assessments pre- and post-roundup operations over the last 40 years to support the claim that removals of WHBs achieve a TNEB, including analyses of other contributing factors such as livestock and climate to create alternatives better suited to achieving TNEB.

**10. Data Disclosure/Monitoring Plan Must Be Included in HMAP Specifically for Wild Horses**

Where is the past and present required monitoring data?

The BLM planning regulations (43 Code of Federal Regulations 1610.4-9) require the monitoring of RMPs on a continual basis with a formal evaluation done at periodic intervals. All BLM Nevada land use plans are monitored and formally evaluated at 5-year intervals after the plan is approved. In some cases, formal evaluations may occur more frequently than every 5 years, if appropriate. Monitoring plan decision implementation is an essential component of natural resources management because it provides information on the relative success of RMPs and specific management strategies. Implementation monitoring will be completed annually and will be documented in a tracking log or report, which will be available to the public. Effectiveness monitoring strategies will be developed as allowable uses and management actions are implemented.

Monitoring for each resource program is outlined in the "Management Decisions" section of the Approved Plan. Monitoring also is an integral part of adaptive management and is a key component to achieving the management goals and objectives of the RMP. Tracking the progress of management actions and measuring changes resulting from these activities is important in either determining success or the need for a different management approach. Monitoring results will provide information to determine whether objectives have been met, and whether to continue or modify the management actions. Findings obtained through monitoring, together with research and other new information will provide a basis for adaptive management changes. Within this framework, if monitoring shows land use plan actions or best management practices are not effective, the BLM may modify or adjust management without amending or revising the plan if we are in conformance with the Approved Plan. In those cases where the BLM considers implementing actions that will alter or not conform to the overall direction of the Approved Plan, the BLM will prepare a plan amendment or revision and environmental analysis of appropriate scope.

RMP Livestock Grazing: Monitoring to assess rangeland health standards will include records of actual livestock use, measurements of forage utilization, ecological site inventory data, cover data, soil mapping, and allotment evaluations or rangeland health assessments. Conditions and trends of resources affected by livestock grazing will be monitored to support periodic analysis/evaluation, site-specific adjustments of livestock management actions, and term permit renewals. Monitoring will determine when grazing will be authorized in burned areas and will contribute to the selection of prescribed burn treatments or other types of treatments based on attainment of resource objectives.

NOTICE OF APPEAL EXHIBIT 1: APPELLANTS COMMENTS DOI-BLM-NV-B010-2025-0006-EA

The RMP requires monitoring for a plethora of approved resources, including, but not limited to, recreation, ROW, forest/woodland products, geology and mineral extraction, air (CAA), water (CWA), soils, vegetation, noise, greater sage grouse, desert tortoise, big game, raptors, etc.

The BLM is encouraged to utilize and share monitoring information with sister-agencies like USFS, USGS and others.  BLM certainly has access to high quality and detailed topographic maps from "sister-agencies" that identify roads/ROWs, elevations, perennial/seasonal water resources, livestock allotments and allocated AUMs, multiple uses (past, present, and reasonably foreseeable future/proposed), abandoned mines, air quality, water quality, soil testing for contaminants, etc.

Please provide rangeland-monitoring plans (goals, objectives, and frequency) for habitat and resources specifically for the Callaghan Complex including the same details/parameters as the previously identified in other HMAP/HMP monitoring plans for public review prior to any forthcoming Callaghan Complex Draft HMAP document.

NOTHING in the monitoring plan in this HMAP is geared to do anything except determine a gather.

Monitoring must identify crucial habitat needs to allow for appropriate mitigation of loss or impact.

BLM created a recreation area that encompasses the entire South Shoshone HMA and does not include monitoring of impacts and/or looking at what appropriate mitigation measures are.

By lumping these HMAs together and not completing a site-specific HMAP for each HMA, BLM is creating another nonspecific document that does not provide appropriate guidance to collect necessary data to determine impacts to wild horses and their habitat and the management actions necessary to protect that habitat or mitigate the loss of habitat to mining/livestock/recreation/etc.

## 11. Mitigation (No Net Loss, No Net Gain)

NEPA, FLPMA, and Agency Policies mandate that mitigation of impacts be evaluated, analyzed, and monitoring planned for in the NEPA process.

For example:
RMP  – Wildlife Water Developments: WL-20: Use the criteria listed below to identify artificial wildlife water developments:
• To mitigate for loss of natural water sources;
• To mitigate for habitat loss or habitat fragmentation;
• To reduce inter-specific competition between wildlife, livestock, and wild horses;
• To reduce inter-specific competition between wildlife species; and
• In suitable wildlife habitat that is water limited.

RMP Objective WHB 3: Ensure WHB have safe, unencumbered access to water within HMAs.
Action WHB 3.1: In accordance with State of Nevada water law, develop alternate waters within HMAs when existing water sources that are used by WHBs have been impacted by either natural or man- caused events that render water unavailable.  Development of artificial water sources will not be used to increase WHB populations, but will make water available to support AML or distribute WHB use on available habitat.

Action WHB 3.2: In accordance with Nevada water law, acquire water rights for WHB within HMAs

BLM notes "limited water" resources on the Callaghan Complex. Yet, BLM permits both mining and livestock in the area with no mitigation of habitat nor resources for wild horses.

The HMAP must include water improvement analysis to distribute and sustain wild horse populations and mitigation for loss of resources and habitat from livestock, mining, and other multiple uses.

Specific mitigation evaluation is critical in the HMAP. Example: When BLM was approving Fiore Gold and cutting off clear access to limited water, the mine was willing to drill wells and maintain them for wild horses. BLM would not approve the measure and fought it on Appeal. Indeed, BLM then approved a water pipeline for livestock use, expanded livestock range, and did not consider wild horses before approving the "livestock range improvement" without requiring that the water remain turned on for wildlife and wild horses. This entire scenario is unacceptable.

