# Exhibit D

U.S. Department of the Interior
Bureau of Land Management

# Mount Lewis Field Office
**Environmental Assessment**

United States Department of the Interior
Bureau of Land Management

**Callaghan Complex Herd Management Plan / Gather Plan
Environmental Assessment.**

**DOI-BLM-NV-B010-2025-0006-EA**

February 13, 2026

PREPARING OFFICE
U.S. Department of the Interior
Bureau of Land Management
Battle Mountain District
Mount Lewis Field Office
50 Bastian Rd.
Battle Mountain, Nevada 89820
775-635-4000

CAL_08861

# Table of Contents

**Chapter 1: Introduction**------------------------------------------------------------------------------------ **1**

*1.1 Background* ------------------------------------------------------------------------------------------- *1*

*1.2 Purpose and Need* ------------------------------------------------------------------------------------ *4*

*1.3 Land Use Plan Conformance and Consistency with Other Authorities*-------------------------------- *4*

*1.4 Relationship to Statutes, Regulations, or Other Plans* ----------------------------------------------- *4*

*1.5 Decision to be Made*---------------------------------------------------------------------------------- *5*

**Chapter 2: Proposed Action and Alternatives**--------------------------------------------------------- **5**

*2.1 Description of Alternatives in Detail* ---------------------------------------------------------------- *6*

   2.1.1 BLM's Use of Contraception in Wild Horse Management (Alternatives A&B Only) -------------------- 6

   2.1.2 Management Actions in Common with Alternatives A – C ----------------------------------------- 7

*2.2 Herd Management Area Plan* ----------------------------------------------------------------------- *12*

*2.3 Alternative A: Proposed Action* -------------------------------------------------------------------- *14*

*2.4 Alternative B*------------------------------------------------------------------------------------------ *16*

*2.5 Alternative C* ----------------------------------------------------------------------------------------- *16*

*2.6 Alternatives Considered but Eliminated from Detailed Analysis*----------------------------------- *17*

   2.6.1 Use of Bait and/or Water Trapping Only--------------------------------------------------------- 17

   2.6.2 Field Darting PZP Treatment as Exclusive Method of Population Control ----------------------- 17

   2.6.3 Gathering the Callaghan Complex only to upper-level AML ---------------------------------- 17

   2.6.4 Control of Wild Horse Populations by Natural Means----------------------------------------- 18

   2.6.5 Raising the Appropriate Management Levels for Wild Horses--------------------------------- 19

   2.6.6 Remove or Reduce Livestock within the Callaghan Complex -------------------------------- 19

   2.6.7 Control of Wild Horse Populations by Fertility Control Treatment Only (No Gathers) ------------ 20

   2.6.8 Use of Alternative Capture Techniques Instead of Helicopter Capture ----------------------- 20

   2.6.9 Designation of the Complex to be Managed Principally for Wild Horses------------------------ 21

**Chapter 3: Affected Environment and Environmental Effects**------------------------------------------ **21**

*3.1 General Setting* ---------------------------------------------------------------------------------------*21*

*3.2 Description of Affected Resources/Issues* ---------------------------------------------------------- *22*

   3.2.1 Wild Horses ------------------------------------------------------------------------------- 25

   3.2.2 Native American Religious Concerns ------------------------------------------------------- 46

   3.2.3 Noxious Weed and Invasive Nonnative Species -------------------------------------------- 46

   3.2.4 Rangeland Health Standards and Guidelines and Livestock Grazing------------------------- 48

   3.2.5 Recreation --------------------------------------------------------------------------------- 50

   3.2.6 Socioeconomics --------------------------------------------------------------------------- 51

   3.2.7 Soils--------------------------------------------------------------------------------------- 51

   3.2.8 Special Status Species--------------------------------------------------------------------- 52

   3.2.9 Vegetation -------------------------------------------------------------------------------- 53

   3.2.10 Wetlands and Riparian Zones and Water Quality - Surface and Ground. ----------------------- 55

   3.2.11 Wildfire and Fuels ------------------------------------------------------------------------ 56

   3.2.12 Wilderness-------------------------------------------------------------------------------- 58

   3.2.13 Wildlife, Including Migratory Birds-------------------------------------------------------- 60

**Chapter 4: Reasonably Foreseeable Effects** ----------------------------------------------------------- **61**

*4.1 Past and Present Actions* ---------------------------------------------------------------------------- *61*

*4.2 Reasonably Foreseeable Future Actions* ----------------------------------------------------------- *63*

**Chapter 5: Monitoring**---------------------------------------------------------------------------------- **65**

**Chapter 6: Consultation and Coordination**------------------------------------------------------------- **66**

CAL_08862

**Chapter 7: List of Preparers** --------------------------------------------------------------------------------- **67**

**Chapter 8: Acronyms and References** ------------------------------------------------------------------------- **68**

*8.1 Acronyms* ----------------------------------------------------------------------------------------------------- 68

*8.2 Literature Cited* --------------------------------------------------------------------------------------------- 69

## List of Tables

**Table 1: Estimated Population and Removal Numbers to Achieve Low AML.** ...........................................3

**Table 2: Callaghan Complex Herd Management Area Plan Matrix** ........................................................13

**Table 3: Supplemental Authorities (Critical Elements of Human Environment)** ....................................23

**Table 4: Permitted Grazing within Bald Mountain HMA** ..................................................................48

**Table 5: Permitted Grazing within Callaghan HMA** .......................................................................48

**Table 6: Permitted Grazing within Hickison HMA, north of US Route 50** ..........................................48

**Table 7: Permitted Grazing within North Shoshone HA** ..................................................................48

**Table 8: Permitted Grazing within South Shoshone HMA** ................................................................49

**Table 9: Permitted Grazing in Gather Area and Outside of HMAs/HAs** ..............................................49

**Table 10: Previously Captured and Released Wild Horses from the Callaghan Complex** .......................62

**Table 11: Wild Horse Populations with No Wild Horse Removal and/or Fertility Control** .......................64

**Table 12: List of Preparers** ............................................................................................................67

## Table of Contents: Appendices

| | |
|---|---|
| Appendix I | Project Area Maps |
| Appendix II | Greater- Sage Grouse Required Design Features |
| Appendix III | Comprehensive Animal Welfare Program and Euthanasian Policy |
| Appendix IV | Standard Gather Operating Procedures, Public Observation, and Risk Assessment |
| Appendix V | Standard Operating Procedures for Mare Fertility Control and Gelding, and Scientific Literature Reviews |
| Appendix VI | Henneke Body Condition Scoring Chart |
| Appendix VII | Population Modeling |
| Appendix VIII | Monitoring Data and Reports |
| Appendix IX | Noxious Weeds |
| Appendix X | Rangeland Health Standards and SSDs |
| Appendix XI | Sensitive Species, Special Status Species, Threatened and Endangered Species |
| Appendix XII | Response to Comments |
| Appendix XIII | Herd Management Area Plan |

CAL_08863

# Chapter 1: Introduction

This Environmental Assessment (EA) has been prepared to analyze the Bureau of Land Management's (BLM) Mount Lewis Field Office (MLFO) proposal to prepare a Herd Management Area Plan (HMAP) and a plan to gather and remove excess wild horses and burros from within and outside the South Shoshone, Bald Mountain, Callaghan, and Hickson (north) Herd Management Areas (HMAs), and the North Shoshone Herd Area (HA). These HMAs and HA are referred to as the Callaghan Complex.

The Callaghan Complex HMAP would establish short- and long-term management and monitoring objectives for wild horses and burros and their habitat. These objectives would guide management for the wild horses or burros residing within the Complex, see Appendix XIII. The primary purpose of the plan is to outline and implement management actions necessary to achieve and maintain a thriving natural ecological balance (TNEB) and multiple-use relationships. These actions will include: conducting gathers, removal of excess wild horses and burros in accordance with the Wild Free-Roaming Horses and Burros Act (WFRHBA) of 1971, implementation of population growth suppression measures, outline short and long term habitat management objectives. This EA will assist the BLM MLFO in project planning and ensuring compliance with the National Environmental Policy Act of 1969 (NEPA), and in making a determination as to whether any significant effects could result from the analyzed actions.

Following the requirements of the NEPA (42 U.S.C.) §§ 4321 et seq), this EA describes the potential impacts of a No Action Alternative and the Proposed Action for the Callaghan Complex. If the BLM determines that the Proposed Action for the Callaghan Complex is not expected to have significant impacts a Finding of No Significant Impact (FONSI) would be issued and a Decision Record would be prepared. If significant effects are anticipated, the BLM would prepare an Environmental Impact Statement (EIS).

This document is tiered to and conforms to the Shoshone-Eureka Resource Area (SERA) Resource Management Plan (RMP) Objectives (Shoshone-Eureka RMP Record of Decision dated 1986 and Shoshone-Eureka RMP Amendment, Record of Decision dated 1987); and Greater Sage-Grouse Rangewide Planning Record of Decision and Approved Resource Management Plan Amendment (ARMPA) for Nevada and Northeastern California (December, 2025).

## 1.1 Background
The Callaghan Complex consists of the Callaghan, South Shoshone, Bald Mountain, Hickison (north of US Route 50) HMAs, and North Shoshone HA. The Complex lies entirely within Lander County, Nevada. The Complex expands from approximately 7 miles south of Battle Mountain to approximately 6 miles north of Austin. The gather area encompasses approximately 1,145,515 acres (See Appendix I, Map 1).

Within the Complex, management status differs by designation. Herd Management Areas (HMAs) are designated for long-term wild horse management to maintain healthy herds within established Appropriate Management Levels (AMLs). Through the 1986 SERARMP, the North Shoshone Herd Area was not designated for wild horse management and has an AML of zero. Similarly, areas between HMAs were not designated for wild horse management under the

CAL_08864

WFRHBA. This gather encompasses the entire Complex to support effective management of wild horse populations within their designated HMAs, where they can thrive in balance with other natural resources and multiple uses.

The Appropriate Management Level is defined as the number of wild horses that can be sustained within a designated HMA which achieves and maintains a thriving natural ecological balance in keeping with the multiple-use management concept for the area. The Callaghan Complex has a cumulative AML range of 323-552 wild horses which has been established through land use plans, and Final Multiple Use Decisions (FMUDs). Each HMA also has an AML range. See Table 1, below. This population range was established at a level that would maintain healthy wild horses and rangelands over the long-term based on monitoring data collected over time as well as an in-depth analysis of habitat suitability. AMLs for the Complex were established through prior decision-making processes and will not be re-evaluated in this EA. Lands outside the designated HMA do not have an established AML, since they are not designated for wild horse and burro management and so AML is effectively zero.

The Callaghan Complex AMLs were established through the Shoshone-Eureka Resource Area Management Plan Objectives (Shoshone-Eureka RMP Record of Decision dated 1986 and Shoshone-Eureka RMP Amendment, Record of Decision dated 1987). The AMLs for both South Shoshone and Bald Mountain HMAs were re-affirmed through the Final Multiple Use Decision for the Carico Lake Allotment (Carico Lake FMUD) issued by the MLFO on September 30, 2005, following completion of the Carico Lake Allotment Evaluation and Rangeland Health Assessment and EA #NV062-EA05-61. The AML for the Austin Allotment portion of the South Shoshone HMA was established at zero wild horses in the January 13, 1995 "Full Force and Effect" Final Multiple Use Decision for the Austin Allotment (Austin FMUD).  The Hickison HMA AML was established on September 30, 2005, by the Kingston and Simpson Park Allotment FMUD and states no wild horses or burro should reside north of US Highway 50. The 1986 SERARMP established that zero wild horses would reside in the North Shoshone HA.

Since the passage of the WFRHBA management knowledge regarding wild horse population levels has increased. For example, it has been determined that wild horses are capable of increasing their numbers by 15% to 25% annually, resulting in the doubling of wild horse populations about every four years (NRC 2013). This has resulted in the BLM shifting program emphasis beyond just establishing AML and conducting wild horse gathers to include a variety of management actions that further facilitate the achievement and maintenance of stable wild horse populations and a thriving natural ecological balance. Management actions resulting from shifting program emphasis include increasing fertility control, adjusting sex ratio and collecting genetic baseline data to support genetic health assessments.

CAL_08865

Table 1: Estimated Population and Removal Numbers to Achieve Low AML.

| HMA/HA | Acres | AML | Estimated Adult Population, February 2025 | Estimated Population, Late 2025 | Estimated Excess, Late 2025 |
|---|---|---|---|---|---|
| Bald Mountain HMA | 139,875 | 129-215 | 246 | 282 | 153 |
| Callaghan HMA | 133,093 | 134-237 | 2,207 | 2,538 | 2,404 |
| Hickison HMA (North Portion Only) | 17,485 | 0 | 12 | 12 | 12 |
| North Shoshone HA | 175,131[2] | 0 | 0 [1] | 0 | 0 [1] |
| South Shoshone HMA | 156,156 | 60-100 | 2,025 | 2,328 | 2,268 |
| Total | | 323-552 | 4,489 | 5,160 | 4,837 |

*The current estimated adult population size is based on statistical analysis of aerial survey data from February 2025. The estimated number of excess animals is the number above low AML that would need to be removed reflect expected herd size by late 2025; this is based on the February 2025 adults, plus an expected 15% annual growth rate which is a conservative annual rate to assume. These numbers will continue to grow each year due to normal reproduction.
[1] Population included with South Shoshone HMA. All horses in the North Shoshone HA will be removed.
[2] 151,513 acres of the North Shoshone HA are within the Callaghan Complex boundary. 71,170 (41%) of those acres are privately owned.

The Callaghan Complex was most recently surveyed by aerial flight in February 2025, at which time approximately 4,489 adult wild horses were estimated to be residing within and around the Complex (see Table 1). The inventory was conducted using the Simultaneous Double Observer Method, in which observers in an aircraft independently detect groups of wild horses (Griffin et al. 2020). These methods were developed by scientists with expertise in wildlife survey and analysis, as recommended by the NAS (2013). Sighting rates are estimated by comparing sighting records of the observers. Sighting probabilities for the observers are then computed from the information collected, and the overall population size is estimated. Flight inventories traditionally take place every two to three years. See Appendix VIII for population estimates since 2009.

As displayed in Appendix I, Map 1, wild horses have moved outside the HMA boundaries. This is due to the overpopulation and lack of forage and water resources within the Callaghan Complex and wild horses have traveled in search of critical habitat resources such as forage, water, and space. Any wild burros found within the gather area will be removed, as there is no AML for wild burros and the Complex is not managed for them.

Rangeland resources and wild horse health within the Callaghan Complex have been and are currently being affected by an overpopulated wild horse herd. There has been little to no livestock grazing in some of these areas due to the overutilization of key species within the use area, which is generally attributed to the overpopulation of wild horses. BLM's management of wild horses and burros must be consistent with Standards and Guidelines for Rangeland Health and for Healthy Wild Horse Populations developed by the Sierra Front-Northwest Great Basin Resource Advisory Council (RAC).

Wild horse herd health is currently being impacted due to excess wild horses on the rangeland. The BLM has documented wild horses with body condition scores of 4 to 5 (moderate) with some observations of horses of with body condition scores of 2 (thin). Due to the severe and heavy use documented throughout the Callaghan Complex, wild horses must travel further away from water sources for forage. Large groups of wild horses also permanently reside outside of

3

CAL_08866

HMA boundaries in search of forage and water. Some wild horse groups also reside around and on private property. Increased movement of wild horses has also resulted in public safety issues as the number of wild horses on Nevada State Highway 305 has increased. Since October of 2022, MLFO staff has hazed more than 25 wild horses off highway 305 west of the South Shoshone and Callaghan HMAs.

Based on all information available at this time, the BLM has determined that all wild horses over low AML and all wild burros are in excess and need to be removed in order to achieve TNEB. As of the estimated population from fall 2025, there are approximately 4,837 excess wild horses in the Callaghan Complex, or wild horses over the low end of the established AML for each HMA. As the wild horse population increases at approximately 15-25% per year, that number will increase annually as new foals are born and add to the population. Those excess wild horses need to be removed to restore TNEB and prevent further degradation of rangeland resources resulting from the current overpopulation of wild horses. The BLM would remove excess wild horses down to the low range of AML in order to reduce the frequency of necessary removals and to allow the best chance for success of population growth suppression methods to be successful, if approved.

## 1.2 Purpose and Need

The purpose of the BLM's action is to reduce the current wild horse population and growth rates, and to achieve and maintain wild horse population sizes within established AML ranges. The purpose is also to remove excess wild horses and burros outside established HMAs within the identified gather area. This action will also adopt and implement an HMAP consistent with the authority provided in the BLM's regulations that implement the WFRHBA at 43 CFR Subpart 4700 for the HMAs within the Callaghan Complex.

The need for the action is to prevent undue or unnecessary degradation of the public lands associated with excess wild horses and burros, and to restore a TNEB and multiple-use relationship on the public lands, consistent with the provisions of WFRHBA and its implementing regulations.

## 1.3 Land Use Plan Conformance and Consistency with Other Authorities

The alternatives described are in conformance:
- Shoshone-Eureka Resource Area (SERA) Management Plan (RMP) Objectives (Shoshone-Eureka RMP Record of Decision dated 1986 and Shoshone-Eureka RMP Amendment, Record of Decision dated 1987).
- Greater Sage-Grouse Rangewide Planning Record of Decision and Approved Resource Management Plan Amendment (GRSG Approved Resource Management Plan) for Nevada and Northeastern California (December 2025).

## 1.4 Relationship to Statutes, Regulations, or Other Plans

The Proposed Action is consistent with all applicable Federal laws, regulations, and policies, as well as with applicable State, and local plans, and guidelines to the maximum extent possible.

In *Animal Protection Institute,* 118 IBLA 63, 75 (1991), the Interior Board of Land Appeals found that under the WFRHBA, the BLM is not required to wait until the range has sustained resource damage to reduce the size of the herd. Instead, proper range management dictates

4

removal of excess animals before range conditions deteriorate in order to preserve and maintain a thriving natural ecological balance and multiple-use relationship in that area.

**1.5 Decision to be Made**

The Authorized Officer would determine whether to approve all, part, or none of the Proposed Action or Alternatives as described in Section 2.1 to manage wild horses within the Callaghan Complex. The Authorized Officer's decision may select among gather methods, implementation of an HMAP, and population growth suppression technique depending on the alternative or parts of any alternative chosen. The Authorized Officer will not set or adjust the AML range, since this was set through previous decisions and the available monitoring data does not support adjustment of the AML at this time.

# Chapter 2: Proposed Action and Alternatives

This section of the EA describes the Proposed Action and Alternatives, including any that were considered but eliminated from detailed analysis. A summary description of the alternatives analyzed in detail is as follows:

*Alternative A: Proposed Action* -
- Adopt an HMAP with a management strategy which would include several population growth suppression methods.
- Adopt a gather plan that would include:
  o Immediately gathering and removing excess wild horses and burros that reside within and outside the Callaghan Complex to achieve low AMLs through an initial gather and follow-up gather or gathers, as necessary;
  o implementing population growth methods, including use of fertility control vaccines, use of intra-uterine devices (IUDs), and managing for a small non-reproducing population of sterilized mares (not exceeding approximately ¼ of the overall number of mares); and
  o adjusting sex ratios so that males make up approximately 60% of the herd.

*Alternative B:*
- Adopt an HMAP with a management strategy which would include several population growth suppression methods.
- Adopt a gather plan that would include:
  o Immediately gathering and removing excess wild horses and burros that reside within and outside the Callaghan Complex to achieve low AMLs through an initial gather and follow-up gather or gathers, as necessary;
  o implement population growth methods, including use of fertility control vaccines and managing for a small non-reproducing population of geldings (castrated stallions) (not exceeding approximately ¼ of the overall herd size); and
  o adjusting sex ratios so that males make up approximately 60% of the herd.

*Alternative C:*
- Adopt an HMAP with a management strategy which would include only gather and removal of excess wild horses residing within and outside the Complex and would not include population growth suppression or fertility control.

5

CAL_08868

- Adopt a gather plan that would include immediately gathering and removing excess wild horses and burros that reside within and outside the Callaghan Complex to achieve low AMLs through an initial gather and follow-up gather or gathers, as necessary. No population growth suppression measures would be approved.

*Alternative D - No Action*: Existing management would continue and the BLM would defer gather and removal of excess wild horses that reside within the Callaghan Complex. The BLM would not adopt or implement an HMAP for the Callaghan Complex. There would be no active management to control population growth rates or the size of the wild horse population to bring the wild horse population to AML or maintain it within the AML range.

Alternatives A-C were developed to respond to the identified resource issues and the Purpose and Need, to differing degrees and by differing means. The gather and removal components of Alternatives A-C would be implemented within the Callaghan Complex until low AML is achieved. Global Positioning Systems (GPS) radio collars and / or GPS tail tag transmitters may be used as part of monitoring efforts for Alternatives A-C. Radio collars would not be used on stallions (Schoenecker et al. 2020). Such collars and tags have been used to monitor wild horse movements in the states of Nevada, Utah, and Wyoming and are analyzed in Chapter 3 of this EA.

Alternative D, No Action, would not achieve the identified Purpose and Need. However, it is analyzed in this EA to provide a basis for comparison with other action alternatives, and to assess the effects of not adopting an HMAP and not removing excess wild horses. The No Action Alternative is not consistent with the WFRHBA and the SERA RMP, which requires the BLM to manage the population within AML and to remove excess animals when necessary to achieve a thriving natural ecological balance.

## 2.1 Description of Alternatives in Detail

### 2.1.1 BLM's Use of Contraception in Wild Horse Management (Alternatives A&B Only)

Expanding the use of population growth suppression (PGS) to slow population growth rates and reducing the number of animals removed from the range and sent to off-range corral (ORCs) and off-range pastures (ORPs) is a BLM priority (BLM 2020). The WFRHBA specifically provides for sterilization (section 3.b.1). No finding of excess determination is required for BLM to pursue contraception in wild horses. Contraception has been shown to be a cost-effective and humane treatment to slow increases in wild horse populations or, when used with other techniques, to reduce horse population size (Bartholow 2004, de Seve and Boyles-Griffin 2013, Fonner and Bohara 2017).

Alternatives A and B would include the application of fertility control vaccines PZP vaccine (ZonaStat-H, PZP-22), GonaCon-Equine vaccine, or the most current formulation to prevent pregnancy in the following years. Treated mares would be released back to the Complex. BLM would return to the complex for additional gathers, as needed, to re-apply and or initiate new treatments in order to maintain contraceptive effectiveness in controlling population growth rates. Booster doses may lead to increased effectiveness of contraception, which is generally the intent.

6

CAL_08869

In cases where a booster vaccine dose is required, mares could be held for approximately 30 days (or other time period as appropriate and recommended by policy or scientific literature) and given a booster injection prior to release. Treated mares would be freeze marked and microchipped for future identification during gathers and on the range. Field darting could also be utilized to treat identifiable mares with vaccine primers and boosters where and if feasible.

Once the herd size in the project area is within the AML range and population growth seems to be stabilized, BLM would make a determination as to the required frequency of new mare fertility control treatments and re-treatments \to maintain the number of horses within AML.

### 2.1.2 Management Actions in Common with Alternatives A – C

- Funding limitations and competing national priorities my impact the timing and ability to gather and conduct population control components of the alternatives.
- Excess wild horses may be gathered and removed from within HMA boundaries as well as outside HMA boundaries.
- Gather operations would be conducted in accordance with the Comprehensive Animal Welfare Plan (CAWP; BLM 2021) Appendix III, or as it may be updated in the future.
- The BLM's gather, removal, and fertility control operations are intended to address management needs regarding public safety, emergency situations and private land issues.
- Trap sites and temporary holding facilities would be located in previously used sites or other disturbed areas whenever possible. Undisturbed areas identified as potential trap sites or holding facilities would be inventoried for cultural resources and sensitive species prior to use and if encountered, these locations would not be used unless operations could be modified to avoid impacts.
- The BLM will make any decisions necessary to humanely euthanize animals in field situations in conformance with BLM policy, which is currently Permanent Instruction Memorandum 2021-007 or as it may be updated in the future.
- Data including sex and age distribution, condition class information (using the Henneke body condition score (BCS)), color, size and other information may also be recorded, along with the disposition of the animal (removed or released).
- Hair follicle samples may be collected from animals across the Complex to assess the current genetic diversity in the herd, and their relatedness to other, previously sampled herds. Samples would also be collected during future gathers as needed to determine whether BLM's management is maintaining acceptable genetic diversity (i.e., avoiding high risk of inbreeding depression).
- In the event that genetic monitoring indicates relatively low levels of observed heterozygosity (a measure of genetic diversity), the BLM may introduce additional wild horses into the Callaghan Complex to augment genetic diversity in the herd.
- A veterinarian would be on-call or on-site as the helicopter gather is started and then as needed for the duration of the gather to examine animals and make recommendations to the BLM for the care and treatment of wild horses and ensure humane treatment. Additionally, all animals transported to BLM wild horse facilities will be inspected by facility staff and the veterinarian, to observe health and ensure the animals have been cared for humanely.

CAL_08870

- GPS radio collars may be attached to wild horse mares, and / or GPS tail tags may be attached to wild horses of either sex, for the purposes of monitoring movements and foaling status.
- Noxious weed monitoring at gather sites and temporary holding corrals would be conducted following the gather by BLM.
- The BLM will engage in routine population inventories and resource/habitat monitoring of rangeland forage condition and utilization, water availability, aerial population surveys and animal health, depending on the BLM's funding limitations and competing priorities.
- Proposed gather activities within PHMAs, GHMAs, and Other Habitat Management Areas (OHMAs) will implement the applicable Required Design Features consistent with the 2025 GRSG ARMPA.

**Helicopter Drive Trapping**

If the local conditions require a helicopter drive-trap operation, the BLM will use a contractor to perform the gather activities. The contractor would be required to conduct all helicopter operations in a safe manner and in compliance with Federal Aviation Administration (FAA) regulations 14 CFR§ 91.119. Helicopter landings would not be allowed in wilderness except in the case of an emergency. For safety purposes, any public observers must be located a minimum of 1,000 feet from the areas where the helicopter may be herding animals or flying over.

Helicopter drive trapping involves use of a helicopter to herd wild horses into a temporary trap. The CAWP (BLM 2021, PIM 2021-002) or most current policy guidelines would be implemented to ensure that the gather is conducted in a safe and humane manner, and to minimize potential impacts or injury to the wild horses. Traps would be set in an area with high probability of access by horses using the topography, if possible, to assist with capturing excess wild horses residing within the area. Traps consist of a large catch pen with several connected holding corrals, jute-covered wings and a loading chute. The jute-covered wings are made of burlap like material, not wire, to avoid injury to the horses. The wings form an alley way used to guide the horses into the trap. Trap locations are changed during the gather to reduce the distance that the animals must travel. A helicopter is used to locate and herd wild horses to the trap location. The pilot uses a pressure and release system while guiding them to the trap site, allowing them to travel at their own pace. As the herd approaches the trap the pilot applies pressure and a 'prada' horse is released guiding the wild horses into the trap. Once horses are gathered, they are removed from the trap and transported to a temporary holding facility where they are sorted.

If helicopter drive-trapping operations are needed to capture the targeted animals, BLM would assure a veterinarian is on-site and/ or on-call during the gather to examine animals and make recommendations to BLM for care and treatment of wild horses. BLM staff would be present on the gather at all times to observe animal condition, ensure humane treatment of wild horses, and ensure contract requirements are met. Studies show that gather related mortality has averaged only 0.5%, which is very low when handling wild animals (GAO 2008, Scasta 2019). Another 0.6% of the animals captured were humanely euthanized due to pre-existing conditions and in accordance with BLM policy. This data affirms that the use of helicopters and motorized vehicles

CAL_08871

are a safe, humane, effective, and practical means for gathering and removing excess wild horses and burros from the range.

The BLM may find it necessary to issue a temporary closure and restriction order to ensure that gather operations will be effective and to protect the safety of the contractors, employees, public and the wild horses during gather operations. Any such closures will comply with the public notification process outlined in BLM's regulations at 43 C.F.R. § 8364.1. The BLM will limit any such closure to the appropriate area needed to conduct gather operations and may move the closed/restricted area from capture site to capture site to ensure access to public lands when operations are not occurring near the capture site or temporary holding corrals. Where possible, closed areas may be open to traffic when directed by a pilot car.

### Bait/Water Trapping

Bait and/or water trapping may be used if circumstances require it or best fits the management action to be taken. Bait and/or water trapping generally require a longer window of time for success than helicopter drive trapping. Although the trap would be set in a high probability area for capturing excess wild horses residing within the area, and at the most effective time periods, time is required for the horses to acclimate to the trap and/or decide to access the water/bait.

Trapping involves setting up portable panels around an existing water source or in an active wild horse area, or around a pre-set water or bait source. The portable panels would be set up to allow wild horses to go freely in and out of the corral until they have adjusted to it. When the wild horses fully adapt to the corral, it is fitted with a gate system. The acclimation of the horses creates a low stress trapping method. During this acclimation period the horses would experience some stress due to the panels being setup and perceived access restriction to the water/bait source.

When actively trapping wild horses, the trap would be staffed or checked on a daily basis by either BLM personnel or authorized contractor staff. Horses would be either removed immediately or fed and watered for up to several days prior to transport to a holding facility. Existing roads would be used to access the trap sites.

Gathering excess horses using bait/water trapping could occur at any time of the year and traps would remain in place until the target number of animals are removed. Generally, bait/water trapping is most effective when a specific resource is limited, such as water during the summer months. For example, in some areas, a group of wild horses may congregate at a given watering site during the summer because few perennial water resources are available nearby. Under those circumstances, water trapping could be a useful means of reducing the number of horses at a given location, which can also relieve the resource pressure caused by too many horses. As the proposed bait and/or water trapping in this area is a low stress approach to gathering wild horses, such trapping can continue into the foaling season without undue harm to mares or foals. Due to the nature of the bait and water trap method, wild horses are reluctant to approach the trap site when there is too much activity. Only essential gather operations personnel would be at the trap site during gather operations and, there is generally no public observation allowed. The BLM may issue a closure and restriction order in accordance with 43 C.F.R. § 8364.1 to ensure that the gather is effective and to protect wild horse and public safety.

CAL_08872

**Gather Related Temporary Holding Facilities (Corrals)**

Wild horses that are gathered would be transported from the gather sites to a temporary holding facility in goose-neck trailers, if necessary. At the temporary holding facility, wild horses would be sorted into different pens based on sex. The horses would be aged and provided good quality hay and water. Mares and their un-weaned foals would be kept in pens together. At the temporary holding facility, a veterinarian, when present, would provide recommendations to the BLM regarding care and treatment of the recently captured wild horses. Any animals affected by a chronic or incurable disease, injury, lameness or serious physical defect (such as severe tooth loss or wear, club foot, and other severe congenital abnormalities) would be humanely euthanized using methods acceptable to the American Veterinary Medical Association (AVMA) and in accordance with BML policy.

Herd health and characteristics data would be collected as needed as part of continued monitoring of the wild horse herds.

If a temporary holding facility is utilized as part of the gather operations, the horses would generally stay at that facility for 24-48 hours, then be transported to BLM off-range corrals where they would be prepared for adoption and/or sale to qualified individuals or transfer to off-range pastures or other disposition authorized by WFRHBA.

**Transport, Off-Range Corrals (ORC), and Adoption Preparation**

All excess wild horses that are gathered for removal would be transported to BLM ORC (formerly called short-term holding facility) where they would be inspected by facility staff and, if needed, a contract veterinarian to observe health and ensure the animals are being humanely cared for.

Those wild horses that are removed from the range and are identified to not return to the range would be transported to the receiving ORC in a goose-neck stock trailer or straight-deck semi-tractor trailers. Trucks and trailers used to haul the wild horses would be inspected prior to use to ensure wild horses can be safely transported. Wild horses would be segregated by age and sex when possible and loaded into separate compartments. Mares and their un-weaned foals may be shipped together. Transportation of recently captured wild horses is limited to a maximum of 10 hours.

Upon arrival at the ORC, recently captured wild horses are off-loaded by compartment and placed in holding pens where they are provided good quality hay and water. Most wild horses begin to eat and drink immediately and adjust rapidly to their new situation. At the off-range corral, a contract veterinarian provides recommendations to the BLM regarding care, treatment, and if necessary, euthanasia of the recently captured wild horses. Wild horses in very thin condition or animals with injuries are sorted and placed in hospital pens, fed separately and/or treated for their injuries. Recently captured animals in very thin condition may have difficulty transitioning to feed. Some of these animals may be in such poor condition that it is unlikely they would have survived if left on the range. Similarly, some females may lose their pregnancies. Certain management techniques would be taken to help females make a quiet, low stress transition to captivity and domestic feed to minimize the risk of miscarriage or death.

10

CAL_08873

After recently captured wild horses have transitioned to their new environment, they are prepared for adoption, sale, or transport to Off-Range Pastures. Preparation involves freeze-marking the animals with a unique identification number, vaccination against common diseases, castration, microchipping, and de-worming. At ORC facilities, a minimum of 700 square feet of space is provided per animal.  Mortality at ORCs average approximately 5% per year (GAO, 2008), and includes animals euthanized due to pre-existing conditions; animals in extremely poor conditions; animals that are injured and would not recover; animals which are unable to transition to feed; and animals which are seriously injuring or accidentally die during sorting, handling, or preparation. ORCs may be BLM-owned or contracted private facilities.

### Adoption

Adoption applicants are required to have at least a 400 square foot corral with panels that are at least six feet tall. Applicants are required to provide adequate shelter, feed, and water. The BLM retains title to the horse for one year and inspects the horse and facilities during this period. After one year, the applicant may take title to the horse, at which point the horse becomes the property of the applicant. Adoptions are conducted in accordance with 43 CFR Subpart 4750.

### Sale with Limitations

Buyers must fill out an application and be pre-approved before they may buy a wild horse. A sale-eligible wild horse is any animal that is more than 10 years old or has been offered unsuccessfully for adoption at least three times. The application also specifies that buyers cannot sell the horse to slaughter buyers or anyone who would sell the animals to a commercial processing plant. Sales of wild horses are conducted in accordance with the WFRHBA and congressional limitations.

### Off-Range Pastures (ORP)

In ORP, mares and sterilized stallions (geldings) are segregated into separate pastures. Although the animals are placed in ORP, they remain available for adoption or sale to qualified individuals; and foals born to pregnant mares in ORP are gathered and weaned when they reach about 8-12 months of age and are also made available for adoption. The ORP contracts specify the care that wild horses must receive to ensure they remain healthy and well- cared for. Handling by humans is minimized to the extent possible although regular on-the- ground observation by the ORP contractor and periodic counts of the wild horses to ascertain their well-being and safety are conducted by BLM personnel and/or veterinarians.

### Shipping

When shipping wild horses for adoption, sale, or ORP the animals may be transported for up to a maximum of 24 hours. Immediately prior to transportation, and after every 24 hours of transportation, animals are offloaded and provided a minimum of 8 hours on-the-ground rest. During the rest period, each animal is provided access to unlimited amounts of clean water and two pounds of good quality hay per 100 pounds of body weight with adequate space to allow all animals to eat at one time.

### Euthanasia or Sale without Limitations

Under the WFRHBA, healthy excess wild horses can be euthanized or sold without limitation if there is no adoption demand for the animals. However, while euthanasia of healthy WHB and

CAL_08874

sale without limitation are allowed under the statute, these activities have not been permitted under current Congressional appropriations for over a decade and are consequently inconsistent with BLM policy. If Congress were to lift the current appropriations restrictions, then it is possible that excess horses removed from the Callaghan Complex could potentially be euthanized or sold without limitation consistent with the provisions of the WFRHBA.

Any old, sick or lame horses unable to maintain an acceptable body condition greater than or equal to a Henneke BCS of 3 or with serious physical defects would be humanely euthanized either before gather activities begin or during the gather operations. Decisions to humanely euthanize animals in field situations would be made in conformance with BLM policy (Permanent Instruction Memorandum (PIM) 2021-007 or the most current edition).

### Public Viewing Opportunities

Opportunities for public observation of the gather activities on public lands would be provided, when and where feasible, and would be consistent with WO IM No. 2013-058 and the Visitation Protocol and Ground Rules for Helicopter WH&B Gathers within Nevada (see Appendix IV), or other current policy. As part of public viewing of the gather operations, BLM will establish observation locations that reduce safety risks to the public during helicopters flights (e.g. from helicopter-related debris or from the rare helicopter crash landing, or from the potential path of gathered wild horses), to the wild horses (e.g. by ensuring observers would not be in the line of vision of wild horses being moved to the gather site), and to contractors and BLM employees who must remain focused on the gather operations and the health and well-being of the wild horses. As feasible, observation locations would be located near gather or holding sites, although safety, gather efficiency, terrain, and land status factor into how close observation locations will be. All observation location would be subject to the same cultural resource requirements as gather and holding sites.

During water/bait trapping operations, spectators and viewers would be prohibited as it would impact the contractor's ability to capture wild horses. Only essential gather operation personnel would be allowed at the trap site during operations.

### 2.2 Herd Management Area Plan

The Herd Management Area Plan (HMAP) is a plan for the management of wild horses within the Callaghan Complex. The HMAP is described in more detail in Appendix XII, including management, monitoring, and implementation objectives. Potential future actions listed in the objectives of the HMAP would be reviewed prior to implementation to determine if additional NEPA documentation is required.

12

CAL_08875

Table 2: Callaghan Complex Herd Management Area Plan Matrix

| Item | Alternatives A-C | No Action |
|---|---|---|
| Population Management | Manage wild horse population within the established AML range of 323-552 wild horses to protect the range from deterioration associated with overpopulation. Excess wild horses would be removed to the low range of AML upon determination that excess animals are present. Once high-end of AML has been surpassed, follow up gathers would occur to remove excess wild horses back to low AML. | The Callaghan Complex would be managed under existing management. |
| Adjust to AML | AML would be reevaluated, as needed, following an in-depth analysis of resource conditions including but not limited to actual use, utilization, available forage and water, range conditions, trend, and precipitation. | |
| Population Control Method | Alternatives A & B: Gathers to remove excess wild horses. Additional population growth suppression methods would be utilized by implementing fertility control methods once low AML is achieved.<br><br>Alternative C: Gathers to remove excess wild horses. No Fertility control methods would be utilized but would be gathered once High-end of AML is reached and excess animals would be removed to achieve low-end of AML. | Continue existing management, a gather to remove excess wild horses would not occur. There would be no active management to control population growth rates, the size of the wild horse population or to bring the wild horse population to AML. |
| Sex Ratio | Approximately 60% studs/40% mares | No sex ratio adjustment would occur. |
| Total Animals Remaining Following Gathers | Low range of AML across the Complex:<br>Bald Mountain HMA: 129 wild horses<br>Callaghan HMA: 134 wild horses<br>South Shoshone HMA: 60 wild horses<br>Complex Total: 323 | N/A |
| Selective Removal Criteria | Selective Removals would only be implemented once the Complex is within Appropriate Management Levels. Selection would be focused on returning animals with good conformation or size, etc. | No Selective Removal would occur. |

13

CAL_08876

| Item | Alternatives A-C | No Action |
|---|---|---|
| Genetic Diversity | Collect genetic (hair follicle) samples and if sampling indicates a loss of 10% heterozygosity per generation or a level of observed heterozygosity below .66 for the standard DNA markers currently used in analysis. 3-4 mares from similar HMAs would be introduced. | No correction for potential future genetic loss would be implemented under this alternative. |
| Rangeland Health | Utilization by all herbivores is limited to 40% of current year's production for key grasses, key shrubs, and forbs. | |
| Riparian Health | Existing water developments would be periodically maintained, and new water developments could be constructed as needed. | Maintain existing water developments until they outlive their useful life then remove them and readjust AML based on available water. |
| Wild Burros | The Callaghan Complex is not designated for wild burro management. All wild burros present within the Complex are determined to be excess and would be removed to the extent practicable. | No removal of wild burros. |

## 2.3 Alternative A: Proposed Action

This alternative would adopt and implement a HMAP consisting of a management strategy that incorporates a number of population growth suppression methods. Wild horses within the Callaghan Complex will be managed within the AML range (see table 1 for HMA/Acres/AML).

Further, the BLM would immediately remove excess wild horses to low AML through an initial gather and if necessary, a follow up gather or gathers.  The BLM would also implement population growth suppression utilizing vaccines for horses, IUDs for horses, sex ratio adjustments for horses and managing no more than approximately ¼ of the mares at low AML as a permanently non-reproducing portion of the population, including mares that are sterilized with a minimally invasive procedure.

All wild horses and burros residing outside designated HMAs would be removed as excess animals since these areas are not designated for wild horse and burro management. However, if the population of wild horses is below the low AML inside the HMAs of the Complex, the BLM will consider relocating wild horses residing outside the HMA rather than removing them. After the initial gather, the conduct population inventories for the Callaghan Complex to determine whether there are still excess animals remaining. The principal management goal for the Complex would be to bring the population to low AML across all HMAs to allow range resources to recover. In order to maintain the wild horse population within the AML range for as long as possible, the BLM may conduct fertility control measures by treating some mares then returning them to the HMAs. The majority of mares returned to HMAs would be treated with a population growth suppression vaccine (i.e., Porcine Zona Pellucida (PZP) ZonaStat, PZP vaccine pellets (PZP-22), GonaCon- Equine, or most current formulation; see Appendix V) or an

14

CAL_08877

IUD. Only mares that are not pregnant would be considered for treatment with an IUD. No mare would be administered an IUD and a vaccine at the same point in time. The remainder of mares returned to the HMA would be treated with a humane, minimally-invasive sterilization procedure (defined and addressed in Appendix V). Up to approximately ¼ of the population of mares at low AML would be managed as a non-reproducing component, comprised of mares sterilized by minimally-invasive procedure. The sex ratio adjustments for horses would temporarily lead to males being up to 60% of the herd. The procedures to be followed for minimally invasive mare sterilization are described in Appendix V.

It is expected that gather efficiencies and holding space during the initial gather may not allow for the removal of sufficient excess animals during the initial gather to reach low AML. Based on BLM's experience over the past few decades, there are a number of logistical and operational factors that can affect BLM's ability to achieve low AML with a single gather, including (but not limited to): gather efficiency is typically less than 80%, which reduces the likelihood that all excess animals can be removed in a single operation when the population significantly exceeds AML; the likely population undercount can result in additional excess wild horses being identified in a follow-up inventory even if the targeted numbers of estimated excess wild horses have been removed; the wild horses become more challenging to catch as the helicopter gather operation progresses and they learn to evade the helicopter; weather conditions may impede achieving the targeted removal numbers; and/or limited availability of contractors with the expertise needed to gather animals safely can impact the ability to continue with a gather until all excess animal have been removed. For this reason, if low AML cannot be achieved through a single initial gather, a follow-up gather or gathers may be necessary to achieve low AML. The BLM would return to the Complex to remove the remaining excess horses in follow-up gathers as necessary. Follow-up gathers would be scheduled as expeditiously as feasible, considering all factors including logistics, contractor availability, space capacity at holding facilities, and funding.

Population inventories and routine resource/habitat monitoring would be completed between gather cycles to document current population levels, growth rates, and areas for any follow-up gathers. Follow-up gathers would be conducted in a manner consistent with those described for the initial gather. Catch, treat, and release actions would be targeted to be conducted from November through February, which is identified as the period of maximum effectiveness for fertility control vaccine application. However, funding limitations and competing priorities might impact the timing of subsequent gather and population control components of this action.

The procedures to be followed for implementing fertility control vaccines and IUDs are detailed in Appendix V. Any animals that receive fertility control treatments would be freeze marked and receive a uniquely numbered RFID chip for the purpose of identifying the treated animals and tracking their treatment history. At the AML level established for the HMA and based on known seasonal movements of the horses (BLM), sufficient genetic exchange should occur to maintain the genetic health of the population, even if some of the horse herd is temporarily non-reproductive as a result of vaccines or IUDs, and if 1/4 of the mares at low AML are permanently non-reproductive. All horses identified to remain in the HMA would be selected to maintain a diverse age structure, herd characteristics, and body type (conformation). Please refer to Appendix V for further information on BLM's use of population growth suppression in wild horse management, and analyses of anticipated effects.

15

CAL_08878

Under Alternative A, no gathered mare younger than the age of 5 would be returned to the Callaghan Complex, and one or more of the minimally invasive sterilization procedures discussed in detail in Appendix V would be conducted on a selection of mares to be returned to the Complex. All mares considered for sterilization would be 5 years old or older and would, therefore have already had some opportunity to reproduce. Any mares receiving an IUD or a minimally invasive sterilization procedure would be required to be not pregnant at the time, and at a minimum body condition score of 3 (See Appendix VI, Body Condition Score Chart); however, BLM MLFO will prioritize treatment to horses with body scores of 4 or better to increase the likelihood of a faster recovery from any potential disturbance (which is expected to be minimal). Only a veterinarian experienced in the use of ultrasonography to determine pregnancy status would conduct pregnancy screenings. Only a veterinarian would place any IUD. At no time would more than ¼ of the existing mare population on the range be sterile after the total population is within AML.

For any minimally invasive sterilization procedure in which animal handling will be required, a veterinarian will conduct the procedure and ensure use of appropriate sedation, anesthesia, analgesics and antibiotics. The procedures may take place at a private veterinarian's facility or at a contract facility approved by BLM thus giving the horses the best possible care and post operation welfare observation and recovery. Treated mares will remain at the facility for welfare monitoring and until the veterinarian is confident they are healing enough to be released. For observation opportunities please reference Appendix IV.

Even when the population size of the horse herd is at the low end of AML, three-quarters or more of the mares in the herd would still be potentially of reproducing age. Hair samples would be collected for genetic monitoring during the initial gather, and then subsequently every 5-10 years; with even higher frequency if the initial results indicate that is warranted. If genetic monitoring results show a need to increase observed heterozygosity levels then BLM would augment the genetic diversity in the herd by introducing fertile adults from other HMAs.

### 2.4 Alternative B
Alternative B is similar to Alternative A, except that released mares would not receive IUDs or any minimally invasive sterilization procedures. The permanently non- reproducing portion of the horse population in the Callaghan Complex would be no more than one-quarter of the total herd at low AML but those would be limited to geldings. This alternative is not expected to reduce annual wild horse herd growth rates as much as Alternative A, but because the geldings would be a part of the total number of animals at AML and because a 60:40 sex ratio would be the target for management, it is expected that the need for follow up gathers over time would be less frequent than under Alternative C.

### 2.5 Alternative C
Alternative C is similar to Alternative A, except that gathers would be the only method of population management in the Callaghan Complex. The BLM would gather and remove excess wild horses from within and outside the three HMAs to achieve low AML. Population growth suppression measures would not be applied and no changes to the herd's sex ratios would be made. Under this alternative, follow up gathers will be conducted after the initial gather until low AML is achieved.

CAL_08879

## 2.6 Alternatives Considered but Eliminated from Detailed Analysis

The following alternatives to the helicopter drive and bait/water trapping method for the removal of wild horses to reach the established AML were considered but eliminated from detailed analysis for the reasons stated below.

### 2.6.1 Use of Bait and/or Water Trapping Only

An alternative considered but eliminated from detailed analysis was use of bait and/or water trapping as the sole gathering method. The use of bait and water trapping, though effective in specific areas and circumstances, would not be timely, cost-effective or practical as the sole gather method for the Callaghan Complex. However, water or bait trapping may be used as a supplementary approach to achieve the desired goals of Alternatives A-C, such as if gather efficiencies are too low using a helicopter, if a helicopter gather cannot be timely scheduled, excess animals are congregated in an area suitable for water or bait trapping, or for follow up gathers involving removal of a small number of animals. This alternative was dismissed from detailed study as a primary or sole gather method for the following reasons:

1. The project area is too large to effectively use this gather method as the primary or sole method;
2. Road access for vehicles to potential trapping locations necessary to get equipment in/out as well as safely transport gathered wild horses is limited.
3. The large numbers of horses proposed to be gathered would make water or bait trapping as a sole capture method impossible within a reasonable time frame, due to terrain, management status of land (ie. Wilderness), etc.

### 2.6.2 Field Darting PZP Treatment as Exclusive Method of Population Control

Under this scenario, BLM would administer PZP in the one-year liquid dose inoculations by field darting the mares as the sole method of population management. This method is currently approved for use and is being utilized by BLM in a small number of other HMAs. This alternative was dismissed from detailed study for the following reasons:

1. The size of the area at 1,145,515 acres is too large to use this method.
2. The presence of water sources on both private and public lands inside and outside the complex would make it almost impossible to restrict wild horse access to be able to dart horses consistently.
3. Horse behavior limits their approachability/ accessibility, so that the number of mares expected to be treatable via darting would be insufficient to control growth.
4. BLM would have difficulties keeping records of unmarked animals that have been treated due to large numbers of animals and common and similar colors and patterns in this herd. For these reasons, this alternative was determined to not be an effective or feasible method for managing wild horses from the Callaghan Complex.

### 2.6.3 Gathering the Callaghan Complex only to upper-level AML

Gathering wild horses to achieve a post-gather population size at the upper level of the AML range would result in AML being exceeded with the next foaling season.

The upper levels of the AML range established for the Complex represents the maximum population for which a thriving natural ecological balance can be maintained. The lower range

17

CAL_08880

represents the number of animals that should remain in the Complex following a wild horse gather in order to allow for a periodic gather cycle of approximately every four years and to prevent the population from exceeding the established AML between gathers. The need to gather below the upper range of AML has been recognized by the IBLA, which has held that:

"... the term AML within the context of the statute to mean[s] that "optimum number" of wild horses which results in a thriving natural eco- logical balance and avoids a deterioration of the range." (Animal Protection Institute of America, 109 IBLA 112, 119 (1989))

Proper range management dictates removal of horses before the herd size causes damage to the range land. Thus, the optimum number of horses is fewer than the number that would cause damage. Removal of horses before range conditions deteriorate ensures that horses enjoy adequate forage and an ecological balance is maintained (Animal Protection Institute of America, 118 IBLA 63 (1991)).

Additionally, gathering to the upper level of AML would result in the need to follow up with another gather within one year, and could result in over utilization of vegetation resources, damage to the rangeland, and increased stress to wild horses. For these reasons, this alternative did not receive further consideration in this document.

### 2.6.4 Control of Wild Horse Populations by Natural Means

This alternative would use natural means, such as natural predation and weather, to control the wild horse population. This alternative was eliminated from further consideration because it would be contrary to the WFRHBA, which requires the BLM to protect the range from deterioration associated with an overpopulation of wild horses and burros. The alternative of using natural controls to achieve a desirable AML has not been shown to be feasible (NAS 2013). Wild horse population in the Callaghan Complex is not substantially regulated by predators, as evidenced by the 15-20% annual increase in the wild horse populations. In addition, wild horses are a long-lived species with documented foal survival rates that may exceed 95% (Ransom et al. 2016) and are not a 'self-regulating' species. This alternative would allow for a steady increase in the wild horse populations which would continue to exceed the carrying capacity of the range and would cause increasing damage to the rangelands until severe range degradation or natural conditions that occur periodically – such as blizzards or extreme drought – cause a catastrophic mortality of wild horses in the Complex.

Many horse herds grow at sustained high rates of 15-25% per year and wild horses are not a self-regulating species (NRC 2013). The NAS report (NRC 2013) concluded that the primary way that equid populations self-limit is through increased competition for forage at higher densities, which results in smaller quantities of forage available per animal, poorer body condition, and decreased natality and survival. It also concluded that the effect of this would be impacts to resource and herd health that are contrary to BLM management objectives and statutory and regulatory mandates. This alternative would result in a steady increase in the wild horse populations which would continue to exceed the carrying capacity of the range resulting in a catastrophic mortality of wild horses in the HMA, and irreparable damage to rangeland resources.

CAL_08881

## 2.6.5 Raising the Appropriate Management Levels for Wild Horses

This alternative was not brought forward for detailed analysis because it would be outside of the scope of the analysis, and would be inconsistent with the WFRHBA which directs the Secretary to immediately remove excess wild horses and to manage for a thriving natural ecological balance and for multiple uses. AML within the Complex was last reevaluated in the SERARMP (1986), Austin FMUD (1995), Carico Lake FMUD (2002), and the Kingston Simpson Park FMUD (2005) and there is no basis for modifying the AML at this time. Available data shows that excess wild horses are present on the range, that these excess horses need to be removed, and that there is insufficient water and forage within the complex to support an increase in the wild horse AML. Given the resource degradation occurring with the current overpopulation of wild horses, it is necessary to bring the population back to low AML first, and to provide the range sufficient opportunity to recover, so the agency can collect data that would help inform whether the range could support additional horses above currently defined AML levels, while still ensuring a thriving natural ecological balance. Given the absence of data that would support a modification to the AML, and that such modification could require an RMP amendment, this gather decision is not an appropriate mechanism for adjusting AML.

## 2.6.6 Remove or Reduce Livestock within the Callaghan Complex

This alternative would involve no removal of wild horses and would instead address the range deterioration caused by excess wild horse numbers through the removal of livestock or reductions in livestock grazing allocations within the Complex. This alternative was not brought forward for analysis because it would be inconsistent with the current land use plans and with the WFRHBA which mandates management of wild horses in balance with other multiple uses.

The proposal to reduce livestock would not meet the purpose and need for action. Monitoring indicates that the wild horses are causing resource degradation, even in areas with no livestock grazing, and that there is insufficient water and forage for the number of horses present, resulting in their movement outside of HMA boundaries to public and private lands that are not managed for wild horses.

This alternative would also be inconsistent with the WFRHBA, which directs the Secretary to immediately remove excess wild horses. Livestock grazing can only be reduced or eliminated if BLM follows regulations at 43 CFR § 4100 and must be consistent with multiple use allocations set forth in the land-use plan. Such changes to livestock grazing cannot be made through a wild horse gather decision and are only possible if BLM first revises the land-use plans to re-allocate livestock forage to wild horses and to eliminate or reduce livestock grazing.

Furthermore, re-allocation of livestock AUMs to increase the wild horse AMLs would not achieve a thriving natural ecological balance due to differences in how wild horses and livestock graze. Unlike livestock which can be confined to specific pastures, limited periods of use, and specific seasons-of-use to minimize impacts to vegetation during the critical growing season or to riparian zones during the summer months, wild horses are present year-round and their impacts to rangeland resources cannot be controlled through establishment of a grazing system, such as for livestock. Thus, impacts from wild horses can only be addressed by limiting their numbers to a level that does not adversely impact rangeland resources and other multiple uses.

While the BLM is authorized to remove livestock from HMAs "if necessary to provide habitat for wild horses or burros, to implement herd management actions, or to protect wild horses or

19

burros from disease, harassment or injury" (43 CFR § 4710.5), this authority is usually applied in cases of emergency and not for general management of wild horses since it cannot be applied in a manner that would be inconsistent with the existing land-use plans. (43 CFR § 4710.1) For the reasons stated above, this alternative was not carried through for detailed analysis. For modifications in long-term multiple use management, changes in forage allocations between livestock and wild horses would have to be re-evaluated and implemented through the appropriate public decision-making processes to determine whether a thriving natural ecological balance can be achieved at a higher AML and in order to modify the current multiple use relationship established in the land-use plans.

### 2.6.7 Control of Wild Horse Populations by Fertility Control Treatment Only (No Gathers)

This alternative would require repeated gathers of a significant portion of the existing population (95%) to implement fertility control treatments only, without removal of excess horses and was modeled using a three-year gather/treatment interval over a 10-year period (See Appendix VII). Based on preliminary modeling, this alternative would not result in attainment of the AML range for the Callaghan Complex. Wild horse population would continue to increase the current wild horse overpopulation, albeit at a slower rate of growth.

*Use of GonaCon Only:*
Over the next 10 years, on average 16,254 horses would need to be gathered. Of the horses gathered an average of 9,563 horses would have to be treated. After 10 years the final average population would be 6,511 (approximately 12 times over high AML) wild horses throughout the Complex.

*Use of PZP-22 Only:*
Over the next 10 years, on average 21,393 horses would need to be gathered. Of the horses gathered an average of 7,708 horses would have to be treated. After 10 years final average population would be 11,423 (approximately 20 times over high AML) wild horses throughout the Complex.

This alternative would not bring the horse population to AML and would allow wild horse population to continue to grow even further in excess of AML. Resource degradation would escalate, and implementation of this alternative would result in significantly increased gather and fertility control costs without achieving a thriving natural ecological balance. Existing studies also indicate that management plans that rely exclusively on fertility control methods will not lead to AML being achieved in the near future (i.e., Fonner and Bohara 2017). This alternative would not meet the purpose and need of the proposed action therefore was eliminated from further consideration.

### 2.6.8 Use of Alternative Capture Techniques Instead of Helicopter Capture

The BLM identified chemical immobilization, net gunning, and wrangler/horseback drive trapping as potential alternative methods for gathering wild horses. Net gunning techniques normally used to capture big game animals also rely on helicopters, and may be associated with high injury rates. Chemical immobilization is a very specialized technique and strictly regulated. Currently the BLM does not have sufficient expertise to implement either of these methods and it would be impractical to use given the size of the project area, access limitations, and difficulties in approachability of the wild horses.

CAL_08883

Use of wrangler on horseback drive-trapping to remove excess wild horses can be fairly effective on a small scale. However, given the number of excess wild horses to be removed, the large geographic size of the gather area, access limitations, and difficulties in approaching the wild horses this technique would be ineffective and impractical. Horseback drive-trapping is also very labor intensive and can be very dangerous to the domestic horses and the wranglers used to herd the wild horses. Domestic horses can easily be injured while covering rough terrain and the wrangler could be injured if he/she falls off. For these reasons, this alternative was eliminated from further consideration.

### 2.6.9 Designation of the Complex to be Managed Principally for Wild Horses

This action under 43 CFR 4710.3-2 would require amendment of the SERARMP, which is outside the scope of this EA. The Callaghan Complex is not currently designated as a wild horse 'range.' Only the BLM Director or Assistant Director (as per BLM Manual 1203: Delegation of Authority), may establish a Wild Horse and Burro Range after a full assessment of the impact on other resources through the land-use planning process. Wild Horse and Burro Range is also not an "exclusive" designation. Designation would not necessarily exclude livestock use; therefore levels of permitted livestock grazing could remain the same.

## Chapter 3: Affected Environment and Environmental Effects

### 3.1 General Setting

The Callaghan Complex consists of the Callaghan, South Shoshone, Bald Mountain, Hickison (north of US Route 50) HMAs, and North Shoshone HA. The Complex lies entirely within Lander County, Nevada. The northern end of the Complex is approximately 7 miles south of Battle Mountain, NV and the southern end of the complex is approximately 6 miles north Austin, NV. The gather area encompasses approximately 1,145,515 acres. The Complex also includes the area spanning in between HMA boundaries where wild horses and burros currently reside. Terrain varies from level valleys to steep, rugged mountains, with elevations ranging from 4,800 feet at the valley floor to 8,500 feet on mountain peaks. The highest point in the Complex is Mount Callaghan at 10,200 feet. Climate within the complex is characterized by warm dry days, cool nights and low yearly precipitation that ranges from 5 inches at lower elevations to approximately 16 inches at higher elevations. Temperatures in the Complex can range from excess of 100 degrees in the summer and negative 20 in the winter.

Vegetation types are distributed according to topography, elevation and associated precipitation. Within the highest elevations, and subsequently the greatest precipitation, the vegetation consists primarily of pinyon-pine and juniper trees, mountain-mahogany, and low sagebrush. The lower and drier elevations consist of saltbush, greasewood, sagebrush, and a variety of annual and perennial grasses and wildflowers.

In the Great Basin high desert of Nevada, the average annual precipitation is often less than 11 inches (which defines the term desert). Drought conditions may occur as frequently as 6 out of every 10 years. Drought is defined by the Society for Range Management as "…prolonged chronic shortage of water" (SRM 1998).

21

CAL_08884

## 3.2 Description of Affected Resources/Issues

To comply with the National Environmental Policy Act, the following elements of the human environment are subject to requirements specified in statute, regulation or executive order and must be considered.

22

CAL_08885

Table 3: Supplemental Authorities (Critical Elements of Human Environment)

| Resources | Present | Affected | Rational for Dismissal from Detailed Analysis |
|---|---|---|---|
| Wild Horse and Burro | Yes | Yes | Effects to resource are analyzed in this EA |
| Air Quality | Yes | May be affected | The proposed gather area is not within an area of non-attainment or areas where total suspended particulates exceed Nevada air quality standards. Areas of disturbance would be small and temporary. Detailed analysis not required. |
| Areas of Critical Environmental Concern (ACEC's) | No | No | Resource not present within Complex boundaries. |
| Cultural Resources | Yes | No | In accordance with the SOPs for Gather and Handling Activities in Appendix IV (BLM/SHPO Protocol), gather facilities would be placed in previously disturbed areas. Should new, previously undisturbed gather sites or holding facility locations be required, appropriate Class III cultural resource inventories would be conducted to avoid placing gather facilities in areas with cultural resources and to ensure that measures are taken to avoid any cultural resource impacts. |
| Environmental Justice and Socioeconomics | Yes | No | The Proposed Action would not have disproportionately high or adverse effects on low income or minority populations. Health and environmental statues would not be compromised. The Proposed Action would not disproportionately impact social or economic values. |
| Forest Health | Yes | No | Project has a negligible effects to forest health. Detailed analysis not required. |
| Migratory Birds | Yes | May be affected | Effects to resource are analyzed in this EA. |
| Mineral Resources | Yes | No | There would be no modifications to mineral resources through the Proposed Action. |
| Native American Religious Concerns | Yes | May be affected | Effects to resource are analyzed in this EA. |
| Noxious Weeds and Invasive Nonnative Species | Yes | May be affected | Any noxious weeds or non-native invasive weeds would be avoided when establishing trap and/or holding facilities, would not be driven through. Noxious weed monitoring at trap/holding sites would be conducted and applicable treatment of weeds would occur per Noxious Weed Control EA#NV-020-02- 19 as needed. Effects to resource are analyzed in this EA. |
| Paleontology | No | No | All known Paleontology would be avoided. |
| Prime or Unique Farmlands | No | No | Resource not present. |
| Public Health & Safety | Yes | Yes | Risks have been assessed to mitigate any safety hazards in the form of safety plans and risk management worksheets. See Appendix IV. |
| Rangeland Standard and Guidelines and Livestock Grazing | Yes | Yes | Effects to resource are analyzed in this EA |
| Recreation | Yes | Yes | Effects to resource are analyzed in this EA |
| Soils | Yes | Yes | Effects to resource are analyzed in this EA |
| Special Status Species | Yes | Yes | Effects to resource are analyzed in this EA |

23

CAL_08886

| Resources | Present | Affected | Rational for Dismissal from Detailed Analysis |
|---|---|---|---|
| Threatened & Endangered Species | No | No | The Monarch Butterfly (Danaus plexippus) is a candidate species and has the potential to occur with no known critical habitats within the gather area. Detailed analysis not required. |
| Vegetation | Yes | Yes | Effects to resource are analyzed in this EA |
| Wastes, Hazardous or Solid | No | No | Resource not present. |
| Water Quality (Surface/Ground) | Yes | May be affected | Surface water disturbance would be minimal and temporary. Ground water would not be affected. |
| Wetlands and Riparian Zones | Yes | Yes | Effects to resource are analyzed in this EA |
| Wild and Scenic Rivers | No | No | Resource not present. |
| Wildfire and Fuels | Yes | Yes | Effects to resource are analyzed in this EA |
| Wildlife | Yes | Yes | Effects to resource are analyzed in this EA. |
| Wilderness/WSA | Yes | No | Effects to resource are analyzed in this EA. |

24

CAL_08887

### 3.2.1 Wild Horses

<u>Affected Environment</u>

Wild horses are the descendants of domesticated horses that were introduced to North America. Wild horse populations may grow at 15-20 percent per year (NAS 2013, Ransom et al. 2016), and predation does not typically prevent populations from growing (see literature review in Appendix V). Maintaining a herd within AML requires removing animals in roundups, also known as gathers, and may require management actions that limit population growth rates (NAS 2013). Wild horse herds compete with native wildlife for forage and water resources (reviewed in Crist et al. 2019). Since 2008, population inventory flights have been conducted every two to three years. These population inventory flights have provided information about population numbers, apparent growth rates, spatial distribution, and herd health. A population inventory was conducted in February 2025 using the simultaneous double-observer method (Crabb, 2025). Based on analysis of data from that survey the current estimated wild horse population throughout the Complex was 4,489 adult wild horses, at that time. Conservatively assuming a 15% growth rate, the population size by late 2025 was expected to reach 5,160 (Table 1). That greatly exceeds the AML for this Complex, which is 323-552.

Monitoring data shows that wild horses are having negative impacts on rangeland health conditions. The results of key species utilization monitoring reveal slight to moderate use throughout the Callaghan Complex including in areas where there has been no cattle grazing. Utilization data was collected within the project area in 2023 and 2024. Utilization was unable to be conducted at approximately 25% of sites monitored in 2023 and 33% of sites monitored in 2024 due to a lack of available key forage species. Wild horses have been a contributing factor to riparian areas not meeting PFC standards and observed areas are at risk with a downward trend. See Appendix VIII for monitoring data summaries.

<u>Diet/dietary Overlap with Other Species</u>

Numerous studies identify dietary overlap of preferred forage species and habitat preference between horses, cattle, and wildlife species in the Great Basin ecosystems for all seasons (Ganskopp 1983; Ganskopp et al. 1986, 1987; McInnis 1984; McInnis 1987; Smith et al 1982; Vavra and Sneva 1987). A strong potential exists for exploitative competition between horses and cattle under conditions of limited forage (water and space) availability (McInnis et al. 1987). Although horses and cattle are often compared as grazers, horses can be more destructive to the range than cattle due to their differing digestive systems and grazing habits. The dietary overlap between wild horses and cattle is much higher than with wildlife, and averages between 60 and 80% (Hubbard and Hansen 1976, Hansen et al. 1977, Hanley 1982, Krysl et al. 1984, McInnis and Vavra 1987). Horses are cecal digesters while most other ungulates including cattle, pronghorn, and others are ruminants (Hanley and Hanley 1982, Beever 2003). Cecal digesters do not ruminate or have to regurgitate and repeat the cycle of chewing until edible particles of plant fiber are small enough for their digestive system. Ruminants, especially cattle, must graze selectively, searching out digestible tissue (Olsen and Hansen 1977). Horses, however, are one of the least selective grazers in the West because they can consume high fiber foods and digest larger food fragments (Hanley and Hanley 1982, Beever 2003).

Wild horses can exploit the high cellulose of graminoids, or grasses, which have been observed to make up over 88% of their diet (McInnis and Vavra 1987, Hanley 1982) but shrubs –

CAL_08888

including sagebrush – can represent a large part of a horse's diet, at least in summer in the Great Basin (Nordquist 2011). However, this lower quality diet requires that horses consume 20-65% more forage than a cow of equal body mass (Hanley 1982, Menard et al. 2002). With more flexible lips and upper front incisors, both features that cattle do not have, wild horses trim vegetation more closely to the ground (Symanski 1994, Menard et al. 2002, Beever 2003). As a result, areas grazed by horses may retain fewer plant species and may be subject to higher utilization levels than areas grazed by cattle or other ungulates.

Wild horses cannot be managed like livestock by restricting their grazing to certain pastures or seasons of use. As a result of the potential for wild horse populations to grow rapidly, impacts from wild horses on water, soil, vegetation, and native wildlife resources (Davies and Boyd 2019) can increase exponentially unless there is active management to limit their population sizes through removal of excess animals or action to control their rate of population growth. Horses can compete with managed livestock in forage selected (Scasta et al. 2016). For the majority of wild horse herds, there is little overall evidence that population growth is significantly affected by predation (NAS 2013), although wild horse herd growth rates may be somewhat reduced by predation in some localized areas, particularly where individual cougars specialize on horse predation (Turner and Morrison 2001, Roelle et al. 2010). Andreasen et al. (2021) recently found that some mountain lions (*Puma concolor*) prey on young horses, particularly where horses are at very high densities and native ungulates are at very low densities. The greatest rate of predation on horses was in the Virginia Range, where the state of Nevada manages a herd of feral horses that is not federally protected. Where lion predation on horses was common, Andreasen et al. (2021) found that female lions preyed on horses year-round, but 13% or fewer of horses killed by lions were adults. BLM does not have the legal authority to regulate or manage mountain lion populations, and it is not clear whether there are any mountain lions in the Callaghan Complex that specialize on horse predation. Andreasen et al. (2021) concluded that "At landscape scales, cougar predation is unlikely to limit the growth of feral horse populations." Given the recent history of consistent growth in the Callaghan Complex, as documented by repeated aerial survey, the inference that predation does not limit local wild horse herd growth rates apparently applies.

The USFWS (2008), Beever and Aldridge (2011), Chambers et al (2017) and Crist et al. (2019) summarize much of the literature that quantifies direct ecosystem effects of wild horse presence. Beever and Aldridge (2011) present a conceptual model that illustrates the effects of wild horses on sagebrush ecosystems. In the Great Basin, areas without wild horses had greater shrub cover, plant cover, species richness, native plant cover, and overall plant biomass, and less cover percentage of grazing-tolerant, unpalatable, and invasive plant species, including cheatgrass, compared to areas with horses. Grazing by wild horses can have severe impacts on water source quality, aquatic ecosystems and riparian communities as well (Beever and Brussard 2000; Barnett 2002; Nordquist 2011; USFWS 2008; Earnst et al. 2012; USFWS 2012, Kaweck et al. 2018), sometimes excluding native ungulates from water sources (Ostermann-Kelm et al. 2008; USFWS 2008; Perry et al. 2015; Hall et al. 2016; Gooch et al. 2017; Hall et al. 2018). Impacts to riparian vegetation per individual wild horse can exceed impacts per individual domestic cow (Kaweck et al. 2018). A potential benefit of a horse's digestive system may come from seeds passing through system without being digested but the benefit is likely minimal. Wild horses can spread nonnative plant species, including cheatgrass (King et al. 2019), and may limit the

26

CAL_08889

effectiveness of habitat restoration projects. Horses require access to large amounts of water; an individual can drink an average of 7.4 gallons of water per day (Groenendyk et al. 1988). Despite a general preference for habitats near water (e.g., Crane et al. 1997), wild horses will routinely commute long distances (e.g., 10+ miles per day) between water sources and palatable vegetation (Hampson et al. 2010). During periods of increased temperature and decreased precipitation, horses monopolized access to water sources, leaving limited time for other species; this raises concerns about resource availability for native wildlife in water-limited environments (Hall et al. 2016)

Wild horses and burros may have ecologically beneficial effects, especially when herd sizes are low relative to available natural resources, but those ecological benefits do not typically outweigh damage caused when herd sizes are high, relative to available natural resources. Under some conditions, there may not be observable competition with other ungulate species for water (e.g., Meeker 1979), but recent studies that used remote cameras have found wild horses excluding native wildlife from water sources under conditions of relative water scarcity (Perry et al. 2015, Hall et al. 2016, Hall et al. 2018). Wild burros (and, less frequently, wild horses) have been observed digging 'wells;' such digging may improve habitat conditions for some vertebrate species and, in one site, may improve tree seedling survival (Lundgren et al. 2021). This behavior has been observed in intermittent stream beds where subsurface water is within 2 meters of the surface (Lundgren et al. 2021). The BLM is not aware of published studies that document wild horses or burros in the western United States causing similar or widespread habitat amelioration on drier upland habitats such as sagebrush, grasslands, or pinyon-juniper woodlands. Lundgren et al. (2021) suggested that, due to well-digging in ephemeral streambeds, wild burros (and horses) could be considered 'ecosystem engineers;' a term for species that modify resource availability for other species (Jones et al. 1994). Bleich et al. (2021) responded by pointing out that ecological benefits from wild horse and burro presence must be weighed against ecological damage they can cause, especially at high densities. In HMAs where wild horse and burro biomass is very large relative to the biomass of native ungulates (Boyce and McLoughlin 2021), they should probably also be considered 'dominant species' (Power and Mills 1995) whose ecological influences result from their prevalence on the landscape. Wild horse densities could be maintained at high levels in part because artificial selection for early or extended reproduction may mean that wild horse population dynamics are not constrained in the same way as large herbivores that were never domesticated (Boyce and McLoughlin 2021).

Another potentially positive ecological effect of wild horses and burros is that they, like all large herbivores, redistribute organic matter and nutrients in dung piles (i.e., King and Gurnell 2007), which could disperse and improve germination of undigested seeds. This could be beneficial if the animals spread viable native plant seeds, but could have negative consequences if the animals spread viable seeds of invasive plants such as cheatgrass (i.e., Loydi and Zalba 2009, King et al. 2019). Increased wild horse and burro density would be expected to increase the spatial extent and frequency of seed dispersal, whether the seeds distributed are desirable or undesirable. As is true of herbivory by any grazing animals, light grazing can increase rates of nutrient cycling (Manley et al. 1995) and foster compensatory growth in grazed plants which may stimulate root growth (Osterheld and McNaughton 1991, Schuman et al. 1999) and, potentially, an increase in carbon sequestration in the soil (i.e., Derner and Schuman 2007, He et al. 2011). However, when grazer density is high relative to available forage resources, overgrazing by any species can lead

27

CAL_08890

to long-term reductions in plant productivity, including decreased root biomass (Herbel 1982, Williams et al. 1968) and potential reduction of stored carbon in soil horizons. Recognizing the potential beneficial effects of low-density wild horse and burro herds, but also recognizing the totality of available published studies documenting ecological effects of wild horse and burro herds, especially when above AML (as noted elsewhere), it is prudent to conclude that horse and burro herd sizes above AML may cause levels of disturbance that reduce landscapes' capacity for resilience in the face of further disturbance, such as is posed by extreme weather events and other consequences of meteorological changes. Further review on the ecological interactions between wild horses and their environments is included in Appendix V.

Population modeling was completed for the Callaghan Complex using Version 1.0.2 of *PopEquus*: A Predictive Modeling Tool to Support Management Decisions for Free-roaming Horse Populations (Folt et. all 2023) to analyze how the alternatives would affect the wild horse population. This modeling analyzed removal of excess wild horses with no fertility control, as compared to removal of excess wild horses with fertility control for released horses. The no action alternative was also modeled. One objective of the modeling was to identify whether any of the alternatives "crash" the population or cause extremely low population numbers or growth rates. Minimum population levels and growth rates were found to be within acceptable ranges, and above levels that would be grounds for concern; adverse impacts to the population that might cause the herd to no longer be self-sustaining are not likely under any of Alternatives A-D. Graphic and tabular results are also displayed in detail in Appendix VII.

### Environmental Impacts Common to Alternatives A-C
Helicopter/Bait and Water Trap Impacts to Wild Horses
Impacts can occur to horses after the initial stress event (capture) and include increased social displacement or increased conflict between studs. These impacts are known to occur intermittently during wild horse gather operations. Traumatic injuries could occur and typically involve biting and /or kicking bruises. Horses may potentially strike or kick gates, panels, or the working chute while in corrals or trap which may cause injuries. Lowered competition for forage and water resources would reduce stress and fighting for limited resources (water and forage) and promote healthier animals. Indirect individual impacts are those impacts which occur to individual wild horses after the initial stress event and may include spontaneous abortions in mares. These impacts, like direct individual impacts, are known to occur intermittently during wild horse gather operations. An example of an indirect individual impact would be the brief skirmish which occurs among studs following sorting and release into the stud pen, which lasts less than a few minutes and ends when one stud retreats. Traumatic injuries usually do not result from these conflicts. These injuries typically involve a bite and/or kicking with bruises which don't break the skin. Like direct individual impacts, the frequency of occurrence of these impacts among a population varies with the individual animal.

Spontaneous abortion events among pregnant mares following capture are rare, though poor body condition at time of gather can increase the incidence of spontaneous abortions. Given the two different capture methods proposed, spontaneous abortion is not considered to be an issue for either of the two proposed capture methods, since helicopter/drive trap method would not be utilized during peak foaling season (March 1 thru June 30), unless an emergency exists, and the water/bait trapping method is anticipated to be low stress.

28

Foals are often gathered that were orphaned on the range (prior to the gather) because the mother rejected it or died. These foals are usually in poor, unthrifty condition. Orphans encountered during gathers are cared for promptly and rarely die or have to be euthanized. It is unlikely that orphan foals would be encountered since majority of the foals would be old enough to travel with the group of wild horses. Also, depending on the time of year, the age of any foals at the time would be six to nine months of age and may have already been weaned by their mothers.

Gathering wild horses during the summer months can potentially cause heat stress. Gathering wild horses during the fall/winter months reduces risk of heat stress, although this can occur during any gather, especially in older or weaker animals. Adherence to standard operating produces (SOPs) and techniques used by the gather contractor or BLM staff would help minimize the risks of heat stress. Heat stress does not occur often, but if it does, death can result. Most temperature related issues during a gather can be mitigated by adjusting daily gather times to avoid the extreme hot or cold periods of the day. The BLM and the contractor would be pro-active in controlling dust in and around the holding facility and the gather corrals to limit the horses' exposure to dust.

The BLM has been gathering excess wild horses from public lands since 1975 and has been using helicopters for such gathers since the late 1970's. Refer to Appendix IV for information on the methods that are utilized to reduce injury or stress to wild horses during gathers.

Since 2006, BLM Nevada has gathered over 40,000 excess animals. Of these, gather related mortality has averaged only 0.5%, which is very low when handling wild animals (GAO 2008, Scasta 2019). Another 0.6% of the animals captured were humanely euthanized due to pre-existing conditions and in accordance with BLM policy. This data affirms that the use of helicopters and motorized vehicles are a safe, humane, effective, and practical means for gathering and removing excess wild horses and burros from the range. For animals left on the range after gather activities, transient changes in social relations may result from gathers, but these do not fundamentally change the social structure of wild horses, which tend to live in bands of several mares and their offspring with one or more mature stallions. Hansen and Mosley (2000) concluded that gather activities had no effect on observed wild horse foraging or social behaviors, in terms of time spent resting, feeding, vigilant, traveling, or engaged in agonistic encounters. BLM policy prohibits gathering wild horses with a helicopter (unless under emergency conditions) during the period of March 1 to June 30 which includes and covers the six weeks that precede and follow the peak of foaling period (mid-April to mid-May).

Through the capture and sorting process, wild horses are examined for health, injury and other defects. Decisions to humanely euthanize animals in field situations would be made in conformance with BLM policy. BLM Euthanasia Policy PIM 2021-007 is used as a guide to determine if animals meet the criteria and should be euthanized. Animals that are euthanized for non-gather related reasons include those with old injuries (broken hip, leg) that have caused the animal to suffer from pain or which prevent them from being able to travel or maintain body condition: old animals that have lived a successful life on the range, but now have few teeth remaining, are in poor body condition, or are weak from old age; and wild horses that have congenital (genetic) or serious physical defects such as club foot, blindness, or sway back and

CAL_08892

should not be returned to the range. Further review on potential effects of wild horse gathers is included in Appendix V.

Temporary Holding Facilities During Gathers
Wild horses gathered would be transported from the trap sites to a temporary holding corral within the gather area in goose-neck trailers or straight-deck semi-tractor trailers. At the temporary holding corral, the wild horses would be aged and sorted into different pens based on sex. The horses would be provided ample supply of good quality hay and water. Mares and their un-weaned foals would be kept in pens together. All horses identified for retention in the complex would be penned separately from those animals identified for removal as excess. All mares identified for release would be treated with fertility control vaccine in accordance with the SOPs for Fertility Control Implementation in Appendix V.

At the temporary holding facility, a veterinarian, would provide recommendations to the BLM regarding care, treatment, and if necessary, euthanasia of the recently captured wild horses. Any animals affected by a chronic or incurable disease, injury, lameness, or serious physical defect (such as severe tooth loss or wear, club foot, and other severe congenital abnormalities) would be humanely euthanized consistent with BLM PIM 2021-007, using methods acceptable to the American Veterinary Medical Association (AVMA).

Transport, Off Range Corrals, and Adoption Preparation
Wild horses removed from the range as excess would be transported to the receiving short-term holding facility in a goose-neck stock or straight-deck semi-tractor trailers. Trucks and trailers used to haul the wild horses would be inspected prior to use to ensure wild horses can be safely transported and that the interior of the vehicle is in a sanitary condition. Wild horses would be segregated by age and sex when possible and loaded into separate compartments.

Mares and their un-weaned foals may be shipped together. Transportation of recently captured wild horses is limited to a maximum of 10 hours. During transport, potential impacts to individual horses can include stress, as well as slipping, falling, kicking, biting, or being stepped on by another animal. Unless wild horses are in extremely poor condition, it is rare for an animal to die during transport.

Upon arrival, recently captured wild horses are off-loaded by compartment and placed in holding pens where they are fed good quality hay and water. Most wild horses begin to eat and drink immediately and adjust rapidly to their new situation. At the short-term holding facility, a veterinarian provides recommendations to the BLM regarding care, treatment, and if necessary, euthanasia of the recently captured wild horses. Any animals affected by a chronic or incurable disease, injury, lameness or serious physical defect (such as severe tooth loss or wear, club foot, and other severe congenital abnormalities) that was not diagnosed previously at the temporary holding corrals at the gather site would be humanely euthanized using methods acceptable to the AVMA. Wild horses in very thin condition or animals with injuries are sorted and placed in hospital pens, fed separately and/or treated for their injuries. Recently captured wild horses, generally mares, in very thin condition may have difficulty transitioning to feed. A small percentage of animals can die during this transition; however, some of these animals are in such poor condition that it is unlikely they would have survived if left on the range.

30

CAL_08893

After recently captured wild horses have transitioned to their new environment, they are prepared for adoption or sale. Preparation involves freeze-marking the animals with a unique identification number, microchipping, vaccination against common diseases, castration, and de-worming. During the preparation process, potential impacts to wild horses are similar to those that can occur during transport. Injury or mortality during the preparation process is low but can occur.

Mortality at off range corral (ORC) facilities averages approximately 5% (GAO 2008), and includes animals euthanized due to a pre-existing condition, animals in extremely poor condition, animals that are injured and would not recover, animals which are unable to transition to feed; and animals which die accidentally during sorting, handling, or preparation.

Adoption
Adoption applicants are required to have at least a 400 square foot corral with panels that are at least six feet tall. Applicants are required to provide adequate shelter, feed, and water. The BLM retains title to the horse for one year and the horse and facilities are inspected. After one year, the applicant may take title to the horse at which point the horse become the property of the applicant. Adoptions are conducted in accordance with 43 CFR Subpart 4750.

Sale with Limitation
Buyers must fill out an application and be pre-approved before they may buy a wild horse. A sale-eligible wild horse is any animal that is more than 10 years old; or has been offered unsuccessfully for adoption at least 3 times. The application also specifies that all buyers are not to sell to slaughter buyers or anyone who would sell the animals to a commercial processing plant. Sale of wild horses are conducted in accordance with the WFRHBA and congressional limitations that are presently in place.

Off-range Pastures
Most animals not immediately adopted or sold have been transported to off range pastures (ORP) in the Midwest given current Congressional prohibitions on selling excess animals without limitations, or on euthanizing healthy animals for which no adoption or sale demand exists as required by the WFRHBA.

Potential impacts to wild horses from transport to adoption, sale or ORP are similar to those previously described. One difference is that when shipping wild horses for adoption, sale or ORP, animals may be transported for a maximum of 24 hours. Immediately prior to transportation, and after every 24 hours of transportation, animals are offloaded and provided a minimum of 8 hours on-the-ground rest. During the rest period, each animal is provided access to unlimited amounts of clean water and 2 pounds of good quality hay per 100 pounds of body weight with adequate bunk space to allow all animals to eat at one time. The rest period may be waived in situations where the anticipated travel time exceeds the 24-hour limit, but the stress of offloading and reloading is likely to be greater to the animals than the stress involved in the additional period of uninterrupted travel.

31

CAL_08894

Off-range pastures are designed to provide excess wild horses with humane, and in some cases life-long care in a natural setting off the public rangelands. There wild horses are maintained in grassland pastures large enough to allow free-roaming behavior (i.e., the horses are not kept in corrals) and with the forage, water, and shelter necessary to sustain them in good condition. Approximately 38,000 wild horses that are in excess of the current adoption or sale demand (because of age or other factors such as economic recession), are currently located on private land pastures in Oklahoma, Kansas, South Dakota, Iowa, Missouri, Wyoming, Montana, Nebraska, Washington, and Utah. Establishment of an ORP is subject to a separate NEPA and decision-making process. Located primarily in mid or tall grass prairie regions of the United States, these ORPs are highly productive grasslands compared to the more arid western rangelands. These pastures comprise about 400,000 acres (an average of about 10-11 acres per animal). Of the animals currently located in ORP, less than one percent is age 0-4 years, 49 percent are age 5-10 years, and about 51 percent are age 11+ years.

Mares and sterilized stallions (geldings) are segregated into separate pastures. Although the animals are placed in ORP, they remain available for adoption or sale to qualified individuals; and foals born to pregnant mares in ORP are gathered and weaned when they reach about 8-12 months of age and are also made available for adoption. The ORP contracts specify the care that wild horses must receive to ensure they remain healthy and well-cared for. Handling by humans is minimized to the extent possible, although regular on-the-ground observation by the ORP contractor and periodic counts of the wild horses to ascertain their well-being and safety are conducted by BLM personnel and/or veterinarians. A very small percentage of the animals may be humanely euthanized if they are in very poor condition due to age or other factors. Natural mortality of wild horses in ORP averages approximately 8% per year but can be higher or lower depending on the average age of the horses pastured there (GAO-09-77, Page 52). Wild horses residing on ORP facilities live longer on the average, than wild horses residing on public rangelands.

Euthanasia and Sale Without Limitation
Under the WFRHBA, healthy excess wild horses can be euthanized or sold without limitation if there is no adoption demand for the animals. However, while euthanasia and sale without limitation are allowed under the statute, these activities have not been permitted under current Congressional appropriations for over a decade and are consequently inconsistent with BLM policy. If Congress should remove this prohibition, then excess horses removed from the HMA could potentially be sold without limitations or humanely euthanized, as required by statute, if no adoption or sale demand exists for some of the removed excess horses.

Wild Horses Remaining or Released into the HMA following Gather
Under the proposed action, the post-gather population of wild horses would be about 60 wild horses in the South Shoshone HMA, 129 in the Bald Mountain HMA, and 134 in the Callaghan HMA which is the low end of AML. Reducing population size would also ensure that the remaining wild horses are healthy and vigorous, are not at risk of death or suffering from starvation due to insufficient habitat coupled with the effects of frequent drought (lack of forage and water), and that the population does not exceed AML between gathers.

The wild horses that are not captured may be temporarily disturbed and move into another area

CAL_08895

during the gather operations. With the exception of changes to herd demographics, direct population wide impacts have proven, over the last 20 years, to be temporary in nature with most if not all impacts disappearing within hours to several days of when wild horses are released back into their respective HMAs. No observable effects associated with these impacts would be expected within one month of release, except for a heightened awareness of human presence.

As a result of lower density of wild horses across the Callaghan Complex following the removal of excess horses, competition for resources would be reduced, allowing wild horses to utilize preferred, quality habitat. Confrontations between stallions would also become less frequent, as would fighting among wild horse bands at water sources. Achieving the low AML and improving the overall health and fitness of wild horses could also increase foaling rates and foaling survival rates over the current conditions.

The primary effects to the wild horse population that would be directly related to this proposed gather would be to herd population dynamics, age structure or sex ratio, and subsequently to the growth rates and population size over time.

The remaining wild horses would contribute to the resulting social structure and herd demographics (including age and sex ratios, and survival and fertility rates). No observable effects to the remaining population associated with the gather impacts would be expected except a heightened shyness toward human contact.

Impacts to the rangeland as a result of the current overpopulation of wild horses would be reduced under the action alternatives. Fighting among stud horses would be expected to decrease since they would protect their position at water sources less frequently; injuries and death to all age classes of animals would also be expected to be reduced as competition for limited forage and water resources is decreased.

Individual impacts are those impacts which occur to individual wild horses after the initial stress event, and may include spontaneous abortions in mares, and increased social displacement and conflict in studs. These impacts, like direct individual impacts, are known to occur intermittently during wild horse gather operations. An example of an indirect individual impact would be the brief skirmish which occurs among older studs following sorting and release into the stud pen, which lasts less than two minutes and ends when one stud retreats. Traumatic injuries usually do not result from these conflicts. These injuries typically involve a bite and/or kicking with bruises which don't break the skin. Like direct individual impacts, the frequency of occurrence of these impacts among a population varies with the individual animal.

Spontaneous abortion events among pregnant mares following capture are rare, though poor body condition can increase the incidence of such spontaneous abortions. Given the timing of this gather, spontaneous abortion is not considered to be an issue for the proposed gather.

Oftentimes, foals are gathered that were already orphans on the range (prior to the gather) because the mother rejected it or died. These foals are usually in poor, unthrifty condition. Orphans encountered during gathers are cared for promptly and rarely die or have to be euthanized. Most foals that would be gathered would be over four months of age and some would

33

be ready for weaning from their mothers. In private industry, domestic horses are normally weaned between four and six months of age.

Gathering the wild horses during the fall reduces risk of heat stress, although this can occur during any gather, regardless of season, especially in older or weaker animals. Adherence to the SOPs as well and techniques used by the gather contractor help minimize the risks of heat stress. Heat stress does not occur often, but if it does, death can result.

During summer gathers, roads and corrals may become dusty, depending upon the soils and specific conditions at the gather area. The BLM ensures that contractors mitigate any potential impacts from dust by slowing speeds on dusty roads and watering down corrals and alleyways. Despite precautions, it is possible for some animals to develop complications from dust inhalation and contract dust pneumonia. This is rare and usually affects animals that are already weak or otherwise debilitated due to older age or poor body condition. Summer gathers pose increased risk of heat stress, so contractors use techniques that minimize heat stress, such as conducting gather activities in the early morning, when temperatures are coolest, and stopping well before the hottest period of the day. The helicopter pilot also brings in the horses at an easy pace. If there are extreme heat conditions, gather activities are suspended during that time. Water consumption is monitored, and wild horses or burros are often lightly sprayed with water as the corrals are being sprayed to reduce dust. The wild horses and burros appear to enjoy the cool spray during summer gathers. Individual animals are also monitored, and veterinary or supportive care administered as needed. Electrolytes can be administered to the drinking water during gathers that involve animals in weakened conditions or during summer gathers. Additionally, BLM Wild Horse and Burro staff maintains supplies of electrolyte paste if needed to directly administer to an affected animal. As a result of adherence to SOPs and care taken during summer gathers, potential risks to wild horses associated with summer gathers can be minimized or eliminated.

During winter gathers, wild horses and burros are often located in lower elevations, in less steep terrain due to snow cover in the higher elevations. Subsequently, the animals are closer to the potential gather corrals and need to maneuver less difficult terrain in many cases. However, snow cover can increase fatigue and stress during winter gathers, therefore the helicopter pilot allows horses to travel slowly at their own pace. The contractor may plow trails in the snow leading to the gather corrals to make it easier for animals to travel to the gather site and to ensure the wild horses can be safely gathered.

Through the capture and sorting process, wild horses are examined for health, injury and other defects. Decisions to humanely euthanize animals in field situations would be made in conformance with BLM policy. BLM Euthanasia Policy PIM- 2021-007 is used as a guide to determine if animals meet the criteria and should be euthanized (refer to SOPs Appendix III). Animals that are euthanized for non-gather related reasons include those with old injuries (broken hip, leg) that have caused the animal to suffer from pain or which prevent them from being able to travel or maintain body condition; old animals that have lived a successful life on the range, but now have few teeth remaining, are in poor body condition, or are weak from old age; and wild horses that have congenital (genetic) or serious physical defects such as club foot, or sway back and should not be returned to the range.

34

CAL_08897

GPS Radio Collars and Tail Tags

To facilitate the BLM's monitoring of released wild horses, United States Geological Survey (USGS) staff or other qualified personnel designated by the BLM may affix small, lightweight GPS radio transmitters (GPS tail tags) into the tails of wild horses of either sex, and / or fit GPS radio collars to wild mares, before such animals are released back to their respective HMA. This would be a part of BLM's wild horse monitoring. Telemetry- based monitoring (Schoenecker et al. 2020, 2024) has been used in other HMAs to allow the BLM to more easily observe the outcome of fertility control treatments, and to learn more about wild horse movement patterns specific conditions at the gather area.

Using telemetry for wild horse monitoring does not constitute a research project but does allow for improved accuracy of monitoring to document the outcomes of BLM management actions. The primary motivations to conduct this non-destructive data collection activity would be, first, to monitor the outcome of fertility control treatments and, second, to learn more about wild horse movements in the area. Having tail tags or radio collars on mares will allow the BLM, or the USGS as a cooperating agency, to periodically locate the animals with telemetry and check whether they have a foal. The kind of detailed information about wild horse movements within HMAs that GPS telemetry can provide is not currently available from opportunistic visual observations. The location data from the telemetry devices is expected to inform the BLM about locations and natural resources that the wild horses use throughout the year.

Qualified personnel would affix tags or collars on fewer than 100 horses, with no more than 50 attached at a time. The tail-mounted GPS units (< 50 g) or GPS radio collars (< 1 kg) would be programmed to collect multiple locations per day. Both the collars and the tail- braid attachments are designed to prevent negative impacts to horse welfare and are expected to detach from the horse within 3 years. The collars have a longer expected duration of use and would be more informative for fertility control monitoring. The tail tags have a more limited duration of use but will increase the number of animals providing monitoring results for seasonal movements. Both collars and tail tags are solid-battery powered and will include a very- high frequency (VHF) transmitter to facilitate unit location and recovery. See Appendix V for further details on GPS collar and tag application, and periodic monitoring to ensure ongoing animal safety.

Genetic Diversity

Approximately 3,000 excess wild horses have been removed from the Callaghan Complex since 1987. All current information shows that the populations are thriving and have not been negatively impacted by gather operations. The limiting factors that impact animal health are water and forage resources in light of overpopulation and further exacerbated by drought conditions.

The age selection criteria requiring the release of older horses has influenced the age structure through the years, resulting in a higher proportion of horses older than 15, an increased proportion of the population between 0-5 years of age, and a decreased proportion of 10 –14-year-old horses than a typical population would exhibit. However, the deviations have been minimal and have not been extreme departures from natural age structures. Since it has been over

CAL_08898

ten years since the last gather event, it is expected that the age structure will reflect only natural birth and death processes for all animals born since that gather.

Fertility control was implemented with Callaghan and Bald Mountain HMAs between 2009 and 2011, approximately 200 animals were treated. No further fertility control has been implemented since. The South Shoshone HMA has received no fertility control measures in the past.

The past gathers do not appear to have impaired genetic diversity of the population. DNA samples taken from the complex have been found to be highly diverse with no concerns raised for the current time or near future. In 2002, 52 blood samples, were taken from horses within the Callaghan HMA (Cothran 2003a, 2003b). Those blood samples were analyzed with respect to a number of allozyme markers, and observed heterozygosity for horses sampled in the Grass Valley allotment was equal to the mean for feral horses; observed heterozygosity was above the mean for feral horses sampled in the Austin Allotment. Callaghan HMA was sampled again in 2009 with 80 hair follicle samples which were analyzed with respect to a number of microsatellite genetic loci (Cothran 2010a, 2010b). Hair follicle samples from 52 horses were collected in 2008 for the South Shoshone HMA (Cothran 2010c). In Bald Mountain, 97 hair follicle samples were collected in 2009 (Cothran 2010d).

In the more recent samples analyzed with DNA genotyping (Cothran 2010a, 2010b, 2010c, 2010d), observed heterozygosity was above the mean for feral horses in all four sampled sets of wild horses (Callaghan west, Callaghan East, South Shoshone, and Bald Mountain). Those results did not indicate cause for concern about genetic diversity at the time, and the reports indicated that a high degree of population interchange could contribute to maintenance of genetic diversity in the area. Under all the action alternatives, hair samples would be collected during gathers, from at least 25 animals, to assess the contemporary levels of genetic diversity in the HMA. Analysis would determine whether management is maintaining acceptable genetic diversity (and avoiding excessive risk of inbreeding depression). Under all action alternatives, wild horse introductions from other HMAs could be used if needed, to augment observed heterozygosity, which is a measure of genetic diversity, the result of which would be to reduce the risk of inbreeding-related health effects. If at some point in the future genetic monitoring indicates an unacceptably low level of observed heterozygosity in the Callaghan Complex, then fertile animals from other HMAs could be introduced from other similar herds, in keeping with guidelines from the BLM WHB herd management handbook 4700 (BLM 2010).

It is not expected that observed heterozygosity would be greatly reduced by the Action Alternatives, and genetic monitoring would be used to identify any need for animal introductions that would increase genetic diversity in the HMA. Even if the potentially breeding population includes 60% male and 40% female at low AML, along with a small number of, the AML range of 323-552 wild horses in the Callaghan Complex should provide for a relatively high genetic effective population size and correspondingly low rate of loss of observed heterozygosity that would be well below 1% per generation (after Frankham et al. 2010), which is a suggested level in the BLM WHB herd management handbook (2010). For most treated mares, currently available fertility control vaccines and flexible intrauterine devices (IUDs) are expected to be temporary contraceptives, relative to the long lifespan of a wild horse mare. Many mares would

CAL_08899

likely have had one or more foals before treatment with fertility control, and many would likely regain fertility and subsequently have one or more foals.

Because of history, context, and periodic introductions, wild horses that live in the Callaghan Complex should not be considered as truly isolated populations (NAS 2013). Rather, managed herds of wild horses should be considered as components of interacting metapopulations, connected by interchange of individuals and genes due to both natural and human-facilitated movements. These animals are likely to be part of part of a larger metapopulation (NAS 2013) that has demographic and genetic connections with other BLM managed herds in Nevada, California, Oregon, Utah, and beyond. Geography suggests that wild horses could move in and out of the Callaghan Complex, fostering genetic exchange with other wild horse herds. Wild horse herds in the larger metapopulation have a background of diverse domestic breed heritage, probably caused by natural and intentional movements of animals between herds.

Available evidence supports a strong inference that wild horses in the Callaghan Complex are highly related to a number of other BLM-managed herds across the west, and that they are not genetically unusual, with respect to other wild horse herds. Cothran (20003a, 2003b, 2010a, 2010b, 2010c, 2010d) reported no unique alleles present in the sampled horses from the Complex. In a meta-analysis of wild horse population genetics, the samples from the Callaghan Complex are not unusual with respect to other wild horse herds across the west, considering that patterns of allelic diversity in those samples placed them within a large cloud of relatively closely-related sampled populations (Figure 5 in Cothran et al. 2024). Also, the 2013 NAS report includes a table showing the estimated 'fixation index' (Fst) values between 183 pairs of samples from wild horse herds. Fst is a measure of genetic differentiation. Low values of Fst indicate that a given pair of sampled herds has a shared genetic background. The lower the Fst value, the more genetically similar are the two sampled herds. Values of Fst under approximately 0.05 indicate virtually no differentiation. Values of 0.10 indicate very little differentiation. Only if values are above about 0.15 are any two sampled subpopulations considered to have evidence of elevated differentiation (Frankham et al 2010). Fst values were presented in that 2013 NAS report for the sample sets from Bald Mountain, Callaghan Austin allotment, Callaghan east, and South Shoshone. All four of those sample sets had pairwise Fst values that were less than 0.05 with 128 or more other sample sets. These results suggest that wild horses from the Callaghan Complex are genetically extremely similar to nearly three quarters of other BLM-managed herds.

In the future, the BLM would manage wild horses within the Callaghan Complex that have suitable habitat for an AML range that maintains genetic diversity, age structure, and targeted sex ratios. Current policy is to express all future wild horse AMLs as a range, to allow for regular population growth, as well as better management of populations rather than individual HMAs. Wild horses would continue to be a component of the public lands, managed within a multiple use concept.

*Environmental Effects - Alternative A (Proposed Action)*
The Proposed Action would remove excess wild horses within the Callaghan Complex. Under this alternative, excess wild horses would be removed to the low range of the AML. All wild horses residing outside of an HMA boundary would be removed. Fertility control vaccines and / or flexible IUDs would be applied to all breeding age mares that are captured and released only

CAL_08900

after low AML is achieved, except that up to approximately ¼ of the population of mares on the range at low AML for horses may be sterilized through a minimally invasive procedure. Only non-pregnant mares would be considered for application of IUDs or minimally invasive sterilization. Sex ratio manipulation would be used with wild horses so that, by returning more males than females to the complex, the overall horse sex ratio would be no more than 60% male.

Successful implementation of this alternative requires a 90-95% gather efficiency in order to have enough animals in the initial gather available for release post-gather. Historically, gather efficiencies have averaged approximately 75-80% in this complex; at this level of efficiency, all the wild horses gathered would need to be removed during the initial gather in order to restore population size to within the established AML. If gather efficiencies do not allow for the attainment of the chosen action, the BLM would return in two to three years from the initial gather to remove remaining excess wild horses and apply fertility control treatments. This would allow BLM to achieve the desired goal or reaching the low range of AML as well as to gather a sufficient number of remaining horses to implement fertility control treatments to control population growth.

When wild horse numbers have been reduced to low AML, subsequent gathers following the initial gather would be to apply or reapply fertility controls. Mares selected for release would be treated with fertility control vaccines and or IUDs (except that up to ¼ of mares at low AML may be sterilized by minimally invasive procedure) and released back to the range. Vaccinations and IUDs would be applied in keeping with standard operating procedures (SOPs, Appendix V). Consideration of which animals are selected for release would reflect the objective of adjusting the overall horse sex ratio with 60% males 40% females. Mares and studs would be selected to maintain a diverse age structure, herd characteristics and conformation (body type).  If after achieving low AML and implementing population controls, the wild horse population again exceeds high AML following the initial gather, BLM may gather and remove adoptable wild horses in excess of high AML in order to maintain the wild horse population at low AML for a sufficient period of time to allow for recovery of range resources.

Decreased competition for forage following removal of excess animals, coupled with reduced reproduction as a result of fertility control, should result in improved health and condition of mares and foals that remain on the range, and would maintain healthy range conditions over the longer-term.  Additionally, reduced reproduction rates would be expected to extend the time interval between gathers and reduce disturbance to individual animals as well as herd social structure over the foreseeable future.

The removal of excess horses, and maintenance of the herd at AML would reduce damage to the range from the current overpopulation of wild horses and allow vegetation resources time to recover.  As a result, there would be fewer disturbances to individual animals and the herd, and a more stable wild horse social structure would be provided. Removal of excess wild horses would also improve herd health. Lower competition for forage and water resources would reduce stress and promote healthier animals.

All fertility control methods affect the behavior and physiology of treated animals (NAS 2013), and are associated with potential risks and benefits, including effects of handling, frequency of

CAL_08901

handling, physiological effects, behavioral effects, and reduced population growth rates (Hampton et al. 2015). Because applying fertility control vaccines or IUDs, or sterilizing animals, requires capturing and handling, the risks and costs associated with capture and handling of horses may be comparable to those of gathering for removal, but with expectedly lower adoption and long-term holding costs in the long term. Although fertility control vaccines can be applied remotely (via darting) and some dart-based delivery may be possible in this Complex, that method was not considered to be a reliable enough method of delivery in the Complex (see 'Alternatives Considered but Eliminated').

In cases where a booster vaccine is required, mares could be held for approximately 30 days and given a booster shot prior to release. Over the course of multiple gathers, BLM would treat/retreat mares with fertility control to help meet herd management objectives. Since release of the 2013 NAS Report, the BLM has supported field trials of potential sterilization methods that may be used in WHB management, but inclusion of any particular method as a part of management does not depend on completion of any given research project. The use of any new fertility control method would conform to current best management practices at the direction of the National Wild Horse and Burro Program.

*Fertility Control Vaccines*
Immunocontraceptive Porcine Zona Pellucida (PZP) vaccines are currently being used on over 75 areas managed for wild horses by the National Park Service, US Forest Service, and the Bureau of Land Management and its use is appropriate for free-ranging wild horse herds. A full review of PZP vaccines and their effects is in Appendix V. Taking into consideration available literature on the subject, the National Academies of Sciences concluded in their 2013 report that PZP vaccine was one of the preferred available methods for contraception in wild horses and burros (NAS 2013). PZP vaccine use can reduce or eliminate the need for gathers and removals (Turner et al. 1997).  PZP vaccines meet most of the criteria that the NAS (2013) used to identify promising fertility control methods, in terms of delivery method, availability, efficacy, and side effects. It has been used extensively in wild horses (NAS 2013), and in a population of feral burros in territory of the US (Turner et al. 1996). PZP vaccine can be relatively inexpensive, meets BLM requirements for safety to mares and the environment, and is commercially produced as ZonaStat-H, an EPA-registered product (EPA 2012, SCC 2015), as PZP-22, which is a formulation of PZP in polymer pellets that can lead to a longer immune response (Turner et al. 2002, Rutberg et al. 2017, Carey et al. 2019), and as Spay-Vac (Roelle et al. 2017).

Under the proposed action, mares being treated with PZP vaccine for the first time would receive a liquid primer dose along with time release pellets.  BLM would return to the HMAs as needed to re-apply PZP-22 and/or ZonaStat-H and initiate new treatments in order to maintain contraceptive effectiveness in controlling population growth rates. Application methods could be by hand in a working chute during gathers, or through field darting if mares in some portions of the complex prove to be approachable.  Both forms of PZP can safely be reapplied as necessary to control the population growth rate. Even with repeated booster treatments of PZP, it is expected that most, if not all, mares would return to fertility, and not all mares would be treated or receive boosters within the complex to the sheer numbers of the population, the large size of the gather area and logistics of wild horse gathers. Once the population is at AML and population growth seems to be stabilized, BLM could use population planning software (i.e., PopEquus, Folt

39

CAL_08902

et al. 2023a, 2023b) to refine estimates of the required frequency of re-treating mares with PZP or other fertility control methods.

The immune-contraceptive GonaCon-Equine vaccine meets most of the criteria that the National Research Council of the National Academy of Sciences (NAS 2013) used to identify the most promising fertility control methods, in terms of delivery method, availability, efficacy, and side effects. A full review of GonaCon and other GnRH vaccines and their effects is in Appendix V. GonaCon-Equine is approved for use by authorized federal, state, tribal, public and private personnel, for application to wild and feral equids in the United States (EPA 2013, 2025) and is being used in an increasing number of wild horse herds. This vaccine is not experimental, and its use is appropriate for free-ranging wild horse herds. Taking into consideration available literature on the subject, the National Research Council concluded in their 2013 report that GonaCon-B (which is produced under the trade name GonaCon-Equine for use in feral horses and burros) was one of the most preferable available methods for contraception in wild horses and burros (NAS 2013). GonaCon-Equine has been used on feral horses in Theodore Roosevelt National Park (Baker et al. 2018, 2023) and on a number of wild horses in HMAs within Nevada and other states. GonaCon-Equine can be remotely administered in the field in cases where mares are relatively approachable, using a customized pneumatic dart (McCann et al. 2017, Baker et al. 2023). Use of remotely delivered (dart-delivered) vaccine is generally limited to populations where individual animals can be accurately identified and repeatedly approached within 50 meters or less (BLM 2010).

As with other contraceptives applied to wild horses, the long-term goal of GonaCon-Equine use is to reduce or eliminate the need for gathers and removals (NAS 2013). GonaCon-Equine vaccine is an EPA-approved pesticide (EPA, 2009a) that is relatively inexpensive, meets BLM requirements for safety to mares and the environment, and is produced in a USDA-APHIS laboratory. Its categorization as a pesticide is consistent with regulatory framework for controlling overpopulated vertebrate animals, and in no way is meant to convey that the vaccine is lethal; the intended effect of the vaccine is as a contraceptive. GonaCon is produced as a pharmaceutical-grade vaccine, including aseptic manufacturing technique to deliver a sterile vaccine product (Miller et al. 2013). If stored at 4° C, the shelf life is 6 months (Miller et al 2013). Miller et al. (2013) reviewed GonaCon environmental safety and toxicity. When advisories on the product label (EPA 2025) are followed, the product is safe for users and the environment (EPA 2009b). EPA waived a number of tests prior to registering the vaccine, because GonaCon was deemed to pose low risks to the environment, so long as the product label is followed (Wang-Cahill et al. 2022).

Under the proposed action, the BLM would return to the complex for additional gathers, as needed, to re-apply GonaCon-Equine and initiate new treatments to maintain contraceptive effectiveness in controlling population growth rates. Booster dose effects may lead to increased effectiveness of contraception, which is generally the intent (EPA 2025). GonaCon-Equine can safely be reapplied as necessary to control the population growth rate. Even with one booster treatment of GonaCon-Equine, it is expected that most, if not all, mares would eventually return to fertility at some point, although the average duration of effect after booster doses has not yet been quantified. The expected rate for the return to fertility rate in mares boosted more than once with GonaCon-Equine has not been precisely quantified, but as the mechanism of action operates

40

CAL_08903

via an immune response, a return to fertility may be expected after that immune response wanes. Once the herd size in the project area is at AML and population growth seems to be stabilized, BLM would make a determination as to the required frequency of new mare treatments and mare re-treatments with GonaCon or other fertility control methods, to maintain the number of horses within AML.

All fertility control methods in wild animals are associated with potential risks and benefits, including effects of handling, frequency of handling, physiological effects, behavioral effects, and reduced population growth rates (Hampton et al. 2015). Contraception by itself does not remove excess horses from an HMA's population, so if a wild horse population is in excess of AML, then contraception alone would result in some continuing environmental effects of horse overpopulation. Successful contraception reduces future reproduction. Limiting future population increases of horses could limit increases in environmental damage from higher densities of horses than currently exist. Horses are long-lived, potentially reaching 20 years of age or more in the wild and, if the population is above AML, treated horses and burros returned to the complex HMA may continue exerting negative environmental effects throughout their life span. In contrast, if horses above AML are removed when horses are gathered, that leads to an immediate decrease in the severity of ongoing detrimental environmental effects. A course of management actions that combines removals and fertility control can reduce negative effects of overpopulation in the near term and also reduce the number of animals that must be removed from the range in the long term.

Successful contraception would be expected to reduce the effects of frequent gather activities on the environment, as well as wild horse management costs to taxpayers. Bartholow (2007) concluded that the application of 2 or 3-year contraceptives to wild mares could reduce operational costs in a project area by 12-20%, or up to 30% in carefully planned population management programs. He also concluded that contraceptive treatment would likely reduce the number of horses that must be removed in total, with associated cost reductions in the number of adoptions and total holding costs. If applying contraception to horses requires capturing and handling horses, the risks and costs associated with capture and handling of horses may be comparable to those of gathering for removal, but adoption and long-term holding costs would be lower. Fonner and Bohara (2017) concluded that a combination of removals and PGS treatments is cost effective and can lead to achieving on-range population size goals, while relying only on PGS methods cannot achieve population size goals in the short term. Selectively applying contraception to older animals and returning them to the HMA could reduce long-term holding costs for such horses, which are difficult to adopt, and could reduce the compensatory reproduction that often follows removals (Kirkpatrick and Turner 1991). On the other hand, selectively applying contraception to younger animals and allowing older animals to be the ones that continue to breed can slow the rate of genetic diversity loss in herds where that may be a concern – a process that tends to be slow in a long-lived animal with high levels of genetic diversity – and could reduce growth rates further by delaying the age of first parturition (Gross 2000). Although contraceptive treatments are associated with a number of potential physiological, behavioral, demographic, and genetic effects, detailed Chapter 3, Environmental Effects and in Appendix V, those concerns do not generally outweigh the potential benefits of using contraceptive treatments in situations where it is a management goal to reduce population growth rates (Garrott and Oli 2013). The Proposed Action reflects proposed management

41

CAL_08904

strategies that are consistent with the WFRHBA, which allows for sterilization as a means of population control, as well as recommendations from the National Academy of Science (2013).

BLM has identified fertility control as a method that could be used to protect rangeland ecosystem health and to reduce the frequency of wild horse gathers and removals. Expanding the use of population growth suppression to slow population growth rates and reduce the number of animals removed from the range and sent to ORP is a BLM priority. The WFRHBA specifically provides for contraception (section 3.b.1). No finding of excess animals is required for BLM to pursue contraception in wild horses. Please refer to Appendix V for further detailed analysis on fertility control in wild horse management, and the effects of various methods.

*IUDs (Intrauterine Device)*
IUDs are considered a temporary fertility control method that does not generally cause future sterility (Daels and Hughes 1995). It is expected that IUDs would only be inserted in non-pregnant (open) mares. Wild mares receiving IUDs would be checked for pregnancy by a veterinarian prior to insertion of an IUD. At times of year when BLM gathers wild horses by helicopter, more than half the adult mares are pregnant. Candidate mares for treatment would need to be screened by a veterinarian to ensure they are not pregnant, because any transcervical procedures can cause a pregnancy to terminate. Screening could be with transrectal palpation or ultrasonography. Those screening procedures require restraint and evacuation of the colon, but do not require sedation or analgesia. For palpation, the veterinarian uses a sleeved hand in the rectum to feel for a fetus in the uterus. For ultrasound screening, the veterinarian brings the ultrasound probe (transducer) with a sleeved hand into the mare's rectum and visualizes the uterus. If palpation or ultrasound indicate that the mare is pregnant, then that mare is not considered for IUD application.

Based on promising results from studies in domestic mares, BLM has begun to use IUDs as a wild horse and burro fertility control method on the range. The initial management use was in mares from the Swasey HMA, in Utah. The BLM supported research into the development and testing of effective and safe IUDs for use in wild horse mares (Baldrighi et al. 2017, Holyoak et al. 2021). Available literature on the use of IUDs and some preliminary results from monitoring allow for inferences about expected effects of any management alternatives that might include use of IUDs in wild horses (see Appendix V).

Flexible IUDs may cause relatively less discomfort than hard IUDs (Daels and Hughes 1995). The 2013 National Academies of Sciences (NAS) report considered IUDs and suggested that research should test whether IUDs cause uterine inflammation and should also test how well IUDs stay in mares that live and breed with fertile stallions. Since that report, researchers tested a Y-shaped IUD to determine retention rates and assess effects on uterine health; retention rates were greater than 75% for an 18-month period, and mares returned to good uterine health and reproductive capacity after removal of the IUDs (Holyoak et al. 2021). Also, the University of Massachusetts has developed a magnetic IUD that has been effective at preventing estrus in non-breeding domestic mares (Gradil et al. 2019, Joonè et al. 2021, Gradil et al. 2021). The overall results are consistent with results from an earlier study (Daels and Hughes 1995), which used O-shaped silicone IUDs.

CAL_08905

*Minimally invasive Mare Sterilization Procedures*

Population growth suppression becomes less expensive if fertility control is long-lasting (Hobbs et al. 2000), such as with spaying and neutering. For the purposes of this EA, 'minimally invasive sterilization' is defined to be the minimally invasive sterilization of a female horse (mare) by physical means. The physical means considered here include forms of oviduct blockage; for the purposes of this analysis, these are considered minimally invasive insofar as no incisions are required. Unlike in dog and cat spaying, these minimally invasive forms of mare sterilization do not entail removal of the ovaries or uterus. Only healthy mares in BCS score of 3 or greater would be considered.

The specific minimally invasive sterilization procedures could include any form of procedure that leads a mare to be unable to become pregnant, or to maintain a pregnancy, but that does not entail incision by scalpel. The two transcervical procedures analyzed below are physical, minimally invasive sterilization methods that cause long-term blockage of the oviduct, so that fertile eggs cannot go from the ovaries to the uterus. A detailed analysis of those methods and their expected effects is included in Appendix V.

As is the case for IUDs, candidate mares for minimally-invasive sterilization procedure treatment would need to be screened by a veterinarian to ensure they are not pregnant, because any transcervical procedures can cause a pregnancy to terminate. If palpation or ultrasound indicate that the mare is pregnant, then she is not considered for the minimally invasive sterilization procedure.

One form of minimally invasive oviduct blockage procedure, "endoscopic oviduct ablation," infuses medical-grade N-butyl cyanoacrylate glue into the oviduct (Bigolin et al. 2009). In the procedure, the veterinarian passes an endoscope through the cervix, to visualize the interior of the uterus. Treated mares would stand in a padded, hydraulic chute. Banamine may be administered intravenously prior to the procedure to minimize transient colic (abdominal cramping) following the procedure. Use of any additional sedation for standing chemical restraint is at the discretion of the attending veterinarian. Fecal material is removed from the rectum, the tail is wrapped and suspended, the perineal and vaginal areas are cleansed. A sterilized, flexible endoscope would be placed into the vaginal vault and advanced through the cervix in an atraumatic manner. A veterinary team is required to manipulate and operate the endoscope monitor, insert and hold the endoscope, manipulate and position the fine-tipped catheter into the oviduct, and infuse the fluid into the oviduct. The uterus would be partially inflated with filtered room air to visualize the oviduct papilla located at the proximal end of the uterine horn. A sterile catheter is guided to each uterotubal junction (which is the entrance to the oviduct), and medical-grade glue (N-butyl cyanoacrylate) is introduced to the oviduct, where it causes blockage. After the procedure, the uterus could be infused with an antibiotic and saline to minimize the potential for infection secondary to any unintended bacterial contamination. The mares are monitored initially for 10 minutes and observed by a veterinarian twice per day for 10-14 days, but no further pain management is expected to be needed. Any mare showing signs of postoperative complications would receive treatment as indicated by a veterinarian. The total duration of the procedure per mare is expected to be less than 30 minutes. After receiving support from the California legislature (AWHC 2019), researchers at the UC Davis School of Veterinary Medicine used a similar method in burros, but with electrocauterization of the utero-

43

CAL_08906

tubular junction. A five-person team completed the procedure in 20-30 minutes total time which included a short wait for onset of light anesthesia and 5-6 minutes use of the endoscope to guide an elecotrocautery device to the uterotubal junction and apply enough heat to cause scarring.

Another form of minimally invasive oviduct blockage procedure, "endoscopic laser ablation of the oviduct papilla," is similar to the procedure described above, except that the oviducts are blocked via heating from a laser to ablate the oviduct papilla. The diode laser is expected to immediately "seal" the oviduct opening, and the resulting inflammatory reaction is expected to result in additional scar tissue formation, forming a barrier to the passage of eggs from the ovary to the uterus. Local anesthesia could be dripped directly onto each oviduct papilla to minimize any discomfort. This method has been used successfully in Georgia (Edwards et al. 2021).

Neither of these minimally invasive procedures damages the ovaries. The mare would be sterile, although she would continue to have estrus cycles. Because of the retention of estrus cycles, it is expected that behavioral outcomes of either method would be similar to those observed for PZP vaccine treated mares. Namely, mares would continue with hormonal cycles and associated breeding behaviors during the typical breeding season.

If the minimally invasive sterilization techniques are either of the two noted above, then mares chosen for the minimally invasive sterilization procedure could include adult females and immature females estimated to be older than 8 months. Immature females could be included because there are no concerns regarding space for instruments, as an endoscope and associated instruments used along with the endoscope are the only tools used, and only open (non-pregnant) females would receive the procedure.

*Sex Ratio Adjustment*
Sex ratio adjustment, leading to a reduced fraction of mares in the herd, can be considered a form of contraceptive management, insofar as it can reduce the realized per-capita growth rate in a herd. By reducing the proportion of breeding females in a population (as a fraction of the total number of animals present), the technique leads to fewer foals being born, relative to the total herd size. Sex ratio is typically adjusted in such a way that 60 percent of the horses are male. As new foals are born into the herd, the ratio tends to become closer to a 50-50 ratio. In the absence of other fertility control treatments, a 60:40 sex ratio alone can temporarily reduce population growth rates from approximately 20% to approximately 15% (Bartholow 2004). While such a decrease in growth rate may not appear to be large or long-lasting, the net result can be that fewer foals being born, at least for a few years – this can extend the time between gathers, and reduce impacts on-range, and costs off-range. A more complete analysis of sex ratio adjustment is in Appendix V.

*Environmental Effects - Alternative B*
Alternative B is similar to alternative A, except that no mares returned to the range would have a minimally invasive sterilization procedure or receive IUDs. Up to approximately ¼ of all horses on the range at low AML (i.e., about 80) may be geldings, and the wild horse herd could have up to 60% males overall at times. Because the fertility control vaccines used are potentially reversible, all the horses on the range would be potentially fertile, after vaccine effects wear off. Even while vaccines are effective, it is not expected that the BLM would be able to capture and

CAL_08907

treat all the mares in the herd, such that it is expected that some potentially large fraction (i.e., ½ or more, depending on gather efficiencies) of the mares at any given time would be fertile. Up to ¼ of the males at low AML could be geldings. This is expected to slow population growth rates, partly as a result of the larger number of males than females in the wild horse herd, and partly because geldings that retain harems do appear to prevent fertile stallions from breeding with females, at least for some number of years after gelding (King et al. 2022). Fertile studs would be selected to maintain a diverse age structure, herd characteristics and body type (conformation).

*Gelding*

In order to reduce the total number of excess wild horses that would otherwise be permanently removed from the Callaghan Complex, a portion of the horse population would be managed as geldings (castrated males). The procedures to be followed for gelding of stallions are detailed in the Gelding Standard Operating Procedures (SOPs) in Appendix V. Chemical vasectomy was identified as a promising method in the 2013 NAS report, but chemical vasectomy has since been identified as an unsuccessful method in horses (Scully et al. 2015); the method is, therefore, not being considered for use under these alternatives. Gelded animals would be monitored periodically after release. This monitoring would be completed either through aerial reconnaissance, if available, or through ground-based observations from major roads and trails. It is not anticipated that all the geldings would be observed but monitoring may detect complications if they are occurring and could confirm that horses are freely moving about the complex. Once released, preliminary results from Conger HMA indicate that geldings would continue to move and behave like fertile stallions, at least for the initial year or two after treatment (King et al. 2022). Periodic but informal observations of geldings could be recorded during routine resource monitoring work, but such observations are not intended to be part of any structured research project. Such incidental observations could include but not be limited to band size, social interactions with other geldings and harem bands, distribution within their habitat, forage utilization and activities around key water sources.

<u>*Environmental Effects - Alternative C*</u>

Under this alternative no population growth suppression methods would be utilized for animals remaining on the range. Selective removal or application of fertility control measures could not be implemented. The post-gather sex ratio would be about 50:50 mares to studs or would slightly favor males. This would be expected to result in fewer and smaller bachelor bands, increased female reproduction on a proportional basis within the herd, larger band sizes, and individual mares may begin actively producing at a slightly older age.

<u>*Environmental Effects - Alternative D*</u>

Under the no action alternative, there would be no active management to control the population size within the established AML at this time. In the absence of a gather, wild horse population would continue to grow at an average rate of approximately 18% per year. Without a gather and removal of excess animals, the wild horse population may grow to approximately 9,028 by March 1, 2030, which reflects a 15% assumed average annual growth rate this rate is at the low end of the 15%-20% of likely annual growth rates, so with no removals the actual population size by March 2030 may be larger. See Table 11.

Use by wild horses would continue to exceed the amount of forage available for their use.

45

Competition between wildlife and wild horses for limited forage and water resources would continue. Damage to rangeland resources would continue and increase. Over time, the potential risks to the health of individual horses would increase, and the need for emergency removals to prevent their death from starvation or thirst would also increase. Over the long-term, the health and sustainability of the wild horse population is dependent upon achieving a thriving natural ecological balance and sustaining healthy rangelands. Allowing wild horses to die of dehydration or starvation would be inhumane and would be contrary to the WFRHBA which requires that excess wild horses be immediately removed. Allowing rangeland damage to continue as a result of wild horse overpopulation would also be contrary to the WFRHBA which requires the BLM to "protect the range from the deterioration associated with overpopulation", "remove excess animals from the range so as to achieve appropriate management levels", and "to preserve and maintain a thriving natural ecological balance and multiple-use relationship in that area."

### 3.2.2 Native American Religious Concerns

Horse use was widespread among many Native American people in the 1600s (Taylor et al. 2023). Horses may have been introduced into Paiute and Shoshone societies from trade with the Comanche and other Plains groups (Shimkin 1986). By the mid-19th century, the horse had made a substantial impact on the political organization of the Paiute and Shoshone, as well as their subsistence and trade. The ethnographic literature presents no clear trend on whether horses were used as food by the Northern Paiutes and Shoshone. Some Native Americans argue, though, that the horse has been in Nevada since time immemorial.

The BLM consulted tribes that have an interest in this action based on their current and traditional locations. On July 3, 2023, the BLM sent consultation letters to: the Yomba Shoshone Tribe, Shoshone-Paiute Tribes of the Duck Valley Reservation, Duckwater Shoshone Tribe, South Fork Band of the Te-Moak Tribe of Western Shoshone, Ely Shoshone Tribe, Battle Mountain Band of the Te-Moak Tribe of Western Shoshone, and Te-Moak Tribe of Western Shoshone (Tribes). The BLM also notified the consulting tribes of the Management Evaluation being posted on E-Planning on March 14, 2025. To date, the BLM has not received any comments from consulting tribes on this project.

*Environmental Effects*
Alternatives A-C
Native Americans utilize a variety of plants for medicinal and other uses. They also consider all water to be sacred. Several springs are located within the gather area. Both of these resources can be adversely affected by excess domestic and wild horses. Removal of excess wild horses would generally benefit vegetation growth and spring health.

Alternative D
Under this alternative, without the removal of wild horses, springs and vegetation would continue to be degraded.

### 3.2.3 Noxious Weed and Invasive Nonnative Species

Several federal laws, regulations and policies guide BLM management activities to control noxious weeds and invasive non-native species on public lands. Laws applicable to control invasive vegetation include: the Federal Land Policy and Management Act; Carlson-Foley Act of 1968;

46

CAL_08909

Plant Protection Act of 2000; Federal Noxious Weed Act of 1974; The Federal Insecticide, Fungicide and Rodenticide Act of 1972; and the Noxious Weed Control Act of 2004. To comply with these Laws, BLM policy directs the agency to inventory and control invasive vegetation utilizing integrated weed control management techniques.

Nevada Revised Statutes, Chapter 555.05 defines "noxious weeds" and mandates landowners and land management agencies to include control of noxious weeds on lands under their jurisdiction. Nevada has listed 47 non-native invasive plant species that require control. Of these 47 species, 32 of species have been identified in the Battle Mountain District, see Appendix IX.

Weed infestations have been found within the Callaghan Complex gather area including; Scotch thistle (*Onopordum acanthium*), hoary cress (*Cardaria draba*), Russian knapweed (*Acroptilon repens*), perennial pepperweed (*Lepidium latifolium)* and bull thistle (*Cirsium vulgare*) have been observed within the Callaghan Complex gather area. Saltcedar (*Tamarix spp.*) has also been observed throughout the gather area; infestations are mainly focused in and along riparian areas. Infestations of exotic annual plants including cheatgrass (*Bromus tectorum*), tumble mustard (*Sisymbrium altissimum*), halogeton (*Halogeton glomerata*), and Russian thistle (*Salsola tragus*) commonly dominate areas that have been previously overgrazed or have burned from wildfire. The entire project area has not been inventoried for the presence of invasive non-native species.

*Environmental Effects*
Alternatives A-C
Areas most vulnerable to establishment of invasive vegetation as a result of gather operations are heavily disturbed areas, such as trap sites and temporary holding facilities.  These areas would be prioritized for follow up inventory and treatment reducing the potential for establishment and spread.  Setting trap sites and holding facilities outside of areas known to contain noxious or non-native species would limit the potential to spread invasive vegetation.

In areas where perennial vegetation is sparse, helicopter use could cause the removal of vegetation around landing zones; these areas would be susceptible to erosion and invasive species establishment.  Using sites with established perennial vegetation likely to withstand helicopter pressure would limit the potential for vegetation removal and spread.  Selecting landing zones outside of areas known to contain noxious or non-native species would also limit the potential to spread invasive vegetation.

Rangeland not heavily disturbed from gather operations contain native shrubs, understory grasses, and forbs that remain intact and would serve to compete with the invasive annual species.  Following BLM policy, integrated weed management practices including continued treatments throughout the area, would help control the spread of invasive vegetation along roadsides and other areas used during gather operations.

The action alternatives are anticipated to result in fewer invasive species within the gather area in the long term as compared to Alternative D. Wild horses have been associated with the spread of invasive exotic plants, including cheatgrass (King et al. 2019). By decreasing wild horse and burro populations levels, associated utilization levels in the uplands and the riparian areas are anticipated to also decrease. This would enable native species to seed out, while enhancing plant

47

CAL_08910

vigor, and increasing the competitive abilities of native vegetation with invasive species.

Alternative D

The No Action Alternative would not result in impacts from gather operations, but the continued wild horse overpopulation could lead to a loss of native species that allows for the spread of invasive species.

### 3.2.4 Rangeland Health Standards and Guidelines and Livestock Grazing

The Callaghan Complex Includes portions of several livestock grazing allotments. Permitted livestock grazing use in the HMAs includes both cattle and sheep. Some grazing occurs during all seasons through pastures. Livestock grazing also occurs in areas adjacent to HMAs within the Callaghan Complex Wild Horse Complex. Tables 4 through 9 represent the permitted AUM use and the percent of actual livestock use with each HMA/HA.

Table 4: Permitted Grazing within Bald Mountain HMA

| Allotment | Season of Use | Percent of HMA/HA in Allotment | Permitted Use (AUM)** | Ten Year Average AUM Use | Percent Actual Use of Permit |
|---|---|---|---|---|---|
| Carico Lake | Cattle 10/1-4/30 Sheep 11/1-6/30 | 100% | 24,956 | 1,569 | 7.74% |

Table 5: Permitted Grazing within Callaghan HMA

| Allotment | Season of Use | Percent of HMA/HA in Allotment | Permitted Use (AUM)** | Ten Year Average AUM Use | Percent Actual Use of Permit |
|---|---|---|---|---|---|
| Austin | Cattle 3/1-2/28 Sheep 3/1-10/20, 11/1-2/28 | 51% | 14,192 | 12,493 | 88.09% |
| Grass Valley | Cattle 3/1- 1/31 | 42% | 17,681 | 14,008 | 79.23% |
| Simpson Park | Cattle 3/1-2/28 Sheep 5/1-6/30 | 7% | 1,306 | 295 | 22.62% |

Table 6: Permitted Grazing within Hickison HMA, north of US Route 50.

| Allotment | Season of Use | Percent of HMA/HA in Allotment | Permitted Use (AUM)** | Ten Year Average AUM Use | Percent Actual Use of Permit |
|---|---|---|---|---|---|
| Simpson Park | Cattle 3/1-2/28 Sheep 5/1-6/30 | 49% | 3, 446 | 2,272 | 65.93% |

Table 7: Permitted Grazing within North Shoshone HA

| Allotment | Season of Use | Percent of HMA/HA in Allotment | Permitted Use (AUM)** | Ten Year Average AUM Use | Percent Actual Use of Permit |
|---|---|---|---|---|---|
| Argenta | Cattle 3/1-2/28 | 75% | 17, 570 | 3,868 | 22.01% |
| Carico Lake | Cattle 10/1-4/30 Sheep 11/1-6/30 | 25% | 24, 956 | 20,261 | 81.19% |

CAL_08911

Table 8: Permitted Grazing within South Shoshone HMA

| Allotment | Season of Use | Percent of HMA/HA in Allotment | Permitted Use (AUM)** | Ten Year Average AUM Use | Percent Actual Use of Permit |
|---|---|---|---|---|---|
| Austin | Cattle 3/1-2/28 Sheep 3/1-10/20, 11/1-2/28 | 11% | 806 | 439 | 54.48% |
| Carico Lake | Cattle 10/1-4/30 Sheep 11/1-6/30 | 89% | 24,956 | 2,251 | 11.11 % |

Table 9: Permitted Grazing in Gather Area and Outside of HMAs/HAs

| Allotment | Season of Use | Percent of HMA/HA in Allotment | Permitted Use (AUM)** | Ten Year Average AUM Use | Percent Actual Use of Permit |
|---|---|---|---|---|---|
| Argenta | Cattle 3/1-2/28 | 0% | 17,570 | 3,868 | 22.01% |
| Austin | Cattle 3/1-2/28 Sheep 3/1-10/20, 11/1-2/28 | 0% | 14,192 | 12,493 | 88.09% |
| Carico Lake | Cattle 10/1-4/30 Sheep 11/1-6/30 | 0% | 24,956 | 20,261 | 81.19% |
| Grass Valley | Cattle 3/1- 1/31 | 0% | 17, 681 | 14,008 | 79.23% |
| Simpson Park | Cattle 3/1-2/28 Sheep 5/1-6/30 | 0% | 3,446 | 2,272 | 65.93% |

Allotments continue to be evaluated for achievement of the rangeland health standards, and adjustments to livestock grazing are implemented as appropriate, as grazing term permits are renewed or through annual coordination between BLM and grazing permit holders. (A summary of the Standards Determination Documents can be found Appendix X). Adjustments can include livestock stocking levels, Season of use, grazing rotations, utilization standards, and other management practices to better control livestock distribution.

The Standard Determination Documents (SDDs) evaluate and assess livestock grazing management practices to determine whether those practices are conforming to the standards and guidelines for rangeland health, as required by 43 C.F.R. Subpart 4180. These SDDs do not evaluate or assess achievement of the Wild Horse and Burros Standards during the livestock permit renewal process (Appendix X)

Over ten years, actual livestock use has generally been less than permitted use for each of the grazing allotments (Tables 4 through 9). This has been in part due to drought, competition with wild horses for resources, and needs of livestock operations.

*Environmental Effects*
Alternatives A-C
Gather activities such as helicopters, increased vehicle traffic, and temporary holding facility will temporarily disturb or displace livestock near gather location. Once gather activities cease,

49

livestock would move back into the areas. Under the proposed action, competition between livestock and wild horses for water and forage resources would be reduced over time as excess wild horses are removed from the Complex. Forage availability and quality would improve over time as the wild horse population would be brought within AML range. These effects would likely be observed faster and for a longer period of time in the alternatives that include population growth control measures.

Alternative D
Livestock would not be displaced or disturbed under this Alternative from results of gather operations. However, competition between livestock and excess wild horses for limited water and forage resources would continue. As wild horse numbers continue to increase, livestock grazing within HMAs may be further reduced in effort to slow deterioration of the range to the greatest possible extent.

### 3.2.5 Recreation

Recreation opportunities that exist in the area contain dispersed recreation, wildlife watching/photography, wild horse and burro watching/photography, rock hounding, target shooting, off-highway vehicle use limited to existing roads and trails, and hunting for both large and small game. The area is a preferred site by visitors who enjoy wilderness areas and historic landmarks and mining sites. Use levels range from extremely low in winter, low to moderate in the summer, and peak in the fall during hunting seasons with season opening weekends having the highest visitation of the year.

The gather area includes three designated recreation sites the Shoshone OHV Trail System, Mill Creek Campground, and the Hickison Petroglyph Recreation Area (See Appendix I, Map 5). Nevada Department of Wildlife Hunt Units 152, 154, and 155 also fall within the gather area. The Pony Express Trail also runs through the southern portion of Complex.

*Environmental Effects*
Alternatives A-C
Activities associated with the wild horse gather would impact recreational opportunities. The dates of the initial gather and follow-up gathers (if needed) would determine the amount of impact to visitors, as use levels range from extremely low in winter, low to moderate in the summer, and peak in the fall during hunting seasons with season opening weekends having the highest visitation of the year.  Hunters would be impacted by wildlife movements if gather operations occur during their hunting seasons.

Recreationists in the wilderness areas wanting the opportunities of solitude and naturalness would be affected during helicopters herding activities.  Individuals wanting to view/photograph wild horses would also be impacted by a gather since horses would have a heightened response to human presence following operations and might be more difficult to observe for a period following the gather.  Even though the density of wild horses in the area would be reduced, it would still be possible to view/photograph wild horses.

Any impacts on recreation from gather operations would be short term and temporary.

CAL_08913

Alternative D

No impacts would occur under this alternative. However, without a gather to remove excess wild horses, recreational values would continue to be impacted since the overpopulation of wild horses results in competition with wildlife for resources, which in turn reduces hunting opportunities.

### 3.2.6 Socioeconomics

Socioeconomics considerations include the value placed on wild horses that may contribute to the economy. At this time there are no registered guided tours or known sales of commercial pictures being sold to increase the value to the communities from the wild horses that reside within or outside the Callaghan Complex. It is acknowledged that some people that drive through the general area may stop and view or photograph wild horses, and BLM may not be fully aware of the magnitude of socioeconomic impacts from those activities.

Potential negative impacts are those that may affect wildlife enthusiasts that hunt, photograph, and guide big game that have abandoned use of the area due to the poor condition of wildlife habitats or wildlife populations resulting in part from the overpopulation of wild horses. Although grazing permits have not been recently reduced as a direct result of the overpopulation of wild horses, the strain of excess horses on the land, as well as impacts from recent drought and fires, have cumulatively put a strain on many agricultural related businesses in the area.

It is not possible to quantify the revenue or losses attributable to the Callaghan Complex wild horses. It is recognized that for local industries the excess wild horses cause a negative impact to resources and to many businesses that rely on healthy range conditions, and to healthy wildlife in the area. Lander County apparently had a slight loss of jobs in the farming sector between 2021 and 2022 (BLM 2026). Considering that excess wild horses in the Callaghan Complex may impact natural resource and hunting-related productivity in the affected area, this could contribute to a loss of income or employment in those sectors. It is also recognized that any revenue brought by tourism, and photography of wild horses in the Complex is unknown.

### 3.2.7 Soils

A wide range of soils occur within the gather area, ranging from deep saline-alkaline soils associated with valley bottoms, to shallow loamy soils at higher elevations in the mountain ranges. Soil development generally occurred under low precipitation regimes resulting in relatively slow development of soils. These soils are described by taxonomic classifications as aridisols in lower elevations and mollisols in high elevations.

Microbiotic crusts are composed of living organisms and their by-products creating a surface crust of soil particles up to 10 cm in depth and are bound by organic materials. These associations are made up of cyanobacteria and cyanolichens and sometimes include mosses, microfungi, liverworts, green algae and bacteria. These innocuous communities are very important because they stabilize soil surfaces, reduce water and wind erosion, fix nitrogen, increase water infiltration and provide nutrients for other plant species. Microbiotic crusts are found throughout the Great Basin, Nevada.

Aerial monitoring indicates increasingly heavy trailing by wild horses between limited water sources and foraging areas. Trailing and hoof action by wild horses has the potential to accelerate

51

CAL_08914

erosion following intense summer convection storms or rapid snow melt through increased soil compaction and associated losses of vegetative cover.  Extensive wild horse utilization and trailing are occurring in the complex and are decreasing vegetative cover while altering vegetative composition, particularly in areas of water sources. Changes in vegetative composition can reduce soil infiltration rates, which increases run off and consequently soil erosion, as well as decreased soil productivity.

*Environmental Effects*
Alternatives A-C
Trailing and hoof action by wild horses and would be expected to decrease due to the decrease in wild horse population levels within the Complex.  This would lead to increased soil functionality and increased soil processing resulting in increased soil development, while decreasing potential erosion and soil loss.

Alternative D
The no action alternative would result in the continuation of erosion due to the trailing and hoof action by an over population of wild horses. Compaction and soil loss are likely to accelerate as wild horse populations continue to grow.

### 3.2.8 Special Status Species
BLM protects by policy (see 6840 section of the BLM Manual) federally listed species and other *special status* plant and animal species. Special status species (SSS) that may potentially occur within the Callaghan Complex, include bat, reptile, amphibian, bird, insect, and plant species. See Appendix XI for an explanation and current list of Nevada BLM sensitive species. One of the more prominent sensitive species known to occur within the Complex is the Greater sage-grouse (GRSG). Within the Complex boundaries, 57% of the acreage is represented by Greater sage-grouse habitat, with 38% of the Complex being Priority Habitat.

*Environmental Effects*
Alternative A-C
Individual raptors and birds may be disturbed during helicopter gather operations; however, birds should return to normal activities after gather operations are complete. Plant species may be trampled by wildlife and wild horse movement during gather operations. Staging, corral, and trapping locations would be surveyed for special status species and nests if operations take place during the breeding season, minimizing impacts to species. Gather sites and holding corrals would not be located where sensitive animal and plant species are known to occur, there would be minimal and temporary impact from the placement of facilities.

The presence of wild horses is associated with a reduced degree of Greater sage-grouse lekking behavior (Muñoz et al. 2020). Moreover, increasing densities of wild horses, measured as a percentage above AML, are associated with decreasing greater sage-grouse population sizes, measured by lek counts (Coates et al. 2021). In northwest Nevada, Behnke et al. (2023) found that Greater sage-grouse nesting rates were marginally higher in areas with wild horses, but Behnke et al. (2022) found that Greater sage-grouse in areas with feral horses had elevated corticosterone levels, especially under drought conditions. Behnke et al. (2022) also found that high corticosterone levels were associated with low Greater sage-grouse nesting success rates. In

52

CAL_08915

Wyoming, Hennig et al. (2023) found a high degree of spatial overlap between wild horses and Greater sage-grouse in summer. Most recently, Beck et al. (2024) demonstrated significant declines in Greater sage-grouse survival rates associated with wild horse densities, with greater wild horse densities above AML causing greater declines in sag-grouse survival at several life stages.

Important habitat used for greater sage-grouse strutting grounds and pygmy rabbit habitat would not be used for trap sites or staging areas. Additionally, greater sage-grouse timing restrictions and Resource Design Features (RDF's) identified in the Proposed Action would be applied to the greatest extent possible to minimize impacts to breeding, nesting and brood-rearing birds (See Appendix II). Water bait trapping sites that occurred on natural water sources during the late brood-rearing season would be reviewed for use by greater sage-grouse prior to use as a trapping location to minimize impacts to birds. BLM would coordinate with NDOW if the gather could not meet any of these stipulations. Greater sage-grouse may be disturbed during the winter if gather operations were to occur in sage-grouse winter habitat during the winter seasonal timeframe.

Under the Proposed Action habitat conditions would improve for all special status species within the gather area. However, this action does not remove all wild horses, and the gather would accomplish a low to mid AML that is the most effective at improving special status species habitat than the other alternatives.

Alternatives B and C would have similar impacts as the Proposed Action on special status species. Impacts would be temporary and minimal in nature with wildlife returning to normal activities post disturbance. Minimal impacts on special status plant species could occur from animal movement during gather operations.

Alternative D
Individual animals would not be disturbed or displaced because gather operations would not occur under the No Action Alternative. However, habitat conditions for all special status animal species would continue to deteriorate as wild horse numbers above the established AMLs further reduce herbaceous vegetative cover and trample riparian areas, springs, and stream banks. Sensitive plant species would be more likely to be grazed and trampled under the No Action Alternative because there would be more wild horses in the HMAs. Greater sage-grouse and other special status animal species would have increased competition for forage, habitat, and water resources as wild horse numbers increase over AML. As competition increases, some special status wildlife species may not be able to compete successfully, potentially leading to increased stress and possible dislocation or death of special status wildlife over the long-term.

### 3.2.9 Vegetation

The vegetation of the Callaghan Complex varies from salt desert shrub communities at lower elevations, to low and big sagebrush/grass communities at higher elevations. The lower elevations are comprised of salt tolerant plants such as bud sagebrush (*Picrothamnus desertorum*), shadscale (*Atriplex confertifolia*), gooseberry-leaf globemallow (*Sphaeralcea grossulariifolia*), and Bailey's and black greasewood (*Sarcobatus spp.*). Mid-elevations and alluvial fans consist of Wyoming big sagebrush (*Artemisia tridentate wyomingensis*) or low sagebrush (*Artemisia*

53

CAL_08916

*arbuscula*), with an understory of sulphur-flower buckwheat (*Eriogonum umbellatum*), Sandberg's bluegrass (*Poa secunda*), bottlebrush squirreltail (Elymus elymoides), and Thurber's needlegrass (*Achnatherum thurberianum*). Within the mid and higher elevations, there is an occurrence of Utah juniper (*Juniperus osteosperma*). The higher elevation sites are comprised of mountain big sagebrush (*Artemisia tridentate vaseyana*), bluebunch wheatgrass (*Pseudoroegneria spicata*), Idaho fescue (*Festuca idahoensis*), longleaf phlox (*Phlox longifolia*), and also support mountain browse species that include serviceberry (*Amelanchier spp.*), snowberry (*Symphoriocarpos spp.*), and currant (*Ribes spp.*). Riparian areas at mid to higher elevations support quaking aspen (*Populus tremuloides*), cottonwood (*Populus sp.*), and willows (*Salix spp*). Disturbed areas within and around the Callaghan Complex support primarily cheatgrass, a non-native invasive plant.

Increasing wild horse utilization and trailing due to increasing excess numbers is occurring in the Complex and is reducing vegetative cover and vigor, particularly, in those areas immediately adjacent to water sources. The reduction of vegetative cover and increased trampling resulting from higher wild horse numbers has led to increased soil compaction, which negatively impacts the establishment and root abilities of native vegetation. Changes to vegetation can also potentially accelerate run off and subsequent soil erosion.

The relative quantity of vegetative cover removed by grazing and trampling also affects soil properties. In general, vegetative cover provides shading for soils, which increases their ability to retain moisture, reduces soil erosion by intercepting precipitation and reducing surface wind velocities, and provides organic input into the soil (Beever and Herrick 2006).

*Environmental Effects*
Alternatives A-C
Impacts associated with gathers under the action alternatives would consist of disturbance to soil surfaces and vegetation immediately in and around the temporary gather site(s) and holding facilities. Impacts would be created by vehicle traffic and hoof action as a result of concentrating horses and could be locally high in the immediate vicinity of the gather site(s) and holding facilities. Generally, these sites would be small (generally less than 0.5 acre/trap site) in size. Any impacts would remain site specific and isolated in nature. Impacts would be minimal as herding would have a short-term duration.

In addition, most gather sites and holding facilities would be selected to enable easy access by transportation vehicles and logistical support equipment. Normally, these gather sites are located near or on roads, pullouts, gravel pits, water haul sites or other flat areas, which have been previously disturbed. These common practices would minimize the potential impacts to soils and the associated native vegetative communities.

The action alternatives will reduce the wild horse population to within the established AML resulting in decreased pressure on vegetative resources within the uplands and riparian areas. This will allow for native species recovery, resulting in a lesser likelihood of invasive species and improve riparian and upland functionality within the gather area.

Impacts of implementing the action alternatives would be reduced concentrations of wild horses,

54

CAL_08917

leading to reduced soil erosion, vegetation trampling, and utilization of areas most frequented in this complex by wild horses. This reduction in soil erosion would be most notable and important in the vicinity of small spring meadows and water developments experiencing high levels of disturbance and bare ground from the current excess numbers of wild horses. Maintaining the population within AML would also provide sufficient time for degraded resources to recover.

Alternative D
In the absence of a wild horse gather, soil loss from wind and water vulnerability to erosion, particularly in the vicinity of small spring meadows and water developments, would be expected to accelerate. The increasing over-utilization of vegetation and heavy trailing due to an over-population of wild horses, would continue the loss of native perennial bunchgrasses, forbs and shrubs exposing larger areas to potential soil loss, and expansion of invasive weeds within the Callaghan Complex.

### 3.2.10 Wetlands and Riparian Zones and Water Quality - Surface and Ground.

Wetland areas are scattered through the Callaghan Complex, and range in size from small seeps to large meadow complexes. Similarly, perennial, and intermittent streams are also present within the complex and are commonly spring fed and snow melt driven systems, respectively. These areas typically occupy a small percentage of the landscape but are disproportionately important centers for biodiversity. They often provide the only available source of water for many miles, and are used by wild horses, livestock, birds, and many types of wildlife. Although the Taylor Grazing Act of 1934 established some control over grazing practices for domestic livestock, wild horses are not regulated under this legislation. Wild horses use these areas year-long, resulting in degradation and decreased functionality of wetlands and riparian zones if excess numbers of wild horses are present.

Riparian areas tend to stay healthy when they remain in a vegetated state and are relatively undisturbed (Belsky et al 1999). Well-vegetated stream banks help to dissipate energy and reduce discharge velocities, allowing water to percolate into the soil, where it is stored for late season discharge and used by plants. Where vegetative cover is greatly reduced, stream bank stability is negatively impacted from the loss of vegetation and the associated root masses of those plants. In systems with excessive pressure, vegetation is often absent, bare ground is higher, and the soil compacted. These factors enable water to flow more quickly, resulting in erosion and decreased system functionality.

*Environmental Effects*
Alternatives A-C
All action alternatives would result in identical impacts to wetlands and riparian zones. Impacts from gather operations would likely be negligible relative to variations in the affected environment or would be of such short duration that they would not be measurable and would not remain any longer than the gather activities themselves. These effects include trampling of vegetation and alteration of sediments during the gather when wild horses cross streams or springs as they are herded to temporary gather sites. To avoid impacts potentially associated with the gather operation, temporary gather sites and holding facilities would not be located within riparian areas. Other effects would be related to wild horse population size. Use of riparian areas by wild horses during non-gather periods leads to utilization of riparian vegetation which is not

CAL_08918

regulated like use by livestock. This results in alteration of soil and hydrologic function from punching, shearing, and compaction of soft sediments. Loss of vegetation can also lead to increased erosion and, therefore, loss of riparian soils and organic material. All alternatives would reduce the total number of wild horses in the complex which would reduce utilization pressure at all wetland and riparian zones. Reduced pressure is anticipated to allow regeneration of riparian vegetation which would lead to improved system functionality over time.

All action alternatives would result in impacts to water quality. However, the degree and timing of these impacts would vary under each alternative. The impacts resulting from the gather operations would likely be negligible relative to variations in the affected environment or would be of such short duration that they would not be measurable and would not remain any longer than the gather activities themselves. These effects include increased sediment loading to streams that occurs when wild horses cross streams or springs as they are herded to temporary gather sites. Other impacts would be related to wild horse overpopulation. Use of riparian areas by wild horses during non-gather periods leads to increased sediment loading from hoof action and reduction of vegetation as well as the introduction of excess nutrients and bacteria from feces and urine. Loss of vegetation can also lead to increased surface water temperatures due to decreased shade. All alternatives would remove excess animals and reduce the total number of wild horses in the complex, which would reduce utilization pressure at all surface water sources. Removal of excess wild horses and maintaining the population at AML would allow for regeneration of riparian vegetation, which would lead to a restored hydrologic function. This would reduce sediment loading through reduced erosion and keep water temperatures low via increased shading.

Alternative D
Under this alternative, excess wild horses would not be removed and the horse population within the Callaghan Complex would not be reduced. Increased competition at currently utilized wetland and riparian zones would lead to continued loss of vegetative, soil, and hydrologic functionality.

Increasing wild horse numbers would likely result in even more horses traveling further in search of available water sources leading to an increased number of wetland and riparian zones being impacted by wild horse use.

### 3.2.11 Wildfire and Fuels

The Callaghan Complex contains areas that are dominated by vegetation typical of the Great Basin consisting of Pinyon and Juniper Woodlands, Sagebrush ecological sites, Salt Desert Scrub and Greasewood communities. Maintaining a balance of grazing animals and controlling the timing and amount of forage that is consumed each year by wildlife, livestock, and wild horses is crucial to maintaining healthy upland plant communities within the Complex. Appropriately managed grazing by large ungulates has been associated with the known effect of reducing the cover, density, and volume of fuels, particularly fine fuels, on the landscape (Schmelzer et al., 2014). This can reduce the probability and severity of catastrophic wildfires due to the reduction in fine fuel loading. Recent research has identified that moderate grazing levels by herbivore species, including but not limited to horses, aids in the reduction of fuel loading and the impact of grazing by herbivores, including livestock, have long been recognized (Crist et al. 2019).

56

CAL_08919

Year-round heavy grazing on upland vegetation from all ungulates reduces the overall amount of fuels available for wildfires, but does not allow upland sites to recover from past disturbances and those areas are in danger of trending downward in ecological health and increasing in annual invasive grasses. Subsequently, the spread of annual invasive grasses can increase fine fuel loading and continuity, which can increase the intensity and rate of spread of wildland fires in the Great Basin. Intensive grazing can have the opposite effect of moderate grazing on fine fuel loads by reducing the cover of herbaceous vegetation over time and favoring the encroachment of highly flammable woody vegetation (Rouet-Leduc, 2021). Additionally, plant communities and sagebrush ecosystems that have been impacted in the past by wildfires and historic grazing are vulnerable to losing more of their native perennial grass component when grazed at higher than moderate utilization levels. This can result in decreased fine fuel moisture and earlier seasonal curing of fine fuel loads due to increased spread of invasive annuals, which can extend the fire season and decrease the resistance of these areas to wildfire disturbances.

Past fire history data, from 1985 through 2020, shows that there was a combined total of 67 wildfires that started within the Callaghan Complex for a total of 138,598 acres burned. During the period from 1999 to 2024, a combined total of 185 fuel treatment projects occurred in the Complex for a total of 94,857 acres.

*Environmental Effects*
Alternatives A-C
The growing scientific literature has continued to affirm that even though grazing reduces fuel loading, proper grazing management is critical for the advancement of land health characteristics (Copeland et al., 2023). Soil health, hydrologic function, and biotic integrity are all impacted differently depending on the location, timing, duration, and intensity of grazing management (Hennig et al., 2021). Properly managed grazing is critical to achieve reductions in fuel loads while curbing the expansion of invasive annual grasses, promoting native perennial species, and protecting sensitive riparian habitats. Research continues to indicate that a variable season of use contributes to site resiliency while repeated year-long, high intensity use, contributes to the degradation of rangelands and the expansion of annual grasses (Copeland et al., 2023; Davies et al., 2015; Davies et al., 2024).

While the BLM is granted the duty of managing wild horses, the day-to-day movement of wild horses on the range is inherently unmanaged from a livestock management perspective (Davies & Boyd, 2019). With the exception of fencing and water locations, wild horses are free-ranging grazers that can utilize forage for any amount of time throughout the year in whatever locations are accessible to them. In more natural systems, predation may augment the location, timing, and duration. However, wild horses face very limited predation and subsequently impressive reproduction rates as a result (Garrott, 2018).

Under the Proposed Action (Alternative A) the numbers of wild horses would be reduced to low AML, and maintained at AML, which would result in a short-term increase in the volume of fine fuels throughout the Complex. Conversely, the removal of excess wild horses would promote more moderate grazing utilization levels, which may reduce the long-term increase in areas dominated by annual invasive grasses (cheatgrass) and loss of preferred perennial grasses. This would prevent further increases in fine fuel loading and woody encroachment in the long-term,

CAL_08920

which would promote greater resistance of vegetative communities and reduced frequency of future wildland fires within the Callaghan Complex. Overall, the Proposed Action would benefit fuels and fire management within this area in the long-term.

Impacts of Alternative B and C would be similar to those of the Proposed Action as the population would be managed within AML.

Alternative D
The No Action Alternative could be expected to result in a continued decrease of the overall availability of fuels, particularly fine fuels, within the HMAs and surrounding areas in the short term. However, it would result in a continued increase in the number of wild horses above AML, which would have compounding impacts upon upland vegetation composition and the potential for future fires. The continued overgrazing of the landscape could be expected to decrease the native grass component and increase the invasive non-native species across the landscape which would reduce the resistance and resiliency of the landscape to disturbance such as wildfires. The increase in invasive non-native species would promote a more frequent and intense fire cycle that would further reduce native species across the landscape.

### 3.2.12 Wilderness
The Wilderness Act of 1964 established a "National Wilderness Preservation System" to be composed of federally managed areas designated by Congress as "wilderness areas". These shall be "administered for the use and enjoyment of the American people in such manner as will leave them unimpaired for future use and enjoyment as wilderness, and so as to provide for the protection of these areas, the preservation of their wilderness character, and for the gathering and dissemination of information regarding their use and enjoyment as wilderness." The Wilderness Act of 1964 mandates that Wilderness areas are managed in a manner that maintains or enhances the areas' Wilderness Characteristics. Wilderness Characteristics include: untrammeled, natural, undeveloped, and outstanding opportunities for solitude or a primitive and unconfined type of recreation. The proposed Callaghan Complex gather area includes a small portion of the Simpson Park Wilderness Study Area (WSA) that was established as a WSA for further review during the original inventories in 1979-80.  The findings from the study and suitability recommendations were included in the Shoshone-Eureka Wilderness Recommendations Environmental Impact Statement, 1987, In October 1991, the Nevada Statewide Wilderness Report formally reported the recommendations on suitability for wilderness for designation and/or release to the President. Currently this WSA is being managed as WSA until designated as wildness or released from WSA status through an Act of Congress.  See Appendix I, Map 5 for the WSA.

Management of Wilderness Study Areas (BLM Manual 6330) establishes policy and guidance with the objective to manage and protect WSAs to preserve wilderness characteristics so as not to impair the suitability of such areas for designation by Congress as wilderness.  Manual 6330 provides policies for specific activities, one of which, is wild horse management.

Simpson Park WSA is located in the Simpson Park Mountain Range and contains approximately 49, 670 acres of public land.  The northern part of the unit is covered with steep hillsides, and the southern region changes from steep hills to a series of mesas and plateaus.  A large stand of pinon-juniper woodland exists along part of the western boundary.  The rest of the unit is

58

CAL_08921

dominated by plants of the sagebrush community.  Combined factors of screening, configuration, and size are sufficient to offer numerous secluded spots for solitude and those opportunities are outstanding.  There is diverse opportunity for hiking, horseback riding, and hunting in the area.  The Nevada Statewide Wilderness Report identified the entire area is not recommended for Wilderness.

*Environmental Effects*
Alternatives A-C
The action alternatives A-C include helicopter overflights under 300 feet to herd wild horses/burros in areas that overlap with the wilderness study area boundary. All temporary trap sites are located outside of the wilderness study area boundary.

No negative effects to the untrammeled quality of wilderness characteristics would occur within the WSA boundary.  BLM Manual 6330, Section 10 requires management of herd populations at levels that will preserve the natural quality of wilderness characteristics and as not to impair wilderness characteristics in the Simpson Peak WSA.

No motorized vehicles, no landing of aircraft, and no temporary installments would be located within wilderness study area: therefore, the undeveloped character of wilderness study area would not be affected.

The action alternatives A-C would impact the opportunity for solitude during gather activities.  The impact to solitude are expected to occur as a result of the presence and noise of helicopter use for the duration of the gather. The WSA has very few trails and so visitation is generally low.  These areas generally appear highly undeveloped as few human effects are encountered.  Visitors may commonly experience sights of human activity outside of the WSAs, but these sights are less extensive because WSAs are mostly remote. Consequently, the degree of solitude is high, visitors have a high expectation of solitude, and visitors are more sensitive to disruption of solitude.  The entirety of the wilderness study area will not be impacted as the action is ephemeral by nature, though this quality of wilderness characteristics would be impacted for the duration of gather and monitoring operations where the presence and sound of helicopter use is prevalent.  There would be no effects on the opportunity for unconfined recreation.

The action alternatives A-C would remove excess wild horses to reduce their population to the low-level AML for the proposed area overlapping wilderness. By removing the excess wild horses, the natural quality of wilderness characteristics may be preserved and enhanced by reducing the degradation due to excess animals within the wilderness study area boundary.  Removing the excess wild horses may reduce or eliminate the impact of excess animals competing with native wildlife for forage utilization, reduce excess trampling of native vegetation, and reduce trampling of watersheds and other riparian areas within the wilderness area.

Alternative D
The no action alternative would not result in impacts from gather operations. The opportunities for solitude and primitive recreation, untrammeled, and undeveloped qualities of wilderness characteristics would not be affected. However, the natural quality of wilderness characteristics may be impacted. If the wild horse populations exceed their AML, the potential herd health and

CAL_08922

impacts to the landscape from excess wild horses may occur. Excess wild horses may compete with native populations of wildlife, overgraze riparian areas, and trample native vegetation at and near springs and other water sources. For these reasons, the natural quality of wilderness characteristics would not be preserved and would potentially degrade.

### 3.2.13 Wildlife, Including Migratory Birds

A variety of wildlife species inhabits the HMAs within the Callaghan Complex. These areas support several species of mammals, birds, and reptiles. Big game species present include mule deer and pronghorn antelope. Fur bearing species include coyote, bobcat, mountain lion, and badger. Upland species include chuckar, gray partridge, and blue grouse.

The Complex is located within occupied mule deer habitat. Mule deer summer range is in the higher elevations and winter ranges are in the lower elevation areas. Summer ranges provide flowering plants and grasses for mule deer to consume. In the winter, mule deer move to winter ranges at the lower elevations where snow depths are lower and sagebrush and other shrubs are available for consumption. Year-round and summer habitat for pronghorn are present within the Complex. Pronghorn primarily use the area within the Complex for year-round and summer range habitat usually located within the lower elevations where shrubs and brush are readily available to consume.

Migratory birds are bird species protected by the Migratory Bird Treaty Act of 1918, which prohibits the take of protected species without prior authorization by the USFWS. Numerous migratory birds are known to occur within the Complex. Predominant habitat types within the Complex which are likely to support migratory birds include: aspen, mountain riparian, mountain shrub, sagebrush, pinyon/juniper, playa, and cliffs/talus habitat types. There are small inclusions of mountain-mahogany, salt desert scrub, lower riparian, and playa.

*Environmental Effects*
Alternatives A-C
Individual animals of all species may be disturbed or displaced temporarily during gather operations. Large mammals and some birds may run or fly (flush from nest/hiding) during helicopter operations, but animals should return to normal behaviors post disturbance. Small animals, birds, and reptiles would be displaced at staging areas and trap sites with slower moving animals may be harmed. Overall, these impacts are expected to be minimal and temporary in nature to animal populations as a result of gather operations.

The use of previously disturbed areas would reduce impacts to wildlife and migratory birds. Any new staging, corral, and trap sites with vegetation would be surveyed for nesting birds, if gather operations occur during migratory bird breeding season.

Removing wild horses would result in decreased competition between wild horse and wildlife for available forage and water resources. Over the long-term, both riparian and upland habitat conditions (forage quality and quantity) for wildlife would recover and improve.

CAL_08923

Alternative D

Wildlife, including migratory birds, would not be disturbed or displaced by gather operations under the No Action alternative. The No Action alternative would allow the continuation of competition increase between wildlife and wild horses. Competition would continue to increase for forage, habitat, and water resources and may grow worse as wild horse numbers continue to increase above AML. As competition increases, some wildlife species may not be able to compete successfully, potentially leading to increased stress and possible dislocation or death of native wildlife species over the long-term.

# Chapter 4: Reasonably Foreseeable Effects

Reasonably foreseeable effects are defined as assess the potential effects from past actions, present actions, and reasonably foreseeable future actions within the reasonably foreseeable future effects analysis area (henceforth simply "reasonably foreseeable effects").

The reasonably foreseeable future effects analysis area for the purpose of this analysis is the Callaghan Complex gather area. Refer to Appendix I, Map 1.

## 4.1 Past and Present Actions
### Wild Horses
In 1971 Congress passed the Wild Free-Roaming Horses and Burros Act which placed wild and free-roaming horses and burros, that were not claimed for individual ownership, under the protection of the Secretaries of Interior and Agriculture. In 1976 the FLPMA gave the Secretary the authority to use motorized equipment in the capture of wild free-roaming horses as well as continued authority to inventory the public lands. In 1978, the Public Range Improvement Act (PRIA) was passed which amended the WFRHBA to provide additional directives for BLM's management of wild free-roaming horses on public lands.

Wild horses existed with the Callaghan Complex prior to the passage of WFRHBA in 1971. The 1986 SERARMP designated the Callaghan, Bald Mountain, South Shoshone, and Hickison HMAs for long term wild horse/burro management. These HMAs partially overlap the 1971 Herd Areas which represent where wild horses existed at the passage of WFRHBA. Objectives for theses HMAs were further defined with SERARMP. Because of movement between the HMAs, it has been determined that management should be as Complex. AMLs have been set through FMUDs following evaluation of resource issues and available resource data. Through ongoing assessment of monitoring data, distribution, use patterns, habitat characteristics, herd health, and other factors have been evaluated to direct management of these HMAs through gathers and removals. The Land Use Plan analyzed impacts of management's direction for grazing and wild horses, as updated through Bureau policies, Rangeland Program direction, and Wild Horse Program direction.  Forage was allocated within the allotments for livestock use and range monitoring studies were initiated to determine if allotment objectives were being achieved, or that progress toward the allotment objectives was being made.

Actions which have influenced the wild horse populations in existence today are primarily wild horse gathers, which resulted in the capture and removal of approximately 4,500 excess wild horses from across the Callaghan Complex. Approximately 200 horses have received fertility control treatment and been released back into the Bald Mountain and Callaghan HMAs. Table 10

CAL_08924

illustrates past removals, fertility control treatments, and wild horses released back the Callaghan Complex.

Table 10: Previously Captured and Released Wild Horses from the Callaghan Complex.

| HMA | Year | Removed | Released | Treated |
|---|---|---|---|---|
| Bald Mountain | 2011 | 62 | 114 | 54 |
| | 2009 | 511 | 64 | 32 |
| | 1982 | 364 | 0 | 0 |
| Callaghan | 2011 | 119 | 135 | 55 |
| | 2009 | 825 | 80 | 40 |
| | 2002 | 855 | 0 | 0 |
| | 1997 | 1,066 | 338 | 0 |
| | 1987 | 471 | 0 | 0 |
| South Shoshone | 2008 | 319 | 55 | 0 |
| | 2002 | 47 | 0 | 0 |

*Vegetation, Riparian and Water Resources*

Forage utilization during the 1900's was high when thousands of cattle, sheep, and horses grazed lands in northern Nevada. In the 1930s when overgrazing threatened to reduce Western rangelands to a dust bowl, Congress approved the Taylor Grazing Act (TGA) of 1934, which for the first time regulated grazing on public lands. The TGA required ranchers who grazed horses or livestock on public lands to have a permit and to pay a grazing fee, but by that time, thousands of horses roamed the Nevada desert unbranded and unclaimed.

Prior to the TGA, livestock grazing practices resulted in significant impacts to soil resources. The soil tolerance was exceeded and the soil medium for plant growth was not maintained. As a result, historic livestock grazing activities prior to the TGA had significant impacts on the vegetation resources within the impact assessment area by eliminating or greatly reducing the primary understory plants. Cheatgrass was introduced into the area in the early 1900s.

Prior to the TGA, livestock grazing practices also had significant impacts on wetland and riparian zones leading to a decline in wetland and riparian zones. Riparian vegetation was insufficient to dissipate energy or filter sediments, thereby increasing erosion and destabilizing stream banks and meadows. Destabilization of streams and meadows led to incised channels, gullies, and a lowered water table. Efforts have been made to prevent adverse impacts to rangeland health, and to support better distribution of livestock on public range since the 1930's by implementing a variety of range improvement projects.
A series of livestock grazing decisions since the implementation of TGA have resulted in reductions in livestock numbers and changes in seasons of use and in grazing management practices to promote rangeland health within grazing allotments. Other management changes have also resulted in restrictions on when, where and the duration of livestock grazing, to minimize potential impacts to rangeland health.

While the present livestock grazing system and efforts to manage the wild horse population within AML has helped reduce past historic soil impacts and has improved current soil resource conditions, the current overpopulation of wild horses is resulting in areas of heavy vegetative utilization, trailing and trampling damage, and prevents BLM from managing public lands within the Callaghan Complex for rangeland health and for a thriving natural ecological balance.

CAL_08925

**4.2 Reasonably Foreseeable Future Actions**

*Wild Horses*
Wild horse population is expected to continue to grow and increase at a rate of 15-20% annually. If necessary, BLM may provide water for wild horses until wild horse populations could be reduced with an emergency gather to within AML or in periods of critical need.

*Vegetation, Riparian and Water Resources*
Livestock grazing is expected to continue at similar stocking rates. Under current livestock stocking rates, objectives pertaining to rangeland health can continue to be met with proper livestock management. Given that wild horse population numbers will continue to grow, upland and riparian recourse degradation can be anticipated if numbers exceed AML. Degradation and resource impacts from excess wild horse will negatively impact all users, such as wildlife, and prevent the BLM from maintaining or improving rangeland health and achieving a thriving natural ecological balance.

Impacts from Alternatives A-C
Reasonably foreseeable effects expected under any of the action alternatives would include continued improvement of upland and riparian vegetation conditions, which would in turn benefit permitted livestock, native wildlife, and wild horse populations as forage (habitat) quantity and quality is improved over the current level. Benefits from reduced wild horse populations would include fewer animals competing for limited water quantity and at limited sites. Ultimately there should be more stable wild horse populations, healthier rangelands, healthier wild horses, and fewer multiple use conflicts within the reasonably foreseeable future effects analysis area over the short and long-term.

Over the next 10–20-year period, continuing to manage wild horses within the established AML range would result in improved vegetation condition (i.e. forage availability and quantity), which in turn would result in improved vegetation density, cover, vigor, seed production, seedling establishment and forage production over current conditions. Managing wild horse populations within the established AML range would allow the primary forage plant species to recover and return more rapidly and allow for improvements to riparian habitat, even though some vegetation conditions may never be able to return to their potential. Maintaining AML over a sustained period of time throughout the reasonably foreseeable future effects analysis area would allow for the collection of scientific data to evaluate whether changes to AML levels are warranted or necessary.

Cumulatively over the next 10-20 years, achieving AML and lowering the population growth rate would result in fewer gathers and less disturbance to individual wild horses and the herds' social structure. Individual and herd health would be maintained.

By bringing the wild horse populations to AML, it would be possible to gather a higher percentage of the total population in future gathers, which would allow the increased use of fertility control and sex ratio adjustments as methods to slow population growth. However, releasing gathered wild horses back into the Callaghan Complex (following application of population control methods) may lead to the decreased ability to gather horses in the future as released horses learn

63

CAL_08926

to evade the helicopter.

Alternative D

Under the no action alternative, AML would not be achieved within the Callaghan, Bald Mountain, and South Shoshone HMAs and excess wild horses would not be removed from areas within or outside of the designated HMAs. There would be no active management to control the size of the population at this time. Without a gather and removal now, wild horse populations would continue to increase at an average rate of 15-20% per year (see Table 11, which assumes a conservative annual growth rate of only 15% per year). Based on population annual reproduction rate estimates. These population levels would continue to exceed the carrying capacity of the range.

Table 11: Wild Horse Populations with No Wild Horse Removal and/or Fertility Control

| HMA | Current Estimated Adult Population as of February 2025 | 5 Years with No Wild Horse Removal | 10 Years with No Wild Horse Removal |
|---|---|---|---|
| Bald Mountain | 246 | 495 | 994 |
| Callaghan | 2,207 | 4,438 | 8,926 |
| South Shoshone | 2,025 | 4,072 | 8,189 |
| Hickison (North) | 11 | 22 | 44 |

High AML is the maximum population at which a thriving natural ecological balance would be maintained and that avoids deterioration of the rangeland. The increasing population of wild horses even further in excess of AML under the no action alternative would over-extend and deplete water and forage resources. Excessive utilization, trampling, and trailing by wild horses would further degrade the vegetation, prevent improvement of range that is already in less than desirable or in degraded condition, would degrade currently healthy rangelands, and would not allow for sufficient availability of forage and water for wild horses or other ungulates, especially during drought years or severe winter conditions.

Throughout the HMAs administered by the Battle Mountain District, few predators exist to control wild horse or burro populations. Some mountain lion predation occurs but does not appear to be substantial. Coyotes are not prone to prey on wild horses unless such horses are young or extremely weak. Other predators such as wolf or bear do not exist at detectable numbers in the Callaghan Complex.

Wild horses are a long-lived species with documented foal survival rates that can exceed 95% (Ransom et al. 2016). The high survival rates typical of wild horse herds are reflected in the PopEquus population model (Folt et al. 2023a, 2023b). Wild horses are not a 'self-regulating' species (NAS 2013) and would continue to reproduce until their habitat can no longer support them. It is not realistic to rely on wild horse and burro herds to limit their own population size or growth rates in the western United States. Predators such as mountain lions tend to not fully prevent free-roaming horse population growth, even in locations where relatively high numbers of foals die per year, such as in the Virginia Range of Nevada (Schulman et al. 2024). Usually the habitat is severely, if not irreversibly, damaged before the wild horse population is abruptly impacted and experiences substantial death loss. Once the vegetative and water resources are at these critically low levels due to excessive utilization by an over population of wild horses, the

64

CAL_08927

weaker animals, generally the older animals and the mares and foals, are the first to be impacted. It is likely that a majority of these animals would die from starvation and dehydration. The resultant population would be heavily skewed towards the stronger stallions which would lead to substantial social disruption in HMAs. Fighting among stud horses would increase as they protect their position at scarce water sources, and injuries and death to all age classes of animals would be anticipated. Substantial loss of the wild horses in the complex due to starvation or lack of water would have obvious consequences to the long-term viability of the herd. By mismanaging the public lands in this way, the vegetative and water resources would be impacted first and to the point that they have no potential for recovery. This degree of resource impact would lead future wild horse herds to persist only at a greatly reduced level if BLM is able to manage for wild horses at all on the complex in the future.

Trampling and trailing damage by wild horses in or around riparian areas would also be expected to increase, resulting in larger, more extensive areas of bare ground. Continued decline of rangeland health and irreparable damage to vegetative, soil and riparian resources, would have obvious impacts to the future of the Callaghan Complex and all other users of the range's resources. Competition for the available water and forage between wild horses, domestic livestock, and native wildlife would increase. Continued decline of rangeland health and irreparable damage to vegetative, soil and riparian resources, would have obvious impacts to the future of the complex and all other users of the resources, which depend upon them for survival. As a result, the no action alternative would not ensure healthy rangelands that would allow for the management of a healthy wild horse population and would not promote a thriving natural ecological balance.

As populations increase beyond the capacity of the habitat to sustain them, more bands of horses would leave the HMA boundaries in search of forage and water. This alternative would also result in increasing numbers of wild horses in areas not designated for their use and would not achieve the stated objectives for wild horse herd management areas, to "prevent the range from deterioration associated with overpopulation", and "preserve and maintain a thriving natural ecological balance and multiple use relationship in that area".

Regulations at Title 43 CFR § 4700.0-6 (a) state "*Wild horses shall be managed as self- sustaining populations of healthy animals in balance with other uses and the productive capacity of their habitat*" (emphasis added). Allowing excess wild horses to remain ungathered would be inconsistent with the mandates of the WFRHBA and implementing regulations.

## Chapter 5: Monitoring

The BLM has already incorporated design features into the Proposed Action and alternatives. These design features are listed as SOPs (Appendix IV and V) and represent the "best methods" for reducing impacts associated with gathering, handling, and transporting wild horses and collecting herd data. Hair follicle samples would be collected to establish an ongoing genetic baseline measure for the wild horses from the Complexes. Additional samples would be collected during future gathers (in 10-15 years) to determine trend. If monitoring indicates that genetic diversity (as measured in terms of observed heterozygosity) is not being adequately maintained (BLM 2010), additional young mares from HMAs in similar environments may be added every generation (every 8-10 years) to avoid inbreeding depression and to maintain acceptable genetic diversity.

CAL_08928

Samples may also be analyzed for genetic ancestry.

Ongoing resource monitoring, including climate (weather), and forage utilization, riparian, population inventory, and distribution data would continue to be collected. There are no separate mitigation measures necessary, as all reasonable means of reducing adverse environmental impacts have already been incorporated into the Proposed Action and alternatives as design features.

*Gather Operations*
The BLM Contracting Officer Representative (COR) and Project Inspectors (PIs) assigned to the gather(s) would be responsible for ensuring contract personnel abide by contract specifications and SOPs.

Under Action Alternatives A-C:
- Fertility control monitoring of treated mares would be conducted in accordance with the CAWP outlined in Appendix III;
- Genetic monitoring would take place through analysis of hair follicle samples;
- Rangeland health monitoring would continue;
- Routine monitoring of wild horse herd health would continue;
- Aerial surveys to estimate herd size would continue;
- Monitoring of fertility control treated wild horse mares may be facilitated by GPS radio collars, or GPS tail tags on either sex of horses.

## Chapter 6: Consultation and Coordination

The BLM hosts public hearings annually to discuss the use of motorized vehicles, including helicopters and fixed-wing aircraft, in the management of wild horses and burros. During these meetings, the public is given the opportunity to present new information and to voice any concerns regarding the use of the motorized vehicles. The BLM hosted its annual public hearing on the use of motorized vehicles in the management of wild horses and burros on May 6, 2025, via a Microsoft Teams webinar. A total of 17 individuals provided oral comments during the hearing, and 3,084 written comments were submitted by email. Most public input expressed opposition to the use of helicopters for gathering excess wild horses and burros. All oral and written comments submitted by the deadline are part of the official record. In response to the concerns raised, the BLM reviewed its Standard Operating Procedures (SOPs) governing motorized vehicle use. Based on this review, no changes to the SOPs were warranted.

The use of helicopters and motorized vehicles has proven to be a safe, effective and practical means for the gather and removal of excess wild horses and burros from the range. Since 2006, Nevada has gathered over 40,000 animals with a total mortality of 1.1% (of which 0.5% was gather related), which is very low when handling wild animals. BLM also does not conduct helicopter removals of wild horses during the period prior to or during the peak of foaling (i.e., from March 1 through June 30).

The Battle Mountain District BLM has coordinated with Nevada Department of Wildlife (NDOW) during the yearly coordination meeting on this gather. Additionally, as required by the GRSG Land Use Plan Amendment (2025), BMDO included input from NDOW on the use of

CAL_08929

Resource Design Features. BLM will continue to coordinate with NDOW regarding the locations of staging, trapping, and corrals to minimize impacts to wildlife.

The MLFO issued a Management Evaluation for the Complex to interested individuals, agencies and groups for a 30-day public review and comment period that opened on March 14, 2025 and closed April 14, 2025. Approximately 4,000 scoping comments were received, primarily as form letters, from individuals, organizations and agencies. Many of these comments contained overlapping issues/concerns which were consolidated and considered in this Environmental Assessment.

About 124 comment letters were received from various organizations, institutions, or individuals. Comments received were considered in completion of the Final Callaghan Complex EA and summarized in Appendix XII of the Final Callaghan Complex EA. Tribal Coordination Letters were sent on July 03, 2023 and March 14, 2025, and no comments were received.

## Chapter 7: List of Preparers

Table 12: List of Preparers

| Name | Title | Responsible for the Following Section(s) of this Document |
|---|---|---|
| Aimee Bolinger | Wild Horse and Burro Specialist | Project Lead, Wild Horse and Burro Specialist |
| Rachelle Peppers | Supervisory Natural Resource Specialist | Wildlife, Migratory Birds, Special Status and T&E Species |
| Zach Long | Rangeland Management Specialist | Rangeland Management, Livestock Grazing, Vegetation, Soils |
| Kenner Vorheis | Outdoor Recreation Planner | Wilderness, Wilderness Study Areas, Recreation |
| Robert Burdick | Fuels Program Manager | Wildfire, Fuels, Noxious Weeds, and Invasive Species |
| Neal Endacott | Archaeologist | Archaeology and Paleontology |
| Samual Ault | Field Manger | Tribal Consultation |

CAL_08930

# Chapter 8: Acronyms and References

## 8.1 Acronyms

AIRFA – The American Indian Religious Freedom Act of 1978

APHIS – Animal and Plant Health Inspection Service

ARPA – The Archaeological Resources Protection Act of 1979

ARMPA – Greater Sage-Grouse Rangewide Planning Approved Resource Management Plan Amendment for Nevada and California.

AVMA – American Veterinary Medical Association

AML – Appropriate Management Level

AUM – Animal Unit Month

BCS – Body Condition Score

BGEPA – The Bald and Golden Eagle Protection Act

BLM – Bureau of Land Management

CAWP – Comprehensive Animal Welfare Program

CFR – Code of Federal Regulations

COR – Contracting Officer Representative

CX – Categorical Exclusion

EA – Environmental Assessment

ESA – Endangered Species Act of 1973

EIS - Environmental Impact Statement

ESA – Endangered Species Act of 1973

FAA – Federal Aviation Administration

FLPMA – Federal Land Policy and Management Act of 1976

FMUD – Final Multiple Use Decision

FONSI – Finding of No Significant Impact

GHMA – General Habitat Management Area

GRSG – Greater Sage-Grouse

HA – Herd Area

HMA – Herd Management Area

HMAP – Herd Management Area Plan

IBLA – Inter Board of Land Appeals

IM – Instructional Memorandum

IUD – Intrauterine Device

MBTA – Migratory Bird Treaty Act

MD – Management Decision

MLFO – Mount Lewis Field Office

MRDG – Minimum Requirements Decision Guide

NAGPRA – Native American Graves Protection and Reparation Act of 1990

NAS – National Academies of Sciences

NEPA – National Environmental Projection Act

NDOW – Nevada Department of Wildlife

NHPA – National Preservation Act of 1960

NNHP – Nevada Natural Heritage Program

NRPH – National Register of Historic Places

OHMA – Other Habitat Management Area

ORC – Off Range Corral

ORP – Off Range Pastures

PI – Project Inceptor

PIM – Permanent Instruction Memorandum

PGS – Population Growth Suppression

PMHA – Primary Habitat Management Area

PRIA – Public Range Improvement Act

PZP – Porcine Zona Pellucida

RAC – Resource Advisory Council

RDF – Required Design Features

RMP – Resource Management Plan

ROD – Record of Decision

SFA – Sagebrush Focal Areas

SDD – Standard Determination Documents

SIR – Supplemental Information Report

SOP – Standard Operating Procedures

SREA – Shoshone-Eureka Resource Area

SSS – Special Status Species

T&E – Threatened and Endangered species

TGA – Taylor Grazing Act of 1934

TNEB – Thriving Natural Ecological Balance

USFWS – Untied States Fish and Wildlife Service

USGS – United States Geological Survey

WHB – Wild Horse and Burro

WFRHBA – Wild Free-Roaming Horses and Burros Act

68

CAL_08931

## 8.2 Literature Cited

Andreasen, A.M., K.M. Stewert, W.S. Longland, and J.P. Beckmann. 2021. Prey specialization by cougars on feral horses in a desert environment. Journal of Wildlife Management: 8 5:1104-1120.

Baker, D.L., J.G. Power, J.I. Ransom, B.E. McCann, M.W. Oehler, J.E. Bruemmer, N.L. Galloway, D.C. Eckery, and T.M. Nett. 2018. Reimmunization increases contraceptive effectiveness of gonadotropin-releasing hormone vaccine (GonaCon-Equine) in free-ranging horses (*Equus caballus*): Limitations and side effects. PLoS ONE 13(7): e0201570.

Baker, D.L., B.E. McCann, J.G. Powers, N.L. Galloway, J.E. Bruemmer, M.A. Thompson, and T.M. Nett. 2023. Reimmunization intervals for application of GnRH immunocontraceptive vaccine (GonaCon-Equine) in free-roaming horses (Equus ferus caballus) using syringe darts. Theriogenology Wild (3): 100061.

Baldrighi, J.M., C.C. Lyman, K. Hornberger, S.S. Germaine, A. Kane, and G.R. Holyoak. 2017. Evaluating the efficacy and safety of silicone O-ring intrauterine devices as a horse contracetive through a captive breeding trial. Clinical Theriogenology 9:471.

Barber, M.R., and R.A. Fayer-Hosken. 2000. Evaluation of somatic and reproductive immunotoxic effects of the porcine zone pellucida vaccination. Journal of Experimental Zoology 286:641-646.

Bartholow, J.M. 2004. An economic analysis of alternative fertility control and associated management techniques for three BLM wild horse herds. USGS Open-File Report 2004-1199.

Bartholow, J. 2007. Economic benefit of fertility control in wild horse populations. The Journal of Wildlife Management 71:2811-2819.

Beck, J.L., M.C. Milligan, K.T. Smith, P.A. Street, A.C. Pratt, C.P. Kirol, C.P. Wanner, J.D. Hennig, J.B. Dinkins, J.D. Scasta, and P.S. Coates. 2024. Free-roaming horses exceeding appropriate management levels affect multiple vital rates in greater sage-grouse. Journal of Wildlife Management 2024; e22669.

Beever, E.A., R.J. Tausch, and P.F. Brussard. 2003. Characterizing grazing disturbance in semiarid ecosystems across broad scales, using diverse indices. Ecological Applications 13:119-136.

Beever, E. A., and C. L. Aldridge. 2011. Influences of free-roaming equids on sagebrush ecosystems, with a focus on greater sage-grouse. Studies in Avian Biology 38:273–290.

Beever, E.A. and J.E. Herrick. 2006. Effects of feral horses in Great Basin landscapes on soils and ants: direct and indirect mechanisms. Journal of Arid Environments 66:96-112.

Behnke, T.L., P.A. Street, S. Davies, J.Q. Ouyang, and J.S. Sedinger. 2022. Non-native grazers affect physiological and demographic responses of greater sage-grouse. Ecology and Evolution 12(9), p.e9325

Belsky, A.J., A. Matzke, S. Uselman. 1999. Survey of livestock influences on stream and riparian ecosystems in the western United States. Journal of Soil and Water Conservation 54: 419-431.

Bigolin, S., D.J. Fagundes, H.C. Rivoire, A.T. Negrini Fagundes, A.L. Negrini Fagundes. 2009. Transcervical hysteroscopic sterilization using cyanoacrylate: a long-term experimental study on sheep. The Journal of Obstectrics and Gynaecology Research 35:1012-1018.

Bleich, V.C., J.S. Sedinger, C.M. Aiello, C. Gallinger, D.A. Jessup, and E.M. Rominger. 2021. RE: Ecological "benefits" of feral equids command disclosure of environmental impacts.

CAL_08932

Science eLetters. 19 July 2021. https://science.sciencemag.org/content/372/6541/491/tab-e-letters accessed 9 August 2021. Response to Lundgren et al., 2021, "Equids engineer desert water availability," in Science 372: 491–495.

Bureau of Land Management (BLM). 1990. BLM-H1741-2; Water Developments Handbook. Washington, D.C.

Bureau of Land Management (BLM). 2026. Socioeconomic Profile Mount Lewis Field Office. Generated by the BLM Socioeconomic Profile Tool (https://apps.headwaterseconomics.org/eps-blm) on January 22, 2026.

Boyce, P.N., and P.D. McLoughlin. 2021. Ecological interactions involving feral horses and predators: review with implications for biodiversity conservation. Journal of Wildlife Management. DOI: 10.1002/jwmg.21995

Carey, K.A., A. Ortiz, K. Grams, D. Elkins, J.W. Turner, and A.T. Rutberg. 2019. Efficacy of dart delivered PZP-22 immunocontraceptive vaccine in wild horses.

Chambers, J.C., et al. 2017. Science Framework for Conservation and Restoration of the Sagebrush Biome: Linking the Department of the Interior Secretarial Order 3336 to Long-Term Strategic Conservation Actions. Part 1. Science Basis and Applications. RMRS-GTR-360. Fort Collins, CO: U.S Department of Agriculture, Forest Service, Rocky Mountain Research Station.

Coates, P.S., O'Neil, S.T., Muñoz, D.A., Dwight, I.A., and Tull, J.C. 2021. Sage-grouse population dynamics are adversely impacted by overabundant free-roaming horses. The Journal of Wildlife Management 85:1132-1149.

Copeland, S. M., Hoover, D. L., Augustine, D. J., Bates, J. D., Boyd, C. S., Davies, K. W., ... & Vermeire, L. T. (2023). Variable effects of long-term livestock grazing across the western United States suggest diverse approaches are needed to meet global change challenges. Applied Vegetation Science, 26(1), e12719.

Cothran, E.G. 2003a. Genetic analysis of the Grass Valley allotment, Callaghan, NV feral horse herd. January 13, 2003 report to the BLM from University of Kentucky Department of Veterinary Science.

Cothran, E.G. 2003b. Genetic analysis of the Hall Creek (Austin allotment), NV feral horse herd. April 11, 2003 report to the BLM from University of Kentucky Department of Veterinary Science.

Cothran, E.G. 2010a. Genetic analysis of the South Shoshore HMA, NV. August 11, 2010 report to the BLM from Texas A&M University Department of Veterinary Integrative Bioscience.

Cothran, E.G. 2010b. Genetic analysis of the Callaghan East HMA, NV. August 11, 2010 report to the BLM from Texas A&M University Department of Veterinary Integrative Bioscience.

Cothran, E.G. 2010c. Genetic analysis of the Callaghan West HMA, NV. August 12, 2010 report to the BLM from Texas A&M University Department of Veterinary Integrative Bioscience.

Cothran, E.G. 2010d. Genetic analysis of the Bald Mountain HMA, NV. August 13, 2010 report to the BLM from Texas A&M University Department of Veterinary Integrative Bioscience.

Cothran, E.G., A. Khanshour, S. Funk, E. Conant, R. Juras, and B.W. Davis. 2024. Genetic dynamics of Mustang and Feral Horse Populations in the Western United States. BioRxiv doi.org/10.1101/2024.01.28.577652.

CAL_08933

Crane, K.K., M.A. Smith, and D. Reynolds. 1997. Habitat selection patterns of feral horses in south central Wyoming. Journal of Range Management 50:374-380.

Crist, M., et al. 2019. Science Framework for Conservation and Restoration of the Sagebrush Biome: Linking the Department of the Interior Secretarial Order 3336 to Long-Term Strategic Conservation Actions. Part 2. Management applications. Gen. Tech. Rep. RMRS-GTR-389. Fort Collins, CO: U.S Department of Agriculture, Forest Service, Rocky Mountain Research Station.

Daels, P.F, and J.P. Hughes. 1995. Fertility control using intrauterine devices: an alternative for population control in wild horses. Theriogenology 44:629-639.

Davies, K.W., G. Collins, and C.S. Boyd. 2014. Effects of free-roaming horses on semi-arid rangeland ecosystems: an example from the sagebrush steppe. Ecosphere 5:1-14.

Davies, K.W., C.S. Boyd, J.D. Bates, L.N. Svejcar, and L.M. Porensky. 2024, Ecological benefits of strategically applied livestock grazing in sagebrush communities. Ecosphere 15(5); e4859. https://doi.org/10.1002/ecs2.4859

Davies, K.W. and C.S. Boyd. 2019. Ecological effects of free-roaming horses in North American rangelands. Bioscience 69:558-565.

de Seve, C.W. and S.L. Boyles-Griffin. 2013. An economic model demonstrating the long-term cost benefits of incorporating fertility control into wild horse (Equus caballus) management in the United States. Journal of Zoo and Wildlife Medicine 44(4s:S34-S37).

Derner, J.D. and G.E. Schuman. 2007. Carbon sequestration and rangelands: a synthesis of land management and precipitation effects. Journal of Soil and Water Conservation 62:77-85

Environmental Protection Agency (EPA). 2009b. Memorandum on GonaCon ™ Immunocontraceptive Vaccine for Use in White-Tailed Deer. Section 3 Registration. US Environmental Protection Agency, Washington, DC.

Environmental Protection Agency (EPA). 2012. Porcine Zona Pellucida. Pesticide fact Sheet. Office of Chemical Safety and Pollution Prevention 7505P. 9 pages.

Environmental Protection Agency (EPA). 2013. Notice of pesticide registration for GonaCon Equine. US Environmental Protection Agency, Washington, DC.

Environmental Protection Agency (EPA). 2015. Label and CSF Amendment. November 19, 2015 memo and attachment from Marianne Lewis to David Reinhold. US Environmental Protection Agency, Washington, DC.

Environmental Protection Agency (EPA). 2025. Non-PRIA (Pesticide Registration Improvement Act) Labeling Amendment – Change in time interval of the optional second dose; product name: GonaCon - Equine. January 21, 2025 memo and attachment from Melissa Bridges to Emily Ruell. US Environmental Protection Agency, Washington, DC.

Folt, B.P., L.S. Ekernas, D.R. Edmunds, M.T. Hannon, and K.S. Schoenecker. 2023a. PopEquus: A Predictive Modeling Tool to Support Management Decisions for Free-roaming Horse Populations, Version 1.0.1. USGS Software Release. USGS Fort Collins Science Center, Fort Collins, Colorado. DOI: 10.5066/P9NMRQDG

Folt, B., K.A. Schoenecker, L.S. Ekernas, D.R. Edmunds, and M. Hannon. 2023b. PopEquus: A predictive modeling tool to support management decisions for free-roaming horse populations. Ecosphere, 14(9), e4632.

Fonner, R. and A.K. Bohara. 2017. Optimal control of wild horse populations with nonlethal methods. Land Economics 93:390-412.

CAL_08934

Ganskopp, D.C. 1983. Habitat use and Spatial Interactions of Cattle, Wild Horses, Mule Deer, and California Bighorn Sheep in the Owyhee Breaks of Southeast Oregon. PhD Dissertation, Oregon State University.

Ganskopp, D.C. and M. Vavra. 1986. Habitat Use by Feral Horses in the Northern Sagebrush Steppe. Journal of Range Management 39(3):207-211.

Ganskopp, D.C. and M. Vavra. 1987. Slope Use by cattle, feral horses, deer, and bighorn sheep. Northwest Science, 61(2):74-80

Garrott, R. A. (2018). Wild horse demography: implications for sustainable management within economic constraints.

Garrott, R.A., and M.K. Oli. 2013. A Critical Crossroad for BLM's Wild Horse Program. Science 341:847-848.

Gooch, A.M., S.L. Petersen, G.H. Collins, T.S. Smith, B.R. McMillan, and D.L. Eggett. 2017. The impacts of feral horses on the use of water by pronghorn in the Great Basin. Journal of Arid Environments 168:38-43.

Government Accountability Office (GAO). 2008. Bureau of Land Management; Effective Long-Term Options Needed to Manage Unadoptable Wild Horses. Report to the Chairman, Committee on Natural Resources, House of Representatives, GAO-09-77.

Gradil, C. 2019. The Upod IUD: a potential simple, safe solution for long-term, reversible fertility control in feral equids. Oral presentation at the Free Roaming Equids and Ecosystem Sustainability Summit, Reno, Nevada.

Gradil, C.M., C.K. Uricchio, and A. Schwarz. 2019. Self-Assembling Intrauterine Device (Upod) Modulation of the Reproductive Cycle in Mares. Journal of Equine Veterinary Science 83: 102690.

Gradil, C., C. Joonè, T. Haire, B. Fowler, J. Zinchuk, C.J. Davies, and B. Ball. 2021. An intrauterine device with potential to control fertility in feral equids. Animal Reproductive Science. doi.org/10.1016/j.anireprosci.2021.106795

Groenendyk, P., B. English, and I. Abetz. 1988. External balance of water and electrolytes in the horse. Equine Veterinary Journal 20:189-193.

Gross, J.E. 2000. A dynamic simulation model for evaluating effects of removal and contraception on genetic variation and demography of Pryor Mountain wild horses. Biological Conservation 96:319-330.

Hall, L.K., R.T. Larsen, M.D. Westover, C.C. Day, R.N. Knight, and B.R. McMillan. 2016. Influence of exotic horses on the use of water by communities of native wildlife in a semi-arid environment. Journal of Arid Environments 127:100-105

Hall, L.K., R.T. Larsen, R.N. Knight, and B.R. McMillan. 2018. Feral horses influence both spatial and temporal patterns of water use by native ungulates in a semi-arid environment. Ecosphere 9(1):e02096

Hampton, J.O., T.H. Hyndman, A. Barnes, and T. Collins. 2015. Is wildlife fertility control always humane? Animals 5:1047-1071.

Hampson, B. A., J. M. Morton, P. C. Mills, M. G. Trotter, D. W. Lamb, and C. C. Pollitt. 2010b. Monitoring distances travelled by horses using GPS tracking collars. Australian Veterinary Journal 88:176–181.

Hanley, T.A. 1982. The Nutritional Basis for Food Selection by Ungulates. Journal of Range Management 35: 146-151.

Hanley, T. A., and K. A. Hanley. 1982. Food resource partitioning by sympatric ungulates on Great Basin rangeland. Journal of Range Management 35(2):152-158.

CAL_08935

Hansen, R. M., R. C. Clark, and W. Lawhorn. 1977. Foods of wild horses, deer, and cattle in the Douglas Mountain Area, Colorado. Journal of Range Management 30(2):116-118.

He, N.P., Y.H. Zhang, Q. Yu, Q.S. Chen, Q.M. Pan, G.. Zhang, and X.G. Han. 2011. Grazing intensity impacts soil carbon and nitrogen storage of continental steppe. Ecosphere 2:(1;8). DOI: 10.1890/ES10-00017.1

Hennig, J. D., Beck, J. L., Gray, C. J., & Scasta, J. D. (2021). Temporal overlap among feral horses, cattle, and native ungulates at water sources. The Journal of Wildlife Management, 85(6), 1084-1090.

Hennig, J.D., J.D. Scasta, A.C. Pratt, C.P. Wanner, and J.L. Beck. 2023. Habitat selection and space use overlap between feral horses, pronghorn, and greater sage-grouse in cold arid steppe. Journal of Wildlife Management 87(1), e22329.

Herbel, C.H. 1982. Grazing management on rangelands. Journal of Soil and Water Conservation 37:77-79.

Hobbs, N.T., D.C. Bowden and D.L. Baker. 2000. Effects of Fertility Control on Populations of Ungulates: General, Stage-Structured Models. Journal of Wildlife Management 64:473 491.

Holyoak, G.R., C.C. Lyman, S. Wang, S.S. Germaine, C.O. Anderson, J.M. Baldrighi, N. Vemula, G.B. Rexabek, and A.J. Kane. 2021. Efficacy of a Y-design intrauterine device as a horse contraceptive. Journal of Wildlife Management 85:1169-1174.

Hubbard R.E. and R. M. Hansen 1976. Diets of Wild Horses, Cattle and Mule Deer in the Piceance Basin, Colorado. Journal of Range Management 29: 389-392

Jones, C.G., J.H. Lawton and M. Shachak. 1994. Organisms as ecosystem engineers. Oikos 69:373- 386.

Joonè, C.J., C.M. Gradil, J.A. Picard, J.D. Taylor, D. deTonnaire, and J. Cavalieri. 2021. The contraceptive efficacy of a self-assembling intra-uterine device in domestic mares. Australian Veterinary Journal. doi: 10.1111/avj.13055

Kaweck, M.M., J.P. Severson, and K.L. Launchbaugh. 2018. Impacts of wild horses, cattle, and wildlife on riparian areas in Idaho. Rangelands 40:45-52.

King, S.R.B., and J. Gurnell. 2007. Scent-marking behaviour by stallions: An assessment of function in a reintroduced population of Przewalski horses (Equus ferus przewalskii). Journal of Zoology, 272, 30-36.

King, S.R.B., K.A. Schoenecker, and D.J. Manier. 2019. Potential spread of cheatgrass (*Bromus tectorum*) and other invasive species by feral horses (*Equus ferus caballus*) in western Colorado. Rangeland Ecology and Management 72:706-710.

King, S.R.B., K.A. Schoenecker, and M.J. Cole. 2022. Effect of adult male sterilization on the behavior and social associations of a feral polygynous ungulate: the horse. Applied Animal Behaviour Science 249: 105598.

Kirkpatrick, J.F., R. Naugle, I.K.M. Lui, J.W. Turner JR., M. Bernocco. 1995. Effects of Seven Consecutive years of PZP Contraception on Ovarian Function in Feral Mares, Biology of Reproduction Monograph Series 1: Equine Reproduction VI: 411-418.

Krysl, L.T., M.E. Hubbert, B. F. Sowell, G. E. Plumb, T. K. Jewett, M. A. Smith and J. W. Waggoner. 1984. Horses and Cattle Grazing in the Wyoming Red Desert, I. Food Habits and Dietary Overlap. Journal of Range Management. 37: 72-76.

Loydi, A. and S.M. Zalba. 2009. Feral horses dung piles as potential invasion windows for alien plant species in natural grasslands. Plant Ecology 201:471-480.

CAL_08936

Lundgren, E.J., D. Ramp, J.C. Stromberg, J. Wu, N.C. Nieto, M. Sluk, K.T. Moeller, and A.D. Wallach. 2021. Equids engineer desert water availability. Science 372:491-495.

Manley, J.T., G.E. Schuman, J.D. Reeder, and R.H. Hart. 1995. Rangeland soil carbon and nitrogen responses to grazing. Journal of Soil and Water Conservation 50:294-298.

McCann, B., D. Baker, J. Powers, A. Denicola, B. Soars, and M. Thompson. 2017. Delivery of GonaCon-Equine to feral horses (Equus caballus) using prototype syringe darts. Presentation to the International Wildlife Fertility Control conference, Washington, D.C.

McInnis, M.A. 1984. Ecological Relationships among Feral Horses, Cattle, and Pronghorn in Southeastern Oregon. PhD Dissertation. Oregon State University.

McInnis, M.A. and M. Vavra. 1987 Dietary relationships among feral horses, cattle, and Pronghorn in southeastern Oregon. Journal of Range Mgt 40(1):60-66.

Meeker, J.O. 1979. Interactions between pronghorn antelope and feral horses in northwestern Nevada. University of Nevada, Reno M.S. Thesis. Reno, Nevada.

Menard, C., P. Duncan, G, Fleurance, J. Georges, M. Lila.  2002. Comparative foraging and nutrition of horses and cattle in European wetlands.  Journal of Applied Ecology 39:120 133.

Miller, L.A., K.A. Fagerstone, and D.C. Eckery. 2013. Twenty years of immunocontraceptive research: lessons learned. Journal of Zoo and Wildlife Medicine 44:S84-S96.

Muñoz, D.A., P.S. Coates, and M.A. Ricca. 2020. Free-roaming horses disrupt greater sage-grouse lekking activity in the great basin. Journal of Arid Environments 184: 104304.

National Research Council of the National Academies of Sciences (NAS). 2013. Using science to improve the BLM wild horse and burro program: a way forward. National Academies Press. Washington, DC.

Nordquist, M. K. 2011. Stable isotope diet reconstruction of feral horses (Equus caballus) on the Sheldon National Wildlife Refuge, Nevada, USA. Thesis, Brigham Young University, Provo, Utah.

Olsen, F.W., and R.M. Hansen.  1977.  Food Relations of Wild Free-Roaming Horses to Livestock and Big Game, Red Desert Wyoming.  Journal of Range Management.  30:17-20.

Osterheld, M. and S.J. McNaughton. 1991. Effect of stress and time for recovery on the amount of compensatory growth after grazing. Oecologica 85:305-313.

Ostermann-Kelm, S., E.R. Atwill, E.S. Rubin, M.C. Jorgensen, and W.M. Boyce. 2008. Interactions between feral horses and desert bighorn sheep at water. Journal of Mammalogy 89:459-466

Perry, N.D., P. Morey and G.S. Miguel. 2015. Dominance of a Natural Water Source by Feral Horses. The Southwestern Naturalist 60:390-393.

Power, M.E., and L.S. Mills. 1995. The keystone cops meet in Hilo. Trends in Ecology and Evolution 10: 182-184.

Ransom, J.I., L Lagos, H. Hrabar, H. Mowrazi, D. Ushkhjargal, and N. Spasskaya. 2016. Wild and feral equid population dynamics. Pages 68-86 in J. I. Ransom and P Kaczensky, eds., Wild equids; ecology, management and conservation. Johns Hopkins University Press, Baltimore, Maryland.

Roelle, J. E., F. J. Singer, L. C. Zeigenfuss, J. I. Ransom, L. Coates-Markle, and K. A. Schoenecker. 2010. Demography of the Pryor Mountain Wild Horses, 1993–2007. pubs.usgs.gov. U.S. Geological Survey Scientific Investigations Report 2010-5125.

CAL_08937

Rouet-Leduc, J., Pe'er, G., Moreira, F., Bonn, A., Helmer, W., Shahsavan Zadeh, S. A., ... & van der Plas, F. (2021). Effects of large herbivores on fire regimes and wildfire mitigation. Journal of Applied Ecology, 58(12), 2690-2702.

Rutberg, A., K. Grams, J.W. Turner, and H. Hopkins. 2017. Contraceptive efficacy of priming and boosting does of controlled-release PZP in wild horses. Wildlife Research: http://dx.doi.org/10.1071/WR16123

Scasta, J.D., J.L. Beck and C.J. Angwin. 2016. Meta-analysis of diet composition and potential conflict of wild horses with livestock and wild ungulates on western rangelands of North America. Rangeland Ecology & Management.

Scasta, J.D. 2019. Mortality and operational attributes relative to feral horse and burro capture techniques based on publicly available data from 2010-2019. Journal of Equine Veterinary Science, 102893. Science and Conservation Center (SCC). 2015. Materials Safety Data Sheet, ZonaStat-H. Billings, Montana.

Schmelzer, L., Perryman, B., Bruce, B., Schultz, B., McAdoo, K., McCuin, G., ... & Conley, K. (2014). Case study: reducing cheatgrass (Bromus tectorum L.) fuel loads using fall cattle grazing. The Professional Animal Scientist, 30(2), 270-278.

Schoenecker, K.A., King, S.R.B, Collins, G.H. 2020. Evaluation of the impacts of radio-marking devices on feral horses and burros in a captive setting. Journal of Human and wildlife Interactions. 14(1), 73-86. https://digitalcommons.usu.edu/hwi/vol14/iss1/12/

Schoenecker, K.A., S.R.B. King, J.D. Hennig, M.J. Cole, J.D. Scasta, and J. L. Beck. 2024. Effects of telemetry collars on two free-roaming feral equid species. PLoS One 19(5):e0303312.

Schuman, G.E., J.D. Reeder, J.T. Manley, R.H. Hart, and W.A. Manley. 1999. Impact of grazing management on the carbon and nitrogen balance of a mixed-grass rangeland. Ecological Applications 9:65-71.

Schulman, M.L., N.K. Hayes, T.A. Wilson, and J.D. Grewar. 2024. Immunocontraceptive efficacy of native porcine zona pellucida (pZP) treatment of Nevada's Virginia range free-roaming horse population. Vaccines 12:96.

Scully, C.M., R.L. Lee, L. Pielstick, J. Medlock, K.M. Patton, G.H. Collins, and M. Kutzler. 2015. Comparison of chemical and surgical vasectomy on testicular activity in free-roaming horses (Equus caballus). Journal of Zoo and Wildlife Medicine 46:815-824

Shimkin, D.B. 1986. Eastern Shoshone. In Handbook of North American Indians, Vol. 11, Great Basin, edited by L. d'Azevedo, 308-335. Washington, D.C

Smith, M.A and J.W. Waggoner, Jr., et al. 1982. Vegetation Utilization, Diets, and Estimated Dietary Quality of Horses and Cattle Grazing in the Red Desert of Westcentral Wyoming. BLM Contract No. AA851-CTO-31.

Society for Range Management, 1998. Glossary of Terms Used in Range Management (Fourth edition). Society for Range Management, Denver, Colo.

Symanski, R. 1994. Contested Realities: Feral Horses in Outback Australia. Annals of the Association of American Geographers. 84: 251-269

Taylor D.A.R., and M.D. Tuttle. 2007. Water for Wildlife: A Handbook for Ranchers and Range Managers. Bat Conservation International. 20 pp. www.batcon.org.

Taylor, W.T.T., P. Librado, M.H. Tašukne Icu, et al. 2023. Early dispersal of domestic horses into the Great Plains and northern Rockies. Science 379:1316-1323.

Turner, J.W., I.K.M. Liu, and J.F. Kirkpatrick. 1996. Remotely delivered immunocontraception in free-roaming feral burros (Equus asinus). Journal of Reproduction and Fertility 107:31-35.

75

CAL_08938

Turner Jr., J.W., I.K.M. Liu, Rutberg, A., J.W., Kirkpatrick. 1997. Immunocontraception Limits Foal Production in Free Roaming Feral Horses in Nevada, J. Wildlife. Management. 61 (3):873-880.

Turner, A, and Kirkpatrick, JF. 2002. Effects of immunocontraception on population, longevity and body condition in wild mares (Equus caballus). Reproduction (Suppl. 60): 187-195.

Turner, J.W. and M.L. Morrison. 2001. Influence of predation by mountain lions on numbers and survivorship of a feral horse population. The Southwestern Naturalist 46:183-190.

US Department of Interior, Bureau of Land Management. 2025. Record of Decision and Approved Resource Management Plan Amendment for Nevada and California. December 2025. Reno, Nevada

US Fish and Wildlife Service (USFWS). 2008. Revised, Final Environmental Assessment for Horse and Burro Management at Sheldon National Wildlife Refuge. April 2008. U.S. Fish and Wildlife Service, Lake County, Oregon.

US Fish and Wildlife Service (USFWS). 2012. Sheldon National Wildlife Refuge Comprehensive Conservation Plan. USFWS, Lakeview, Oregon.

Vavra, M. and F. Sneva. 1978. Seasonal Diets of five ungulates grazing the cold desert biome. Proceedings of the First International Rangeland Congress. Society for Range Mgt. Denver, CO.

Wang-Cahill, F., J. Warren, T. Hall, J. O'Hare, A. Lemay, E. Ruell, and R. Wimberly. 2022. Use of GonaCon in wildlife management. Chapter XI in USDA-APHIS, Human health and ecological risk assessment for the use of wildlife damage management methods by APHIS Wildlife Services. USDA APHIS, Fort Collins, Colorado.

Williams, R. E., Allred, B. W., Denio, R. M., & H.A. Paulsen. 1968. Conservation, development, and use of the world's rangelands. Journal of Range Management. 21:355-360.

CAL_08939

# Bureau of Land Management

## Mount Lewis Field Office

## Callaghan Wild Horse Complex Gather Area Overview

Attachment I: Map 1

### Legend

**Boundaries**
- BLM District Boundary
- Callaghan Complex Gather Area
- Herd Management Area
- Herd Area Polygons
- Grazing Allotment

**Range Improvements**
- Fence
- Pipeline

**Surface Management**
- BIA
- BLM
- BOR
- USFS
- PVT

North Shoshone HA

South Shoshone HMA

Bald Mountain HMA

Callaghan HMA

Hickison HMA

SIMPSON PARK

0   5   10   15   20   Miles

1:650,000

No warranty is made by the Bureau of Land Management as to the accuracy, reliability, or completeness of these data for individual use or aggregate use with other data. This product was developed through digital means and may be updated without notification.

CAL_08940

# Bureau of Land Management

## Mount Lewis Field Office

## Callaghan Wild Horse Complex - North Shoshone Herd Area
Attachment I: Map 2

North Shoshone HA

### Legend

**Boundaries**

Callaghan Complex Gather Area

Herd Management Area

Herd Area Polygons

Grazing Allotment

**Range Improvements**

—✕— Fence

Pipeline

**Surface Management**

BIA

BLM

BOR

PVT

0   1.5   3   4.5   6   Miles

1:240,000

No warranty is made by the Bureau of Land Management as to the accuracy, reliability, or completeness of these data for individual use or aggregate use with other data. This product was developed through digital means and may be updated without notification.

CAL_08941

**Bureau of Land Management**

*Mount Lewis Field Office*

## Callaghan Wild Horse Complex - February 2025 Census Flight Data
Attachment I: Map 3

### Legend

**Boundaries**

Callaghan Complex Gather Area

Herd Management Area

Herd Area Polygons

Grazing Allotment

**Range Improvements**

—✳— Fence

Pipeline

**Surface Management**

BIA

BLM

BOR

USFS

PVT

### Feb 2025 Census Flight

— Flight Lines

Observed # of Adults

○ 0 - 10

● 8 - 25

● 25 - 50

● 50 - 100

● 100 - 263

0    5    10    15    20    Miles

1:650,000

No warranty is made by the Bureau of Land Management as to the accuracy, reliability, or completeness of these data for individual use or aggregate use with other data. This product was developed through digital means and may be updated without notification.

CAL_08942

*Bureau of Land Management*

*Mount Lewis Field Office*

## Callaghan Wild Horse Complex - Grazing Allotments

Attachment I: Map 4

### Legend

**Boundaries**
- BLM District Boundary
- Callaghan Complex Gather Area
- Grazing Allotment

**Range Improvements**
- ✕ Fence
- ⋯ Pipeline

**Surface Management**
- BIA
- BLM
- BOR
- USFS
- PVT

0    5    10    15    20
Miles
1:650,000

No warranty is made by the Bureau of Land Management as to the accuracy, reliability, or completeness of these data for individual use or aggregate use with other data. This product was developed through digital means and may be updated without notification.

CAL_08943

# Bureau of Land Management

## Mount Lewis Field Office

## Callaghan Wild Horse Complex - Recreation & WSA
Attachment I: Map 5

Mill Creek

Shoshone OHV Trail System

Fish Creek

Augusta Mountains

LANDER COUNTY

Reese River

Simpson Park

Callaghan Creek

### Legend

**Boundaries**

| | |
|---|---|
| ▭ | Callaghan Complex Gather Area |
| ▭ | Grazing Allotment |

**Recreation Sites**

| | |
|---|---|
| ■ | CAMPGROUND |
| ■ | DAY USE AREA |
| ■ | OHV DESIGNATED AREA |
| ■ | RECREATION MANAGEMENT AREA |
| ⚠ | Campgrounds |
| — | NHT Pony Express Trail |
| ■ | NLCS Wilderness Study Areas |

0   5   10   15   20   Miles

1:650,000

Hickison Petroglyphs

No warranty is made by the Bureau of Land Management as to the accuracy, reliability, or completeness of these data for individual use or aggregate use with other data. This product was developed through digital means and may be updated without notification.

CAL_08944



# Bureau of Land Management

## Mount Lewis Field Office

## Callaghan Wild Horse Complex - Water Sources
### Attachment I: Map 6

### Legend

**Boundaries**

- Callaghan Complex Gather Area
- Herd Management Area
- Herd Area Polygons
- Grazing Allotment

**Range Improvements**

- Fence
- Pipeline
- Range Improvements

**NHD - HU4 - 1604**

- SpringSeep
- Stream/River: Intermittent
- Stream/River: Perennial

0   5   10   15   20  Miles
1:650,000

No warranty is made by the Bureau of Land Management as to the accuracy, reliability, or completeness of these data for individual use or aggregate use with other data. This product was developed through digital means and may be updated without notification.

CAL_08945

**Bureau of Land Management**

**Mount Lewis Field Office**

# Callaghan Wild Horse Complex - 2025 ROD GRSG Habitat
Attachment I: Map 7

Nevada

Callaghan Complex Gather Area
Grazing Allotment

## 2025 NVCA GRSG HMA ROD
PHMA
GHMA
OHMA

0    3.5    7    10.5    14    17.5    21
                                    Miles
1:650,000

No warranty is made by the Bureau of Land Management as to the accuracy, reliability, or completeness of these data for individual use or aggregate use with other data. This product was developed through digital means and may be updated without notification.

CAL_08946

**GRSG Proposed Activities Form IM 2016-056, Attachment 3:** Required Design Features (RDF) identified in the Nevada and Northeastern California Greater Sage-Grouse Approved Resource Management Plan Amendment (SGPA) Appendix C

**Project Name:** Callaghan Complex Wildhorse and Burro Gather          **NEPA #:**

| General RDFs | Applied | If RDF not applied, select reason: |
|---|---|---|
| **RDF Gen 1:** Locate new roads outside of GRSG habitat to the extent practical. | ☐ Yes  ☑ No | ☑ A specific RDF is documented to not be applicable to the site-specific conditions of the project/activity (e.g. due to site limitations or engineering considerations). Economic considerations, such as increased costs, do not necessarily require that an RDF be varied or rendered inapplicable.<br>☐ An alternative RDF is determined to provide equal or better protection for GRSG or its habitat. Alternative RDF # _____<br>☐ A specific RDF will provide no additional protection to GRSG or its habitat. |
| **Rationale if RDF is not applied:** There will be no new roads constructed | | |
| **RDF Gen 2:** Avoid constructing roads within riparian areas and ephemeral drainages. Construct lowwater crossings at right angles to ephemeral drainages and stream crossings (note that such construction may require permitting under Sections 401 and 404 of the Clean Water Act). | ☐ Yes  ☑ No | ☑ A specific RDF is documented to not be applicable to the site-specific conditions of the project/activity (e.g. due to site limitations or engineering considerations). Economic considerations, such as increased costs, do not necessarily require that an RDF be varied or rendered inapplicable.<br>☐ An alternative RDF is determined to provide equal or better protection for GRSG or its habitat. Alternative RDF # _____<br>☐ A specific RDF will provide no additional protection to GRSG or its habitat. |
| **Rationale if RDF is not applied:** There will be no new roads constructed | | |
| **RDF Gen 3:** Limit construction of new roads where roads are already in existence and could be used or upgraded to meet the needs of the project or operation. Design roads to an appropriate standard, no higher than necessary, to accommodate intended purpose and level of use. | ☐ Yes  ☑ No | ☑ A specific RDF is documented to not be applicable to the site-specific conditions of the project/activity (e.g. due to site limitations or engineering considerations). Economic considerations, such as increased costs, do not necessarily require that an RDF be varied or rendered inapplicable.<br>☐ An alternative RDF is determined to provide equal or better protection for GRSG or its habitat. Alternative RDF # _____<br>☐ A specific RDF will provide no additional protection to GRSG or its habitat. |
| **Rationale if RDF is not applied:** There will be no new roads constructed | | |
| **RDF Gen 4:** Coordinate road construction and use with ROW holders to minimize disturbance to the extent possible. | ☐ Yes  ☑ No | ☑ A specific RDF is documented to not be applicable to the site-specific conditions of the project/activity (e.g. due to site limitations or engineering considerations). Economic considerations, such as increased costs, do not necessarily require that an RDF be varied or rendered inapplicable.<br>☐ An alternative RDF is determined to provide equal or better protection for GRSG or its habitat. Alternative RDF # _____<br>☐ A specific RDF will provide no additional protection to GRSG or its habitat. |
| **Rationale if RDF is not applied:** There will be no new roads constructed | | |
| **RDF Gen 5:** During project construction and operation, establish and post speed limits in GRSG habitat to reduce vehicle/wildlife collisions or design roads to be driven at slower speeds. | ☑ Yes  ☐ No | ☐ A specific RDF is documented to not be applicable to the site-specific conditions of the project/activity (e.g. due to site limitations or engineering considerations). Economic considerations, such as increased costs, do not necessarily require that an RDF be varied or rendered inapplicable.<br>☐ An alternative RDF is determined to provide equal or better protection for GRSG or its habitat. Alternative RDF # _____<br>☐ A specific RDF will provide no additional protection to GRSG or its habitat. |
| **Rationale if RDF is not applied:** | | |

1

**Project Name:** Callaghan Complex Wildhorse and Burro Gather     **NEPA #:**

| RDF Gen 6: | Newly constructed project roads that access valid existing rights would not be managed as public access roads. Proponents will restrict access by employing traffic control devices such as signage, gates, and fencing. | ☑ Yes / ☐ No | ☑ A specific RDF is documented to not be applicable to the site-specific conditions of the project/activity (e.g. due to site limitations or engineering considerations). Economic considerations, such as increased costs, do not necessarily require that an RDF be varied or rendered inapplicable. <br> ☐ An alternative RDF is determined to provide equal or better protection for GRSG or its habitat. Alternative RDF # _____ <br> ☐ A specific RDF will provide no additional protection to GRSG or its habitat. |

**Rationale if RDF is not applied:**
There will be no new roads constructed

| RDF Gen 7: | Require dust abatement practices when authorizing use on roads. | ☑ Yes / ☐ No | ☐ A specific RDF is documented to not be applicable to the site-specific conditions of the project/activity (e.g. due to site limitations or engineering considerations). Economic considerations, such as increased costs, do not necessarily require that an RDF be varied or rendered inapplicable. <br> ☐ An alternative RDF is determined to provide equal or better protection for GRSG or its habitat. Alternative RDF # _____ <br> ☐ A specific RDF will provide no additional protection to GRSG or its habitat. |

**Rationale if RDF is not applied:**

**NO RDF 8 Identified**

| RDF Gen 9: | Upon project completion, reclaim roads developed for project access on public lands unless, based on site-specific analysis, the route provides specific benefits for public access and does not contribute to resource conflicts. | ☑ Yes / ☐ No | ☐ A specific RDF is documented to not be applicable to the site-specific conditions of the project/activity (e.g. due to site limitations or engineering considerations). Economic considerations, such as increased costs, do not necessarily require that an RDF be varied or rendered inapplicable. <br> ☐ An alternative RDF is determined to provide equal or better protection for GRSG or its habitat. Alternative RDF # _____ <br> ☐ A specific RDF will provide no additional protection to GRSG or its habitat. |

**Rationale if RDF is not applied:**

| RDF Gen 10: | Design or site permanent structures that create movement (e.g., pump jack/ windmill) to minimize impacts on GRSG habitat. | ☐ Yes / ☑ No | ☑ A specific RDF is documented to not be applicable to the site-specific conditions of the project/activity (e.g. due to site limitations or engineering considerations). Economic considerations, such as increased costs, do not necessarily require that an RDF be varied or rendered inapplicable. <br> ☐ An alternative RDF is determined to provide equal or better protection for GRSG or its habitat. Alternative RDF # _____ <br> ☐ A specific RDF will provide no additional protection to GRSG or its habitat. |

**Rationale if RDF is not applied:**
There will be no permanent structures

| RDF Gen 11: | Equip temporary and permanent aboveground facilities with structures or devices that discourage nesting and perching of raptors, corvids, and other predators. | ☐ Yes / ☑ No | ☑ A specific RDF is documented to not be applicable to the site-specific conditions of the project/activity (e.g. due to site limitations or engineering considerations). Economic considerations, such as increased costs, do not necessarily require that an RDF be varied or rendered inapplicable. <br> ☐ An alternative RDF is determined to provide equal or better protection for GRSG or its habitat. Alternative RDF # _____ <br> ☐ A specific RDF will provide no additional protection to GRSG or its habitat. |

**Rationale if RDF is not applied:**
There will be no permanent structures

2

Version: 08/22/2016

**Project Name:** Callaghan Complex Wildhorse and Burro Gather    **NEPA #:**

| RDF Gen 12: | Control the spread and effects of nonnative, invasive plant species (e.g., by washing vehicles and equipment, minimize unnecessary surface disturbance; Evangelista et al. 2011). All projects would be required to have a noxious weed management plan in place prior to construction and operations. | ☑ Yes ☐ No | ☐ A specific RDF is documented to not be applicable to the site-specific conditions of the project/activity (e.g. due to site limitations or engineering considerations). Economic considerations, such as increased costs, do not necessarily require that an RDF be varied or rendered inapplicable. |
| | | | ☐ An alternative RDF is determined to provide equal or better protection for GRSG or its habitat. Alternative RDF # _____ |
| | | | ☐ A specific RDF will provide no additional protection to GRSG or its habitat. |

**Rationale if RDF is not applied:**

| RDF Gen 13: | Implement project site-cleaning practices to preclude the accumulation of debris, solid waste, putrescible wastes, and other potential anthropogenic subsidies for predators of GRSG. | ☑ Yes ☐ No | ☐ A specific RDF is documented to not be applicable to the site-specific conditions of the project/activity (e.g. due to site limitations or engineering considerations). Economic considerations, such as increased costs, do not necessarily require that an RDF be varied or rendered inapplicable. |
| | | | ☐ An alternative RDF is determined to provide equal or better protection for GRSG or its habitat. Alternative RDF # _____ |
| | | | ☐ A specific RDF will provide no additional protection to GRSG or its habitat. |

**Rationale if RDF is not applied:**

| RDF Gen 14: | Locate project related temporary housing sites outside of GRSG habitat. | ☐ Yes ☑ No | ☑ A specific RDF is documented to not be applicable to the site-specific conditions of the project/activity (e.g. due to site limitations or engineering considerations). Economic considerations, such as increased costs, do not necessarily require that an RDF be varied or rendered inapplicable. |
| | | | ☐ An alternative RDF is determined to provide equal or better protection for GRSG or its habitat. Alternative RDF # _____ |
| | | | ☐ A specific RDF will provide no additional protection to GRSG or its habitat. |

**Rationale if RDF is not applied:**
No temporary housing sites will be constructed

| RDF Gen 15: | When interim reclamation is required, irrigate site to establish seedlings more quickly if the site requires it. | ☑ Yes ☐ No | ☐ A specific RDF is documented to not be applicable to the site-specific conditions of the project/activity (e.g. due to site limitations or engineering considerations). Economic considerations, such as increased costs, do not necessarily require that an RDF be varied or rendered inapplicable. |
| | | | ☐ An alternative RDF is determined to provide equal or better protection for GRSG or its habitat. Alternative RDF # _____ |
| | | | ☐ A specific RDF will provide no additional protection to GRSG or its habitat. |

**Rationale if RDF is not applied:**

| RDF Gen 16: | Utilize mulching techniques to expedite reclamation and to protect soils if the site requires it. | ☑ Yes ☐ No | ☐ A specific RDF is documented to not be applicable to the site-specific conditions of the project/activity (e.g. due to site limitations or engineering considerations). Economic considerations, such as increased costs, do not necessarily require that an RDF be varied or rendered inapplicable. |
| | | | ☐ An alternative RDF is determined to provide equal or better protection for GRSG or its habitat. Alternative RDF # _____ |
| | | | ☐ A specific RDF will provide no additional protection to GRSG or its habitat. |

**Rationale if RDF is not applied:**

Version: 08/22/2016

| Project Name: | Callaghan Complex Wildhorse and Burro Gather | NEPA #: | |

| RDF Gen 17: | Restore disturbed areas at final reclamation to the pre-disturbance landforms and desired plant community. | ☑ Yes ☐ No | ☐ A specific RDF is documented to not be applicable to the site-specific conditions of the project/activity (e.g. due to site limitations or engineering considerations). Economic considerations, such as increased costs, do not necessarily require that an RDF be varied or rendered inapplicable. |
| | | | ☐ An alternative RDF is determined to provide equal or better protection for GRSG or its habitat. Alternative RDF # _____ |
| | | | ☐ A specific RDF will provide no additional protection to GRSG or its habitat. |
| | | **Rationale if RDF is not applied:** | |
| RDF Gen 18: | When authorizing ground-disturbing activities, require the use of vegetation and soil reclamation standards suitable for the site type prior to construction. | ☑ Yes ☐ No | ☐ A specific RDF is documented to not be applicable to the site-specific conditions of the project/activity (e.g. due to site limitations or engineering considerations). Economic considerations, such as increased costs, do not necessarily require that an RDF be varied or rendered inapplicable. |
| | | | ☐ An alternative RDF is determined to provide equal or better protection for GRSG or its habitat. Alternative RDF # _____ |
| | | | ☐ A specific RDF will provide no additional protection to GRSG or its habitat. |
| | | **Rationale if RDF is not applied:** | |
| RDF Gen 19: | Instruct all construction employees to avoid harassment and disturbance of wildlife, especially during the GRSG breeding (e.g., courtship and nesting) season. In addition, pets shall not be permitted on site during construction (BLM 2005b). | ☑ Yes ☐ No | ☐ A specific RDF is documented to not be applicable to the site-specific conditions of the project/activity (e.g. due to site limitations or engineering considerations). Economic considerations, such as increased costs, do not necessarily require that an RDF be varied or rendered inapplicable. |
| | | | ☐ An alternative RDF is determined to provide equal or better protection for GRSG or its habitat. Alternative RDF # _____ |
| | | | ☐ A specific RDF will provide no additional protection to GRSG or its habitat. |
| | | **Rationale if RDF is not applied:** | |
| RDF Gen 20: | To reduce predator perching in GRSG habitat, limit the construction of vertical facilities and fences to the minimum number and amount needed and install anti-perch devices where applicable. | ☑ Yes ☐ No | ☐ A specific RDF is documented to not be applicable to the site-specific conditions of the project/activity (e.g. due to site limitations or engineering considerations). Economic considerations, such as increased costs, do not necessarily require that an RDF be varied or rendered inapplicable. |
| | | | ☐ An alternative RDF is determined to provide equal or better protection for GRSG or its habitat. Alternative RDF # _____ |
| | | | ☐ A specific RDF will provide no additional protection to GRSG or its habitat. |
| | | **Rationale if RDF is not applied:** | |
| RDF Gen 21: | Outfit all reservoirs, pits, tanks, troughs or similar features with appropriate type and number of wildlife escape ramps (BLM 1990; Taylor and Tuttle 2007). | ☑ Yes ☐ No | ☐ A specific RDF is documented to not be applicable to the site-specific conditions of the project/activity (e.g. due to site limitations or engineering considerations). Economic considerations, such as increased costs, do not necessarily require that an RDF be varied or rendered inapplicable. |
| | | | ☐ An alternative RDF is determined to provide equal or better protection for GRSG or its habitat. Alternative RDF # _____ |
| | | | ☐ A specific RDF will provide no additional protection to GRSG or its habitat. |
| | | **Rationale if RDF is not applied:** | |

4

**Project Name:** Callaghan Complex Wildhorse and Burro Gather          **NEPA #:**

| | | | | |
|---|---|---|---|---|
| **RDF Gen 22:** | Load and unload all equipment on existing roads to minimize disturbance to vegetation and soil. | ☑ Yes | ☐ | A specific RDF is documented to not be applicable to the site-specific conditions of the project/activity (e.g. due to site limitations or engineering considerations). Economic considerations, such as increased costs, do not necessarily require that an RDF be varied or rendered inapplicable. |
| | | ☐ No | ☐ | An alternative RDF is determined to provide equal or better protection for GRSG or its habitat. Alternative RDF # _____ |
| | | | ☐ | A specific RDF will provide no additional protection to GRSG or its habitat. |
| | | **Rationale if RDF is not applied:** | | |

Version: 08/22/2016

**GRSG Proposed Activities Form IM Attachment 3:** Required Design Features (RDF) identified in the
Nevada and Northeastern California Greater Sage-Grouse Approved Resource Management Plan Amendment
(SGPA Appendix C)

*In addition to the General RDFs, apply Lands and Realty RDFs to PHMA, GHMA and OHMA as appropriate and consistent with applicable law:*

**Project Name:** Callaghan Complex Wildhorse and Burro Gather          **NEPA #:**

| Lands and Realty RDFs* | | Applied | If RDF not applied, select reason: |
|---|---|---|---|
| **RDF LR-LUA 1:** | Where new ROWs associated with valid existing rights are required, co-locate new ROWs within existing ROWs or where it best minimizes impacts in GRSG habitat. Use existing roads or realignments of existing roads to access valid existing rights that are not yet developed. | ☐ Yes <br> ☑ No | ☑ A specific RDF is documented to not be applicable to the site-specific conditions of the project/activity (e.g. due to site limitations or engineering considerations). Economic considerations, such as increased costs, do not necessarily require that an RDF be varied or rendered inapplicable. <br><br> ☐ An alternative RDF is determined to provide equal or better protection for GRSG or its habitat. Alternative RDF # _____ <br><br> ☐ A specific RDF will provide no additional protection to GRSG or its habitat. |
| | | | **Rationale if RDF is not applied:** <br> No new ROWs are associated with this project |
| **RDF LR-LUA 2:** | Do not issue ROWs to counties on newly constructed energy/mining development roads, unless for a temporary use consistent with all other terms and conditions included in this document. | ☐ Yes <br> ☑ No | ☑ A specific RDF is documented to not be applicable to the site-specific conditions of the project/activity (e.g. due to site limitations or engineering considerations). Economic considerations, such as increased costs, do not necessarily require that an RDF be varied or rendered inapplicable. <br><br> ☐ An alternative RDF is determined to provide equal or better protection for GRSG or its habitat. Alternative RDF # _____ <br><br> ☐ A specific RDF will provide no additional protection to GRSG or its habitat. |
| | | | **Rationale if RDF is not applied:** <br> No new ROWs are associated with this project |
| **RDF GEN (LR-LUA) 3:** | Where necessary, fit transmission towers with anti-perch devices (Lammers and Collopy 2007) in GRSG habitat. | ☐ Yes <br> ☑ No | ☑ A specific RDF is documented to not be applicable to the site-specific conditions of the project/activity (e.g. due to site limitations or engineering considerations). Economic considerations, such as increased costs, do not necessarily require that an RDF be varied or rendered inapplicable. <br><br> ☐ An alternative RDF is determined to provide equal or better protection for GRSG or its habitat. Alternative RDF # _____ <br><br> ☐ A specific RDF will provide no additional protection to GRSG or its habitat. |
| | | | **Rationale if RDF is not applied:** <br> No new towers are associated with this project |
| **\*These RDFs also apply to other land use authorizations such as leases and permits** | | | |

1

**GRSG Proposed Activities Form IM Attachment 3:** Required Design Features (RDF) identified in the
Nevada and Northeastern California Greater Sage-Grouse Approved Resource Management Plan Amendment
(SGPA Appendix C)

*In addition to the General RDFs, apply Fuels and Fire Management RDFs to PHMA, GHMA and OHMA as appropriate and consistent with applicable law:*

**Project Name:** Callaghan Complex Wildhorse and Burro Gather

**NEPA #:**

| Fuels and Fire Management RDFs | | Applied | If RDF not applied, select reason: |
|---|---|---|---|
| **RDF WFM 1:** | Power-wash all firefighting vehicles, including engines, water tenders, personnel vehicles, and all-terrain vehicles (ATVs), prior to deploying in or near GRSG habitat to minimize the introduction and spread of undesirable and invasive plant species. | ☑ Yes  ☐ No | ☐ A specific RDF is documented to not be applicable to the site-specific conditions of the project/activity (e.g. due to site limitations or engineering considerations). Economic considerations, such as increased costs, do not necessarily require that an RDF be varied or rendered inapplicable.<br>☐ An alternative RDF is determined to provide equal or better protection for GRSG or its habitat. Alternative RDF # _____<br>☐ A specific RDF will provide no additional protection to GRSG or its habitat.<br>**Rationale if RDF is not applied:** |
| **RDF WFM 2:** | Protect wildland areas from wildfire originating on private lands, infrastructure corridors, and recreational areas. | ☑ Yes  ☐ No | ☐ A specific RDF is documented to not be applicable to the site-specific conditions of the project/activity (e.g. due to site limitations or engineering considerations). Economic considerations, such as increased costs, do not necessarily require that an RDF be varied or rendered inapplicable.<br>☐ An alternative RDF is determined to provide equal or better protection for GRSG or its habitat. Alternative RDF # _____<br>☐ A specific RDF will provide no additional protection to GRSG or its habitat.<br>**Rationale if RDF is not applied:** |
| **RDF WFM 3:** | Reduce the risk of vehicle or human-caused wildfires and the spread of invasive species by planting perennial vegetation (e.g., green-strips) paralleling road rights-of-way. | ☑ Yes  ☐ No | ☑ A specific RDF is documented to not be applicable to the site-specific conditions of the project/activity (e.g. due to site limitations or engineering considerations). Economic considerations, such as increased costs, do not necessarily require that an RDF be varied or rendered inapplicable.<br>☐ An alternative RDF is determined to provide equal or better protection for GRSG or its habitat. Alternative RDF # _____<br>☐ A specific RDF will provide no additional protection to GRSG or its habitat.<br>**Rationale if RDF is not applied:** |

1

**GRSG Proposed Activities Form IM Attachment 3:** Required Design Features (RDF) identified in the
Nevada and Northeastern California Greater Sage-Grouse Approved Resource Management Plan Amendment
(SGPA Appendix C)

*In addition to the General RDFs, apply Fluid Minerals RDFs to PHMA, GHMA and OHMA as appropriate and consistent with applicable law:*

**Project Name:** Callaghan Complex Wildhorse and Burro Gather          **NEPA #:**

| Fluid Minerals RDFs | | Applied | If RDF not applied, select reason: |
|---|---|---|---|
| **RDF Lease FM 1:** | Co-locate power lines, flow lines, and small pipelines under or immediately adjacent to existing roads (Bui et al. 2010) in order to minimize or avoid disturbance. | ☐ Yes  ☑ No | ☑ A specific RDF is documented to not be applicable to the site-specific conditions of the project/activity (e.g. due to site limitations or engineering considerations). Economic considerations, such as increased costs, do not necessarily require that an RDF be varied or rendered inapplicable.<br>☐ An alternative RDF is determined to provide equal or better protection for GRSG or its habitat. Alternative RDF # _____<br>☐ A specific RDF will provide no additional protection to GRSG or its habitat. |
| | **Rationale if RDF is not applied:** No power lines will be constructed | | |
| **RDF Lease FM 2:** | Cover, create barriers, or implement other effective deterrents (e.g., netting, fencing, birdballs, and sound cannons) for all ponds and tanks containing potentially toxic materials to reduce GRSG mortality. | ☐ Yes  ☑ No | ☐ A specific RDF is documented to not be applicable to the site-specific conditions of the project/activity (e.g. due to site limitations or engineering considerations). Economic considerations, such as increased costs, do not necessarily require that an RDF be varied or rendered inapplicable.<br>☐ An alternative RDF is determined to provide equal or better protection for GRSG or its habitat. Alternative RDF # _____<br>☐ A specific RDF will provide no additional protection to GRSG or its habitat. |
| | **Rationale if RDF is not applied:** There will be no tanks with toxic materials | | |
| **RDF Lease FM 3:** | Require installation of noise shields to comply with noise restrictions (see Action SSS 7) when drilling during the breeding, nesting, brood-rearing, and/or wintering season. Require applicable GRSG seasonal timing restrictions when noise restrictions cannot be met (see Action SSS 6). | ☐ Yes  ☑ No | ☑ A specific RDF is documented to not be applicable to the site-specific conditions of the project/activity (e.g. due to site limitations or engineering considerations). Economic considerations, such as increased costs, do not necessarily require that an RDF be varied or rendered inapplicable.<br>☐ An alternative RDF is determined to provide equal or better protection for GRSG or its habitat. Alternative RDF # _____<br>☐ A specific RDF will provide no additional protection to GRSG or its habitat. |
| | **Rationale if RDF is not applied:** The will be no drilling during this project | | |
| **RDF Lease FM 4:** | Ensure habitat restoration meets GRSG habitat objectives (Table 2-2) for reclamation and restoration practices/sites (Pyke 2011). | ☐ Yes  ☑ No | ☑ A specific RDF is documented to not be applicable to the site-specific conditions of the project/activity (e.g. due to site limitations or engineering considerations). Economic considerations, such as increased costs, do not necessarily require that an RDF be varied or rendered inapplicable.<br>☐ An alternative RDF is determined to provide equal or better protection for GRSG or its habitat. Alternative RDF # _____<br>☐ A specific RDF will provide no additional protection to GRSG or its habitat. |
| | **Rationale if RDF is not applied:** There are no leased areas that will be restored in this project. | | |

1

| Project Name: | Callaghan Complex Wildhorse and Burro Gather | NEPA #: | |
|---|---|---|---|

| | | | |
|---|---|---|---|
| **RDF Lease FM 5:** | Maximize the area of interim reclamation on long-term access roads and well pads, including reshaping, topsoil management, and revegetating cut-and-fill slopes. | ☐ Yes  ☑ No | ☑ A specific RDF is documented to not be applicable to the site-specific conditions of the project/activity (e.g. due to site limitations or engineering considerations). Economic considerations, such as increased costs, do not necessarily require that an RDF be varied or rendered inapplicable.<br><br>☐ An alternative RDF is determined to provide equal or better protection for GRSG or its habitat. Alternative RDF # _____<br><br>☐ A specific RDF will provide no additional protection to GRSG or its habitat. |
| | **Rationale if RDF is not applied:**<br>There will be no long-term access roads | | |
| **RDF Lease FM 6:** | Restore disturbed areas at final reclamation to the pre-disturbance landforms and meets the GRSG habitat objectives (Table 2-2). | ☐ Yes  ☑ No | ☑ A specific RDF is documented to not be applicable to the site-specific conditions of the project/activity (e.g. due to site limitations or engineering considerations). Economic considerations, such as increased costs, do not necessarily require that an RDF be varied or rendered inapplicable.<br><br>☐ An alternative RDF is determined to provide equal or better protection for GRSG or its habitat. Alternative RDF # _____<br><br>☐ A specific RDF will provide no additional protection to GRSG or its habitat. |
| | **Rationale if RDF is not applied:**<br>If reclamation is needed it will be restored to pre-distrubance | | |
| **RDF Lease FM 7:** | Use only closed-loop systems for drilling operations and no reserve pits within GRSG habitat. | ☐ Yes  ☑ No | ☑ A specific RDF is documented to not be applicable to the site-specific conditions of the project/activity (e.g. due to site limitations or engineering considerations). Economic considerations, such as increased costs, do not necessarily require that an RDF be varied or rendered inapplicable.<br><br>☐ An alternative RDF is determined to provide equal or better protection for GRSG or its habitat. Alternative RDF # _____<br><br>☐ A specific RDF will provide no additional protection to GRSG or its habitat. |
| | **Rationale if RDF is not applied:**<br>There will be no drilling with this project. | | |
| **RDF Lease FM 8:** | Place liquid gathering facilities outside of GRSG habitat. Have no tanks at well locations within GRSG habitat to minimize vehicle traffic and perching and nesting sites for aerial predators of GRSG. | ☐ Yes  ☑ No | ☑ A specific RDF is documented to not be applicable to the site-specific conditions of the project/activity (e.g. due to site limitations or engineering considerations). Economic considerations, such as increased costs, do not necessarily require that an RDF be varied or rendered inapplicable.<br><br>☐ An alternative RDF is determined to provide equal or better protection for GRSG or its habitat. Alternative RDF # _____<br><br>☐ A specific RDF will provide no additional protection to GRSG or its habitat. |
| | **Rationale if RDF is not applied:**<br>There will be no liquid gathering facilities with this project | | |
| **RDF Lease FM 9:** | In GRSG habitat, use remote monitoring techniques for production facilities and develop a plan to reduce vehicular traffic frequency of vehicle use (Lyon and Anderson 2003). | ☐ Yes  ☑ No | ☑ A specific RDF is documented to not be applicable to the site-specific conditions of the project/activity (e.g. due to site limitations or engineering considerations). Economic considerations, such as increased costs, do not necessarily require that an RDF be varied or rendered inapplicable.<br><br>☐ An alternative RDF is determined to provide equal or better protection for GRSG or its habitat. Alternative RDF # _____<br><br>☐ A specific RDF will provide no additional protection to GRSG or its habitat. |
| | **Rationale if RDF is not applied:**<br>There are no production facilities with this project | | |

2

| Project Name: | Callaghan Complex Wildhorse and Burro Gather | | NEPA #: | |

| | | | |
|---|---|---|---|
| **RDF Lease FM 10:** Use dust abatement practices on well pads. | ☐ Yes  ☑ No | ☑ | A specific RDF is documented to not be applicable to the site-specific conditions of the project/activity (e.g. due to site limitations or engineering considerations). Economic considerations, such as increased costs, do not necessarily require that an RDF be varied or rendered inapplicable. |
| | | ☐ | An alternative RDF is determined to provide equal or better protection for GRSG or its habitat. Alternative RDF # _____ |
| | | ☐ | A specific RDF will provide no additional protection to GRSG or its habitat. |

**Rationale if RDF is not applied:**
There are no well pads with this project

| | | | |
|---|---|---|---|
| **RDF Lease FM 11:** Cluster disturbances associated with operations and facilities as close as possible, unless site-specific conditions indicate that disturbances to GRSG habitat would be reduced if operations and facilities locations would best fit a unique special arrangement. | ☐ Yes  ☑ No | ☑ | A specific RDF is documented to not be applicable to the site-specific conditions of the project/activity (e.g. due to site limitations or engineering considerations). Economic considerations, such as increased costs, do not necessarily require that an RDF be varied or rendered inapplicable. |
| | | ☐ | An alternative RDF is determined to provide equal or better protection for GRSG or its habitat. Alternative RDF # _____ |
| | | ☐ | A specific RDF will provide no additional protection to GRSG or its habitat. |

**Rationale if RDF is not applied:**
There are no lease associated facilities with this project

| | | | |
|---|---|---|---|
| **RDF Lease FM 12:** Apply a phased development approach with concurrent reclamation. | ☐ Yes  ☑ No | ☑ | A specific RDF is documented to not be applicable to the site-specific conditions of the project/activity (e.g. due to site limitations or engineering considerations). Economic considerations, such as increased costs, do not necessarily require that an RDF be varied or rendered inapplicable. |
| | | ☐ | An alternative RDF is determined to provide equal or better protection for GRSG or its habitat. Alternative RDF # _____ |
| | | ☐ | A specific RDF will provide no additional protection to GRSG or its habitat. |

**Rationale if RDF is not applied:**
Phased development does not apply to this project

| | | | |
|---|---|---|---|
| **RDF Lease FM 13:** Restrict pit and impoundment construction to reduce or eliminate augmenting threats from West Nile virus (Dougherty 2007). | ☐ Yes  ☑ No | ☑ | A specific RDF is documented to not be applicable to the site-specific conditions of the project/activity (e.g. due to site limitations or engineering considerations). Economic considerations, such as increased costs, do not necessarily require that an RDF be varied or rendered inapplicable. |
| | | ☐ | An alternative RDF is determined to provide equal or better protection for GRSG or its habitat. Alternative RDF # _____ |
| | | ☐ | A specific RDF will provide no additional protection to GRSG or its habitat. |

**Rationale if RDF is not applied:**
There will be no impoundment construction with this project.

Version: 08/22/2016

**Project Name:** Callaghan Complex Wildhorse and Burro Gather          **NEPA #:**

| | | | |
|---|---|---|---|
| **RDF Lease FM 14:** | In GRSG habitat, remove or re-inject produced water to reduce habitat for mosquitoes that vector West Nile virus. If surface disposal of produced water continues, use the following steps for reservoir design to limit favorable mosquito habitat (Doherty 2007): <br>• Overbuild size of ponds for muddy and non-vegetated shorelines <br>• Build steep shorelines to decrease vegetation and increase wave actions <br>• Avoid flooding terrestrial vegetation in flat terrain or low lying areas <br>• Construct dams or impoundments that restrict down slope seepage or overflow <br>• Line the channel where discharge water flows into the pond with crushed rock <br>• Construct spillway with steep sides and line it with crushed rock. <br>• Treat waters with larvicides to reduce mosquito production where water occurs on the surface | ☐ Yes <br><br> ☑ No | ☑ A specific RDF is documented to not be applicable to the site-specific conditions of the project/activity (e.g. due to site limitations or engineering considerations). Economic considerations, such as increased costs, do not necessarily require that an RDF be varied or rendered inapplicable. <br><br> ☐ An alternative RDF is determined to provide equal or better protection for GRSG or its habitat. Alternative RDF # _____ <br><br> ☐ A specific RDF will provide no additional protection to GRSG or its habitat. |
| | | **Rationale if RDF is not applied:** There will be no injection wells associated with this project. | |
| **RDF Lease FM 15:** | Consider using oak (or other material) mats for drilling activities to reduce vegetation disturbance and for roads between closely spaced wells to reduce soil compaction and maintain soil structure to increase likelihood of vegetation reestablishment following drilling. | ☐ Yes <br><br> ☑ No | ☑ A specific RDF is documented to not be applicable to the site-specific conditions of the project/activity (e.g. due to site limitations or engineering considerations). Economic considerations, such as increased costs, do not necessarily require that an RDF be varied or rendered inapplicable. <br><br> ☐ An alternative RDF is determined to provide equal or better protection for GRSG or its habitat. Alternative RDF # _____ <br><br> ☐ A specific RDF will provide no additional protection to GRSG or its habitat. |
| | | **Rationale if RDF is not applied:** There is no drilling activity with this project | |

4

**GRSG Proposed Activities Form IM Attachment 3:** Required Design Features (RDF) identified in the Nevada and Northeastern California Greater Sage-Grouse Approved Resource Management Plan Amendment (SGPA Appendix C)

*In addition to the General RDFs, apply Locatable Minerals RDFs to PHMA, GHMA and OHMA as appropriate and consistent with applicable law:*

**Project Name:** Callaghan Complex Wildhorse and Burro Gather      **NEPA #:**

| Locatable Minerals RDFs | | Applied | If RDF not applied, select reason: |
|---|---|---|---|
| **RDF LOC 1:** | Install noise shields to comply with noise restrictions (see Action SSS 7) when drilling during the breeding, nesting, brood-rearing, and/or wintering season. Apply GRSG seasonal timing restrictions when noise restrictions cannot be met (see Action SSS 6). | ☐ Yes  ☑ No | ☑ A specific RDF is documented to not be applicable to the site-specific conditions of the project/activity (e.g. due to site limitations or engineering considerations). Economic considerations, such as increased costs, do not necessarily require that an RDF be varied or rendered inapplicable. |
| | | | ☐ An alternative RDF is determined to provide equal or better protection for GRSG or its habitat. Alternative RDF # _____ |
| | | | ☐ A specific RDF will provide no additional protection to GRSG or its habitat. |
| | **Rationale if RDF is not applied:** There is no drilling with this project | | |
| **RDF LOC 2:** | Cluster disturbances associated with operations and facilities as close as possible, unless site-specific conditions indicate that disturbances to GRSG habitat would be reduced if operations and facilities locations would best fit a unique special arrangement. | ☐ Yes  ☑ No | ☑ A specific RDF is documented to not be applicable to the site-specific conditions of the project/activity (e.g. due to site limitations or engineering considerations). Economic considerations, such as increased costs, do not necessarily require that an RDF be varied or rendered inapplicable. |
| | | | ☐ An alternative RDF is determined to provide equal or better protection for GRSG or its habitat. Alternative RDF # _____ |
| | | | ☐ A specific RDF will provide no additional protection to GRSG or its habitat. |
| | **Rationale if RDF is not applied:** There are no lease facilities with this project | | |
| **RDF LOC 3:** | Restrict pit and impoundment construction to reduce or eliminate augmenting threats from West Nile virus (Dougherty 2007). | ☐ Yes  ☑ No | ☑ A specific RDF is documented to not be applicable to the site-specific conditions of the project/activity (e.g. due to site limitations or engineering considerations). Economic considerations, such as increased costs, do not necessarily require that an RDF be varied or rendered inapplicable. |
| | | | ☐ An alternative RDF is determined to provide equal or better protection for GRSG or its habitat. Alternative RDF # _____ |
| | | | ☐ A specific RDF will provide no additional protection to GRSG or its habitat. |
| | **Rationale if RDF is not applied:** There will be no impoundment construction with this project | | |

1

**Project Name:** Callaghan Complex Wildhorse and Burro Gather      **NEPA #:**

| RDF LOC 4: | Remove or re-inject produced water to reduce habitat for mosquitoes that vector West Nile virus. If surface disposal of produced water continues, use the following steps for reservoir design to limit favorable mosquito habitat (Doherty 2007):<br>• Overbuild size of ponds for muddy and non-vegetated shorelines<br>• Build steep shorelines to decrease vegetation and increase wave actions<br>• Avoid flooding terrestrial vegetation in flat terrain or low lying areas<br>• Construct dams or impoundments that restrict down slope seepage or overflow<br>• Line the channel where discharge water flows into the pond with crushed rock<br>• Construct spillway with steep sides and line it with crushed rock.<br>• Treat waters with larvicides to reduce mosquito production where water occurs on the surface | ☐ Yes<br><br>☑ No | ☑ A specific RDF is documented to not be applicable to the site-specific conditions of the project/activity (e.g. due to site limitations or engineering considerations). Economic considerations, such as increased costs, do not necessarily require that an RDF be varied or rendered inapplicable.<br><br>☐ An alternative RDF is determined to provide equal or better protection for GRSG or its habitat. Alternative RDF # _____<br><br>☐ A specific RDF will provide no additional protection to GRSG or its habitat.<br><br>**Rationale if RDF is not applied:**<br><br>There is no injection wells in this project. |
| --- | --- | --- | --- |
| RDF LOC 5: | Address post reclamation management in reclamation plan such that goals and objectives are to protect and improve sage-grouse habitat needs. | ☐ Yes<br><br>☑ No | ☑ A specific RDF is documented to not be applicable to the site-specific conditions of the project/activity (e.g. due to site limitations or engineering considerations). Economic considerations, such as increased costs, do not necessarily require that an RDF be varied or rendered inapplicable.<br><br>☐ An alternative RDF is determined to provide equal or better protection for GRSG or its habitat. Alternative RDF # _____<br><br>☐ A specific RDF will provide no additional protection to GRSG or its habitat.<br><br>**Rationale if RDF is not applied:**<br>There is no post reclamation for lease disturbance in this project |
| RDF LOC 6: | Maximize the area of interim reclamation on long-term access roads and well pads including reshaping, topsoiling and revegetating cut and fill slopes. | ☐ Yes<br><br>☑ No | ☑ A specific RDF is documented to not be applicable to the site-specific conditions of the project/activity (e.g. due to site limitations or engineering considerations). Economic considerations, such as increased costs, do not necessarily require that an RDF be varied or rendered inapplicable.<br><br>☐ An alternative RDF is determined to provide equal or better protection for GRSG or its habitat. Alternative RDF # _____<br><br>☐ A specific RDF will provide no additional protection to GRSG or its habitat.<br><br>**Rationale if RDF is not applied:**<br>There are no long-term roads or well pads with this project |
| RDF LOC 7: | Cover (e.g., fine mesh netting or use other effective techniques) all pits and tanks regardless of size to reduce sage-grouse mortality. | ☐ Yes<br><br>☑ No | ☑ A specific RDF is documented to not be applicable to the site-specific conditions of the project/activity (e.g. due to site limitations or engineering considerations). Economic considerations, such as increased costs, do not necessarily require that an RDF be varied or rendered inapplicable.<br><br>☐ An alternative RDF is determined to provide equal or better protection for GRSG or its habitat. Alternative RDF # _____<br><br>☐ A specific RDF will provide no additional protection to GRSG or its habitat.<br><br>**Rationale if RDF is not applied:**<br>There are no pits associated with this project |

2

GRSG Proposed Activities Form III Attachment 3: Required Design Features (RDFs) Identification
Nevada and Northeastern California Greater Sage-Grouse Approved Resource Management Plan Amendment
(SGPA Appendix C)

*In addition to the General RDFs, apply Comprehensive Travel and Transportation Management RDFs to PHMA, GHMA and OHMA as appropriate and consistent with applicable law:*

**Project Name:** Callaghan Complex Wildhorse and Burro Gather  **NEPA #:**

| Comprehensive Travel and Transportation Management RDFs | Applied | If RDF not applied, select reason: |
|---|---|---|
| **RDF CTTM 1:** Rehabilitate roads, primitive roads, and trails not designated in approved travel management plans. | ☐ Yes ☑ No | ☑ A specific RDF is documented to not be applicable to the site-specific conditions of the project/activity (e.g. due to site limitations or engineering considerations). Economic considerations, such as increased costs, do not necessarily require that<br>☐ An alternative RDF is determined to provide equal or better protection for GRSG or its habitat. Alternative RDF # _____<br>☐ A specific RDF will provide no additional protection to GRSG or its habitat.<br>**Rationale if RDF is not applied:** |
| **RDF CTTM 2:** Reclaim closed duplicate roads by restoring original landform and establishing desired vegetation in GRSG habitat in accordance with GRSG habitat objectives (Table 2-2) as identified in travel management planning. | ☐ Yes ☑ No | ☑ A specific RDF is documented to not be applicable to the site-specific conditions of the project/activity (e.g. due to site limitations or engineering considerations). Economic considerations, such as increased costs, do not necessarily require that<br>☐ An alternative RDF is determined to provide equal or better protection for GRSG or its habitat. Alternative RDF # _____<br>☐ A specific RDF will provide no additional protection to GRSG or its habitat.<br>**Rationale if RDF is not applied:** There are no duplicate roads associated with this project |

1



# United States Department of the Interior

BUREAU OF LAND MANAGEMENT
Washington, D.C.  20240
https://www.blm.gov



May 26, 2021

In Reply Refer To:
4730 (260) P

**Permanent Instruction Memorandum No. 2021-007 (Revised)**

To:             All Field Office Officials

From:           Assistant Director, Resources and Planning

Subject:        Euthanasia of Wild Horses and Burros Related to Acts of Mercy, Health or Safety.

**Program Area:** Wild Horse and Burro (WHB) Program

**Purpose:** This Permanent Instruction Memorandum (PIM) establishes policy and procedures for the euthanasia of wild horses and burros managed by the Bureau of Land Management (BLM) when the BLM determines, consistent with this policy, an appropriate end-of-life action is required for reasons related to acts of mercy, health or safety.

**Policy/Action:** Effective immediately, all BLM state, district, and field offices must comply with the policies described in this PIM. The key aspects of this policy are the authority, training, approved methods, reporting documentation, and reasons for euthanizing a wild horse or burro related to acts of mercy, health, or safety (Attachments 1 and 2).

The Authorized Officer (AO) or the Authorized Officer's Representative (AR) will euthanize or authorize the euthanasia of a wild horse or burro when any of the following conditions exist:

1.  Sickness, failing health, or an infirmity, disease, injury, lameness, or serious physical condition or defect that has a poor prognosis for improvement or chance of recovery. This includes conditions that are not treatable or when treatment is impractical for a wild horse or burro in its present setting.

2.  A Henneke body condition score (Attachment 2) of less than three with a poor prognosis for improvement.

3.  Old age characterized by physical deterioration, the inability to fend for itself, suffering or closeness to death.

CAL_08961

4.  Direction from a state or federal animal health official ordering the euthanasia of the animal as a disease control measure.

5.  The animal exhibits dangerous characteristics beyond those inherently associated with the wild characteristics of wild horses and burros.

6.  The animal poses a public safety hazard (e.g., loose on a busy highway), has escaped from a facility or pasture or is otherwise roaming freely in an unauthorized area and an alternative remedy (capture, relocation or return to a herd management area (HMA), pasture or facility) is not immediately available.

**Budget Impact:**  None.

**Background:**  The authority for euthanizing a wild horse or burro is provided by Public Law 92-195, Wild Free-Roaming Horses and Burros Act of 1971 Section 1333 (b)(2)(A) and 43 CFR 4730.l. The policy contained in this PIM amends and/or replaces previous policies contained in BLM Handbook H-4750-1 Wild Horse and Burro Preparation and Management and in BLM Handbook H-4700-1 Wild Horses and Burros Management.

The humane care of wild horses and burros on the range, during gathers, or located on off-range corrals/pastures or other facilities require periodic evaluation of their condition by qualified BLM  personnel or a veterinarian to provide for their well-being. At times, these evaluations will result in  decisions that require euthanasia. These decisions are made with the intent to prevent animal suffering through acts of mercy, protecting animal and public health and safety, and the definitions of "old, sick and lame" that are provided in 43 CFR 4700.0-5 as follows:

1.  <u>Old Wild Horse or Burro</u> - Characterized because of age by its physical deterioration and inability to fend for itself, suffering, or closeness to death.

2.  <u>Sick Wild Horse or Burro</u> - A wild horse or burro with failing health, infirmity, or disease from which there is little chance of recovery.

3.  <u>Lame Wild Horse or Burro</u> - A wild horse or burro with one or more malfunctioning limbs that permanently impair its freedom of movement.

**Pages of Manual/ Handbook Sections Affected:**  This IM supersedes the Wild Horses and Burros Management Handbook, H-4700-1 Section 4.9.

**Instruction Memorandums Affected:**  This IM replaces expired IM 2015-070, Animal Health, Maintenance, Evaluation and Response

**Coordination:** This PIM was coordinated among HQ-100, HQ-200, HQ-260, HQ-600, WHB State Leads, APHIS Veterinarian, WHB Facility Managers, and WHB Specialists.

CAL_08962

**Contact:**  Direct all questions regarding this IM to the Division Chief, Wild Horse and Burro Program (HQ-260) at 866-468-7826 or wildhorse@blm.gov.


Signed by:                                          Authenticated by:
David Jenkins                                     Ambyr Fowler
Assistant Director                              Division of Regulatory Affairs and Directives (HQ-630)
Resources and Planning


3 Attachments
   1- Guidance for Euthanasia Related to Acts of Mercy, Health, and Safety (11 pp)
   2- Henneke Equine Body Condition Scoring Chart (1 p)
   3- Firearms training and certification

CAL_08963



United States Department of the Interior
BUREAU OF LAND MANAGEMENT
Grand Junction, Colorado 81506
https://www.blm.gov



December 18, 2020

In Reply Refer To:
4700 (260) P

EMS TRANSMISSION 12/18/2020
Permanent Instruction Memorandum No. 2020- 002

To:         All Headquarters Officials and Field Office Officials
            Attn: State and Center Directors

From:       Assistant Director, Resources and Planning

Subject:    Wild Horse and Burro Comprehensive Animal Welfare Program

**Program Area:**  Wild Horse and Burro Program

**Purpose:**  The purpose of this Permanent Instruction Memorandum (PIM) is to re-affirm the Bureau of Land Management's (BLM's) longstanding commitment to ensure the humane treatment of wild horses and burros (WHB) in all on-range and off-range management activities through the Comprehensive Animal Welfare Program (CAWP).  The humane treatment of wild horses and burros outlined in this policy reiterates the BLM's longstanding practices but also provides additional clarification to BLM employees.  This PIM consolidates current humane practices, incorporates the existing Standard Operating Procedures (SOPs) outlined in Attachments 1 and 2 to ensure humane care and handling of the animals, and increases transparency concerning the humane treatment of wild horses and burros.

**Policy/Action:**  The BLM is committed to continue protecting animal welfare and providing humane care and treatment to WHBs both on and off the range.  Consistent with long-standing policies and practices, the handling and treatment provided by the BLM, its contractors, and its partners is based on compassion and concern for the animals' well-being at all times.  Animals are managed and cared for to optimize animal condition, health, and safety.

All state, district, and field offices will continue to comply with the WHB CAWP policy within their jurisdiction at all times.  The WHB CAWP policy includes:

1. CAWP Standards for Wild Horse and Burro Gathers (Attachment 1):  These standards include requirements for trap and temporary holding facility design, capture and handling, transportation, and care after capture.  The standards are also incorporated into helicopter gather contracts as specifications for performance.

CAL_08964

2. Training for gather operations:  All BLM staff associated with gather operations (incident commanders, contracting officer representatives, project inspectors, public affairs officials, and law enforcement officers) and contractor crews are required to complete online training annually for CAWP – Gathers (BLM-TC-4700-13), which is available through DOI Talent.
3. CAWP Standards for Off-Range Corral Facilities, Transportation, and Adoption/Sale Events (Attachment 2):  This includes requirements for holding of animals in off-range corrals, transportation, and adoptions/sales events.  These SOPs are incorporated into off-range corral contracts as specifications for performance.
4. Training for the Care, Handling, and Transportation of Wild Horses and Burros at off-range corrals and adoption/sales events:  All personnel, including contractors and partners involved in the care, handling, and transportation of wild horses and burros at off-range corrals and adoption/sale events are required to complete online training annually. Development of this training will begin following issuance of this PIM.
5. CAWP Standards and SOPs (to be developed) for animals on the range, in off-range pastures, and public off-range pastures:  All personnel, contractors, and partners involved in management of WHBs on the range, in off-range pastures, or public off-range pastures are required to complete online training annually following the development of these guidelines and SOPs.

The purpose of this PIM is to continue to ensure that the humane care and treatment of WHBs remains the priority for the BLM, its contractors, and its partners. The BLM will continue to use the best available science, husbandry, and handling practices applicable for WHBs.  Whenever possible, the BLM will make improvements to its practices while also meeting planned objectives in accordance with current BLM policy, SOPs, as well as contractual and cooperative agreement requirements. The CAWP will be reviewed periodically by WHB program leadership and modified as necessary to strengthen public trust, transparency, and effectiveness in assuring the humane care and treatment of the WHBs.

The authorized officer is the primary party responsible for immediately addressing any actions that are inconsistent with the CAWP.  Consistent with applicable BLM delegation of authority manuals, the authorized officer may delegate responsibility to an alternate individual.  The authorized officer should promptly notify the employees, contractors, and partners of actions that are not compliant with the CAWP and correct all issues immediately.  It is the responsibility of all individuals engaged in actions throughout the WHB program to implement all aspects of the CAWP.

The WHB CAWP Coordinator will lead the implementation, development, and modification of all aspects of the CAWP, including those developed to date as well as future components of the CAWP.

**Timeframe:**  This policy is effective immediately.

**Budget Impact:**  This PIM codifies long-standing policy, practice, and guidance to include mandatory annual training and reporting requirements for BLM personnel, contractors, and partners associated with gather operations.  The cost for the required training is approximately $100 per person per year.  This PIM also formalizes SOPs for off-range holding, adoptions, sales, and transportation of excess WHB.  When fully developed, the CAWP program

implementation, oversight, data compilation, and reporting requirements will require an additional 12 to 18 work months per year.

**Background:**  Public Law-195, Wild Free-Roaming Horses and Burros Act of 1971 (as amended) and 43 CFR 4700.0-2 provide the authority for a CAWP for WHB.

This CAWP policy provides a comprehensive approach to long-standing policies and practices within the BLM WHB program.  Despite these policies and practices, the BLM has been criticized by some animal protection organizations on its handling and care of wild horses and burros, especially during the gathering activities and transitioning of the horses from public lands to off-range facilities.  Some of the criticisms include concerns as to the transportation conditions of the horses, facility design, environmental conditions, handling practices, and nutrition.  Similar to policies adopted by other organizations in agricultural and animal research industries, this PIM establishes a framework to ensure there are programs in place to verify humane care and handling of animals.  It provides transparency on how the animals are assured humane care and proper handling.  This framework seeks to confirm that the WHB program is conducted in a humane and caring manner.

The CAWP for WHB consolidates and highlights the BLM policies, procedures, and ongoing commitment to protect animal welfare; provides training for employees, contractors, and partners on animal care and handling, and implements assessment tools to evaluate adherence to the CAWP SOP by the agency, contractors, and partners.

**Manual/Handbook Sections Affected:**  This PIM affects policies in BLM Manual/Handbooks H-4700-1 "Wild Horse and Burro Management" and H-4750-2 "Adoption of Wild Horses and Burros".

**Coordination:**  This PIM was coordinated among HQ-100, HQ-200, HQ-260, HQ-600, Deputy State Directors, WHB State Leads, APHIS Veterinarian, WHB Facility Managers, and WHB Specialists.

**Contact:**  If you have any questions, please contact the Wild Horse and Burro Division Chief, at 866-468-7826 or wildhorse@blm.gov.


Signed by:                                              Authenticated By:
David Jenkins                                          Ambyr Fowler
Assistant Director                                   Division of Regulatory Affairs (HQ-630)
Resources and Planning


2 Attachments
    1 -  CAWP Gather Standards (20 pp)
    2 -  Comprehensive Animal Welfare Program Standards for Off-Range Corrals, Transportation and Adoption/Sale Events (24 pp)

CAL_08966

# ATTACHMENT 1:  COMPREHENSIVE ANIMAL WELFARE PROGRAM FOR WILD HORSE AND BURRO GATHERS

# STANDARDS

Developed by

The Bureau of Land Management
Wild Horse and Burro Program

in collaboration with

Carolyn L. Stull, PhD
Kathryn E. Holcomb, PhD
University of California, Davis
School of Veterinary Medicine

June 30, 2015

CAL_08967

# WELFARE ASSESSMENT STANDARDS for GATHERS

## CONTENTS

**Welfare Assessment Standards**

I.    FACILITY DESIGN ................................................................................................ 2

    A.    Trap Site and Temporary Holding Facility ................................................... 2

    B.    Loading and Unloading Areas ...................................................................... 4

II.   CAPTURE TECHNIQUE ...................................................................................... 5

    A.    Capture Techniques ........................................................................................ 5

    B.    Helicopter Drive Trapping ............................................................................ 5

    C.    Roping ............................................................................................................. 7

    D.    Bait Trapping .................................................................................................. 8

III.  WILD HORSE AND BURRO CARE .................................................................. 8

    A.    Veterinarian .................................................................................................... 8

    B.    Care ................................................................................................................. 9

    C.    Biosecurity ...................................................................................................... 11

IV.   HANDLING ........................................................................................................... 12

    A.    Willful Acts of Abuse .................................................................................... 12

    B.    General Handling ........................................................................................... 12

    C.    Handling Aids ................................................................................................. 12

V.    TRANSPORTATION ........................................................................................... 13

    A.    General ............................................................................................................ 13

    B.    Vehicles .......................................................................................................... 14

    C.    Care of WH&Bs during Transport Procedures ............................................ 15

VI.   EUTHANASIA or DEATH .................................................................................. 16

    A.    Euthanasia Procedures during Gather Operations ....................................... 16

    B.    Carcass Disposal ............................................................................................ 17

**Required documentation and responsibilities of Lead COR/COR/PI at gathers** ................ 18

**Schematic of CAWP Gather Components** ............................................................ 20

## STANDARDS

> **Standard Definitions**
>
> **Major Standard:** Impacts the health or welfare of WH&Bs. Relates to an alterable equipment or facility standard or procedure. Appropriate wording is "must," "unacceptable," "prohibited."
>
> **Minor Standard:** unlikely to affect WH&Bs health or welfare or involves an uncontrollable situation.  Appropriate wording is "should."

**Lead COR** = Lead Contracting Officer's Representative

**COR** = Contracting Officer's Representative

**PI** = Project Inspector

**WH&Bs** = Wild horses and burros

## I.    FACILITY DESIGN

### A.  Trap Site and Temporary Holding Facility

1. The trap site and temporary holding facility must be constructed of stout materials and must be maintained in proper working condition, including gates that swing freely and latch or tie easily. (**major**)

2. The trap site should be moved close to WH&B locations whenever possible to minimize the distance the animals need to travel.(minor)

3. If jute is hung on the fence posts of an existing wire fence in the trap wing, the wire should be either be rolled up or let down for the entire length of the jute in such a way that minimizes the possibility of entanglement by WH&Bs unless otherwise approved by the Lead COR/COR/PI. (minor)

4. Fence panels in pens and alleys must be not less than 6 feet high for horses, 5 feet high for burros, and the bottom rail must not be more than 12 inches from ground level. (**major**)

5. The temporary holding facility must have a sufficient number of pens available to sort WH&Bs according to gender, age, number, temperament, or physical condition. (**major**)

   a. All pens must be assembled with capability for expansion. (**major**)

   b. Alternate pens must be made available for the following: (**major**)

      1) WH&Bs that are weak or debilitated

      2) Mares/jennies with dependent foals

   c. WH&Bs in pens at the temporary holding facility should be maintained at a proper stocking density such that when at rest all WH&Bs occupy no more than half the pen area. (minor)

6. An appropriate chute designed for restraining WH&Bs must be available for necessary procedures at the temporary holding facility. This does not apply to bait trapping operations unless directed by the Lead COR/COR/PI. (**major**)

7. There must be no holes, gaps or openings, protruding surfaces, or sharp edges present in fence panels or other structures that may cause escape or possible injury. (**major**)

8. Padding must be installed on the overhead bars of all gates and chutes used in single file alleys. (**major**)

9. Hinged, self-latching gates must be used in all pens and alleys except for entry gates into the trap, which may be secured with tie ropes. (**major**)

10. Finger gates (one-way funnel gates) used in bait trapping must be constructed of materials approved by the Lead COR/COR/PI. Finger gates must not be constructed of materials that have sharp ends that may cause injuries to WH&Bs, such as "T" posts, sharpened willows, etc. (**major**)

11. Water must be provided at a minimum rate of ten gallons per 1000 pound animal per day, adjusted accordingly for larger or smaller horses, burros and foals, and environmental conditions, with each trough placed in a separate location of the pen (i.e. troughs at opposite ends of the pen). Water must be refilled at least every morning and evening. (**major**)

12. The design of pens at the trap site and temporary holding facility should be constructed with rounded corners. (minor)

13. All gates and panels in the animal holding and handling pens and alleys of the trap site must  be covered with materials such as plywood, snow fence, tarps, burlap, etc. approximately 48" in height to provide a visual barrier for the animals. All materials must be secured in place.(**major**)

    These guidelines apply:

    a.  For exterior fences, material covering panels and gates must extend from the top of the panel or gate toward the ground.(**major** )

    b.  For alleys and small internal handling pens, material covering panels and gates should extend from no more than 12 inches below the top of the panel or gate toward the ground to facilitate visibility of animals and the use of flags and paddles during sorting. (minor)

    c.  The initial capture pen may be left uncovered as necessary to encourage animals to enter the first pen of the trap. (minor)

14. Non-essential personnel and equipment must be located to minimize disturbance of WH&Bs. (**major**)

15. Trash, debris, and reflective or noisy objects should be eliminated from the trap site and temporary holding facility. (minor)

## B.  Loading and Unloading Areas

1.  Facilities in areas for loading and unloading WH&Bs at the trap site or temporary holding facility must be maintained in a safe and proper working condition, including gates that swing freely and latch or tie easily. (**major**)

2.  The side panels of the loading chute must be a minimum of 6 feet high and fully covered with materials such as plywood or metal without holes that may cause injury. (**major**)

3.  There must be no holes, gaps or openings, protruding surfaces, or sharp edges present in fence panels or other structures that may cause escape or possible injury. (**major**)

4.  All gates and doors must open and close easily and latch securely. (**major**)

**CAL_08971**

5. Loading and unloading ramps must have a non-slip surface and be maintained in a safe and proper working condition to prevent slips and falls. Examples of non-slip flooring would include, but not be limited to, rubber mats, sand, shavings, and steel reinforcement rods built into ramp. There must be no holes in the flooring or items that can cause an animal to trip. (**major**)

6. Trailers must be properly aligned with loading and unloading chutes and panels such that no gaps exist between the chute/panel and floor or sides of the trailer creating a situation where a WH&B could injure itself. (**major**)

7. Stock trailers should be positioned for loading or unloading such that there is no more than 12" clearance between the ground and floor of the trailer for burros and 18" for horses. (minor)

## II.    CAPTURE TECHNIQUE

### A. Capture Techniques

1. WH&Bs gathered on a routine basis for removal or return to range must be captured by the following approved procedures under direction of the Lead COR/COR/PI. (**major**)
   a.  Helicopter
   b.  Bait trapping

2. WH&Bs must not be captured by snares or net gunning. (**major**)

3. Chemical immobilization must only be used for capture under exceptional circumstances and under the direct supervision of an on-site veterinarian experienced with the technique. (**major**)

### B. Helicopter Drive Trapping

1. The helicopter must be operated using pressure and release methods to herd the animals in a desired direction and should not repeatedly evoke erratic behavior in the WH&Bs causing injury or exhaustion. Animals must not be pursued to a point of exhaustion; the on-site veterinarian must examine WH&Bs for signs of exhaustion. (**major**)

2. The rate of movement and distance the animals travel must not exceed limitations set by the Lead COR/COR/PI who will consider terrain, physical barriers, access limitations, weather, condition of the animals, urgency of the operation (animals facing drought, starvation, fire, etc.) and other factors. (**major**)

   a. WH&Bs that are weak or debilitated must be identified by BLM staff or the contractors. Appropriate gather and handling methods should be used according to the direction of the Lead COR/COR/PI. (**major**)

   b. The appropriate herding distance and rate of movement must be determined on a case-by-case basis considering the weakest or smallest animal in the group (e.g., foals, pregnant mares, or horses that are weakened by body condition, age, or poor health) and the range and environmental conditions present. (**major**)

   c. Rate of movement and distance travelled must not result in exhaustion at the trap site, with the exception of animals requiring capture that have an existing severely compromised condition prior to gather. Where compromised animals cannot be left on the range or where doing so would only serve to prolong their suffering, euthanasia will be performed in accordance with BLM policy. (**major**)

3. WH&Bs must not be pursued repeatedly by the helicopter such that the rate of movement and distance travelled exceeds the limitation set by the Lead COR/COR/PI. Abandoning the pursuit or alternative capture methods may be considered by the Lead COR/COR/PI in these cases. (**major**)

4. When WH&Bs are herded through a fence line en route to the trap, the Lead COR/COR/PI must be notified by the contractor. The Lead COR/COR/PI must determine the appropriate width of the opening that the fence is let down to allow for safe passage through the opening. The Lead COR/COR/PI must decide if existing fence lines require marking to increase visibility to WH&Bs. (**major**)

5. The helicopter must not come into physical contact with any WH&B. The physical contact of any WH&B by helicopter must be documented by Lead COR/COR/PI along with the circumstances. (**major**)

6. WH&Bs may escape or evade the gather site while being moved by the helicopter. If there are mare/dependent foal pairs in a group being brought to a trap and half of an identified pair is thought to have evaded capture, multiple attempts by helicopter may

be used to bring the missing half of the pair to the trap or to facilitate capture by roping. In these instances, animal condition and fatigue must be evaluated by the Lead COR/COR/PI or on-site veterinarian on a case-by-case basis to determine the number of attempts that can be made to capture an animal.(**major**)

7. Horse captures must not be conducted when ambient temperature at the trap site is below 10ºF or above 95ºF without approval of the Lead COR/COR/PI. Burro captures must not be conducted when ambient temperature is below 10ºF or above 100ºF without approval of the Lead COR/COR/PI. The Lead COR/COR/PI will not approve captures when the ambient temperature exceeds 105 ºF. (**major**)

## C. Roping

1. The roping of any WH&B must be approved prior to the procedure by the Lead COR/COR/PI. (**major**).

2. The roping of any WH&B must be documented by the Lead COR/COR/PI along with the circumstances. WH&Bs may be roped under circumstances which include but are not limited to the following: reunite a mare or jenny and her dependent foal; capture nuisance, injured or sick WH&Bs or those that require euthanasia; environmental reasons such as deep snow or traps that cannot be set up due to location or environmentally sensitive designation; and public and animal safety or legal mandates for removal. (**major**)

3. Ropers should dally the rope to their saddle horn such that animals can be brought to a stop as slowly as possible and must not tie the rope hard and fast to the saddle so as to intentionally jerk animals off their feet. (**major**)

4. WH&Bs that are roped and tied down in recumbency must be continuously observed and monitored by an attendant at a maximum of 100 feet from the animal. (**major**)

5. WH&Bs that are roped and tied down in recumbency must be untied within 30 minutes. (**major**)

6. If the animal is tied down within the wings of the trap, helicopter drive trapping within the wings will cease until the tied-down animal is removed. (**major**)

7. Sleds, slide boards, or slip sheets must be placed underneath the animal's body to move and/or load recumbent WH&Bs. (**major**)

8. Halters and ropes tied to a WH&B may be used to roll, turn, position or load a recumbent animal, but a WH&B must not be dragged across the ground by a halter or rope attached to its body while in a recumbent position. (**major**)

9. Animals captured by roping must be evaluated by the on-site/on-call veterinarian within four hours after capture, marked for identification at the trap site, and be re-evaluated periodically as deemed necessary by the on-site/on-call veterinarian. (**major**)

## D. Bait Trapping

1. WH&Bs may be lured into a temporary trap using bait (feed, mineral supplement, water) or sexual attractants (mares/jennies in heat) with the following requirements:

    a. The period of time water sources other than in the trap site are inaccessible must not adversely affect the wellbeing of WH&Bs, wildlife or livestock, as determined by the Lead COR/COR/PI. (**major**)

    b. Unattended traps must not be left unobserved for more than 12 hours. (**major**)

    c. Mares/jennies and their dependent foals must not be separated unless for safe transport. (**major**)

    d. WH&Bs held for more than 12 hours must be provided with accessible clean water at a minimum rate of ten gallons per 1000 pound animal per day, adjusted accordingly for larger or smaller horses, burros and foals and environmental conditions. (**major**)

    e. WH&Bs held for more than 12 hours must be provided good quality hay at a minimum rate of 20 pounds per 1000 pound adult animal per day, adjusted accordingly for larger or smaller horses, burros and foals. (**major**)

        1) Hay must not contain poisonous weeds, debris, or toxic substances. (**major**)

        2) Hay placement must allow all WH&Bs to eat simultaneously. (**major**)

## III.  WILD HORSE AND BURRO CARE

### A. Veterinarian

1. On-site veterinary support must be provided for all helicopter gathers and on-site or on-call support must be provided for bait trapping. (**major**)

CAL_08975

2. Veterinary support must be under the direction of the Lead COR/COR/PI. The on-site/on-call veterinarian will provide consultation on matters related to WH&B health, handling, welfare, and euthanasia at the request of the Lead COR/COR/PI. All decisions regarding medical treatment or euthanasia will be made by the on-site Lead COR/COR/PI. (**major**)

**B. Care**

1. Feeding and Watering

   a. Adult WH&Bs held in traps or temporary holding pens for longer than 12 hours must be fed every morning and evening with water available at all times other than when animals are being sorted or worked. (**major**)

   b. Water must be provided at a minimum rate of ten gallons per 1000 pound animal per day, adjusted accordingly for larger or smaller horses, burros and foals, and environmental conditions, with each trough placed in a separate location of the pen (i.e. troughs at opposite ends of the pen). . (**major**)

   c. Good quality hay must be fed at a minimum rate of 20 pounds per 1000 pound adult animal per day, adjusted accordingly for larger or smaller horses, burros and foals. (**major**)

      i. Hay must not contain poisonous weeds or toxic substances. (**major**)

      ii. Hay placement must allow all WH&Bs to eat simultaneously. (**major**)

   d. When water or feed deprivation conditions exist on the range prior to the gather, the Lead COR/COR/PI should adjust the watering and feeding arrangements in consultation with the onsite veterinarian as necessary to provide for the needs of the animals. (minor)

2. Dust abatement

   a. Dust abatement by spraying the ground with water must be employed when necessary at the trap site and temporary holding facility. (**major**)

**CAL_08976**

3. Trap Site

   a. Dependent foals or weak/debilitated animals must be separated from other WH&Bs at the trap site to avoid injuries during transportation to the temporary holding facility. Separation of dependent foals from mares must not exceed four hours unless the Lead COR/COR/PI authorizes a longer time or a decision is made to wean the foals. (**major**)

4. Temporary Holding Facility

   a. All WH&Bs in confinement must be observed at least once daily to identify sick or injured WH&Bs and ensure adequate food and water. (**major**)

   b. Foals must be reunited with their mares/jennies at the temporary holding facility within four hours of capture unless the Lead COR/COR/PI authorizes a longer time or foals are old enough to be weaned during the gather. (**major**)

   c. Non-ambulatory WH&Bs must be located in a pen separate from the general population and must be examined by the BLM horse specialist and/or on-call or on-site veterinarian as soon as possible, no more than four hours after recumbency is observed.  Unless otherwise directed by a veterinarian, hay and water must be accessible to an animal within six hours after recumbency.(**major**)

   d. Alternate pens must be made available for the following: (**major**)

      1) WH&Bs that are weak or debilitated

      2) Mares/jennies with dependent foals

   e. Aggressive WH&Bs causing serious injury to other animals should be identified and relocated into alternate pens when possible. (minor)

   f. WH&Bs in pens at the temporary holding facility should be maintained at a proper stocking density such that when at rest all WH&Bs occupy no more than half the pen area. (minor)

## C. Biosecurity

1. Health records for all saddle and pilot horses used on WH&B gathers must be provided to the Lead COR/COR/PI prior to joining a gather, including: (**major**)

   a. Certificate of Veterinary Inspection (Health Certificate, within 30 days).

   b. Proof of:

      1) A negative test for equine infectious anemia (Coggins or EIA ELISA test) within 12 months.

      2) Vaccination for tetanus, eastern and western equine encephalomyelitis, West Nile virus, equine herpes virus, influenza, *Streptococcus equi*, and rabies within 12 months.

2. Saddle horses, pilot horses and mares used for bait trapping lures must not be removed from the gather operation (such as for an equestrian event) and allowed to return unless they have been observed to be free from signs of infectious disease for a period of at least three weeks and a new Certificate of Veterinary Examination is obtained after three weeks and prior to returning to the gather. (**major**)

3. WH&Bs, saddle horses, and pilot horses showing signs of infectious disease must be examined by the on-site/on-call veterinarian. (**major**)

   a. Any saddle or pilot horses showing signs of infectious disease (fever, nasal discharge, or illness) must be removed from service and isolated from other animals on the gather until such time as the horse is free from signs of infectious disease and approved by the on-site/on-call veterinarian to return to the gather. (**major**)

   b. Groups of WH&Bs showing signs of infectious disease should not be mixed with groups of healthy WH&Bs at the temporary holding facility, or during transport. (minor)

4. Horses not involved with gather operations should remain at least 300 yards from WH&Bs, saddle horses, and pilot horses being actively used on a gather. (minor)

**CAL_08978**

## IV.  HANDLING

### A.  Willful Acts of Abuse

1.  Hitting, kicking, striking, or beating any WH&B in an abusive manner is prohibited. (**major**)

2.  Dragging a recumbent WH&B without a sled, slide board or slip sheet is prohibited. Ropes used for moving the recumbent animal must be attached to the sled, slide board or slip sheet unless being loaded as specified in Section II. C. 8. (**major**)

3.  There should be no deliberate driving of WH&Bs into other animals, closed gates, panels, or other equipment. (minor)

4.  There should be no deliberate slamming of gates and doors on WH&Bs. (minor)

5.  There should be no excessive noise (e.g., constant yelling) or sudden activity causing WH&Bs to become unnecessarily flighty, disturbed or agitated. (minor)

### B.  General Handling

1.  All sorting, loading or unloading of WH&Bs during gathers must be performed during daylight hours except when unforeseen circumstances develop and the Lead COR/CO/PI approves the use of supplemental light. (**major**)

2.  WH&Bs should be handled to enter runways or chutes in a forward direction. (minor)

3.  WH&Bs should not remain in single-file alleyways, runways, or chutes longer than 30 minutes. (minor)

4.  Equipment except for helicopters should be operated and located in a manner to minimize flighty behavior . (minor)

### C.  Handling Aids

1.  Handling aids such as flags and shaker paddles must be the primary tools for driving and moving WH&Bs during handling and transport procedures. Contact of the flag or paddle end of primary handling aids with a WH&B is allowed. Ropes looped around the hindquarters may be used from horseback or on foot to assist in moving an animal forward or during loading. (**major**)

2. Electric prods must not be used routinely as a driving aid or handling tool. Electric prods may be used in limited circumstances only if the following guidelines are followed:

   a. Electric prods must only be a commercially available make and model that uses DC battery power and batteries should be fully charged at all times. (**major**)

   b. The electric prod device must never be disguised or concealed. (**major**)

   c. Electric prods must only be used after three attempts using other handling aids (flag, shaker paddle, voice or body position) have been tried unsuccessfully to move the WH&Bs. (**major**)

   d. Electric prods must only be picked up when intended to deliver a stimulus; these devices must not be constantly carried by the handlers. (**major**)

   e. Space in front of an animal must be available to move the WH&B forward prior to application of the electric prod. (**major**)

   f. Electric prods must never be applied to the face, genitals, anus, or underside of the tail of a WH&B. (**major**)

   g. Electric prods must not be applied to any one WH&B more than three times during a procedure (e.g., sorting, loading) except in extreme cases with approval of the Lead COR/COR/PI. Each exception must be approved at the time by the Lead COR/COR/PI. (**major**)

   h. Any electric prod use that may be necessary must be documented daily by the Lead COR/COR/PI including time of day, circumstances, handler, location (trap site or temporary holding facility), and any injuries (to WH&B or human). (**major**)

## V.   TRANSPORTATION

### A.  General

1. All sorting, loading, or unloading of WH&Bs during gathers must be performed during daylight hours except when unforeseen circumstances develop and the Lead COR/CO/PI approves the use of supplemental light. (**major**)

2. WH&Bs identified for removal should be shipped from the temporary holding facility to a BLM facility within 48 hours. (minor)

   a. Shipping delays for animals that are being held for release to range or potential on-site adoption must be approved by the Lead COR/COR/PI. (**major**)

3. Shipping should occur in the following order of priority; 1) debilitated animals, 2) pairs, 3) weanlings, 4) dry mares and 5) studs. (minor)

4. Planned

5. transport time to the BLM preparation facility from the trap site or temporary holding facility must not exceed 10 hours. (**major**)

6. WH&Bs should not wait in stock trailers and/or semi-trailers at a standstill for more than a combined period of three hours during the entire journey. (minor)

**B. Vehicles**

1. Straight-deck trailers and stock trailers must be used for transporting WH&Bs. (**major**)

   a. Two-tiered or double deck trailers are prohibited. (**major**)

   b. Transport vehicles for WH&Bs must have a covered roof or overhead bars containing them such that WH&Bs cannot escape. (**major**)

2. WH&Bs must have adequate headroom during loading and unloading and must be able to maintain a normal posture with all four feet on the floor during transport without contacting the roof or overhead bars. (**major**)

3. The width and height of all gates and doors must allow WH&Bs to move through freely. (**major**)

4. All gates and doors must open and close easily and be able to be secured in a closed position. (**major**)

5. The rear door(s) of the trailers must be capable of opening the full width of the trailer. (**major**)

6. Loading and unloading ramps must have a non-slip surface and be maintained in proper working condition to prevent slips and falls. (**major**)

CAL_08981

7. Transport vehicles more than 18 feet and less than 40 feet in length must have a minimum of one partition gate providing two compartments; transport vehicles 40 feet or longer must have at least two partition gates to provide a minimum of three compartments. (**major**)

8. All partitions and panels inside of trailers must be free of sharp edges or holes that could cause injury to WH&Bs. (**major**)

9. The inner lining of all trailers must be strong enough to withstand failure by kicking that would lead to injuries. (**major**)

10. Partition gates in transport vehicles should be used to distribute the load into compartments during travel. (minor)

11. Surfaces and floors of trailers must be cleaned of dirt, manure and other organic matter prior to the beginning of a gather. (**major**)

C. **Care of WH&Bs during Transport Procedures**

1. WH&Bs that are loaded and transported from the temporary holding facility to the BLM preparation facility must be fit to endure travel. (**major**)

   a. WH&Bs that are non-ambulatory, blind in both eyes, or severely injured must not be loaded and shipped unless it is to receive immediate veterinary care or euthanasia. (**major**)

   b. WH&Bs that are weak or debilitated must not be transported without approval of the Lead COR/COR/PI in consultation with the on-site veterinarian. Appropriate actions for their care during transport must be taken according to direction of the Lead COR/COR/PI. (**major**)

2. WH&Bs should be sorted prior to transport to ensure compatibility and minimize aggressive behavior that may cause injury. (minor)

3. Trailers must be loaded using the minimum space allowance in all compartments as follows: (**major**)

   a. 12 square feet per adult horse.

   b. 6.0 square feet per dependent horse foal.

   c. 8.0 square feet per adult burro.

   d. 4.0 square feet per dependent burro foal.

4. The Lead COR/COR/PI in consultation with the receiving Facility Manager must document any WH&B that is recumbent or dead upon arrival at the destination. (**major**)

   a. Non-ambulatory or recumbent WH&Bs must be evaluated on the trailer and either euthanized or removed from the trailers using a sled, slide board or slip sheet. (**major**)

5. Saddle horses must not be transported in the same compartment with WH&Bs. (**major**)

## VI.    EUTHANASIA OR DEATH

### A.  Euthanasia Procedure during Gather Operations

1. An authorized, properly trained, and experienced person as well as a firearm appropriate for the circumstances must be available at all times during gather operations. When the travel time between the trap site and temporary holding facility exceeds one hour or if radio or cellular communication is not reliable, provisions for euthanasia must be in place at both the trap site and temporary holding facility during the gather operation. (**major**)

2. Euthanasia must be performed according to American Veterinary Medical Association euthanasia guidelines (2013) using methods of gunshot or injection of an approved euthanasia agent. (**major**)

3. The decision to euthanize and method of euthanasia must be directed by the Authorized Officer or their Authorized Representative(s) that include but are not limited to the Lead COR/COR/PI who must be on site and may consult with the on-site/on-call veterinarian. (**major**)

4. Photos needed to document an animal's condition should be taken prior to the animal being euthanized. No photos of animals that have been euthanized should be taken. An exception is when a veterinarian or the Lead COR/COR/PI may want to document certain findings discovered during a postmortem examination or necropsy. (minor)

5. Any WH&B that dies or is euthanized must be documented by the Lead COR/COR/PI including time of day, circumstances, euthanasia method, location, a

CAL_08983

description of the age, gender, and color of the animal and the reason the animal was euthanized. (**major**)

6. The on-site/on-call veterinarian should review the history and conduct a postmortem physical examination of any WH&B that dies or is euthanized during the gather operation. A necropsy should be performed whenever feasible if the cause of death is unknown. (minor)

**B. Carcass Disposal**

1. The Lead COR/COR/PI must ensure that appropriate equipment is available for the timely disposal of carcasses when necessary on the range, at the trap site, and temporary holding facility. (**major**)

2. Disposal of carcasses must be in accordance with state and local laws. (**major**)

3. WH&Bs euthanized with a barbiturate euthanasia agent must be buried or otherwise disposed of properly. (**major**)

4. Carcasses left on the range should not be placed in washes or riparian areas where future runoff may carry debris into ponds or waterways. Trenches or holes for buried animals should be dug so the bottom of the hole is at least 6 feet above the water table and 4-6 feet of level earth covers the top of the carcass with additional dirt mounded on top where possible. (minor)

# CAWP

## REQUIRED DOCUMENTATION AND RESPONSIBILITIES OF LEAD COR/COR/PI

### Required Documentation

| Section | Documentation |
|---|---|
| II.B.5 | Helicopter contact with any WH&B. |
| II.C.2 | Roping of any WH&B. |
| III.B.3.a and III.B.4.b | Reason for allowing longer than four hours to reunite foals with mares/jennies. Does not apply if foals are being weaned. |
| III.C.1 | Health status of all saddle and pilot horses. |
| IV.C.2.h | All uses of electric prod. |
| V.C.4 | Any WH&B that is recumbent or dead upon arrival at destination following transport. |
| VI.A.5 | Any WH&B that dies or is euthanized during gather operation. |

### Responsibilities

| Section | Responsibility |
|---|---|
| I.A.10 | Approve materials used in construction of finger gates in bait trapping |
| II.A.1 | Direct gather procedures using approved gather technique. |
| II.B. 2 | Determine rate of movement and distance limitations for WH&B helicopter gather. |
| II.B.2.a | Direct appropriate gather/handling methods for weak or debilitated WH&B. |
| II.B.3 | Determine whether to abandon pursuit or use other capture method in order to avoid repeated pursuit of WH&B. |
| II.B.4 | Determine width and need for visibility marking when using opening in fence en route to trap. |
| II.B.6 | Determine number of attempts that can be made to capture the missing half of a mare/foal pair that has become separated. |
| II.B.7 | Determine whether to proceed with gather when ambient temperature is outside the range of 10°F to 95°F for horses or 10°F to 100°F for burros. |
| II.C.1 | Approve roping of any WH&B. |
| II.D.1.a | Determine period of time that water outside a bait trap is inaccessible such that wellbeing of WH&Bs, wildlife, or livestock is not adversely affected. |
| III.A.2 | Direct and consult with on-site/on-call veterinarian on any matters related to WH&B health, handling, welfare and euthanasia. |

| | |
|---|---|
| III.B.1.e | Adjust feed/water as necessary, in consultation with onsite/on call veterinarian, to provide for needs of animals when water or feed deprivation conditions exist on range. |
| III.B.4.c | Determine provision of water and hay to non-ambulatory animals. |
| IV.C.2.g | Approve use of electric prod more than three times, for exceptional cases only. |
| V.A.1 | Approve sorting, loading, or unloading at night with use of supplemental light. |
| V.A.2.a | Approve shipping delays of greater than 48 hours from temporary holding facility to BLM facility. |
| V.C.1.b | Approve of transport and care during transport for weak or debilitated WH&B. |
| VI.A.3 | Direct decision regarding euthanasia and method of euthanasia for any WH&B; may consult with on-site/on-call veterinarian. |
| VI.B.1 | Ensure that appropriate equipment is available for carcass disposal. |

# COMPREHENSIVE ANIMAL WELFARE PROGRAM

# STANDARDS

## OFF-RANGE CORRAL FACILITIES

## TRANSPORTATION

## ADOPTION EVENTS

Developed by

The Bureau of Land Management
Wild Horse and Burro Program

in collaboration with

Carolyn L. Stull, PhD
Kathryn E. Holcomb, PhD
University of California, Davis
School of Veterinary Medicine

January 29, 2016

**TABLE OF CONTENTS**

PREFACE...................................................................................................................... 2

Section 1. OFF-RANGE CORRAL FACILITY STANDARDS ......................................... 3

    I.    FACILITY PERSONNEL ................................................................................3

    II.   FACILITY DESIGN..........................................................................................3

    III.  RECEIVING WILD HORSE AND BURROS ...............................................5

    IV.  CARE OF WILD HORSE AND BURROS .................................................6

    V.   HANDLING WILD HORSES AND BURROS ..........................................10

Section 2. TRANSPORTATION STANDARDS TO ANOTHER OFF-RANGE CORRAL FACILITY, OFF-RANGE PASTURE, ECO-SANCTUARY, OR ADOPTION EVENT ............................................. 13

    I.    LOADING AND UNLOADING FACILITIES .............................................13

    II.   CARE OF WILD HORSES AND BURROS DURING TRANSPORT PREPARATION PROCEDURES.............................................................14

    III.  VEHICLES ....................................................................................................14

    IV.  TRANSPORT PROCEDURES ..................................................................15

    V.   RECEIVING PROCEDURES .....................................................................16

Section 3. ADOPTION EVENT STANDARDS.............................................................. 17

    I.    ADOPTION EVENT PERSONNEL ...........................................................17

    II.   SATELLITE FACILITY DESIGN .................................................................17

    III.  EUTHANASIA  PROCEDURES AT SATELLITE FACILITIES.....................18

    IV.  CARCASS DISPOSAL AT SATELLITE FACILITIES ..................................19

    V.   CARE OF WILD HORSES AND BURROS RECEIVED AT SATELLITE FACILITIES........18

    VI.  HANDLING WILD HORSES AND BURROS AT SATELLITE FACILITIES....................19

REQUIRED DOCUMENTATION AND RESPONSIBILITIES OF AUTHORIZED OFFICER .................. 20

PROPOSED CAWP COMPONENTS FOR OFF-RANGE CORRAL FACILITIES, TRANSPORTATION, AND ADOPTION EVENTS ..................................................................................... 22

**CAL_08988**

## PREFACE

The Bureau of Land Management (BLM) estimates that 58,150 wild horses and burros (WH&Bs) are roaming on BLM-managed rangelands in 10 Western states, based on the latest data available, compiled as of March 1, 2015. Wild horses and burros have virtually no natural predators and their herd sizes can double about every four years. As a result, the agency must remove thousands of animals from the range each year to control herd sizes.

The Bureau of Land Management manages many off-range corral facilities throughout the U.S. The primary mission of the off-range corral facilities is to act as a holding and preparation facility that accepts WH&Bs from gather/removal operations and prepares them for adoption to the public or placement into off-range pastures. As of November 2015, there are 16,182 WH&Bs in off-range corral facilities.

The design of each facility is organized to handle large numbers of WH&Bs with pens, corrals, alleys, and loading/unloading areas that facilitate animal movement. There are multiple pens and corrals to sort animals for compatibility and care upon arrival to the facility. Each pen or corral offers all animals continuous water accessibility and quality feed on a daily basis.

The BLM strives to place horses removed from the range into private homes that provide quality care. Horses placed in off-range corral facilities are made available to the public for adoption or sale at adoption events held throughout the U.S. and through the BLM's Adopt or Sales Program (http://www.blm.gov/wo/st/en/prog/whbprogram/adoption_program/schedule.html). The off-range corral facility transitions WH&Bs to hay diets, performs necessary vaccinations and deworming procedures, provides hoof care and may train WH&Bs. Other WH&Bs, due to age, temperament, or other factors, may not be adopted or sold and subsequently are placed in off-range pastures. These facilities are designed to provide unadoptable wild horses with humane life-long care in a natural setting off the public rangelands. There are approximately 46,016 WH&Bs being cared for in off-range pastures (November 2015). All WH&Bs residing in both off-range corral facilities and off-range pastures, like those roaming Western public rangelands, are protected by the BLM under the 1971 Wild Free-Roaming Horses and Burros Act, as amended.

The BLM has been criticized by the public and animal protection organizations on their handling and care of wild horses and burros especially during the gathering activities and transitioning of the horses from public lands to off-range facilities. Some of the issues include the transportation conditions of the horses, facility design, environmental conditions, handling practices, and nutrition. Agricultural and research animal industries have developed assessment or auditing programs to verify humane care and handling of their industry's animals. These industries are performing both internal and 3rd-party audits for animal welfare to assure their stakeholders and provide transparency on how these animals are provided care and proper handling. Assessment programs based on standards have multifaceted benefits in providing education to employees and assurance to societal entities that their programs are responsible for properly handling and providing care for the animals. An assessment welfare program reported routinely to the public will increase transparency concerning the humane treatment of BLM's WH&Bs, as recommended by the 2008 US Government Accountability Office.

## STANDARDS

---

### Deficiency Definitions

**Major Deficiency**: impacts welfare of WH&Bs; usually is a procedure. Appropriate wording is "must," "unacceptable," "prohibited."

**Minor Deficiency:** a reporting deficiency (lack of, not enough detail) or involves an uncontrollable situation. Appropriate wording is "should."

---

WH&Bs = Wild horses and burros

## SECTION 1.

## OFF-RANGE CORRAL FACILITY STANDARDS

I.  **FACILITY PERSONNEL**

   A.  Facility management establishes and implements standards of care, treatment, and handling of WH&Bs, and communicates expectations to all personnel to ensure the humane care and treatment of all WH&Bs at the facility. (**major**)

   B.  The facility must have employees with training, skills, and experience to observe, move, and handle the WH&Bs on the facility. (**major**)

   C.  The facility must have personnel that can properly maintain the working chute systems and facility infrastructure to provide for the safe housing, movement, and processing of the WH&Bs. (**major**)

   D.  The facility should be staffed by appropriate office staff for record maintenance and recording. (minor)

II. **FACILITY DESIGN**

   A.  Facilities must be operated in a manner to provide a safe, clean and supportive environment for all WH&Bs. (major)

B.  WH&Bs must be allowed to exist in an undisturbed environment unless being prepared for health procedures, identification, adoption events, or transportation. (major)

C.  All WH&Bs must have adequate space to move freely within a pen enclosure. (major)

D.  The facility must have a sufficient number of pens available to sort WH&Bs according to sex, age, temperament, health status, or physical condition as needed. (major)

E.  Facility fences, gates, alleys, tubs, and working chutes must be constructed of stout materials and must be maintained in proper working condition. (major)

F.  Fences in pens, alleys, and working chute systems must be not less than 6 feet high for horses, 5 feet high for burros, and the bottom rail must not be more than 12 inches from ground level. (major)

G.  Fences must be of stout design and be maintained in proper condition with no holes, gaps, or sharp edges which could result in WH&Bs being injured. (major )

H.  All WH&Bs within a pen must have adequate dry space to rest. (major)

I.  Ground surfaces in pens must be maintained to promote drainage, reduce wet ground conditions, and allow for routine manure removal. (major)

J.  Watering systems in WH&B holding pens must provide unlimited access to clean water appropriate for livestock at all times. (major)

K.  Feeding areas must be accessible to all WH&Bs in the enclosure and maintained as a dry area without excessive manure accumulation. (major)

L.  An appropriate squeeze chute maintained in proper working order must be available for safely restraining WH&Bs for necessary procedures at the facility including hoof trimming. (major)

M.  Facilities must provide access to shade and shelter (wind breaks) in pens designated for compromised animals needing special care (i.e., injured or weak animals). Additional provisions for shade and shelter (wind breaks) will be evaluated and determined by managers as appropriate for their region, the function of their facility and the condition of the animals under their care. (major)

N.  Shelter structures should be designed or constructed to reduce the risk for injury of the WH&Bs and maintained to avoid excessive manure and mud. (minor)

III.  **RECEIVING WILD HORSES AND BURROS**

A.  Loading and Unloading Facilities

1.  Facilities in areas for loading and unloading WH&Bs must be maintained in a safe and proper working condition, including gates and doors that swing freely and latch or tie easily as designed. (**major**)

2.  The side panels of the loading chute must be a minimum of 6 feet high and covered with materials such as plywood or metal without holes that may cause injury. (**major**)

3.  There must be no holes, gaps or openings, protruding surfaces, or sharp edges present in fence panels or other structures that may cause escape or possible injury. (**major**)

4.  Loading and unloading ramps must have a non-slip surface and be maintained in a safe and proper working condition to prevent slips and falls. Examples of non-slip floors would include, but not be limited to, rubber mats, sand, shavings, and steel reinforcement rods or rough surfaces built into the ramp. There must be no holes in flooring or items that cause an animal to trip. (**major**)

5.  Trailers must be properly aligned with loading and unloading chutes and panels with no gaps between the chute/panel and floor or sides of the trailer creating a situation where a WH&B could injure itself. (**major**)

6.  Stock trailers should be positioned for loading and unloading such that there is no more than 12" clearance between the ground and floor of the trailer for burros and 18" for horses. (minor)

B.  Receiving Procedures

1.  All unloading of WH&Bs must be performed during daylight hours except when unforeseen circumstances develop and the Authorized Officer approves of the use of supplemental light. (**major**)

2. At the time of unloading, WH&Bs must be inspected by facility personnel to look for signs of infectious disease, sickness or injury and take appropriate steps if these conditions are observed. (**major**)

3. Any WH&B needing immediate veterinary attention must be identified and separated as necessary for examination, and a consultation with a veterinarian must be conducted within 4 hours. (**major**)

4. An authorized, properly trained, and experienced person, as well as euthanasia equipment and supplies, must be available immediately following unloading in the event that the emergency euthanasia of an animal is required. Euthanasia must be done in compliance with BLM Euthanasia policy. (**major**)

5. The receiving Authorized Officer must document any WH&B that is recumbent or dead upon arrival at the destination. (**major**)

6. Reporting of animals received from gather operations or from another BLM facility must be done in compliance with BLM policy. (**major**)

7. WH&Bs received from a gather must remain segregated from resident animals at the facility until a negative test for Equine Infectious Anemia (EIA) can be confirmed. (**major**)

8. Newly arrived WH&Bs must immediately be provided hay and water upon unloading. (**major**)

9. When WH&Bs are received from gather operations or from another facility, the receiving facility should unload them in a manner to minimize stress. (minor)

10. WH&Bs should be penned with WH&Bs of like age, sex, and temperament. (minor)

11. Newly arrived WH&Bs should be observed for signs that they may have difficulty transitioning to hay in a domestic setting. (minor)

CAL_08993

**IV.    CARE OF WILD HORSE AND BURROS**

    A. Veterinarian

        1. Routine presence by an on-site or on-call veterinarian must be provided at each facility with records of those visits maintained at the facility. (**major**)

        2. A veterinarian must be available to collect and submit blood samples for Equine Infectious Anemia (EIA) testing and rabies immunization. (**major**)

        3. Health care protocols must be in accordance with Program guidelines and accepted by the facility veterinarian for preventive health care procedures (vaccinations, deworming, hoof trimming, freeze marking). Medical treatments will be prescribed by or performed under the supervision of a veterinarian. Surgical procedures will only be performed by a veterinarian. (**major**)

        4. WH&B deaths in a facility should be discussed with the facility veterinarian to review the probable causes of death. (minor)

        5. If multiple animals die due to a related cause or unknown cause(s), a post-mortem examination or necropsy should be performed by the facility's on-call or on-site veterinarian to identify the cause of death where possible. Laboratory testing should be performed when possible to aid in determining the cause of death or related underlying factors that may be present when these are not readily apparent during the gross examination. (minor)

        6. If a series of unexplained deaths occurs, facility quarantine measures must be considered with input from the attending veterinarian until the cause has been determined or when indicated until adequate bio-security measures are in place to prevent the spread of disease. Coordination with State and/or Federal Animal Health Officials in consultation with the attending veterinarian must be done if this occurs. (**major**)

    B. Bio-Security

        1. Authorized Officers must consult with the on-site or on-call veterinarian(s) to establish and review biosecurity and health care decisions. (**major**)

2. Newly arrived WH&Bs from gather operations must not be co-mingled with resident animals at the facility. (**major**)

3. Pens should be provided to segregate sick, infectious, injured, or weak WH&Bs from other healthy individuals in the facility when possible. (minor )

4. Hazardous or infectious biological waste (i.e., sharps, needles, blood samples, etc.) must be properly disposed in labeled containers. (**major**)

5. Working chute and tub systems should be routinely cleaned and disinfected to reduce the risk of disease transmission, especially after moving contagious WH&Bs through the system. (minor)

C. Feed and Water

1. Quality hay must be provided daily to WH&Bs in the amount of 2-3% of their body weight per day. **(major)**

2. Fresh, clean water appropriate for livestock must be accessible to WH&Bs located in holding pens at all times. (**major**)

3. Water troughs and watering systems must be checked daily to ensure they are clean and operating correctly. (**major**)

4. Feeding sites must allow all WH&Bs within a pen simultaneous access to hay. (**major**)

5. Newly arrived WH&Bs from gather operations may be fed grass hay and transitioned to alfalfa. (minor)

6. Salt and/or mineral blocks should be provided in holding pens at all times. (minor)

7. Supplemental feeds should be provided to address the nutritional needs of the WH&Bs, if needed. (minor)

D. Preparation Procedures

1. Facilities must identify individual WH&Bs and maintain inventories in accordance with BLM policy. This includes unmarked WH&Bs as well as those provided a freeze-mark. **(major)**

2. Facilities must conduct Equine Infectious Anemia (EIA) testing and apply freeze-marks within 30 days of receiving WH&Bs, unless directed by the facility veterinarian when age or physical condition requires a delay. (**major**)

3. WH&Bs receiving a freeze-mark must be recorded on the animal preparation record using the approved Signalment Key. (**major**)

4. Foals born in the facility should be freeze-marked no earlier than 3 months of age. (minor)

5. WH&Bs must be evaluated daily by facility personnel to identify animals in poor body condition, poor hoof condition, injured, or in need of veterinary evaluation/treatment, and/or supplemental feeding. (**major**)

6. Facilities must adhere to the current BLM vaccination policy. (**major**)

7. Foals must be tested for EIA and vaccinated when weaned or at 6 months of age. (**major**)

8. Hoof trimming must be performed twice per year at minimum or as necessary to maintain hooves in a proper condition. (**major**)

9. Castration of stallions and jack burros must be performed by a veterinarian using general anesthesia. If a surgical plane of anesthesia is not reached initially animals must be re-dosed or the procedure postponed until the problem can be resolved. (**major**)

10. Stallions and jack burros should be castrated as soon as approved by the on-site veterinarian for the procedure in accordance with BLM policy. (minor)

11. WH&Bs being prepared for freeze-marking, blood collection, vaccination, hoof trimming, sorting, and other care treatments should be handled to minimize stress and injuries (minor).

E. Euthanasia Procedures

1. The decision to euthanize and method of euthanasia must be directed by the Authorized Officer(s) who may consult with the on-site/on-call veterinarian. (**major**)

2. Euthanasia must be done in compliance with BLM Euthanasia policy. (**major**)

3. An authorized, properly trained, and experienced person, as well as euthanasia equipment and supplies, must be available at off-range corral facilities in the event that the emergency euthanasia of an animal is required. (**major**)

4. Any WH&B that dies or is euthanized must be documented including the circumstances, freeze brand ID if present, a description of the age, sex, color of the animal and the reason the animal was euthanized. A death record must be entered into the WHBPS. (**major**)

5. If an animal is euthanized due to an unknown cause, a post-mortem examination or necropsy should be performed by the facility's on-call or on-site veterinarian to identify the cause of death where possible.  Laboratory testing should be performed when possible to aid in determining the cause of death or related underlying factors that may be present when these are not readily apparent during the gross examination. (minor)

F. Carcass Disposal

1. The Authorized Officer must ensure that appropriate procedures are in place for the timely disposal of carcasses when necessary at off-range corral facilities. (**major**)

2. Disposal of carcasses must be in accordance with applicable state and local laws. (**major**)

## V.    HANDLING WILD HORSES AND BURROS

A. Willful Acts of Abuse

1. Hitting, kicking, or beating any WH&Bs in an abusive manner is prohibited. **(major)**

2. Dragging a recumbent WH&Bs without a sled, side board or slip sheet is prohibited. Ropes used for moving the recumbent animal must be attached to the sled, slide board, or slip sheet. (**major**)

3. There should be no deliberate driving of WH&Bs into other animals, closed gates, panels, or other equipment. (minor)

4. There should be no deliberate slamming of gates and doors on WH&Bs. (minor)

5. There should be no excessive noise (e.g., constant yelling) or sudden activity causing WH&Bs to become unnecessarily flighty, disturbed or agitated. (minor)

B.  General Handling

1.  All sorting, loading or unloading of WH&Bs must be performed during daylight hours except when unforeseen circumstances develop and the Authorized Officer approves of the use of supplemental light. (**major**)

2.  Halters and ropes tied to a WH&B may be used to roll, turn, position, or load a recumbent animal, but a WH&B must not be dragged across the ground by a halter or rope attached to its body while in a recumbent position. (**major**)

3.  WH&Bs should be moved into and out of pens in a manner that will minimize stress and injury. (minor)

4.  When possible, WH&Bs should be allowed to move at their own pace to new pens or sorting/handling locations. (minor)

5.  WH&Bs should be handled to enter runways or chutes in a forward direction. (minor)

6.  Any unattended WH&Bs or a single WH&B should not remain in single-file alleyways, runways or chutes longer than 30 minutes. (minor)

7.  No equipment should be operated in such a manner as to cause flighty behavior or injury to WH&Bs. (minor)

B.  Handling Aids

1.  Handling aids such as flags and shaker paddles must be the primary tools for driving and moving WH&Bs during handling and transport procedures. Contact of the flag or paddle end of primary handling aids with a WH&B is allowed. Ropes looped around the hindquarters may be used from horseback or on foot to assist in moving an animal forward or during loading. **(major)**

2.  Electric prods must not be used routinely as a driving aid or handling tool. Electric prods may be used in limited circumstances only if the following guidelines are followed:

    a.  Electric prods must only be a commercially available make and model that uses DC battery power with batteries fully charged at all times. (**major**)

    b.  The electric prod device must never be disguised or concealed. (**major**)

CAL_08998

c.  Electric prods must only be used after three attempts using other handling aids (flag, shaker paddle, voice or body position)  have been tried unsuccessfully to move the WH&Bs. (**major**)

d.  Electric prods must only be picked up when intended to deliver a stimulus; these devices are not constantly carried by the handlers. (**major**)

e.  Space in front of an animal should be available for the WH&B to move forward prior to application of the electric prod. (**major**)

f.  Electric prods must never be applied to the face, genitals, anus, or underside of the tail of a WH&B. (**major**)

g.  Electric prods must not be applied to any one WH&B more than three times during a procedure (e.g., sorting, loading) except in extreme cases with the approval of the Authorized Officer. Each exception must be approved at the time by the Authorized Officer. (**major**)

## SECTION 2.

## TRANSPORTATION STANDARDS TO ANOTHER OFF-RANGE CORRAL FACILITY, OFF-RANGE PASTURE, ECO-SANCTUARY OR ADOPTION EVENT

I.  **LOADING AND UNLOADING FACILITIES**

   A.  Facilities in areas for loading and unloading WH&Bs must be maintained in a safe and proper working condition, including gates and doors that swing freely and latch or tie easily as designed. (**major**)

   B.  The side panels of the loading chute must be a minimum of 6 feet high and covered with materials such as plywood or metal without holes that may cause injury. (**major**)

   C.  There must be no holes, gaps or openings, protruding surfaces, or sharp edges present in fence panels or other structures that may allow escape or cause possible injury. (**major**)

   D.  Loading and unloading ramps must have a non-slip surface and be maintained in a safe and proper working condition to prevent slips and falls. Examples of non-slip floors would include, but not be limited to, rubber mats, sand, shavings, and steel reinforcement rods or rough surfaces built into the ramp. There must be no holes in flooring or items that cause an animal to trip. (**major**)

   E.  Trailers must be properly aligned with loading and unloading chutes and panels with no gaps between the chute/panel and floor or sides of the trailer creating a situation where a WH&B could injure itself. (**major**)

   F.  Stock trailers should be positioned for loading and unloading such that there is no more than 12" clearance between the ground and floor of the trailer for burros and 18" for horses. (minor)

**II.CARE OF WILD HORSES AND BURROS DURING TRANSPORT PREPARATION PROCEDURES**

A. WH&Bs being transferred to another off-range corral facility, off-range pasture, eco-sanctuary or adoption event must have a current negative EIA test, be in a state of health appropriate for a Certificate of Veterinary Inspection (CVI), and be accompanied by appropriate paperwork as required by the laws of the receiving state. **(major)**

B. WH&Bs being transferred to another off-range corral facility, off-range pasture, eco-sanctuary or adoption event must be fit to endure the travel. (**major**)

    1. WH&Bs that are non-ambulatory, blind in both eyes, or severely injured must not be loaded and shipped unless it is to receive immediate veterinary care or euthanasia (**major**)

    2. WH&Bs that are weak or debilitated must not be transported without the approval of Authorized Officer in consultation with the on-site veterinarian. Appropriate actions for their care during transport must be taken according to the Authorized Officer. (**major**)

C. WH&Bs being transferred to another off-range corral facility, off-range pasture, eco-sanctuary, or adoption event must be sorted prior to shipping to ensure compatibility and minimize aggressive behavior that may cause injury during transport. (**major**)

D. Except for exceptional circumstances including but not limited to trap site adoptions, WH&Bs being offered for adoption should have received primary and booster vaccinations as well as deworming medications prior to adoption. (minor)

II. **VEHICLES**

A. Straight deck trailers or stock trailers must be used for transporting WH&Bs to another off-range corral facility, off-range pasture, eco-sanctuary or adoption event. **(major)**

    1. Two-tiered or double deck trailers are prohibited. **(major)**

    2. Transport vehicles for WH&Bs must have a covered roof containing them such that WH&Bs cannot escape. **(major)**

CAL_09001

B. WH&Bs must have adequate headroom during loading and unloading and must be able to maintain a normal posture with all four feet on the floor during transport without contacting the roof. **(major)**

C. The width and height of all gates and doors must allow WH&Bs to move through freely. **(major)**

D. All gates and doors must open and close easily and be able to be secured in a closed position. **(major)**

E. Loading and unloading ramps of vehicles must have a non-slip surface and be maintained in a safe and proper working condition to prevent slips and falls. Examples of non-slip flooring would include, but not be limited to, rubber mats, sand, shavings, and steel reinforcement rods built into ramp. There must be no holes in the flooring or items that can cause an animal to trip. **(major)**

F. Transport vehicles more than 18 feet and less than 40 feet in length must have a minimum of one partition gate providing two compartments; transport vehicles 40 feet or longer must have at least two partition gates to provide a minimum of three compartments. **(major)**

G. Partition gates in transport vehicles should be used to distribute the load into compartments during travel. (minor)

H. All partitions and panels inside of trailers must be free of sharp edges or holes that could cause injury to WH&Bs. **(major)**

I. The inner lining of all trailers must be strong enough to withstand failure by kicking that would lead to injuries. **(major)**

J. Surfaces and floors of trailers must be cleaned of dirt, manure and other organic matter prior to the beginning of a shipping event, and must have non-skid material on the trailer floor, such as, wood shavings, rubber non-skid mats etc. **(major)**

III. **TRANSPORT PROCEDURES**

A. WH&Bs must be loaded at the following rates: **(major)**

1. 12 square feet per adult horse.

2. 6.0 square feet per dependent horse foal.

3. 8.0 square feet per adult burro or yearling horse.

    4.  4.0 square feet per dependent burro foal

B. Planned drive time from off-range corral facility to another off-range corral facility, off-range pasture, eco-sanctuary, or adoption must not exceed 24 hours without unloading. (**major**)

C. Trucking companies or haulers must be provided directions and contact phone numbers for the facility or adoption location. **(major**)

D. A transportation event that is longer than 24 hours will require unloading and a minimum rest period of 8 hours with access to hay and water prior to being re-loaded and sent to the final destination. **(major**)

E. While in transit, WH&Bs must be observed by the transport driver a minimum of once every 8 hours. **(major)**

F. Non-ambulatory or recumbent WH&Bs must be evaluated on the trailer and either euthanized or removed from the trailers using a sled, slide board or slip sheet. (**major**)

G. WH&Bs should not be allowed to remain standing on straight-deck and stock trailers while not in transport for a combined period of greater than three (3) hours. (minor)

## IV.   RECEIVING PROCEDURES

See Section 1. Off-range Corral Standards, Part III. B. 1-5 and 8-11.

CAL_09003

## SECTION 3.

## ADOPTION EVENT STANDARDS

I.  **ADOPTION EVENT PERSONNEL**

A.  BLM establishes and implements standards of care, treatment, and handling of WH&Bs, and communicates expectations to all personnel to ensure the humane care and treatment of all WH&Bs at the adoption event. **(major)**

B.  The adoption event must have employees with training, skills, and experience to observe, move, and handle the WH&Bs at the event. **(major)**

C.  The adoption event must have maintenance staff that can properly maintain the facilities to provide for the safe housing, movement, and processing of the WH&Bs. **(major)**

II.  **SATELLITE FACILITY DESIGN**

A.  All satellite facilities must be operated in a manner to provide a safe, clean and supportive environment for all WH&Bs. **(major)**

B.  The satellite facility must have a sufficient number of pens available to sort WH&Bs according to sex, temperament, or physical condition as needed. (**major**)

C.  The satellite facility's fences, gates, alleys, and working chutes must be constructed of stout materials and must be maintained in proper working condition. (**major**)

D.  Fences in adoption pens, alleys, and working chute systems must not be less than 6 feet high for horses and 5 feet high for burros. (**major**)

E.  Adoption pen fences must be of stout design and must be maintained in proper condition with no holes, gaps, or sharp edges that could result in WH&Bs being injured. (**major**)

F.  Watering systems in WH&B adoption holding pens must provide unlimited access to clean water appropriate for livestock at all times. (**major**)

G.  Adoption pen feeding areas must be accessible to all WH&Bs in the pen at the same time. (**major**)

H.  Ground surfaces in adoption pens should promote drainage to reduce wet ground conditions. (minor)

I. WH&Bs in pens at the satellite facility should be maintained at a stocking density such that when at rest all WH&Bs occupy no more than half the pen area. (minor)

III. **CARE OF WILD HORSES AND BURROS RECEIVED AT SATELLITE FACILITIES**

A. Provisions to provide care by a veterinarian in a timely manner on-site, on call, or by transporting an animal to a veterinarian must be made in advance**. (major)**

B. Provisions for medical care (treatments including euthanasia if necessary) at adoption events will be made in accordance with BLM policy and carried out as described above for preparation facilities (Section 1. Off-range Corral Facility Standards, Part IV. A. 1-6). (**major**)

C. WH&Bs must be sorted upon arrival at adoption events into pens with animals of appropriate age and temperament such that animals can promptly begin a period of rest, eating, and drinking with limited disturbance. **(major)**

D. All WH&Bs must have adequate space to move freely within an adoption facility pen. **(major)**

E. WH&Bs, to the greatest extent possible, must be allowed to exist in an undisturbed environment after arriving at an adoption facility until the adoption event begins. **(major)**

F. Quality hay must be provided to WH&Bs in the amount of 2-3% of their body weight per day upon unloading following transport and daily during the adoption event. **(major)**

G. WH&Bs at adoption events may be supplemented with feed or water supplements to address the stress of transport. (minor)

H. WH&Bs will be sorted during the adoption event in a manner to reduce stress and opportunity for injury. (minor)

I. WH&Bs transported for more than 12 hours to an adoption event should be allowed a rest period of 5 hours or more prior to formal viewing by the adopting public. (minor)

IV. **EUTHANASIA PROCEDURES AT SATELLITE FACILITIES**

See Section 1. Off-range Corral Facility Standards, Part IV. E. 1-4.

## V.  CARCASS DISPOSAL AT SATELLITE FACILITIES

See Section 1. Off-range Corral Facility Standards, Part IV. F. 1-2.

## VI.  HANDLING WILD HORSES AND BURROS AT SATELLITE FACILITIES

A.  Willful Actus of Abuse

See Section 1. Off-range Corral Facility Standards, Part V. A. 1-5

B.  General Handling

See Section 1. Off-range Corral Facility Standards, Part V. B. 1-7

C.  Handling Aids

See Section 1. Off-range Corral Facility Standards, Part V. C. 1-2

# REQUIRED DOCUMENTATION AND RESPONSIBILITIES
# OF AUTHORIZED OFFICERS

## REQUIRED DOCUMENTATION

| STANDARD | DOCUMENTATION |
|---|---|
| **Section 1** | **Off-Range Corral Facility Standards** |
| Part III. B. 5 | Any WH&B that is recumbent or dead upon arrival at the destination |
| Part IV. A. 1 | Record of visits by on-site/on-call veterinarian |
| Part IV. E. 4 | Any WH&B that dies or is euthanized at facility, including the circumstances, freeze brand ID if present, a description of the age, sex, color of the animal and the reason the animal was euthanized. A death record must be entered into the WHBPS. |
| **Section 2** | **Transportation Standards** |
| Part V | Refer to Section 1. Off-range Corral Facility Standards, Part III. B. 5, as above. |
| **Section 3** | **Adoption Event Standards** |
| Part IV | Refer to Section 1. Off-range Corral Facility Standards, Part IV. E. 4, as above |

## RESPONSIBILITIES

| STANDARD | RESPONSIBILITY |
|---|---|
| **Section 1** | **Off-Range Corral Facility Standards** |
| Parts III. B. 1 & V.B.1 | Approve use of supplemental lighting when sorting, loading, or unloading WH&Bs |
| Part III. B. 5 | Document any WH&B that is recumbent or dead upon arrival at the destination |
| Part IV. B. 1 | Consult with on-site/on-call veterinarian to establish and review biosecurity and health care decisions |
| Part IV. E. 1 | Direct decision regarding euthanasia and method of euthanasia for any WH&B; may consult with on-site/on-call veterinarian |
| Part IV. F. 1 | Ensure that appropriate procedures are in place for carcass disposal |
| Part V. C. 2. g | Approve use of electric prod more than three times, for exceptional cases only |

| STANDARD | RESPONSIBILITY |
|---|---|
| **Section 2** | **Transportation Standards** |
| Part II. D | Approve of transport and care during transport for weak or debilitated WH&B |
| | |
| **Section 3** | **Adoption Event Standards** |
| Part VI. B | Refer to Section 1. Off-range Corral Facility Standard, Part IV.B.1, above. |
| Part VI. C | Refer to Section 1. Off-range Corral Facility Standard, Part V.C.2.g, above. |

# PROPOSED CAWP COMPONENTS FOR OFF-RANGE CORRAL FACILITIES, TRANSPORTATION, AND ADOPTION EVENTS



**Education**

- Online
- Certification on completion
- Includes examples, videos

**Standards**

- Off-Range Corral Facilities
- Transportation
- Adoption Events

**Assessment Tool**

- Off-Range Corral Facilities
- Transportation
- Adoption Events

**Records**

- Summary
- Cumulative capacity
- Capacity to create different reports

23

CAL_09009

**Appendix IV: Standard Gather Operating Procedures, Public Observation, and Risk Assessment.**

<u>Gather Operations Standard Operating Procedures</u>
Gathers would be conducted by utilizing contractors from the Wild Horse Gathers-Western States Contract, or BLM personnel. The following procedures for gathering and handling wild horses would apply whether a contractor or BLM personnel conduct a gather. For helicopter gathers conducted by BLM personnel, gather operations will be conducted in conformance with the *Wild Horse Aviation Management Handbook* (January 2009).

Prior to any gathering operation, the BLM will provide for a pre-gather evaluation of existing conditions in the gather area(s). The evaluation will include animal conditions, prevailing temperatures, drought conditions, soil conditions, road conditions, and a topographic map with wilderness boundaries, the location of fences, other physical barriers, and acceptable trap locations in relation to animal distribution. The evaluation will determine whether the proposed activities will necessitate the presence of a veterinarian during operations. If it is determined that a large number of animals may need to be euthanized or gather operations could be facilitated by a veterinarian, these services would be arranged before the gather would proceed. The contractor will be apprised of all conditions and will be given instructions regarding the gather and handling of animals to ensure their health and welfare is protected.

Trap sites and temporary holding sites will be located to reduce the likelihood of injury and stress to the animals, and to minimize potential damage to the natural resources of the area. These sites would be located on or near existing roads whenever possible.

The primary gather methods used in the performance of gather operations include:
1) Helicopter Drive Trapping. This gather method involves utilizing a helicopter to herd wild horses into a temporary trap.
2) Helicopter Assisted Roping. This gather method involves utilizing a helicopter to herd wild horses or burros to ropers.
3) Bait Trapping. This gather method involves utilizing bait (e.g., water or feed) to lure wild horses into a temporary trap.

The following procedures and stipulations will be followed to ensure the welfare, safety and humane treatment of wild horses in accordance with the provisions of 43 CFR 4700.

*A. Gather Methods used in the Performance of Gather Contract Operations*
1) The primary concern of the contractor is the safe and humane handling of all animals gathered. All gather attempts shall incorporate the following:

    All trap and holding facilities locations must be approved by the Contracting Officer's Representative (COR) and/or the Project Inspector (PI) prior to construction. The Contractor may also be required to change or move trap locations as determined by the COR/PI. All traps and holding facilities not located on public land must have prior written approval of the landowner.

CAL_09010

2) The rate of movement and distance the animals travel shall not exceed limitations set by the COR who will consider terrain, physical barriers, access limitations, weather, extreme temperature ( high and low), condition of the animals, urgency of the operation (animals facing drought, starvation, fire rehabilitation, etc.) and other factors. In consultation with the contractor the distance the animals travel will account for the different factors listed above and concerns with each HMA.

3) All traps, wings, and holding facilities shall be constructed, maintained and operated to handle the animals in a safe and humane manner and be in accordance with the following:

   a. Traps and holding facilities shall be constructed of portable panels, the top of which shall not be less than 72 inches high for horses and 60 inches for burros, and the bottom rail of which shall not be more than 12 inches from ground level. All traps and holding facilities shall be oval or round in design.

   b. All loading chute sides shall be a minimum of 6 feet high and shall be fully covered, plywood, metal without holes larger than 2"x4".

   c. All runways shall be a minimum of 30 feet long and a minimum of 6 feet high for horses, and 5 feet high for burros, and shall be covered with plywood, burlap, plastic snow fence or like material a minimum of 1 foot to 5 feet above ground level for burros and 1 foot to 6 feet for horses. The location of the government furnished portable fly chute to restrain, age, or provide additional care for the animals shall be placed in the runway in a manner as instructed by or in concurrence with the COR/PI.

   d. All crowding pens including the gates leading to the runways shall be covered with a material which prevents the animals from seeing out (plywood, burlap, plastic snow fence, etc.) and shall be covered a minimum of 1 foot to 5 feet above ground level for burros and 2 feet to 6 feet for horses

   e. All pens and runways used for the movement and handling of animals shall be connected with hinged self-locking or sliding gates.

4) No modification of existing fences will be made without authorization from the COR/PI. The Contractor shall be responsible for restoration of any fence modification which he has made.

5) When dust conditions occur within or adjacent to the trap or holding facility, the Contractor shall be required to wet down the ground with water.

6) Alternate pens, within the holding facility shall be furnished by the Contractor to separate mares or jennies with small foals, sick and injured animals, estrays or other animals the COR determines need to be housed in a separate pen from the other animals. Animals shall be sorted as to age, number, size, temperament, sex, and condition when in the holding facility so as to minimize, to the extent possible, injury due to fighting and trampling. Under normal conditions, the government will require that animals be restrained for the purpose of determining an animal's age, sex, or other necessary procedures. In these instances, a portable restraining chute may be necessary and will be provided by the government. Alternate pens shall be furnished by the Contractor to hold

CAL_09011

animals if the specific gathering requires that animals be released back into the gather area(s). In areas requiring one or more satellite traps, and where a centralized holding facility is utilized, the contractor may be required to provide additional holding pens to segregate animals transported from remote locations so they may be returned to their traditional ranges. Either segregation or temporary marking and later segregation will be at the discretion of the COR.

7) The Contractor shall provide animals held in the traps and/or holding facilities with a continuous supply of fresh clean water at a minimum rate of 10 gallons per animal per day. Animals held for 10 hours or more in the traps or holding facilities shall be provided good quality hay at the rate of not less than two pounds of hay per 100 pounds of estimated body weight per day. The contractor will supply certified weed free hay if required by State, County, and Federal regulation.
   a. An animal that is held at a temporary holding facility through the night is defined as a horse/burro feed day. An animal that is held for only a portion of a day and is shipped or released does not constitute a feed day.

8) It is the responsibility of the Contractor to provide security to prevent loss, injury or death of gathered animals until delivery to final destination.

9) The Contractor shall restrain sick or injured animals if treatment is necessary. The COR/PI will determine if animals must be euthanized and provide for the destruction of such animals. The Contractor may be required to humanely euthanize animals in the field and to dispose of the carcasses as directed by the COR/PI.

10) Animals shall be transported to their final destination from temporary holding facilities as quickly as possible after gather unless prior approval is granted by the COR for unusual circumstances. Animals to be released back into the HMA following gather operations may be held up to 21 days or as directed by the COR. Animals shall not be held in traps and/or temporary holding facilities on days when there is no work being conducted except as specified by the COR. The Contractor shall schedule shipments of animals to arrive at final destination between 7:00 a.m. and 4:00 p.m. No shipments shall be scheduled to arrive at final destination on Sunday and Federal holidays, unless prior approval has been obtained by the COR. Animals shall not be allowed to remain standing on trucks while not in transport for a combined period of greater than three (3) hours in any 24 hour period. Animals that are to be released back into the gather area may need to be transported back to the original trap site. This determination will be at the discretion of the COR/PI or Field Office horse specialist.

*B. Gather Methods That May Be Used in the Performance of a Gather*
   1) Gather attempts may be accomplished by utilizing bait (feed, water, mineral licks) to lure animals into a temporary trap. If this gather method is selected, the following applies:
      a. Finger gates shall not be constructed of materials such as "T" posts, sharpened willows, etc., that may be injurious to animals.
      b. All trigger and/or trip gate devices must be approved by the COR/PI prior to gather of animals.

    c. Traps shall be checked a minimum of once every 10 hours.

2) Gather attempts may be accomplished by utilizing a helicopter to drive animals into a temporary trap. If the contractor selects this method the following applies:

    a. A minimum of two saddle-horses shall be immediately available at the trap site to accomplish roping if necessary. Roping shall be done as determined by the COR/PI. Under no circumstances shall animals be tied down for more than one half hour.

    b. The contractor shall assure that foals shall not be left behind, and orphaned.

3) Gather attempts may be accomplished by utilizing a helicopter to drive animals to ropers. If the contractor, with the approval of the COR/PI, selects this method the following applies:

    a. Under no circumstances shall animals be tied down for more than one hour.

    b. The contractor shall assure that foals shall not be left behind, or orphaned.

    c. The rate of movement and distance the animals travel shall not exceed limitations set by the COR/PI who will consider terrain, physical barriers, weather, condition of the animals and other factors.

## C. Use of Motorized Equipment

1) All motorized equipment employed in the transportation of gathered animals shall be in compliance with appropriate State and Federal laws and regulations applicable to the humane transportation of animals. The Contractor shall provide the COR/PI, if requested, with a current safety inspection (less than one year old) for all motorized equipment and tractor-trailers used to transport animals to final destination.

2) All motorized equipment, tractor-trailers, and stock trailers shall be in good repair, of adequate rated capacity, and operated so as to ensure that gathered animals are transported without und risk or injury.

3) Only tractor-trailers or stock trailers with a covered top shall be allowed for transporting animals from trap site(s) to temporary holding facilities, and from temporary holding facilities to final destination(s). Sides or stock racks of all trailers used for transporting animals shall be a minimum height of 6 feet 6 inches from the floor. Single deck tractor-trailers 40 feet or longer shall have at least two (2) partition gates providing at least three (3) compartments within the trailer to separate animals. Tractor-trailers less than 40 feet shall have at least one partition gate providing at least two (2) compartments within the trailer to separate the animals. Compartments in all tractor-trailers shall be of equal size plus or minus 10 percent. Each partition shall be a minimum of 6 feet high and shall have a minimum 5 foot wide swinging gate. The use of double deck tractor-trailers is unacceptable and shall not be allowed.

4) All tractor-trailers used to transport animals to final destination(s) shall be equipped with at least one (1) door at the rear end of the trailer which is capable of sliding either horizontally or vertically. The rear door(s) of tractor-trailers and stock trailers must be capable of opening the full width of the trailer. Panels facing the inside of all trailers must

be free of sharp edges or holes that could cause injury to the animals. The material facing the inside of all trailers must be strong enough so that the animals cannot push their hooves through the side. Final approval of
tractor-trailers and stock trailers used to transport animals shall be held by the COR/PI.

5) Floors of tractor-trailers, stock trailers and loading chutes shall be covered and maintained wood shavings to prevent the animals from slipping as much as possible during transport.

6) Animals to be loaded and transported in any trailer shall be as directed by the COR/PI and may include limitations on numbers according to age, size, sex, temperament and animal condition. The following minimum square feet per animal shall be allowed in all trailers:
   - 11 square feet per adult horse (1.4 linear foot in an 8 foot wide trailer);
   - 8 square feet per adult burro (1.0 linear foot in an 8 foot wide trailer);
   - 6 square feet per horse foal (.75 linear foot in an 8 foot wide trailer); square feet per burro foal (.50 linear feet in an 8 foot wide trailer).

7) The COR/PI shall consider the condition and size of the animals, weather conditions, distance to be transported, or other factors when planning for the movement of gathered animals. The COR/PI shall provide for any brand and/or inspection services required for the gathered animals.

8) If the COR/PI determines that dust conditions are such that the animals could be endangered during transportation, the Contractor will be instructed to adjust speed.

*D. Safety and Communications*
1) The Contractor shall have the means to communicate with the COR/PI and all contractor personnel engaged in the gather of wild horses utilizing a VHF/FM Transceiver or VHF/FM portable Two-Way radio. If communications are ineffective the government will take steps necessary to protect the welfare of the animals.
   a. The proper operation, service and maintenance of all contractor furnished property is the responsibility of the Contractor. The BLM reserves the right to remove from service any contractor personnel or contractor furnished equipment which, in the opinion of the contracting officer or COR/PI violate contract rules, are unsafe or otherwise unsatisfactory. In this event, the Contractor will be notified in writing to furnish replacement personnel or equipment within 48 hours of notification. All such replacements must be approved in advance of operation by the Contracting Officer or his/her representative.
   b. The Contractor shall obtain the necessary FCC licenses for the radio system
   c. All accidents occurring during the performance of any task order shall be immediately reported to the COR/PI.
2) Should the contractor choose to utilize a helicopter the following will apply:
   a. The Contractor must operate in compliance with Federal Aviation Regulations, Part 91. Pilots provided by the Contractor shall comply with the Contractor's

CAL_09014

Federal Aviation Certificates, applicable regulations of the State in which the gather is located.

b. Fueling operations shall not take place within 1,000 feet of animals.

*E. Site Clearances*

No personnel working at gather sites may excavate, remove, damage, or otherwise alter or deface or attempt to excavate, remove, damage or otherwise alter or deface any archaeological resource located on public lands or Indian lands.

Prior to setting up a trap or temporary holding facility, BLM will conduct all necessary clearances (archaeological, T&E, etc). All proposed site(s) must be inspected by a government archaeologist. Once archaeological clearance has been obtained, the trap or temporary holding facility may be set up. Said clearance shall be arranged for by the COR, PI, or other BLM employees.

Gather sites and temporary holding facilities would not be constructed on wetlands or riparian zones.

*F. Animal Characteristic and Behavior*

Releases of wild horses would be near available water when possible. If the area is new to them, a short-term adjustment period may be required while the wild horses become familiar with the new area.

*G. Public Participation*

Opportunities for public viewing (i.e. media, interested public) of gather operations will be made available to the extent possible; however, the primary considerations will be to protect the health, safety and welfare of the animals being gathered and the personnel involved. The public must adhere to guidance from the on-site BLM representative. It is BLM policy that the public will not be allowed to come into direct contact with wild horses or burros being held in BLM facilities. Only authorized BLM personnel or contractors may enter the corrals or directly handle the animals. The general public may not enter the corrals or directly handle the animals at anytime or for any reason during BLM operations.

*H. Responsibility and lines of Communication*

The Contracting Officer's Representatives (CORs) and the project inspectors (PIs) have the direct responsibility to ensure the Contractor's compliance with the contract stipulations. The Schell Supervisory Natural Resource Specialist and the Schell Field Managers will take an active role to ensure the appropriate lines of communication are established between the field, Field Office, State Office, National Program Office, and BLM Holding Facility offices. All employees involved in the gathering operations will keep the best interests of the animals at the forefront at all times. All publicity, formal public contact and inquiries will be handled through the Field Manager and/or the Supervisory Natural Resource Specialist and Field Office Public Affairs. These individuals will be the primary contact and will coordinate with the COR/PI on any inquiries. The COR will coordinate with the contractor and the BLM Corrals to ensure animals are being transported from the gather site in a safe and humane manner and are arriving in good condition. The contract specifications require humane treatment and care of the animals during

removal operations. These specifications are designed to minimize the risk of injury and death during and after gather of the animals. The specifications will be vigorously enforced. Should the Contractor show negligence and/or not perform according to contract stipulations, he will be issued written instructions, stop work orders, or defaulted.

Wild Horse Gather Observation Protocol

BLM recognizes and respects the right of interested members of the public and the press to observe wild horse gather operations. At the same time, BLM must ensure the health and safety of the public, BLM's employees and contractors, and America's wild horses. Accordingly, the BLM developed these rules to maximize the opportunity for reasonable public access to the gather while ensuring that BLM's health and safety responsibilities are fulfilled. Failure to maintain safe distances from operations at the gather and temporary holding sites could result in members of the public inadvertently getting in the path of the wild horses or gather personnel, thereby placing themselves and others at risk, or causing stress and potential injury to the wild horses. The BLM and the contractor's helicopter pilot must comply with 14 CFR Part 91 of the Federal Aviation Regulations, which determines the minimum safe altitudes and distance people must be from the aircraft. To be in compliance with these regulations, the viewing location at the gather site and holding corrals must be approximately 500 feet from the operating location of the helicopter at all times. The viewing locations may vary depending on topography, terrain and other factors.

*Daily Visitor Protocol*

- A Wild Horse Gather Information Phone Line would be set up prior to the gather so the public can call for daily updates on gather information and statistics. Visitors are strongly encouraged to check the phone line the evening before they plan to attend the gather to confirm the gather and their tour of it is indeed taking place the next day as scheduled (weather, mechanical issues or other things may affect this) and to confirm the meeting location.

- Visitors must direct their questions/comments to either their designated BLM representative or the BLM spokesperson on site, and not engage other BLM/contractor staff and disrupt their gather duties/responsibilities - professional and respectful behavior is expected of all. BLM may make the BLM staff available during down times for a Q&A session on public outreach and education days. However, the contractor and its staff would not be available to answer questions or interact with visitors.

- Observers must provide their own 4-wheel drive high clearance vehicle, appropriate shoes, winter clothing, food and water. Observers are prohibited from riding in government and contractor vehicles and equipment.

- Gather operations may be suspended if bad weather conditions create unsafe flying conditions.

- BLM would establish one or more observation areas, in the immediate area of the gather and holding sites, to which individuals would be directed. These areas would be placed so as to maximize the opportunity for public observation while providing for a safe and effective wild horse gather. The utilization of such observation areas is necessary due to the use and presence of heavy equipment and aircraft in the gather operation and the critical need to allow BLM personnel and contractors to fully focus on attending to the needs of the wild horses while maintaining a safe environment for all involved. In

addition, observation areas would be sited so as to protect the wild horses from being spooked, startled or impacted in a manner that results in increased stress.

- BLM would delineate observation areas with yellow caution tape (or a similar type of tape or ribbon).
- Visitors would be assigned to a specific BLM representative on public outreach and education days and must stay with that person at all times.
- Visitors are NOT permitted to walk around the gather site or temporary holding facility unaccompanied by their BLM representative.
- Observers are prohibited from climbing/trespassing onto or in the trucks, equipment or corrals, which is the private property of the contractor.
- When BLM is using a helicopter or other heavy equipment in close proximity to a designated observation area, members of the public may be asked to stay by their vehicle for some time before being directed to an observation area once the use of the helicopter or the heavy machinery is complete.
- When given the signal that the helicopter is close to the gather site bringing wild horses in, visitors must sit down in areas specified by BLM representatives and must not move or talk as the wild horses are guided into the corral.
- Individuals attempting to move outside a designated observation area would be requested to move back to the designated area or to leave the site. Failure to do so may result in citation or arrest. It is important to stay within the designated observation area to safely observe the wild horse gather.
- Observers would be polite, professional and respectful to BLM managers and staff and the contractor/employees. Visitors who do not cooperate and follow the rules would be escorted off the gather site by BLM law enforcement personnel and would be prohibited from participating in any subsequent observation days.
- BLM reserves the right to alter these rules based on changes in circumstances that may pose a risk to health, public safety or the safety of wild horses (such as weather, lightening, wildfire, etc.).

*Public Outreach and Education Day*
- The media and public are welcome to attend the gather any day and are encouraged to attend on public outreach and education days. On this day, BLM would have additional interpretive opportunities and staff available to answer questions.
- The number of public outreach and education days per week, and which days they are, would be determined prior to the gather and would be announced through a press release and on the website. Interested observers should RSVP ahead through the BLM-Battle Mountain District Office. A meeting place would be set for each public outreach and education day and the RSVP list notified. BLM representatives would escort observers on public outreach and education days to and from the gather site and temporary holding facility.

CAL_09017

Gather Risk Assessment

**Attachment 6: Risk Management Worksheet (for working in field conditions and handling wild horses or burros)**

| 1. Organization and Location | | | | | | | | | | | 2. Page  1  of  5 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 3. Operation / Task<br>Wild Horse Gather Operations | | | | | 4. Beginning Date: | | | 5. Ending Date: | | | 6. Date Prepared | |
| 7. Prepared by *(Name / Duty Position)*: | | | | | | | | | | | | |

| 8. Identified Hazards<br>*(Be Specific)* | 9. Assess the Hazards: Initial Risk | | | | 10. Control Measures Developed for Identified Hazards: *(Specific measures taken to reduce the probability of a hazard)*<br>*(Be Specific)* | 11. Assess the Hazard's Residual Risk: | | | | 12. How to Implement the Controls: (May Be Filled In By Hand)<br>*(Be Specific)* | 13. Supervisors and Evaluation by: (Continuous Leader Checks, Buddy System, etc.)<br>*(Be Specific)* |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | L | M | H | E | | L | M | H | E | | |
| Pre-gather facility setup could cause injury to personnel when setting up panels for alleyways and corrals | | × | | | Tailgate safety sessions to remind employees of back strains when lifting and to use cautions when connecting pins on panels. Contractor will be building corrals. | × | | | | Proper attire (boots, gloves, etc.) to prevent injuries. | Leader, buddy system |
| Moving horses through corral system could cause injuries to employees. Possibility of being bitten, kicked or run over by frightened animals exists. Injuries from gates could also occur. | | | × | | Only authorized employees are allowed to move animals through the corral system. Inform employees to be alert. Close all gates and latches securely. Contractor is the primary entity that will be moving or having contact with animals. | | × | | | Limit number of employees in alleyways during movement of animals. Do not interfere with contractor. Situational awareness at all times. | Supervisor, IC, Buddy System |

| 14. Remaining Risk Level After Control Measures Are Implemented: (CIRCLE HIGHEST REMAINING RISK LEVEL) | LOW<br>(Line Supervisor) | MEDIUM<br>(Branch Chief) | HIGH<br>(District Manager) | EXTREMELY HIGH<br>(Must be State Director/Associate) |
|---|---|---|---|---|

15. RISK DECISION AUTHORITY: (Approval/Authority Signature Block) (If Initial Risk Level is Medium, High or Extremely High, Brief Risk Decision Authority at that level on Controls and Control Measures used to reduce risks) (Note: If the person preparing the form signs this block, the signature indicates only that the appropriate risk decision authority was notified of the initial risk level, control measures taken and appropriate resources requested; and that the risk was accepted by the decision authority.)

(Signature)

**CONTINUED**

| 8. Identified Hazards<br>*(Be Specific)* | 9. Assess the Hazards: Initial Risk | | | | 10. Control Measures Developed for Identified Hazards: *(Specific measures taken to reduce the probability of a*<br>*(Be Specific)* | 11. Assess the Hazard's Residual | | | | 12. How to Implement the Controls; (May Be Filled In By Hand)<br>*(Be Specific)* | 13. Supervisors and Evaluation by: (Continuous Leader Checks, Buddy<br>*(Be Specific)* |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | L | M | H | E | | L | M | H | E | | |
| Preparing horses through corral system (squeeze chute) for veterinary and freeze marking purposes could cause injury to employees by being bitten, kicked. | | | × | | Limit number of employees in chute area to only those necessary to do the job (including contractor). Test chute prior to animals entering to assure all is working properly. | | × | | | Limit number of employees to only those necessary to complete task. Check alleyways prior to moving animals. | Supervisor, IC, Buddy System |
| Feeding animals, being kicked or run could cause back strain. Potential for injury from equipment used to move hay bales. | | × | | | Only authorized employees in pens or alleyways during feeding. Use only approved equipment operators on machinery. Contractor is responsible for animal care and feeding. | × | | | | Only authorized employees in alleyways during feed time. | Supervisor, IC, Buddy System |
| Loading horses onto trailers for shipping could cause injury to animals or employees if loading chute fails or if animals turn back on loading personnel. | | | × | | Inspect loading chute prior to using. Ensure no "holes" exist and that it is securely attached to trailer. Close communication between wranglers and trailer gate person is critical to preventing injury. Contractor is responsible for loading and unloading animals. BLM employees should not interfere or get in the way. | | × | | | Assign specific duties for unloading animals. Use radios if necessary to keep close contact BLM to not interfere or be in the contractor's way. | Supervisor, Buddy System |
| Weather: heat exhaustion or Hypothermia | | | × | | Carry sufficient water/fluids to remain hydrated (important in either hot or cold weather). Learn signs and treatment for | | × | | | Check weather forecast prior to going to the field. Take first aid/CPR, hazcom, | Continuous COR/PI and Manager checks. Review practices in daily meetings with participants. |

CAL_09018

**CONTINUED**

| 8. Identified Hazards | 9. Assess the Hazards: Initial Risk | | | | 10. Control Measures Developed for Identified Hazards: (Specific measures taken to reduce the probability of a | 11. Assess the Hazard's Residual | | | | 12. How to Implement the Controls: (May Be Filled in By Hand) | 13. Supervisors and Evaluation by: (Continuous Leader Checks, Buddy |
|---|---|---|---|---|---|---|---|---|---|---|---|
| (Be Specific) | L | M | H | E | (Be Specific) | L | M | H | E | (Be Specific) | (Be Specific) |
| | | | | | hypothermia/frostbite and heat exhaustion/stroke. | | | | | hazard awareness courses as required. Carry the necessary equipment in your vehicle and back pack in order to be prepared. Use situational awareness at all times | |
| Insect stings, severe allergic reactions. | | X | | | If you are aware that you are allergic to insect venom (bees, wasps, hornets) acquire an epinephrine injection kit (epipen) through your physician and carry it with you at all times when working outdoors. Use of an antihistamine may be appropriate if your physician concurs. If unaware of any allergies, but begin to feel throat constriction, get medical attention immediately. | X | | | | Carry Benadryl or Zyrtec for allergic reactions to stings. | Make supervisor aware |
| Rattlesnake bite | | X | | | Wear hiking boots that cover the ankle and long pants. Be careful around mine workings, old buildings, equipment and rock formations that may be suitable habitat. Look carefully before putting your hand in or under objects. If you hear or see a rattlesnake, stop your movement and move away slowly. Don't agitate or try to kill a snake. | X | | | | If bit, stay calm, contact CNIDC, and get transportation back to town and see a doctor as soon as possible. | Supervisor, Buddy system |
| Lightning and thunderstorms | | X | | | Watch for approaching storms. Be aware of electron exchange build up as evidenced by hair rising up. Stay away from trees, metal objects and high ground. Be aware of possible flash flooding | X | | | | Check weather forecast prior to going to the field. Follow the 30/30 rule (if less than 30 seconds elapses between the lightning flash and its thunder, seek shelter). Use situational awareness at | Continuous COR/PI and manager checks. Review Practices in daily meetings with participants and dispatch |

**CONTINUED**

| 8. Identified Hazards | 9. Assess the Hazards: Initial Risk | | | | 10. Control Measures Developed for Identified Hazards: (Specific measures taken to reduce the probability of a | 11. Assess the Hazard's Residual | | | | 12. How to Implement the Controls: (May Be Filled in By Hand) | 13. Supervisors and Evaluation by: (Continuous Leader Checks, Buddy |
|---|---|---|---|---|---|---|---|---|---|---|---|
| (Be Specific) | L | M | H | E | (Be Specific) | L | M | H | E | (Be Specific) | (Be Specific) |
| | | | | | all times | | | | | | |
| Fatigue | | | X | | Refer to BLM Manual H1112-1, Ch. 14, BLM H1112-2, Topic 4 Pre-trip briefing Drivers will not exceed 8 hours driving time within a 16 hour duty period. At least 8 consecutive hours of rest are required before any duty period requiring driving. If desired by the driver, use adequate amounts of caffeinated products to stay alert. | | X | | | Take adequate rest stops/stretch breaks, driver rotation. Use techniques to stay awake. – chew gum or sunflower seeds, listen to radio or roll window down. | Continuous COR/PI and manager checks. Review Practices in daily meetings with participants. |
| Backcountry driving, gravel and/or mountainous roads  *Poor traction  *Tire puncture  *Dust/mud obscured visibility  *Brake failure  *Brush fire under vehicle | | | X | | Reduce speed. Increase following distance/time to 4 seconds. Watch for vehicle dust as a sign of an oncoming vehicle. Insure proper tire inflations as per info on tire. Ensure that spare tire and necessary tools are prepared prior to departure. Utilize windshield cleaner, increase following distance to 4 seconds. Avoid riding brakes on long or steep downhill grades; utilize low gears as much as possible to reduce speed. Daily pre-trip "walk-around" inspections must include looking under the vehicle for brush caught under the catalytic converter. Clean out brush if present. Carry 5lb or larger fire extinguisher. During the summer carry water pump and 5 gallon cube of water. Carry shovel and Pulaski. Park in locations with as little, short fire resistant brush as possible. Shift into 4 wheel drive shortly before it is needed. Drive carefully at prudent speeds. | | X | | | Team new employees with employees experienced with local conditions for initial trips. Must have BLM 4x4 training prior to driving off well maintained roads. Safety meeting reminders, briefings. Must follow office check in check out policy | Continuous COR/PI and manager checks. Review Practices in daily meetings with participants and dispatch. |

**CONTINUED**

| 8. Identified Hazards | 9. Assess the Hazards: Initial Risk | | | | 10. Control Measures Developed for Identified Hazards: (Specific measures taken to reduce the probability of a | 11. Assess the Hazard's Residual | | | | 12. How to Implement the Controls: (May Be Filled in By Hand) | 13. Supervisors and Evaluation by: (Continuous Leader Checks, Buddy |
|---|---|---|---|---|---|---|---|---|---|---|---|
| (Be Specific) | L | M | H | E | (Be Specific) | L | M | H | E | (Be Specific) | (Be Specific) |
| *Road conditions or grade requiring the use of 4 wheel drive  *Vehicle stuck | | | | | Only go there if it appears safe and you are confident that you will not damage the vehicle. Carry sufficient tools such as shovel, Pulaski, tow strap, and vehicle jack. Carry sufficient food and water supplies and equipment (e.g. sleeping bag/blanket) to stay overnight in the vehicle while waiting for help. Act prudently and don't be afraid. Beware of high traffic due to mines nearby and heavy dust at times impairing visibility. | | | | | | |

CAL_09019

# HENNEKE BODY CONDITION SCORE SHEET

DATE: _____

NAME:_____

ANIMAL ID:_____

DESCRIPTION:_____

☐ VISUAL   or   ☐ HANDS-ON   ASSESSMENT

COMMENTS: _____

OVERALL BODY CONDITION SCORE: _____ ÷ 6 = _____

                   sum total      overall score



modified from Henneke et al. EVJ 1983;15:371-372

(circle descriptions for each area of the body then average together)

| Condition | Neck | Withers | Shoulder | Ribs | Back | Tailhead Area |
|---|---|---|---|---|---|---|
| **1 Poor** (*extremely emaciated*) | Bone structure easily noticeable | Bone structure easily noticeable | Bone structure easily noticeable | Ribs projecting prominently | Spinous processes projecting prominently | Tailhead, pinbones, and hook bones projecting prominently |
| | | | No fatty tissue can be felt | | | |
| **2 Very Thin** (*emaciated*) | Bone structure faintly discernible | Bone structure faintly discernible | Bone structure faintly discernible | Ribs prominent | Slight fat covering over base of spinous processes. Transverse processes of lumbar vertebrae feel rounded. Spinous processes are prominent | Tailhead prominent<br><br>Pin bones prominent<br><br>Hook bones prominent |
| **3 Thin** | Neck accentuated | Withers accentuated | Shoulder accentuated | Slight fat cover over ribs. Ribs easily discernible | Fat buildup halfway on spinous processes, but easily discernible. Traverse processes cannot be felt | Tailhead prominent but individual vertebrae cannot be visually identified. Hook bones appear rounded, but are still easily discernible. Pin bones not distinguishable |
| **4 Moderately Thin** | Neck not obviously thin | Withers not obviously thin | Shoulder not obviously thin | Faint outline of ribs discernible | Negative crease (peaked appearance) along back | Prominence depends on conformation. Fat can be felt. Hook bones not discernible |
| **5 Moderate** | Neck blends smoothly into body | Withers rounded over spinous processes | Shoulder blends smoothly into body | Ribs cannot be visually distinguished, but can be easily felt | Back is level | Fat around tailhead beginning to feel spongy |
| **6 Moderately Fleshy** | Fat beginning to be deposited | Fat beginning to be deposited | Fat beginning to be deposited behind shoulder | Fat over ribs feels spongy | May have a slight positive crease (a groove) down back | Fat around tailhead feels soft |
| **7 Fleshy** | Fat deposited along neck | Fat deposited along withers | Fat deposited behind shoulder | Individual ribs can be felt, but noticeable fat filling between ribs | May have a positive crease down the back | Fat around tailhead is soft |
| **8 Fat** | Noticeable thickening of neck | Area along withers filled with fat | Area behind shoulder filled with fat | Difficult to feel ribs | Positive crease down back | Fat around tailhead very soft |
| **9 Extremely Fat** | Bulging fat | Bulging fat | Bulging fat | Patchy fat appearing over ribs | Obvious crease down back Flank filled with fat | Bulging fat around tailhead |

CAL_09020
(prepared by A Kane USDA APHIS 11/21/17)

# *PopEquus* (1.0.2) Advanced Tool - Simulation Report

**25 July 2025 14:55:01**

## Population inputs

You used the *PopEquus* Advanced Tool to simulate a horse population that started with 4489 horses, had a population sex ratio where 0.5 of the population is female, was censused at a time that foals were present (Yes), had a mean annual population growth rate of 15 percent per year, and a capture probability during management (e.g., helicopter gather) of 0.75. You assumed that the target population size range for the population (i.e., Appropriate Management Level) was 323-552 horses, that removals aimed for a target population size of 323, and that if the population decreased to beneath 30 horses that it would be at high risk of local extirpation. In summary:

- Population size: 4489
- Female proportion of population: 0.5
- Foals included in population size? Yes
- Population growth rate (% increase per year): 15
- Capture proportion during gathers: 0.75
- Appropriate management level (minimum): 323
- Appropriate management level (maximum): 552
- Target population size: 323
- Persistence threshold (i.e., minimum number of individuals): 30

## Simulation inputs

You simulated populations over a 10-year projection interval, and you performed 10 replicate projections.

- Projection interval (years): 10
- Number of simulation replicates: 10

## Management alternatives

You simulated 6 management alternatives using the tool: **GonaCon, No management, PZP-22, Removals, Removals and GonaCon, Removals and PZP-22**.

The following settings were specified for management actions:

**Gather options**

- Short-term holding costs ($ per day): 7.61

**Removal options**

- Removal years: 1, 4, 7, 10
- Reactive removals: No
- Minimum gather interval (years) for a reactive removal: 2
- Selective removals: No
- Male proportion of population returned after a removal: 0.6
- Maximum number removed from the population per year: 1500
- Number of years to project holding population: 25
- Long-term holding costs ($ per day): 2.02
- Proportion of horses adopted per year: 0.69
- Net adoption cost to agency ($ per horse): 1775
- Breeding reduction (%) of removed females in captivity the first year after removal: 25

**GonaCon options**

- Treatment years: 1, 4, 7, 10
- Treatment ages: 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20

1

CAL_09021

- Treatment percentage (%) for age-eligible females: 100
- Treatment cost per shot ($): 50
- Hold to give booster treatment: Yes
- Days in holding until booster: 30

**PZP-22 options**

- Treatment years: 1, 4, 7, 10
- Treatment ages: 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20
- Treatment percentage (%) for age-eligible females: 100
- Primer treatment cost ($): 430
- Days in holding to receive treatment: 7
- Booster treatment cost ($): 30

2

CAL_09022

## Results

Simulation outcomes can be summarized with a table(s) describing mean values among replicates for relevant metrics. Metrics include: population size in the final year of the projection interval ('Final population size'), average population size across all years ('Mean population size'), proportion of replicates that ended within the AML (i.e., the likelihood that an alternative yielded AML in the final year; 'AML probability'), proportion of replicates that ended above the persistence threshold ('Persistence probability'), total number of horses gathered ('Number gathered'), total number of horses removed ('Number removed'), total number of horses treated ('Number treated'), cost of management in the Herd Management Area (HMA) in millions of USD ['On-range cost ($ million)'], and total cost of management, including costs incurred at the HMA and in holding facilities ['Total cost ($ million)']. Values in parentheses are 95% confidence intervals.

| Alternative | Final population size | Overall mean population size | AML probability |
|---|---|---|---|
| No management | 16429 (14049-19226) | 9236 (8294-10308) | 0.00 |
| Removals | 2847 (1755-4296) | 3632 (3042-4302) | 0.00 |
| GonaCon | 6511 (5720-7506) | 5527 (5034-5998) | 0.00 |
| PZP-22 | 11423 (9724-13719) | 7464 (6585-8359) | 0.00 |
| Removals and GonaCon | 1026 (838-1200) | 2432 (2164-2635) | 0.00 |
| Removals and PZP-22 | 1842 (1171-2794) | 3146 (2596-3653) | 0.00 |

| Alternative | Persistence probability | Number gathered | Number removed | Number treated |
|---|---|---|---|---|
| No management | 1.00 | 0 (0-0) | 0 (0-0) | 0 (0-0) |
| Removals | 1.00 | 12724 (11120-14546) | 5999 (5992-6005) | 0 (0-0) |
| GonaCon | 1.00 | 16254 (14860-17450) | 0 (0-0) | 7708 (7248-8186) |
| PZP-22 | 1.00 | 21393 (19047-23752) | 0 (0-0) | 9563 (8768-10661) |
| Removals and GonaCon | 1.00 | 9048 (8196-9681) | 4840 (4475-5194) | 2612 (2303-2828) |
| Removals and PZP-22 | 1.00 | 11209 (9664-12586) | 5889 (5549-6008) | 3078 (2502-3576) |

| Alternative | On-range cost ($ million) | Off-range cost ($ million) | Total cost ($ million) |
|---|---|---|---|
| No management | 0.00 (0.00-0.00) | 0.00 (0.00-0.00) | 0.00 (0.00-0.00) |
| Removals | 8.41 (7.35-9.62) | 46.24 (45.08-47.28) | 54.65 (52.43-56.66) |
| GonaCon | 12.10 (11.11-12.94) | 0.00 (0.00-0.00) | 12.10 (11.11-12.94) |
| PZP-22 | 16.80 (15.05-18.52) | 0.00 (0.00-0.00) | 16.80 (15.05-18.52) |
| Removals and GonaCon | 6.38 (5.78-6.82) | 36.37 (32.78-39.19) | 42.75 (38.56-46.00) |
| Removals and PZP-22 | 8.09 (6.92-9.15) | 44.33 (41.39-45.58) | 52.42 (48.32-54.47) |

CAL_09023

A graph of population size through time can be used to visualize effects of management alternatives on population size. Different colored lines indicate management alternatives simulated by the user; for each alternative, individual lines are different simulation replicates, that vary due to random chance. Dashed horizontal black lines indicate the minimum and maximum target population size range (i.e., AML).



4

CAL_09024

Individuals might be interested in identifying a management alternative(s) that achieves the reduction or maintenance of a population within the target population size range (i.e., AML) while also incurring lower direct costs relative to other options. We can visualize the relationship between predicted population size and direct costs of management by graphing the overall mean population size (number of horses) on the x-axis and total cost of management (millions of USD) on the y-axis predicted by each alternative. Points are mean predictions among replicates and are colored by scenario (as in in the first graph); horizontal and vertical lines from points represent 95% confidence intervals in predicted population size and cost, respectively, for each scenario. While this graph does not account for all factors that might be important during management decisions, the graph provides a useful illustration of the trade-off between predicted population size and total direct cost of management resulting from the simulated alternatives.



CAL_09025

**Summary**

The alternative that yielded the smallest average population size was:

```
## [1] "Removals and GonaCon"
```

The alternative that incurred the lowest direct costs 'on range' (other than 'no management') over the next 10 years was:

```
## [1] "Removals and GonaCon"
```

The alternative that incurred the lowest total direct costs across the sum of 'on range' and 'off range' (other than 'no management') over the next 35 years was:

```
## [1] "GonaCon"
```

Among the alternatives that achieved population size within Appropriate Management Levels, the alternative that incurred the lowest total direct costs across the sum of 'on range' and 'off range':

```
## [1] "None"
```

Note: results from the simulations may not be the sole basis for a management decision. The model does not explicitly account for or consider multiple uses on public lands, local land use planning considerations, ecological costs of horses on ecosystems, or other important values. The results presented here reflect considerations related to population size, amount of management, and fiscal costs of management that were estimated, given the input parameters and alternatives specified.

CAL_09026

# *PopEquus* (1.0.2) Advanced Tool - Simulation Report

**25 July 2025 15:02:20**

## Population inputs

You used the *PopEquus* Advanced Tool to simulate a horse population that started with 246 horses, had a population sex ratio where 0.5 of the population is female, was censused at a time that foals were present (Yes), had a mean annual population growth rate of 15 percent per year, and a capture probability during management (e.g., helicopter gather) of 0.75. You assumed that the target population size range for the population (i.e., Appropriate Management Level) was 129-215 horses, that removals aimed for a target population size of 129, and that if the population decreased to beneath 30 horses that it would be at high risk of local extirpation. In summary:

- Population size: 246
- Female proportion of population: 0.5
- Foals included in population size? Yes
- Population growth rate (% increase per year): 15
- Capture proportion during gathers: 0.75
- Appropriate management level (minimum): 129
- Appropriate management level (maximum): 215
- Target population size: 129
- Persistence threshold (i.e., minimum number of individuals): 30

## Simulation inputs

You simulated populations over a 10-year projection interval, and you performed 10 replicate projections.

- Projection interval (years): 10
- Number of simulation replicates: 10

## Management alternatives

You simulated 6 management alternatives using the tool: **GonaCon, No management, PZP-22, Removals, Removals and GonaCon, Removals and PZP-22**.

The following settings were specified for management actions:

**Gather options**

- Short-term holding costs ($ per day): 7.61

**Removal options**

- Removal years: 1, 4, 7, 10
- Reactive removals: No
- Minimum gather interval (years) for a reactive removal: 2
- Selective removals: No
- Male proportion of population returned after a removal: 0.6
- Maximum number removed from the population per year: 1500
- Number of years to project holding population: 25
- Long-term holding costs ($ per day): 2.02
- Proportion of horses adopted per year: 0.69
- Net adoption cost to agency ($ per horse): 1775
- Breeding reduction (%) of removed females in captivity the first year after removal: 25

**GonaCon options**

- Treatment years: 1, 4, 7, 10
- Treatment ages: 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20

CAL_09027

- Treatment percentage (%) for age-eligible females: 100
- Treatment cost per shot ($): 50
- Hold to give booster treatment: Yes
- Days in holding until booster: 30

**PZP-22 options**

- Treatment years: 1, 4, 7, 10
- Treatment ages: 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20
- Treatment percentage (%) for age-eligible females: 100
- Primer treatment cost ($): 430
- Days in holding to receive treatment: 7
- Booster treatment cost ($): 30

CAL_09028

## Results

Simulation outcomes can be summarized with a table(s) describing mean values among replicates for relevant metrics. Metrics include: population size in the final year of the projection interval ('Final population size'), average population size across all years ('Mean population size'), proportion of replicates that ended within the AML (i.e., the likelihood that an alternative yielded AML in the final year; 'AML probability'), proportion of replicates that ended above the persistence threshold ('Persistence probability'), total number of horses gathered ('Number gathered'), total number of horses removed ('Number removed'), total number of horses treated ('Number treated'), cost of management in the Herd Management Area (HMA) in millions of USD ['On-range cost ($ million)'], and total cost of management, including costs incurred at the HMA and in holding facilities ['Total cost ($ million)']. Values in parentheses are 95% confidence intervals.

| Alternative | Final population size | Overall mean population size | AML probability |
|---|---|---|---|
| No management | 894 (807-1079) | 500 (441-538) | 0.00 |
| Removals | 193 (135-238) | 198 (177-210) | 0.50 |
| GonaCon | 350 (319-431) | 302 (275-326) | 0.00 |
| PZP-22 | 633 (565-753) | 412 (377-443) | 0.00 |
| Removals and GonaCon | 188 (149-217) | 176 (163-189) | 0.80 |
| Removals and PZP-22 | 195 (138-248) | 190 (181-200) | 0.70 |

| Alternative | Persistence probability | Number gathered | Number removed | Number treated |
|---|---|---|---|---|
| No management | 1.00 | 0 (0-0) | 0 (0-0) | 0 (0-0) |
| Removals | 1.00 | 439 (370-570) | 289 (237-369) | 0 (0-0) |
| GonaCon | 1.00 | 889 (833-948) | 0 (0-0) | 425 (397-451) |
| PZP-22 | 1.00 | 1174 (1093-1293) | 0 (0-0) | 534 (514-566) |
| Removals and GonaCon | 1.00 | 582 (544-622) | 124 (115-187) | 219 (203-230) |
| Removals and PZP-22 | 1.00 | 647 (623-692) | 234 (201-326) | 205 (196-221) |

| Alternative | On-range cost ($ million) | Off-range cost ($ million) | Total cost ($ million) |
|---|---|---|---|
| No management | 0.00 (0.00-0.00) | 0.00 (0.00-0.00) | 0.00 (0.00-0.00) |
| Removals | 0.41 (0.35-0.54) | 1.85 (1.44-2.41) | 2.26 (1.80-2.94) |
| GonaCon | 0.89 (0.84-0.94) | 0.00 (0.00-0.00) | 0.89 (0.84-0.94) |
| PZP-22 | 1.15 (1.09-1.24) | 0.00 (0.00-0.00) | 1.15 (1.09-1.24) |
| Removals and GonaCon | 0.62 (0.58-0.65) | 0.79 (0.68-1.23) | 1.41 (1.29-1.88) |
| Removals and PZP-22 | 0.68 (0.67-0.71) | 1.43 (1.13-1.98) | 2.11 (1.80-2.69) |

CAL_09029

A graph of population size through time can be used to visualize effects of management alternatives on population size. Different colored lines indicate management alternatives simulated by the user; for each alternative, individual lines are different simulation replicates, that vary due to random chance. Dashed horizontal black lines indicate the minimum and maximum target population size range (i.e., AML).



CAL_09030

Individuals might be interested in identifying a management alternative(s) that achieves the reduction or maintenance of a population within the target population size range (i.e., AML) while also incurring lower direct costs relative to other options. We can visualize the relationship between predicted population size and direct costs of management by graphing the overall mean population size (number of horses) on the x-axis and total cost of management (millions of USD) on the y-axis predicted by each alternative. Points are mean predictions among replicates and are colored by scenario (as in in the first graph); horizontal and vertical lines from points represent 95% confidence intervals in predicted population size and cost, respectively, for each scenario. While this graph does not account for all factors that might be important during management decisions, the graph provides a useful illustration of the trade-off between predicted population size and total direct cost of management resulting from the simulated alternatives.



CAL_09031

**Summary**

The alternative that yielded the smallest average population size was:

```
## [1] "Removals and GonaCon"
```

The alternative that incurred the lowest direct costs 'on range' (other than 'no management') over the next 10 years was:

```
## [1] "Removals"
```

The alternative that incurred the lowest total direct costs across the sum of 'on range' and 'off range' (other than 'no management') over the next 35 years was:

```
## [1] "GonaCon"
```

Among the alternatives that achieved population size within Appropriate Management Levels, the alternative that incurred the lowest total direct costs across the sum of 'on range' and 'off range':

```
## [1] "Removals"
```

Note: results from the simulations may not be the sole basis for a management decision. The model does not explicitly account for or consider multiple uses on public lands, local land use planning considerations, ecological costs of horses on ecosystems, or other important values. The results presented here reflect considerations related to population size, amount of management, and fiscal costs of management that were estimated, given the input parameters and alternatives specified.

6

**CAL_09032**

## *PopEquus* (1.0.2) Advanced Tool - Simulation Report

**25 July 2025 14:58:35**

### Population inputs

You used the *PopEquus* Advanced Tool to simulate a horse population that started with 2027 horses, had a population sex ratio where 0.5 of the population is female, was censused at a time that foals were present (Yes), had a mean annual population growth rate of 15 percent per year, and a capture probability during management (e.g., helicopter gather) of 0.75. You assumed that the target population size range for the population (i.e., Appropriate Management Level) was 134-237 horses, that removals aimed for a target population size of 134, and that if the population decreased to beneath 30 horses that it would be at high risk of local extirpation. In summary:

- Population size: 2027
- Female proportion of population: 0.5
- Foals included in population size? Yes
- Population growth rate (% increase per year): 15
- Capture proportion during gathers: 0.75
- Appropriate management level (minimum): 134
- Appropriate management level (maximum): 237
- Target population size: 134
- Persistence threshold (i.e., minimum number of individuals): 30

### Simulation inputs

You simulated populations over a 10-year projection interval, and you performed 10 replicate projections.

- Projection interval (years): 10
- Number of simulation replicates: 10

### Management alternatives

You simulated 6 management alternatives using the tool: **GonaCon, No management, PZP-22, Removals, Removals and GonaCon, Removals and PZP-22**.

The following settings were specified for management actions:

**Gather options**

- Short-term holding costs ($ per day): 7.61

**Removal options**

- Removal years: 1, 4, 7, 10
- Reactive removals: No
- Minimum gather interval (years) for a reactive removal: 2
- Selective removals: No
- Male proportion of population returned after a removal: 0.6
- Maximum number removed from the population per year: 1500
- Number of years to project holding population: 25
- Long-term holding costs ($ per day): 2.02
- Proportion of horses adopted per year: 0.69
- Net adoption cost to agency ($ per horse): 1775
- Breeding reduction (%) of removed females in captivity the first year after removal: 25

**GonaCon options**

- Treatment years: 1, 4, 7, 10
- Treatment ages: 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20

1

CAL_09033

- Treatment percentage (%) for age-eligible females: 100
- Treatment cost per shot ($): 50
- Hold to give booster treatment: Yes
- Days in holding until booster: 30

**PZP-22 options**

- Treatment years: 1, 4, 7, 10
- Treatment ages: 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20
- Treatment percentage (%) for age-eligible females: 100
- Primer treatment cost ($): 430
- Days in holding to receive treatment: 7
- Booster treatment cost ($): 30

CAL_09034

**Results**

Simulation outcomes can be summarized with a table(s) describing mean values among replicates for relevant metrics. Metrics include: population size in the final year of the projection interval ('Final population size'), average population size across all years ('Mean population size'), proportion of replicates that ended within the AML (i.e., the likelihood that an alternative yielded AML in the final year; 'AML probability'), proportion of replicates that ended above the persistence threshold ('Persistence probability'), total number of horses gathered ('Number gathered'), total number of horses removed ('Number removed'), total number of horses treated ('Number treated'), cost of management in the Herd Management Area (HMA) in millions of USD ['On-range cost ($ million)'], and total cost of management, including costs incurred at the HMA and in holding facilities ['Total cost ($ million)']. Values in parentheses are 95% confidence intervals.

| Alternative | Final population size | Overall mean population size | AML probability |
|---|---|---|---|
| No management | 7586 (6462-8915) | 4150 (3744-4563) | 0.00 |
| Removals | 238 (210-275) | 500 (483-510) | 0.60 |
| GonaCon | 2974 (2554-3391) | 2495 (2260-2600) | 0.00 |
| PZP-22 | 5235 (4702-6064) | 3353 (3094-3559) | 0.00 |
| Removals and GonaCon | 194 (146-239) | 493 (481-509) | 0.90 |
| Removals and PZP-22 | 217 (185-275) | 496 (474-511) | 0.80 |

| Alternative | Persistence probability | Number gathered | Number removed | Number treated |
|---|---|---|---|---|
| No management | 1.00 | 0 (0-0) | 0 (0-0) | 0 (0-0) |
| Removals | 1.00 | 2294 (2238-2347) | 2211 (2149-2275) | 0 (0-0) |
| GonaCon | 1.00 | 7292 (6699-7650) | 0 (0-0) | 3443 (3242-3618) |
| PZP-22 | 1.00 | 9519 (8763-10046) | 0 (0-0) | 4260 (3967-4501) |
| Removals and GonaCon | 1.00 | 2435 (2380-2502) | 2202 (2146-2292) | 112 (101-132) |
| Removals and PZP-22 | 1.00 | 2448 (2381-2487) | 2208 (2150-2255) | 114 (104-123) |

| Alternative | On-range cost ($ million) | Off-range cost ($ million) | Total cost ($ million) |
|---|---|---|---|
| No management | 0.00 (0.00-0.00) | 0.00 (0.00-0.00) | 0.00 (0.00-0.00) |
| Removals | 1.62 (1.59-1.66) | 16.98 (16.36-17.67) | 18.61 (17.96-19.33) |
| GonaCon | 5.42 (5.00-5.69) | 0.00 (0.00-0.00) | 5.42 (5.00-5.69) |
| PZP-22 | 7.47 (6.90-7.89) | 0.00 (0.00-0.00) | 7.47 (6.90-7.89) |
| Removals and GonaCon | 1.79 (1.76-1.83) | 16.93 (16.27-17.89) | 18.72 (18.07-19.71) |
| Removals and PZP-22 | 1.82 (1.77-1.85) | 16.94 (16.10-17.83) | 18.76 (17.88-19.66) |

CAL_09035

A graph of population size through time can be used to visualize effects of management alternatives on population size. Different colored lines indicate management alternatives simulated by the user; for each alternative, individual lines are different simulation replicates, that vary due to random chance. Dashed horizontal black lines indicate the minimum and maximum target population size range (i.e., AML).



CAL_09036

Individuals might be interested in identifying a management alternative(s) that achieves the reduction or maintenance of a population within the target population size range (i.e., AML) while also incurring lower direct costs relative to other options. We can visualize the relationship between predicted population size and direct costs of management by graphing the overall mean population size (number of horses) on the x-axis and total cost of management (millions of USD) on the y-axis predicted by each alternative. Points are mean predictions among replicates and are colored by scenario (as in in the first graph); horizontal and vertical lines from points represent 95% confidence intervals in predicted population size and cost, respectively, for each scenario. While this graph does not account for all factors that might be important during management decisions, the graph provides a useful illustration of the trade-off between predicted population size and total direct cost of management resulting from the simulated alternatives.



CAL_09037

**Summary**

The alternative that yielded the smallest average population size was:

```
## [1] "Removals and GonaCon"
```

The alternative that incurred the lowest direct costs 'on range' (other than 'no management') over the next 10 years was:

```
## [1] "Removals"
```

The alternative that incurred the lowest total direct costs across the sum of 'on range' and 'off range' (other than 'no management') over the next 35 years was:

```
## [1] "GonaCon"
```

Among the alternatives that achieved population size within Appropriate Management Levels, the alternative that incurred the lowest total direct costs across the sum of 'on range' and 'off range':

```
## [1] "None"
```

Note: results from the simulations may not be the sole basis for a management decision. The model does not explicitly account for or consider multiple uses on public lands, local land use planning considerations, ecological costs of horses on ecosystems, or other important values. The results presented here reflect considerations related to population size, amount of management, and fiscal costs of management that were estimated, given the input parameters and alternatives specified.

6

CAL_09038

# *PopEquus* (1.0.2) Advanced Tool - Simulation Report

**25 July 2025 15:04:34**

## Population inputs

You used the *PopEquus* Advanced Tool to simulate a horse population that started with 2025 horses, had a population sex ratio where 0.5 of the population is female, was censused at a time that foals were present (Yes), had a mean annual population growth rate of 15 percent per year, and a capture probability during management (e.g., helicopter gather) of 0.75. You assumed that the target population size range for the population (i.e., Appropriate Management Level) was 60-100 horses, that removals aimed for a target population size of 60, and that if the population decreased to beneath 30 horses that it would be at high risk of local extirpation. In summary:

- Population size: 2025
- Female proportion of population: 0.5
- Foals included in population size? Yes
- Population growth rate (% increase per year): 15
- Capture proportion during gathers: 0.75
- Appropriate management level (minimum): 60
- Appropriate management level (maximum): 100
- Target population size: 60
- Persistence threshold (i.e., minimum number of individuals): 30

## Simulation inputs

You simulated populations over a 10-year projection interval, and you performed 10 replicate projections.

- Projection interval (years): 10
- Number of simulation replicates: 10

## Management alternatives

You simulated 6 management alternatives using the tool: **GonaCon, No management, PZP-22, Removals, Removals and GonaCon, Removals and PZP-22**.

The following settings were specified for management actions:

**Gather options**

- Short-term holding costs ($ per day): 7.61

**Removal options**

- Removal years: 1, 4, 7, 10
- Reactive removals: No
- Minimum gather interval (years) for a reactive removal: 2
- Selective removals: No
- Male proportion of population returned after a removal: 0.6
- Maximum number removed from the population per year: 1500
- Number of years to project holding population: 25
- Long-term holding costs ($ per day): 2.02
- Proportion of horses adopted per year: 0.69
- Net adoption cost to agency ($ per horse): 1775
- Breeding reduction (%) of removed females in captivity the first year after removal: 25

**GonaCon options**

- Treatment years: 1, 4, 7, 10
- Treatment ages: 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20

1

CAL_09039

- Treatment percentage (%) for age-eligible females: 100
- Treatment cost per shot ($): 50
- Hold to give booster treatment: Yes
- Days in holding until booster: 30

**PZP-22 options**

- Treatment years: 1, 4, 7, 10
- Treatment ages: 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20
- Treatment percentage (%) for age-eligible females: 100
- Primer treatment cost ($): 430
- Days in holding to receive treatment: 7
- Booster treatment cost ($): 30

CAL_09040

**Results**

Simulation outcomes can be summarized with a table(s) describing mean values among replicates for relevant metrics. Metrics include: population size in the final year of the projection interval ('Final population size'), average population size across all years ('Mean population size'), proportion of replicates that ended within the AML (i.e., the likelihood that an alternative yielded AML in the final year; 'AML probability'), proportion of replicates that ended above the persistence threshold ('Persistence probability'), total number of horses gathered ('Number gathered'), total number of horses removed ('Number removed'), total number of horses treated ('Number treated'), cost of management in the Herd Management Area (HMA) in millions of USD ['On-range cost ($ million)'], and total cost of management, including costs incurred at the HMA and in holding facilities ['Total cost ($ million)']. Values in parentheses are 95% confidence intervals.

| Alternative | Final population size | Overall mean population size | AML probability |
|---|---|---|---|
| No management | 7615 (6144-8727) | 4135 (3539-4592) | 0.00 |
| Removals | 85 (63-114) | 460 (427-500) | 0.70 |
| GonaCon | 3027 (2412-3488) | 2489 (2194-2763) | 0.00 |
| PZP-22 | 5620 (4603-6642) | 3493 (3028-3957) | 0.00 |
| Removals and GonaCon | 82 (60-112) | 456 (428-481) | 0.60 |
| Removals and PZP-22 | 78 (64-107) | 456 (431-480) | 0.80 |

| Alternative | Persistence probability | Number gathered | Number removed | Number treated |
|---|---|---|---|---|
| No management | 1.00 | 0 (0-0) | 0 (0-0) | 0 (0-0) |
| Removals | 1.00 | 2334 (2168-2513) | 2297 (2149-2464) | 0 (0-0) |
| GonaCon | 1.00 | 7250 (6412-7983) | 0 (0-0) | 3472 (3127-3867) |
| PZP-22 | 1.00 | 9891 (8496-11181) | 0 (0-0) | 4440 (4037-5022) |
| Removals and GonaCon | 1.00 | 2348 (2230-2443) | 2273 (2133-2384) | 42 (30-53) |
| Removals and PZP-22 | 1.00 | 2349 (2254-2437) | 2277 (2179-2370) | 40 (34-48) |

| Alternative | On-range cost ($ million) | Off-range cost ($ million) | Total cost ($ million) |
|---|---|---|---|
| No management | 0.00 (0.00-0.00) | 0.00 (0.00-0.00) | 0.00 (0.00-0.00) |
| Removals | 1.68 (1.54-1.81) | 17.62 (16.01-19.28) | 19.29 (17.55-21.09) |
| GonaCon | 5.40 (4.79-5.94) | 0.00 (0.00-0.00) | 5.40 (4.79-5.94) |
| PZP-22 | 7.77 (6.73-8.71) | 0.00 (0.00-0.00) | 7.77 (6.73-8.71) |
| Removals and GonaCon | 1.71 (1.63-1.77) | 17.42 (16.17-18.91) | 19.12 (17.80-20.67) |
| Removals and PZP-22 | 1.71 (1.65-1.77) | 17.41 (16.30-18.73) | 19.12 (17.96-20.50) |

CAL_09041

A graph of population size through time can be used to visualize effects of management alternatives on population size. Different colored lines indicate management alternatives simulated by the user; for each alternative, individual lines are different simulation replicates, that vary due to random chance. Dashed horizontal black lines indicate the minimum and maximum target population size range (i.e., AML).



4

CAL_09042

Individuals might be interested in identifying a management alternative(s) that achieves the reduction or maintenance of a population within the target population size range (i.e., AML) while also incurring lower direct costs relative to other options. We can visualize the relationship between predicted population size and direct costs of management by graphing the overall mean population size (number of horses) on the x-axis and total cost of management (millions of USD) on the y-axis predicted by each alternative. Points are mean predictions among replicates and are colored by scenario (as in in the first graph); horizontal and vertical lines from points represent 95% confidence intervals in predicted population size and cost, respectively, for each scenario. While this graph does not account for all factors that might be important during management decisions, the graph provides a useful illustration of the trade-off between predicted population size and total direct cost of management resulting from the simulated alternatives.



CAL_09043

**Summary**

The alternative that yielded the smallest average population size was:

```
## [1] "Removals and GonaCon" "Removals and PZP-22"
```

The alternative that incurred the lowest direct costs 'on range' (other than 'no management') over the next 10 years was:

```
## [1] "Removals"
```

The alternative that incurred the lowest total direct costs across the sum of 'on range' and 'off range' (other than 'no management') over the next 35 years was:

```
## [1] "GonaCon"
```

Among the alternatives that achieved population size within Appropriate Management Levels, the alternative that incurred the lowest total direct costs across the sum of 'on range' and 'off range':

```
## [1] "None"
```

Note: results from the simulations may not be the sole basis for a management decision. The model does not explicitly account for or consider multiple uses on public lands, local land use planning considerations, ecological costs of horses on ecosystems, or other important values. The results presented here reflect considerations related to population size, amount of management, and fiscal costs of management that were estimated, given the input parameters and alternatives specified.

CAL_09044

# *PopEquus* (1.0.2) Advanced Tool - Simulation Report

**25 July 2025 15:06:25**

## Population inputs

You used the *PopEquus* Advanced Tool to simulate a horse population that started with 12 horses, had a population sex ratio where 0.5 of the population is female, was censused at a time that foals were present (Yes), had a mean annual population growth rate of 15 percent per year, and a capture probability during management (e.g., helicopter gather) of 0.75. You assumed that the target population size range for the population (i.e., Appropriate Management Level) was 0-0 horses, that removals aimed for a target population size of 0, and that if the population decreased to beneath 30 horses that it would be at high risk of local extirpation. In summary:

- Population size: 12
- Female proportion of population: 0.5
- Foals included in population size? Yes
- Population growth rate (% increase per year): 15
- Capture proportion during gathers: 0.75
- Appropriate management level (minimum): 0
- Appropriate management level (maximum): 0
- Target population size: 0
- Persistence threshold (i.e., minimum number of individuals): 30

## Simulation inputs

You simulated populations over a 10-year projection interval, and you performed 10 replicate projections.

- Projection interval (years): 10
- Number of simulation replicates: 10

## Management alternatives

You simulated 6 management alternatives using the tool: **GonaCon, No management, PZP-22, Removals, Removals and GonaCon, Removals and PZP-22**.

The following settings were specified for management actions:

**Gather options**

- Short-term holding costs ($ per day): 7.61

**Removal options**

- Removal years: 1, 4, 7, 10
- Reactive removals: No
- Minimum gather interval (years) for a reactive removal: 2
- Selective removals: No
- Male proportion of population returned after a removal: 0.6
- Maximum number removed from the population per year: 1500
- Number of years to project holding population: 25
- Long-term holding costs ($ per day): 2.02
- Proportion of horses adopted per year: 0.69
- Net adoption cost to agency ($ per horse): 1775
- Breeding reduction (%) of removed females in captivity the first year after removal: 25

**GonaCon options**

- Treatment years: 1, 4, 7, 10
- Treatment ages: 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20

1

CAL_09045

- Treatment percentage (%) for age-eligible females: 100
- Treatment cost per shot ($): 50
- Hold to give booster treatment: Yes
- Days in holding until booster: 30

**PZP-22 options**

- Treatment years: 1, 4, 7, 10
- Treatment ages: 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20
- Treatment percentage (%) for age-eligible females: 100
- Primer treatment cost ($): 430
- Days in holding to receive treatment: 7
- Booster treatment cost ($): 30

CAL_09046

**Results**

Simulation outcomes can be summarized with a table(s) describing mean values among replicates for relevant metrics. Metrics include: population size in the final year of the projection interval ('Final population size'), average population size across all years ('Mean population size'), proportion of replicates that ended within the AML (i.e., the likelihood that an alternative yielded AML in the final year; 'AML probability'), proportion of replicates that ended above the persistence threshold ('Persistence probability'), total number of horses gathered ('Number gathered'), total number of horses removed ('Number removed'), total number of horses treated ('Number treated'), cost of management in the Herd Management Area (HMA) in millions of USD ['On-range cost ($ million)'], and total cost of management, including costs incurred at the HMA and in holding facilities ['Total cost ($ million)']. Values in parentheses are 95% confidence intervals.

| Alternative | Final population size | Overall mean population size | AML probability |
|---|---|---|---|
| No management | 32 (19-52) | 18 (11-25) | 0.00 |
| Removals | 37 (17-52) | 20 (10-28) | 0.00 |
| GonaCon | 9 (5-12) | 8 (6-10) | 0.00 |
| PZP-22 | 21 (11-30) | 14 (9-19) | 0.00 |
| Removals and GonaCon | 10 (7-14) | 9 (8-10) | 0.00 |
| Removals and PZP-22 | 17 (9-25) | 12 (8-16) | 0.00 |

| Alternative | Persistence probability | Number gathered | Number removed | Number treated |
|---|---|---|---|---|
| No management | 0.50 | 0 (0-0) | 0 (0-0) | 0 (0-0) |
| Removals | 0.80 | 0 (0-0) | 0 (0-0) | 0 (0-0) |
| GonaCon | 0.00 | 35 (26-39) | 0 (0-0) | 18 (13-23) |
| PZP-22 | 0.00 | 51 (36-69) | 0 (0-0) | 27 (18-33) |
| Removals and GonaCon | 0.00 | 36 (33-40) | 0 (0-0) | 20 (15-24) |
| Removals and PZP-22 | 0.00 | 44 (32-57) | 0 (0-0) | 23 (16-34) |

| Alternative | On-range cost ($ million) | Off-range cost ($ million) | Total cost ($ million) |
|---|---|---|---|
| No management | 0.00 (0.00-0.00) | 0.00 (0.00-0.00) | 0.00 (0.00-0.00) |
| Removals | 0.00 (0.00-0.00) | 0.00 (0.00-0.00) | 0.00 (0.00-0.00) |
| GonaCon | 0.04 (0.03-0.05) | 0.00 (0.00-0.00) | 0.04 (0.03-0.05) |
| PZP-22 | 0.07 (0.05-0.09) | 0.00 (0.00-0.00) | 0.07 (0.05-0.09) |
| Removals and GonaCon | 0.05 (0.04-0.05) | 0.00 (0.00-0.00) | 0.05 (0.04-0.05) |
| Removals and PZP-22 | 0.06 (0.04-0.07) | 0.00 (0.00-0.00) | 0.06 (0.04-0.07) |

CAL_09047

A graph of population size through time can be used to visualize effects of management alternatives on population size. Different colored lines indicate management alternatives simulated by the user; for each alternative, individual lines are different simulation replicates, that vary due to random chance. Dashed horizontal black lines indicate the minimum and maximum target population size range (i.e., AML).



CAL_09048

Individuals might be interested in identifying a management alternative(s) that achieves the reduction or maintenance of a population within the target population size range (i.e., AML) while also incurring lower direct costs relative to other options. We can visualize the relationship between predicted population size and direct costs of management by graphing the overall mean population size (number of horses) on the x-axis and total cost of management (millions of USD) on the y-axis predicted by each alternative. Points are mean predictions among replicates and are colored by scenario (as in in the first graph); horizontal and vertical lines from points represent 95% confidence intervals in predicted population size and cost, respectively, for each scenario. While this graph does not account for all factors that might be important during management decisions, the graph provides a useful illustration of the trade-off between predicted population size and total direct cost of management resulting from the simulated alternatives.



CAL_09049

**Summary**

The alternative that yielded the smallest average population size was:

```
## [1] "GonaCon"             "Removals and GonaCon"
```

The alternative that incurred the lowest direct costs 'on range' (other than 'no management') over the next 10 years was:

```
## [1] "Removals"
```

The alternative that incurred the lowest total direct costs across the sum of 'on range' and 'off range' (other than 'no management') over the next 35 years was:

```
## [1] "Removals"
```

Among the alternatives that achieved population size within Appropriate Management Levels, the alternative that incurred the lowest total direct costs across the sum of 'on range' and 'off range':

```
## [1] "None"
```

Note: results from the simulations may not be the sole basis for a management decision. The model does not explicitly account for or consider multiple uses on public lands, local land use planning considerations, ecological costs of horses on ecosystems, or other important values. The results presented here reflect considerations related to population size, amount of management, and fiscal costs of management that were estimated, given the input parameters and alternatives specified.

6

CAL_09050

**Nevada Noxious Weed List by Category**
Revised 2/2/21

## Category A Weeds:

*Category A noxious weeds are weeds that are generally not found or that are limited in distribution throughout the State.*

| | |
|---|---|
| African rue | *Peganum harmala* |
| Austrian fieldcress | *Rorippa austriaca* |
| Austrian peaweed | *Sphaerophysa salsula* |
| Barbed goatgrass | *Aegilops triuncialis* |
| Bufflegrass | *Pennisetum ciliare* |
| Camelthorn | *Alhagi pseudalhagi* |
| Common crupina | *Crupina vulgaris* |
| Curly-leaf pondweed | *Potamogton crispus* |
| Desert knapweed | *Volutaria tubuliflora* |
| Dyer's woad | *Isatis tinctoria* |
| Eurasian water-milfoil | *Myriophyllum spicatum* |
| Flowering rush | *Butomus umbellatus* |
| Giant salvinia | *Salvinia molesta* |
| Goats rue | *Galega officinalis* |
| Green foutain grass | *Pennisetum setaceum* |
| Houndstongue | *Cynoglossum officinale* |
| Hydrilla | *Hydrilla verticillata* |
| Iberian starthistle | *Centaurea iberica* |
| Jointed goatgrass | *Aegilops cylindrical* |
| Klamath weed | *Hypericum peerforatum* |
| Malta starthistle | *Centaurea melitensis* |
| Mediterranean sage | *Salvia aethiopis* |
| Purple loosestrife | *Lythrum salicaria* |
| Purple starthistle | *Centaurea calcitrapa* |
| Rush skeletonweed | *Chondrilla juncea* |
| Squarrose knapweed | *Centaurea virgata* |
| Sulfur cinquefoil | *Potentilla recta* |
| Syrian bean caper | *Zygophyllum fabago* |
| Ventenata | *Ventenata dubia* |
| Yellow starthistle | *Centaurea solstitialis* |
| Yellow toadflax | *Linaria vulgaris* |

## Category B Weeds:

*Category B listed noxious weeds are weeds that are generally established in scattered populations in some counties of the State.*

2300 East Saint Louis Ave
Las Vegas, NV 89104

405 South 21st St.
Sparks, NV 89431

4780 East Idaho St.
Elko, NV 89801

**agri.nv.gov**

page | 1

CAL_09051

| Black henbane | *Hysocyamus niger* |
| Carolina horse nettle | *Solanum carolinense* |
| Dalmation toadflax | *Linaria dalmatica* |
| Diffuse knapweed | *Centaurea diffusa* |
| Giant reed | *Arundo donax* |
| Leafy spurge | *Euphorbia esula* |
| Medusahead | *Taeniatherum caput-medusae* |
| Mayweed chamomile | *Anthemis cotula* |
| Perennial sowthistle | *Sonchus arvensis* |
| Sahara mustard | *Brassica tournefortii* |
| Silverleaf nightshade | *Solanum elaeagnifolium* |
| Spotted knapweed | *Centaurea maculosa* |

**Category C Weeds:**
*Category C listed noxious weeds are weeds that are generally established and generally widespread in many counties of the State.*

| Canada thistle | *Cirsium arvense* |
| Hoary cress | *Cardaria draba* |
| Johnson grass | *Sorghum halepense* |
| Musk thistle | *Caduus nutans* |
| Perennial pepperweed | *Lepidium latifolium* |
| Poison hemlock | *Conium maculatum* |
| Puncture vine | *Tribulus terrestris* |
| Russian knapweed | *Acroptilon repens* |
| Salt cedar | *Tamarix spp.* |
| Scotch thistle | *Onopordum acanthium* |
| Water hemlock | *Cicuta maculata* |

APPENDIX

Rangeland Health Standards Summary

Standard Determination Documents (SDDs) evaluate and Assess livestock grazing management practices, to determine whether those practices are conforming to standards and guidelines for rangeland health, as required by 43 C. F. R. Subpart 4180. These SDDs do not evaluate or assess achievement of the wild horse and burro standards but do provide insights into whether wild horses are contributing to non-attainment of overall standards during the livestock permit renewal process.

| HMA/HA | Allotment | Use Area | Rangeland Health Standards | Completion |
|---|---|---|---|---|
| Callaghan HMA | Austin | Boone Creek FFR | **Standard 1: Upland Sites;** Not achieving the Standards, not making significant progress towards. Livestock are a contributing factor to not meeting the standards. Other issues are contributing to failure to meet the standards. Both livestock and horses attribute to 62.7% of utilization of upland species which is above the objective of 50% utilization of upland species.<br>**Standard 2: Riparian Wetland;** Not achieving standards. Livestock is a contributing factor to riparian species degradation. Livestock and cattle attribute 62.7% greater than 30% vegetation reduction in riparian/ wetland areas.<br>**Standard 3: Habitat;** Not achieving the Standards, not making significant progress towards. Livestock are a contributing factor to not meeting the standards. Other issues are | 1994 |
| Callaghan HMA | Austin | Boone Creek FFR | contributing factor to not meeting the standards. Other issues are | 1994 |

CAL_09053

| Callaghan HMA | Austin | Carico Flat | contributing to failure to meet the standards. Both livestock and horses attribute to 62.7% of utilization of upland species which is above the objective of 50% utilization of upland species. | |
|---|---|---|---|---|
| | | Carico Flat | **Standard 1: Upland Sites;** Not achieving the Standards, not making significant progress towards. Livestock are a contributing factor to not meeting the standards. Other issues are contributing to failure to meet the standards. Both livestock and horses attribute to 62.7% of utilization of upland species which is above the objective of 50% utilization of upland species. | |
| | | | **Standard 2: Riparian Wetland;** Not achieving standards. Livestock is a contributing factor to riparian species degradation. Livestock and cattle attribute 62.7% greater than 30% vegetation reduction in riparian/ wetland areas. | |
| Callaghan HMA | Austin | Carico Flat | **Standard 3: Habitat;** Not achieving the Standards, not making significant progress towards. Livestock are a contributing factor to not meeting the standards. Other issues are contributing to failure to meet the standards. Both livestock and | 1994 |

CAL_09054

| | | | | |
|---|---|---|---|---|
| | | | horses attribute to 62.7% of utilization of upland species which is above the objective of 50% utilization of upland species. | |
| | | Elkhorn | **Standard 1: Upland Sites;** Not achieving the Standards, not making significant progress towards. Livestock are a contributing factor to not meeting the standards. Other issues are contributing to failure to meet the standards. Both livestock and horses attribute to 62.7% of utilization of upland species which is above the objective of 50% utilization of upland species. | |
| | | | **Standard 2: Riparian Wetland;** Not achieving standards. Livestock is a contributing factor to riparian species degradation. Livestock and cattle attribute 62.7% greater than 30% vegetation reduction in riparian/ wetland areas. | |
| | | | **Standard 3: Habitat;** Not achieving the Standards, not making significant progress towards. Livestock are a contributing factor to not meeting the standards. Other issues are contributing to failure to meet the standards. Both livestock and horses attribute to 62.7% of utilization of upland species which | |
| Callaghan HMA | Austin | Elkhorn | | 1994 |

CAL_09055

| Callaghan HMA | Austin | Mailbox | is above the objective of 50% utilization of upland species. | |
| | | | **Standard 1: Upland Sites;** Not achieving the Standards, not making significant progress towards. Livestock are a contributing factor to not meeting the standards. Other issues are contributing to failure to meet the standards. Both livestock and horses attribute to 62.7% of utilization of upland species which is above the objective of 50% utilization of upland species. | |
| | | Mailbox | **Standard 2: Riparian Wetland;** Not achieving standards. Livestock is a contributing factor to riparian species degradation. Livestock and cattle attribute 62.7% greater than 30% vegetation reduction in riparian/ wetland areas. | |
| | | | **Standard 3: Habitat;** Not achieving the Standards, not making significant progress towards. Livestock are a contributing factor to not meeting the standards. Other issues are contributing to failure to meet the standards. Both livestock and horses attribute to 62.7% of utilization of upland species which is above the objective of 50% utilization of upland species. | |
| Callaghan HMA | Austin | Mailbox | | 1994 |

CAL_09056

| | | | | |
|---|---|---|---|---|
| | | Mountain | **Standard 1: Upland Sites;** Not achieving the Standards, not making significant progress towards. Livestock are a contributing factor to not meeting the standards. Other issues are contributing to failure to meet the standards. Both livestock and horses attribute to 62.7% of utilization of upland species which is above the objective of 50% utilization of upland species. | |
| | | | **Standard 2: Riparian Wetland;** Not achieving standards. Livestock is a contributing factor to riparian species degradation. Livestock and cattle attribute 62.7% greater than 30% vegetation reduction in riparian/ wetland areas. | |
| | | | **Standard 3: Habitat;** Not achieving the Standards, not making significant progress towards. Livestock are a contributing factor to not meeting the standards. Other issues are contributing to failure to meet the standards. Both livestock and horses attribute to 62.7% of utilization of upland species which is above the objective of 50% utilization of upland species. | |
| Callaghan HMA | Austin | Mountain | | 1994 |
| | | Middle Italian | **Standard 1: Upland Sites;** Not achieving the Standards, not | |

CAL_09057

| | | | making significant progress towards. Livestock are a contributing factor to not meeting the standards. Other issues are contributing to failure to meet the standards. Both livestock and horses attribute to 62.7% of utilization of upland species which is above the objective of 50% utilization of upland species. | |
| | | | **Standard 2: Riparian Wetland;** Not achieving standards. Livestock is a contributing factor to riparian species degradation. Livestock and cattle attribute 62.7% greater than 30% vegetation reduction in riparian/ wetland areas. | |
| | | | **Standard 3: Habitat;** Not achieving the Standards, not making significant progress towards. Livestock are a contributing factor to not meeting the standards. Other issues are contributing to failure to meet the standards. Both livestock and horses attribute to 62.7% of utilization of upland species which is above the objective of 50% utilization of upland species. | |
| Callaghan HMA | Austin | Middle Italian | | 1994 |
| | | Upper Italian | **Standard 1: Upland Sites;** Not achieving the Standards, not making significant progress towards. Livestock are a | |

CAL_09058

| Callaghan HMA | | | contributing factor to not meeting the standards. Other issues are contributing to failure to meet the standards. Both livestock and horses attribute to 62.7% of utilization of upland species which is above the objective of 50% utilization of upland species. | |
| --- | --- | --- | --- | --- |
| | | | **Standard 2: Riparian Wetland;** Not achieving standards. Livestock is a contributing factor to riparian species degradation. Livestock and cattle attribute 62.7% greater than 30% vegetation reduction in riparian/ wetland areas. | |
| | Austin | Upper Italian | **Standard 3: Habitat;** Not achieving the Standards, not making significant progress towards. Livestock are a contributing factor to not meeting the standards. Other issues are contributing to failure to meet the standards. Both livestock and horses attribute to 62.7% of utilization of upland species which is above the objective of 50% utilization of upland species. | 1994 |
| | Carico Lake | Silver creek Ranch | **Standard 1: Upland Sites;** Not achieving the Standards. Livestock are a contributing factor to not meeting the standards. Other issues are contributing to the failure to meet the standards. Livestock and | 2005 |

CAL_09059

| | | | |
|---|---|---|---|
| | | | wild horses are a contributing issue in grass decrease. Shrub dominated communities when the land and standard are perennial grass dominate the landscape with one site carrying a significant increase in non-native/invasive grasses. | |
| | | | **Standard 2: Riparian Wetland;** Not achieving the standards, not making significant progress on stands. Livestock and wild horses are a contributing issue on not meeting the standards. Wild horse and livestock use of riparian-wetlands with loss of adequate vegetation to dissipate energy associated with high flows and water retention of water in both Lentic and lotic systems. 92 % or lentic and 55% of lotic are non-functional or downward trend. Livestock change of season of use and duration of use are necessary to improve riparian-wetland functioning condition. | |
| | | | **Standard 3: Habitat;** Not achieving the Standards. Livestock are a contributing factor to not meeting the standards. Other issues are contributing to the failure to meet the standards. Livestock and wild horses are a contributing issue in grass decrease. Shrub dominated | |

CAL_09060

| Grass Valley | Antelope | communities when the land and standard are perennial grass dominate the landscape with one site carrying a significant increase in non-native/invasive grasses. | |
| | | **Standard 1: Upland Sites;** Not achieving the standards, not making progress towards standards. Livestock and wild Horses are a contributing Issue to not achieving the standards. Other issues are contributing to not achieving standards. Livestock and wild horse population levels fail to maintain and promote upland vegetation species. They fail to maintain permeability, infiltration soil moisture storage, and soil stability appropriately for the soil standard. Perennial grass species are under the potential 40% standard with shrub dominance on site due to overgrazing by both livestock and wild horses contributing, Cheatgrass and other invasive plant species have replaced native perennial species on site. | 2002 |
| | | **Standard 2: Riparian Wetland;** Not achieving the standards, making significant progress towards riparian portion of standards, but no significant progress made towards wetland | |

CAL_09061

| | | | |
|---|---|---|---|
| | | | standards. Livestock are a contributing issue to not achieving standards. Other issues are contributing to not achieving standards. Livestock and wild horse populations are contributing to the degradation of large portions of riparian/wetland systems. Riparian/wetland vegetation damage due to trampling and hoof action by wild horses, and they were present on sites. Livestock and other issue contributed to decrease in riparian vegetation particularly willows and grasses leading to less recovery and streambank erosion in riparian systems. | |
| | | | **Standard 3: Habitat;** Not achieving the standards, not making progress towards standards. Livestock and wild Horses are a contributing Issue to not achieving the standards. Other issues are contributing to not achieving standards. Livestock and wild horse population levels fail to maintain and promote upland vegetation species. They fail to maintain permeability, infiltration soil moisture storage, and soil stability appropriately for the soil standard. Perennial grass species are under the potential 40% standard with | |

CAL_09062

| | | | shrub dominance on site due to overgrazing by both livestock and wild horses contributing, Cheatgrass and other invasive plant species have replaced native perennial species on site. | |
|---|---|---|---|---|
| | | Callaghan Mountain | **Standard 1: Upland Sites;** Not achieving the standards, not making progress towards standards. Livestock and wild Horses are a contributing Issue to not achieving the standards. Other issues are contributing to not achieving standards. Livestock and wild horse population levels fail to maintain and promote upland vegetation species. They fail to maintain permeability, infiltration soil moisture storage, and soil stability appropriately for the soil standard. Perennial grass species are under the potential 40% standard with shrub dominance on site due to overgrazing by both livestock and wild horses contributing, Cheatgrass and other invasive plant species have replaced native perennial species on site. | |
| | | | **Standard 2: Riparian Wetland;** Not achieving the standards, making significant progress towards riparian portion of standards, but no significant | |

CAL_09063

| | | | |
|---|---|---|---|
| | | | progress made towards wetland standards. Livestock are a contributing issue to not achieving standards.  Other issues are contributing to not achieving standards. Livestock and wild horse populations are contributing to the degradation of large portions of riparian/wetland systems. Riparian/ wetland vegetation damage due to trampling and hoof action by wild horses, and they were present on sites. Livestock and other issue contributed to decrease in riparian vegetation particularly willows and grasses leading to less recovery and streambank erosion in riparian systems. | |
| | | | **Standard 3: Habitat;** Not achieving the standards, not making progress towards standards. Livestock and wild Horses are a contributing Issue to not achieving the standards. Other issues are contributing to not achieving standards. Livestock and wild horse population levels fail to maintain and promote upland vegetation species. They fail to maintain permeability, infiltration soil moisture storage, and soil stability appropriately for the soil standard. Perennial grass species are under | |

CAL_09064

| | | | |
|---|---|---|---|
| | | | the potential 40% standard with shrub dominance on site due to overgrazing by both livestock and wild horses contributing, Cheatgrass and other invasive plant species have replaced native perennial species on site. | |
| | | Cowboy Flat | **Standard 1: Upland Sites;** Not achieving the standards, not making progress towards standards. Livestock and wild Horses are a contributing Issue to not achieving the standards. Other issues are contributing to not achieving standards. Livestock and wild horse population levels fail to maintain and promote upland vegetation species. They fail to maintain permeability, infiltration soil moisture storage, and soil stability appropriately for the soil standard. Perennial grass species are under the potential 40% standard with shrub dominance on site due to overgrazing by both livestock and wild horses contributing, Cheatgrass and other invasive plant species have replaced native perennial species on site. | |
| | | | **Standard 2: Riparian Wetland;** Not achieving the standards, making significant progress towards riparian portion of | |

CAL_09065

| | | | | |
|---|---|---|---|---|
| | | | standards, but no significant progress made towards wetland standards. Livestock are a contributing issue to not achieving standards. Other issues are contributing to not achieving standards. Livestock and wild horse populations are contributing to the degradation of large portions of riparian/wetland systems. Riparian/ wetland vegetation damage due to trampling and hoof action by wild horses, and they were present on sites. Livestock and other issue contributed to decrease in riparian vegetation particularly willows and grasses leading to less recovery and streambank erosion in riparian systems. | |
| | | | **Standard 3: Habitat;** Not achieving the standards, not making progress towards standards. Livestock and wild Horses are a contributing Issue to not achieving the standards. Other issues are contributing to not achieving standards. Livestock and wild horse population levels fail to maintain and promote upland vegetation species. They fail to maintain permeability, infiltration soil moisture storage, and soil stability appropriately for the soil standard. | |

CAL_09066

| | | | |
|---|---|---|---|
| | | Perennial grass species are under the potential 40% standard with shrub dominance on site due to overgrazing by both livestock and wild horses contributing, Cheatgrass and other invasive plant species have replaced native perennial species on site. | |
| Mount Airy | N Gandolfo Triangle | **Standard 1: Upland Sites;** Standards have not been done or completed.<br>**Standard 2: Riparian Wetland;** Standards have not been done or completed.<br>**Standard 3: Habitat;** Standards have not been done or completed. | N/A |
| Simpson Park | Willow/Barton | **Standard 1: Upland Sites;** Achieving the standards. Livestock is a contributing issue to meeting of the standards. Other issues are a contributing to achieving the standards. Ecological site and soils contribute to meeting standards through slow and low permeable soils and shallow soils on the site. Vegetation and ground cover with grasses, forbs, and shrubs contributing to meeting the standards. Cheatgrass and invasive species in the future could have an impact on achieve the standards.<br>**Standard 2: Riparian Wetland;** Not achieving the standards, no | 2005 |

CAL_09067

| | | | significant progress being made. Livestock and wild horses from Callaghan HMA are a contributing issue to not meeting standards Loss of riparian habitat due to loss of vegetation, hummocking, stunted growth of vegetation bare, and compacted soil contribute to not meeting stands. The non-attainment of PFC on 60% of lotic and 65% or lentic site. Chemical, Biological, and physical water constituents would not exceed the water quality stands for use. | |
| | | | **Standard 3: Habitat;** Not achieving the standards, no significant progress being made. Livestock and wild horses from Callaghan HMA are a contributing issue to not meeting standards. Shrubs dominate pasture with low amount of perennial grass and forbs 8-19% grasses and 0.4-5 precent forbs) generate low amounts of cover and nesting habitat for small mammals, small birds, and sage grouse. The perennial grasses with first and second perennial key gasses are in small percentages lowering habitat cover, nesting habitat, and forage. The low percentage of grasses and forbs considered to me more important | |

CAL_09068

| | | | | |
|---|---|---|---|---|
| | | | for sage grouse nest success due to species providing scent, visual, and physical barriers to predators impacts nesting habitat. The shrub composition of 90% dominated generates inadequate seeding and nesting habitat for small mammals, and birds. | |
| | | Lake Ranch | **Standard 1: Upland Sites;** Achieving the standards. Livestock is a contributing issue to meeting of the standards. Other issues are a contributing to achieving the standards. Vegetation and ground cover with grasses, forbs, and shrubs contributing to meeting the standards. Cheatgrass and invasive species in the future could have an impact on achieve the standards | |
| | Simpson Park | Lake Ranch | **Standard 2: Riparian Wetland;** Not achieving the standards, no significant progress being made. Livestock and wild horses from Callaghan HMA are a contributing issue to not meeting standards Loss of riparian habitat due to loss of vegetation, hummocking, stunted growth of vegetation bare, and compacted soil contribute to not meeting stands. The non-attainment of PFC on 60% of lotic and 65% or lentic site. Chemical, Biological, and physical water constituents | 2005 |

CAL_09069

| | | | |
|---|---|---|---|
| | | | would not exceed the water quality stands for use. |
| | | | **Standard 3: Habitat;** Not achieving the standards, no significant progress being made. Livestock and wild horses from Callaghan HMA are a contributing issue to not meeting standards other issues are contributing issues to not meeting standards. The vegetative community low percentage of Perennial Grasses and forbs combined to be 10% (grasses 9%and forbs 1%) with insufficient Indian ricegrass and perennial forbs reduces the habitat for pronghorn, whitetail deer and sage grouse. The percentage cover at 32.8% is half the cover required for pronghorn habitat and the coverage precent may not be appreciate for sage grouse breeding and nesting habitat. The low percentage of grasses and forbs considered to me more important for sage grouse nest success due to species providing scent, visual, and physical barriers to predators impacts nesting habitat. The shrub composition of 90% dominated generates inadequate seeding and nesting habitat for small mammals, and birds. |

CAL_09070

| Bald Mountain HMA | Austin | Carico Flat | **Standard 1: Upland Sites;** Not achieving the Standards, not making significant progress towards. Livestock are a contributing factor to not meeting the standards. Other issues are contributing to failure to meet the standards. Both livestock and horses attribute to 62.7% of utilization of upland species which is above the objective of 50% utilization of upland species. | 1994 |
| | | | **Standard 2: Riparian Wetland;** Not achieving standards. Livestock is a contributing factor to riparian species degradation. Livestock and cattle attribute 62.7% greater than 30% vegetation reduction in riparian/ wetland areas. | |
| | | | **Standard 3: Habitat;** Not achieving the Standards, not making significant progress towards. Livestock are a contributing factor to not meeting the standards. Other issues are contributing to failure to meet the standards. Both livestock and horses attribute to 62.7% of utilization of upland species which is above the objective of 50% utilization of upland species. | |
| | | Mountain | **Standard 1: Upland Sites;** Not achieving the Standards, not | |

CAL_09071

| | | | | |
|---|---|---|---|---|
| | | | making significant progress towards. Livestock are a contributing factor to not meeting the standards. Other issues are contributing to failure to meet the standards. Both livestock and horses attribute to 62.7% of utilization of upland species which is above the objective of 50% utilization of upland species. | |
| | | | **Standard 2: Riparian Wetland;** Not achieving standards. Livestock is a contributing factor to riparian species degradation. Livestock and cattle attribute 62.7% greater than 30% vegetation reduction in riparian/ wetland areas. | |
| | | | **Standard 3: Habitat;** Not achieving the Standards, not making significant progress towards. Livestock are a contributing factor to not meeting the standards. Other issues are contributing to failure to meet the standards. Both livestock and horses attribute to 62.7% of utilization of upland species which is above the objective of 50% utilization of upland species. | |
| | Carico Lake | Carico Lake Valley | **Standard 1: Upland Sites;** Not achieving the Standards, not making progress on standards. Livestock are a contributing Issue | 2005 |

CAL_09072

| | | | | |
|---|---|---|---|---|
| | | | on upland species. Other issues are a contributing to failure to meet the standards. Annual species and invasive grasses are abundant throughout sites and perennial species are in trace or absent from sites with composition of perennial grasses. | |
| | | | **Standard 2: Riparian Wetland;** Not achieving the standards, not making significant progress on stands. Livestock and wild horses are a contributing issue on not meeting the standards. Wild horse and livestock use of riparian-wetlands with loss of adequate vegetation to dissipate energy associated with high flows and water retention of water in both Lentic and lotic systems. 92 % or lentic and 55% of lotic are non-functional or downward trend. Livestock change of season of use and duration of use are necessary to improve riparian-wetland functioning condition. | |
| | | | **Standard 3: Habitat;** Not achieving the Standards, not making progress on standards. Livestock are a contributing Issue on upland species. Other issues are a contributing to failure to meet the standards. Annual species and | |

CAL_09073

| | | | |
|---|---|---|---|
| | | | invasive grasses are abundant throughout sites and perennial species are in trace or absent from sites with composition of perennial grasses. |
| | | Cortez Joint Venture | **Standard 1: Upland Sites;** Not achieving the Standards, not making progress on standards. Livestock are a contributing Issue on upland species. Other issues are a contributing to failure to meet the standards. Annual species and invasive grasses are abundant throughout sites and perennial species are in trace or absent from sites with composition of perennial grasses. |
| | | | **Standard 2: Riparian Wetland;** Not achieving the standards, not making significant progress on stands. Livestock and wild horses are a contributing issue on not meeting the standards. Wild horse and livestock use of riparian-wetlands with loss of adequate vegetation to dissipate energy associated with high flows and water retention of water in both Lentic and lotic systems. 92 % or lentic and 55% of lotic are non-functional or downward trend. Livestock change of season of use and duration of use are necessary to |

CAL_09074

| | | | |
|---|---|---|---|
| | | | improve riparian-wetland functioning condition. |
| | | | **Standard 3: Habitat;** Not achieving the Standards, not making progress on standards. Livestock are a contributing Issue on upland species. Other issues are a contributing to failure to meet the standards. Annual species and invasive grasses are abundant throughout sites and perennial species are in trace or absent from sites with composition of perennial grasses. |
| | | Silver Creek Ranch | **Standard 1: Upland Sites;** Not achieving the Standards. Livestock are a contributing factor to not meeting the standards. Other issues are contributing to the failure to meet the standards. Livestock and wild horses are a contributing issue in grass decrease. Shrub dominated communities when the land and standard are perennial grass dominate the landscape with one site carrying a significant increase in non-native/invasive grasses. |
| | | | **Standard 2: Riparian Wetland;** Not achieving the standards, not making significant progress on stands. Livestock and wild horses are a contributing issue on not meeting the standards. Wild horse |

CAL_09075

| | | | |
|---|---|---|---|
| | | | and livestock use of riparian-wetlands with loss of adequate vegetation to dissipate energy associated with high flows and water retention of water in both Lentic and lotic systems. 92 % or lentic and 55% of lotic are non-functional or downward trend. Livestock change of season of use and duration of use are necessary to improve riparian-wetland functioning condition. |
| | | | **Standard 3: Habitat;** Not achieving the Standards. Livestock are a contributing factor to not meeting the standards. Other issues are contributing to the failure to meet the standards. Livestock and wild horses are a contributing issue in grass decrease. Shrub dominated communities when the land and standard are perennial grass dominate the landscape with one site carrying a significant increase in non-native/invasive grasses. |
| | | Toiyabe Flat | **Standard 1: Upland Sites;** Not achieving the Standards. Livestock are a contributing factor to not meeting the standards. Other issues are contributing to the failure to meet the standards. Livestock and wild horses are a contributing issue in grass decrease. Shrub dominated |

| | | | |
|---|---|---|---|
| | | | communities when the land and standard are perennial grass dominate the landscape. |
| | | | **Standard 2: Riparian Wetland;** Not achieving the standards, not making significant progress on stands. Livestock and wild horses are a contributing issue on not meeting the standards. Wild horse and livestock use of riparian-wetlands with loss of adequate vegetation to dissipate energy associated with high flows and water retention of water in both Lentic and lotic systems. 92 % or lentic and 55% of lotic are non-functional or downward trend. Livestock change of season of use and duration of use are necessary to improve riparian-wetland functioning condition. |
| | | | **Standard 3: Habitat;** Not achieving the Standards. Livestock are a contributing factor to not meeting the standards. Other issues are contributing to the failure to meet the standards. Livestock and wild horses are a contributing issue in grass decrease. Shrub dominated communities when the land and standard are perennial grass dominate the landscape. |

CAL_09077

| | | | |
|---|---|---|---|
| | | Toiyabe Mountain | **Standard 1: Upland Sites;** Not achieving the Standards. Livestock are a contributing factor to not meeting the standards. Other issues are contributing to the failure to meet the standards. Livestock and wild horses are a contributing issue in grass decrease. Shrub dominated communities when the land and standard are perennial grass dominate the landscape with one site carrying a significant increase in non-native/invasive grasses. |
| | | | **Standard 2: Riparian Wetland;** Not achieving the standards, not making significant progress on stands. Livestock and wild horses are a contributing issue on not meeting the standards. Wild horse and livestock use of riparian-wetlands with loss of adequate vegetation to dissipate energy associated with high flows and water retention of water in both Lentic and lotic systems. 92 % or lentic and 55% of lotic are non-functional or downward trend. Livestock change of season of use and duration of use are necessary to improve riparian-wetland functioning condition. |
| | | | **Standard 3: Habitat;** Not achieving the Standards. Livestock |

| | | | | |
|---|---|---|---|---|
| | | | are a contributing factor to not meeting the standards. Other issues are contributing to the failure to meet the standards. Livestock and wild horses are a contributing issue in grass decrease. Shrub dominated communities when the land and standard are perennial grass dominate the landscape with one site carrying a significant increase in non-native/invasive grasses. | |
| Bald Mountain HMA | Grass Valley | Callahan Mountain | **Standard 1: Upland Sites;** Not achieving the standards, not making progress towards standards. Livestock and wild Horses are a contributing Issue to not achieving the standards. Other issues are contributing to not achieving standards. Livestock and wild horse population levels fail to maintain and promote upland vegetation species. They fail to maintain permeability, infiltration soil moisture storage, and soil stability appropriately for the soil standard. Perennial grass species are under the potential 40% standard with shrub dominance on site due to overgrazing by both livestock and wild horses contributing, Cheatgrass and other invasive plant species have replaced native perennial species on site. | 2002 |

CAL_09079

| | | | |  |
|---|---|---|---|---|
| | | | **Standard 2: Riparian Wetland;** Not achieving the standards, making significant progress towards riparian portion of standards, but no significant progress made towards wetland standards. Livestock are a contributing issue to not achieving standards. Other issues are contributing to not achieving standards. Livestock and wild horse populations are contributing to the degradation of large portions of riparian/wetland systems. Riparian/ wetland vegetation damage due to trampling and hoof action by wild horses, and they were present on sites. Livestock and other issue contributed to decrease in riparian vegetation particularly willows and grasses leading to less recovery and streambank erosion in riparian systems. | |
| | | | **Standard 3: Habitat;** Not achieving the standards, not making progress towards standards. Livestock and wild Horses are a contributing Issue to not achieving the standards. Other issues are contributing to not achieving standards. Livestock and wild horse population levels fail to maintain and promote upland vegetation | |

CAL_09080

| | | | |
|---|---|---|---|
| | | | species. They fail to maintain permeability, infiltration soil moisture storage, and soil stability appropriately for the soil standard. Perennial grass species are under the potential 40% standard with shrub dominance on site due to overgrazing by both livestock and wild horses contributing, Cheatgrass and other invasive plant species have replaced native perennial species on site. | |
| | | Cowboy Flat | **Standard 1: Upland Sites;** Not achieving the standards, not making progress towards standards. Livestock and wild Horses are a contributing Issue to not achieving the standards. Other issues are contributing to not achieving standards. Livestock and wild horse population levels fail to maintain and promote upland vegetation species. They fail to maintain permeability, infiltration soil moisture storage, and soil stability appropriately for the soil standard. Perennial grass species are under the potential 40% standard with shrub dominance on site due to overgrazing by both livestock and wild horses contributing, Cheatgrass and other invasive plant | |

CAL_09081

Case 3:26-cv-00423-MMD-CSD    Document 24-4    Filed 06/10/26    Page 223 of 336

| | | | |
|---|---|---|---|
| | | | species have replaced native perennial species on site. |
| | | | **Standard 2: Riparian Wetland;** Not achieving the standards, making significant progress towards riparian portion of standards, but no significant progress made towards wetland standards. Livestock are a contributing issue to not achieving standards. Other issues are contributing to not achieving standards. Livestock and wild horse populations are contributing to the degradation of large portions of riparian/wetland systems. Riparian/ wetland vegetation damage due to trampling and hoof action by wild horses, and they were present on sites. Livestock and other issue contributed to decrease in riparian vegetation particularly willows and grasses leading to less recovery and streambank erosion in riparian systems. |
| | | | **Standard 3: Habitat;** Not achieving the standards, not making progress towards standards. Livestock and wild Horses are a contributing Issue to not achieving the standards. Other issues are contributing to not achieving standards. Livestock and wild horse |

| HMA | Field Office | Allotment | Standards | Year |
|---|---|---|---|---|
| | | | population levels fail to maintain and promote upland vegetation species. They fail to maintain permeability, infiltration soil moisture storage, and soil stability appropriately for the soil standard. Perennial grass species are under the potential 40% standard with shrub dominance on site due to overgrazing by both livestock and wild horses contributing, Cheatgrass and other invasive plant species have replaced native perennial species on site. | |
| South Shoshone HMA | Austin | Cedars | **Standard 1: Upland Sites;** Not achieving the Standards, not making significant progress towards. Livestock are a contributing factor to not meeting the standards. Other issues are contributing to failure to meet the standards. Both livestock and horses attribute to 62.7% of utilization of upland species which is above the objective of 50% utilization of upland species.<br>**Standard 2: Riparian Wetland;** Not achieving standards. Livestock is a contributing factor to riparian species degradation. Livestock and cattle attribute 62.7% greater than 30% vegetation reduction in riparian/ wetland areas. | 1994 |

CAL_09083

| | | | | |
|---|---|---|---|---|
| | | | **Standard 3: Habitat;** Not achieving the Standards, not making significant progress towards. Livestock are a contributing factor to not meeting the standards. Other issues are contributing to failure to meet the standards. Both livestock and horses attribute to 62.7% of utilization of upland species which is above the objective of 50% utilization of upland species. | |
| | | Cedars | **Standard 1: Upland Sites;** Not done on Cedars Pasture. | |
| | | | **Standard 2: Riparian Wetland;** Not done on Cedars Pasture. | |
| | | | **Standard 3: Habitat;** Not done on Cedars Pasture. | |
| | Carico Lake | Cedars 1 | **Standard 1: Upland Sites;** Not achieving the standards, not making significant progress. Livestock and wildfire are a contributing issue on not meeting the standards. Other issues are contributing not achieving the standards. Shrubs present, but sparse from the area due to wildfire. The pasture is not making progress to   significant progress to meeting standards with 75% invasive annual grasses with no forbs. The pasture does not have adequate vegetation cover to promote infiltration and | 2005 |

CAL_09084

| | | | permeability, and it does not have adequate deep rooted perennial grasses, forbs, or shrubs to protect the soil. | |
| --- | --- | --- | --- | --- |
| | | | **Standard 2: Riparian Wetland;** Not achieving the standards, not making significant progress on stands. Livestock and wild horses are a contributing issue on not meeting the standards. Wild horse and livestock use of riparian-wetlands with loss of adequate vegetation to dissipate energy associated with high flows and water retention of water in both Lentic and lotic systems. 92 % or lentic and 55% of lotic are non-functional or downward trend. Livestock change of season of use and duration of use are necessary to improve riparian-wetland functioning condition. | |
| | | | **Standard 3: Habitat;** Not achieving the standards, not making significant progress. Livestock and wildfire are a contributing issue on not meeting the standards. Other issues are contributing not achieving the standards. Shrubs are present, but sparse missing from the area due to wildfire. The pasture is not making progress to significant progress to meeting standards with | |

CAL_09085

| | | | | |
|---|---|---|---|---|
| | | | 75% invasive annual grasses with no forbs. The pasture does not have adequate vegetation cover to promote infiltration and permeability. The composition and production of vegetation with the invasive Species is threatening the integrity of the biotic community ion the pasture. Diversity of the vegetation are limiting the range of diverse habitat for small mammals, small birds, hawks, Falcons, burrowing owls, and eagles. The lack of perennial grasses and forbs provide insufficient forage for pronghorn lactation and gestation. | |
| | | Cedars North 1 | **Standard 1: Upland Sites;** Not done on Cedar North 1 Pasture. | |
| | | | **Standard 2: Riparian Wetland;** Not done on Cedar North 1 Pasture. | |
| South Shoshone HMA | Carico Lake | | **Standard 3: Habitat;** Not done on Cedar North 1 Pasture. | |
| | | Cedars South | **Standard 1: Upland Sites;** Not achieving not making significant progress. Wildfire, Livestock, and wild horses are a contributing issue on not meeting standards. Shrub including shadscale and bud sagebrush absent with excessive composition of invasive species infiltration and permeability are being inhibited on the pasture. Forage kochia is present with an | 2005 |

CAL_09086

| | | | |
|---|---|---|---|
| | | | increase in vegetation cover and reduction in annual species would be necessary to ensure that the standard is attained. |
| | | | **Standard 2: Riparian Wetland;** Not achieving the standards, not making significant progress on stands. Livestock and wild horses are a contributing issue on not meeting the standards. Wild horse and livestock use of riparian-wetlands with loss of adequate vegetation to dissipate energy associated with high flows and water retention of water in both Lentic and lotic systems. 92 % or lentic and 55% of lotic are non-functional or downward trend. Livestock change of season of use and duration of use are necessary to improve riparian-wetland functioning condition. |
| | | | **Standard 3: Habitat;** Meeting the standards. Forage The pasture primarily consisting of forage kochia with perennial grasses is adequate desirable forage for livestock, pronghorn, and non-game wildlife use. The composition of forage kochia would be utilized by pronghorn throughout the year, and by mule deer during spring and winter. The composition would be |

CAL_09087

| | | | adequate in providing habitat in providing habitat for small mammals and birds but may not meet the requirements of species requiring a diverse native herbaceous plant community. The pasture is functioning at risk with the current vegetation community. | |
| --- | --- | --- | --- | --- |
| | | Carico Lake Valley | **Standard 1: Upland Sites;** Not achieving the Standards, not making progress on standards. Livestock are a contributing Issue on upland species. Other issues are a contributing to failure to meet the standards. Annual species and invasive grasses are abundant throughout sites and perennial species are in trace or absent from sites with composition of perennial grasses. | |
| | | | **Standard 2: Riparian Wetland;** Not achieving the standards, not making significant progress on stands. Livestock and wild horses are a contributing issue on not meeting the standards. Wild horse and livestock use of riparian-wetlands with loss of adequate vegetation to dissipate energy associated with high flows and water retention of water in both Lentic and lotic systems. 92 % or lentic and 55% of lotic are non- | |

CAL_09088

| | | | |
|---|---|---|---|
| | | | functional or downward trend. Livestock change of season of use and duration of use are necessary to improve riparian-wetland functioning condition. |
| | | | **Standard 3: Habitat;** Not achieving the Standards, not making progress on standards. Livestock are a contributing Issue on upland species. Other issues are a contributing to failure to meet the standards. Annual species and invasive grasses are abundant throughout sites and perennial species are in trace or absent from sites with composition of perennial grasses. |
| | | Dolby George | **Standard 1: Upland Sites;** Not achieving the standards, making progress toward standards. Livestock is a contributing issue on upland species. Other issues are contributing. Area is low or sparse in key species understory grasses and slightly shrub dominated. Perennial grasses that consist of understory are there, but they are in limited or sparse throughout. |
| | | | **Standard 2: Riparian Wetland;** Not achieving the standards, not making significant progress on stands. Livestock and wild horses are a contributing issue on not |

CAL_09089

| | | | |
|---|---|---|---|
| | | | meeting the standards. Wild horse and livestock use of riparian-wetlands with loss of adequate vegetation to dissipate energy associated with high flows and water retention of water in both Lentic and lotic systems. 92 % or lentic and 55% of lotic are non-functional or downward trend. Livestock change of season of use and duration of use are necessary to improve riparian-wetland functioning condition. | |
| | | | **Standard 3: Habitat;** Not achieving the standards, making progress toward standards. Livestock is a contributing issue on upland species. Other issues are contributing. Area is low or sparse in key species understory grasses and slightly shrub dominated. Perennial grasses that consist of understory are there, but they are in limited or sparse throughout. | |
| | | Harry Canyon Use Area | **Standard 1: Upland Sites;** Not achieving the Standards, not making progress on standards. Livestock are a contributing Issue on upland species. Other issues are a contributing to failure to meet the standards. Annual species and invasive grasses are abundant throughout sites and perennial | |

| | | | | |
|---|---|---|---|---|
| | | | species are in trace or absent from sites with composition of perennial grasses. | |
| | | | **Standard 2: Riparian Wetland;** Not achieving the standards, not making significant progress on stands. Livestock and wild horses are a contributing issue on not meeting the standards. Wild horse and livestock use of riparian-wetlands with loss of adequate vegetation to dissipate energy associated with high flows and water retention of water in both Lentic and lotic systems. 92 % or lentic and 55% of lotic are non-functional or downward trend. Livestock change of season of use and duration of use are necessary to improve riparian-wetland functioning condition. | |
| | | | **Standard 3: Habitat;** Not achieving the Standards, not making progress on standards. Livestock are a contributing Issue on upland species. Other issues are a contributing to failure to meet the standards. Annual species and invasive grasses are abundant throughout sites and perennial species are in trace or absent from sites with composition of perennial grasses. | |

CAL_09091

| | | Moss Fire Use Area | **Standard 1: Upland Sites;** Not achieving the standards, not making progress towards standards. Livestock are a contributing issue to not meeting standards. Other issues are contributing factor. A wildfire in 1985 contributed to loss of mot perennial grasses and shrubs. Annual grasses such as cheatgrass has taken over the area and it is slowly recovering to meet standards. | |
| --- | --- | --- | --- | --- |
| | | | **Standard 2: Riparian Wetland;** Not achieving the standards, not making significant progress on stands. Livestock and wild horses are a contributing issue on not meeting the standards. Wild horse and livestock use of riparian-wetlands with loss of adequate vegetation to dissipate energy associated with high flows and water retention of water in both Lentic and lotic systems. 92 % or lentic and 55% of lotic are non-functional or downward trend. Livestock change of season of use and duration of use are necessary to improve riparian-wetland functioning condition. | |
| | | | **Standard 3: Habitat;** Not achieving the standards, not making progress towards standards. | |

CAL_09092

| | | | |
|---|---|---|---|
| | | | Livestock are a contributing issue to not meeting standards. Other issues are contributing factor. A wildfire in 1985 contributed to loss of mot perennial grasses and shrubs. Annual grasses such as cheatgrass has taken over the area and it is slowly recovering to meet standards. | |
| | | Shoshone Mountain | **Standard 1: Upland Sites;** Achieving the standards, livestock are a contributing issue to achieving the Standards. Livestock and horses are a contributing factor to meeting standards. Some areas are at risk of not achieving or at risk due to annual grass production over perennial production | |
| | | | **Standard 2: Riparian Wetland;** Not achieving the standards, not making significant progress on stands. Livestock and wild horses are a contributing issue on not meeting the standards. Wild horse and livestock use of riparian-wetlands with loss of adequate vegetation to dissipate energy associated with high flows and water retention of water in both Lentic and lotic systems. 92 % or lentic and 55% of lotic are non-functional or downward trend. Livestock change of season of use | |

CAL_09093

| | | | | |
|---|---|---|---|---|
| | | | and duration of use are necessary to improve riparian-wetland functioning condition. | |
| | | | **Standard 3: Habitat;** Achieving the standards, livestock are a contributing issue to achieving the Standards. Livestock and horses are a contributing factor to meeting standards. Some areas are at risk of not achieving or at risk due to annual grass production over | |
| North Shoshone HA | Carico Lake | Dolby George | **Standard 1: Upland Sites;** Not achieving the standards, making progress toward standards. Livestock are a contributing issue on upland species. Other issues are contributing. Area is low or sparse in key species understory grasses and slightly shrub dominated. Perennial grasses that consist of understory are there, but they are in limited or sparse throughout. | 2005 |
| | | | **Standard 2: Riparian Wetland;** Not achieving the standards, not making significant progress on stands. Livestock and wild horses are a contributing issue on not meeting the standards. Wild horse and livestock use of riparian-wetlands with loss of adequate vegetation to dissipate energy associated with high flows and water retention of water in both | |

CAL_09094

| | | | |
|---|---|---|---|
| | | | Lentic and lotic systems. 92 % or lentic and 55% of lotic are non-functional or downward trend. Livestock change of season of use and duration of use are necessary to improve riparian-wetland functioning condition. |
| | | | **Standard 3: Habitat;** Not achieving the standards, making progress toward standards. Livestock is a contributing issue on upland species. Other issues are contributing. Area is low or sparse in key species understory grasses and slightly shrub dominated. Perennial grasses that consist of understory are there, but they are in limited or sparse throughout. |
| | | Cortez Joint Venture | **Standard 1: Upland Sites;** Not achieving the Standards, not making progress on standards. Livestock are a contributing Issue on upland species. Other issues are a contributing to failure to meet the standards. Annual species and invasive grasses are abundant throughout sites and perennial species are in trace or absent from sites with composition of perennial grasses. |
| | | | **Standard 2: Riparian Wetland;** Not achieving the standards, not making significant progress on |

CAL_09095

| North Shoshone HA | Carico Lake | Cortez Joint Venture | stands. Livestock and wild horses are a contributing issue on not meeting the standards. Wild horse and livestock use of riparian-wetlands with loss of adequate vegetation to dissipate energy associated with high flows and water retention of water in both Lentic and lotic systems. 92 % or lentic and 55% of lotic are non-functional or downward trend. Livestock change of season of use and duration of use are necessary to improve riparian-wetland functioning condition. | |
| --- | --- | --- | --- | --- |
| North Shoshone HA | Carico Lake | Cortez Joint Venture | **Standard 3: Habitat;** Not achieving the Standards, not making progress on standards. Livestock are a contributing Issue on upland species. Other issues are a contributing to failure to meet the standards. Annual species and invasive grasses are abundant throughout sites and perennial species are in trace or absent from sites with composition of perennial grasses. | 2005 |

CAL_09096

## Appendix XI: Sensitive Species, Special Status Species, Threatened and Endangered Species

All species listed here are Nevada BLM Sensitive Species as designated by the BLM State Director and are identified on the State Director's list as occurring in the Battle Mountain District, as of September 2023. Criteria set forth in the BLM 6840 Manual for designating sensitive species are:

1. Species designated as Bureau sensitive must be native species found on BLM administrated lands for which BLM has the capability to significantly affect the conservation status of the species through management, and either:
    a. There is information that a species has recently undergone, is undergoing, or is predicted to undergo a downward trend such that the viability of the species or a distinct population segment of the species is at risk across all or a significant portion of the species range, or
    b. The species depends on ecological refugia or specialized or unique habitats on BLM-administered lands, and there is evidence that such areas are threatened with alteration such that the continued viability of the species in that area would be at risk.
2. All federally designated candidate species, proposed species, and delisted species in the 5 years following their delisting shall be conserved as Bureau sensitive species.

Species listed by U.S. Fish and Wildlife Service under the Endangered Species Act are identified in the first part of the table below (all are also Nevada BLM Sensitive species).

**Table 1. Battle Mountain District Endangered and Threatened Species List**

| Battle Mountain District *Endangered and Threatened* Species List | | |
|---|---|---|
| **Amphibian Common Name** | **Scientific Name** | **Federal Listing and Critical Habitat Status** |
| Dixie Valley Toad | *Anaxyrus nevadensis* | Endangered |
| **Bird Common Name (3)** | **Scientific Name** | **Federal Status** |
| Greater Sage-grouse | *Centrocercus urophasianus* | Proposed threatened |
| Western Yellow-billed Cuckoo | *Coccyzus americanus occidentalis* | Threatened |
| Southwestern Willow Flycatcher | *Empidonax trailii extimus* | Endangered, Critical Habitat |
| Ridgway's Rail (Yuma clapper rail) | *Rallus obsoletus yumanensis* | Endangered |
| **Plants Common Name (4)** | **Scientific Name** | **Federal Status** |
| Ash Meadows Sunray | *Enceliopsis nudicaulis var. corrugata* | Threatented, Critical Habitat |
| Spring-loving Centaury | *Centarium namophilum* | Threatened |
| Tiehm's Buckwheat | *Eriogonum tiehmii* | Endangered, Critical Habitat |
| Ash Meadows Mousetails | *Ivesia kingii var. eremica* | Threatened, Critical Habitat |
| **Reptile Common Name (1)** | **Scientific Name** | **Federal Status** |
| Mojave Desert Tortoise | *Gopherus agassizii* | Threatened, Critical Habitat |
| **Fish Common Name (3)** | **Scientific Name** | **Federal Status** |
| Railroad Valley Springfish | *Crenichthys nevadae* | Threatened, Critical Habitat |
| Moapa Dace | *Moapa coriacea* | Endangered |

CAL_09097

| Lahontan Cutthroat Trout | *Oncorhynchus clarkii henshawi* | Threatened |
|---|---|---|
| **Insect Common Name** | **Scientific Name** | **Federal Status** |
| Monarch butterfly | *Danaus plexippus plexippus* | Candidate |

**Table 2. US Fish and Wildlife Service (USFWS) Listing Definitions**

| Status | Definition |
|---|---|
| **Endangered** | Listed by the USFWS as endangered under the Endangered Species Act (ESA) as a species which is in danger of extinction throughout all or a significant portion of its range. |
| **Threatened** | Listed by the USFWS as threatened under the Endangered Species Act (ESA) as a species which is likely to become endangered within the foreseeable future throughout all or a significant portion of its range. |
| **Proposed Endangered** | Any species USFWS has determined is in danger of extinction throughout all or a significant portion of its range and USFWS has proposed a draft rule to list as endangered. |
| **Proposed Threatened** | Any species the USFWS has determined is likely to become endangered within the foreseeable future throughout all or a significant portion of its range and USFWS has proposed a draft rule to list as threatened. |
| **Critical Habitat** | Specific areas within the geographic area determined by USFWS, occupied by the species at the time it was listed, that contain the physical or biological features that are essential to the conservation of endangered and threatened species and that may need special management or protection. |

**Table 3. Battle Mountain District Special Status Plant Species List**

| Battle Mountain District Special Status Plant Species List (65) | |
|---|---|
| Common Name | Scientific Name |
| Eastwood's Milkweed | *Asclepias eastwoodiana* |
| Callaway Milkvetch | *Astragalus callithrix* |
| One-leaflet Torrey's Milkvetch | *Astragalus calycosus var. monophyllidius* |
| Cima Milkvetch | *Astragalus cimae* var. *cimae* |
| Meadow Milkvetch | *Astragalus diversifolius* |
| Needle Mountains Milkvetch | *Astragalus eurylobus* |
| Black Woollypod | *Astragalus funereus* |
| Broad-pod Freckled Milkvetch | *Astragalus lentiginosus var. latus* |
| Sodaville Milkvetch | *Astragalus lentiginosus var. sesquimetralis* |
| Nye Milkvetch | *Astragalus nyensis* |
| Tonopah Milkvetch | *Astragalus pseudiodanthus* |
| Winged Milkvetch | *Astragalus pterocarpus* |
| Toquima Milkvetch | *Astragalus toquimanus* |

CAL_09098

| Battle Mountain District Special Status Plant Species List (65) | |
|---|---|
| Common Name | Scientific Name |
| Currant Milkvetch | *Astragalus uncialis* |
| Elko Rockcress | *Boechera falcifructa* |
| Dainty Moonwort | *Botrychium crenulatum* |
| Cactus Family Species | *Cactaceae spp. (Protection from poaching)* |
| Monte Neva Paintbrush | *Castilleja salsuginosa* |
| Tecopa Salty Bird's Beak | *Cordylanthus tecopensis* |
| Mojave Thistle | *Circium mohavense* |
| Clokey Cryptantha | *Cryptantha clokeyi* |
| Toiyabe Springparsley | *Cymopterus goodrichii* |
| Sanicle Biscuitroot | *Cymopterus ripleyi var. saniculoides* |
| Ash Meadows Sunray | *Enceliopsis nudicaulis var. corrugata* |
| Nevada Willowherb | *Epilobium nevadense* |
| West Humboldt Buckwheat | *Eriogonum anemophilum* |
| Beatley's Buckwheat | *Eriogonum beatleyae* |
| Tiehm's Buckwheat | *Eriogonum tiehmii* |
| Short-pedicel Monkeyflower | *Erythranthe brachystylis* |
| Limestone Monkeyflower | *Erythranthe calcicola* |
| Pahute Green Gentian | *Frasera pahutensis* |
| Starcup | *Gymnosteris nudicaulis* |
| Ash Meadows Mousetails | *Ivesia kingii* var. *kingii* |
| Lunar Crater Buckwheat | *Johanneshowellia crateriorum* |
| Bullfrog Hills Sweetpea | *Lathyrus hitchcockianus* |
| Thickleaf Pepperweed | *Lepidium integrifolium* |
| Davis' Peppercress | *Lepidium davisii* |
| Maquire's Lewisia | *Lewisia maguirei* |
| Holmgren's Lupine | *Lupinus holmgrenianus* |
| Candelaria Blazingstar | *Mentzelia candelariae* |
| Inyo Blazingstar | *Mentzelia inyoensis* |
| Nye County Smelowskia | *Nevada holmgrenii* |
| Sagebrush Cholla | *Opuntia pulchella* |
| Spjut Bristlemoss | *Orthotrichum spjutii* |
| Watson's Spinecup | *Oxytheca watsonii* |
| Low Feverfew | *Parthenium ligulatum* |
| Nevada Dune Beardtongue | *Penstemon arenarius* |

CAL_09099

| Battle Mountain District Special Status Plant Species List (65) | |
|---|---|
| Common Name | Scientific Name |
| Pahute Mesa Beardtongue | *Penstemon pahutensis* |
| Lahontan Beardtongue | *Penstemon palmeri var. macranthus* |
| Kawich Range Beardtongue | *Penstemon pudicus* |
| Bashful Beardtongue | *Penstemon pudicus* |
| Tiehm's Beardtongue | *Penstemon tiehmii* |
| Clarke Phacelia | *Phacelia filiae* |
| Reese River Phacelia | *Phacelia glaberrima* |
| Least Phacelia | *Phacelia inundata* |
| Mono County Phacelia | *Phacelia monoensis* |
| Bristlecone Pine | *Pinus longaeva* |
| Williams Combleaf | *Polyctenium williamsiae* |
| Blaine Fishhook Cactus | *Sclerocactus blainei* |
| Nye County Fishhook Cactus | *Sclerocactus nyensis* |
| Mojave Fishhook Cactus | *Sclerocactus polyancistrus* |
| Railroad Valley Globemallow | *Sphaeralcea caespitosa var. williamsiae* |
| Ash Meadows Ladies Tresses | *Spiranthes infernalis* |
| Granite Serpentweed | *Tonestus graniticus* |
| Western Joshua Tree | *Yucca Brevifolia* |

**Table 4. Battle Mountain District Special Status Animal Species List**

| Battle Mountain District *Special Status* Animal Species List | |
|---|---|
| **Bird Common Name (43)** | **Scientific Name** |
| Northern Goshawk | *Accipiter gentilis* |
| Golden Eagle | *Aquila chrysaetos* |
| Sagebrush Sparrow | *Artemisiospiza nevadensis* |
| Short-eared Owl | *Asio flammeus* |
| Long-eared Owl | *Asio otus* |
| Burrowing Owl (includes Western Burrowing Owl) | *Athene cunicularia* |
| Verdin | *Auriparus flaviceps* |
| Ferruginous Hawk | *Buteo regalis* |
| Swainson's Hawk | *Buteo swainsoni* |
| Greater Sage-Grouse | *Centrocercus urophasianus* |
| Greater Sage-Grouse (Bi-State DPS) | *Centrocercus urophasianus* |
| Western Snowy Plover | *Charadrius nivosus nivosus* |
| Common Nighthawk | *Chordeiles minor* |
| Western Yellow-billed Cuckoo | *Coccyzus americanus occidentalis* |
| Olive-sided Willow Flycatcher | *Contopus cooperi* |
| Bobolink | *Dolichonyx oryzivorus* |

| Battle Mountain District *Special Status* Animal Species List | |
|---|---|
| Great Basin Willow Flycatcher | *Empidonax traillii odastus* |
| Southwestern Willow Flycatcher | *Empidonax traillii extimus* |
| Peregrine Falcon | *Falco peregrinus* |
| Pinyon Jay | *Gymnorhinus cyanocephalus* |
| Cassin's Finch | *Haemorhous cassinii* |
| Bald eagle | *Halioeetus leucocephalus* |
| Scott's Oriole | *Icterus parisorum* |
| Least Bittern (includes Western Lease Bittern) | *Ixobrychus exilis* |
| Loggerhead Shrike | *Lanius ludovicianus* |
| Virginia's Warbler | *Leiothlypis virginiae* |
| Black Rosy-Finch | *Leucosticte atrata* |
| Gray-crowned Rosy-Finch | *Leucosticte tephrocotis* |
| Lewis' Woodpecker | *Melanerpes lewis* |
| Long-billed Curlew | *Numenius americanus* |
| Mountain Quail | *Oreortyx pictus* |
| Sage Thrasher | *Oreoscoptes montanus* |
| Phainopepla | *Phainopepla nitens* |
| Flammulated owl | *Psiloscops flammeolus* |
| Ridgway's Rail (Yuma Clapper Rail) | *Rallus obsoletus  yumanensis* |
| Bank Swallow | *Riparia riparia* |
| Broad-tailed Hummingbird | *Selasphorus platycercus* |
| Black-throated Gray Warbler | *Setophaga nigrescens* |
| Black-chinned Sparrow | *Spizella atrogularis* |
| Brewer's sparrow | *Spizella breweri* |
| Crissal Thrasher | *Toxostoma crissale* |
| LeConte's Thrasher | *Toxostoma lecontei* |
| Arizona Bell's Vireo | *Vireo bellii arizonae* |
| **Fish Common Name (14)** | **Scientific Name** |
| Railroad Valley Springfish | *Crenichthys nevadae* |
| Moapa Dace | *Moapa coriacea* |
| Lahontan Cutthroat Trout | *Oncorhynchus clarkii henshawi* |
| Big Smoky Valley Speckled Dace | *Rhinichthys osculus lariversi* |
| Monitor Valley Speckled Dace | *Rhinichthys osculus ssp. 5* |
| Diamond Valley Speckled Dace | *Rhinichthys osculus ssp.10* |
| Fish Creek Springs Tui Chub | *Siphateles bicolor euchila* |
| Butterfield Spring Tui Chub | *Siphateles bicolor ssp.* |
| Charnock Ranch (Charnock Springs) Tui Chub | *Siphateles bicolor ssp. 10* |
| Fish Lake Valley Tui Chub | *Siphateles bicolor ssp. 4* |
| Hot Creek Valley Tui Chub | *Siphateles bicolor ssp. 5* |
| Little Fish Lake Valley Tui Chub | *Siphateles bicolor ssp. 6* |
| Railroad Valley Tui Chub | *Siphateles bicolor ssp. 7* |
| Big Smoky Valley Tui Chub | *Siphateles bicolor ssp. 8* |
| **Mammals Common Name (40)** | **Scientific Name** |
| Pallid Bat | *Antrozous pallidus* |

CAL_09101

| Battle Mountain District *Special Status* Animal Species List | |
|---|---|
| Pygmy Rabbit | *Brachylagus idahoensis* |
| Townsend's Big-eared Bat | *Corynorhinus townsendii* |
| Desert Kangaroo Rat | *Dipodomys deserti* |
| Panamint Kangaroo Rat | *Dipodomys panamintinus* |
| Spotted Bat | *Euderma maculatum* |
| Greater Bonneted Bat | *Eumops perotis* |
| Allen's Big-eared | *Idionycteris phyllotis* |
| Silver-haired Bat | *Lasionycteris noctivagans* |
| Hoary Bat | *Lasiurus cinereus* |
| Western Red Bat | *Lasiurus blossevillii* |
| Northern River Otter | *Lontra canadensis* |
| Dark Kangaroo Mouse | *Microdipodops megacephalus ssp.* |
| Pale Kangaroo Mouse | *Microdipodops pallidus* |
| California Myotis | *Myotis californicus* |
| Western Small-footed Myotis | *Myotis ciliolabrum* |
| Long-eared myotis | *Myotis evotis* |
| Little Brown Bat | *Myotis lucifugus* |
| Fringed Myotis | *Myotis thysanodes* |
| Cave Myotis | *Myotis velifer* |
| Long-legged Myotis | *Myotis volans* |
| Yuma Myotis | *Myotis yumanensis* |
| Big Free-tailed Bat | *Nyctinomops macrotis* |
| American Pika | *Ochotona princeps* |
| Bighorn Sheep | *Ovis canaensis* |
| Canyon Bat | *Parastrellus hesperus* |
| Merriam's Shrew | *Sorex merriami* |
| Western Water Shrew | *Sorex preblei* |
| Inyo Shrew | *Sorex tenellus* |
| Mexican Free-tailed Bat | *Tadarida brasiliensis* |
| Fish Spring Pocket Gopher | *Thomomys bottae abstrusus* |
| Kawich Pocket Gopher | *Thomomys bottae curatus* |
| Monitor Valley Pocket Gopher | *Thomomys bottae concisor* |
| San Antonio Pocket Gopher | *Thomomys bottae curtatus* |
| Dixie Valley Pocket Gopher | *Thomomys bottae depressus* |
| Moores Creek Pocket Gopher | *Thomomys bottae fumosus* |
| Fish Lake Valley Pocket Gopher | *Thomomys bottae lacrymalis* |
| Belted Range Pocket Gopher | *Thomomys bottae nanus* |
| Stewart Valley Pocket Gopher | *Thomomys bottae solitarius* |
| Western Jumping Mouse | *Zapus princeps* |
| **Amphibian Common Name (6)** | **Scientific Name** |
| Western toad | *Anaxyrus boreas* |
| Hot Creek Toad | *Anaxyrus monfontanus* |
| Amargosa Toad | *Anaxyrus nelsoni* |
| Railroad Valley Toad | *Anaxyrus nevadensis* |

CAL_09102

| Battle Mountain District *Special Status* Animal Species List | |
|---|---|
| Northern leopard Frog | *Lithobates pipiens* |
| Columbia Spotted Frog | *Rana luteiventris* |
| **Crustacean Common Name (2)** | **Scientific Name** |
| Ostracod sp. | *Thermopsis thermophila* |
| Side Hill Spring Amphipod | *Hyalella azteca sp. 26* |
| **Gastropod Common Name (13)** | **Scientific Name** |
| Whitepine Mountainsnail | *Oreohelix hemphilli* |
| Great Basin Mountainsnail | *Oreohelix strigosa depressa* |
| Elongate Cain Spring Pyrg | *Pyrgulopsis augustae* |
| Large Gland Carico Pyrg | *Pyrgulopsis basiglans* |
| Surprise Valley Pyrg | *Pyrgulopsis gibba* |
| Lockes Pyrg | *Pyrgulopsis lockensis* |
| Oasis Valley Springsnail | *Pyrgulopsis micrococcus* |
| Ovate Cain Spring Pyrg | *Pyrgulopsis pictilis* |
| Fish Lake Valley Pyrg | *Pyrgulopsis ruinosa* |
| Sada's Pyrg | *Pyrgulopsis sadai* |
| Sterile Basin Pyrg | *Pyrgulopsis sterilis* |
| Wong's Pyrg | *Pyrgulopsis wongi* |
| Monitor Tryonia | *Tryonia monitorae* |
| **Reptile Common Name (9)** | **Scientific Name** |
| Northern Rubber Boa | *Charina bottae* |
| Ring-necked Snake | *Diadophis punctatus* |
| Desert Iguana | *Dipsosaurus dorsalis* |
| Mojave Desert Tortoise | *Gopherus agassizii* |
| Sonoran Mountain Kingsnake | *Lampropeltis pyromelana* |
| Greater Short-Horned Lizard | *Phrynosoma hernandesi* |
| Desert Horned Lizard | *Phrynosoma platyrhinos* |
| Gilbert' Skink | *Plestiodon [Eumeces] gilberti rubricaudatus* |
| Common Chuckwalla | *Sauromalus ater* |
| **Mollusk Common Name (2)** | **Scientific Name** |
| California Floater | *Anodonta californiensis* |
| Western Ridged Mussel | *Gonidea angulata* |
| **Insect Common Name (25)** | **Scientific Name** |
| Crescent Dunes Aegialian Scarab | *Aegialia crescenta* |
| Mojave Gypsum Bee | *Andrena balsamorhizae* |
| Apache Silverspot Butterfly | *Argynnis Nokomis appacheana* |
| Big Smoky Wood Nymph | *Cercyonis oetus alkalorum* |
| Pallid Wood Nymph | *Cercyonis pegala carsonensis* |
| White River Wood Nymph | *Cercyonis pegala pluvialis* |
| Crescent Dunes Aphodius Scarab | *Aphodius* ssp. 2 |
| Monarch butterfly | *Danaus plexippus plexippus* |
| Fused Battoides Blue | *Euphilotes battoides fusimaculata* |
| Inyo Mountain Blue | *Euphilotes Bernardino inyomontana* |
| Pallid Blue subspecies Confusa | *Euphilotes pallescens confusa* |

CAL_09103

| Battle Mountain District *Special Status* Animal Species List | |
|---|---|
| Railroad Valley Skipper | *Hesperia uncas fulvapalla* |
| White River Valley Skipper | *Hesperia uncas grandiosa* |
| Reese River Railroad Valley Skipper | *Hesperia uncas reeseorum* |
| Nevada Viceroy | *Limenitis Archippus lahontani* |
| Nye County Army Ant | *Neivamyrmex nyensis* |
| Darkling Beetle sp. | *Neobaphion papula* |
| Great Basin Yuma Skipper | *Ochlodes Yuma lutea* |
| Great Basin Small Blue | *Philotiella speciosa septentrionalis* |
| Pallid Skipper | *Polites sabuleti basinensis* |
| Dark Sandhill Skipper | *Polites sabuleti nigrescens* |
| Nevada Alkali Skipperling | *Pseudocopaeodes eunus flavus* |
| Pallid Sylvinus Hairstreak | *Satyrium sylvinus megapallidum* |
| Crescent Dunes Serican Scarab | *Serica ammomenisco* |
| Sand Mountain Aphodius Scarab | *Stenotothorax comosus* |
| **Lichen Common Name (1)** | **Scientific Name** |
| Rim Lichen | *Aspicilia rogeri* |

CAL_09104

**Greater Sage-Grouse**

Greater sage-grouse (GRSG) is a sagebrush-obligate species. They are dependent on sagebrush habitat for lekking, nesting, brood rearing, and wintering (feeding almost exclusively on sagebrush leaves during the winter). The GRSG are known to occur in foothills, plains, and mountain slopes with nearby sagebrush meadows. Dense sagebrush overstory and an herbaceous understory of grasses are important to provide shade and security. Both new herbaceous growth and residual cover are important in the understory. The GRSG have specific habitat requirements for carrying out each of their life cycle functions (e.g., courtship and mating on lek habitat, nesting habitat, brood-rearing habitat and wintering habitat). Each of these habitat types can be widely separated geographically, hence having corridors between habitats is important. Early spring breeding sites called "leks" are usually situated on ridge tops or grassy areas surrounded by a substantial brush and herbaceous components. Leks have less herbaceous and shrub cover than surrounding areas. In early spring, males gather on leks where they strut to attract females (BLM, 2018).

The distribution of GRSG in Nevada is dependent on the sagebrush ecosystem that provides lekking habitat, nesting habitat, brood-rearing habitat, and fall/winter cover as well as forage throughout the year. Summer habitat consists of sagebrush mixed with areas of wet meadows and riparian vegetation. They may also use irrigated agricultural fields. Fall habitat consists of mosaics of low-growing sagebrush and Wyoming big sagebrush. Areas used as winter habitat are influenced by the severity of winter weather, topography, and vegetative cover. Nesting sites are located in thick cover in sagebrush habitat beneath sagebrush or other shrubs. Nests are situated on the ground in a shallow depression, with an average distance between nest sites and nearest leks ranging from 2.1 to 4.8 miles (Schroeder et al., 1999). In some cases, females may move greater than 12.4 miles from a lek to nest. Individual GRSG move seasonally between habitat types throughout the year. Additionally, GRSG exhibit strong site fidelity (loyalty to a particular area) to seasonal habitats, which includes breeding, nesting, brood rearing, and wintering areas (BLM, 2018). Appendix H contains maps for all geothermal lease sale parcels with GRSG habitat.

**2022 Plan Maintenance for the 2015 Record of Decision and Approved Resource Management Plan Amendments for the Great Basin Region including the Greater Sage-Grouse Sub-Regions of: Idaho and Southwestern Montana, Nevada and Northeastern California, Oregon, and Utah (excerpt)**

The Greater Sage Grouse (GRSG) ARMPA includes an overarching adaptive management strategy that includes soft and hard triggers and responses to meet GRSG conservation objectives. These triggers are habitat and population thresholds and are based on the two key metrics that are being monitored: habitat condition and population numbers. Sage-grouse population and habitat trends are evaluated by a statewide technical team using collected data and the U.S. Geological Survey modeling Targeted Annual Warning System (TAWS). The result of this process is reported by the State of Nevada Sagebrush Ecosystem Program and are used to prioritize funding for restoration and implementing management actions as stated in the GRSG ARMPA. Hard triggers (TAWS Warnings) have been reached in some parcels therefore, more restrictive allocations (stipulations) and management actions were implemented in conformity with adaptive management trigger responses detailed in the 2015 GRSG Plan Amendment, Appendix J, Tables J-1 and J-2 (BLM, 2015).

# Appendix J
## Adaptive Management Plan

# APPENDIX J

# ADAPTIVE MANAGEMENT PLAN

Adaptive management is a decision process that promotes flexible resource management decision- making. These decisions can be adjusted in the face of uncertainties as outcomes from management actions and other events become better understood. Carefully monitoring these outcomes both advances scientific understanding and helps with adjusting resource management directions as part of an iterative learning

process.

On February 1, 2008, the Department of the Interior published its Adaptive Management Implementation Policy (522 DM 1). The Forest Service adaptive management direction is FSH 1909.12 Ch. 20, FSM 1920, and 36 CFR, Part 219.6. The adaptive management strategy presented in this Proposed LUPA/Final EIS complies with this policy and direction.

In relation to the BLM's and Forest Service's National Greater Sage-Grouse Planning Strategy, adaptive management would help identify if GRSG conservation measures presented in this Proposed LUPA/ Final EIS contain the needed level of certainty for effectiveness. Principles of adaptive management are incorporated into the conservation measures in the plan to lessen threats to GRSGs and their habitat, thereby increasing the likelihood that the conservation measures and plan would be effective in reducing threats to them.

The following provides the BLM's and Forest Service's adaptive management strategy for the Nevada and Northeastern California Greater Sage-Grouse Sub-region Proposed LUPA/Final EIS.

This Proposed LUPA/Final EIS contains a monitoring framework plan (**Appendix E**) that includes an effectiveness monitoring component. The agencies intend to use the data collected from the effectiveness monitoring to identify any changes in habitat conditions related to the goals and objectives of the plan and other range-wide conservation strategies (DOI 2004; Stiver et al. 2006; USFWS 2013). The BLM and Forest Service will use the information collected through the monitoring framework plan outlined in **Appendix E** to determine when adaptive management hard and soft triggers are met (see below).

The BLM and Forest Service cooperated with the Nevada SETT, NDOW, CDFW, and USFWS, along with GRSG research scientists from the USGS and the University of Nevada Reno in developing the adaptive management triggers, definitions, and methods of calculating population and habitat trends.

## ADAPTIVE MANAGEMENT APPLICATION SCALE AND REPORTING UNITS

The scale used to monitor for application of the adaptive management triggers are the Biological Significant Units (BSUs; **Map J-1**) developed in collaboration with the Nevada SETT, NDOW, CDFW, and USGS. These areas represent local GRSG population use areas in the sub-region. The monitoring data on population and habitat can be aggregated up to the population, WAFWA management zone, or other reporting units, such as priority areas for conservation (PACs). Likewise, finer-scale management adjustments can be applied at the lek cluster-scale using population responses and triggers. The boundaries of the BSUs, lek clusters, and other reporting units may be adjusted over time, based on the understanding of local population interactions, genetic sampling and climate variation. Population monitoring methods may be updated based on new science and advances in technology (e.g., integrated population models).

Applying adaptive management responses once a soft or hard trigger is reached will be at the BSU or a finer scale, as detailed below. The hierarchy of GRSG population and habitat scales is as follows:

- Lek—Individual breeding display sites where male and female GRSGs congregate, with males performing courtship displays to gain mating opportunities with females.

- Lek cluster—A group of leks in the same vicinity, between which GRSG may interchange over time and representing a group of closely related individuals. Agencies may revise the lek clusters listed above, based on new data.

- Population management units (PMUs)—Areas delineated based on aggregations of GRSG lek

locations, where the potential for genetic interchange (short-term) among populations is high.

- BSU—Based on the PMUs (defined above) where GRSG interactions have been documented between two or more PMUs and represent local GRSG population habitats and seasonal use areas in the sub-region.

- WAFWA Management Zones (MZ)—Determined by GRSG populations and sub- populations identified in seven floristic provinces (Connelly et al. 2004). Floristic provinces reflect ecological and biological issues and similarities, not political boundaries. The vegetation communities and management challenges found in the floristic provinces in an MZ are similar, and GRSGs and their habitats are likely to respond similarly to environmental factors and management actions.

**Map J-1 Biological Significant Units for GRSG in the Nevada and Northeastern California Sub-region**



Source: NDOW 2015

## ADAPTIVE MANAGEMENT TRIGGERS—PROJECT SCALE

**Soft Triggers**

Soft triggers represent an intermediate threshold indicating that management changes are needed at the project/implementation level to address GRSG habitat and population losses. If a soft trigger is reached, the BLM or Forest Service would apply additional mitigation measures to alleviate the specific or presumptive causes in the decline of GRSG populations or its habitats with consideration of local knowledge and conditions. Three consecutive soft triggers would result in a hard trigger.

The application of population triggers can be illustrated in the following scenario:

A soft trigger would be reached if, when an authorized project is implemented, the results of population monitoring reveal there is a decrease in male attendance at a lek in the project area, as compared to adjacent or trend leks.[1] This would initiate a project design response and require the modification of or additional mitigation to the project.[2] For example, if the data were to suggest the decline may be attributed to GRSG collisions with monitoring tower guy wires associated with the project, the BLM would modify the current authorization to apply an identified adaptive management response, which would be to flag the guy wires.

When the BLM receives a new application for a proposed monitoring tower in the same GRSG population area, it would require the new authorization's monitoring tower guy wires to be flagged. These types of adjustments would be made to preclude reaching a hard trigger (which signals more severe GRSG habitat loss or population declines). While there should be no expectation of hitting a hard trigger, if unforeseen circumstances occur that trip either a habitat or population hard trigger, more restrictive management would be required.

**Hard Triggers**

Hard triggers represent a threshold indicating that immediate action is necessary to stop a severe deviation from GRSG conservation goals and objectives, as set forth in the BLM and Forest Service plans.

If soft triggers are hit for both GRSG populations and its habitat, this would result in a hard trigger response for the BSU.

## POPULATION TRENDS FOR TRIGGERS

Counts of male GRSGs attending breeding leks provide reliable data for analyzing population growth trends (Fedy and Aldridge 2011). Lek counts can inform statistical estimation of population growth rates (see below) at each scale. "Trend leks" have been identified by NDOW, USGS and CDFW within each BSU. Trend leks are monitored consistently each year and have more available data than adjacent leks within the BSU. These trend leks will be used to estimate the population trends/averages within each

---

[1]Thresholds regarding soft and hard triggers for GRSG populations are identified below under Population Hard and Soft triggers.

[2]The specific response would be identified as a project adaptive management response. If the project authorization does not include an adaptive management strategy, adjustments of the proposal could be limited. All projects implemented consistent with the GRSG LUPA/FEIS would contain a project-specific adaptive management strategy (response).

---

BSU. Triggers for changes in population growth will be evaluated at three scales: individual lek (smallest scale), lek cluster, and BSU (largest scale).

Lek cluster delineations may be determined by movement data from radio-marked GRSG when available and by ongoing and future genetic analyses when results are provided. Lek clusters may be separated from each other by physical barriers to dispersal (e.g., mountain ranges and expansive salt flats). Hence, lek clusters take into account spatial connectivity and are associated with high probabilities of GRSG movement among individual leks. However, emerging science associated with genetic analysis may allow for a more comprehensive demonstration of population connectivity or fragmentation. Analyses are being conducted and may be incorporated when available. Estimates for lek clusters may then be scaled up to inform regional population trends at the BSU scale.

Analyses of population changes at the three scales allow for detailed examination of how and where changes are occurring (for example, individual leks describe site-level changes, lek clusters describe local population changes, and BSUs describe changes relative to variation in climate within the sub-region.

These scales are compared at immediate hierarchical levels (i.e., lek to lek cluster, lek cluster to BSU, BSU to MZ) to decouple the trend and subsequent soft and hard triggers at the appropriate hierarchy at which adaptive management actions will be applied. This approach maximizes the level of inference that can be drawn at each scale because it allows information from leks with larger amounts of available data (trend leks) to inform estimates from lek clusters where data are sparse, which in turn provides greater precision to sub-regional (BSU) estimates.

Comparison across regions can also be conducted while accounting for different climatic effects at the lek cluster scale. Trends at the BSU are measured against trends at the MZ for distinguishing local effects from other extrinsic influences (e.g., climate change).

## POPULATION GROWTH RATE CALCULATIONS FOR TRIGGERS

GRSG state-space models (Coates et al. 2014) will be used to estimate the rate of GRSG population growth (increase or decrease in population numbers) and the number of males at individual lek, lek cluster, BSU, and MZ scales. Lek count data collected by NDOW and CDFW from 2000 to present will be used in the model. Some lek clusters may need additional monitoring to gain adequate sampling data in order to be modeled, although the state-space model method will incorporate uncertainty levels from limited samples into each analysis and in threshold determinations (Coates et al. 2014).

## POPULATION HARD AND SOFT TRIGGERS

Modeled growth rates from GRSG population estimates will be calculated at the relevant management level annually as lek data are finalized by the state wildlife management agencies. The GRSG state-space model will be used to establish population growth rates using lek data in BSUs for the sub-region. When lek cluster data is adequate, the same method may be applied at the individual lek (i.e., when individual lek triggers are reached) or the local population (i.e., when lek cluster triggers are reached) to provide adaptive management strategies at the most appropriate scales.

Specific triggers at each GRSG population scale (Coates et al. in prep) are as follows:

1. Individual lek;

    a. Two criteria are needed to reach a soft trigger.

        i. The population rate of change of a lek is less than 0.85-0.95 for two consecutive years; and

        ii. The population rate of change of the lek in relation to the lek cluster reference is less than 0.85-0.95 for both years.

    b. Two criteria are needed to reach a hard trigger:

        i. The population rate of change of a lek is less than 0.01-0.15 for one year; and

        ii. The population rate of change of the lek in relation to the lek cluster is less than 0.01-0.15 for one year.

    c. Three consecutive soft triggers will result in a hard trigger.

    d. The causal factor(s) evaluation area is the GRSG seasonal habitats and use areas associated with the lek (Space Use Index [SUI]; Coates 2014). If the seasonal habitats have not been defined, then the SUI would be applied.

    e. The trigger response area is the GRSG seasonal habitats and use areas associated with the lek that is specifically affected by the causal factor(s). If the seasonal habitats have not been defined, then the SUI would be applied.

2. Lek cluster (project level)

    a. Two criteria are needed to reach a soft trigger:

        i. The population rate of change of the lek cluster is less than 0.90 for two consecutive years; and

        ii. The population rate of change of the lek cluster in relation to the BSU is less than 0.90 for both years.

    b. Two criteria are needed to reach a hard trigger:

        i. The population rate of change of the lek cluster is less than 0.10 for one year; and

        ii. The population rate of change of the lek cluster in relation to the BSU is less than 0.10 for one year.

    c. Three consecutive soft triggers would result in a hard trigger.

3. BSU (sub-regional scale)

    a. Two criteria are needed to reach a soft trigger.

        i. The population rate of change within the BSU is less than 0.90 for two years; and

        ii. The population change of the BSU in relation to the MZ is less than 0.90 for both years.

---

*Nevada and Northeastern California Greater Sage-Grouse Approved RMP Amendment*

    b.   Two criteria are needed for a hard trigger.

        i.    The population rate of change is less than 0.10 for one year; and

        ii.    The population rate of change in relation to the MZ is less than 0.10 for one year.

    c.   Three consecutive soft triggers would result in a hard trigger.

The rate of GRSG population decline and the time frame over which populations are evaluated would be monitored and adjusted as understanding of GRSG population thresholds emerge. The BLM, Forest Service, NDOW, USGS, and CDFW would pursue a program to collect and incorporate additional demographic data into the GRSG space-use model.

## HABITAT TRENDS FOR TRIGGERS

Triggers for habitat trend would be evaluated at the lek and BSU scales. Lek scale trends incorporate the project boundary and adjoining GRSG seasonal habitats. The adjoining GRSG seasonal habitat is defined as the GRSG habitat and use areas within four miles of the disturbance perimeter, unless otherwise specified in an accepted protocol. Site-level habitat trends would be based on changes in habitat components using the methods in the HAF. These changes would be compared to the GRSG habitat objectives in Table 2-2 of the Final EIS.

The BSUs would be based on the percentage of sagebrush cover across the landscape. The categories of the percent landscape sagebrush cover that would apply are the 25 to 65 percent level and the above 65 percent level, as identified in the Matrix Based on Concepts of Resistance and Resiliency (Chambers et al. 2014).

## HARD AND SOFT HABITAT TRIGGERS

Habitat trends would be evaluated by changes in GRSG habitat characteristics identified in the GRSG habitat objectives (see Table 2-2 of the Final EIS) and the percent of landscape sagebrush cover.

1.   At the lek or lek cluster, if the habitat disturbance were to exceeds five percent of any individual GRSG seasonal habitat component used by the local population, then a soft trigger would be hit; if the disturbance exceeds 10 percent, than a hard trigger would be hit.

2.   At the BSU, the two components would have separate triggers.

    a.   In areas with 25 to 65 percent sagebrush cover, if there were a decline in sagebrush cover of 2 percent, then a soft trigger would be hit. A hard trigger would be hit if there were a decline of 5 percent or greater of sagebrush cover or if the disturbance were to reduce the landscape sagebrush cover below 30 percent.

    b.   In areas with greater than 65 percent landscape sagebrush cover, a soft trigger would be hit if there were a decline of 5 percent in landscape sagebrush cover. A hard trigger would be hit if there were a decline of 10 percent or greater in landscape sagebrush cover or if the disturbance were to reduce the landscape sagebrush cover below 70 percent.

## SOFT AND HARD TRIGGER RESPONSES

**Soft Trigger Responses**

When a soft trigger is reached, the causal factor would be identified and management actions would be adjusted to lessen the cause by applying project-level adaptive management contained in the authorization and for future similar authorizations. The adjustment in management would be based on the causal factor and would affect only the area being impacted in the lek cluster or appropriate scale. GRSG populations and habitat would continue to be monitored annually. If the causal factor were not readily discernable, then an interdisciplinary team, including the BLM, Forest Service and state wildlife agency representative, would identify the appropriate mitigation or adjusted management actions in a timely manner.

**Hard Trigger Responses**

When a hard trigger is reached due to a disturbance (anthropogenic, fire, drought, etc.), more restrictive allocations and/or management actions would be implemented within the BSU.

Specific hard trigger responses due to anthropogenic disturbances are identified in **Table J-1** and **Table J-2**.

**Table J-1**

**Hard Trigger Responses in PHMAs Under the Proposed Plan**

| Program | Proposed Plan Allocation | Adaptive Management Response |
|---|---|---|
| Land use authorizations—existing corridors | Open | Manage as a ROW avoidance area. |
| Land use authorizations—major outside corridors | Avoidance areas for all major ROWs | Management of the affected BSU would change to exclude high voltage transmission lines ($\geq$100 kV) and major pipelines ($\geq$24 inches). |
| Land use authorizations—minor ROWs outside corridors | Avoidance areas for all minor ROWs | Limit ROW authorizations, leases, and permits to those needed for public safety and valid existing rights. |
| Wind energy development | ROW exclusion for utility-scale commercial wind energy facilities. | No change |
| Industrial solar | ROW exclusion for utility-scale solar energy facilities. | No change |
| Fluid minerals (Oil, gas, and geothermal in California) (Oil and gas in Nevada) | • In SFAs, manage as NSO with no waiver, exception, or modification. • In PHMAs outside of SFAs, manage as NSO, with two limited exceptions. | • No change • Manage as NSO, with no waivers, exceptions, or modifications. |
| Fluid minerals (Geothermal in Nevada) | • In SFAs, manage as NSO with no waiver, exception, or modification. • In PHMAs outside SFAs, manage as NSO with three specific limited exceptions. | • No change • Manage as NSO, with no waivers, exceptions, or modifications. |
| Locatable minerals | In SFAs, recommended for withdrawal; manage locatable mineral development to minimize effects on GRSG habitat. | No change |

**Table J-1**

**Hard Trigger Responses in PHMAs Under the Proposed Plan**

| Program | Proposed Plan Allocation | Adaptive Management Response |
|---|---|---|
| Salable minerals | Closed to new mineral disposal. | No change |
| Nonenergy leasable minerals | Closed to new nonenergy leasable mineral leasing. | No change |
| Vegetation management | Identify and prioritize landscape-scale enhancement, restoration, fuels reduction, and mitigation projects based on ecological site potential, state and transition models, and other data that would contribute to decision-making informed by science to increase rangeland resilience before and following wildfire. | BSUs where a hard trigger has been reached would be the first priority for regional mitigation habitat restoration and fuels reduction treatments. |

**Table J-2**

**Hard Trigger Responses in GHMAs Under the Proposed Plan**

| Program | Proposed Plan Allocation | Adaptive Management Response |
|---|---|---|
| Land use authorizations—existing corridors | Open to new uses. | Manage as ROW avoidance area. |
| Land use authorizations—major ROWs outside corridors | Avoidance areas for wind, high-voltage transmission lines, and major pipeline ROWs. | Manage affected BSU as exclusion for high-voltage transmission lines (≥100 KV), major pipelines (>24 inches), and wind energy. |
| Land use authorizations—minor ROWs outside corridors | Open for minor ROWs. | Manage as avoidance area for ROWs, leases, and permits. |
| Wind energy development | ROW avoidance for utility-scale commercial wind energy facilities. | Manage as exclusion for utility-scale commercial wind energy facilities. |
| Industrial solar | ROW exclusion for utility-scale solar energy facilities. | No change |
| Fluid minerals | Apply moderate stipulations (CSU and TL). | Apply an NSO stipulation, with limited exceptions. |
| Locatable minerals | Manage locatable mineral development to minimize effects on GRSG habitat. | No change |
| Salable minerals | Open to new mineral disposal. | Manage as closed to new mineral disposal. |
| Nonenergy leasable minerals | Open to new nonenergy leasable mineral leasing. | Manage as closed to new nonenergy leasable mineral leasing. |
| Vegetation management | Identify and prioritize landscape-scale enhancement, restoration, fuels reduction, and mitigation projects, based on ecological site potential, state and transition models, and other data that would contribute to decision-making informed by science to increase rangeland resilience before and following wildfire. | BSUs where a hard trigger has been reached would be the first priority for regional mitigation habitat restoration and fuels reduction treatments. |

# Appendix C
## Required Design Features

# APPENDIX C

# REQUIRED DESIGN FEATURES

Required Design Features (RDFs) are required for certain activities in all GRSG habitat. RDFs establish the minimum specifications for certain activities to help mitigate adverse impacts. However, the applicability and overall effectiveness of each RDF cannot be fully assessed until the project level when the project location and design are known. Because of site-specific circumstances, some RDFs may not apply to some projects (e.g., a resource is not present on a given site) and/or may require slight variations (e.g., a larger or smaller protective area). All variations in RDFs would require that at least one of the following be demonstrated in the NEPA analysis associated with the project/activity:

- A specific RDF is documented to not be applicable to the site-specific conditions of the project/activity (e.g. due to site limitations or engineering considerations). Economic considerations, such as increased costs, do not necessarily require that an RDF be varied or rendered inapplicable;

- An alternative RDF is determined to provide equal or better protection for GRSG or its habitat;

- A specific RDF will provide no additional protection to GRSG or its habitat.

**PROPOSED PLAN**

## General RDFs

The following RDFs would apply to development in all programs within PHMA, GHMA and OHMA consistent with applicable law.

RDF Gen 1: Locate new roads outside of GRSG habitat to the extent practical.

RDF Gen 2: Avoid constructing roads within riparian areas and ephemeral drainages. Construct low- water crossings at right angles to ephemeral drainages and stream crossings (note that such construction may require permitting under Sections 401 and 404 of the Clean Water Act).

RDF Gen 3:  Limit construction of new roads where roads are already in existence and could be used or upgraded to meet the needs of the project or operation. Design roads to an appropriate standard, no higher than necessary, to accommodate intended purpose and level of use.

RDF Gen 4: Coordinate road construction and use with ROW holders to minimize disturbance to the extent possible.

RDF Gen 5: During project construction and operation, establish and post speed limits in GRSG habitat to reduce vehicle/wildlife collisions or design roads to be driven at slower speeds.

RDF Gen 6: Newly constructed project roads that access valid existing rights would not be

managed as public access roads. Proponents will restrict access by employing traffic control devices such as signage, gates, and fencing.

RDF Gen 7: Require dust abatement practices when authorizing use on roads.

RDF Gen 9: Upon project completion, reclaim roads developed for project access on public lands unless, based on site-specific analysis, the route provides specific benefits for public access and does not contribute to resource conflicts.

RDF Gen 10: Design or site permanent structures that create movement (e.g., pump jack/ windmill) to minimize impacts on GRSG habitat.

RDF Gen 11: Equip temporary and permanent aboveground facilities with structures or devices that discourage nesting and perching of raptors, corvids, and other predators.

RDF Gen 12: Control the spread and effects of nonnative, invasive plant species (e.g., by washing vehicles and equipment, minimize unnecessary surface disturbance; Evangelista et al. 2011). All projects would be required to have a noxious weed management plan in place prior to construction and operations.

RDF Gen 13: Implement project site-cleaning practices to preclude the accumulation of debris, solid waste, putrescible wastes, and other potential anthropogenic subsidies for predators of GRSG.

RDF Gen 14: Locate project related temporary housing sites outside of GRSG habitat.

RDF Gen 15: When interim reclamation is required, irrigate site to establish seedlings more quickly if the site requires it.

RDF Gen 16: Utilize mulching techniques to expedite reclamation and to protect soils if the site requires it.

RDF Gen 17: Restore disturbed areas at final reclamation to the pre-disturbance landforms and desired plant community.

RDF GEN 18: When authorizing ground-disturbing activities, require the use of vegetation and soil reclamation standards suitable for the site type prior to construction.

RDF GEN 19: Instruct all construction employees to avoid harassment and disturbance of wildlife, especially during the GRSG breeding (e.g., courtship and nesting) season. In addition, pets shall not be permitted on site during construction (BLM 2005b).

RDF GEN 20: To reduce predator perching in GRSG habitat, limit the construction of vertical facilities and fences to the minimum number and amount needed and install anti-perch devices where applicable.

RDF GEN 21: Outfit all reservoirs, pits, tanks, troughs or similar features with appropriate type and number of wildlife escape ramps (BLM 1990; Taylor and Tuttle 2007).

CAL_09118

RDF GEN 22: Load and unload all equipment on existing roads to minimize disturbance to vegetation and soil.

In addition to the General RDFs, the following resource programs will include the following program specific RDFs applicable to PHMA, GHMA and OHMA consistent with applicable law:

## Lands and Realty*

RDF LR-LUA 1: Where new ROWs associated with valid existing rights are required, co-locate new ROWs within existing ROWs or where it best minimizes impacts in GRSG habitat. Use existing roads or realignments of existing roads to access valid existing rights that are not yet developed.

RDF LR-LUA 2: Do not issue ROWs to counties on newly constructed energy/mining development roads, unless for a temporary use consistent with all other terms and conditions included in this document.

RDF GEN 3: Where necessary, fit transmission towers with anti-perch devices (Lammers and Collopy 2007) in GRSG habitat.

*These RDFs also apply to other land use authorizations such as leases and permits.

## Fuels and Fire Management

RDF WFM 1: Power-wash all firefighting vehicles, including engines, water tenders, personnel vehicles, and all-terrain vehicles (ATVs), prior to deploying in or near GRSG habitat to minimize the introduction and spread of undesirable and invasive plant species.

RDF WFM 2: Protect wildland areas from wildfire originating on private lands, infrastructure corridors, and recreational areas.

RDF WFM 3: Reduce the risk of vehicle or human-caused wildfires and the spread of invasive species by planting perennial vegetation (e.g., green-strips) paralleling road rights-of-way.

## Fluid Minerals RDFs

RDF Lease FM 1: Co-locate power lines, flow lines, and small pipelines under or immediately adjacent to existing roads (Bui et al. 2010) in order to minimize or avoid disturbance.

RDF Lease FM 2: Cover, create barriers, or implement other effective deterrents (e.g., netting, fencing, birdballs, and sound cannons) for all ponds and tanks containing potentially toxic materials to reduce GRSG mortality.

RDF Lease FM 3: Require installation of noise shields to comply with noise restrictions (see Action SSS 7) when drilling during the breeding, nesting, brood-rearing, and/or wintering season. Require applicable GRSG seasonal timing restrictions when noise restrictions cannot be met (see Action SSS 6).

RDF Lease FM 4: Ensure habitat restoration meets GRSG habitat objectives (Table 2-2) for

reclamation and restoration practices/sites (Pyke 2011).

RDF Lease FM 5: Maximize the area of interim reclamation on long-term access roads and well pads, including reshaping, topsoil management, and revegetating cut-and-fill slopes.

RDF Lease FM 6: Restore disturbed areas at final reclamation to the pre-disturbance landforms and meets the GRSG habitat objectives (Table 2-2).

RDF Lease FM 7: Use only closed-loop systems for drilling operations and no reserve pits within GRSG habitat.

RDF Lease FM 8: Place liquid gathering facilities outside of GRSG habitat. Have no tanks at well locations within GRSG habitat to minimize vehicle traffic and perching and nesting sites for aerial predators of GRSG.

RDF Lease FM 9: In GRSG habitat, use remote monitoring techniques for production facilities and develop a plan to reduce vehicular traffic frequency of vehicle use (Lyon and Anderson 2003).

RDF Lease FM 10: Use dust abatement practices on well pads.

RDF Lease FM 11: Cluster disturbances associated with operations and facilities as close as possible, unless site-specific conditions indicate that disturbances to GRSG habitat would be reduced if operations and facilities locations would best fit a unique special arrangement.

RDF Lease FM 12: Apply a phased development approach with concurrent reclamation.

RDF Lease FM 13: Restrict pit and impoundment construction to reduce or eliminate augmenting threats from West Nile virus (Dougherty 2007).

RDF Lease FM 14: In GRSG habitat, remove or re-inject produced water to reduce habitat for mosquitoes that vector West Nile virus. If surface disposal of produced water continues, use the following steps for reservoir design to limit favorable mosquito habitat (Doherty 2007):

- Overbuild size of ponds for muddy and non-vegetated shorelines
- Build steep shorelines to decrease vegetation and increase wave actions
- Avoid flooding terrestrial vegetation in flat terrain or low lying areas
- Construct dams or impoundments that restrict down slope seepage or overflow
- Line the channel where discharge water flows into the pond with crushed rock
- Construct spillway with steep sides and line it with crushed rock.
- Treat waters with larvicides to reduce mosquito production where water occurs on the surface

RDF Lease FM 15: Consider using oak (or other material) mats for drilling activities to reduce vegetation disturbance and for roads between closely spaced wells to reduce soil compaction and maintain soil structure to increase likelihood of vegetation reestablishment following drilling.

CAL_09120

## Locatable Minerals

RDF LOC 1: Install noise shields to comply with noise restrictions (see Action SSS 7) when drilling during the breeding, nesting, brood-rearing, and/or wintering season. Apply GRSG seasonal timing restrictions when noise restrictions cannot be met (see Action SSS 6).

RDF LOC 2: Cluster disturbances associated with operations and facilities as close as possible, unless site-specific conditions indicate that disturbances to GRSG habitat would be reduced if operations and facilities locations would best fit a unique special arrangement.

RDF LOC 3: Restrict pit and impoundment construction to reduce or eliminate augmenting threats from West Nile virus (Dougherty 2007).

RDF LOC 4: Remove or re-inject produced water to reduce habitat for mosquitoes that vector West Nile virus. If surface disposal of produced water continues, use the following steps for reservoir design to limit favorable mosquito habitat (Doherty 2007):

- Overbuild size of ponds for muddy and non-vegetated shorelines

- Build steep shorelines to decrease vegetation and increase wave actions

- Avoid flooding terrestrial vegetation in flat terrain or low lying areas

- Construct dams or impoundments that restrict down slope seepage or overflow

- Line the channel where discharge water flows into the pond with crushed rock

- Construct spillway with steep sides and line it with crushed rock.

- Treat waters with larvicides to reduce mosquito production where water occurs on the surface

RDF LOC 5: Address post reclamation management in reclamation plan such that goals and objectives are to protect and improve sage-grouse habitat needs.

RDF LOC 6: Maximize the area of interim reclamation on long-term access roads and well pads including reshaping, topsoiling and revegetating cut and fill slopes.

RDF LOC 7: Cover (e.g., fine mesh netting or use other effective techniques) all pits and tanks regardless of size to reduce sage-grouse mortality.

## Comprehensive Travel and Transportation Management

RDF CTTM 1: Rehabilitate roads, primitive roads, and trails not designated in approved travel management plans.

RDF CTTM 2: Reclaim closed duplicate roads by restoring original landform and establishing desired vegetation in GRSG habitat in accordance with GRSG habitat objectives (Table 2-2) as identified in travel management planning.

CAL_09121

**References:**

Bureau of Land Management (BLM). 2015. Nevada and Northeastern California Greater Sage-Grouse Approved Resource Management Plan Amendment. Attachment 2 from the USDI Record of Decision and Approved Resource Management Plan Amendments for the Great Basin Region including the Greater Sage-Grouse Sub-Regions of: Idaho and Southwestern Montanan, Nevada and Northeastern California, Oregon, and Utah. U.S. Department of the Interior, Bureau of Land Management, Nevada State Office. September 2015.

BLM, 2018. Resource Report 7, Wildlife Resources. Gold Bar Exploration Project. August. BLM Battle Mountain District.

Coates, P.S., B.G. Prochazka, M.A. Ricca, G.T. Wann, C.L. Aldridge, S.E. Hanser, K.E. Doherty, M.S. O'Donnell, D.R. Edmunds, and S.P. Espinosa. 2017. Hierarchical population monitoring of greater sage-grouse (Centrocercus urophasianus) in Nevada and California—Identifying populations for management at the appropriate spatial scale: U.S. Geological Survey Open-File Report 2017–1089.

Coates, P.S., B.G. Prochazka, S.T. O'Neil, and M.A. Ricca. 2019. Geothermal energy production impacts a sensitive indicator species within sagebrush ecosystem in western North America. Restricted File Federal Interagency Report, U.S. Department of the Interior, United States Geological Survey.

Coates, P.S., B.G. Prochazka, M.S. O'Donnell, C.L. Aldridge, D.R. Edmunds, A.P. Monroe, M.A. Ricca, G.T. Wann, S.E. Hanser, L.A. Wiechman, and M.P. Chenaille. 2021. (USGS 2020). Range-wide greater sage-grouse hierarchical monitoring framework—Implications for defining population boundaries, trend estimation, and a targeted annual warning system: U.S. Geological Survey Open-File Report 2020–1154.

Garton, E.O., A.G. Wells, J.A. Baumgardt, and J.W. Connelly. Greater sage-grouse population dynamics and probability of persistence. 2015. Technical report. Pew Charitable Trusts.

Schroeder, M. A., J. R. Young, and C. E. Braun, 1999. Greater Sage-Grouse (Centrocercus urophasianus), version 2.0. In The Birds of North America (A. F. Poole and F. B. Gill, Editors). Cornell Lab of Ornithology, Ithaca, NY, USA. https://doi.org/10.2173/bna.425.

Springsnail Conservation Team.  2018.  Conservation Agreement for Springsnails in Nevada and Utah. Nevada Department of Wildlife, Reno, Nevada. 28 pp.

Steidl, P. (1993). Evaluation of induced fractures intercepted by mining, Proceedings 1993 Coalbed Methane Symposium, University of Alabama, pp.675-686.

USGS 2014. U.S. Department of the Interior | U.S. Geological Survey. "Man Made Earthquakes" URL: www.usgs.gov/blogs/features/usgs_top_story/man-made-earthquakes/.

U.S. Geological Survey, 2020; Range-wide Greater Sage-Grouse Hierarchical Monitoring Framework: Implications for Defining Population Boundaries, Trend Estimation, and a Targeted Annual Warning System. Prepared in cooperation with the Western Association of Fish and Wildlife Agencies and the Bureau of Land Management. Open-File Report 2020–1154 U.S.

CAL_09122

Warpinski, N.R., Branagan, P.T., Satler, A.R., Cippolla, C.L., Lorenz, J.G., and Thorne, B.J. 1988. A case study of a stimulation experiment in a fluvial, tight, sandstone gas reservoir. Society of Petroleum Engineers Paper No. 18258, Proceedings 63rd Annual Technology Conference, October 1988 (Houston), pp. 616-632.

Western Association of Fish and Wildlife Agencies. 2015. Greater sage-grouse population trends: an analysis of lek count databases 1965-2015. Cheyenne, Wyoming.

Willberg et al. (1997). Determination of the Effect of Formation Water on Fracture Fluid Cleanup Through Field Testing in the East Texas Cotton Valley.

Willberg DM, Steinsberger N, Hoover R, Card RJ, Queen J (1998) Optimization of fracture cleanup using flowback analysis. SPE 39920. Presented paper. SPE Rocky Mountain Regional/Low-permeability Reservoirs Symposium and Exhibition, Denver CO, 5-8 April 1998.

CAL_09123

## Appendix   II: Preliminary EA Comments and Responses

A Preliminary Callaghan Complex Gather & Herd Management Area Plan was made available to interested individuals, agencies and groups for a 30-day public review and scoping period that opened on August 4th, 2025 and closed on September 3rd, 2025. Comments were received from approximately 124 individuals (primarily as form letters) or organizations. Many of these comments contained overlapping issues/concerns which were consolidated into topics.

**Support and Other:**

| | Commenter | Comment | BLM Response |
|---|---|---|---|
| 1 | Nevada Department of Agriculture | We endorse proposed actions that ensure wild horses are managed as healthy populations within established an indicator of historic overutilization, dominates several sites. While some new growth was observed, plant vigor was significantly reduced, and many sites have experienced severe to total loss of key perennial species.<br><br>The NDA appreciates the opportunity to provide input and supports the development and full implementation of the Callaghan Complex HMAP proposed action. We endorse proposed actions that ensure wild horses are managed as healthy populations within established AMLs, in a manner that promotes ecological balance and supports multiple-use objectives on public lands. | Comment noted. |
| 2 | North American Pronghorn Foundation | The North American Pronghorn Foundation expresses strong support for removal of all excess horses from the Callaghan Complex Herd Management Area. Feral horses have long been a management and conservation concern in North America. Several studies corroborate the understanding that wild horses can lead to biologically significant changes in sagebrush ecosystems, particularly when their populations are overabundant compared to forage and water resources. Citing peer reviewed scientific literature from the | Comment noted. |

1

| | | | |
|---|---|---|---|
| | | Great Basin specifically, "areas without wild horses had higher shrub cover, plant cover, species richness, native plant cover, and overall plant biomass, and lower cover of grazing tolerant, unpalatable, and invasive plant species such as cheatgrass (Bromus tectorum), when compared to areas with horses" (Beever et al. 2008; Boyd et al. 2017; Davies et al. 2014; Smith 1986; Zeigenfuss et al. 2014).<br><br>To further emphasize the need for this action, a 2022 report led by the Western Association of Fish and Wildlife Agencies and the U.S. Fish and Wildlife Service showed that sagebrush rangelands were lost at "an average of 1.3 million acres per year" between 2001-2020. These losses are not sustainable, and we must act to protect the sagebrush landscapes of Nevada. These landscapes are integral to the survival and success of pronghorn and feral horses are one of the biggest invasive threats to those landscapes in Nevada. The impacts of drought and extreme winter events are magnified by poor range conditions created by excess feral horses. A significant reduction in their numbers will improve the range conditions which will stabilize and protect native species populations as well as make the landscape more productive for all users. | |
| 3 | Eureka County Board of Commissioners | While not directly in Eureka County, the County has an interest in this EA and management of the Complex because much of the social and economic benefits of the multiple land uses, including ranches and grazing permits in the area, occur to Eureka County and its citizens. Many of the ranches and land users affected utilize Eureka as their hub for business and social dealings and portions of the base properties for some | The following additional text has been added to section 3.2.6. Socioeconomics. "Lander County apparently had a slight loss of jobs in the farming sector between 2021 and 2022 (BLM 2026). Considering that excess wild horses in the Callaghan Complex may impact natural resource and hunting-related productivity in the affected |

2

| | | | |
|---|---|---|---|
| | | ranches are in Eureka County. These ranches are long-term keys to the socioeconomic stability of southern Eureka County and the surrounding region.<br><br>We do appreciate the inclusion of socioeconomic analysis in the EA. However, we do take issue with the statement in the EA that "[i]t is not possible to quantify the revenue or losses attributable to the Callaghan Complex wild horses" (p. 51). There has been much peer-reviewed research quantifying the value of grazing and hunting and recreation and included in other recent BLM NEPA documents. These sources should be summarized and referenced. While the exact economic impact may not be quantifiable, there can be statements, based on the best available data, of the economic impact caused by excess horses in dollar per hunting tag, dollar per cow grazed, etc. Please include these in the final EA. | area, this could contribute to a loss of income or employment in those sectors." The citation here is to a BLM socioeconomic profile report that has now been added to the list of Literature Cited in EA section 8.2. That report is cited as: |
| 4 | Eureka County Board of Commissioners | Eureka County does support the Proposed Action, Alternative A. We also mostly support Alternative B but request BLM not limit the fertility control tools available as Alternative B does. Alternatives A and B outline the proven proper use of fertility controls and other non-gather management tools by first removing horses to or below low-end AML and slowing population growth to remain within AML for a long period of time. Given the budget woes, increasing gaps in time between gathers, and the importance of keeping herds at or below AML, the number of wild horses gathered must be high enough to bring the herd to numbers that will keep within AML for as long as possible. Retaining all available management tools is crucial. Fertility control (including use of IUDs and | Comment noted. |

3

CAL_09126

| | | | |
|---|---|---|---|
| | | minimally invasive sterilization procedures), gelding, and implementing a higher male to female ratio will facilitate keeping numbers within the range of AML longer. | |
| 5 | Eureka County Board of Commissioners | Eureka County did provide comments to BLM in April 2025 with specific requests for BLM to include the Complex Herd Management Area Plan (HMAP). We note that many of our requests were not incorporated into the HMAP and did not translate to the EA. Therefore, our comments below are somewhat repetitive to the comments we made in April.<br><br>We previously noted evidence and local observations of Callaghan Complex horses residing in and moving to-and-from areas in Eureka County. In fact, in Summer 2021, Eureka County representatives attended a tour hosted by the Nevada Sagebrush Ecosystem Council where BLM was present and one of the sites visited was between the 3 Bars Ranch in Eureka County and the Bald Mountain HMA. Wild horses were encountered in this area. We are concerned that the area covered by the EA does not include these horses as this area is east of the line on Map 1 of depicting the "gather area." In the final EA, please make it clear that any horses outside of the Complex but that "belong" to this Complex, regardless of a map line, would be able to be gathered under this EA. | In areas with no fencing wild horses travel between HMAs. Animals cannot be gathered from outside of the gather area analyzed in the EA. The Callaghan Complex borders the Roberts Mountain Complex and will border the Rocky Hills gather area in forthcoming NEPA analyses. The goal of the MLFO is to include all areas where wild horses reside under future gather NEPA to include all horses outside of HMAs boundaries. |
| 6 | Anonymous | The horse population is exploding. Something must be done. They don't need to be protected anymore. Open a hunting season on them. Offer tags. Hunter will eat the meat and now will make money off of tags to help other wild life in the state. | The WFRHB Act of 1971 contains provisions hunting wild horses. |

4

CAL_09127

| 7 | Lisa Keisler | These iconic animals are a symbol of freedom and the untamed spirit of the West. In some instances, their growing numbers can lead to overgrazing, habitat degradation, and competition with native wildlife but much of the reporting attributed to the horses is skewed and misleading. Ranchers, cattle and sheep have far too long been given priority access to public lands and their impact on native wildlife and habitat degradation is most certainly underreported and under studied. The Bureau of Land Management (BLM) and other federal agencies often use these outdated misconceptions about wild horses to justify the current roundup, removal and stockpile cycle. Even worse, industries that support the roundup of wild horses and burros, like ranchers and other commercial interests, push these false narratives in order to free up more of our public lands for extractive purposes. | Comment noted. |
|---|---|---|---|
| 8 | Wild Horse Education | BLM has not provided any explanation for the proposed change in the identity of the Callaghan Complex. Historically, Callaghan HMA and New Pass-Ravenswood made up the Callaghan Complex. To evaluate historic management strategies, we need to access the existing Gather-EAs for the historic complex. BLM has removed all of them from any online portals. South Shoshone was managed distinctly. | The BLM 2010 WHB Herd Management handbook H-4700-1 states that *"HMAPs may be prepared for a single HMA or a complex of adjacent HMAs where animal interchange occurs."*<br><br>Due to interchange between the HMAs within the Callaghan Complex they will be managed as a Complex as described and analyzed in this EA moving forward. Nevada State Highway 305 is the western border of the Complex and impedes interchange with the New Pass – Ravenswood HMA. |

**Scoping and Public Comment Period:**

5

CAL_09128

| | Commenter | Comment | BLM Response |
|---|---|---|---|
| 9 | Carolyn Borkowski | The BLM labeled this as a *scoping period* when it was in fact comments on a draft plan. This error must be rectified and the comment period extended. | On March 14th, 2025, the MLFO published a Management Evaluation for the Callaghan Complex beginning the scoping period. https://www.blm.gov/announcement/blm-seeks-initial-input-callaghan-complex-wild-horse-management<br><br>On August 4th, 2025 the MLFO published a press release detailing the public comment timeline and submission process. The press release can be viewed at the following link: https://www.blm.gov/announcement/blm-seeks-input-wild-horse-management-plan-central-nevada |
| 10 | Maria Egbert | BLM's announcement and website noted the above a Scoping period for public comment. It was comments for a Draft Plan. Please correct the mistake and extend comment period accordingly. | See comment 9. |
| 11 | Rebecca Falk | There is an error on BLM homepage. BLM page says scoping period. The website announcement is misleading. There needs to be a clear objective. Comment on draft Ea. BLM loaded with word.doc not the final PDF. I am unsure on the formal document. This needs to be corrected. The comment period needs to be extended after this is corrected. | See comment 9. |
| 12 | Andrea Lonseth | The Callahan public comment access is impossible in its confusion. Extend the public comment. Do rewrite the access so that the public can actually comment. | See comment 9. |
| 13 | Jean Public | the deadline for public comment must be extended. vicious blm has issued confusing proposal on this wild horse extinction plan, that is slipshod and needs reversal. | See comment 9. |

6

CAL_09129

| | Commenter | Comment | BLM Response |
|---|---|---|---|
| 14 | Charlotte Roe | In announcing the EA, the Mt. Lewis Field Office called this a Scoping period. This should instead be a request for comments on a draft plan. Please fix this mistaken announcement and grant a 30-day extension to undue the confusion. | See comment 9. |
| 15 | Wild Horse Education | The BLM announcement and website noted this as a Scoping period when it was not a Scoping, it was comments on a draft plan. Please rectify the error and extend the comment period accordingly. | See comment 9. |
| 16 | Laurie Ford, Wild Horse Education | Data and analysis of any, and all, issues imperative to a science based and legitimate HMAP EA seem to have been omitted and, therefore; the public has been denied their lawful right *to meaningfully participate in and comment on the preparation of* the Callaghan Complex Herd Area Management Plan. | BLM offered two separate 30-day public comment periods. The first after the Management Evaluation was published and the second after Draft EA was published.<br><br>See comment 9. |

**Hickison (North) HMA and North Shoshone HA:**

| | Commenter | Comment | BLM Response |
|---|---|---|---|
| 17 | Carolyn Borkowski | Zero out of the 12 horses on the Hickison (North) is unnecessary. | The purpose of this EA and HMAP is to conform with the SERARMP and the 2005 the Kingston and Simpson Park Allotment FMUD. Refer to Section *1.1 Bac ground* of the EA.<br><br>This EA is not zeroing out or changing the AML of the northern portion of the Hickison HMA it is enforcing a previously determined AML of zero wild horses. |
| 18 | Carolyn Borkowski | The zeroing of the North Shoshone for wild horses was inappropriately done in favor of domestic horses, contrary to the CFRs. This requires reevaluation. | The purpose of this EA and HMAP is to conform with the SERARMP and the FMUDs associated with the Complex. Refer to Section *1.1 Bac ground* of the EA. |

7

CAL_09130

| | | | In accordance with the SERARMP the North Shoshone Herd Area is not designated for wild horse use to due to the area being 41% privately owned land.<br><br>The BLM 2010 WHB Herd Management handbook H-4700-1 states:<br>*erd Areas Not Desi nated as      As*<br>*Where appropriate, the LUP may include decisions not to manage WH&B in all or a part of an HA. An example is intermingled and unfenced private lands within HAs where the landowners are unwilling to make them available for WH&B use, or the animals present at that time were later found to be claimed domestic horses (or burros). Another example would be where essential habitat components (forage, water, cover and space) are unavailable or insufficient to sustain healthy WH&B and healthy rangelands over the long term.* |
|---|---|---|---|
| 19 | Carolyn Borkowski | The complete elimination of burros from the Complex without ecological justification. | In accordance with the SERARMP the HMAs within Callaghan Complex are not designated for wild burro use. Right of way fencing along north of US Route 50 confines wild burros to the southern portion of the Hickison HMA. |
| 20 | The Cloud Foundation | The EA fails to address repatriating wild horses to Congressionally-designated wild horse areas, including the Hickison North and North Shoshone HMAs. Stripping these public lands of wild horses puts this herd on a collision course with BLM's continued mismanagement. The final EA must state | See comments 17 and 18. |

8

| | | | |
|---|---|---|---|
| | | why these lands were zeroed out, whether any conditional BLM management or usage of these public lands remains, and whether opportunities exist to repatriate wild horses to these public lands. | |
| 21 | Wild Horse Education | The zeroed out portion of North Shoshone must be reevaluated. It was inappropriately zeroed out of wild horses in favor of domestic horses in contravention of the CFRs. | See comment 18. |
| 22 | The Cloud Foundation | Because this HMAP seeks to implement/formalize the HMA and zeroed-out HA boundaries (North Hickison and North Shoshone), the HMAP EA must disclose where livestock operators claimed horses in this area to show the data for the basis of the original HA boundaries, as well as all BLM documentation justifying the reduction of the HAs to the current HMA boundaries. | This EA is not making changes to any HMA or HA boundaries. Adjustments to HMA and HA boundaries must be done through a Land Use Plan.<br><br>See comments 17 and 18. |

## Water Issues and Range Improvements:

| | Commenter | Comment | BLM Response |
|---|---|---|---|
| 23 | Eureka County Board of Commissioners | While the EA does discuss impacts of horses on water sources, it is silent on how wild horses are or are not accessing water according to Nevada Water Law and how this has bearing on the need for a gather to ensure consistency with State Water Law and BLM regulation and policy. We argue that the horses are, in many cases, using fully appropriated water sources in which there is no appropriated right by BLM. Discussion about water rights is not outside of the scope of analysis. BLM has policy regarding water rights for wild horses and the BLM Wild Horse Handbook outlines water rights related issues for wild horses. Water rights issues are directly related to bolster the need to gather excess horses. We request | The WFRHBA declares wild horses and burros to be "an integral part of the natural system of public lands," 16 U.S.C. § 1331, and provides "for the management and protection of wild horses and burros on public lands" throughout the western United States. Fallini v. United States, 56 F.3d 1378, 1379-80 (Fed. Cir. 1995). Under the WFRHBA, the Secretary of the Interior has jurisdiction over all wild free-roaming horses and burros located on public lands administered by BLM for purposes of protecting and managing those wild horses and burros "as components of the public |

9

CAL_09132

| | | BLM clarify this issue in the final EA which we argue alone provides impetus for BLM to reduce the herd to AML and do a valid assessment on the efficacy of the HMA providing a TNEB. | lands." 16 U.S.C. §§ 1332, 1333(a). The statute has been described as "a land-use regulation enacted by Congress to ensure survival of a particular species of wildlife." Mountain States Legal Found. v. Hodel, 799 F.2d 1423, 1428 (10th Cir. 1986). Per BLM Handbook H-4700-1 - Wild Horses and Burros Management, where water is essential to sustaining wild horse and burro populations. The amount of water available for WH&B use is generally based on public, natural waters (i.e., water occurring on private lands is not considered unless a written agreement with the private landowner is obtained). Water availability during drought conditions is also considered. Sufficient water for WH&B must be available during drought to achieve and maintain a thriving natural ecological balance and multiple use relationship on the public lands. The BLM would also consider securing water rights public water sources could be developed and maintained. The EA analyzes the BLM's proposed action and alternatives, including implementing an HMAP as well as gathering and removing excess wild horses and as such this action would not affect existing water rights as there would be no associated consumptive use of water. Over time the Proposed Action may provide a benefit to existing water rights holders as pressure from horse use is reduced. |
|---|---|---|---|

10

| 24 | Environmental Protection Agency | Following our review of the Draft EA, the EPA has identified additional information for the BLM to include in the Final EA in order to disclose and minimize impacts of the project and best inform a potential Finding of No Significant Impact.<br><br>The Draft EA mentions that new water developments could be constructed as needed but does not provide any detail about them (p. 15). In the Final EA, the EPA recommends discussing how it would be determined that a water development was needed, what would be constructed, the amount and source of water that would be needed, and whether additional water permits could be required. To avoid adverse impacts to greater sage grouse habitat, pygmy rabbit habitat, and sensitive riparian areas, we also recommend disclosing possible locations for water developments and how a site would be selected. In the case that new troughs would be installed, we recommend keeping them at least 500 feet away from any spring or riparian areas to avoid negative impacts from surface disturbance activities. | Any future water developments would have to analyzed under their own NEPA documents once locations were determined. Additionally, the BLM would issue separate decisions to authorize any such water developments. This EA does not analyze specific water developments, nor does the BLM intend on approving water developments as part of its current decision-making process. |
| 25 | Carolyn Borkowski | Waters have been fenced off or left non-functional, and cattle guards are in disrepair. BLM must include a strategy and mapping for restoration of water infrastructure and range improvements. | Refer to the Callaghan HMAP: Management Objective 4 Assure Riparian/Wetland Area Health in Appendix XIII and Appendix I: Map 6 Water Sources. |
| 26 | Charlotte Roe | I understand that most of the water resources are closed off to wild horses and/or not functional on a year round basis. The draft plan does not address mitigation measures to improve springs or other potentially available sources of water. Kindly do so. | Refer to the Callaghan HMAP: Management Objective 4 Assure Riparian/Wetland Area Health in Appendix XIII |

CAL_09134

| 27 | Charlotte Roe | In like fashion, an HMAP needs to address steps to repair cattle guards, remove old fencing and other hazards in the designated wild horse territory. | Refer to the Callaghan HMAP Objective 4 in Appendix XIII. |
| 28 | The Cloud Foundation | Appendix I, which appears to contain the only maps referenced in the EA, could not be located on the ePlanning website. | Appendix I – Project Area Maps is under the "Maps" links on the Callaghan Complex ePlanning website. |
| 29 | The Cloud Foundation | The EA makes no mention of reducing fencing that obstructs "normal distribution and movement patterns," nor does it document whether fencing in the Complex has been reduced since the 1987 RMP amendment — which acknowledged that fencing would have a "significant adverse impact" to wild horses. | All range improvement projects that are developed are installed in accordance with the WFRHBA to allow for wild and free roaming horse behavior. |
| 30 | The Cloud Foundation | The RMP Amended notes in the Wild Horses and Burros section states that there were 37 water developments to be made in "the short term" an additional "113 in the long term, for a total of 150 water developments." The EA fails to acknowledge that the RMP requirements for water development in the HMAs throughout the Shoshone-Eureka Resource Area, including HMAs in the Complex, have been developed. The EA must disclose a complete list and map of the water developments (not natural springs) that existed at the time of the adoption of the RMP and the years when the water developments have been constructed for wild horses since 1987. If 150 year-round water sources have not been developed since 1987 or if they are not currently functioning or available to horses in the Shoshone-Eureka Resource Area, including the Complex, the EA must address this lack of conformance with the RMP and outline how/when it will be remedied. The Proposed Action is also not in conformance with one of the RMP | The scope of the analysis for this document is limited to the preparation and adoption of an HMAP and gather plan. The suggested action, which includes an analysis of the water developments throughout the Shoshone-Eureka Resource Area, is far larger and more complex than the scope of this analysis. The BLM is not currently analyzing or proposing to approve water developments. |

12

CAL_09135

| 31 | Wild Horse Education | The HMAP must include water improvement analysis to distribute and sustain wild horse populations and mitigation for loss of resources and habitat from livestock, mining, and other multiple uses. | Any prior approved water improvements would have analyzed effects to wild horses and burros in its associated NEPA document. |
|---|---|---|---|
| 32 | Wild Horse Education | BLM must apply for and maintain water rights/permits for wild horses and burros and maintain those permits. BLM has repeatedly failed to apply for and renew existing water permits. | Application and maintenance of water right permits are out of the scope of this analysis document.

Refer to comment 23. |
| 33 | Wild Horse Education | The Nevada BLM did not provide a current water inventory while noting which waters were functional, turned on or off, etc. | Refer to Appendix I: Map 6 Water Sources.

Refer to comment 23. |
| 34 | Wild Horse Education | BLM must include range improvements. Waters in these HMAs have either been fenced off or are non functional. Cattle guards are in disrepair and not safe for horses or burros. Please provide a map and strategy for repairs. | Refer to Appendix I: Maps Water Sources. This map also includes fencing. Refer to the Callaghan HMAP Objective 4 in Appendix XIII for maintenance strategy.

Maintenance of the cattle guards and fences within grazing allotments are often the responsibility for permittees. Maintenance of the cattle guards and fences along highway right of ways is the responsibility Nevada Department of Transportation (NDOT). Although, BLM often makes repairs as needed in response to public and animal safety issues. |
| 35 | Lander County | Further, plans for riparian and spring resources rehabilitation should not require more NEPA documents. Categorical Exclusions should be provided for any and all work performed to improve water resources and rangeland conditions. | Any future water developments would have to be analyzed under their own NEPA documents once locations were determined. |
| 36 | Lander County | Form a Stakeholder Coalition: To prioritize water improvements and range rehabilitation to restore | Comment noted. |

13

CAL_09136

| | | ecosystems in a concurrent reclamation fashion as horses are removed. | |
|---|---|---|---|

**NEPA, Regulations, and Policy:**

| | Commenter | Comment | BLM Response |
|---|---|---|---|
| 37 | Charlotte Roe | The SERARMP is 40 years old and outdated. | Comment noted. |
| 38 | Carolyn Borkowski | **Inadequate Length and Analysis:** A 68-page EA cannot credibly serve as both a gather plan and an HMAP for 1.1 million acres covering 4 HMAs, especially when the same field office produced a 185-page "gather-only" EA for the smaller Fish Creek HMA (230,675 acres). This is a gross shortchanging of NEPA's analytical purpose. | In accordance with 42 U.S.C. §4336a(e)(1)(A) § 4336a(e)(2) An environmental assessment shall not exceed 75 pages, not including any citations or appendices. |
| 39 | Wild Horse Education | This EA that purports itself to be both a gather plan and an HMAP is only 68 pages long for a 1.1 million acre gather area of 4 HMAs, compared to the "gather only EA" for the single HMA Fish Creek, 230,675 acres created by the same field office that was 185 pages. BLM has clearly shortchanged the much larger and complex Callaghan Complex. This EA is woefully data and analysis poor. | See comment 38. |
| 40 | Laurie Ford, Wild Horse Education | The following claim references antiquated documents – for which links were not provided - that pertain to the individual HMAs rather than the "Complex". BLM can ONLY satisfy HMAP requirements if they clearly demonstrate that data and analysis were disclosed in these documents. | Through the EA BLM has provided a list of all references. The BLM is not required to provide copies of the documents. |
| 41 | Laurie Ford, Wild Horse Education | Formulating an HMAP after a massive roundup has been conducted is akin to asking a guest what they would like for dinner after dinner has been served. According to the BLM Handbook (6.1.1) *The first step in the HMAP analysis process should generally be to evaluate existing management.* | The BLM WHB Herd Management handbook H-4700-1 states that *"HMAPs may be prepared for a single HMA or a complex of adjacent HMAs where animal interchange occurs."* |

14

CAL_09137

| | | | |
|---|---|---|---|
| | | *Review existing goals and objectives for the herd and its habitat and determine whether these have been met, partly met, or not met.*<br><br>Because this Complex was only recently created there is no existing management plan, goals or objectives for the Callahan Complex available to review - only management plans, goals and objectives for the South Shoshone, Bald Mountain, Callaghan, and Hickison (north) Herd Management Areas (HMAs), and the North Shoshone Herd Area (HA). HMAs and HA included in the Complex cannot simply be "lumped together" and "averaged out" and then referred to, without analysis, as the Callaghan Complex. | AML for each HMA within the Complex will be maintained individually.<br><br>No HMA within the Callaghan Complex has been gathered since 2011. This HMAP has been developed and will be implemented before the next gather.<br><br>The Management Evaluation was published in March 2025 and the publishing of that document started the Scoping Period.<br><br>The Callaghan Complex was created due to the high likelihood of interchange of wild horses between the HMAs within the Complex.<br><br>Analysis by HMA can be found throughout the EA. |
| 42 | Laurie Ford, Wild Horse Education | A gather plan EA and an HMAP EA are not the same thing. *(Leigh v. Raby   :22-cv-000    and 2:22-cv-01200).* BLM can create both concurrently but cannot ignore the specific difference between the two and must meet requirements of both. This EA fails to even meet the established standard for this district for a gather EA only. | Refer to Section 1.2 Purpose and Need.<br><br>There is nothing in statute, regulation, or policy that prohibits the BLM from preparing and analyzing HMAPs for nearby/adjacent HMAs or Complexes at the same time. |
| 43 | Colette Kaluza, Wild Horse Education | I expressed concerns during scoping. Scoping is relevant issues and concerns that need to be addressed in the EA. And you did not address those concerns. You created nothing more than a gather-EA. | Refer to Section 1.2 Purpose and Need. Refer to Appendix XIII  for the Callaghan Complex Herd Management Area Plan. |
| 44 | Carolyn Borkowski | A gather plan EA and an HMAP EA are not interchangeable. Court rulings (Leigh v. Raby 3:22-cv-00034; 2:22-cv-01200) confirm that BLM must | Refer to Section 1.2 Purpose and Need. |

15

CAL_09138

| | | meet the requirements of both. This EA fails to even meet the established standard for a gather-only EA. | |
|---|---|---|---|
| 45 | Carolyn Borkowski | The EA lacks direct data and accessible links to rangeland health assessments, forage utilization, water availability and flow. A map without analysis is insufficient. | Monitoring data can be located in Appendix VIII of the EA. |
| 46 | Carolyn Borkowski | BLM must analyze how removing large numbers of horses impacts fire fuels, consistent with **Leigh v. Raby (3:22-cv-00034)**. | Refer to Section 3.2.12 Wildfire and Fuel in the EA. |
| 47 | Carolyn Borkowski | HMAP requirements cannot be satisfied by referencing prior RMPs or FMUDs that lacked landscape-level analysis. NEPA demands disclosure of methodology and data, not just citations. | Refer to Appendix VIII Monitoring data. |
| 48 | Dina Titus, Congress | Moreover, current operations are costly to the taxpayers. In the last fiscal year alone, BLM spent $8 million to round up and remove 16,000 wild horses, about $500 per animal. To remove the estimated 5,000 animals from the Callaghan Complex, it would cost approximately $2.5 million in roundup expenses. After these roundups, thousands of horses and burros are then subject to confinement in overcrowded, disease-ridden holding facilities. These conditions not only jeopardize the well-being and safety of these animals but also place a growing financial burden on taxpayers, who are funding a system that causes suffering without offering a sustainable solution. I strongly urge the BLM to reconsider the wide-ranging effects of its proposed herd management plan. Accordingly, I request that the agency eliminate the use of helicopters in its wild horse gathers and prioritize investment in effective fertility controls. | Comment noted. Use of bait-trapping or water-trapping alone is not expected to be able to meet management goals, as noted in EA section 2.6.1, and would therefore not meet BLM's legal requirements outlined in EA section 1.2. Similarly, use of fertility control without gathers is not expected to be able to meet management goals, as noted in EA section 2.6.7. Relying on alternative capture techniques to the exclusion of helicopter drive trapping was considered but eliminated from detailed analysis, as noted in EA section 2.6.8. |
| 49 | Carolyn Borkowski | The South Shoshone HMA overlaps with a newly created recreation area, causing herd stress and | The Mill Creek Recreation Area was established in 1975 and lies outside of HMA |

16

CAL_09139

| | | displacement. The HMAP must evaluate these impacts and propose mitigation. | boundaries. The Shoshone OHV Trail System was completed in 2008.<br><br>Impacts to wild horses were analyzed in the *Mill Cree  Recreation Area and Shoshone Off Highway Trail System Expansion Project EA*. Refer to Section 1.1 and 3.13.1 of that EA for background information and effects on wild horses. |
|---|---|---|---|
| 50 | Wild Horse Education | BLM created a recreation area that encompasses the entire South Shoshone HMA and does not include monitoring of impacts and/or looking at what appropriate mitigation measures are. | See comment 49. |
| 51 | Charlotte Roe | A gather plan EA does not equate to an HMAP EA: what the Mount Lewis FO has presented is unacceptable. The courts have clearly ruled that BLM must meet the requirements of a valid management plan, e.g. Leigh v. Ruby 3:22-cv-0034 and 2:22-cv-01200, and that an HMAP is distinctly different from a gather plan. BLM needs to stop substituting removal schemes for management. | Callaghan Complex Herd Management Area Plan and Gather Plan EA analyzes both a multiyear gather plan and an HMAP. Refer to Section 1.2 Purpose and Need. The HMAP can be found in Appendix XIII. |
| 52 | Charlotte Roe | The Mt. Lewis field office manages more than 39 thousand active mining claims. The draft plan needs to show how these intersect Bald Mountain, Callaghan, Hickins and the Shoshone HMAs. The impact of this water-intensive, disruptive, chemical-heavy activity must be accounted for. To omit this widespread extractive industry from consideration of TREB invalidates any claim that wild horse removal will somehow improve the natural environment. | The effects that mining has on wild horses and burros are analyzed in NEPA documents associated with induvial mining projects. |
| 53 | Charlotte Roe | Planning to remove close to 5000 wild horses without a management plan or a shred of ground-based analysis is not simply flouting the law. It shows | Refer to Appendix XIII for the Callaghan Complex Herd Management Area Plan. |

17

| | | blatant disrespect for a uniquely American natural resource, a species beloved by the public, and one which the BLM is mandated to protect, not harm. | |
|---|---|---|---|
| 54 | Debra Clemente | This proposed reads like a gather report.  Just a big mass removal with no adjustments to the livestock grazing and aum. Every report excludes damage by the livestock.  Livestock are on over 44 million areas of failed health standards. Reducing livestock will help w drought. | Refer to Section 1.2 Purpose and Need. |
| 55 | Debra Clemente | The 1,145,515 acres belong to the wild horses.  This land was given to them.  AML for this area set at 323-552 is crazy low.  AML is too low n was set 40 years ago.  I feel the estimated  number is good .. that land should sustain 4000 wild horses. You never add deaths and too many foals into counts.  These horses are genetically sound and healthy.  Removals skew the dynamics of the herds. | Comment noted. |
| 56 | Charlotte Roe | How were the boundary lines set in the late 1970's and 1980's restricting wild equids to a small portion of the public lands on which they were found when the 1971 Wild Horse Act was passed. Kindly add this background to the draft plan. | The agency actions for herd management areas as analyzed in this EA are designed to conform with resource management plan decisions referred to in section 1.3. |
| 57 | Friends of Animals | BLM does not have the statutory authority to continually round up horses over multiple gathers once it achieves low AML.<br>BLM does not have authority to continually remove wild horses for multiple years without making a specific determination before each individual roundup. The WFHBA states that, before removing wild horses, the Federal Agencies must make a determination that 1) an overpopulation exists, and 2) that action is necessary to remove animals. | This EA analyzes an initial gather/removal then follow-up gather or gathers to remove excess animals until low AML is achieved. When the BLM reaches low AML, the BLM will not conduct new gather/removal operations until it makes a new determination of excess. |

18

CAL_09141

| 58 | The Cloud Foundation | The EA fails to consider cumulative impacts and fails to disclose and consider the quantity of livestock grazing AUMs throughout the Field and District offices' jurisdictions in comparison to AUMs allocated for wild horses and burros. This must be disclosed and considered because the National Environmental Policy Act (NEPA) requires the agency to consider the cumulative effect of each decision. If there are excessive numbers of AUMs utilized by livestock in and around the Complex, the EA must disclose this and provide the *scientific rationale for the agency s failure to provide balanced use of the resource*. The HMAP EA cannot simply state that implementing an action outlined in a Land Use Plan (LUP) is exempt from further analysis or "outside the scope." | EA section 3.2.4 notes the permitted levels of livestock grazing in the Callaghan Complex gather area, and that actual livestock use has generally been less than permitted use been less than permitted use for each of the grazing allotments. The analysis in this EA addresses wild horses and burros in the Callaghan Complex, the number of which are in excess of AML set in relevant Resource Management Plans. The BLM is not currently making decisions regarding the level of livestock use, so the analysis of any such changes are outside the scope of the EA's analysis. |
|----|----------------------|----|----|
| 59 | The Cloud Foundation | The EA cannot claim that re-allocating livestock AUMs to wild horses would fail to contribute to achieving a TNEB simply because wild horses graze year-round. As well BLM knows, wild horses are — or can be — excluded from portions of HMAs due to fencing. If the EA's authors elect to use this rational, the EA must provide the scientific evidence that supports this premise, including the site-specific data and criteria used to differentiate impacts of livestock grazing from those of wild horses. | Reallocation of livestock AUMs is beyond the scope of this EA. |
| 60 | The Cloud Foundation | The final EA cannot rely on a nearly 40-year-old LUP to create a new LUP (HMAP) that implements actions not in compliance/inconsistent with existing law and statute. | Comment noted. |
| 61 | The Cloud Foundation | The EA fails to render a comparable evaluation of wild horse use of these public lands with that of privately-owned livestock that use the same area - | Refer to Section 1.2 Purpose and Need. None of the HMAs in the Callaghan Complex has been designated as a Wild Horse Range in the |

19

CAL_09142

| | | despite Congress' clear intention that these public lands are to be devoted **principally** to wild horses. | sense of BLM regulations that govern wild horse management (43 CFR § 4710.3–2). |
|---|---|---|---|
| 62 | The Cloud Foundation | Final EA cannot implement the Proposed Action because it is not in compliance with existing laws and statutes.<br><br>The EA fails to provide any scientific data that shows the removal of livestock could not achieve the same objective. It is legally established that the BLM has no authority to remove horses merely to achieve AML *especially when there are alternative actions that can address the claimed reason for the removals* (e.g. TNEB). | Refer to Section 2.6.6 Remove or Reduce Livestock within the Callaghan Complex and Tables 4-9 in Section 3.2.4. |
| 63 | American Wild Horse Conservation | NEPA requires federal agencies to "[study], develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." *See* 42 U.S.C. § 4332(2)(E). A robust range of alternatives lies at the heart of an adequate NEPA review. Agencies must "rigorously explore and objectively evaluate reasonable alternatives" that could accomplish the purpose and need of the proposed action with less environmental harm. *Id.*<br>In this case, the agency has failed to consider a reasonable range of alternatives including:<br>● Lowering the number of wild horses it plans to remove in consideration of a robust fertility control program;<br>● Reviewing and resetting AML based on monitoring data that represents current information; and/or<br>● Reevaluating the HA in the Complex to determine if it can be returned to HMA status | Refer to Chapter 2: Proposed Action and Alternatives. |

20

CAL_09143

| 64 | The Cloud Foundation | There is nothing in part 43 CFR part 1600, nor any BLM regulation, that prohibits the BLM from amending the LUP or delaying the Proposed Action until such amending could be implemented. The EA must consider and take a hard look at using adaptive management and, through the LUP process, amending the RMP. | Commented noted. |
|---|---|---|---|
| 65 | The Cloud Foundation | FLPMA does not require that livestock grazing continue in these HMAs or on any public lands. The EA cannot dismiss the option to "Clos[e] HMA to Livestock Use" by stating, "This alternative was not brought forward for detailed analysis because such an action would not be in conformance with the multiple-use mandate of FLPMA (1976) and the existing Three Rivers RMP/ROD (1992) and Andrews/Steens CMPA RMP/ROD (2005)." Closing the HMA would not be a violation of FLMPA. In addition, the EA fails to consider reducing livestock grazing in the HMAs to accommodate/allow for healthy AMLs for each of the HMAs. | Refer to Section 2.6.6 Remove or Reduce Livestock within the Callaghan Complex |
| 66 | The Cloud Foundation | Based solely on FLPMA, wild horses should be allocated 50% of the AUMs allocated to livestock and wild horses in each of the HMAs which would result in the wild horse AML increasing and accommodating nearly all the horses targeted for removal. In fact, the wild horse AMLs should be higher than the 50% based on the Act which requires the HMA be "devoted principally" to wild horses. The percentage of AUMs for wild horses is dependent on one's interpretation of "devoted" and "principally" but clearly it would be above 51%. | See comment 61. |
| 67 | Wild Horse Education | In the 2017/2018 District Manager's report BLM stated: The MLFO is currently working on a wild | Changes in policy and administration dictate agency priorities.  See comment 8. |

21

CAL_09144

| | | horse Herd Management Area Plan (HMAP) for the South Shoshone HMA in Lander County and the Roberts Complex in Eureka County. The South Shoshone HMAP was begun in 2016 with coordination with the National Office to create a template for HMAPs (our team lead was involved). For BLM to simply switch gears after stating they would move forward with a site-specific, landscape level analysis of South Shoshone to address historic deficits and flaws and create a complex where none existed and simply create a 68 page gather plan (in fact) is unconscionable. BLM must create the HMAP for South Shoshone that was begun in 2016 that they have said numerous times was "in process" or fully disclose data and analysis to demonstrate why they are shortchanging these HMAs. | |
|---|---|---|---|
| 68 | Wild Horse Education | **during that    EPA process.) BLM must also provide narrative to explain WH    and provide data supporting its decision to now include wild horses from the Bald Mountain HMA in this Draft Callaghan Complex HMAP and Gather EA, which was not provided for during the scoping    EPA process. (Obviously our scoping comments did not include discussion of the Bald Mountain wild horse HMA because this information was not previously nor transparently provided to the sta  e holding public by BLM | See comment 8. |
| 69 | Wild Horse Education | Please transparently provide the public all records regarding the Agency decision to establish the North Shoshone as a "non-managed" herd area, including landscape level analyses of range resources and carrying capacity prior to releasing any Draft form of this EA. | See comment 18. |

CAL_09145

| 70 | Wild Horse Education | Please note that the Hickison and Bald Mountain HMAs do not have population exchange with any of the HMAs in the proposed change to the identity of the Complex. Hickison and Bald Mountain must be removed from any new "complex" HMAP (H-4700-1, 2.5.2). *"HMAPs may be prepared for a single HMA or a complex of adjacent HMAs where animal interchange occurs."* | See comments 8 and 17. |
|---|---|---|---|
| 71 | Wild Horse Education | The EA track is far too superficial to address and analyze past, present and future issues, deficits and options in an HMAP NEPA planning procedure (42 CFR §4336(a) & (b)). NEPA requires documents to be "concise, clear, and to the point (40 CFR §§1500.2(b) & 1502.4). The square acreage, timeframe, and numbers of wild horses and burros impacted alone warrants an EIS. Furthermore, NEPA requires that cumulative impacts and mitigation strategies must be fully analyzed in an EIS rather than an EA in order to protect wild horses and burros (public value/resource) and address habitat impact issues due to encroachment by discretionary permitted uses. This includes BLM compliance with federal law and the enforcement of removing all domestic horses from HMA/HA lands. | An EA is a concise public document, for which a federal agency is responsible, for an action that is not likely to have a significant effect or for which the significance of the effects is unknown, that is used to support an agency's determination of whether to prepare an EIS or a FONSI. The BLM is complying with NEPA and its regulations by preparing an EA, but if the BLM determines that the action is likely to have a significant environmental effect, it will move forward with preparation of an EIS. |
| 72 | Wild Horse Education | Indeed, AMLs must be evaluated and established with landscape level data and analyses that establish an up-to-date range carrying capacity (including climate impacts and up-to-date "key and indicator plant species") in this HMAP process under an EIS. | Comment noted. Revaluation of AML is beyond the scope of this EA. |
| 73 | Wild Horse Education | The Management Evaluation Report (MER) and this Draft EA provided by Nevada BLM BMDO was not adequate nor sufficient for this NEPA process, such as failure to provide past, present, and reasonably foreseeable mining maps, fencing maps, seasonal and | See comment 40. |

23

CAL_09146

| | | perennial water resources, etc. Referencing data and making assertions *without providing "quic lin s" to* referenced documents impedes public involvement and transparency of cited data and analyses of information in order for stakeholders to determine accuracy of BLM assertions. | |
|---|---|---|---|
| 74 | Wild Horse Education | The existing Land Use Plan is the oldest in the country. This LUP has been amended and bent numerous times for livestock (Argenta) and others. For wild horses, this LUP is older than finalization of codification of the 1971 law. The only way to rectify the sheer neglect of management/protection of wild horses in this area is to complete a thorough and data-rich, transparent HMAP. | Comment noted. |
| 75 | Wild Horse Education | The 1971 Wild Free-Roaming Horses and Burros Act as amended (WHBA, PL 92-195) protects herd areas (HAs) established in 1971 (i.e., North Shoshone HA). Analysis for management of wild horses in North Shoshone HA must be included. The Norther portion of Shoshone must also be included in analysis for management and triggers for repatriation as mitigation in order to provide protection and habitat for WHBs. | In accordance with the SERARMP the North Shoshone Herd Area is not designated for wild horse use, |
| 76 | Wild Horse Education | Analysis should include the benefits of wild horses on cheat grass and other fire fuels in comparison with domestic livestock and wildlife species. BLM cannot simply state, domestic livestock are used for fire-fuel reduction" as a best and fair use" without supporting data nor analyses. Current databased research indicates there are far fewer invasive weeds (fire fuels) where wild horses (and burros) are present, and livestock is not. | Refer to Section 3.2.13 12 of the EA. |
| 77 | Wild Horse Education | BLM states that wild horses interchange and can be found throughout the plan area at different times of the | Refer to Section 1.2 Purpose and Need and Appendix I: Project Area Maps. |

24

| | | | |
|---|---|---|---|
| | | year. However, the only map that BLM provided in the MER delineated a gather area well beyond the proposed plan area boundary and is merely defined by the base of the valley. Any proposed gather ("tool" of management) area must be included as an HMA for evaluation in the HMAP, as the environmental impacts of a "gather" must be included in any future Gather EA that must conform to the HMAP. | |
| 78 | Wild Horse Education | Please provide rangeland-monitoring plans (goals, objectives, and frequency) for habitat and resources specifically for the Callaghan Complex including the same details/parameters as the previously identified in other HMAP/HMP monitoring plans for public review prior to any forthcoming Callaghan Complex Draft HMAP document. | Refer to the HMAP in Appendix XIII. |
| 79 | Wild Horse Education | By lumping these HMAs together and not completing a site-specific HMAP for each HMA, BLM is creating another nonspecific document that does not provide appropriate guidance to collect necessary data to determine impacts to wild horses and their habitat and the management actions necessary to protect that habitat or mitigate the loss of habitat to mining/livestock/recreation/etc. | Comment noted. See comment 8. |
| 80 | Wild Horse Education | Impacts from the multitude of hardrock mines operated by Nevada Gold Mines, Inc., directly impacts and irreparably harms the Callaghan and Shoshone wild horse habitat and resources and our interests. BLM has failed to provide protection and mitigation for wild horses and burros and has denied any cumulative impacts from these mining operations ON the WHBs and their habitat and resources required for their wellbeing. | Effects of mining project on wild horses are analyzed in their associated NEPA documents. |

25

| 81 | Wild Horse Education | As the BLM crafts the federally mandated site-specific wild horse HMAPs, they should include in the NEPA process the wild horse herd management areas that overlap greater sage grouse (GrSG) priority habitat management areas (PHaMAs). The Callaghan Complex wild horse HMAPs should support the following changes as considered in the proposed GrSG amendments:<br><br>The wild horse and burro (WHB) herd management areas (HMAs) and herd areas (HAs) and Greater Sage Grouse (GrSG) priority habitat management areas (PHaMAs) shall be managed as priority public resource areas.<br><br>The BLM shall close WHB HMAs & HAs and GRSG PHaMAs to new fluid mineral leasing, saleable minerals/mineral materials permits, and non-energy leasable minerals leasing (development associated with existing permits and leases would not be precluded).<br><br>WHB HMAs & HAs and GrSG PHaMAs shall be recommended for withdrawal from location and entry under the Mining Law of 1872 and unavailable for livestock grazing.<br><br>WHB HMAs & HAs and GrSG PHaMAs shall be ROW exclusion areas.<br><br>WHB HMAs and HAs not overlapping GrSG PHaMAs shall have the same allocations (i.e., allowable uses) as previously identified. | The Herd Management Plan and the Gather EA includes wild horse areas that overlap greater sage-grouse PHMAs and supports the recently signed *Greater Sage-Grouse Rangewide Planning Record of Decision and Approved RMP Amendment for  evada California.* The Record of Decision provides management direction on wild horse and burro management that provides additional, specific direction regarding how to promote GRSG habitat conservation when applying the existing BLM policies and approaches for wild horse and burro management. Specifically, the management direction for wild horses and burros seeks to address areas within GRSG habitat where horses are a significant causal factor in not meeting LHS. Scientific literature has found that managing wild horses and burros at or below appropriate management levels minimizes negative impacts on GRSG population trends (Coates et al. 2021; Beck et al. 2024). Where GRSG habitat overlaps with wild horse and burro ranges, the Approved RMP Amendment calls for managing wild horse and burro populations within established appropriate management levels and to achieve or make significant progress toward achieving LHS. The management direction also directs the prioritization of wild horse gathers in PHMA unless removals are necessary in other areas to address higher |

26

CAL_09149

| | | | priority issues, including herd health impacts (BLM, 2025). |
|---|---|---|---|
| 82 | Wild Horse Education | Provide the greatest level of restrictions on resource uses in all WHB HMAs & HAs and GRSG PHaMAs. Tourist and stakeholders in this country and abroad have a vested interest in the wild horses of the Callaghan Complex, and their concerns are undeniable. Nevada misses the boat by not promoting and encouraging tourism for the largest population of wild horses and burros in the country. | Refer to Section 3.2.6 Socioeconomics. |
| 83 | Wild Horse Education | A gather plan EA and an HMAP EA are not the same thing, Leigh v. Raby 3:22-cv-00034 and 2:22-cv-01200 BLM can create both concurrently but cannot ignore the specific difference between the two and must meet requirements of both. This EA falls short of even meeting the established standard for this district for a gather EA only. | See comment 42. |
| 84 | Wild Horse Education | BLM can satisfy HMAP requirements ONLY if they can clearly demonstrate that data and analysis were disclosed in other documents. The RMP that set boundary lines and AML was not a landscape level analysis and no analysis or methodology was disclosed. Please rectify. | Comment noted. |
| 85 | Lander County | Legal Obligation to Maintain AML The Wild Free-Roaming Horses and Burros Act of 1971 (Public Law 92-195) mandates that the BLM manage wild horse populations to maintain a "thriving natural ecological balance" and prevent range deterioration. Under 43 CFR 4710.3-1, the BLM is required to establish and enforce AMLs to ensure that horse populations do not exceed the carrying capacity of the land. Failure to maintain populations within AML risks environmental degradation, including overgrazing, soil erosion, and | Comment noted. |

27

| | | harm to native wildlife, which violates both the Act and the National Environmental Policy Act (NEPA)…. | |
| | | | |
| | | The WFRHBA requires BLM to protect and manage wild horses on public lands to achieve and maintain a "thriving natural ecological balance" while considering multiple uses of the land, such as grazing for livestock. | |
| | | | |
| | | Excess Horses in the Callaghan Complex The Callaghan Complex HMAs are significantly overpopulated, with current estimates indicating that the wild horse population far exceeds the AML range of 323-552 horses. | |

**Gather Operations and Standard Operating Procedure:**

| | Commenter | Comment | BLM Response |
|---|---|---|---|
| 86 | Multiple | Abandon the use of helicopters. | Comment noted. |
| 87 | Multiple | Enforce CAWP. | Consistent with long-standing policies and practices including the CAWP, the handling and treatment provided by the BLM, its contractors, and its partners is always based on compassion and concern for the animals' well-being. The standards in the CAWP were developed in collaboration with professionals, including from the UC Davis School of Veterinary Medicine. Animals are managed and cared for to optimize animal condition, health, and safety. |
| 88 | Colette Kaluza, Wild Horse Education | BLM needs to evaluate capture methods and analyze site-specific issues involving motorized vehicle use during helicopter-drive trapping. This evaluation should include setting a site-specific foaling season | The Bureau of Land Management held its 2025 annual public hearing on the use of motorized vehicles in wild horse and burro management on May 6, 2025, via Microsoft |

28

CAL_09151

| | | and, if fertility control is used, monitoring changes in peak foaling or extensions of foaling season to comply with the prohibition against drive-trapping during foaling season. | Teams. A total of 19 individuals provided oral comments during the hearing, and 3,146 written comments were submitted by email. Most public input expressed opposition to the use of helicopters for gathering excess wild horses and burros. All oral and written comments submitted by the deadline are part of the official record. In response to the concerns raised, the BLM reviewed its Standard Operating Procedures (SOPs) governing motorized vehicle use. Based on this review, no changes to the SOPs were warranted. |
|---|---|---|---|
| 89 | Carolyn Borkowski | BLM must establish safe gather seasons tailored to terrain and foaling cycles. Humane management requires this analysis. | Refer to EA Section 3.2.1 *Wild Horses.* <br><br> Current BLM policy prohibits gathering wild horses with a helicopter (unless under emergency conditions) during the period of March 1 to June 30 which includes and covers the six weeks that precede and follow the peak of foaling period (mid-April to mid-May). |
| 90 | Friends of Animals | BLM should also analyze in detail several issues that were raised in scoping, including how the proposed action would impact herds genetic characteristics; and how concentrations of wild horses at trap sites would impact other resources, including cultural, paleontological, special plant species, historic trails, and wildlife habitats. | Refer to the following sections/tables of the EA: <br> • 3.2.1 Wild Horses <br> • 3.2.2 Native American Religious Concerns <br> • 3.2.5 Recreation <br> • 3.2.8 Special Status Species <br> • 3.2.14 Wildlife, Including Migratory Birds <br> • Table 3 Paleontology |

29

CAL_09152

| 91 | Friends of Animals | The proposed action, removing more than 4,000 wild horses primarily through the use of helicopter drive trapping, will have significant, lasting impacts on all the wild horses. In rounding up wild horses for permanent removal, BLM will utilize helicopter operations over a period of weeks and possibly months. BLM knows all too well that roundups can be stressful for wild horses and result in injuries or death. BLM included a brief and incomplete discussion of the harmful consequences experienced by wild horses in these removal operations. | Refer to Section 3.2.1 Wild Horses and Appendices IV and V. |
|---|---|---|---|
| 92 | Debra Clemente | Livestock, your helicopters, traps, vehicles, people at gather trample the land.  You only mention horses trampling our public lands. Helicopters stress, injure n kill the horses.  Cawp is never enforced at gathers.  You can not police yourselves.  Deaths in the field and a month after roundups in holding should be gather related if horses are gathered.  I think you need new plans to manage our iconic wild horses and burros on our public lands. | Refer to comment 87. |
| 93 | Return to Freedom, Humane World for Animals and Humane World Action Fund | we strongly recommend that the BLM focus primarily on the use of water and bait trapping for gathering wild horses—especially in the warm summer months when helicopter gathers pose inherent risks and water and bait traps may be most attractive. | Comment noted. |
| 94 | Return to Freedom, Humane World for Animals and Humane World Action Fund | While the agencies maintain that CAWP is always followed, repeated incidences of SOPs not properly being followed have been documented by wild horse advocacy groups. It is important that BLM take complaints and perceptions of CAWP not being properly followed seriously. Contracting Officer Representatives must maintain rigorous standards for contractors and BLM staff during gather operations. | Refer to comment 87. |

30

| | | Strict adherence to CAWP and zero tolerance for practices or incidents that fall outside of CAWP will go a long way towards beginning the slow process of re-establishing trust between agencies, contractors, and stakeholders. | |
|---|---|---|---|
| 95 | American Wild Horse Conservation | The right to observe the removal of wild equines from their habitat is a protected form of access to government activity under the First Amendment of the United States Constitution. This principle has been upheld by consistent decisions in federal courts, reinforcing the public's and press's right to observe and document such actions. The BLM must ensure that no barriers—whether physical, procedural, or related to operations on private land—unjustly obstruct public observation of roundups and gather operations described in the proposed action. | Refer to Appendix IV: Standard Gather Operating Procedures, Public Observation, and Risk Assessment. |
| 96 | The Cloud Foundation | The EA fails to consider the following information to minimize trauma and injury to wild horses or burros during a roundup including: Limiting the distance wild horses or burros may be chased by a helicopter to no more than five (5) miles.<br><br>Requiring that the helicopter not chase/move wild horses or burros at a pace that exceeds the natural rate of movement of the slowest animal. This means that if an animal begins to lag behind, the helicopter must lift pressure off the band to bring them in together. Keeping older, sick, and young animals together with their companions, bands, or mothers as they are moved to the trap. The helicopter should not move or capture compromised, old, weak, or young animals. | Refer to Appendix III: Comprehensive Animal Welfare Program and Appendix IV: Standard Gather Operating Procedures, Public Observation, and Risk Assessment.<br><br>Refer to comment 87. |

31

| | | | |
|---|---|---|---|
| | | Establishing strict requirements for suspending helicopter roundup operations in temperatures below 32 degrees F (freezing) or over 90 degrees F. Roundups outside of this temperature range would be blatantly inhumane. | |
| 97 | The Cloud Foundation | Hence, the EA fails to and must consider and implement the following issues and specific alternatives regarding ensuring transparency, First Amendment rights and public observation of the Proposed Action: • Improve public observation of all agency actions to provide meaningful observation. There is significant public interest in the agency's management of wild horses and burros, including but not limited to government activities at roundups. The NAS specifically recommended the BLM improve the transparency of its management of the Wild Horse and Burro Program (NAS 2013). The treatment of the wild horses and burros and agency transparency are paramount and include all aspects of the highly controversial roundups ("gathers"). • Ensure members of the public are provided with meaningful observation and the ability to clearly see the trap site, clearly view wild horses or burros in temporary holding; ensure observation from a vantage point that allows observation of the handling of the animals at the trap, being loaded into trailers, sorted at temporary holding and all aspects of the removal and handling of the animals. • All removal operations must be located on public lands to provide meaningful public observation of all activities. No government operations should be | Changes in SOPs, public viewing, and safety procedures are beyond the scope of this EA. Refer to comment 95. |

32

| | | located on private lands for which the owners will not give permission for public observation of activities. | |
|---|---|---|---|
| 98 | The Cloud Foundation | EA Fails To Analyze the Installation of Cameras on Helicopters, at Trap Sites and Temporary Holding Pens to Provide Meaningful Public Observation in Compliance with First Amendment Rights | The comment states that the BLM has failed to analyze the use of cameras as part of the NEPA analysis. However, the use of cameras is not related to the purpose and need of the HMAP and gather plan, which is to reduce the wild horse population size and growth rates to within established AML ranges and adopt a management plan in order to restore TNEB to the public lands. The use of cameras is thus outside the scope of the BLM's decision space and the EA's analysis. Moreover, the use of cameras and/or the commenter's First Amendment rights do not constitute an environmental impact that must be analyzed during the NEPA process. The BLM properly analyzed reasonable alternatives in accordance with NEPA.<br><br>Further, as outlined in this EA, the BLM must consider the safety of the public observers, BLM and contractor staff, and the horses themselves when engaging in gather operations. The BLM has determined that placing equipment like cameras on gather equipment, including helicopters and traps/holding facilities, poses an unacceptable risk to a safe, effective, and efficient gather. |
| 100 | Wild Horse Education | WHB Gather plans should comply with the herd management plans (HMPs) for other wild, free-roaming species such as deer, elk, pronghorn, bighorn | Refer to comment 81. |

33

| | | | |
|---|---|---|---|
| | | sheep, etc. WHB Gather plans tier to management plans for greater sage grouse. WHB Gather plans tier to Allotment management plans for domestic livestock. None of these HMPs conform in any way to the critical habitat and forage/resource requirements/needs of wild horses and burros. | |

**Wild Horse Population, AML, and Herd Health:**

| | Commenter | Comment | BLM Response |
|---|---|---|---|
| 101 | Lisa Keisler | the accuracy of the number of horses in this HMA, their negative effect on the environment, and the condition of the horses are highly suspect based on reports from several advocacy groups, observing most horses in this area are at least a 5 based on the Henneke Score. | See Section 1.1 of the EA. The estimated adult population sizes are based on statistical analysis of aerial survey data from February 2025. As noted in the EA, the survey followed standard operating procedures for simultaneous double-observer data collection and analysis. The estimated number of excess animals is the number above low AML that would need to be removed reflect expected herd size by late 2025; this is based on the February 2025 adults, plus an expected 15% annual growth rate which is a conservative annual rate to assume. |
| 102 | Front Range Equine Rescue | Finally, where AMLs have been pinned at 323-552 wild horses, the revised EA should explain how many cattle and sheep (by equivalent AUM) have been grazing the same areas. | Actual use livestock in areas where HMAs overlap the grazing allotments and areas outside of HMA boundaries can be found in Section 3.2.4 Table 4 - 9 of the EA in the columns titled *Percent Actual Use of Permit*. |
| 103 | Dina Titus, Congress | The BLM should reevaluate AML to reflect current ecological conditions and allow the Callaghan wild horses and burros to continue roaming free, not confined in government holding. | Reevaluation of AML is out of the scope of the document, as the BLM has no information to support a change at this time.  As outlined in the EA, the Complex is currently exhibiting |

34

| 104 | Multiple | Disclose how AML ranges were established. | degraded resources due to the overpopulation of wild horses.

The AMLs established through Final Multiple Use Decisions (FMUDs) were determined to be the level of use by wild horses, that would provide for a Thriving Natural Ecological balance and prevent deterioration of the range. The AMLs were also determined to be the levels that would provide for sound and healthy populations within the capacity of the habitat to provide forage and water, even in "poor" drought years or severe winters. AMLs were established following the collection, analysis, and interpretation of many years' worth of monitoring data, which included precipitation, use pattern mapping, trend, production, inventory and carrying capacity analysis, as well as coordination with the interested public.  Monitoring has continued to document conditions in the Complex.

The upper levels of the AML ranges represent the maximum population for which a thriving natural ecological balance and multiple use relationship on the public lands can be maintained. "Proper range management dictates removal of horses before the herd size causes damage to the range land. Thus, the optimum number of horses is somewhere below the number that would cause resource damage." Animal Protection Institute of America, 118 IBLA 63, 75 (1991) |

35

| 105 | Charlotte Roe | An HMAP must demonstrate how the carrying capacity of the land was calculated and show the forage allocation for the complex, including how – and based on what metrics – forage has been divided between livestock, wild horses and burros, and other wildlife. Please provide this data. | Refer to comment 104. |
|---|---|---|---|
| 106 | Colette Kaluza, Wild Horse Education | I requested population data and other information from the Mount Lewis Field Office in person and in emails seven times so far over 2024 and 2025, and I have not been provided anything and not been given a time frame when to expect it. I personally visited this office on February 8, August 2, August 9, August 21, 2024. I sent emails August 2, 2024 (twice), January 29, April 1, 2025. I specifically asked for population information regarding Callaghan, South Shoshone, Bald Mountain, Rocky Hills, Fish Creek, and New Pass Ravenswood. I asked for the most recent census flight maps, you know, the recent population census, flyover map, the count, the last flight data, last census, the map with the little dots of where the horses are.<br><br>I have been given lots of excuses for the information not being provided to me, such as they do not have time to provide to me in the proper format, or their office has a lot of ongoing projects right now, or their office will coordinate with their managers and give me a time frame, and it may take a couple of weeks.<br><br>In addition, I asked for census flight maps for the last ten years. Again, I have not been provided any of my requested information nor given a time frame to expect it. I am still asking for this information, because without it I am restrained in my ability to | For past population data refer to Appendix VIII, Table 2: Estimated Wild Horse Populations in the Callaghan Complex since 2009.<br><br>BLM publishes annual wild horse and burro population estimates on March 1st of every year. These estimates can be viewed at the following link: https://www.blm.gov/programs/wild-horse-and-burro/about-the-program/program-data<br><br>Additional data can be requested through the Freedom of Information Act process. |

36

| | | | |
|---|---|---|---|
| | | properly comment on the "Management Evaluation Report Callaghan Wild Horse Complex March 14th , 2025." | |
| 107 | Carolyn Borkowski | **Outdated AMLs:** AMLs set through 1980s agreements are reaffirmed without valid methodology. BLM must provide a contemporary, transparent analysis for determining AMLs. The logic of leaving AML at 323–552 when current populations exceed 5,000 is indefensible and unjust. | Adjustments to AML are beyond the scope of this EA and must be done through a Land Use Plan Amendment.<br><br>The purpose of this EA and HMAP is to conform with the SERARMP and the FMUDs associated with the Complex. Refer to Sections *1.1 Bac ground, 1.2 Purpose and eed,* and *1.  Land Use Plan Conformance* of the EA. |
| 108 | Charlotte Roe | An HMAP is precisely where the window is opened so we the public can understand how and when the AML was proposed and provide input into that determination. In these documents, the AML of 323-552 arose from an archaic agreement made with ranchers and added to a Shoshone-Eureka RMP in 1986. | Refer to comment 104. |
| 109 | Charlotte Roe | To preserve healthy herds in the 600,000 acres to which they are presently limited, I recommend an AML of at least 2000 wild equids. Commercial livestock, which are now allowed in a much wider area, must not be favored over wild horses. | Comment noted. |
| 110 | Friends of Animals | BLM cannot continue to rely on outdated AMLs from more than 20 years ago.<br>The WHBA mandates that determination of excess animals should be based on current information. Yet, the newest AMLs within the Callaghan Complex were set in 2005, twenty years ago this month. In fact, all four of the Final Multiple Use Decisions only re- | Comment noted, see comment 107. |

37

| | | | |
|---|---|---|---|
| | | affirmed AMLs that had been set as far back as 1986 and 1987.

Regardless, relying on AMLs from more than 20 years ago does not qualify as "current" information under the WHBA. BLM should not proceed with the proposed HMAP without first recalculating the AMLs based on current information and updated studies about the positive impacts of wild horses. | |
| 111 | Friends of Animals | BLM failed to consider in detail the alternative of recalculating or increasing the AML based on current information. | See comment 107.

Refer to Section 2.6.5 Raising the Appropriate Management Levels for Wild Horses. |
| 112 | Friends of Animals | Moreover, BLM exaggerates the growth rate of wild horses in the HMAs and thus what alleged impacts increasing the AML may have. According to the EA, no roundups have occurred in the Callaghan Complex since 2011, more than 14 years ago. Yet the annual increase in horse numbers varies widely and does not always adhere to the "15% to 25% annually" that BLM claims. In fact, many yearly increases in the Callaghan Complex were below 15%, and even below 10%. Additionally, the wild horse populations in all three HMAs actually decreased from 2023 to 2024, which BLM has not explained.
The analysis and data present in the EA and appendices are incomplete because they do not explain this massive drop in population numbers from 2023 to 2024 in the absence of a roundup. | Estimates of between 15% to 25% net annual growth rates per year for BLM-managed wild horses have been corroborated by the National Academies of Sciences (2013). Publicly reported wild horse and burro population size estimates reflecting the best available information about herds as of March 1 every year are publicly available (https://www.blm.gov/programs/wild-horse-and-burro/about-the-program/program-data), and include notes about what is the most recent month and year when an inventory (usually an aerial survey) was conducted. As explained in Appendix VIII, the values presented in Table 2 of that Appendix reflect available aerial inventory data, as well as ground-based observations and estimates in years a formal inventory was not conducted. As such, some ground-based observations |

38

| | | | may lead estimates in that table to differ from the March 1 reported values for a given year. Also, as noted in the standard operating procedures for double-observer aerial surveys (Griffin et al. 2020), detection probability is imperfect and can vary from survey to survey. Therefore, it can happen that BLM's publicly reported herd size estimates sometimes change from year to year in a way that is inconsistent with an expectation of constant growth. That is because the best information available changes over time. Recent aerial surveys of HMAs in the Callaghan complex include December 2021, September 2023, and February 2025. The 2024 herd size estimates were informed by the September 2023 survey, while the herd estimates for 2023 herd size was informed by the 2021 survey plus inferred growth. Notably, the 2023 estimates and the 2024 estimates are both far greater than AML. |
|---|---|---|---|
| 113 | Return to Freedom, Humane World for Animals and Humane World Action Fund | The number of horses the BLM intends to gather is very high. This will result in an influx of horses into already-saturated holding facilities at a time when budgets for federal programs are flat or reduced. If fertility control is incorporated, AML may not need to be maintained at low AML since a decreased population growth rate translates to both longer intervals between gathers and fewer animals gathered and removed over time. Outside of gather-only management scenarios, it is possible to adjust AML to improve financial and welfare outcomes. (For example, low AML could be higher, or, alternatively, | One objective of this action is to maintain the wild horse population within AML range, not at low AML. Gathering to low AML allows for population growth between gathers before the population exceeds high AML.

See comment 107. |

39

CAL_09162

| | | the maintenance number the BLM aims for at a gather may no longer need to be low AML.) | |
|---|---|---|---|
| 114 | The Cloud Foundation | Unbalanced AUM Allocations: Livestock AUMs in and around the Complex highlight that livestock is the principal user of these public lands. Livestock use should be minimized within the Complex to accommodate a more suitable population of wild horses and prevent the inbreeding that will inevitably occur under the current proposal. For a healthy wild horse herd covering 600,000 acres, BLM must establish a minimum AML of at least 1,500 to 2,000 adult wild horses in the Complex. | See comments 107 and 116. |
| 115 | The Cloud Foundation | Lacks Adequate Genetic Health Data: The EA fails to provide the genetic health reports, instead citing only incomplete data and failing to quote the genetics analysis. The final EA must include, as appendices, all genetic health reports in order that the public can better understand the data available on the Complex herd. | Refer to Section 3.2.1 Wild Horses - Genetic Diversity for a summary of past genetic reports from the Callaghan Complex. |
| 116 | The Cloud Foundation | The EA must *provide scientific data* demonstrating that removing livestock would not achieve Thriving Natural Ecological Balance (TNEB). Legally, the BLM has no authority to remove wild horses merely to achieve AML; other analyses and determinations must be made first. Extensive livestock grazing, authorized by BLM in this same area, is well-documented as the greatest threat to TNEB. (Attachment 4) This must be thoroughly considered and analyzed in the EA. | Removal of livestock is out of the scope of this EA. Refer to Section 2.2.6 *Remove or Reduce Livestoc  within the Callaghan Complex*<br><br>The BLM 2010 WHB Herd Management handbook H-4700-1 states: *Closure to livestoc  grazing may be temporary or permanent (  CFR   10. (c)). Prior to issuing a final decision to permanently close an area to livestoc  grazing use, a LUP amendment should be completed. Completion of site-specific environmental analysis and issuance of a proposed and final decision* |

40

CAL_09163

| | | | |
|---|---|---|---|
| | | | *pursuant to    CFR   1  0 (200  ) is also required.* |
| 117 | The Cloud Foundation | The EA fails to provide hard data that justifies the AML, the criteria for determining an "overpopulation," and how meeting those goals or purposes cannot be fulfilled by reducing or eliminating livestock grazing.<br><br>The EA's primary intent is not to improve the TNEB but rather to force wild horse numbers down to low AML. The true purpose of HMAP EA is to reduce competition for vegetation and water resources between wild horses and privately-owned livestock, and to create a system for the continued removal of wild horses so livestock can have greater use of our public lands. If TNEB were the true intent, livestock grazing would be reduced to establish reasonable AMLs for each of the HMAs rather than keep the numbers so low they will be forced to inbreed. | The purpose of this EA and HMAP is to conform with the SERARMP and the FMUDs associated with the Complex. Refer to Sections *1.1 Bac ground, 1.2 Purpose and   eed,* and *1.  Land Use Plan Conformance* of the EA.<br><br>Removal of livestock is out of the scope of this EA. Refer to Section 2.2.6 *Remove or Reduce Livestoc   within the Callaghan Complex.* |
| 118 | The Cloud Foundation | The AMLs, still tiered to the 38-year old Battle Mountain RMP, fail to reflect the prevailing public sentiment on how public lands with wild horses should be managed. While some wild horse advocacy groups were included in the development of the 1986-87 RMP, it is clear that today millions more Americans hold stronger opinion and are tired of seeing wild horses treated as second-class animals on our public lands to cater to the livestock and extractive use industry profiteering. | Comment noted. See comment 107. |
| 119 | American Wild Horse Conservation | Under 43 C.F.R. § 4720.1, the BLM is authorized to remove excess wild horses and burros from public lands only "[u]pon examination of current information and a determination by the authorized officer that an | Comment noted. See comment 107. |

41

| | | | |
|---|---|---|---|
| | | excess of wild horses or burros exists." As disclosed in the EA, the AMLs for this Complex were established through the 1986 Shoshone-Eureka RMP and 1987 Amendment, most recently reaffirmed and reorganized in 2005. EA at 2. The agency's continued reliance on an AML established nearly 40 years ago and most recently reconsidered nearly 20 years ago, is arbitrary and capricious. Assuming that range conditions have remained static for 20-40 years is unreasonable and inconsistent with the agency's duty to make informed management decisions based on current conditions.<br><br>It is incumbent upon the BLM to reassess the land health of the project area to establish an AML that reflects present-day conditions and supports a genetically viable population. At a minimum, the agency must conduct a thorough evaluation of current conditions before advancing any proposed actions for horse removal. | |
| 120 | American Wild Horse Conservation | This is particularly concerning because the Complex does not appear to have had an evaluation of its genetic stability for about 15 years. EA at 36. As part of this reassessment, the agency should prioritize genetic studies of the wild horse populations under its management to ensure their preservation as a genetically viable and ecologically significant species. | Refer to Chapter 5 of the EA and Management Objectives: Objective 2 – *Sustain Healthy Populations of Wild Horse.* It is expected that wild horses from the Callaghan Complex would again be sampled for genetic diversity monitoring during the course of a gather, as noted in EA section 2.1.1. |
| 121 | Wild Horse Education | *BLM can   OT simply claim the   orth Shoshone should be an HA and hide behind fear of conflict and assertions   site-specific data and analyses must be provided.* | The North Shoshone Herd Area was designated as HA in the 1986 SERARMP.<br><br>The BLM 2010 WHB Herd Management handbook H-4700-1 states:<br>*   erd Areas Not Desi   nated as       As* |

42

| | | | *Where appropriate, the LUP may include decisions not to manage WH  B in all or a part of an HA. An example is intermingled and unfenced private lands within HAs where the landowners are unwilling to ma  e them available for WH  B use, or the animals present at that time were later found to be claimed domestic horses (or burros). Another example would be where essential habitat components (forage, water, cover and space) are unavailable or insufficient to sustain healthy WH  B and healthy rangelands over the long term.* |
|---|---|---|---|
| 122 | Wild Horse Education | Based on BLM MER provided data, AMLs of 60-100 for the "Callaghan Complex" are absurdly low for a 1.18 million acre complex where exchange of populations is becoming more limited due to livestock and mining threatening any assertions of stability. BLM must disclose an actual databased equation for how AMLs were established. An evaluation to set a new science-based AML must occur. Populations in the complex have reached more than 1,700. A true AML would be closer to actual populations of today rather than what BLM set through historical agreements with permittees. | The AML range for the Callaghan Complex is 323-552. The AML for each HMA within the Complex can be found in Table 1: *Estimated Population and Removal  umbers to Achieve Low AML.* |
| 123 | Wild Horse Education | BLM relies on outdated and anecdotal information to define a broad and baseless timeframe for wild horse and burro foaling seasons from March 1 until June 30 (from the 1980s).<br><br>BLM must create a databased foaling season for each wild horse herd included in an HMAP. Because BLM is prohibited from doing helicopter drive-trapping | Comment noted. The BLM complies with its policy, which is based on the best available scientific data. |

43

| | | during foaling season, the HMAP must provide site-specific analyses. | |
|---|---|---|---|
| 124 | Wild Horse Education | Overall population growth within the wild horse herds is demonstrated by BLM provided MER data to be between 9.5% and 12%, far below BLM's generalization of 20% to 25%. Compiled BLM provided data from 2009-2024 clearly establishes an overall population growth rate for the Callaghan Complex to be less than 12%. Noteworthy, is the population actually declined significantly and alarmingly (-13%) between 2023 and 2024. Furthermore, it is evident that very healthy wild horse populations have stabilized in accordance with environmental conditions, thus proving sustainable AMLs at these populations. | See comment 112. |
| 125 | Wild Horse Education | The MER provides no genetic evaluations of the populations of wild horses. Any form of PGS or permanent sterilization on wild horses, where AML is set at a level that represents genetic bankruptcy, should be strictly forbidden in the HMAP. | Refer to Section 3.2.1 Wild Horses – Genetic Diversity. |
| 126 | Wild Horse Education | Predation must be included in population modeling for this area. Mountain lion population information must be included and analyzed, especially in concert with AMLs. Perhaps some WHB herd areas/HMAs have no predation, however, this area *has* predation. | Throughout the HMAs administered by the Battle Mountain District, few predators exist to control wild horse or burro populations. Some mountain lion predation occurs but does not appear to be at such a substantial level to limit population growth, as indicated by the overall persistent growth in wild horse herd sizes over time. Coyotes are not prone to prey on wild horses unless such horses are young or extremely weak. Other predators such as wolf or bear do not exist at detectable numbers |

44

| | Commenter | Comment | BLM Response |
|---|---|---|---|
| | | | in the Callaghan Complex. |
| 127 | Wild Horse Education | Define the definition of excess" wild horses specifically for the "Callaghan Complex," as AML alone is not a determination of excess. | The BLM 2010 WHB Herd Management handbook H-4700-1 refers to federal regulations that govern BLM's management of wild horses when it states "*The term "excess animals" is defined as those animals which must be removed from an area in order to preserve and maintain a thriving natural ecological balance and multiple-use relationship in that area (1 USC 1 2(f)(2)). This definition underscores the need to remove excess animals before damage to the range begins to occur.*" |

Grazing and Livestock:

| | Commenter | Comment | BLM Response |
|---|---|---|---|
| 128 | Lisa Keisler | Reduction of private grazing should be a consideration as well. | Livestock grazing may be reduced or eliminated if the BLM follows regulations at 43 CFR § 4100 and must be consistent with multiple use allocations set forth in the land-use plan. Forage allocations are addressed at the planning level. Such changes to livestock grazing cannot be made through a wild horse gather decision or through 4710.5(a), and are only possible if BLM first revises the land-use plans to allocate livestock forage to wild horses and to eliminate or reduce livestock grazing. Livestock permits, their associated administrative management, and land-use plan amendments are out-side the scope of this document. Any increase in authorized |

45

| | | | grazing use must follow the requirements set forth in the 43 CFR Part 4100 regulations. Any reallocation of forage between wild horses and livestock would require a land-use plan amendment. |
|---|---|---|---|
| 129 | Lisa Keisler | The truth by the numbers: Wild horses and burros are not overpopulated. In reality, the only animals truly overtaking the West are the privately owned cattle and sheep permitted to overgraze our public lands. Wild horses are present on just 27 million acres of BLM land in the West, while ranchers have access to livestock grazing on over 155 million acres. Not only that, but 88% of the public lands that the BLM manages have no wild horses or burros present.<br><br>The truth in science: The main cause of land degradation in the American West is livestock grazing. A recent study by Public Employees for Environmental Responsibility (PEER) found that not only do livestock outnumber wild horses and burros on public lands by more than 125:1, but livestock grazing is the reason why 72% of rangelands did not meet the required Land Health Standards. Further, a congressionally mandated study by the National Academy of Sciences found that, in one year, livestock consumed 70% of grazing resources on public lands, while wild horses and burros consumed less than 5%. | Actual use livestock in areas where HMAs overlap the grazing allotments and areas outside of HMA boundaries can be found in Section 3.2.4 Table 4 - 9 of the EA in the columns titled *Percent Actual Use of Permit.* |
| 130 | Front Range Equine Rescue | Livestock Grazing Levels Are Extremely High in Wild Horse Areas So Should Be Reconsidered in the HMAP Development Process.<br>A substantial deficiency in the draft EA is the lack of adequate data and transparency regarding the livestock | Refer to Section 3.2.4, Tables 4 - 9 of the EA in the columns titled *Percent Actual Use of Permit.* |

46

| | | grazing in the HMAs. It is not apparent from BLM's data and the draft EA how BLM is able to determine that the wild horses are causing rangeland degradation, where there are livestock allotments heavily using the same areas, particularly when the biggest livestock grazing allotment, Carico Lake, has been using nearly 100% of its Animal Unit Months (AUM) for the last ten years. | Monitoring data can be found in Appendix VIII. of the EA. |
|---|---|---|---|
| 131 | Front Range Equine Rescue | The draft EA does not justify BLM's position to defer re-evaluation of those existing high livestock AUMs to a later date. BLM states that "changes in forage allocations between livestock and wild horses would have to be re-evaluated and implemented through the appropriate public decision-making processes to determine whether a thriving natural ecological balance can be achieved at a higher [Appropriate Management Level] ("AML")." Initially, it should be noted that the choice is not just to change the wild horse AMLs up or down. BLM could also cut back on forage being allocated to livestock. That said, looking at AMLs is almost certainly warranted in the near-term. That said, looking at AMLs is almost certainly warranted in the near-term. BLM states that "AML would be evaluated, as needed, following an in-depth analysis of resource conditions including but not limited to actual use, utilization, available forage and water, range conditions, trend, and precipitation." …<br><br>Removing wild horses but not considering whether grazing allotments are overutilized, are too high to begin with, or are taking over lands that are specifically designated for wild horse management is | Refer to Section 1.2 Purpose and Need. Reevaluating AMLs and AUMs allocations are outside the scope of this document.<br><br>See comments 107 and 128. |

47

| | | | |
|---|---|---|---|
| | | an inappropriate, skewed, and illegal way to view the design of the HMAP. | |
| 132 | Front Range Equine Rescue | There Is an Overall Lack of Data and Transparency regarding Livestock Grazing in the Complex. BLM draws attention to the fact that overall, livestock grazing allotments have not used 100% of their allocations over the last ten years, but that is misleading. There are substantial areas of livestock grazing allotments that are not frequently visited by the wild horses, such as Argenta. *See* 2018 Preliminary Rangeland Health Assessment and Evaluation Report, at 57 (noting "wild horses are not common within the Argenta Allotment"), Preliminary Rangeland Health Assessment and Evaluation Report - Argenta, Copper Canyon, and North Buffalo Allotments. On the other hand, the large Carico Lake allotment, of approximately 563,000 acres of public land is equal to about 50% of the entire complex that BLM allows for all of the wild horses (~1.1 million acres). (*See* Carico Lake 2005 FMUD, at 6, Final Decision AML Springdale #2 Allotment.) That is only one of the many grazing allotments, used by several private livestock interests,1 yet BLM is for some unexplained reason confident that acreage, stocking rate, and AUM allotment should all remain untouched, while thousands of wild horses are removed. | The Argenta grazing allotment does not contain or overlap any HMA. Any wild horses residing in the Argenta allotment have migrated from other grazing allotments.<br><br>The Copper Canyon and North Buffalo Allotments are not associated with this HMAP or EA. |
| 133 | Front Range Equine Rescue | BLM Should Open Up Additional Areas to Wild Horse Grazing. If (as anticipated) the further grazing utilization data described above will show that livestock are impacting wild horse herds in the existing HMAs, BLM needs to open up more acreage for wild horse grazing. The sizeable North Shoshone HA has not been designated | The Argenta grazing allotment does not contain or overlap any HMA. In accordance with the 1986 SERMP the North Shoshone HA is not designated for wild horse use.<br><br>The SERARMP set AML in the North Shoshone HA to zero due to the area being |

48

| | | | |
|---|---|---|---|
| | | for wild horse usage since 1986, but BLM could allow that area to be utilized by wild horses. BLM could also allow the areas between the existing HMA boundaries to be used by wild horses. By doing so, BLM would reduce some overlap with the livestock grazing and reduce pressure on rangeland and water resources. | 41% privately owned land. Changing AML is beyond the scope this EA.<br><br>The BLM 2010 WHB Herd Management handbook H-4700-1 states ***erd Areas Not Desi nated as As*** *Where appropriate, the LUP may include decisions not to manage WH B in all or a part of an HA. An example is intermingled and unfenced private lands within HAs where the landowners are unwilling to ma e them available for WH B use, or the animals present at that time were later found to be claimed domestic horses (or burros). Another example would be where essential habitat components (forage, water, cover and space) are unavailable or insufficient to sustain healthy WH B and healthy rangelands over the long term.* |
| 134 | Front Range Equine Rescue | Unfortunately, BLM has an economic incentive to allocate acreage to livestock grazing over wild horse usage: *i.e.*, BLM makes money from livestock allotments. BLM also faces community pressure from ranchers who want to exploit that land for their own personal profits and because being permitted by BLM to graze that prime land increases the nearby private land values for them. BLM does not have *any* economic incentive or economic pressure to protect and promote wild horse grazing. Ignoring, under the guise of "deferring," critical examination of the livestock grazing allotments will not sensibly, holistically lead to the thriving natural ecological balance that BLM is mandated by the law to attain. Setting an HMAP without re-examining livestock | Comment noted. |

49

| | | grazing is both arbitrary and capricious, and doomed to produce an incomplete solution that is unjust to the wild horses BLM must protect, and therefore in violation of the WHA. | |
|---|---|---|---|
| 135 | Charlotte Roe | The area addressed by this plan permits the AUM equivalent of 6,466 livestock to graze year-round on land that is admittedly degraded and not suitable for this ruminant species. That "appropriate livestock level" amounts to 20 times the equid population proposed by the plan, in which wild horses would be removed to low AML. BLM's claim that the Land Use Plan process cannot be accessed to adjust livestock grazing is arbitrary and discriminatory. Under 43 CFR 4710, BLM can close or reduce livestock grazing at any time "to provide habitat for wild horses or burros…or to protect wild horses or burros." This legally sanctioned alternative must be incorporated in a draft HMAP. | Refer to section 3.2.4 Rangeland Health Standards and Guidelines and Livestock Grazing for grazing schedules and permitted and actual livestock use.

43 CFR 4710.3-2 states that herd management areas may also be designated as wild horse or burro ranges to be managed principally, but not necessarily exclusively, for wild horse or burro herds. |
| 136 | Charlotte Roe | Any plan must provide information disclosing the movement patterns of wild horses and what parts of their current HMA's as opposed to the larger checkerboard are essential habitat. | Refer to Appendix I: Project Area Maps. |
| 137 | Charlotte Roe | By grazing down cheat grass and other fire fuels, wild horses are vital contributors to lowering wildfire risks. This is evident from data indicating that at much higher populations than the proposed AML, the size and frequency of fires in this Complex were reduced. The positive range impacts of wild equids need to be addressed. As it stands, the EA treats them as pests, revealing innate bias that has no scientific foundation. | Refer to Section 3.2.12 Wildfire and Fuels. |
| 138 | Friends of Animals | BLM failed to consider in detail the alternative of reducing livestock grazing. | Refer to Section 2.6.6 Remove or Reduce Livestock within the Callaghan Complex. See comment 128. |

50

| 139 | Friends of Animals | The Callaghan Complex includes portions of "several livestock grazing allotments," at least some of which are permitted "during all seasons." Perhaps unsurprisingly, BLM does not directly disclose the number of AUMs authorized in the Callaghan Complex. Perhaps BLM does not itself know this exact number, as it proffers only a series of vague tables of data that do not present a clear picture. However, even a generous interpretation of the AUMs provides at least a ten-to-one ratio of livestock AUMs to wild horse AUMs. At the low AML, the wild horses in the Callaghan Complex will only use 3,876 AUMs. While the draft EA itself does not provide a clear answer, the livestock AUMs within the Callaghan Complex easily reach 40,000, more than ten times that of wild horses. | Refer to Section 3.2.4 Rangeland Health Standards and Guidelines and Livestock Grazing: Tables 4-9. |
|---|---|---|---|
| 140 | Friends of Animals | The Draft EA states that wild horses are excess and need to be removed. However, BLM fails to analyze grazing utilization and distribution, trends in ecological conditions, climate data, or any other evidence to support BLM's position that wild horses are responsible for the alleged damage to the range. BLM must consider this information before proceeding. As mentioned above, Appendix VII to the Draft EA, which summarizes the monitoring of rangeland condition data, does distinguish wild horses from other uses. Instead, it directly mentions how "common" it is to observe "hoof action from both livestock and wild horses." | Refer to Appendix VIII Monitoring Data and Reports |
| 141 | The Cloud Foundation | The EA highlights that BLM permits the annual equivalent of 6,466 year-round cows in the Callaghan Complex — 11 to 20 times more than the meager AML of just 323 to 552 wild horses for the entire area. | See comments 107 and 128. |

51

| | | Over the past 10 years, actual livestock use in the Complex has averaged the equivalent of 2,212 year-round cows — more than four times the high AML for wild horses.<br><br>The BLM *must* reevaluate the "Arbitrary" Management Level (AML) of just 323 - 552 wild horses (or 3,876 - 6,624 AUMs) in the Complex, while at the same time permitting the *annual equivalent* of 6,918 year-round cows (or 83,016 AUMs) to graze in the same area. BLM's own data shows that over the past 10 years, livestock have grazed an average of 26,544 AUMs, or the annual equivalent of 2,212 year-round cows. | |
| 142 | The Cloud Foundation | Disclosure of science or historic documents that supports the AUMs allocated for livestock in the HMA | Refer to EA Section 1.1 Background. |
| 143 | The Cloud Foundation | Contradictory TNEB Determination: Livestock was added to the Complex over the past 10 years (and probably beyond) demonstrating BLM determined that Thriving Natural Ecological Balance (TNEB) is being achieved when it comes to livestock grazing. Yet the agency turns around and claims that TNEB is not being achieved when it comes to wild horse usage. Certainly, BLM would not authorize additional grazing animals to an overgrazed area. | Permitted livestock use within any grazing allotment in the Callaghan Complex has not increased since 2005 and 2002.<br><br>Livestock operators have reported ongoing drought conditions and overpopulation of wild horses for increases of nonuse within the Complex.<br><br>Refer to Tables 4 – 9 in the EA. |
| 144 | The Cloud Foundation | Under 43 CFR § 4710, BLM is authorized to close livestock grazing at any time "to provide habitat for wild horses or burros … or to protect wild horses or burros." There are no qualifications requiring an "emergency" or LUP amendment. Yet, the EA fails to acknowledge this legal fact that enables BLM to close | See comments 116 and 128. |

52

CAL_09175

| | | livestock grazing to provide habitat for wild horses, and therefore fails to consider a reasonable alternative action that would protect TNEB. | |
|---|---|---|---|
| 145 | American Wild Horse Conservation | in Appendix VIII: Monitoring Data Summary fails to justify dispositive statements that wild horses are causing harm to the range. To begin with, this summary fails to differentiate the effects of wild horses from livestock including something as basic as hoof action. Given that livestock is the main cause of harm to public lands managed by the agency, it is imperative to determine how much of this harm is truly from wild horses. Forage Utilization within the gather area HMAs as presented in Table 1 of Appendix VIII further undermines the agency's claims regarding harm to the environment. As noted in Table 1, forage utilization within the Gather Area HMAs have ranged from slight to moderate, with only 2022 showing moderate use. In addition, information presented for 2021 and 2023 demonstrates no observed use. Not only does this information undermine agency narrative of severe and heavy use "documented throughout the Callaghan Complex," it further demonstrates the exact kind of monitoring data that should compel the agency to review the AMLs for this Complex. Even the photos included in this summary fail to attribute any of the documented use to wild horses and offer minimal insight with all but one of the photos demonstrating use from 2017 to 2020. | Livestock and wild horse are both contributing factors to rangeland degradation. However, removal or reduction of livestock is beyond the scope of this action. See comments 107 and 116. |
| 146 | Wild Horse Education | *Any adjustments in forage allocations on any such lands shall ta e into consideration the needs of other wildlife species which inhabit such lands.* LIVESTOCK IS NOT WILDLIFE nor is livestock a public value like wild horses, and adjustments to | This action is not adjusting forage allocations for wildlife, livestock, or wild horses. The BLM's multiple use management mandate includes livestock. |

53

| | | livestock forage allocations must be considered before permanent removal and other population control actions are taken against wild horses and/or burros. | |
|---|---|---|---|
| 147 | Wild Horse Education | BLM has known the boundary lines for the Shoshone and Callaghan were incorrect, and in 2010 and 2012, during NEPA planning for HMAP and RMP amendments respectively, BLM moved forward to rectify those inaccuracies, and Ms. Leigh was part of the BLM team doing the data collection and analyses (*see* Matrix Map below). The BLM Matrix map not only provides rectified herd boundaries, it establishes the entire Shoshone as a "managed" herd area. | There have been no amendments to the SERARMP since 1987.<br><br>Decisions to change HA boundaries, to designate HMAs for the maintenance of WH&B, or to remove all or a portion of an area's designation as an HMA must be made through a LUP amendment, revision or new RMP (43 CFR 4710.1 and H-1601-1: Land Use Planning Handbook). |
| 148 | Wild Horse Education | The NEPA directs BLM to evaluate cumulative impacts in EAs/EISs, and BLM is directed to effectively utilize mitigation of resource impacts from multiple uses, which must be included in an HMAP if not provided in an LUP/RMP (which they are not). | Refer to Chapter 5: Monitoring and Mitigation Measures and Appendix XIII HMAP. |
| 149 | Wild Horse Education | BLM shall certainly be in violation of NEPA and the WFRHBA should they fail to address multiple use cumulative impacts on the HMAs' habitat and resources identified in this proposed HMAP and Gather EA and provide mitigation triggers and strategies for this NEPA process. | Refer to Chapters 4 and 5. |
| 150 | Wild Horse Education | BLM has known since its 2012 RMPA analyses that Shoshone herd area boundary lines were incorrect and that the North Shoshone had adequate forage, water, cover, and space to sustain health wild horses and healthy range over the long-term (H-4700-1, H-1601-1, and 43 CFR §4710.1). Analysis and trigger identification for repatriation of North Shoshone HA must be included in the HMAP. | See comment 147. |

54

| 151 | Front Range Equine Rescue | More broadly, it should be clear that the development of the HMAP is the opportunity for just such a public process as BLM cites, particularly where available data indicate that there are two principal land use resources that are in competition for a limited set of available forage and water. BLM is choosing to focus on only one of those (wild horses) as the problem, and moving ahead with setting a management plan that examines and impacts only one of those two uses. Removing wild horses but not considering whether grazing allotments are overutilized, are too high to begin with, or are taking over lands that are specifically designated for wild horse management is an inappropriate, skewed, and illegal way to view the design of the HMAP. | Refer to EA Section 1.2 Purpose and Need. |

**Fertility Control:**

| | Commenter | Comment | BLM Response |
|---|---|---|---|
| 152 | Charlotte Roe | The plan would also manipulate sex ratios in favor of males, although the BLM is aware this practice triggers increased stallion aggression while putting mares and young ones in harm's way. This, combined with the plan to sterilize half of the remaining mares, will create inbreeding and eventually condemn the herds to slow extinction. These impacts and those related to "fertility control" cannot be ignored, but the proposed plan says nothing about the proven risks, as though wild horses are mere guinea pigs. I support PZP immunocontraceptive vaccines; no other vaccine has the long-term testing and proven scientific results that support mare and herd health. | Sex ratio skewing, fertility control (PZP and GonaCon), and gelding have been long-employed by the BLM as population growth suppression methods and they comply with the WFRHBA. This EA analyzes the impacts of use of those methods, including in Appendix V Standard Operating Procedures for Mare Fertility Control and Gelding, and Scientific Literature Reviews |

55

| 153 | Front Range Equine Rescue | Using PZP Is Proven, Safe, Effective, and Should Have Been Done in Greater Amounts and in All HMAs for Years Now. | Comment noted. |
|---|---|---|---|
| 154 | Front Range Equine Rescue | BLM should be focusing on PZP applications on a larger percentage of the herds and conducting those operations more frequently so that population levels are controlled more by PZP application than by removals. | Comment noted. |
| 155 | Front Range Equine Rescue | BLM Should Drop IUDs, Sterilization Procedures, GonaCon, and Gender Ratio Skewing. In connection with increasing the PZP applications, BLM should not include as population control strategies any use of intra-uterine devices (IUDs), sterilization procedures, Gon-Con, or gender ratio skewing. These strategies are inconsistent with minimal feasible management because they are unproven and unsafe (IUDs, sterilization, and GonaCon), no more effective than PZP which is proven and effective (GonaCon and gender ratio skewing), traumatizing and invasive (IUDs and sterilization), irreversible (sterilization), and potentially fatal (IUDs and sterilization procedures). BLM is far afield of the bounds of minimal feasible management required by law in proposing to experiment on this large population of wild horses with IUD and sterilization procedures that have no demonstrated safety and effectiveness in wild horses. | Refer to comment 152. |
| 156 | Charlotte Roe | The proposed alternative would utilize GonaCon, a "fertility control" vaccine that has been shown to be irreversible after two years; it destroys natural hormone regulation and wild behaviors which are protected by the 1971 Wild Horse Act. The plan would also utilize experimental IUDs, which can lead to | Refer to Chapter 2: Alternative A and Appendix V Standard Operating Procedures for Mare Fertility Control and Gelding, and Scientific Literature Reviews. |

56

| | | uterine infection and severe abdominal pain and eventually the death of the mare; this device is ONLY appropriately used with domestic horses that are closely monitored. | |
|---|---|---|---|
| 157 | Dina Titus, Congress | In addition, the BLM should prioritize use of proven fertility control methods, like the Porcine Zona Pellucida (PZP) vaccine, to manage equine population levels. The PZP vaccine is safer, more cost efficient, and more humane than other population control methods. The BLM, however, currently spends less than four percent of its Wild Horse and Burro Program budget on such practices, a gross underinvestment in a tool that can transform the way we manage these icons of the West. | Comment noted. |
| 158 | Friends of Animals | In the EA, BLM indicates that it has already administered porcine zona pellucida (PZP) vaccines in both 2009 and 2011 in multiple HMAs within the Complex. The proposed action will conduct additional fertility experiments skewing the sex ratio and using PZP, Gona-Con, and/or IUDs. These actions could have damaging and irreversible impacts on not just the individual wild horses, but also the entire populations in the Callaghan Complex. These measures disrupt wild horses' natural behaviors, social structures, and hormones that are crucial for their survival. They cause stress and alter the behavior of the animal subject to the treatment and the social health of the herd as a whole. | Refer to comment 152. |
| 159 | Return to Freedom, Humane World for Animals and Humane World Action Fund | We recommend using PZP for management application to wild horses. ZonaStat-H in particular has been studied and proven safe, effective, and humane over the longest period of time and in the greatest number of horses, including, importantly, the | Comment noted. |

57

| | | greatest number of horses in free-roaming situations. Further, ZonaStat-H carries an excellent reputation in wild horse advocacy circles, which can quiet potential distress around using less-well-understood or less-studied on-range fertility control modalities. | |
|---|---|---|---|
| 160 | Return to Freedom, Humane World for Animals and Humane World Action Fund | Though we welcome the careful exploration of new fertility control modalities, IUD's in mares are still being studied, and using them for mares released on-range is premature as they cannot then be monitored sufficiently. It is critically important that IUD's are proven safe, effective and humane before they are implanted in live, wild animals. This is especially important in light of older attempts to use IUD's in mares which resulted poorly welfare-wise. | Comment noted. Refer to Appendix V Standard Operating Producers for Mare Fertility Control and Gelding, and Scientific Reviews. |
| 161 | Return to Freedom, Humane World for Animals and Humane World Action Fund | As with IUDs, all methods of longer-acting or permanent fertility control must be effective, safe and humane. This means that established standards must be developed, agreed upon, and met before they are deployed as management tools. | Comment noted. |
| 162 | Return to Freedom, Humane World for Animals and Humane World Action Fund | Because horse populations typically contain 50:50 ratios of mares to stallions—with behavior and band and herd dynamics inextricably tied to that normal demographic—sex ratio adjustments, though they can reduce population growth rates a small amount and for a short time, could result in behaviors that are not healthy or normal for herd dynamics. Anecdotal evidence (Onaqui HMA in Utah) suggests that higher numbers of stallions than mares results in overly aggressive pursuit of mares, and disruptive behaviors to individual horses and to bands. | Comment noted. Refer to Appendix V Standard Operating Producers for Mare Fertility Control and Gelding, and Scientific Reviews. |
| 163 | Return to Freedom, Humane World for Animals and | To reduce this need, for reasons laid out below, we strongly recommend that management actions include immediate implementation of fertility control | Comment noted. Fertility control is included in Alternatives A and B as part of the overall HMAP and plan. |

58

| | | | |
|---|---|---|---|
| | Humane World Action Fund | alongside the initial gathers occurring within the HMAs, even if AML is not achieved.<br><br>It is most important for the BLM to immediately start treating a significant proportion of mares on the range, even if AML is not first met. Through modeling and peer-review research analysis we have learned that: a multi-faceted approach to wild horse management must include some removals, some on-range fertility control (via darting and/or bait/water trapping), and/or some gather-administer-release fertility control (as can be optimized during a well-supported and -resourced gather operation). | |
| 164 | Return to Freedom, Humane World for Animals and Humane World Action Fund | We do not support any surgical sterilization of animals for management purposes<br><br>Minimally invasive procedures—by definition in this EA, those that do not require a surgical incision—may also result in additional pushback from the public. They are also in very early stages of study, the procedure is only practiced by a handful of veterinarians, and they require a team of veterinarians to perform each procedure. The logistics and feasibility of such a procedure to develop into a useful one is perhaps far-fetched. | Comment noted. |
| 165 | The Cloud Foundation | We support the use of PZP and PZP-22 fertility control because they are reversible and protect natural "wild" behaviors. We cannot overemphasize our strong opposition to the reduction of wild horses to just 323 horses (of which 25% of the mares would be sterilized) on more than 600,000 acres – while BLM allows livestock grazing to continue in the same area; | Comment noted. |

59

| | | this is illegal, wrong, and is opposed by the vast majority of Americans. | |
|---|---|---|---|
| 166 | The Cloud Foundation | The EA misleads about the reversibility of Gonacon and then goes on to acknowledge there is little data available on the reversibility: "Even with one booster treatment of GonaCon-Equine, it is expected that most, if not all, mares would eventually return to fertility at some point, although the average duration of effect after booster doses has not yet been quantified." | Comment noted. Refer to Appendix V Standard Operating Producers for Mare Fertility Control and Gelding, and Scientific Reviews. |
| 167 | The Cloud Foundation | EA FAILS TO PROVIDE SUFFICIENT DATA TO IMPLEMENT OVIDUCT BLOCKAGE; SUCH AN EXPERIMENT REQUIRES AN EIS | Refer to Section 3.2.1 and Appendix V. |
| 168 | The Cloud Foundation | The EA fails to provide scientific information or data to support skewing the sex ratio. Natural wild horse populations favor females and altering that natural ratio to favor males would create aggression between males, potentially causing a decline in male body condition, injury, or even death. Additionally, female and foal foraging would likely be disrupted to varying degrees due to elevated male-on-male aggression. The severity of the social disruption would correspond to the increased percentage of males as outlined in the two peer-reviewed papers and BLM statements below. | Refer to EA Section 3.2.1 – *Sex Ratio Adjustment.* |
| 169 | American Wild Horse Conservation | In addition, the Advisory Board Recommendations explicitly contradict the BLM's longstanding and arbitrary stance that the population must be within AML to begin implementing population control components such as fertility control vaccines. *See* Advisory Board Recommendation "2)" *stating in relevant part* "...application of fertility control should be prioritized as a tool to stabilize population growth in every HMA or WHT…[t]his should include HMAs | Wild horse herd sizes in the Callaghan Complex will not be maintained at levels below low AML. As stated in the Purpose and Need, the BLM's purpose includes to achieve and maintain wild horse population sizes within established AML ranges. |

60

| | | | |
|---|---|---|---|
| | | or WHTs where AML has not been achieved…" Despite this clear direction from experts acting in their official capacity, this proposed action seemingly ignores this advice stating that "[i]f gather efficiencies of the initial gather exceed the target removal number of horses necessary to bring the population to low AML, this would allow the BLM to begin implementing the population control components (fertility control vaccines for hoses; IUDs, mare sterilization, and sex ratio adjustment) of this alternative with the initial gather." EA at 16. Not only does this statement explicitly contradict the Advisory Board, it further presents an unlawful outcome where wild horses are removed from the Complex to a level below low AML by removing a number of horses that exceed the target removal. Further planning should comply with the Advisory Board Recommendation and remove any consideration of unlawful removal of horses to a level below low AML. | |
| 170 | American Wild Horse Conservation | The BLM must shift its focus to range-based management strategies, including expanded fertility control programs, to address the economic, animal welfare, and public health issues associated with its current practices. Any proposed action involving roundups should disclose how it complies with Congressional direction and scientific recommendations while addressing the long-term implications of increased off-range holding. | Addressing the long-term implications of increased off-range holding is beyond the scope of this EA. The EA is notes land use plan conformance in EA section 1.3 and relationship to statutes, regulations or other plans in EA section 1.4. |

61

**Callaghan Complex Herd Management Area Plan**

Introduction
The Callaghan Complex (The Complex) Herd Management Area Plan (HMAP) will establish short and long-term management objectives for the wild horse herd and their habitat within lands administered by the Bureau of Land Management (BLM). These objectives will guide management of the Callaghan Complex and the wild horses within it over the lifetime of the plan. The Callaghan Complex HMAP will remain in effect until superseded by another document.

The Callaghan Wild Horse Complex consists of the Callaghan, South Shoshone, Bald Mountain, and Hickison (north of Nevada State Highway 50) HMAs, and North Shoshone HA. The Complex lies entirely within Lander County, Nevada, and expands from approximately 7 miles south of Battle Mountain to approximately 6 miles north Austin. The Complex encompasses approximately 1,145,515 acres (See Appendix I, Project Area Maps).

During preliminary planning for the Callaghan Wild Horse Complex Herd Management Area Plan / Gather Plan a Habitat Management Evaluation Report was prepared for public comment. mailed to the interested public mailing list informing 77 individuals, organizations and State and Federal Agencies of the availability of the document for public review on March 14th, 2025. Comments were received from 4,312 individuals, groups, and agencies during the 30-day comment period, and 90 comments were received after the end of the comment period. Approximately 4,300 of the comments received were form letters.

The Preliminary EA was posted on eplanning.gov on August 4th, 2025.  A letter was mailed to the interested public mailing list informing 77 individuals, organizations and State and Federal Agencies of the availability of the document for public review. Letters were also sent to 5 Native American Tribal Representatives throughout Central Nevada informing them of the proposed gather. A BLM News Release was also issued, announcing the opportunity to review and submit comments.

In response to the Preliminary EA approximately 124 comment letters were received from various organizations, institutions, or individuals. Comments received were considered in completion of the Final Callaghan Complex EA and summarized in Appendix XIV of the Final Callaghan Complex EA.

For additional general information on the Callaghan Complex, please consult the Callaghan Wild Horse Complex Management Evaluation.

Appropriate Management Level
The Callaghan Complex's Appropriate Management Levels (AML) were established through the Shoshone-Eureka Resource Area (SERA) Management Plan (RMP) Objectives (Shoshone-Eureka RMP Record of Decision dated 1986 and Shoshone-Eureka RMP Amendment, Record of Decision dated 1987). The Mount Lewis Field Office (MLFO) re-affirmed AMLs through the following Final Multiple Use Decisions (FMUD):

- Austin Allotment FMUD, January 13th, 1995
- Carico Lake Allotment FMUD, September 30th, 2005.
- Grass Valley Allotment FMUD, June 21st, 2002.
- Kingston and Simpson Park Allotments FMUD, September 30th, 2005.

HMAP Table 1: Callaghan Complex Acres, AMLs and Decision(s).

| HMA/HA | Acres | AML | Decision(s) |
|---|---|---|---|
| Bald Mountain HMA | 139,875 | 129-215 | Carico Lake FMUD |
| Callaghan HMA | 133,093 | 134-237 | Grass Valley FMUD |
| Hickison HMA (North) | 17,485 | 0 | Kingston and Simpson Park FMUD |
| North Shoshone HA | 175,131 | 0 | SERA RMP |
| South Shoshone HMA | 156,156 | 60-100 | Carico Lake and Austin FMUDs |
| Total | | **323-552** | |

The goal of the MLFO is to manage the Callaghan Complex to protect, and control healthy wild horse populations within established AML in a manner designed to achieve and maintain a thriving natural ecological balance and multiple-use relationship on public lands. Due to animal interchange and population fluctuations between the HMAs, BLM will manage these HMAs as a Complex. The collective AML range for the Callaghan Complex is 323 – 552 wild horses.

As outlined in the SERARMP 1986, the Battle Mountain District Office designated HMAs with preliminary AMLs and indicated priority for assessing, on a per HMA basis, the appropriate AML. The North Shoshone HA was not included in this process due to the amount of intermingled (checkerboard) and unfenced private lands in the area. Removal of wild horses will only be conducted as needed. 151,513 acres of the North Shoshone HA are within the Callaghan Complex boundary. This area is included in the Complex due to wild horses migrating from existing HMAs into this area. See HMAP Table 2 and Appendix I, Maps 1 and 2.

HMAP Table 2: Surface Management of the North Shoshone Herd Area.

| Surface Management | Acres* | Percentage* |
|---|---|---|
| Bureau of Land Management | 103,959 | 59% |
| Private** | 71,170 | 41% |
| Total | 175,129 | 100% |

*Subject to change over time.
**Private acres are both fenced and unfenced acres. A vast majority of these acres are unfenced from BLM managed lands.
[+] 151,513 acres of the North Shoshone HA are within the Callaghan Complex boundary.

HMAP Table 3: Estimated Wild Horse Population, 2009 to 2025.

| Year | HMA | Estimated Population |
|---|---|---|

| Year | HMA | Population |
|---|---|---|
| 2025 | Bald Mountain | 246 |
| | Callaghan | 2,207 |
| | South Shoshone | 2,025 |
| 2024 | Bald Mountain | 205 |
| | Callaghan | 787 |
| | South Shoshone | 1,971 |
| 2023 | Bald Mountain | 940 |
| | Callaghan | 1,147 |
| | South Shoshone | 2,034 |
| 2022 | Bald Mountain | 839 |
| | Callaghan | 1,024 |
| | South Shoshone | 1,812 |
| 2021 | Bald Mountain | 796 |
| | Callaghan | 971 |
| | South Shoshone | 1,723 |
| 2020 | Bald Mountain | 669 |
| | Callaghan | 814 |
| | South Shoshone | 1,148 |
| 2019 | Bald Mountain | 562 |
| | Callaghan | 684 |
| | South Shoshone | 1,217 |
| 2018 | Bald Mountain | 508 |
| | Callaghan | 602 |
| | South Shoshone | 858 |
| 2017 | Bald Mountain | 427 |
| | Callaghan | 425 |
| | South Shoshone | 721 |
| 2016 | Bald Mountain | 359 |
| | Callaghan | 425 |
| | South Shoshone | 606 |
| 2015 | Bald Mountain | 334 |
| | Callaghan | 512 |
| | South Shoshone | 476 |
| 2014 | Bald Mountain | 281 |
| | Callaghan | 430 |
| | South Shoshone | 400 |
| 2013 | Bald Mountain | 211 |
| | Callaghan | 322 |
| | South Shoshone | 282 |
| 2012 | Bald Mountain | 179 |
| | Callaghan | 279 |
| | South Shoshone | 298 |
| 2011 | Bald Mountain | 160 |
| | Callaghan | 249 |
| | South Shoshone | 259 |
| 2010 | Bald Mountain | 135 |
| | Callaghan | 264 |
| | South Shoshone | 220 |
| 2009 | Bald Mountain | 152 |
| | Callaghan | 157 |
| | South Shoshone | 103 |

Note: Estimated values reflect the best available knowledge at the time of reporting, but there are years when population size appears to increase or decrease as a result of improved information, from aerial surveys and wild horse movement between the HMAs.

CAL_09187

<u>Goals and Objectives</u>

The purpose for the Callaghan Complex Herd Management Area Plan (HMAP) is to establish short- and long-term management and monitoring objectives that would guide management for the wild horse herd and their habitat within the Callaghan Complex. The need for the HMAP is based on 43 Code of Federal Regulation (CFR) 4710 3-1 where "the authorized officer shall prepare a herd management area plan, which may cover one or more herd management areas."

Establishing the HMAP and Callaghan Complex Gather Plan EA would allow the BLM to:
1. Gather and remove excess wild horses and burros from within the Complex over the life of the plan.
2. Remove excess wild horses to achieve and maintain established AML ranges for the Complex.
3. Reduce the wild horse population growth rate in order to prevent undue or unnecessary degradation of the public lands associated with an overpopulation of excess wild horses within the Complex.
4. Gather and remove wild horses and burros due to emergency situations (i.e. fire, drought, natural disaster etc..)
5. Gather wild horses and burros to administer fertility control.
6. Reduce the number of wild horses that would need to be removed over time.
7. Address public safety concerns from wild horses along Nevada State Highway 305.
8. Address nuisance concerns on private lands.
9. Minimize degradation of critical spring water sources and habitat from wild horses and restore a thriving natural ecological balance and multiple use relationship on the public lands consistent with the provisions of Section 3(b)(2) of the Wild Free-Roaming Horses and Burros Act of 1971 (WFRHBA).

Implementation of the HMAP is consistent with the authority provided in 43 CFR 4700 and the 1971 Wild Free-Roaming Horses and Burros Act (WFRHBA). The HMAP is needed to manage wild horses within the Callaghan Complex to maintain the wild horse herd as a self-sustaining population of healthy animals in balance with other uses and the productive capacity of their habitat and attain the objectives within this document. This document is tiered to the Shoshone-Eureka Resource Area (SERA) Management Plan (RMP) (Shoshone-Eureka RMP Record of Decision dated 1986 and Shoshone-Eureka RMP Amendment, Record of Decision dated 1987).

## Herd Management Area Plan

<u>Population Management Objectives and Actions</u>

Gather and remove excess wild horses and burros that reside within the Callaghan Complex to low AML; implement population growth methods, including use of fertility control vaccines, use of intra-uterine devices (IUDs) in mares, and managing for a small non-reproducing population of sterilized mares (not exceeding approximately ¼ of the overall number of mares); and adjust sex ratios so that males make up approximately 60% of the herd; conduct follow up gathers as needed to maintain population at low AML over the life of the plan following the date of the initial gather operation.

<u>Management Objectives</u>

*ective   : Pop  lation Control* – Manage wild horse populations within the AML range (323-552, See HMAP Table 1) to protect range, plant and animal communities and the public from issues related to overpopulation.

*Monitoring Objective(s):* Population inventories at a minimum of once every 2-3 years. Additional inventories as funding and time allows. Determine annual population growth rate and as necessary, consider population inventories surveys to extend beyond the HMA boundaries to encompass a broader area of possible animal movement.

*Implementation Objective(s):* 1) Schedule gathers to remove excess wild horses when the total wild horse population exceeds the high AML range for the associated HMA, when animals permanently reside on lands outside the of HMA boundaries (i.e. use is more than seasonal drift), or whenever animal health/condition is at risk. 2) Remove excess wild horses and/or burros to a point which may allow for 3-4 years of population increase before again reaching the high AML, in accordance with the SERA RMP, 1986. 3) The use of population growth suppression (fertility control) methods should be considered as an option to aid in slowing herd population growth, preferably to levels of between 5-10% per year. This type of tool can reduce the frequency of gathers needed over time.

*ective :   stain   ealt   Pop  lations o    ild   orse* – Manage wild horses to maintain an average body condition class score (BCS) of 5.

*Monitoring Objective(s):* Observe wild horse body conditions during Complex site visits. Document during gather and population inventory operations. Collect hair samples to gather and develop genetic baseline diversity if needed; otherwise, monitor for physical characteristics such as body condition and deformities.

*Implementation Objective(s):* Conduct emergency removals when needed if animal body condition is less than Henneke condition class score 3 due to drought, wildfire or other unplanned/unforeseen events. Euthanasia is to occur when wild horses meet such criteria related to acts of mercy, health or safety as provided in Permanent Instruction Memorandum 2021-007.

*ective  : Ass  re   an  eland   ealt* – Maintain or adjust AML to contribute towards achieving rangeland health standards as outlined in the Rangeland Health Standards. Consider AML to achieve a thriving natural ecological balance among wild horses and ecosystem they inhabit, to manage a balanced population size capable of ensuring available forage and habitat in harmony with the needs of wildlife.

*Monitoring Objective(s):* Continue to monitor and establish trend data at existing key monitoring areas and continue establishing key monitoring areas within the Complex as needed to obtain adequate data. Utilization is to occur in spring and fall while trend monitoring (as outlined in the Rangeland Monitoring Handbook) may occur every 3-5 years. Long-term trend monitoring would be conducted under the Assessment and Inventory Monitoring (AIM) Protocols (Technical Reference 1734-8). Rangeland health would be assessed using procedures outlined in Interpreting Indicators for Rangeland Health (Technical Reference 1734-6). Methods and procedures may be updated to match best practices for the NV Wild Horse and Burro program.

CAL_09189

*Implementation Objective(s):* 1) Complete the Rangeland Health Assessment for the Complex. Summarize trend, precipitation, riparian conditions, and utilization at least every 10 years as resources would allow. 2) Based on data results and rangeland health conditions, if rangeland standards are not being met, re-adjust AML if data indicates current animal management level is not appropriate or identify management actions to address/resolve rangeland health issues. 3) Control the spread of invasive or noxious species within the Complex to maintain or increase desirable forage production. 4) Establish additional site-specific resource management objectives for key areas, as needed.

*ective : Ass re iparian etland Area ealt* – Improve riparian condition and spring health throughout the Callaghan Complex.

*Monitoring Objective(s):* Continue to monitor and establish trend data at existing riparian and spring sites within the Complex. Drought and spring monitoring is to occur in spring and fall, or more frequent if emergency conditions necessitate it, while trend monitoring may occur every 4-6 years. Re-evaluate riparian functionality every 10 years as resources allow. Monitoring data would be collected using the Proper Functioning Condition (PFC) method on key riparian areas throughout the Callaghan Complex.

*Implementation Objective(s):* Existing water development projects within the Callaghan Complex shall be maintained as needed to ensure water availability and health is adequate to disperse wild horse use. If trend conditions remain static or are downward, enclosure fences may be constructed to promote riparian recovery, or additional management measures, including, adjusting AML, or continued development of off-site water for wild horses could be considered where feasible. Wildlife cameras may be used to determine season, frequency, and type of use at key water sources.

*ective : Disperse ild orse se* – Decrease utilization by wild horses, within a 1–3-mile radius, of existing water. Ensure adequate water is available throughout the hot summer months.

*Monitoring Objective(s):* Measure utilization at key areas/use pattern mapping in spring and fall. Monitor water sources continuously through the summer months to ensure adequate water availability.

*Implementation Objective(s):* Annually maintain water developments as needed. Utilize water hauling when necessary.

Any new water development would require the following:
- Acquisition of the necessary water rights.
- Planning and design of the water developments.
- Completion of a site-specific environmental analysis.
- Completion of a site-specific cultural resource inventory.
- Acquisition of necessary funding to construct and/or maintain.

CAL_09190

- Where and when practicable, use population inventories, GPS collars, photos, field reports, mapping, and other tracking methods to monitor movements of wild horses within the Complex.

**Monitoring Plan:**

Monitoring includes wild horse population inventories and habitat monitoring using key areas within the core area. Methods, responsible parties, frequency, and actions that may be implemented after review of the monitoring data are listed below.

Population Management

*ective* : **Manage wild horse populations within the established AML range to protect the range from deterioration associated with overpopulation.**

*How:* Population Inventories through aerial flights following established protocols or when aerial flights are not possible, do direct ground counts. Determine population number and, to the extent possible, annual growth rate.

*Who*: BLM WH&B Specialist; State and National WH&B Staff; and Field Office Staff.

*When*: Conduct Population Inventories in the Complex a minimum of every three years. Schedule flights/counts in January and February, when possible, to use winter conditions to better track and complete adult horse counts before foaling season begins.

*Adaptive Management*: Schedule gathers to remove excess wild horses when the total population exceeds high AML, or when animals permanently reside outside HMA boundaries (i.e. more than seasonal drift), or when animal health/condition is at risk.

*ective* : **Manage wild horses to achieve an average Henneke body condition class score of 5.**

*How:* Visually observe wild horse body condition (Henneke condition class method).   Record average body condition and document other health conditions (i.e. lameness, clubfoot etc.) during periodic gather operations.

*Who:* BLM WH&B Specialist and Field Office Staff.

*When:* Annually, at key water locations particularly during periods of hot weather/drought. Every gather and population inventory. During any field visit.

*Adaptive Management:* Conduct emergency removals when needed if animal body condition is less than Henneke body condition score 3 due to drought, wildlife, or other unplanned/unforeseen event.

*ective* : **Adjust the sex ratio of the breeding population if needed, to maintain an approximately 60:40 ratio (studs/mares). Apply fertility control to mares released back to the range following future gathers, and possibly via remote darting application.**

*How*: Document number of mares and studs released following each gather. Monitor individual and herd behavior following the gather. Conduct post fertility control monitoring in accordance with established procedures.

*Who:* BLM WH&B Specialist and Field Office Staff.

*When*: Every gather. Year 2-4 following each gather.

*Adaptive Management:* Adjust the sex ratio to 60/40 (studs/mares) as needed during future gathers pending monitoring results. Apply fertility control during subsequent gathers or via remote darting.

Habitat Management Monitoring

**ective  : Assess rangeland health approximately every 10 years as resources allow on BLM administered lands with the objective to meet Rangeland Standards and Guidelines. Maintain or improve trend of key forage species within the Complex.**

*How:* Locate key monitoring areas within the core area. Assess rangeland health using procedures outline in Technical Reference 1734-6 and/or the most recent rangeland health technical reference adopted by the local district office. Establish baseline trend studies using the frequency sampling procedures as outlined in the Rangeland Monitoring Handbook. Measure utilization at key areas and develop use pattern maps biannually. Long-term trend monitoring would be conducted under the Assessment and Inventory Monitoring (AIM) Protocols (Technical Reference 1734-8).

*Who:* BLM WH&B Specialist and Field Office Interdisciplinary Team.

*When:* Document indicators of rangeland health and summarize findings.

*Adaptive Management:* Establish additional site-specific resource management objectives for key areas, as needed. Based on the above, re-adjust AMLs or identify additional management actions to address/resolve identified rangeland health issues, as needed/appropriate.

**ective  : Improve riparian condition on springs/streams within the Callaghan Complex that are currently being impacted by heavy to severe wild horse use.**

*How:* Re-evaluate riparian functionality every five years as, resources allow, using the Proper Functioning Condition (PFC) method on springs/streams within the Complex. Assess utilization of riparian vegetation.

*Who:* BLM WH&B Specialist and Field Office Interdisciplinary Team.

*When:* Before and after gathers assess riparian condition and spring health.  PFC every five years as resources allow.

CAL_09192

*Adaptive Management:* Consider adding pipelines, troughs, water storage, and/or fencing to protect riparian habitat, pending evaluation of monitoring results.

**ective    : Decrease utilization by wild horses within a 1–3-mile radius of the existing water developments within the Callaghan Complex from heavy/severe to light/moderate.**

*How: Measure utilization at   ey areas use pattern mapping. Monitor water sources to assure adequate water availability and to determine if when emergency supplemental water hauling will be needed.*

*Who: BLM WH   B Specialist and Field Office Staff.*

*When: Monitoring twice a year. Water availability continuously monitored through the summer months.*

*Adaptive Management: Adjust AML, as needed, pending evaluation of monitoring results.*

**ective   : Monitor/assess annual maintenance needs.**

*How:* Site visits at water sources, fence lines, cattle guards, ect. Photo point monitoring and range improvement inspections.

*Who:* BLM WH&B Specialist and Field Office staff.

*When:* As needed, throughout the year.

*Adaptive Management:* Schedule and complete any necessary maintenance work. Document maintenance activities.

Management Actions
- Future gather operations will be conducted in accordance with the Standard Operating Procedures (SOPs) outlined in Appendix IV and/or the National Wild Horse Gather Contract that is in place at the time of the gather.
- Future gather operations will be conducted in accordance with the most current direction and policies from the BLM.
- Breeding age mares selected for release back to the range can be treated with Porcine Zona Pellucida (PZP) vaccine, GonaCon-Equine vaccine, or another approved fertility treatment in accordance with BLM SOPs for Fertility Control Treatment in Appendix V of the 2025 Callaghan Wild Horse Complex Gather Plan EA.
  - Causing the annual herd growth rates to be between 5-10% per year would be a desirable outcome for fertility control application, but logistical factors could limit the BLM's ability to reach that outcome.
- The appropriate gather method would be determined by the BLM based on the location, accessibility of the animals, local terrain, vegetative cover, and available sources of water and forage. Roping from horseback could also be used when necessary. Based on wild horse and burro watering locations in this area, it is estimated that multiple trap sites may

CAL_09193

be used during trapping activities. The helicopter drive method and helicopter assisted roping from horseback will be the primary gather methods used. To the extent possible, gather sites (traps) will be located in previously disturbed areas.  Post-gather, every effort will be made to return released animals to the same general area from which they were gathered.

- Bait and/or water trapping would be used as appropriate to gather wild equids efficiently and effectively. Bait and water trapping may be utilized when wild horses and burros are in an area where there is a limited forage and/or water resources. Bait and/or water trapping generally require a longer window of time for success than helicopter drive trapping. Although the trap would be set in a high probability area for capturing excess wild horses and burros residing within the area and at the most effective time periods, time is required for the wild horses and burros to acclimate to the trap and/or decide to access the water/bait.

- An Animal and Plant Inspection Service (APHIS) or other veterinarian may be on-site or on-call during future gathers, as needed, to examine animals and make recommendations to BLM for the care and treatment of the wild horse and burros. Decisions to humanely euthanize animals in field situations will be made in conformance with BLM policy.

- Once low AML is achieved a selective removal strategy would be implemented. Selective removal criteria for the Callaghan Complex include:
    1. First Priority: Age Class Five Years and Younger;
    2. Second Priority: Age Class Six to Fifteen Years Old;
    3. Third Priority: Age Class Sixteen Years and Older.

- Data including sex and age distribution, reproduction, condition class information (using the Henneke rating system), color, size, and other information may also be recorded, along with the disposition of that animal (removed or released).
    o Hair and/or blood samples will be acquired at the time of the first gather after implementation of the HMAP, and as resources allow would be collected approximately every 10 years after that to determine whether BLM management is maintaining acceptable levels of genetic diversity (avoiding inbreeding depression).
    o Fertile animals could be introduced from another HMA(s) as needed if that is determined necessary to increase genetic diversity.

- Any wild burros residing within the boundaries of the Callaghan Complex will be removed during the regular gather cycle and placed into the BLM adoption program.

- Any horses or burros gathered and determined, with consultation between BLM and USDA brand inspectors, to be domestic animals will be turned over to the local brand inspector in accordance with state law. This is in accordance with the Department of Agriculture, State of Nevada and the Nevada State Office, BLM operational procedures.


Mitigation
Proven mitigation and monitoring are incorporated through standard operating procedures (SOPs) that have been developed over time. These SOPs represent the "best methods" for reducing impacts associated with gathering, handling, transportation, and herd data collection (Appendix IV and V).

CAL_09194

The Complex will be monitored bi-annually (as resources allow) as outlined in the Monitoring Plan. Management may be adjusted when monitoring data and/or other information indicates a need. In addition to monitoring, long-term evaluations will continue at roughly ten-year intervals, or as needed, based on the results of bi-annual evaluations. Monitoring objectives are outlined in the Monitoring Plan. Monitoring is designed to answer two primary questions:

- *Did   e do    at   e said   e   ere   oin   to do*
- *  as    at   e did e   ective in    eetin    ovin   to  ard o   r o   ectives*

The objective for the long-term evaluation is to determine:
- *Are o   r o   ective s  still c   rrent   or do t  e   need to   e    odi ied*
- *  s o   r    ana  e   ent on trac    or do   e need to    a  e so   e c   an  es*

Significant changes needed as a result of annual or long-term evaluations may require appropriate NEPA analysis and documentation prior to implementation.

CAL_09195