ADAM R.F. GUSTAFSON, Principal Deputy Assistant Attorney General
MEREDITH L. FLAX, Deputy Section Chief
MICHAEL R. EITEL, Acting Assistant Section Chief
DAVIS A. BACKER, Senior Trial Attorney (CO Bar No. 53502)
U.S. Department of Justice
Environment & Natural Resources Division
Wildlife & Marine Resources Section
999 18th Street, North Terrace, Suite 600
Denver, Colorado 80202
Tel: (202) 305-5469
Fax: (202) 305-0275
Email: davis.backer@usdoj.gov

*Attorneys for Defendants*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEVADA

|  |  |
|---|---|
| WILD HORSE EDUCATION, a non-profit corporation, LAURA LEIGH, individually and on behalf of WILD HORSE EDUCATION, and TAMMI ADAMS, individually and on behalf of WILD HORSE EDUCATION,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF THE INTERIOR, BUREAU OF LAND MANAGEMENT, BILL GROFFY, in his official capacity as Principal Deputy Director and Acting Director of the Bureau of Land Management, and JUSTIN ABERNATHY, in his official capacity as acting Nevada State Director of the Bureau of Land Management,<br><br>Defendants. | Case No. 3:26-CV-00423-MMD-CSD<br><br>**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................................................................. 1

BACKGROUND ............................................................................................................................. 2

   I.    Statutory Background ............................................................................................. 2

   II.   The Callaghan Complex Decision ......................................................................... 3

STANDARD OF REVIEW ............................................................................................................ 6

ARGUMENT .................................................................................................................................. 7

   I.    The Court should deny Plaintiffs' motion because Plaintiffs have not properly served the United States. ...................................................................................... 7

   II.   Plaintiffs have not shown a likelihood of success on the merits.......................... 8

       A.   BLM reasonably analyzed and managed the Callaghan Complex as a whole. ........... 8

       B.   BLM was not required to re-set AMLs in this HMAP/gather plan. .......................... 10

       C.   BLM's excess and necessity determinations are amply supported by the record. .... 12

       D.   BLM adopted an HMAP and reasonably analyzed the gather in the same EA......... 13

       E.   Plaintiffs' "proportional removal" theory lacks any legal basis and rests on speculation. ..................................................................................................... 14

       F.   Plaintiffs have not shown a likely consultation violation........................................ 15

   III.  Plaintiffs have not shown likely irreparable harm. ............................................. 16

       A.   Plaintiffs have no right to experience a particular number of wild horses............... 17

       B.   Plaintiffs' "skewed implementation" theory is speculative..................................... 18

       C.   The gather does not authorize intentional killing, and BLM's animal-welfare measures reduce the risk of injury. ......................................................................... 19

       D.   Alleged legal violations do not themselves establish irreparable harm. ................... 20

   IV.  Plaintiffs' proposed injunction runs afoul of Federal Rule of Civil Procedure 65. .......... 21

   V.   The balance of equities and public interest weigh strongly against an injunction............ 22

CONCLUSION.............................................................................................................................. 24

## TABLE OF AUTHORITIES

**Cases**                                                                **Page(s)**

*All. for the Wild Rockies v. Cottrell*,
632 F.3d 1127 (9th Cir. 2011) ............................................................................... 6

*Am. Horse Prot. Ass'n v. Frizzell*,
403 F. Supp. 1206 (D. Nev. 1975) ....................................................................... 21

*Am. Horse Prot. Ass'n v. Watt*,
694 F.2d 1310 (D.C. Cir. 1982) ..................................................................... 3, 12

*Anderson v. Yungkau*,
329 U.S. 482 (1947) ............................................................................................ 11

*Arrington v. Daniels*,
516 F.3d 1106 (9th Cir. 2008) ............................................................................... 6

*Caribbean Marine Servs. Co., v. Baldrige*,
844 F.2d 668 (9th Cir. 1988) .............................................................................. 18

*Cloud Found. v. BLM*,
802 F. Supp. 2d 1192 (D. Nev. 2011) ............................................................. 9, 11

*Colo. Wild Horse & Burro Coal., Inc. v. Jewell*,
130 F. Supp. 3d 205 (D.D.C. 2015) ..................................................................... 18

*Cottonwood Env't Law Ctr. v. U.S. Forest Serv.*,
789 F.3d 1075 (9th Cir. 2015) ....................................................................... 16, 20

*De Beers Consol. Mines v. United States*,
325 U.S. 212 (1945) ............................................................................................ 14

*Direct Mail Specialists, Inc. v. Eclat Computerized Techs., Inc.*,
840 F.2d 685 (9th Cir. 1988) ................................................................................. 7

*Doe v. Snyder*,
28 F.4th 103 (9th Cir. 2022) .................................................................................. 6

*Drakes Bay Oyster Co. v. Jewell*,
747 F.3d 1073 (9th Cir. 2014) ............................................................................. 21

*Earth Island Inst. v. U.S. Forest Serv.*,
2006 WL 3359192 (E.D. Cal. Nov. 20, 2006) ..................................................... 24

*Friends of Animals v. BLM*,
232 F. Supp. 3d 53 (D.D.C. 2017) ....................................................................... 18

*Friends of Animals v. Silvey*,
353 F. Supp. 3d 991 (D. Nev. 2018) .................................................................... 11

*Garcia v. Google, Inc.*,
786 F.3d 733 (9th Cir. 2015) ........................................................... 6, 14, 16, 19

*Gwich'in Steering Comm. v. Bernhardt*,
 No. 20-cv-204, 2021 WL 46703 (D. Alaska Jan. 5, 2021) .................................................... 16

*In Def. of Animals v. U.S. Dep't of Interior*,
 751 F.3d 1054 (9th Cir. 2014).............................................................................. passim

*In Def. of Animals v. U.S. Dep't of the Interior*,
 737 F. Supp. 2d 1125 (E.D. Cal. 2010) ...................................................................... 18, 20

*Leigh v. Raby*,
 726 F. Supp. 3d 1207 (D. Nev. 2024) .................................................................... 13

*Loper Bright v. Raimondo*,
 603 U.S. 369 (2024) ......................................................................................... 9

*Monsanto Co. v. Geertson Seed Farms*,
 561 U.S. 139 (2010) ......................................................................................... 20

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
 463 U.S. 29 (1983) ........................................................................................... 6

*Norton v. S. Utah Wilderness All.*,
 542 U.S. 55 (2004) .................................................................................... 14, 15

*Oakland Tribune, Inc. v. Chronicle Publ'g Co.*,
 762 F.2d 1374 (9th Cir.1985) ............................................................................ 17