BLM has never collected data to distinguish cattle use from wild horses and has repeatedly attributed cattle impact to wild horses. PEER published a report that demonstrates that the BLM even weighs wild horse impacts far greater than livestock, noting: "If the agency used the same approach for calculating the area of influence of livestock within BLM grazing allotments on sage grouse habitat as it did for wild horses and burros, the area of influence for livestock would be roughly 14 times that given in the report and more than six times that of wild horses and burros." (PEER, 2014)

The HMAP must be crafted in a way that protects the Callaghan Complex WHBs from loss of resources and habitat required for their survival and provides for mitigation of lost habitat and resources.

BLM must apply for and maintain water rights/permits for wild horses and burros and maintain those permits. BLM has repeatedly failed to apply for and renew existing water permits.

Distribution of water sources is a key component to distribute all grazing animals throughout a range. Distinctions in distance to water and slope of terrain directly effect distinct species utilization. "The 2 mile bashed landscape on the flat" is not from wild horse use, it is from domestic livestock/cattle.

If conflict exists at current water resources, BLM can reduce conflict by creating water improvements on terrain that has more than a 30-degree slope. The additional water resources will reduce conflict and impacts.

(H-4700-1, 3.4.1.4)
Actions to ensure water is available to WH&B may include:
•       Entering into Cooperative Range Improvement Agreements (Form 4120-6) whose terms and conditions require water to be made available to WH&B and wildlife.
•       Using WH&B program funding (in whole or part) for construction and/or maintenance of a well, spring development, catchment, pond, or other permanent water improvement providing WH&B with access to water on public land.
•       Acquiring the necessary water rights in order to provide and maintain access to water sources. Refer to BLM Manual 7250 (Water Rights).

BLM has always had the ability to obtain water permits. The public has always had an expectation that BLM would not simply approve grazing privately owned livestock on public forage, nor approve and often pay for either construction or maintenance of those improvements for privately owned livestock, but would ensure that BLM obtain water permits to sustain genetically viable herds of wild horses and burros. Regardless of contention (or personal relationships with permittees), BLM needs to do the paperwork to maintain and provide water resources for wild horses and burros.

In July of 2011, the Nevada Supreme Court affirmed that the BLM is entitled to stock water permits in its own name.  BLM remains free to pursue water permits statewide and reallocate them to service grazing permits on its lands and for use by the only heartbeats/animals the BLM itself is required to manage - wild horses and burros.

The Nevada BLM did not provide a current water inventory while noting which waters were functional, turned on or off, etc.

For example:
From Nevada Gold Mines, Cortez Mine Complex Nevada (NI 43-101 Technical report, which directly impact the Callaghan Complex:

- Ore hauling and/or processing options would increase water consumption by mine operations, generate air emissions that would require mitigating controls, increase truck traffic over area roadways, and disturb grounds with potential cultural resources and/or wildlife habitat;
- Dewatering operations would increase the extent of groundwater drawdown and may require mitigation controls to address potential impacts to groundwater resources, surface water resources, and/or riparian habitat and associated existing uses.
- Removal of vegetation, dispersal or displacement of local wildlife, and fragmentation of certain wildlife habitats and populations have occurred.  The Barrick Bank Enabling agreement provides a mechanism to restore and enhance habitat to benefit Greater Sage Grouse and Sagebrush ecosystems and generate credits.
- Other environmental considerations for mining and mineral exploration include environmental justice, geology, hazardous waste, land use, noise, grazing, recreation, socioeconomics, soils, transportation, vegetation, visual resources water resources, and wetlands.  These resources are inventoried and studied to determine what the impacts from mineral exploration and mining activities will have on the resource.
- In the State of Nevada, "the water of all sources of water supply within the boundaries of the State whether above or beneath the surface of the ground, belongs to the public" (NRS 533.025).
- The Cortez Mine operates in the Crescent Valley (Basin 054), Grass Valley (Basin 138), and Pine Valley (053) hydrographic basins and maintains a combination of approximately 430 surface and underground water rights allowing manners of use including mining, milling, dewatering, irrigation, environmental, stock watering, quasi-municipal, and domestic uses.
- Water demand will also increase over the LOM as production increases and depending on the amount of exploration drilling.

NGM's Active Robertson Mine Project (DOI-BLM-NV-B020-2023-0008-EIS):
- A total of 11 perennial streams occur within the area of analysis (Figure 2-2).

- One perennial stream is anticipated to be affected by the Proposed Action, which is a gaining segment of Indian Creek located approximately 1.5 miles north of the proposed Gold Pan Pit.  Groundwater discharge along this segment of Indian Creek is predicted to decrease from a pre-mining rate of 20 gpm to a post-mining rate of 17 gpm.  **This reduction in flow is predicted to occur when the post-mining pit lake is refilling and is anticipated to persist for approximately 100 years post-mining until groundwater recovers in that area** (JSAI 2021).

- Reduced flow to seeps, springs, and perennial streams within the area of analysis would result in an overall reduction of avian habitat used for foraging, nesting, and migratory stopovers.  The implementation of previously authorized mitigation (NGM and Nexus 2023; Itasca 2023) would help reduce effects to surface waters as a result of dewatering activities.  After the end of mining

and the return of surface flow similar to pre-mining conditions (estimated at 100 years of recovery), any lost vegetation would likely be restored.  Therefore, the effects from dewatering operations would be minor to moderate, long-term to permanent, and regional.

- The reduced groundwater discharge of three gpm in Indian Creek would result in an overall reduction of habitat.