*Omni Cap. Int'l, Ltd. v. Rudolf Wolff & Co.*,
 484 U.S. 97 (1987) ........................................................................................... 7

*Reno Air Racing Ass'n, v. McCord*,
 452 F.3d 1126 (9th Cir. 2006) ........................................................................... 21

*Save Our Sonoran, Inc. v. Flowers*,
 408 F.3d 1113 (9th Cir. 2005) ........................................................................... 24

*Winter v. Nat. Res. Def. Council, Inc.*,
 555 U.S. 7 (2008) ..................................................................................... passim

*Zepeda v. INS*,
 753 F.2d 719 (9th Cir. 1983) ........................................................................... 7, 8

**Statutes**

5 U.S.C. § 706(2)(A) ........................................................................................... 6

16 U.S.C. § 1331 ................................................................................................. 2

16 U.S.C. § 1332(f) ...................................................................................... 3, 23

16 U.S.C. § 1333(a) ..................................................................................... 1, 23

16 U.S.C. § 1333(b)(1) ................................................................................... 3, 9

16 U.S.C. § 1333(b)(1)-(2) ................................................................................................ 13

16 U.S.C. § 1333(b)(2) ............................................................................................... passim

**Rules**

Fed. R. Civ. P. 4(i) .............................................................................................................. 7

Fed. R. Civ. P. 4(i)(1)-(2) ................................................................................................... 7

Fed. R. Civ. P. 12(b)(2) ...................................................................................................... 7

Fed. R. Civ. P. 12(b)(5) ...................................................................................................... 7

Fed. R. Civ. P. 65(c) ......................................................................................................... 23

Fed. R. Civ. P. 65(d)(1)(B)-(C) ........................................................................................ 21

**Regulations**

28 C.F.R. § 0.77(j) .............................................................................................................. 7

43 C.F.R. § 4710.3-1 ........................................................................................................... 8

**Administrative Materials**

*Hawkwood Energy Agent Corp.*, 189 IBLA 164 (2017) ................................................. 10

## **INTRODUCTION**

The Wild Free-Roaming Horses and Burros Act ("WHA") charges the Bureau of Land Management ("BLM") with managing wild horses "in a manner that is designed to achieve and maintain a thriving natural ecological balance on the public lands." 16 U.S.C. § 1333(a). That mandate does not require BLM to wait until rangelands collapse, forage and water are exhausted, or wild horses suffer from starvation or dehydration. Once BLM determines that an overpopulation exists and removal is necessary, Congress directs BLM to "immediately remove excess animals from the range so as to achieve appropriate management levels." *Id*. § 1333(b)(2).

That is what BLM is proposing to do here. The Callaghan Complex includes HMAs with a collective appropriate management level ("AML") of 323 to 552 wild horses. *See* Callaghan Complex Herd Management Plan / Gather Plan Environmental Assessment ("EA") at 2-3.[1] By late 2025, BLM estimated that the Complex contained approximately 5,160 wild horses—nearly ten times the low-AML—with approximately 4,837 excess animals. *Id*. at 3-4. Callaghan and South Shoshone alone each contained more than twenty times their respective low-AMLs. *Id*. at 3. BLM has documented that this extreme overpopulation is affecting wild horse health, vegetation, riparian resources, soil, wildlife habitat, and public-safety. *Id*. at 3-4, 45-46, 48-60, 63-64. BLM therefore approved the Callaghan Complex Herd Management Area Plan / Gather Plan to reduce the population toward AML, implement fertility control, and restore a thriving natural ecological balance. *See* Callaghan Complex Herd Management Area Plan / Gather Plan Decision Record ("DR") at 1-2. Even after the planned removal of 2,000 excess horses, more

[1] Both the EA and DR are available at: https://eplanning.blm.gov/Documents/?id=f38370ee-a7f2-f011-8407-001dd80bcf93&spid=367e1195-a8f2-f011-8407-001dd80c29f3 (Last visited June 22, 2026).

1

than 3,100 wild horses would remain on the Complex—approximately 5.5 times the cumulative high-AML. Declaration of Aimee Bolinger ("Bolinger Decl.") ¶¶ 3, 9, 13.

For their part, Plaintiffs do not ask the Court to stop the gather altogether. They acknowledge that emergency conditions exist and agree that the gather should proceed. Their challenge is narrower: they ask the Court to impose a mandatory operational requirement that BLM remove horses "proportional[ly]" from each HMA and HA within the Complex. ECF No. 22 at 7 ("Pls.' Br."). But Plaintiffs identify no statute, regulation, decision document, or binding policy requiring that approach. And their feared injury—that BLM might remove all 2,000 horses from one HMA—is speculative and factually incorrect. BLM confirms that it will not gather and remove wild horses below the low-AML from any single HMA in the upcoming gather. Bolinger Decl. ¶ 10. Plaintiffs therefore ask the Court to manage field-level gather operations based not on law or likely irreparable harm, but on conjecture about how the gather might proceed.

Plaintiffs' motion should be denied for the threshold reason that they have not properly served the United States, and the Court therefore lacks personal jurisdiction to impose preliminary injunctive relief. In any event, Plaintiffs have not shown a likelihood of success on their WHA/Administrative Procedure Act ("APA") claim, have not established likely irreparable harm, and cannot show that the equities or public interest favor judicial interference with BLM's statutory obligation to reduce an extreme overpopulation of wild horses and protect the range, wildlife, and the horses themselves.

**BACKGROUND**

**I.      Statutory Background**

2

Congress enacted the WHA in 1971 to protect wild free-roaming horses and burros as "living symbols of the historic and pioneer spirit of the West." 16 U.S.C. § 1331. But by 1978, Congress recognized that unmanaged population growth could itself harm the range, other wildlife, and the horses Congress sought to protect. *See Am. Horse Prot. Ass'n v. Watt*, 694 F.2d 1310, 1316-18 (D.C. Cir. 1982). Congress therefore amended the WHA to give BLM greater authority to remove excess animals and manage wild horses as part of a broader multiple-use system. *Id*.; *see also In Def. of Animals v. U.S. Dep't of Interior*, 751 F.3d 1054, 1060-62 (9th Cir. 2014).