- Increased human presence and noise created by mine infrastructure and increased traffic may cause wildlife to avoid areas adjacent to the Proposed Action.

- The Proposed Action would affect larger mammals through the loss of habitat, habitat fragmentation, and vehicular collisions.  Large mammals would likely redistribute to adjacent habitat in the vicinity of the Proposed Action.  Effects may still occur as a result of loss of habitat as efforts to relocate may not be successful due to lack of adjacent habitat or adjacent habitat already at carrying capacity.  Within the area of analysis, past and present activities have resulted in displacement and habitat fragmentation for mammal species.

- Under the Proposed Action, additional habitat fragmentation and displacement would occur and may decrease survival rates of affected individuals to some degree and increase competition.  Effects would be minor to moderate, long-term to permanent, and localized.  Reduced flow to seeps, springs, and perennial streams within the area of analysis as a result of mine dewatering and filling of the post-mining pit lake would result in an overall reduction of water sources for mammal species.  Potential flow reductions in seeps, springs, and perennial streams attributable to mine induced drawdown would be addressed through the site-specific contingency mitigation measures identified in the existing contingency mitigation plan (NGM and Nexus 2023).

- All HQs for both arsenic and fluoride were less than one for coyote, cottontail rabbit, little brown bat, white-footed mouse, and white-tailed deer (Table 3-4) (Geomega 2021).  Meaning that adverse ecological 3-8 September 2024 Wildlife Resources Supplemental Environmental Report for the Robertson Mine Project effects from exposure are not expected (Geomega 2021).  However, **it should be noted that the toxicity value for fluoride in white-tailed deer was not calculated as it was not available** (Geomega 2021).

- NGM Proposed Action would add to the vegetation removal that has already occurred within the area of analysis from other past and present activities including mineral development and exploration activities and would result in displacement and habitat fragmentation.  Under the Proposed Action, additional habitat fragmentation and displacement would occur and may decrease survival rates of affected individuals to some degree and increased competition.

- The Proposed Action would add additional noise sources in mule deer habitat created by mine infrastructure and traffic.  Within the area of analysis, past and present projects have added additional noise sources which may have resulted in increased stress and avoidance of areas of increased noise.

- Reduced flow to seeps, springs, and perennial streams within the drawdown contour as a result of mine dewatering and filling of the post-mining pit lake would result in an overall reduction in available water sources for mammal species, including mule deer.  Mule deer migration within the movement corridor could be altered due to reduced surface water flow from mine dewatering.

- The Action overlaps a designated pronghorn movement corridor identified by NDOW, which links crucial winter habitat to year-round habitat.  Pronghorn winter range habitat is essential to herds within the area of analysis and further disturbance within the movement corridor would continue to add effects to migration corridors used by pronghorn within the area of analysis.  The Proposed Action would add to the vegetation removal that has already occurred within the area of analysis from other past and present activities including mineral development and exploration activities and would result in displacement and habitat fragmentation.  Under the Proposed Action, additional habitat fragmentation and displacement would occur and may decrease survival rates of affected individuals to some degree and increase competition from loss of habitat and restricting the movement corridor width.

- Increased traffic in the vicinity of the Proposed Action may lead to pronghorn mortality through vehicular collisions.  The Proposed Action may cause individuals to be injured or perish but would not be anticipated to remove any populations.

- Reduced flow to seeps, springs, and perennial streams within the drawdown contour as a result of mine dewatering and filling of the post-mining pit lake would result in an overall reduction in available water sources for mammal species.

- The Carico Lake Allotment is classified under the "I" or "Improve" category in the Shoshone-Eureka Resource Management Plan and Record of Decision, as amended (BLM 1986, 1988).  The Carico Lake Allotment was last evaluated in 2005 and this designation was not changed.  Allotments designated within category "I" are given the highest priority for development because grazing management is needed to improve the resources and/or resolve resource use conflicts (BLM 1988).  These allotment categories do not apply only to grazing, but also to non-grazing causal factors that may degrade the landscape.

- Direct effects to grazing resources from the implementation of the Proposed Action would include a loss of forage availability and reduced access to a portion of the allotment from fencing.  AUM effects are based on an average stocking rate for the Carico Lake Allotment.  The average stocking rate is calculated by dividing the public acres affected by the active public AUMs for the allotment.  **AUM effects were calculated at 21 acres per AUM**.

- Reductions to permitted AUMs must be made in accordance with the BLM's grazing regulations, including the requirement for a grazing decision as set forth in 43 CFR Subpart 4160.

- The fenced corridor between the Robertson Mine and the Cortez Mine Pipeline Complex would have approximately 307 undisturbed acres.  **An increase in fine fuel production and accumulation could increase the risk of wildfire severity and intensity within this corridor**.

- Reduced flow to seeps, springs, and perennial streams within the groundwater drawdown contour as a result of mine dewatering may result in a reduction of water sources used by livestock. To adhere to the existing mitigation measures for effects to surface water, NGM has developed and implements an updated CMP (NGM and Nexus 2023) and IMP (Itasca 2023). The implementation of the previously authorized mitigation measures described in the updated CMP would minimize potential mine-related effects to surface water sites as a result of mine dewatering. The updated CMP covers the anticipated groundwater drawdown contour and one mile buffer from the Project's dewatering. With the implementation of the previously authorized CMP, if effects to surface water sites used by livestock occur, they would be long-term to permanent, and regional.

- Under the No Action Alternative, 344 acres of disturbance would occur. Using the value of 21 acres per AUM, this equates to about 17 AUMs and up to $1,920 in annual effects.