The Act requires BLM to maintain a current inventory of wild horses to determine whether overpopulation exists, whether action should be taken to remove excess animals, and whether AML should be achieved through removal, sterilization, natural controls, or other means. 16 U.S.C. § 1333(b)(1). "[E]xcess animals" are those that "must be removed from an area in order to preserve and maintain a thriving natural ecological balance and multiple-use relationship in that area." *Id*. § 1332(f). Once BLM determines "that an overpopulation exists" and "that action is necessary to remove excess animals," the Act provides that BLM "shall immediately remove excess animals from the range so as to achieve [AMLs]." *Id*. § 1333(b)(2). The Ninth Circuit has recognized that BLM's excess and removal determinations are reviewed under the APA's deferential arbitrary-and-capricious standard. *In Def. of Animals*, 751 F.3d at 1061-62.

## II.    The Callaghan Complex Decision

The Callaghan Complex is located in Lander County, Nevada, and consists of the Callaghan, South Shoshone, Bald Mountain, and Hickison (north of highway 50) HMAs, as well as the North Shoshone Herd Area ("HA"). EA at 1. The gather area encompasses approximately

1.1 million acres and includes areas between HMA boundaries where wild horses currently reside. *Id*. at 1, 21. The Complex's cumulative AML for the HMAs is 323 to 552 wild horses. *Id*. at 2-3. Lands outside designated HMAs are not managed for long-term wild horse use and have no established AML; the North Shoshone HA and Hickison North HA have AMLs of zero. *Id*. at 2-3. The HMA-by-HMA population figures underscore the scale of the problem: in late-2025, Bald Mountain was estimated at 282 horses (67 above high-AML); Callaghan at 2,538 horses (2,301 above high-AML); Hickison North at 12 horses, despite an AML of zero; and South Shoshone at 2,328 horses (2,228 above high-AML). Bolinger Decl. ¶ 3.

BLM most recently surveyed the Complex by aerial flight in February 2025 using a survey method developed by scientists with expertise in wildlife surveys and analysis. EA at 3. BLM estimated approximately 4,489 adult wild horses in and around the Complex at the time. *Id*. Based on a conservative 15 percent annual growth rate, BLM estimated a late-2025 population of 5,160 wild horses, including 4,837 excess animals above low-AML. *Id*. The Callaghan HMA alone was estimated to contain 2,538 horses, with 2,404 excess horses above low-AML. *Id*. Meanwhile, the South Shoshone HMA was estimated to contain 2,328 horses, with 2,268 excess horses above low-AML. *Id*. The statistical analysis supporting those estimates used methods recommended by BLM policy and the National Academy of Sciences, corrected for known undercounting issues, and produced a population-estimate range of 4,184 to 6,675 horses. Bolinger Decl. ¶ 15.

BLM determined that this extreme overpopulation is already affecting rangeland resources and wild horse health. EA at 3-4. The EA documents that wild horses have moved outside HMA boundaries due to overpopulation in search of forage and water resources. *Id*. at 3. BLM observed body condition scores ranging from moderate to thin, documented severe and

4

heavy use throughout the Complex, and found that horses have been forced to travel farther from water sources for forage. *Id*. at 3-4. Large groups of horses reside outside HMA boundaries, on or near private property. *Id*. at 4. BLM also documented public-safety issues on Nevada State Highway 305, where field-office staff have hazed more than 25 wild horses off the highway since October 2022. *Id*. Since the EA was issued in mid-February 2026, BLM has received at least thirteen calls from the public about wild horses on Highway 305, including seven calls over the last thirty days, and has had to remove one wild horse from private property while many more have been reported. Bolinger Decl. ¶¶ 25-26.

The EA analyzed four alternatives. Alternatives A through C would adopt a Herd Management Area Plan ("HMAP") and gather plan, with differing population-growth suppression measures. EA at 5-16. Alternative D, the No Action Alternative, would defer gather and removal, adopt no HMAP, and provide no active management to control population growth or bring the population within AML. *Id*. at 6. BLM explained that the No Action Alternative would not satisfy the WHA or the underlying Shoshone-Eureka Resource Management Plan because it would not manage the population within AML or remove excess animals as necessary to achieve a thriving natural ecological balance. *Id*.

BLM selected Alternative A as modified. DR at 1. The decision adopts the HMAP, authorizes immediate gather and removal of excess animals to reach low-AML as expeditiously as possible through an initial gather and follow-up gathers as needed, applies fertility-control vaccines to released mares, and maintains a 60 percent male / 40 percent female sex ratio to slow population growth. *Id*. BLM found the HMAP and associated gather plan necessary to remove excess wild horses, bring the population back within the established AML range, achieve a thriving natural ecological balance among wild horses, wildlife, livestock, vegetation, and

available water, and protect rangeland resources from further deterioration as required by Congress. *Id*. at 2.

Plaintiffs appealed BLM's decision to the Interior Board of Land Appeals ("IBLA") and sought a stay. The Board denied the stay petition, holding that Plaintiffs failed to show a likelihood of irreparable harm. *See* IBLA Stay Denial*, Bolinger Decl. Ex. 2 at 1, 4-6. Although the Board's stay decision is not binding on this Court, it addressed the same decision, the same parties, and the same basic harm theory Plaintiffs press here.

## STANDARD OF REVIEW

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Plaintiffs bear the burden of making a clear showing that they are likely to succeed on the merits, likely to suffer irreparable harm absent relief, that the balance of equities tips in their favor, and that an injunction is in the public interest. *Id*. at 20, 22. The Ninth Circuit's sliding-scale approach does not eliminate the requirement to show likely irreparable harm, and Plaintiffs must establish at least serious questions going to the merits and a balance of hardships that tips sharply in their favor. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131-35 (9th Cir. 2011). Meanwhile, "[t]he standard for issuing a mandatory preliminary injunction is high." *Doe v. Snyder*, 28 F.4th 103, 111 (9th Cir. 2022). Plaintiffs "must establish that the law and facts *clearly favor* [their] position, not simply that [they are] likely to succeed." *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (emphasis added).

Where, as here, Plaintiffs challenge agency action under the WHA and APA, the Court applies the APA's deferential standard of review. 5 U.S.C. § 706(2)(A); *In Def. of Animals*, 751 F.3d at 1061. The Court may set aside agency action only if it is arbitrary, capricious, an abuse of

6

discretion, or otherwise not in accordance with law. *Id*. The Court does not substitute its judgment for BLM's expert judgment, and the agency's decision must be upheld if BLM "considered the relevant factors and articulated a rational connection between the facts found and the choices made." *Arrington v. Daniels*, 516 F.3d 1106, 1112 (9th Cir. 2008); *see also Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

## ARGUMENT

**I.      The Court should deny Plaintiffs' motion because Plaintiffs have not properly served the United States.**

As a threshold matter, Plaintiffs have not properly served the United States. Defendants therefore preserve any and all defenses based on insufficient service, lack of personal jurisdiction, and lack of jurisdiction to impose injunctive relief. Fed. R. Civ. P. 4(i); Fed. R. Civ. P. 12(b)(2), (5).