- Indirect effects from the Proposed Action could occur from the proposed boundary fence, as the fencing would result in the absence of livestock grazing on areas that are not disturbed from mining activities. The fenced corridor between the Robertson Mine and the Cortez Mine Pipeline Complex would have approximately 307 undisturbed acres. One such effect could be the accumulation of fine fuels, such as cheatgrass (Bromus tectorum), due to a lack of grazing. An increase in fine fuel production and accumulation could increase the risk of wildfire severity and intensity within this corridor.

- The fenced corridor between the Robertson Mine and the Cortez Mine Pipeline Complex would have approximately 307 undisturbed acres. An increase in fine fuel production and accumulation could increase the risk of wildfire severity and intensity within this corridor.

- There are 210 surface water sites (194 seeps and springs; 16 stream monitoring sites) within the maximum predicted drawdown and its one-mile buffer, of which 186 surface water sites (171 seeps and springs; 14 stream monitoring site) have wetland characteristics.

- Groundwater discharge along this segment of Indian Creek is predicted to decrease from a pre-mining rate of 20 gallons per minute (gpm) to a post-mining rate of 17 gpm. This reduction in groundwater discharge is predicted to occur when the post-mining pit lake is refilling and is anticipated to persist for approximately 100 years post-mining until groundwater recovers in that area (JSAI 2021).

- Reduced flow to seeps, springs, and perennial streams within the groundwater drawdown contour as a result of mine dewatering may result in a reduction of water sources used by livestock. To adhere to the existing mitigation measures for effects to surface water, NGM has developed and implements an updated CMP (NGM and Nexus 2023) and IMP (Itasca 2023). The implementation of the previously authorized mitigation measures described in the updated CMP would minimize potential mine-related effects to surface water sites as a result of mine dewatering. The updated CMP covers the anticipated groundwater drawdown contour and one-mile buffer from the Project's dewatering. With the implementation of the previously authorized CMP, if effects to surface water sites used by livestock occur, they would be negligible to minor, long-term to permanent, and regional.

- Reduced flow to seeps, springs, and perennial streams within the drawdown contour as a result of mine dewatering and filling of the post-mining pit lake would result in an overall reduction in available water sources for mammal species.

- NGM has committed to allocating mitigation funds to the existing Toiyabe Fingers Mule Deer Habitat Treatment Project for the potential impacts on 252 acres of mule deer winter range habitat. The Proposed Action would add to the vegetation removal that has already occurred within the area of analysis from other past and present activities including mineral development and exploration activities and would result in displacement and habitat fragmentation.

- Under the Proposed Action, additional habitat fragmentation and displacement would occur and may decrease survival rates of affected individuals to some degree and increased competition. Overall, effects to mule deer due to surface disturbance would be minor to moderate, long-term, and regional.

- The Proposed Action would add additional noise sources in mule deer habitat created by mine infrastructure and traffic. Within the area of analysis, past and present projects have added additional noise sources which may have resulted in increased stress and avoidance of areas of increased noise.

- Increased traffic in the vicinity of the Proposed Action may lead to mule deer mortality through vehicular collisions.

- Reduced flow to seeps, springs, and perennial streams within the drawdown contour as a result of mine dewatering and filling of the post-mining pit lake would result in an overall reduction in available water sources for mammal species, including mule deer. Mule deer migration within the movement corridor could be altered due to reduced surface water flow from mine dewatering.

- The Proposed Action would add to the vegetation removal that has already occurred within the area of analysis from other past and present activities including mineral development and exploration activities and would result in displacement and habitat fragmentation. Under the Proposed Action, additional habitat fragmentation and displacement would occur and may decrease survival rates of affected individuals to some degree and increase competition. Overall, effects to pronghorn due to surface disturbance would be moderate, long-term to permanent, and regional.

- The Proposed Action overlaps a designated pronghorn movement corridor identified by NDOW, which links crucial winter habitat to year-round habitat. Pronghorn winter range habitat is essential to herds within the area of analysis and further disturbance within the movement corridor would continue to add effects to migration corridors used by pronghorn within the area of analysis.

- The Proposed Action would add to the vegetation removal that has already occurred within the area of analysis from other past and present activities including mineral development and exploration activities and would result in displacement and habitat fragmentation.

- Under the Proposed Action, additional habitat fragmentation and displacement would occur and may decrease survival rates of affected individuals to some degree and increase competition from loss of habitat and restricting the movement corridor width. Overall, effects to pronghorn due to surface disturbance within the movement corridor would be moderate to major, long-term, and regional.

- The Proposed Action would add additional noise sources in pronghorn habitat and the designated pronghorn movement corridor from mine infrastructure and traffic. Within the area of analysis, past and present projects have added additional noise sources which may have resulted in increased stress and avoidance of areas of increased noise. Although there are no thresholds for noise effects to this species, under the Proposed Action, adverse effects would likely increase and continue to occur within the area of analysis. Therefore, if effects to pronghorn are realized under the Proposed Action they would be minor to major, long-term, and localized.

- Increased traffic in the vicinity of the Proposed Action may lead to pronghorn mortality through vehicular collisions

- Mountain Lion: The Action would create an additional approximately 3,998 acres of disturbance to mountain lion habitat available (3,934 in the Project Plan boundary and 64 acres within the Cortez Mine Plan boundary). Effects to mule deer populations within the area of analysis may result in a reduction of primary prey species for mountain lions.