Proper service is a prerequisite to personal jurisdiction. *Omni Cap. Int'l, Ltd. v. Rudolf Wolff & Co.*, 484 U.S. 97, 104 (1987); *Direct Mail Specialists, Inc. v. Eclat Computerized Techs., Inc.*, 840 F.2d 685, 688 (9th Cir. 1988). Nor may a court issue injunctive relief against parties over whom it lacks jurisdiction. *Zepeda v. INS*, 753 F.2d 719, 727 (9th Cir. 1983).

Rule 4(i) required Plaintiffs to serve the United States by serving the U.S. Attorney for this district and mailing the summons and complaint to the Attorney General, and to serve the agencies and official-capacity defendants by mailing them copies as well. Fed. R. Civ. P. 4(i)(1)-(2).

Plaintiffs cannot cure defective service by communicating with agency counsel or Department of Justice counsel. The Department of Justice cannot accept service on behalf of the named defendants, and the United States Attorney has no authority to accept service on behalf of

the Attorney General. *See* Justice Manual § 5-5.124; 28 C.F.R. § 0.77(j).[2] Accordingly, unless and until Plaintiffs satisfy Rule 4(i), the Court lacks personal jurisdiction to enter a preliminary injunction against Defendants in this matter.

The Court should therefore deny Plaintiffs' motion without prejudice or defer consideration until Plaintiffs perfect service. Defendants address the merits in the alternative without waiving service or jurisdictional defenses.

## II.    Plaintiffs have not shown a likelihood of success on the merits.

Plaintiffs' complaint contains three causes of action, but their motion for preliminary injunction focuses only on their claim under the WHA and APA. Pls.' Br. at 14. Plaintiffs therefore cannot obtain emergency relief based on unbriefed claims under either the National Environmental Policy Act or Federal Land Policy and Management Act. *See Winter*, 555 U.S. at 20; *see also Zepeda*, 753 F.2d at 727 (injunctive relief must be tied to the claims and parties before the court). The WHA/APA theory Plaintiffs do brief is unlikely to succeed.

### A.    BLM reasonably analyzed and managed the Callaghan Complex as a whole.

Plaintiffs first argue that BLM improperly treated several HMAs and one HA as part of the Callaghan Complex. Pls.' Br. at 15-18. That argument fails for several reasons.

As an initial matter, Plaintiffs rely on internal handbook language rather than a statute or binding regulation. The WHA does not prohibit BLM from analyzing or managing multiple HMAs together where doing so is appropriate to address how horses use the landscape.[3] Nor

---

[2] Justice Manual available at: https://www.justice.gov/jm/jm-5-5000-procedures#5-5.124 (Last visited: June 19, 2026).

[3] Ms. Bolinger explains that a "complex" is an administrative management tool—not a separate legal designation—used when HMAs are located near or adjacent to each other and experience animal interchange or movement. Each HMA retains its boundary and AML, while BLM may

does it require the Court to impose Plaintiffs' rigid understanding of animal interchange on BLM's expert management judgment. BLM's regulations provide that herd management areas "shall be established for the maintenance of wild horse and burro herds," 43 C.F.R. § 4710.3-1, and the WHA requires BLM to maintain a current inventory and determine whether overpopulation exists "on given areas of the public lands." 16 U.S.C. § 1333(b)(1). Those provisions delegate discretion to BLM to define the appropriate management area based on current conditions, horse movement, land status, and resource-management needs. *See In Def. of Animals*, 751 F.3d at 1061-64; *Cloud Found. v. BLM*, 802 F. Supp. 2d 1192, 1204-06 (D. Nev. 2011); *see also Loper Bright v. Raimondo*, 603 U.S. 369, 394-95 (2024) (deference to agency judgments warranted when statutory commands authorize an agency to "exercise a degree of discretion").

The record also supports BLM's decision. The EA explains that the Complex consists of the Callaghan, South Shoshone, Bald Mountain, and Hickison North HMAs, and the North Shoshone HA, and that the gather area includes land between HMA boundaries where wild horses currently reside. EA at 1, 21. BLM explained that wild horses have moved outside HMA boundaries due to overpopulation and lack of forage and water, traveling in search of those critical and necessary resources. *Id*. at 3. The HMAP likewise explains that BLM will manage these HMAs as a complex "[d]ue to animal interchange and population fluctuations between the HMAs." EA, App. XIII at 2. This was, in part, in response to a 2024 analysis identifying direct gene flow between Callaghan HMA, Bald Mountain HMA, South Shoshone HMA, and other nearby HMAs. EA at 36. Ms. Bolinger further explains that BLM observed horses between and

undertake management actions or monitoring on a complex-wide basis when appropriate. Bolinger Decl. ¶ 6.

9

among the HMAs during the February 2025 census flight; that Bald Mountain and Callaghan are geographically contiguous; that South Shoshone and Hickison north are only a few miles from adjacent Complex HMAs; and that a 2024 genetic analysis identified direct gene flow between Callaghan, Bald Mountain, South Shoshone, and other nearby HMAs. Bolinger Decl. ¶ 7. Although fences and private lands exist across the Complex, they have not been shown to impede wild horse movement between and among HMAs. *Id*. ¶¶ 7, 15.

Plaintiffs' contrary assertion that there is no interchange relies largely on their declarant's disagreement with BLM and on Plaintiffs' interpretation of maps and fencing. Pls.' Br. at 16-17. But the question under the APA is not whether Plaintiffs would have drawn the management area differently. The question is whether BLM considered relevant information and made a rational judgment call. It did. Plaintiffs' disagreement with BLM's assessment of current horse movement and genetic evidence is insufficient to show a likelihood of success. *See In Def. of Animals*, 751 F.3d at 1068 (The court is not empowered to substitute its judgment for that of the agency.); *Hawkwood Energy Agent Corp.*, 189 IBLA 164, 168 (2017) ("mere expressions of disagreement" do not show BLM error). [4]

**B.      BLM was not required to re-set AMLs in this HMAP/gather plan.**

Plaintiffs next argue that BLM acted arbitrarily by refusing to recalculate AMLs in the HMAP/Gather Plan. Pls.' Br. at 22-28. That argument is a collateral attack on prior land-use decisions, and it is not a basis for preliminary injunctive relief.

The EA explains that the Callaghan Complex has a cumulative AML range of 323 to 552 wild horses, and that each HMA has its own AML range established through prior decision-making processes. EA at 2-3. The Callaghan Complex AMLs were established through the

---

[4] Available at: https://www.oha.doi.gov/IBLA/Ibladecisions/189IBLA/189IBLA164.pdf.