- Additionally, anthropogenic noise from mine activities may cause individuals to avoid the area. Effects from the 758 acres of permanent disturbance would lead to an overall reduction to mountain lion prey-base. Overall, effects to mountain lions would be minor to moderate, long-term to permanent, and localized

Impacts from the multitude of hardrock mines operated by Nevada Gold Mines, Inc., directly impacts and irreparably harms the Callaghan and Shoshone wild horse habitat and resources and our interests. BLM has failed to provide protection and mitigation for wild horses and burros and has denied any cumulative impacts from these mining operations ON the WHBs and their habitat and resources required for their wellbeing. This is clearly ludicrous and a failure of NEPA and the WFRHBA as the impacts to other free-roaming grazers (livestock, mule deer, and pronghorn antelope) are addressed in habitat management plans (HMPs) and obviously impact the unprotected and ignored wild horses in the BLM proposed HMAP and Gather Callaghan Complex (Callaghan, Shoshone, Hickison, and Bald Mountain HMAs).

Also noteworthy, is BLM calculations for livestock in the region are 21 acres/AUM (cow/calf pair or 5 sheep), but the wild horse AML on 1.1 million acres is 60-100, hardly equitable and certainly not in compliance with the NEPA, WFRHBA nor FLPMA multiple use doctrine.

Please provide detailed, site-specific past, present, and reasonably foreseeable data and maps, including water resources, livestock allotments, and other multiple uses on the "Callaghan Complex" PRIOR to any Decision, FONSI and releasing any Final HMAP and Gather EA.

NEPA requires an EIS when environmental impacts are significant and mitigation is required.  The impacts listed by NGM in its EIS for other free-roaming grazing ungulates and livestock are identical to those that shall be experienced by the wild horses.  Additionally significant is the evaluation of impacts to mountain lions (predators) and their prey (i.e., wild horses and burros).

**12. Identification of Critical Habitat and Seasonal Movement for preservation and protection from human activities such as mining, livestock, recreation, etc.**

The BLM is required to consider "the habitat requirements" of wild horses and burros (see 43 CFR §4710.3).

RMP General Wild Horse Management
WH-3: Do not construct permanent fences that prohibit the free-roaming behavior of wild horses or prevent wild horses from moving within herd management areas.  Remove existing fences within herd management areas that restrict the free-roaming behavior of wild horses.

In BLM's MER loaded onto the ePlanning.gov site states: "The lack of fencing separating the HMAs and HAs within the Complex can lead to management issues, as WHB traversing the Complex with the seasons in search of forage and water."

The wild horses travel back and forth across the Callaghan boundary lines, mixing with the wild horses from the other HMAs.  The population within these HMAs can fluctuate depending on the seasonal movement of these wild horses.  Yet BLM has provided no maps identifying migratory routes within the Complex and surrounding area.

Every management plan, for any species, begins by identifying habitat requirements and seasonal movements.  The elk, deer, and bighorn habitat management plans (HMPs) utilized by BLM to mitigate damages done to habitat by mining and livestock all contain clear identification of critical habitat, seasonal grazing, and migration/movement corridors.

For example, phrases such as, "The objective of special habitat designations would be to ensure that large blocks of existing high quality public habitat would be managed and protected, with an emphasis on bighorn sheep for the long-term" and "Bighorn sheep movement can be categorized into two general types.  The first is daily movement where bighorns move between watering areas, foraging areas and resting areas.  These movements normally do not exceed more than a few miles in a day.  The second is seasonal movements where bighorn move to other parts of a range or to other mountain ranges in response to changes in vegetation quality, water availability, or weather.  These movements can include several thousand feet in elevation and a 20- or 30-mile movement to another range.  The impediment of either of these movements can be devastating to a bighorn sheep population."

Big Game Habitat Assessment: Since complete inventory and monitoring information on the public lands is not available, BLM managers have relied on the professional judgement of technical experts within BLM and SWAs regarding habitat condition information for each of the 19 big game species addressed in this strategy plan.  For each species, existing habitat conditions were estimated by the season of use (i.e., yearlong, winter, summer, or transitional ranges).  Transitional habitats are those traversed by big game species during some part of the year (seasonal movement between summer and winter ranges).  Habitat condition ratings (good, fair, or poor) were assessed on the basis of availability of food, water, cover, space, arrangement of desirable improvements, and competing land use practices rather than on ecological site potential information.  Condition ratings were quantified in acres and expressed as a

percentage of the total acreage for each seasonal habitat type.  Analyses of these data provided insight into the areas of particular concern for big game habitat management on BLM public lands.  The most frequently identified factor resulting in a fair-to-poor rating for habitat conditions for Rocky Mountain elk, mule deer, and pronghorn antelope was related to forage and distribution conflicts between these species and domestic livestock.  Although livestock grazing management systems have resulted in good-to-excellent ratings in many Resource Areas, conflicts between livestock and big game were identified as serious problems.  (*See* 2000 BLM Big Game HMP.)

Impediments to free-roaming behavior are devastating to all large herbivores, wild horses included.

Wild horses are the only free-roaming grazing species managed behind artificial, human-devised boundary lines.

If a mine takes acreage, guts an area with roads, draws down groundwater tables and surface water resources, wild horses and burros are the only large grazing animal that cannot "legally" leave the area.

This makes identification of critical habitat needs even more important when it comes to wild horses.

Please create comparable habitat identification and preservation strategies for the Callaghan Complex wild horses that are (at minimum) the equivalent of management strategies for other large herbivores.

In addition, the law expressly states:
§ 4710.5 Closure to livestock grazing.
　　(a) If necessary to provide habitat for wild horses or burros, to implement herd management actions, or to protect wild horses or burros, to implement herd management actions, or to protect wild horses or burros from disease, harassment or injury, the authorized officer may close appropriate areas of the public lands to grazing use by all or a particular kind of livestock.
　　(b) All public lands inhabited by wild horses or burros shall be closed to grazing under permit or lease by domestic horses and burros.
　　(c) Closure may be temporary or permanent.  After appropriate public consultation, a Notice of Closure shall be issued to affected and interested parties.