Shoshone-Eureka Resource Area Management Plan and later reaffirmed or established through Final Multiple Use Decisions for relevant allotments. *Id*. at 2. BLM further explained that the AML range was established "at a level that would maintain healthy wild horses and rangelands over the long-term based on monitoring data collected over time as well as an in-depth analysis of habitat suitability," and that AMLs "will not be re-evaluated in this EA." *Id*. Ms. Bolinger confirms that the AMLs and HMA boundaries were not based on "administrative convenience," *contra* Pls.' Br. at 23-24, 27, but on monitoring and analysis, and that each HMA's AML was later reaffirmed or updated through subsequent Final Multiple Use Decisions based on additional monitoring and analysis. Bolinger Decl. ¶¶ 4-5.

Nothing in the WHA required BLM to re-open those AML decisions before addressing a current overpopulation. The Ninth Circuit has recognized that AML serves as the benchmark for determining whether excess animals exist and that BLM has discretion in making overpopulation and removal determinations. *In Def. of Animals*, 751 F.3d at 1061-64. Courts have rejected attempts to use a gather challenge to collaterally attack earlier AML or HMA decisions. *See Friends of Animals v. Silvey*, 353 F. Supp. 3d 991, 1006-08 (D. Nev. 2018), *aff'd*, 820 F. App'x 513 (9th Cir. 2020); *Cloud Found.*, 802 F. Supp. 2d at 1204-06. Plaintiffs cite no statute or regulation requiring BLM to re-set AML whenever it adopts an HMAP or gather plan. At most, they point to guidance suggesting AML may be revisited when appropriate. *See* Pls.' Compl., ECF No. 1 ¶ 160. But "may" is not "must," and agency guidance does not override the WHA's command that BLM remove excess animals once the statutory determinations are made. 16 U.S.C. § 1333(b)(2); *see Anderson v. Yungkau*, 329 U.S. 482, 485 (1947) (as a general rule of statutory construction, "may" is permission, whereas "shall" is mandatory).

Plaintiffs' theory would also frustrate the WHA. By late 2025, the Complex contained approximately 5,160 wild horses—nearly ten times the low-AML and more than nine times the high-AML. EA at 3. The Callaghan HMA alone was more than ten times its high-AML and nearly nineteen times its low-AML. *Id*. South Shoshone was more than twenty-three times its low-AML. *Id*. Requiring BLM to postpone removal of excess animals until it reopens established AML decisions would convert the WHA's immediate-removal mandate into an indefinite bar on management whenever a plaintiff disagrees with an AML. That is not the statute Congress enacted. *Contra* 16 U.S.C. § 1333(b)(2); *see also Am. Horse Prot. Ass'n*, 694 F.2d at 1316-18.

**C.    BLM's excess and necessity determinations are amply supported by the record.**

BLM reasonably determined that excess wild horses exist and that removal is necessary. BLM conducted a February 2025 aerial survey using an established survey method, estimated 4,489 adult wild horses in and around the Complex, and projected a late-2025 population of 5,160 based on a conservative annual growth rate. EA at 3. BLM then compared those figures to established AMLs and determined that approximately 4,837 excess animals were present above low-AML. *Id*. at 3-4. Those figures were conservative. Ms. Bolinger explains that aerial surveys are known to undercount animals, that the statistical analysis corrected for known undercounting issues, and that high movement into or out of the survey area could mean the true population is even higher. Bolinger Decl. ¶ 15.

But BLM did not rely on rote numbers alone. The EA documents that overpopulation is causing horses to move outside HMA boundaries in search of forage, water, and space. EA at 3. BLM documented severe and heavy forage use throughout the Complex, observed horses in moderate to thin condition, and explained that horses must travel farther from water sources to find forage. *Id*. at 3-4. The EA also analyzes effects on vegetation, riparian areas, wetlands,

12

water quality, soils, wildfire and fuels, wilderness characteristics, and wildlife. *Id*. at 45-60. Under the No Action Alternative, BLM found that the horse population would continue to grow at approximately 15 to 20 percent per year and could reach approximately 9,028 horses by 2030 using a conservative 15 percent growth rate. *Id*. at 45-46, 63-64. BLM found that without removal, use by wild horses would continue to exceed available forage, competition for limited forage and water would continue, damage to rangeland resources would increase, and risks to individual horse health would increase, including the risk of emergency removals to prevent death from starvation or thirst. *Id*. at 45-46. For their part, Plaintiffs themselves have acknowledged these risks. *See* Tammi Adams' Email, Bolinger Decl. Ex. 8 (describing an "emergency situation," "dire water situation," and "foals that are being beaten up" in the herd's scramble to find water).

All of this is precisely the type of current information the WHA requires BLM to consider. *See* 16 U.S.C. § 1333(b)(1)-(2). Plaintiffs disagree with BLM's assessment, but they have not shown that BLM ignored relevant factors or failed to provide a rational explanation.

**D.      BLM adopted an HMAP and reasonably analyzed the gather in the same EA.**

Plaintiffs also suggest that BLM unlawfully adopted an HMAP and gather plan at the same time. Pls.' Br. at 18-22. They cite no statute or regulation prohibiting BLM from analyzing an HMAP and gather plan in the same NEPA document. The EA expressly states that it analyzes both the HMAP and the gather/removal decision. EA at 1, 5-16; EA, App. XIII. The HMAP establishes short- and long-term management and monitoring objectives for wild horses and their habitat within the Complex. *See* EA, App. XIII. The EA then analyzes the environmental effects of implementing the gather plan and associated management tools. EA at 25-65.

This case is therefore unlike cases where BLM failed to prepare an HMAP at all before relying on one as a management predicate. *Cf. Leigh v. Raby*, 726 F. Supp. 3d 1207 (D. Nev. 2024). Here, the HMAP exists, was included in the EA, was subject to public comment, and was adopted in the Decision Record. EA, App. XIII; DR at 1-2. Plaintiffs' objection is not that there is no HMAP, but that BLM did not write the HMAP Plaintiffs prefer. That is not a basis for preliminary relief under the APA.