Conflict with livestock is not a reason to set AMLs for wild horses and burros so low as to threaten genetic health.  Conflicts with domestic horses is a moot point, domestic horses are prohibited from WHB designated public herd lands.  If such conflicts exist, to protect genetically healthy herds and their habitat, BLM can limit or close the area to domestic livestock and domestic horses must be removed.

The CFRs require removal of livestock temporarily or permanently to protect the herd and habitat.  BLM must analyze and provide the Callaghan Complex HMAP triggers for permanent removal of livestock.

Critical habitat for maintenance of wild horses must be identified, and seasonal movement needs to be acknowledged in order to create limits on industry and potential issues to be identified for mitigation.  This analysis must be included in the HMAP as it is for all other free-roaming grazing species.  Wild horses and burros are confined behind imaginary human-devised boundary lines, while other free-roaming species are not.  This makes critical habitat identification and preservation even more important for the WHBs is an HMAP.

NEPA requires an EIS when environmental impacts are significant and mitigation is required.

**13.  Cumulative impacts from multiple uses must be evaluated and plans for mitigation of resources and habitat loss to wild horses**.

See #11.

In 32 CFR § 651.16 Cumulative impacts.
(a) NEPA analyses must assess cumulative effects, which are the impact on the environment resulting from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions.  Actions by federal, non-federal agencies, and private parties must be considered (40 CFR 1508.7).
(b) The scoping process should be used to identify possible cumulative impacts.  The proponent should also contact appropriate off-post officials, such as tribal, state, county, or local planning officials, to identify other actions that should be considered in the cumulative effects analysis.
(c) A suggested cumulative effects approach is as follows:
•        (1) Identify the boundary of each resource category.  Boundaries may be geographic or temporal.  For example, the Air Quality Control Region (AQCR) might be the appropriate boundary for the air quality analysis, while a watershed could be the boundary for the water quality analysis.  Depending upon the circumstances, these boundaries could be different and could extend off the installation.
•        (2) Describe the threshold level of significance for that resource category.  For example, a violation of air quality standards within the AQCR would be an appropriate threshold level.
•        (3) Determine the environmental consequence of the action.  The analysis should identify the cause-and-effect relationships, determine the magnitude and significance of cumulative effects, and identify possible mitigation measures.

NEPA requires an EIS when environmental impacts are significant and mitigation is required.  Mitigation measures for cumulative impacts must be included in an HMAP.

**14. "Callaghan Complex" Wild Horses and Greater Sage Grouse Amendments**

As the BLM crafts the federally mandated site-specific wild horse HMAPs, they should include in the NEPA process the wild horse herd management areas that overlap greater sage grouse (GrSG) priority habitat management areas (PHaMAs).  The Callaghan Complex wild horse HMAPs should support the following changes as considered in the proposed GrSG amendments:

The wild horse and burro (WHB) herd management areas (HMAs) and herd areas (HAs) and Greater Sage Grouse (GrSG) priority habitat management areas (PHaMAs) shall be managed as priority public resource areas.

The BLM shall close WHB HMAs & HAs and GRSG PHaMAs to new fluid mineral leasing, saleable minerals/mineral materials permits, and non-energy leasable minerals leasing (development associated with existing permits and leases would not be precluded).

WHB HMAs & HAs and GrSG PHaMAs shall be recommended for withdrawal from location and entry under the Mining Law of 1872 and unavailable for livestock grazing.

WHB HMAs & HAs and GrSG PHaMAs shall be ROW exclusion areas.

WHB HMAs and HAs not overlapping GrSG PHaMAs shall have the same allocations (i.e., allowable uses) as previously identified.

Provide the greatest level of restrictions on resource uses in all WHB HMAs & HAs and GRSG PHaMAs.

NEPA requires an EIS when environmental impacts are significant and mitigation is required.

**15. Include economic analyses of tourist interest and economic impacts from domestic and abroad tourism**.

Tourist and stakeholders in this country and abroad have a vested interest in the wild horses of the Callaghan Complex, and their concerns are undeniable.  Nevada misses the boat by not promoting and encouraging tourism for the largest population of wild horses and burros in the country.

Wild Horse Education receives countless emails from our members, concerned citizens, and from people in Denmark, Germany, the UK, South Africa, etc., expressing their distress for the Nevada Shoshone and Callaghan wild horses and their disappearing numbers.  Emails express people's trepidations regarding the mass removals of the Nevada's wild horses, and their cognizance of the cultural significance of the wild herds to the "Old West," something America is known for and cherishes at home and abroad.  Something that can only be seen and experienced here, in America.

Raising the AML to allow visitors to see these magnificent Shoshone and Callaghan (and all HMAs) wild horses would be of economic benefit to Nevada.  This benefit provides a renewable income for the tourism industry.

Nevada is home to the largest populations of wild horses (and burros) in the country.  Yet, Nevada is one of the only states that does not have a single wild horse (or burro) kiosk, and the HMAP plan boundaries would be the ideal place to create a scenic loop for tourism with its easy access from the highway.  The wild horse and burro herds would be the epitome of representation for Nevada and the "Old West," and possibly turn Battle Mountain and Tonopah into a summer destination for travelers.

Benefits of wild horse and burro tourism requires analysis in the HMAP.
For example: from BLM HANDBOOK, H-8320-1 – PLANNING FOR RECREATION AND VISITOR SERVICES (Public): H. Data and Data Collection.

> Collecting and analyzing data and performing recreation inventories are essential to recreation planning, implementation, monitoring, and evaluation.  Data provide a necessary foundation to yield quality recreation opportunities.  Just as a wildlife biologist needs data on habitat condition, species requirements, and populations, the outdoor recreation planner requires data on RSCs, outcomes, and use levels.