> **E.     Plaintiffs' "proportional removal" theory lacks any legal basis and rests on speculation.**

Plaintiffs must establish a close connection between the asserted irreparable harm and the purposes of the statute they seek to enforce—here, the WHA. *Garcia*, 786 F.3d at 746 (rejecting relief when the asserted "harms are too attenuated from the purpose of copyright" at issue in the case). Plaintiffs argue here that the harms stem from BLM's alleged failure to gather horses "proportional[ly]" from each HMA within the Complex. Pls.' Br. at 7. But there's no connection between this alleged harm and an actionable claim under the WHA. Plaintiffs identify no statutory text, regulation, or binding decision document that requires proportional removal. The WHA establishes priorities for the disposition of excess animals after BLM determines that removal is necessary; it does not require BLM to allocate gather effort by HMA according to Plaintiffs' preferred formula. *See* 16 U.S.C. § 1333(b)(2). Without such a clear-cut duty, Plaintiffs have no claim that BLM failed to act in a manner that this Court can compel through equitable relief. *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004) ("*SUWA*") (viable failure to act claim exists only when "an agency failed to take a *discrete* agency action that it is *required to take.*"); *see also De Beers Consol. Mines v. United States*, 325 U.S. 212, 220 (1945) (reversing preliminary injunction because the injunction in question was not of the same character as "that which may be granted finally").

14

Nor have Plaintiffs shown that BLM intends to remove all 2,000 animals from one HMA. Their motion is based on pure speculation, not on evidence that BLM intends to conduct the gather this way.[5] Gather operations are dynamic field operations influenced by animal distribution, weather, terrain, safety, contractor logistics, trap-site feasibility, holding capacity, and animal welfare. *See* EA at 7-12, 14-15; Bolinger Decl. ¶ 11. Nothing in the WHA requires BLM to predetermine or publicly disclose a rigid per-HMA removal quota before conducting a gather, particularly where horses have moved outside HMA boundaries and the Complex is being managed as a landscape-level unit.

Plaintiffs' proposed injunction would also intrude into day-to-day operational decisions committed to BLM's expertise. Wild horses across the Complex are relatively unconstrained and can move great distances in short periods; the February 2025 census flight observed large numbers of horses between HMAs; and once gather activities begin, horses may move in response to those activities, making it even more difficult to attribute a given horse to a particular HMA. Bolinger Decl. ¶ 11. Courts are simply not called on to manage helicopter gather logistics, trap-site sequencing, or real-time decisions about where animals can safely and humanely be gathered. *SUWA*, 542 U.S. at 66–67 (rejecting notion that it is "the task of the supervising court, rather than the agency, to work out compliance with the broad statutory mandate, injecting the judge into day-to-day agency management."). Plaintiffs have not shown that the law requires the Court to substitute their preferred operational allocation for BLM's expert field judgment.

**F.       Plaintiffs have not shown a likely consultation violation.**

---

[5] BLM will not gather and remove horses below low-AML from any single HMA, and even if all 2,000 removals came from Callaghan or South Shoshone, either HMA would still remain far above high-AML. Bolinger Decl. ¶¶ 9-10.

15

Plaintiffs finally argue that BLM adopted the HMAP/Gather Plan without proper consultation. Pls.' Br. at 28-29. The record does not support that claim. The EA explains that BLM coordinated with the Nevada Department of Wildlife ("NDOW") during the yearly coordination meeting and included NDOW's input on Greater Sage-Grouse required design features. EA at 66-67. BLM also stated that it will continue to coordinate with NDOW regarding locations of staging, trapping, and corrals to minimize impacts to wildlife. *Id*. The EA further documents tribal coordination letters and public involvement, including public comment on the Management Evaluation Report and Preliminary EA. *Id*.; DR at 3. Moreover, the EA explains that BLM issued a management evaluation for the Complex to interested individuals, agencies, and groups for a 30-day public review and comment period that opened on March 14, 2025, and closed April 14, 2025; approximately 4,000 scoping comments were received. EA at 67. BLM did not receive any feedback from the U.S. Fish and Wildlife Service.

BLM satisfied its consultation obligations and Plaintiffs have not shown that any alleged consultation defect is likely to succeed or that it would support the mandatory injunction they seek. Nor have they shown that any alleged procedural violation, standing alone, establishes irreparable harm. *See Cottonwood Env't Law Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1091 (9th Cir. 2015) (plaintiffs must still show likely irreparable injury); *Gwich'in Steering Comm. v. Bernhardt*, No. 20-cv-204, 2021 WL 46703, at *5 (D. Alaska Jan. 5, 2021) ("procedural violations alone do not establish irreparable harm").

**III.    Plaintiffs have not shown likely irreparable harm.**

Plaintiffs' failure to establish irreparable harm independently warrants denial of their motion. The Supreme Court in *Winter* required a showing that irreparable harm is likely—not merely possible. 555 U.S. at 22. And Plaintiffs bear an even heavier burden here, where they ask

the Court to affirmatively control *how* BLM exercises statutory discretion to conduct a gather. *See Garcia*, 786 F.3d at 740 ("a mandatory injunction 'goes well beyond simply maintaining the status quo *pendente lite* and is particularly disfavored.'" (citation omitted)). Plaintiffs fail to meet both the *Winter* and *Garcia* standards.

### A.      Plaintiffs have no right to experience a particular number of wild horses.

In just a few cursory paragraphs, Plaintiffs assert that removal of wild horses will injure their aesthetic and recreational interests, allegedly establishing irreparable harm. Pls.' Br. at 29-30.  But Plaintiffs do not object to a gather, and therefore cannot show that any removal of horses from the range irreparably harms them. Nor have Plaintiffs provided evidence that the specific contemplated removals irreparably harm them.[6] The proposed gather will not eliminate wild horses from the Callaghan Complex. The selected action is designed to merely reduce the population toward the established AML range—not extirpate these animals from HMAs managed for wild horses. EA at 13-15; DR at 1-2. Indeed, even if BLM is successful in gathering the full complement of horses it hopes to, thousands of wild horses will remain available for viewing within the Complex after the operation is complete. *Compare* EA at 3, Table 1 (estimating over 5,000 wild horses across the Callaghan Complex) *with* BLM Fiscal Year 2026

---

[6] Any claim of irreparable harm is further undercut by Plaintiffs' delay in bringing their motion for emergency relief. BLM published its EA and decision record authorizing the proposed gather on February 13, 2026. A month later, on March 13, 2026, BLM published its tentative national gather schedule, which provided public notice that the upcoming gather operation would begin on July 10, 2026. Plaintiffs filed an appeal to the Interior Board of Land Appeals and petitioned to stay the effectiveness of the decision record, but that petition was denied on April 6, 2026. In short, Plaintiffs waited nearly four months after BLM first issued public notice of the proposed gather to seek emergency relief. *Cf. Oakland Tribune, Inc. v. Chronicle Publ'g Co.*, 762 F.2d 1374, 1377 (9th Cir.1985) ("Plaintiff's long delay before seeking a preliminary injunction implies a lack of urgency and irreparable harm.").