> The BLM's recreation customers know what contributes to a quality recreation experience.  The BLM needs to understand stakeholder concerns about protecting the quality of the recreation settings and the resulting outcomes that are realized.  R&VS data regarding what contributes to a quality recreation opportunity must be obtained from visitors, communities, and other recreation providers.  Collecting and analyzing data begins the process to allow managers to create the quality recreational opportunities most desired by stakeholders and visitors.

> Assessments, inventories, monitoring records, and other forms of data collection are used to understand recreation uses and resources in the planning area.  These data may include information on the use of and/or demand for public land recreation opportunities and existing and desired RSCs.

NOTICE OF APPEAL EXHIBIT 1: APPELLANTS COMMENTS DOI-BLM-NV-B010-2025-0006-EA

Assessing Demand.

Demand information includes people's desired activities, experiences, benefits, and settings. Identifying demand requires the collection of data to determine which recreation activities and accompanying experiences and benefits are desired by the visitor. It is also necessary to identify the RSCs required to produce those experiences and benefits. Collect this information geographically in order to tie visitor preferences for recreation opportunities to the landscape. Identifying Recreation Trends. Trend data demonstrate national, regional, and/or local changes in demand for certain recreation activities and outcomes. Trend data are used to determine changes in the type and degree of recreation activities occurring in specific areas.

Awareness of these changes helps determine future demand for recreation opportunities. Information sources include: • RMA monitoring data. • BLM field office staff professional knowledge. • Recreation Management Information System data. • U.S. Forest Service National Visitor Use Monitoring (NVUM) data. • National Survey on Recreation and the Environment. • Concessionaire, outfitter, and guide data. • State fish and game agency data on hunting, fishing, and **wildlife viewing**.

Qualitative data document the experiences and benefits associated with a quality recreation opportunity. These data help the BLM understand the who, what, when, where, and why people recreate in specific areas (outcomes) and what influences these outcomes (setting characteristics). The experience and outcome data allow the BLM to better plan for, offer, and measure what visitors consider quality recreation opportunities.

BLM needs to include analyses of interests and economic impacts from domestic and abroad tourism. Hence, economic analyses should be included in the HMAP.

The EA track is far too superficial to address and analyze past, present and future issues, deficits and options. The square acreage, timeframe, and numbers of wild horses impacted alone warrants an EIS. In addition, cumulative impacts and mitigation strategies must be fully analyzed to protect wild horses (public resource) and address habitat issues due to encroachment by discretionary permitted uses. NEPA requires an EIS when environmental impacts are significant and mitigation is required.

A landscape level analysis has never been completed by Nevada BLM for the wild horses defined by this HMAP EA.

An EA's function is essentially piecemeal planning due to their limited scope, while EIS's function more as holistic, landscape-level planning.

An EIS tract is required as the HMAP shall provide for the management of wild horses and burros on over 1 million acres, and that requires a landscape level analysis only an EIS can provide. NEPA requires an EIS when environmental impacts are significant and mitigation is required.

This area is in wildfire country. The state has issued high preparedness warnings for wildfire every year in this area. BLM has never addressed how many horses and burros should be on the range so they can perform a beneficial use removing fire fuels. BLM must provide and review the new research demonstrating this beneficial use and why wild horses are much better at reducing fire fuel (not increasing noxious weeds) than cows, and AMLs be analyzed scientifically to address this issue.

It is imperative that critical habitat and seasonal movements for the wild horses be identified and protected in an HMAP, with the creations of limits on industry and identification of potential issues that require mitigation of habitat and forage losses.

Every single management plan for any species identifies their habitat needs to sustain viability. Water improvements, fence removal, seasonal corridors, are all identified in habitat management planning (HMP) for every other species. Wild horses and burros are confined behind imaginary man-made boundary lines that other free-roaming ungulate species are not. This makes critical habitat identification and preservation for the Callaghan Complex wild horses even more vital.

Habitat protection is expressed in the law no matter what label BLM puts on a wild horse or burro (see 1971 WFRHBA as amended).

AML of 60-100 is absurdly low for a 1.1 million acre area where exchange of populations is becoming more limited due to livestock and mining threatening any assertions of stability. Populations in the complex have reached more than 1,700 and demonstrates healthy horses with a stabilizing annual population growth rate of less than 12%, and even declined in population.

BLM is directed to and tasked with protecting wild herds and habitat. In this EA, BLM seems to be asserting it has absolutely ZERO obligation to address any factor required to maintain any resources for the survival of any herd on an HMA. FLPMA multiple USE means MULTIPLE USE and habitat must be protected for wild horse use as well. BLM has clearly shown that removal of wild horses is to provide resources for everything else and that planning for discretionary profit use does not have to mitigate damages to anything else as required under NEPA, FLPMA, and Agency policy (H-1794-1, BLM Mitigation Handbook). This is outrageous.

BLM has never defined range TNEB (quantitatively and qualitatively) for WHBs nor demonstrated that a single WHB removal has moved one data point toward achieving TNEB. BLM absurdly makes an entirely generic response: "The term "excess animals" is defined as those animals which must be removed from an area in order to preserve and maintain a thriving natural ecological balance and multiple use relationship in that area (16 USC § 1332(f)(2)). This definition underscores the need to remove excess animals before damage to the range begins to occur." We are stating that BLM needs utilize *best available science* to define what TNEB is (quantitatively and qualitatively), determine if removal actually achieves that end prior to approving more expensive and traumatic removals that have not achieved TNEB due to increases in private use as soon as gathers are completed (*best management practices*). (*See* BLM response, 110.)