17

Tentative Wild Horse & Burro Gather & Fertility Control Schedule at 1 (proposing to gather and remove 2,000 animals) [7]; *see also* Bolinger Decl. ¶ 9.

Courts have repeatedly rejected the proposition that plaintiffs have an enforceable right to view a particular number of wild horses. In *In Defense of Animals v. U.S. Department of the Interior*, the court explained that after a gather, "the animals will still be present," and the court was "unaware of any enforceable right to observe a particular number of animals." 737 F. Supp. 2d 1125, 1138 (E.D. Cal. 2010). Other courts have likewise held that reducing herd size does not establish irreparable aesthetic harm where horses remain available for viewing. *See, e.g.*, *Friends of Animals v. BLM*, 232 F. Supp. 3d 53, 65 (D.D.C. 2017); *Colo. Wild Horse & Burro Coal., Inc. v. Jewell*, 130 F. Supp. 3d 205, 219-20 (D.D.C. 2015). This is particularly true here, where decreasing the number of horses on the range will remove conditions threatening the wild horses and thus *improve* conditions for Plaintiffs. *See* Bolinger Decl., Ex. 8 (describing emergency drought conditions affecting horses, especially foals).

The IBLA reached the same conclusion when it denied Plaintiffs' stay petition. Bolinger Decl., Ex. 2 at 4-5. It held that Plaintiffs had not shown irreparable harm because the decision does not authorize intentional killing, the risk of mortality during or after gather operations is relatively low, Plaintiffs have no enforceable right to view herds of a particular size, and wild horses will remain in the Complex after low-AML is reached. *Id*. There is no reason for the Court to depart from that reasoning here.

**B.      Plaintiffs' "skewed implementation" theory is speculative.**

---

[7] Available at: https://www.blm.gov/sites/default/files/docs/2026-03/FY2026-National-WHB-Gather-and-Fertility-Control-Schedule.pdf.

Plaintiffs next assert they will be irreparably harmed if BLM removes all or most of the 2,000 horses from a single HMA. Pls.' Br. at 29-30. But Plaintiffs have not shown that BLM has decided to do that. Their asserted injury depends on a chain of speculation: that BLM *might* focus on one HMA, that such focus *might* reduce that HMA to a level Plaintiffs consider harmful, and that this hypothetical removal would impair Plaintiffs' interests before the case can be resolved.

Speculative injury cannot support preliminary injunctive relief. *Winter*, 555 U.S. at 22; *Caribbean Marine Servs. Co., v. Baldrige*, 844 F.2d 668, 674-75 (9th Cir. 1988). And to the extent Plaintiffs seek to enjoin BLM based on uncertainty about operational details, that argument misunderstands the practical nature of wild horse gathers. Field operations depend on real-time conditions, including where horses are located, where safe trap sites can be arranged, road access, weather, topography, public and employee safety, and animal-welfare considerations. EA at 7-12; Bolinger Decl. ¶ 11. Plaintiffs have failed to carry their burden to show that BLM's refusal to commit to a rigid pre-gather proportional quota creates likely irreparable harm.

**C. The gather does not authorize intentional killing, and BLM's animal-welfare measures reduce the risk of injury.**

Plaintiffs also rely on cases involving intentional killing or destruction of animals. Those cases are inapposite. This gather authorizes removal of excess wild horses and population-growth suppression; it does not authorize intentional killing of healthy horses. DR at 1-2. Plaintiffs also have not shown an interest in particular horses, much less that any particular horse they might have an interest in is likely to die as a result of the gather. Nor is an emotional reaction to the possibility of mortality cognizable irreparable harm under the WHA; the asserted harm must stem from Plaintiffs' legal interests under the statute they invoke. *See Garcia*, 786 F.3d at 744.

19

The EA analyzed gather-related risks and identified standard operating procedures and animal-welfare measures to minimize them. EA at 7-12, 28-44; EA, App. III-V. Gather operations will comply with BLM's Comprehensive Animal Welfare Program and Standard Operating Procedures. *Id*. at 7-12; EA, App. III-IV. BLM staff will be present to ensure humane treatment and contract compliance, and a veterinarian will be on call or on site as appropriate. *Id*. at 7-10. The EA explains that gather-related mortality has historically been low; Nevada has gathered more than 40,000 animals since 2006 with a total mortality of 1.1 percent, of which 0.5 percent was gather-related.[8] *Id*. at 66. The mere possibility of individual injury does not establish likely irreparable harm sufficient to enjoin a congressionally mandated management action. *See Winter*, 555 U.S. at 22; *In Def. of Animals*, 737 F. Supp. 2d at 1138.

BLM's handling procedures also undermine Plaintiffs' suggestion that removed horses will face unaddressed harm. The removed horses will be shipped to an off-range corral facility, provided good-quality hay and water, transitioned to domestic feed, vaccinated, trimmed as needed, processed, and then prepared for adoption or sale or shipped to off-range pastures. Bolinger Decl. ¶ 13. BLM conducts on-range and off-range management activities in accordance with its Comprehensive Animal Welfare Program, whose standards are incorporated into helicopter gather contracts as contractor-performance specifications. *Id*. ¶ 36.

**D.    Alleged legal violations do not themselves establish irreparable harm.**

Plaintiffs also suggest that being subjected to allegedly unlawful agency action is itself irreparable harm. Pls.' Br. at 29-30. That is not the law. A procedural or statutory violation does not automatically entitle a plaintiff to injunctive relief. *See Monsanto Co. v. Geertson Seed*

---

[8] Published 2010-2019 data found average gather mortality of 1.1 percent, below the approximate 2 percent recommendation for wildlife capture, and the EA analyzed gather-related and off-range corral mortality. Bolinger Decl. ¶¶ 33-35.

20

*Farms*, 561 U.S. 139, 157-58 (2010); *Cottonwood*, 789 F.3d at 1091. Even in environmental cases, plaintiffs must show that irreparable injury is likely absent an injunction. *Winter*, 555 U.S. at 22.

The IBLA rejected this same theory in denying Plaintiffs' stay petition. It held that an alleged violation of NEPA or another environmental statute is insufficient, standing alone, to establish irreparable harm absent a separate showing of likely irreparable injury. Bolinger Decl., Ex. 2 at 5. The same principle applies here.