Furthermore,

1. The BLM announcement and website noted this as a Scoping period when it was not a Scoping, it was comments on a draft plan. **Please rectify the error and extend the comment period accordingly**.

2. This EA that purports itself to be both a gather plan and an HMAP is only 68 pages long for a 1.1 million acre gather area of 4 HMAs, compared to the "gather only EA" for the single HMA Fish Creek, 230,675 acres created by the same field office that was 185 pages. BLM has clearly shortchanged the much larger and complex Callaghan Complex. This EA is woefully data and analysis poor.

3. Please provide direct data and links to rangeland health assessments, inventory, water availability and flow (not just a map that has no info) for each of the HMAs identified under this Draft HMAP and Gather Plan EA (Callaghan, Shoshone, Hickison, and Bald Mountain).

4. Clearly, BLM has failed to address AML which were all set through agreement in the 1980s and not through a NEPA landscape level analysis to determine carrying capacity of the ranges. Please provide a valid methodology for affirming/evaluating AML in these 4 HMAs. AML is illogical and obviously wrong even to the layperson. If high AML is around 500 and BLM has not done a gather and the population has reached 5000, AML lies somewhere between these numbers. BLM must provide some analysis through the Herd Management Area Plan of multiple use (past, present, and reasonably foreseeable future) risk perpetuating a deep injustice to both wild horses and the public interest, as well as plans for mitigation triggers and procedures.

5. The zeroed out portion of North Shoshone must be reevaluated. It was inappropriately zeroed out of wild horses in favor of domestic horses in contravention of the CFRs.

6. BLM must evaluate AML based on fire fuel reduction and analyze the impact of a removal of large numbers of wild horses on fire fuels. Leigh v. Raby (3:22-cv-00034)

7. A gather plan EA and an HMAP EA are not the same thing, Leigh v. Raby 3:22-cv-00034 and 2:22-cv-01200 BLM can create both concurrently but cannot ignore the specific difference between the two and must meet requirements of both. This EA falls short of even meeting the established standard for this district for a gather EA only.

8. BLM can satisfy HMAP requirements ONLY if they can clearly demonstrate that  data and analysis were disclosed in other documents. The RMP that set boundary lines and AML was not a landscape level analysis and no analysis or methodology was disclosed. Please rectify.

9. BLM must establish safe gather times of year specifically for these HMAs. BLM is mandated to manage humanely. Terrain and foaling season are significant factors involved in humane management. BLM must include this analysis.

10. BLM has created a recreation area that encompasses the entire South Shone HMA causing stress and herd movement. The HMAP must include analysis of the impact and mitigation measures.

11. BLM must include range improvements. Waters in these HMAs have either been fenced off or are non functional. Cattle guards are in disrepair and not safe for horses or burros. Please provide a map and strategy for repairs.

In closing I restate #2: This EA that purports itself to be both a gather plan and an HMAP is only 68 pages long for a 1.1 million acre gather area of 4 HMAs  compared to the "gather only EA" for the single HMA Fish Creek, 230,675 acres created by the same field office that was 185 pages. BLM has clearly shortchanged the much larger and complex Callaghan Complex. This EA is woefully data and analysis poor.

**This EA is absolutely inadequate to represent even a gather only plan.** To call this the more in-depth HMAP is an absolute slap in the face to basic purpose of NEPA and federal court rulings, and demonstrates BLM's deep disregard for our public resources, wild horses, and the irreparable harms to advocates for wild horses and burros are countless.

It would be refreshing to the stake holding public if BLM actually crated a wild horse and burro herd management area plan that actually planned for the maintenance and improvement of the range and resources required for WHB health and wellbeing, rather than this continuing barrage of proposed BLM HMAP and Gather EAs which are nothing less than a management plan for all the other multiple uses (mining. Recreation, livestock grazing, etc.) within the WHB federally designated and protected HMAs.

NOTICE OF APPEAL EXHIBIT 1: APPELLANTS COMMENTS DOI-BLM-NV-B010-2025-0006-EA

We appreciate the opportunity to provide our substantive comments and concerns for the Draft Callaghan Complex HMAP and Gather EA (DOI-BLM-NV-B010-2025-0006-EA).

Wild Horse Education offers to meet with the BLM to discuss goals and objectives needed for the adequate development of the Callaghan wild horse Complex HMAP (any gather plan would be included as an SOP to the HMAP as federal court has clearly delineated that an HMAP is NOT a Gather Plan and should be separate NEPA documents).  We look forward to a direct written response from BLM regarding these comments and concerns.

**In closing, this entire document is simply a gather plan and monitoring plan to facilitate gathers (population growth suppression).**

**BLM must rectify the egregious error of creating merely a gather plan and not an HMAP. As an example: If this were a gather plan, addressing the lack of a data-based AML would be "outside the scope." The appropriate place to address this deficit would be the HMAP. In fact, it is the only place where the public can currently have any input on issues such as AML, boundary lines, water improvements, identifying triggers to remove livestock, etc. Through BLM's choice in creating merely a gather plan (in fact), you are denying the public the ability to address any actual management concern and repeating the pattern established in gather plans of cutting the public out of commenting on anything except removal/fertility control (population growth suppression).**

Best Regards,

Laura Leigh, Founder and President, Wild Horse Education
216 Lemmon Drive, #316
Reno, NV 89506
laura@wildhorseeducation.org
As a private citizen and as an authorized representative of Wild Horse Education, its individual board members, and members worldwide.

Tammi Adams, Wild Horse Education, NEPA Program Coordinator
21991 150th Street NW
Elk River, Minnesota 55330
tmadams7263@yahoo.com
As a private citizen, WHE member and volunteer, and as an authorized representative of Wild Horse Education, its individual board members, and members