## IV.     Plaintiffs' proposed injunction runs afoul of Federal Rule of Civil Procedure 65.

Plaintiffs' requested injunction also fails because it is not specific enough to be entered or enforced under Federal Rule of Civil Procedure 65(d), which requires every injunction to state its terms specifically and describe in reasonable detail the acts restrained or required. Fed. R. Civ. P. 65(d)(1)(B)-(C). The rule prevents uncertainty and gives those enjoined explicit notice of precisely what conduct is required or prohibited. *Reno Air Racing Ass'n, v. McCord*, 452 F.3d 1126, 1132 (9th Cir. 2006).

Plaintiffs' proposed proportional-gather order would create the uncertainty Rule 65(d) forbids. Plaintiffs do not say what "proportional" means, what baseline population controls, how BLM must attribute horses observed between HMAs or moving after gather operations begin, or what BLM must do if horses are not distributed in numbers that permit the required proportion from each HMA. Those details matter because horses can move great distances in a short time and may move in response to gather operations. Bolinger Decl. ¶ 11.

The Court should not enter an injunction that sows confusion for BLM and its contractors in the field. At most, BLM has already committed that it will not gather and remove horses below low-AML from any single HMA during the upcoming gather. Bolinger Decl. ¶ 10. An

21

undefined proportional-allocation order would invite disputes over operational judgments that the WHA leaves to BLM's expertise. *Am. Horse Prot. Ass'n v. Frizzell*, 403 F. Supp. 1206, 1217 (D. Nev. 1975).

## V.    The balance of equities and public interest weigh strongly against an injunction.

When the federal government is a party, the balance of equities and public interest merge. *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014). Both factors weigh strongly against an injunction.

BLM determined that the Callaghan Complex contains approximately 4,837 excess wild horses above low-AML. EA at 3-4. Without removal, the population will continue to grow at approximately 15 to 20 percent per year. *Id*. at 45-46, 63-64. Under the No Action Alternative, BLM projected that the wild horse population could reach approximately 9,028 by 2030 using a conservative 15 percent annual growth rate.[9] *Id*. at 45-46. That would worsen the very harms the WHA requires BLM to protect against.

The EA explains that without removal, wild horse use would continue to exceed available forage; competition between wildlife and wild horses for limited forage and water would continue; damage to rangeland resources would continue and increase; and risks to individual horse health would increase. *Id*. at 45-46. One of Plaintiffs' own declarants acknowledges the "dire" conditions for horses within the Complex. *See* Bolinger Decl., Ex. 8 (describing "dire water situation" and "terrible drought" conditions). BLM further found that excessive utilization, trampling, and trailing would degrade vegetation, prevent improvement of already degraded rangelands, degrade healthy rangelands, and reduce available forage and water for wild horses

---

[9] Even if BLM reached low-AML, normal reproduction rates of 15 to 25 percent could return the population to high-AML within a few years. Bolinger Decl. ¶ 31.

and other ungulates, especially during drought years or severe winter conditions. EA at 63-64. In fact, utilization measurements could not even be conducted at approximately 25 percent of monitored sites in 2023 and 33 percent of monitored sites in 2024 because key forage species were unavailable, meaning forage had been overgrazed to the point that measurements were impossible. Bolinger Decl. ¶ 17.

Other resource impacts are significant as well. Continued overpopulation can reduce vegetative cover and vigor, increase soil compaction, accelerate runoff and erosion, expand invasive weeds, reduce resistance and resilience to wildfire, and harm wildlife habitat. EA at 48-60, 63-64. The current extreme overpopulation is likely to increase wildfire risk by reducing herbaceous cover, favoring encroachment of highly flammable woody vegetation, increasing invasive annuals, extending the fire season, and promoting a more frequent and intense fire cycle. Bolinger Decl. ¶ 19. Any delay would also continue unmanaged competition among wild horses, livestock, and wildlife for forage and water, and could harm permitted livestock operations already affected by drought and wild-horse competition. *Id*. ¶ 20. BLM has also documented public-safety concerns on Nevada State Highway 305. EA at 4; Bolinger Decl. ¶ 25. These harms are not speculative; they are well documented in the EA and are precisely why BLM determined that removal is necessary to restore a thriving natural ecological balance as required by the WHA.

Finally, the public has a strong interest in BLM carrying out Congress's directive to manage wild horses as part of a thriving natural ecological balance and multiple-use relationship. 16 U.S.C. §§ 1332(f), 1333(a), (b)(2). Plaintiffs' proposed injunction would frustrate this objective, as it would impose an operational proportional-removal requirement that Congress did not enact, BLM did not adopt, and the record does not require. Such an order would interfere

with BLM's ability to respond to real-time field conditions (like wild animal location and behavior) and conduct the gather safely, efficiently, and humanely. It would also risk delaying desperately needed management action for a population that is already far above AML and only continuing to grow. And, depending on when the gather contract is executed, delaying or stopping the gather altogether could also impose substantial costs on the United States, including hundreds of thousands of dollars for the gather contract alone, plus labor, travel, equipment, mobilization, and pre-gather road or facility work.[10] Bolinger Decl. ¶¶ 28-30.

## CONCLUSION

As a threshold matter, Plaintiffs have not properly served the United States, and the Court should deny their motion on that basis alone. In any event, Plaintiffs have not shown a likelihood of success on the merits, likely irreparable harm, or that the balance of equities and public interest support the extraordinary relief they seek. Accordingly, their motion for preliminary injunctive relief should be denied.

Dated: June 24, 2026                    Respectfully submitted,

                                        ADAM R.F. GUSTAFSON,
                                        Principal Deputy Assistant Attorney General
                                        MEREDITH L. FLAX, Deputy Section Chief
                                        MICHAEL R. EITEL, Acting Assistant Section Chief

                                        /s/ Davis A. Backer
                                        DAVIS A. BACKER
                                        Senior Trial Attorney (CO Bar No. 53502)

---

[10] If the Court issues an injunction, it must require Plaintiffs to post a bond. Fed. R. Civ. P. 65(c). While the Ninth Circuit allows nominal bonds in public interest cases, each case is fact specific, and a plaintiff must produce evidence that a higher bond would constitute an "undue hardship." *Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1126 (9th Cir. 2005); *Earth Island Inst. v. U.S. Forest Serv.*, 2006 WL 3359192, at *1 (E.D. Cal. Nov. 20, 2006). Because Plaintiffs have failed to offer any such evidence, they have forfeited this argument. The Court should require a substantial bond reflecting the heavy financial costs of delaying a project of national significance as outlined herein.

24

United States Department of Justice
Environment & Natural Resources Division
Wildlife & Marine Resources Section
999 18th Street, North Terrace, Suite 600
Denver, Colorado 80202
Tel: (202) 305-5469
Fax: (202) 305-0275
Email: davis.backer@usdoj.gov

***Attorneys for Defendants***